Case 1:09-cv-00080-LPS   Document 149-1   Filed 10/06/10   Page 1 of 13 PageID #: 5827

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| MASIMO CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 09-80-LPS-MPT |
| ) | |
| PHILIPS ELECTRONICS NORTH ) | |
| AMERICA CORPORATION and PHILIPS ) | |
| MEDIZIN SYSTEME BÖBLINGEN GMBH, ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |
| PHILIPS ELECTRONICS NORTH ) | |
| AMERICA CORPORATION, ) | |
| ) | |
| Counterclaim-Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | |
| MASIMO CORPORATION, ) | |
| ) | |
| Counterclaim-Defendant. ) | |

**MEMORANDUM ORDER**

**I.      INTRODUCTION**

Plaintiff Masimo Corporation ("Masimo") and defendants Philips Electronics North American Corporation and Philips Medizin Systeme Böblingen GMBH  (collectively, "Philips") manufacture competing products in pulse oximetry.  Pulse oximetry allows for non-invasive measurement of the oxygen levels in a medical patient's hemoglobin.

Generally, pulse oximetry operates via a sensor placed over a thin section of a patient's body, such as the fingertip or earlobe of an adult, or the foot of an infant.  The sensor emits red and infrared light through a cross-section of the patient's tissue and

measures the amount of light absorbed. Using various algorithms, a monitor then processes the signal and calculates the patient's oxygenation level. Pulse oximtery systems are standard equipment in many clinical settings, either as stand-alone devices, or more commonly, as components of integrated multi-parameter patient monitors which track pulse, temperature, and other physiological vital signs.

## II.     BACKGROUND

On February 3, 2009, Masimo filed a complaint against Philips alleging infringement of a number of Masimo's pulse oximetry-related patents. Masimo filed an amended complaint on May 12, 2009. In the amended complaint, Masimo alleges that Philips' production, use, and sale of pulse oximeters incorporating Philips' "Fourier Artifact Suppression Technology" as well as Philips' IntelliVue line of patient monitors infringe 14 of Masimo's patents. Regarding eight of these patents, Masimo alleges that Philips' infringement is willful, deliberate, and intentional because Philips has had notice of the patents and the alleged infringement. Masimo requests monetary damages and seeks to enjoin Philips from further production, use, or sale of infringing products.

Philips answered the complaint on June 15, 2009. In their answer, both Philips North America and Philips Medizin deny all allegations of infringement citing 12 defenses including, among others, invalidity of Masimo's patents, prosecution history estoppel, laches, unclean hands, patent misuse, and implied license. Philips North America concurrently filed counterclaims against Masimo. According to Philips North America, Masimo has infringed 10 of Philips' patents through the production, use, and sale of various Masimo monitors, boards, sensors, and oximeters using patented Philips technology. Regarding six of these patents, since Masimo has had notice of the patents

and the infringement, Philips North America alleges that Masimo's infringement is willful, deliberate, and intentional. Philips North America requests monetary damages and, for 8 patents, seeks injunctive relief to prevent Masimo from further production, use, or sale of infringing products.

Philips North America's counterclaims also include seven antitrust claims focusing on Masimo's purported anticompetitive restrictions in its licensing agreements; its allegedly improper exclusion of competition in the sensor and patient cable markets; an anticompetitive settlement agreement stemming from a 2006 infringement suit with licensee Nellcor; and claims of exclusionary pricing and bundling practices designed to lock hospitals into Masimo pulse oximetry products. Masimo filed its answer to Philips North America's counterclaims on July 9, 2009, asserting its own counterclaims and defenses. On August 3, 2009, Philips filed its answer to Masimo's counterclaims.

On August 7, 2009, Masimo filed a motion to bifurcate and stay discovery on Philips North America's antitrust counterclaims, which this court granted on March 11, 2010. In its decision, this court found that bifurcation would assist in juror comprehension and increase efficiency without substantial prejudice to either party. This court also stayed discovery concerning Philips North America's antitrust counterclaims, finding that a stay would conserve economy because a trial on Masimo's patent claims could potentially eliminate or simplify Philips North America's antitrust counterclaims. A motion for reconsideration filed by Philips was denied on April 19, 2010, and Judge Farnan denied Philips' objections to this court's order on July 15, 2010.

On July 30, 2010, Philips filed a motion to bifurcate and stay discovery on patent

damages and a brief in support thereof. In its motion, Philips requests bifurcation of the parties' patent damages claims, trial to be scheduled on patent damages to follow trial on the antitrust and patent misuse claims, and a stay of the remaining damages-related discovery until antitrust discovery proceeds. Masimo filed an answering brief on August 27, 2010, to which Philips filed a reply on September 8, 2010. This is the court's decision on Philips' July 30, 2010 motion.[1]

## III. DISCUSSION

### A. MOTION TO BIFURCATE

Rule 42(b) of the Federal Rules of Civil Procedure allows the court broad discretion to "order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or thirdparty claims" where separation is convenient, will avoid prejudice, expedite a resolution, or economize resources.[2] "In the context of patent cases, '[e]xperienced judges use bifurcation and trifurcation both to simplify the issues in patent cases and to maintain manageability of the volume and complexity of the evidence presented to the jury.'"[3] Bifurcation of patent and antitrust claims is not mandatory, but is common.[4] "Motions to separate the issues of liability and damages are to be granted

---

[1] Pursuant to 28 U.S.C. § 646(c) and Fed. R. Civ. P. 73, the parties consented to the jurisdiction of the United State Magistrate Judge to conduct any and all proceedings and enter a final order as to Defendants Philips Electronics North America Corporation's and Philips Medizin Systeme Böblingen GMBH's Motion to Bifurcate and Stay Damages; *See* D.I. 129.

[2] Fed. R. Civ. P. 42(b); *see also Enzo Life Sciences, Inc. v. Digene Corp.*, No. 02-212, 2003 WL 21402512, at *4 (D. Del. June 10, 2003) ("Under Rule 42(b), 'a district court has broad discretion in separating issues and claims for trial as part of its wide discretion in trial management.'") (quoting *Gardco Mfg., Inc. v. Herst Lighting Co.*, 820 F.2d 1209, 121 (Fed. Cir. 1987)); *Barr Labs. v. Abbott Labs.*, 978 F.2d 98, 115 (3d Cir. 1992)).

[3] *Enzo Life Sciences, Inc.*, 2003 WL 21402512, at *4 (quoting Thomas L. Creel & Robert P. Taylor, *Bifurcation, Trifurcation, Opinions of Counsel, Privilege and Prejudice*, 424 PLI/PAT 823, 826 (1995)).

[4] *Id.* at *5 (internal citations omitted).

4

by the court on a case-by-case basis only when the separation will result in judicial economy and will not unduly prejudice any party."[5]

### 1. Promotion of Economy and Preservation of Time and Resources

Generally, a separate trial on damages issues is seldom required, "but in a patent infringement suit, considerations exist which suggest that efficient judicial administration would be served by separate trial on the issues of liability and damages."[6] A trial on the question of infringement damages is "often difficult and expensive, while being easily severed from the trial of the questions of validity and infringement of the patent."[7] Other courts have found that a finding on the question of liability may obviate the necessity for a damages inquiry or encourage a settlement.[8] Further, separation of damages from liability allows the parties to obtain final resolution of the liability issue on appeal without reaching the often time-consuming and difficult damages question.[9] The factors used to determine severability include, but are not limited to: "a) a need for voluminous documents to resolve damages issues; b) complex infringement issues; c) multiple patents, infringing products, claim (*sic*), counterclaims, or parties; or d) the probability that the defendant would prevail on the infringement issue, thereby eliminating the need to address the issue of damages."[10]

In the instant case, Philips argues that bifurcation and a stay on patent damages

---

[5] *Smith v. Alyeska Pipeline Service Co.*, 538 F. Supp. 977, 982 (D. Del. 1982) (citing *Lis v. Packer Hospital*, 579 F.2d 819 (3d Cir. 1978); *Idzojtic v. Pa. R.R. Co.*, 456 F.2d 1228 (3d Cir. 1972)).

[6] *Swofford v B&W, Inc.*, 34 F.R.D. 15, 19-20 (S.D. Tex. 1963).

[7] *Id.* at 20.

[8] *Id.*; *Nettles v. General Acc. Fire & Life Assur. Corp.*, 534 F.2d 243, 247 (5th Cir. 1956); *O'Donnell v. Watson Bros. Transp. Co.*, 183 F. Supp. 577 (N.D. Ill. 1960); *Lyophile-Crychem Corp. v. Chas. Pfizer & Co.*, 7 F.R.D. 362 (E.D.N.Y. 1947).

[9] *Swofford*, 34 F.R.D. at 20.

[10] *Real v. Bunn-O-Matic Corp.*, 195 F.R.D. 618, 621 (N.D. Ill. 2000).

will promote judicial economy and preserve the parties' time and resources because a determination of non-infringement or patent invalidity will render a damages phase unnecessary and damages discovery superfluous. At a minimum, Philips contends that a liability trial will narrow the patents, claims, and accused products at issue, which will reduce the quantity and extent of damages discovery. Further, Philips argues that even if a jury were to find infringement liability on a valid patent, a finding of antitrust liability or patent misuse could preclude any recovery regarding the infringement claims.

Masimo asserts that Philips' proposal would waste resources because Philips has not made a showing regarding the likelihood of their defense. Masimo also cites an increase in costs, in the event of further bifurcation, due to the need to educate a second jury regarding the facts and issues of the patent controversy. Masimo further claims that bifurcation and a stay on damages discovery would result in a duplication of effort due to the close relationship between damages and infringement discovery.

Philips is correct that this is a large and complex case with multiple patents, claims, and counterclaims where a finding of non-infringement or patent invalidity in the liability phase would obviate the necessity for a damages trial and render any damage exclusive discovery a waste. However, Philips has not demonstrated that the probability that its defense will prevail at trial is any higher than the probably that Masimo's claims will.[11]

Additionally, Masimo has alleged, without rebuttal, that certain aspects of its

---

[11] *Contra Amsted Indus. Inc. v. Nat'l Castings, Inc.*, No. 88 C 924, 1990 WL 106548, 16 U.S.P.Q.2d 1737 (N.D. Ill. July 11, 1990) (ordering separate trials on liability and damages where court determined that plaintiff was unlikely to succeed on the merits at trial.).

liability case will require educating the jury on specific damages issues, and that certain aspects of its damages case will require educating the jury on liability issues. Specifically, Masimo reasons that further bifurcation would force the parties to, among other duplicative activities, educate a second jury about the patented technology to allow the jurors to determine lost profits,[12] utilize identical information and witnesses to rebut obviousness in the liability phase as well as demonstrate that Masimo's inventions were significant advances over the prior art in the damages phase,[13] and present identical sales information regarding Masimo and Philips' products to rebut invalidity and demonstrate royalty damages or lost profit damages.[14]  Furthermore, Philips North America has alleged claims of infringement against Masimo.  A stay on the presentation of damages evidence will require educating the second jury on Philips' infringement counterclaims, which are separate and unrelated to Philips' antitrust and patent misuse claims.

In light of the parties' disparate contentions regarding resource expenditure in the event of additional bifurcation or trifurcation, it is not demonstrably clear that bifurcation will conserve resources over a single trial concerning both patent liability and damages.

       2.     Prevention of Prejudice

---

[12] *See Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) ("[*Panduit*] articulated a four-factor test that has since been accepted as a useful, but non-exclusive, way for a patentee to prove entitlement to lost profits damages . . . .  The *Panduit* test requires that a patentee establish: (1) demand for the patent product; (2) absence of acceptable non-infringing substitutes; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of profit it would have made.") (citing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978)).

[13] *See Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) (listing "the utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results," as a factor in the determination of a reasonable royalty).

[14] *See Demaco Corp. v. F. Von Langsdorff Licensing Ltd.*, 851 F.2d 1387, 1391-94 (Fed. Cir. 1988) (explaining that commercial success may rebut evidence of obviousness).

Philips also argues that additional bifurcation will not prejudice either party because this court has already separated the infringement claims from the antitrust and patent misuse counterclaims. Philips suggests that because a final award cannot be determined until the conclusion of both liability phases, and because of the differences in the underlying facts regarding infringement liability and damages, a stay on damages discovery and trial will not impose an adverse economic effect upon the parties.

Philips' position overlooks the possibility of prejudice beyond the unnecessary expenditure of resources. In a previous order granting Masimo's motion to bifurcate and stay discovery of Philips North America's antitrust counterclaims, this court noted that "Philips' allegations of monopolization could bias the jury when it evaluates Masimo's patent claims."[15] Philips' proposition that the court join trial on patent infringement damages and antitrust damages does not alleviate the court's prior concerns regarding the possibility of prejudice.

For most patents, the basic elements of infringement are outlined in title 35, section 271 of the United States Code which provides, in part, that "whoever without authority makes, uses, offers to sell, or sells any patented invention within the United States or imports into the United States any patented invention during the term of the patent thereof, infringes the patent."[16] The Supreme Court has found that "[t]he grant of a patent is the grant of a statutory monopoly."[17] However, other courts have clarified

---

[15] *Masimo Corp. v. Philips Electronics North America Corp.*, 09-80, 2010 WL 925864, at *2 (D. Del. Mar. 11, 2010); *see also Monsanto Co. v. E.I. du Pont De Nemours and Co.*, No. 4:09CV00686, 2009 WL 3012584, at *2 (E.D. Mo. Sept. 16, 2009) ("[T]he Court agrees with Plaintiffs that Defendants' allegations of monopolization could bias the jury when it evaluates Plaintiffs' patent claims.") (citing *Hunter Douglas, Inc. v. Comfortex Cop.*, 44 F. Supp. 2d 145, 154 (N.D.N.Y. 1999)).

[16] 35 U.S.C. §271(a).

[17] *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 229 (1964).

that the statutory monopoly granted by a patent is not a monopoly as the term is used in the antitrust arena.[18] Philips North America's antitrust counterclaims focus on Masimo's purported anticompetitive licensing agreements, its allegedly improper exclusion of competition in certain markets, an alleged anticompetitive settlement agreement, and claims of exclusionary pricing and bundling practices. As with antitrust, patent misuse doctrine requires that a patentee not "use [a patent grant] to acquire a monopoly not embraced in the patent."[19] Whereas an infringement analysis concentrates on the products of the patentee and the alleged infringer, patent misuse analysis focuses on the conduct of the patentee to invalidate the patented product or process through the patentee's use of improper or anticompetitive licensing agreements.[20] Antitrust analysis likewise concentrates on one party's or multiple parties' anticompetitive and/or monopolistic conduct.

However, "[t]here is no unlawful leveraging of monopoly power when a patent holder merely exercises its rights inherent in the patent grant."[21] When the same jury is presented with evidence alleging the lawful exercise of patent rights and evidence alleging the unlawful exercise of anticompetitive behavior, that jury may inadvertently blur the distinction between legitimate patent enforcement and attempts to establish or

---

[18] *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1367 (Fed. Cir. 1984) ("The patent system, which antedated the Sherman Act by a century, is not an 'exception' to the antitrust laws, and patent rights are not *legal monopolies* in the antitrust sense of that word."); *Panduit Corp.*, 575 F.2d at 1160 n.8 ("The loose application of the pejorative term 'monopoly,' to the property right of exclusion represented by a patent, can be misleading.").

[19] *Transparent-Wrap Mach. Corp. v. Stokes & Smith Co.*, 329 U.S. 637, 643 (1947).

[20] *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 136 (1969) ("[T]here are established limits which the patentee must not exceed in employing the leverage of his patent to control or limit the operations of the licensee. Among other restrictions upon him, he may not condition the right to use his patent on the licensee's agreement to purchase, use, or sell, or not to purchase, use, or sell, another article of commerce not within the scope of his patent monopoly.").

[21] *In re Indep. Service Orgs. Antitrust Litig.*, 989 F. Supp. 1131, 1135 (D. Kan. 1997).

further an unlawful monopoly. Both Philips' proposed bifurcation plan, suggesting that patent damages be tried before the antitrust jury following an antitrust liability trial, and Philips' proposed trifurcation plan, empaneling a third jury to determine antitrust and patent damages simultaneously, retain the same possibility of bias previously voiced by the court. In theory, both propositions would require that a jury listen to evidence regarding both patent enforcement and anticompetitive behavior and then determine an award without any safeguard ensuring that each award is calculated based upon its own unique facts.

### 3. Juror Comprehension

The court's interest in juror comprehension also weighs against further bifurcation in this case. The damages due in a patent infringement case are those "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."[22] A patent holder may demonstrate lost profits by proving (1) the demand for the patented product, (2) the absence of acceptable non-infringing substitutes, (3) its capability to exploit the demand, and (4) the amount of profit it would have made.[23] A reasonable royalty may be calculated from "an established royalty, the infringer's profit projections for infringing sales, or a hypothetical negotiation between the patentee and infringer based on the factors *in Georgia-Pacific Corp. v. U.S. Plywood Corp.*"[24] These factors include (1) the royalties received by the patentee for the

---

[22] 35 U.S.C. § 284.
[23] *See Minn. Mining and Mfg. Co. v. Johnston & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1577 (Fed. Cir. 1992).
[24] *Wordtech Systems, Inc. v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1319 (Fed. Cir. 2010) (citing *Georgia-Pacific*, 318 F. Supp. at 1120).

licensing of the patent, (2) the rates paid by the licensee for the use of other comparable patents, (3) the nature and scope of the license, (4) the licensor's established policy to not license others or condition the licensed use of the invention, (5) the commercial relationship between the licensor and licensee as competitors, (6) the effect of selling the patented invention in promoting sales of the parties' other patented or non-patented products, (7) the duration of the patent and term of the license, (8) the established profitability of the patented product, (9) the utility and advantages of the patented property over previous technology, (10) the nature of the patented invention, (11) the extent to which the infringer has made use of the invention, (12) the portion of the profit or selling price that is customary in the particular business to allow for the invention's use, (13) the portion of the realizable profit or selling price attributable to the patented invention as distinguished from non-patented elements, features added by the infringer, the manufacturing process, or business risks, (14) the opinion testimony of qualified experts, and (15) the amount that a licensor and licensee would have agreed upon at the time of the infringement in an arm's length negotiation.[25]

In antitrust, where an alleged monopolist withholds output in an effort to increase profits, courts have measured damages as "the price increment [paid by consumers and] caused by the anticompetitive conduct that originated or augmented the monopolist's control over the market."[26] In other instances involving antitrust violations where a company has leveraged its position to control the flow of products in an

---

[25] *Georgia-Pacific*, 318 F. Supp. at 1120.
[26] *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 297 (2d Cir. 1979) (finding that lost profits were recoverable even where a supplier's profits increased following the supply cutoff).

unlawful effort to create a supply shortage or engaged in a group boycott to increase prices, courts have found that suppliers are entitled to their lost profits.[27] In Philips' proposed schemes, the simultaneous presentation of lost profits evidence would force the jury to separate any antitrust lost profits from any infringement lost profits, and would increase the risk that evidence from one would bias the jury regarding the other. "Complex antitrust cases invariably involve complicated questions of causation and damages,"[28] and further bifurcation would unnecessarily add to the jury's burden in this case.

## IV. CONCLUSION

Although Philips properly maintains that an order to bifurcate and stay discovery on patent damages would conserve resources and further judicial efficiency in the event that a jury were to find non-infringement or patent invalidity, the possibility of resource conservation is outweighed by the extra resources that would be required due to the overlap of evidence in Masimo's patent liability and patent damages case, by Philips' failure to establish a probability of prevailing in its infringement defense incontrovertibly greater than Masimo's, and by the likelihood of undue prejudice against Masimo in the event of further bifurcation. The court finds that patent infringement and infringement damages are distinct and separate from antitrust liability, antitrust damages, and patent

---

[27] *See Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 424 F.3d 363, 374 (3d Cir. 2005) (discussing the opinions of scholars regarding the measures of damages in antitrust cases):
> Thus, as some scholars see it, when antitrust plaintiffs claim that anticompetitive behavior caused prices to increase, two measures of damages could theoretically be used: (1) the overcharge ( i.e., the difference between the price paid for goods actually purchased and the price that would have been paid absent the illegal conduct), or (2) lost profits (i.e., the overcharge paid minus the overcharge passed on for goods actually purchased and resold, plus lost profits from the lost opportunity to buy and resell a greater volume of goods). *Id.*

[28] *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1478 (9th Cir. 1997) (citing *Potters Medical Ctr. v. City Hosp. Ass'n*, 800 F.2d 568 (6th Cir. 1986)).

misuse,[29] and that the award determination for each should be conducted with regard to only the facts pertinent to each issue.[30]

Because of the court's holding regarding damages bifurcation,[31] Philips' motion to stay damages discovery is moot.

For the foregoing reasons, Philips' motion to bifurcate and stay damages (D.I. 121) is hereby DENIED.

Date: October 6, 2010   /s/ Mary Pat Thynge
                        UNITED STATES MAGISTRATE JUDGE

---

[29] *See Eurand Inc. v. Mylan Pharm. Inc.*, 2009 WL 3172197, at *2 (D. Del. Oct. 1, 2009) ("Further militating toward bifurcation of these issues is the distinct lack of evidentiary overlap between issues of patent validity and infringement and issues of patent misuse and antitrust."); *Critical-Vac Filtration Corp. v. Minuteman Int'l, Inc.*, 233 F.3d 697, 703 (2d Cir. 2000) (noting that antitrust claims based on patent misuse "are likely to involve factual issues distinct from those involved in patent litigation between the same parties."); *Components, Inc. v. Western Elec. Co.*, 318 F. Supp. 959, 966 (D. Me. 1970) (finding a distinction between infringement issues and antitrust and patent misuse issues.); *Alarm Device Mfg. Co. v. Alarm Products Int'l Inc.*, 60 F.R.D. 199, 202 (E.D.N.Y. 1973) ("Among the various reasons found in the cases supporting the rationale of separate trials of antitrust and patent issues are: (1) The issues, documentary proof, and witnesses in the validity-infringement claim are essentially different from those of the antitrust-misuse claims . . . .").

[30] Any concerns that may arise regarding the imposition and subsequent enforcement of damages and injunctive relief before the trial on antitrust and patent misuse is conducted can be effectively addressed after the patent liability trial.

[31] The court will consider bifurcating infringement liability and damages via a stay on the presentation of damages evidence until the jury renders a verdict regarding liability. Upon a finding of infringement liability for either party, the parties may then proceed and present infringement damages evidence before that same jury.