# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| HEARING COMPONENTS, INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | Civil Action No. 9:07CV104 |
| v. | § | |
| | § | |
| SHURE, INC., | § | JUDGE RON CLARK |
| | § | |
| *Defendant.* | § | |

## **ORDER**

Before the court is the parties' Joint Motion to Exceed the Page Limitations for *Markman*

briefing [Doc. # 61].  The parties argue that the number of pages allotted to each side for briefing

should be increased from thirty-five to forty-five pages, due to the number of patents (three) and

claim terms (over twenty) at issue.

The court expects the parties and their attorneys to limit the terms they ultimately submit

for construction to those that might be unfamiliar or confusing to the jury, or which are unclear or

ambiguous in light of the specification and patent history. *See United States Surgical Corp. v.*

*Ethicon, Inc.,* 103 F.3d 1554, 1568 (Fed. Cir. 1997). "[A]lthough every word used in a claim has

a meaning, not every word requires a construction." *Orion IP, LLC v. Staples, Inc.,* 406

F.Supp.2d 717, 738 (E.D. Tex. 2005).  As per the parties' Joint Claim Construction and Pre-

Hearing Statement [Doc. # 50], the parties in this case have submitted no fewer than twenty

claim terms spanning twelve claims for the court to construe.

In order to secure the just, speedy and inexpensive determination of this action pursuant

to Fed. R. Civ. P. 1, the court ORDERS that the parties shall elect no more than ten (10) disputed

claim terms for construction. The court further ORDERS that Plaintiff shall select no more than three (3) representative claims from each patent for claim construction and trial.[2]

With this modification of the number of terms to be submitted for construction in mind, the court will deny the parties' motion to exceed the page limits for *Markman* briefing. Thirty-five pages is more than sufficient to permit the parties to identify key issues and concisely explain their respective positions to the court.[3]

IT IS THEREFORE ORDERED that the parties' Joint Motion to Exceed the Page Limitations [Doc. # 61] is DENIED.

So **ORDERED** and **SIGNED** this **13** day of **June, 2008.**

_____
Ron Clark, United States District Judge

---

[1]*See, e.g.*, Local Rules for the Northern District of California, Rule 4-1(b)("The parties shall also jointly identify the 10 terms likely to be most significant to resolving the parties' dispute, including those terms for which construction may be case or claim dispositive.") and Rule 4-3; *Suncast Techs., L.L.C. v. Patrician Products Inc.*, 2008 WL 179648 at *13 (S.D. Fla. Jan. 17, 2008).

[2]*See, e.g., ReRoof America, Inc. v. United Structures of America, Inc.*, 215 F.3d 1351 (Fed. Cir. 1999) (unpublished); *Verizon California Inc. v. Ronald A. Katz Tech.*, 326 F. Supp. 2d 1060, 1066 (C.D. Cal. 2003).

[3]The court also notes that the parties did not identify the number of pages they desired for *Markman* briefing in their Joint Claim Construction and Pre-Hearing Statement. While Local Patent Rule 4-3 does not require the parties to do so, the Scheduling Order does. *See* Doc. # 30 at p. 2. The failure to provide the court with some type of guidance as to how many pages would be appropriate resulted in the thirty-five page limit the parties have deemed inadequate. Despite any rumors to the contrary, the court seldom takes the time to read the parties' minds.

2

# EXHIBIT B

Case 1:09-cv-00080-LPS Document 642-1 Filed 12/23/12 Page 5 of 217 PageID #: 16504
Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 1 of 337 PageID #: 1250

1

1                        IN THE UNITED STATES DISTRICT COURT

2                        IN AND FOR THE DISTRICT OF DELAWARE

3                                    - - -
    INTELLECTUAL VENTURES I, LLC,
4                                              :   CIVIL ACTION
                        Plaintiff,             :
5                                              :
                   v.                          :
6                                              :
    CHECK POINT SOFTWARE TECHNOLOGIES LTD., :
7   CHECK POINT SOFTWARE TECHNOLOGIES INC., :
    McAFEE, INC., SYMANTEC CORP., TREND     :
8   MICRO INCORPORATED, and TREND MICRO,    :
    INC. (USA),                             :   NO. 10-1067-LPS
9                        Defendants.
                                    - - -

10
                             Wilmington, Delaware
11                       Thursday, November 3, 2011
                           *TELEPHONE CONFERENCE*
12
                                    - - -
13
    BEFORE:        HONORABLE **LEONARD P. STARK**, U.S.D.C.J.
14
                                    - - -
15  APPEARANCES:

16              FARNAN, LLP
                BY:  BRIAN E. FARNAN, ESQ.
17
                        and
18
                SUSMAN GODFREY L.L.P.
19              BY:  BROOKE A.M. TAYLOR, ESQ.
                     (Seattle, Washington)
20
                        and
21
                SUSMAN GODFREY L.L.P.
22              BY:  JOHN P. LAHAD, ESQ.
                     (Houston, Texas)
23
                             Counsel for Plaintiff
24

25                                       Brian P. Gaffigan
                                         Registered Merit Reporter

Case 1:09-cv-00080-LPS Document 642-1 Filed 11/29/12 Page 6 of 217 PageID #: 16505
Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 2 of 337 PageID #: 1261

2

```
 1    APPEARANCES:  (Continued)

 2
                   FISH & RICHARDSON, P.C.
 3                 BY:  WILLIAM J. MARSDEN, JR., ESQ.

 4                       and

 5                 FISH & RICHARDSON, P.C.
                   BY:  DAVID HEALY, ESQ., and
 6                      BENJAMIN C. ELACQUA, ESQ.
                        (Houston, Texas)
 7
                            Counsel for McAfee, Inc.
 8
                   MORRIS NICHOLS ARSHT & TAYLOR, LLP
 9                 BY:  KAREN JACOBS LOUDEN, ESQ.

10                       and

11                 McDERMOTT WILL & EMERY, LLP
                   BY:  DAVID M. BECKWITH, ESQ.
12                     (San Diego, California)

13                          Counsel for Trend Micro Incorporated
                            and Trend Micro, Inc. (USA)
14
                   MORRIS NICHOLS ARSHT & TAYLOR, LLP
15                 BY:  THOMAS C. GRIMM, ESQ.

16                       and

17                 DURIE TANGRI, LLP
                   BY:  CLEMENT S. ROBERTS, ESQ.
18                     (San Francisco, California)

19                          Counsel for Check Point Software
                            Technologies Ltd. and Check Point
20                          Software Technologies Inc.

21                 MORRIS NICHOLS ARSHT & TAYLOR, LLP
                   BY:  THOMAS C. GRIMM, ESQ.
22
                         and
23
                   LATHAM & WATKINS, LLP
24                 BY:  YURY KAPGAN, ESQ.
                       (Los Angeles, California)
25
                            Counsel for Symantec Corp.
```

Case 1:09-cv-00080-LPS Document 642-1 Filed 11/23/12 Page 3 of 217 PageID #: 16506
Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 3 of 337 PageID #: 1252

3

Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 3 of 337 PageID #: 1252

1                          - oOo -

2                   P R O C E E D I N G S

3              (REPORTER'S NOTE:  Telephone conference was held

4       in chambers, beginning at 11:33 a.m.)

5              THE COURT:  Good morning, everybody.  This is

6       Judge Stark.  Who is there, please?

7              MR. FARNAN:  Good morning, your Honor.  Brian

8       Farnan on behalf of the plaintiff; and with me is Brooke

9       Taylor and John Lahad from Susman Godfrey.

10             THE COURT:  Okay.

11             MR. GRIMM:  Good morning, your Honor, Tom Grimm

12      at Morris Nichols here in Wilmington.  I'm here on behalf of

13      both Symantec and Check Point this morning.  On the phone

14      with me for Symantec is Yury Kapgan at Latham & Watkins and

15      on the line with me for Check Point is Clem Roberts of Durie

16      Tangri.

17             THE COURT:  Okay.

18             MR. MARSDEN:  David Healy and William Marsden

19      and Ben Elaqua for McAfee.

20             MS. JACOBS LOUDEN:  For Trend Micro, this is

21      Karen Jacobs Louden from Morris Nichols.  On the line with

22      me is David Beckwith of McDermott Will & Emery.

23             THE COURT:  Is there anybody else?

24             Okay.  I have a court reporter with me and for

25      the record, it is our case of Intellectual Ventures versus

Case 1:09-cv-00080-LPS Document 642-1 Filed 11/23/12 Page 2 of 217 PageID #: 16507
Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 4 of 337 PageID #: 1253

4

1    Check Point Software Technologies Limited, et al, Civil

2    Action No. 10-1067-LPS.

3              Today's call is to discuss two discovery

4    disputes that have arisen between the parties.  They're both

5    raised by defendants.  Will defendants be represented by

6    just one speaker today or tell me what you intend to do,

7    please?

8              MR. KAPGAN:  Your Honor, it's Yury Kapgan for

9    Symantec.  As you mentioned, there are two issues.  The

10   first one, in-house counsel access under the protective

11   order, I will be covering that issue.  My colleague Clem

12   Roberts will be covering the issue related to the number of

13   patent claims.

14             THE COURT:  Then you can go ahead first, please,

15   Mr. Kapgan.

16             MR. KAPGAN:  Thank you.  Good morning, your

17   Honor.  I want to make two basic points on this first issue

18   related to in-house counsel access under the protective

19   order.

20             The first is that the defendants have in-house

21   counsel who want to actively participant in the litigation;

22   and to do so, they should have accessed to information

23   relevant to plaintiff's claims.

24             The licensing information that plaintiff wants

25   to keep from in-house counsel is directly relevant to

Case 1:09-cv-00080-LPS Document 642-1 Filed 11/23/12 Page 9 of 217 PageID #: 16508
Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 9 of 337 PageID #: 1254

5

1    evaluating plaintiff's claims for damages and what plaintiff

2    has asserted is the value of the patents at issue.  Past

3    licenses of patents certainly are relevant to evaluating

4    what the case is worth and any damages analysis.

5         Plaintiff's proposal would keep all of this

6    information out of the hands of in-house counsel and limit

7    their ability to participate in the critical part of the

8    case.

9         We know that most of plaintiff's business

10   consists of licensing activities.  Our proposal here

11   granting counsel to in-house information is pro-settlement

12   and allows them to fairly evaluate what the case is worth,

13   and it's a policy that I think should be promoted.

14        On the flip side, plaintiff is seeking

15   defendants' sales and financial information which has been

16   information from defendants you could consider equivalent

17   that would be directly relevant to damages.

18        Defendants have agreed that plaintiff's in-house

19   counsel may have access to this information, and this, too,

20   is pro-settlement and, for that matter, defendants also

21   agree that their licensing information should be available

22   to plaintiff's in-house counsel.

23        Plaintiff claims in its letter that defendants

24   are just seeking this information to gain a competitive

25   advantage in licensing negotiations, but the truth is that

Case 1:09-cv-00001-PSP Document 642-2 Filed 12/29/11 Page 10 of 217 PageID #: 16509
Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 6 of 33 PageID #: 1255

6

1     any advantage that defendants obtained for this information

2     is really a natural consequence of plaintiff deciding to

3     pursue this litigation here in this forum.  It's not a

4     competitive harm, per se, that exists outside the confines

5     of this lawsuit.

6             If defendants can obtain more information that

7     helps settle this case, certainly, that is good from a

8     policy standpoint, but the bottom line here is, your Honor,

9     that this information is relevant to evaluating plaintiff's

10    claims and in-house counsel should be part of that process.

11            So that's the first point I want to make.

12            The second point is that defendants' technical

13    information is not equivalent to plaintiff's licensing

14    information.  Plaintiff makes a point in its letter that

15    if defendants' in-house counsel get access to licensing

16    information, then plaintiff's in-house counsel should have

17    access to defendants' technical information.

18            First of all, this is somewhat surprising to

19    us, your Honor, because in the last proposal that plaintiff

20    sent to us, there was no dispute we thought about the

21    status of technical information.  All the parties had

22    agreed it wouldn't be accessible by in-house counsel.

23            In any event, the comparison between licensing

24    and technical information is really an apples-to-oranges

25    comparison.  The reason that defendants' technical information

1    shouldn't be accessed by plaintiff's in-house counsel; and,

2    again, this is a point that didn't appear to be in dispute

3    in plaintiff's letter; is because there are serious concerns

4    that such disclosure would only lead to more litigation.

5            Plaintiff is in the business of acquiring

6    patents and licensing or litigating them.  If it had

7    technical information about defendants' products, it could

8    go out and be very directed in its purchases of additional

9    patents for litigation purposes, and it could try to amend

10   existing patent applications to try to cover some technical

11   aspects of defendants' products.  So there is a real concern

12   here about competitive harm from defendants' standpoint

13   outside the confines of this lawsuit that would result from

14   disclosure of defendants' technical information.

15           On the other hand, defendants aren't competitors

16   with plaintiff in the area of licensing.

17           To step back a bit here a bit on the history.

18           When we were negotiating the protective order,

19   plaintiff raised the possibility that the parties were

20   potential competitors in the area of patent acquisition.

21   For example, plaintiff suggested they may compete to buy the

22   same patents that are available for sale in the market and

23   if defendants knew about plaintiff's acquisition strategies,

24   plaintiff would be at a competitive disadvantage.

25           Although defendants believe they truly weren't

Case 1:09-cv-00009-LPS Document 642-2 Filed 12/29/11 Page 12 of 217 PageID #: 16511
Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 8 of 33 PageID #: 1257

8

1    competitors in this area, they accommodated plaintiff's

2    concern in that regard by permitting information related to

3    patent acquisition strategies specifically to be shielded

4    from in-house counsel; and that is reflected in Exhibit A to

5    our letter.

6          But defendants here are not competitors with

7    plaintiff in the area of licensing, and we haven't heard any

8    explanation otherwise from plaintiff, so it's difficult to

9    understand the competitive harm that would result from

10   in-house counsel accessing this information.

11         The only other harm that plaintiff articulates

12   here is that knowledge about which patents are contained in

13   plaintiff's portfolio would influence defendants' business

14   plans by encouraging them to design around those patents,

15   but, of course, that point only actually supports disclosure

16   of the information.

17         Promoting avoidance of infringement, your Honor,

18   through design-arounds is a public policy that should be

19   fostered, and it's a principle that has been recognized by

20   the Federal Circuit in fact.  Public disclosure is the benefit

21   of the bargain for awarding exclusive rights under patent law,

22   and keeping patent information secret is contrary to public

23   policy.

24         Your Honor, those are the points I wanted to

25   make with respect to the first issue.

Case 1:09-cv-00080-LPS Document 642-2 Filed 12/22/11 Page 13 of 217 PageID #: 16512
Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 9 of 33 PageID #: 1258

9

1          THE COURT:  Okay.

2          MR. KAPGAN:  We can move on to the second issue,

3    if your Honor still pleases, and Clem Roberts would address

4    that.

5          THE COURT:  Hold on, Mr. Kapgan.  You started

6    off saying licensing information is "directly relevant to

7    damages," and I think you said "and also the value of the

8    patents."  I want to try and understand, are you saying

9    there is two different things that the licensing information

10   is relevant to or is it just one thing?

11         MR. KAPGAN:  Your Honor, I think in any damages

12   analysis, when experts are opining on damages, I think that

13   in any damages analysis, the value of the patents, all of

14   that is relevant to, all of that would be gleaned from

15   licensing information.

16         THE COURT:  But it is ultimately relevant to

17   determining an appropriate damages analysis; correct?

18         MR. KAPGAN:  Correct.

19         THE COURT:  All right.  I want to deal with this

20   licensing issue before I move on to the other one, so let me

21   hear from the plaintiff on this.

22         MS. TAYLOR:  Yes, your Honor.  This is Brooke

23   Taylor.

24         The defendants want to protect their own

25   technical information, attorneys' eyes only, and are arguing

Case 1:09-cv-00086117-LPS Document 642-2 Filed 12/28/12 Page 14 of 217 PageID #: 16513
Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 10 of 33 PageID #: 1259

10

1   it should not be shared with in-house lawyers.

2           The stated need for this is that IV's in-house

3   lawyers don't see the technical information and use it to

4   purchase patents that read on defendants' offering.

5           THE COURT:  Ms.  Taylor, let me interrupt you.

6   I'm sorry.  We're having a hard time hearing you.  I need to

7   ask everybody other than Ms. Taylor to mute their phone

8   right now.

9           Go ahead, Ms. Taylor.

10          MS. TAYLOR:  The defendants, your Honor, want to

11  protect their own technical information as attorney's eyes

12  only, which will not be shared with IV's in-house lawyers.

13  The stated need for this is so that IV's in-house lawyers

14  don't see the technical information and use it to purchase

15  patents that read on defendants' offering.

16          But defendants refused to agree to equal

17  protection for IV's licensing agreements and strategic

18  information of the company, and what is sauce for the

19  goose should be sauce for the gander, and IV should have

20  reciprocal protection for the most sensitive protection.  And,

21          Just to be clear, and I will get to this again

22  in a second, but IV has offered to provide defendants'

23  in-house counsel with access to licenses that are specific

24  to the patents in suit, the specifics to the patents asserted

25  in this litigation.  What we're talking about here today is

Case 1:09-cv-00080-67-LPS Document 642-2 Filed 12/23/12 Page 15 of 217 PageID #: 16514
Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 11 of 33 PageID #: 1260

11

1    defendants want access to their in-house lawyers or IV's

2    portfolio licenses which comprise hundreds of thousands of

3    patents.  Defendants, not the plaintiff, bears the burden of

4    showing why their need for this access trumps the risk of

5    injury to disclosing party.

6           When defendants asked us for access for their

7    in-house counsel for this information, they admitted, as

8    they have on this call today, that the reason they want the

9    information is not for the purpose of litigating this case

10    but instead in order so they will be in a better negotiating

11    position, to negotiate with Intellectual Ventures over

12    thousands of patents that are not being litigated in this

13    case.

14           Through this protective order motion, defendants

15    are attempting to get access to the complete list of patents

16    owned and licensed by IV as a portfolio and the terms of the

17    licenses.  And,

18           Just to comment on something that Mr. Kapgan

19    said.  Of course, all public patents that have been issued are

20    publicly available, so if defendants seek to design-around

21    any patents that have been issued, they're certainly able to

22    do that throughout by looking at the publicly available list

23    of patents that have been issued by the Patent and Trademark

24    Office.

25           Wanting this information for business reasons, as

Case 1:09-cv-00086-LPS Document 642-2 Filed 12/28/12 Page 16 of 217 PageID #: 26515
Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 12 of 33 PageID #: 1261

12

1    defendants do, is understandable but it is not a sufficient

2    reason to provide in-house lawyers access under the protective

3    order.

4              Defendants argue that their in-house counsel

5    won't be able to meaningfully participate in the case if they

6    don't have access to the licensing and strategy information,

7    although I haven't heard that arguments have been made that

8    strongly here today.

9              The contention is wrong on its face.  The case

10   is about whether defendants infringe the plaintiff's patent.

11   That determination will be made by comparing defendants'

12   offerings to the publicly available patents.  There is no

13   IV highly sensitive information required to make that

14   judgment about this critical part of the case.  Indeed, it's

15   defendants' information that will be relevant here, and

16   defendants have asked IV to litigate this case without its

17   in-house lawyers seeing that information.

18             Second, defendants will try to carry their

19   burden that the patents are invalid, relying on publicly

20   available prior art.

21             Again, there is nothing here that implicates

22   IV's highly confidential information.  The only area where

23   IV's licenses could be of any importance is determining

24   damages if the defendants infringe IV's valid patents.

25             Again, to the extent there are licenses that are

Case 1:09-cv-00080-PLS Document 642-2 Filed 12/28/12 Page 17 of 217 PageID #: 16516
Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 13 of 33 PageID #: 1262

13

1       limited to the patent in suit, we have offered that in-house

2       counsel may see those agreements.  Defendants want more than

3       that because they are fishing for reasons unrelated to the

4       merits of this case even though they refuse to permit equal

5       access to IV's in-house lawyers.

6              As represented on this call here today,

7       defendants clearly have sophisticated and competent lawyers

8       who can interpret any information that is subject to the

9       higher bar of the protective order, just as IV's lawyers

10      will need to do the same with respect to defendants'

11      technical information.

12             Defendants have not argued that their outside

13      counsel are incapable of performing this task.  The patent

14      marketplace is a competitive one and unless defendants here

15      never acquire a licensed patent, they will be able to use

16      IV's highly sensitive information about licensing strategies

17      and terms to their benefit in that marketplace while

18      barring IV's in-house counsel access to their own technical

19      information.

20             Defendants have not met their heavy burden and

21      their proposal that IV's information be relegated to the

22      lower level of protection should be rejected.

23             THE COURT:  All right.  Ms. Taylor, first off,

24      Mr. Kapgan indicates that they have agreed that you can

25      protect and limit to outside counsel documents reflecting

Case 1:09-cv-00086-7LPS Document 642-2 Filed 12/28/12 Page 18 of 217 PageID #: 26517
Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 14 of 33 PageID #: 1263

14

1    your patent acquisition strategy.  Do you recognize that is

2    not in dispute?

3              MS. TAYLOR:  Yes, I do, your Honor.

4              THE COURT:  Let me ask you this:  Your agreement

5    to produce licenses that include the patents in suit, are you

6    only offering -- it's not production, I'm sorry, allowing

7    in-house counsel to see.  Is your offer to allow in-house

8    counsel to see licenses if they contain any of the patents in

9    suit or does it only go so far as to licenses that are limited

10   just to the patents in suit?

11             MS. TAYLOR:  It's the latter, your Honor.  It is

12   limited to the patents in suit or those particular patent

13   families.  So there are issues -- there are licenses either

14   by prior owners of these patents or by the plaintiffs in

15   this case that are specific to the patents in suit and only

16   to those patents in suit or their patent families, and we

17   will allow in-house -- we are willing to compromise and

18   allow in-house counsel access to those.

19             The issue here is really the portfolio license

20   which we submit defendants are really looking for not to

21   litigate the case, which their outside counsel can do, but

22   really to discover all of the patents held by Intellectual

23   Ventures, and, more importantly, to negotiate the terms of a

24   portfolio-wide license, which is not at issue in the case,

25   but the issue in this case is a license to two of the four

Case 1:09-cv-00867-LPS Document 642-2 Filed 12/28/12 Page 19 of 217 PageID #: 16518
Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 15 of 33 PageID #: 1264

15

1    patents in suit.

2            THE COURT:  There is a statement in defendants'

3    letter indicating that they believe that you had suggested

4    disputes over designations could be decided in the future on

5    a case-by-case basis as you produce documents.  I don't know

6    if I got that suggestion out of your letter, but defendants

7    seem to believe you have at some point suggested that.  Is

8    that a position that you do take?

9            MS. TAYLOR:  Yes.  We absolutely remain willing,

10   and the idea here would be that if we agree that our inform-

11   ation is subject to the higher bar, if defendant, as they say,

12   think they need some information to share with their in-house

13   counsel to discuss settlement of this case or negotiation of

14   something, the portfolio license with the plaintiff, then

15   we're certainly willing to entertain requests for those and

16   for that information.

17           What we believe is happening here is a request

18   to get access to information for purposes outside of this

19   case but to use litigation to do that.

20           THE COURT:  Now, I'm concerned that if I allow

21   you to do that, that this may create quite a lot of disputes.

22   I know you evidently have a lot of licenses.

23           One thing that I might do, if I go down that

24   road, is send you all to a special discovery master and

25   have you all bear the cost of those disputes.  If I were

Case 1:09-cv-00867-LPS Document 642-1 Filed 12/28/12 Page 20 of 217 PageID #: 16519
Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 16 of 33 PageID #: 1265

16

1    contemplating that, would that change in any way your

2    client's position with respect to that suggestion?

3           MS. TAYLOR:  Let me make sure I understand.  So

4    you would permit the higher designation with the caveat that

5    we would entertain requests down the road from defendants,

6    if they think they need them; and if we have disputes over

7    those requests, you would send us to the discovery master?

8           THE COURT:  That's the question, yes.

9           MS. TAYLOR:  Yes, we're certainly willing to

10    proceed in any way your Honor thinks is appropriate.

11           We think if the information, just as technical

12    information, bears this higher level of scrutiny down the

13    road, we're willing to listen to any request the defendants

14    have for particular information that their outside lawyers

15    believe their in-house counterparts would like to have

16    access to.

17           THE COURT:  All right.  Thank you.

18           Mr. Kapgan, is there anything else you want to

19    add?

20           MR. KAPGAN:  Your Honor, I'll just note I do

21    think we're amenable to whatever suggestion your Honor makes

22    on this point.  But, we do think that this creates some

23    potential for a lot of disputes in the future because we

24    do think that most of this licensing information would be

25    designated in the higher category, and we think that all

Case 1:09-cv-00086-LPS Document 642-2 Filed 12/28/12 Page 21 of 217 PageID #: 16520
Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 17 of 33 PageID #: 1266

17

1    of this information is potentially relevant to damages.

2            We would be surprised if there were any licenses

3    that were specific to just these patents in suit and clearly

4    under the *Georgia-Pacific* factors, licenses to technology

5    that is comparable to the patents in suit is fair game for

6    any damages analysis.  So that is why we're seeking more

7    than just licenses to the patents in suit, because all of

8    this information is relevant to damages.

9            THE COURT:  Okay.  Thank you.

10           Well, I am going to essentially impose upon you

11   my suggestion, but it's a step-by-step process, so let me be

12   clear.

13           The first step is that on the issue today, I

14   largely agree with the plaintiff on this one in a couple of

15   particulars.

16           One, I think that given the business that the

17   plaintiff is in, the licenses and particularly the portfolio

18   licenses and particularly the patent acquisition strategy

19   is competitive-type information that is, in some respects,

20   analogous to the type of technical information relating to

21   the products produced by defendants.  Therefore, I start out

22   thinking that there is some reasonable basis for plaintiff

23   wanting to have a highly confidential "outside counsel only"

24   designation on such material.

25           I appreciate that the defendants have already

Case 1:09-cv-00086-LPS Document 642-2 Filed 12/28/12 Page 22 of 217 PageID #: 16521
Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 18 of 33 PageID #: 1267

18

1    agreed to that designation with respect to patent acquisition

2    related documents, and I understand that that is therefore

3    not in dispute today.  But as an initial matter with respect

4    to today's dispute, again, I think that the plaintiff is

5    right to argue that there is some degree of analogy between

6    their documents and the defendants' documents.

7           Second, I do agree with the plaintiff that this

8    case can, just like in many cases, be litigated in a fully

9    adequate way on both sides, even with the restrictions on

10   what in-house counsel can see.

11          Just as plaintiff is going to be able to

12   effectively litigate this case without in-house counsel

13   seeing the technical documents of the defendants, I believe

14   that defendants will be able to effectively litigate this

15   case without their in-house counsel having complete access

16   to the plaintiff's portfolio licenses.

17          So today's dispute, the protective order I sign

18   will reflect the plaintiff's proposal, not the defendants'

19   proposal.

20          Now, all of that said, I do believe that defense

21   outside counsel will be in a position, once they receive

22   production of these licenses, you will see which ones are

23   marked highly confidential outside counsel only, which ones

24   are permitted to be shared with in-house counsel.  And,

25          In that regard, you will be able to evaluate and

Case 1:09-cv-00080-LPS Document 642-2 Filed 12/28/12 Page 23 of 217 PageID #: 16522
Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 19 of 33 PageID #: 1268

19

1    meet and confer in a concrete manner with the plaintiff as to

2    whether or not you can negotiate some changes in designations.

3            If you cannot, then as an initial matter, you

4    will all come back to me, and I will take a look at a concrete

5    dispute at that time.

6            If I find that it's not one dispute, it's 10,

7    20, 30, 100 disputes, and it seems like it's going to keep

8    coming up, then my inclination will be to refer you to a

9    special discovery master who can carefully give you the time

10   and attention to go through license agreement by license

11   agreement and determine what a proper designation is for

12   each of them.  But, strictly speaking, that is not in front

13   of me today and I'm just telling you what my inclination is

14   today if that is where we end up.

15           Before I move on to the other dispute, let me

16   see if I have been clear enough on this one or if you have

17   anything else we should talk about on licensing.

18           Mr. Kapgan.

19           MR. KAPGAN:  No, your Honor.  Thank you.

20   Nothing from me.

21           THE COURT:  And Ms. Taylor?

22           MS. TAYLOR:  Same here.  Thank you, your Honor.

23   That was clear.

24           THE COURT:  All right.  Let's move on to the

25   next issue which I believe Mr. Roberts was going to address

Case 1:09-cv-00080-LPS Document 642-2 Filed 12/28/12 Page 24 of 217 PageID #: 16523
Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 20 of 33 PageID #: 1269

20

1    first.

2            MR. ROBERTS:  Yes, indeed, your Honor.  Good

3    morning, your Honor.  Clem Roberts from Durie Tangri for

4    Check Point but speaking here on behalf of all of the

5    defendants.

6            Your Honor, it appears from the papers submitted

7    from both sides that there is now agreement that there ought

8    to be at least a date certain for the plaintiff to reduce

9    the number of claims in suit by at least some number.

10           Let's start with the timing.  The plaintiff

11   letter suggests that they are now willing, for the first

12   time, to commit to a date, and that date is six months from

13   now in April.

14           Your Honor, the defendants have spoken about

15   this, and we are prepared to accept that date.  I think I

16   speak for all of us when I say we think it ought to be

17   done sooner, but in terms of trying to narrow the issues in

18   dispute, we're prepared to accept that part of their offer.

19           The place where we get cross-wise with them,

20   your Honor, is on the number of claims.  They're proposing

21   12 claims per patent or 48 claims overall across the four

22   patents.  In this case, your Honor, we feel that is too many

23   claims and it's going to create an enormous burden on both

24   the Court and the defendants.

25           I won't repeat what is in our papers, but let me

1    just make a couple of quick points.

2              First, there are a very large number of accused

3    products in this case.  As to Check Point alone, for

4    example, there are 14 families of accused products, many

5    of which have eight or ten actual products in then.  These

6    aren't just different sized boxes.  They're entirely

7    different code bases.

8              Indeed, your Honor, for Check Point, we don't

9    make any anti-spam or any antivirus software themselves but

10   we OEM it in from a half dozen other companies.  So when you

11   are talking about our 14 different product families, you

12   are talking about literally different products developed by

13   different companies independent of each other.  There is

14   just a very large degree of complexity on the accused

15   product side.

16             In light of that, having 48 claims creates an

17   enormous burden on the defendants.  If you start to think

18   about it, if I have got 48 claims and I have 14 accused

19   product families, how do I write a summary judgment motion?

20             If I have a 40 page limit to my summary judgment

21   motion, how do I agree 14 different products against 48

22   claims sufficient to show the Court that there aren't factual

23   disputes?  I get one sentence or two sentences per product

24   per claim?

25             It's one of these things where just the

Case 1:09-cv-00867-LPS Document 642-1 Filed 12/28/12 Page 26 of 217 PageID #: 26525
Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 22 of 33 PageID #: 1271

22

1    complexity of trying to address that many different claims

2    against that many different products, you know, you just do

3    the math.  It's 578 different claims versus products for

4    Check Point alone before we start adding in all the other

5    products accused from the other defendants.  So in this case

6    where you have so many accused products, the complexity

7    caused by having nearly 50 claims would be enormous.

8              Second, that complexity will affect not just

9    the parties but also the Court on claim construction.

10             IV argued in its letter that the number of

11   asserted claims does not dictate the number of claim terms

12   in dispute because "claims within a patent use common terms

13   and common language."

14             As a factual matter, your Honor, in this case

15   that is not true.  Let's just take the '050 patent, for

16   example.  IV has asserted 14 claims of that patent of which

17   four are independent and 10 are dependent.

18             But if you start looking through the claims,

19   every single one of the claims beyond claim 1 is going to

20   add a new unique term for claim construction and sometimes

21   multiple.

22             So, for example, claim 2 add the term "hatching

23   algorithm," claim 4 adds "digital ID," claim 5 adds both

24   "public networks and private networks."  Claim 6 has

25   "intermediate server."  We can go through this for each of

Case 1:09-cv-00080-LPS Document 642-2 Filed 12/28/12 Page 27 of 217 PageID #: 16526
Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 23 of 33 PageID #: 1272

23

1      the claims for each of the patents.

2              Especially when you are dealing with four

3      defendants, with dozens of different products, each of these

4      claim terms is going to be relevant to a noninfringement or

5      an invalidity argument for at least one of the defendants.

6      So it leads you into a situation where the Court is going

7      to be facing with 48 claims, 50-60 genuine disputes between

8      the parties as to what the meaning of the claims should be,

9      or the Court is going to be artificially imposing on the

10     parties a limit in the number of claim terms they can brief

11     and argue.

12             Now, that limit, let's say, for example, the

13     Court said I'm only going to hear a dozen different claim

14     terms.  That would resound enormously to the benefit of

15     the plaintiff.  Because, again, claim construction is an

16     exercise, frankly, that largely benefits the defendant in a

17     patent case because it adds clarity about what the scope of

18     the claims are; and, in general, the plaintiff wants to keep

19     the scope of the claims as flexible as possible for as long

20     as possible ideally in front of the jury so they can make

21     whatever argument they can make as defenses come up and so

22     that they can sort of adapt to claims and bend them as they

23     see the circumstances arise.

24             So either we're going to be in a situation with

25     that many claims where the Court can have a huge number of

Case 1:09-cv-00080-LPS Document 642-2 Filed 12/28/12 Page 29 of 217 PageID #: 16527
Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 24 of 33 PageID #: 1273

24

1    disputes between the parties or it's going to be artificially

2    limiting the disputes here that it's going to hear to keep the

3    burden on the Court to a reasonable amount which is going to

4    result in enormous prejudice to the defendants.

5             So that's second point.

6             The third point I'll make, your Honor, is just

7    that if we're talking about April as a date, the plaintiff

8    will have had all of our documents by then for two months.

9    Document production will have been complete and will have

10   had our invalidity contentions for six months.

11            The idea that even at that point they're going

12   to know so little about their own case that they have to

13   keep literally four dozen claims at issue because they don't

14   know what they might want to assert at trial I think says a

15   lot about how they're approaching the case.

16            They sued four companies on 60 plus claims and

17   dozens of accused product families.  They have the right to

18   bring that case but they ought to be required to put the

19   work in to sort of bring that case to shore and to narrow

20   the claim to a reasonable number in a timely way.

21            If they will reduce it to sort of five claims

22   per patent, for example, your Honor, by April, there would

23   still be, you know, a dozen or 20 claims at issue against

24   dozens of asserted products even as to Check Point, and that

25   is plenty, plenty, plenty of complexity and may require a

Case 1:09-cv-00080-LPS Document 642-2 Filed 12/28/12 Page 29 of 217 PageID #: 16528
Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 25 of 33 PageID #: 1274

25

1    huge undertaking from both of the defendants and the Court,

2    doubling and tripling that in terms of the base-side is

3    going to increase that workload substantially.

4              THE COURT:  All right.  A couple questions,

5    Mr. Roberts.

6              First, both parties have talked in terms of

7    limiting the number of asserted claims per patent.  If I

8    were to set an overall number of asserted claims, is it

9    important to also keep a per patent limitation?

10             MR. ROBERTS:  I don't think so, your Honor.  I

11   think the workload and the burden generally for the parties

12   is a function of the total number of claims, so we would

13   be willing to let the plaintiffs choose from among which

14   patents they want the claims in.

15             THE COURT:  To the extent I'm thinking of

16   entertaining what you have characterized perhaps fairly as

17   an artificial limit on the number of claim terms that I

18   would be willing to construe, if I were to adopt your

19   proposal of, let's say, 20 asserted claims by April of 2012,

20   where does that leave you in terms of your feeling about

21   any prejudice from an artificial limit of the number of

22   terms to be construed?

23             MR. ROBERTS:  Well, your Honor, obviously

24   depending what that number is.  If your Honor said to us

25   I'm going to construe two terms, then having 20 claims at

Case 1:09-cv-00080-LPS Document 642-1 Filed 12/28/12 Page 30 of 217 PageID #: 16529
Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 26 of 33 PageID #: 1275

26

1   issue and the ability to construe two terms would be very

2   difficult.  So I think, your Honor, if you are going to set

3   reasonable limits on both the number of terms you are going

4   to hear and the number of claims that the plaintiff can

5   bring, I think obviously the defendants are going to be fine

6   with that.

7           THE COURT:  Let me hear from the plaintiffs,

8   please.

9           MS. TAYLOR:  Thank you, your Honor.

10          I think the use of the word "artificial" is

11  appropriate here.  This proposal by the defendants is an

12  artificial attempt to limit our constitutional patent right

13  by limiting the number of claims before even a piece of

14  paper has been produced when we have invalidity charts with

15  pages upon pages of references just listed, not yet charted

16  and not yet a deposition taken.

17          Mr. Roberts mentioned summary judgment.  Summary

18  judgment, as we all know, is not scheduled until the year

19  2013.  His proposal is unreasonable and premature.

20          As I mentioned, defendants initially failed to

21  chart any invalidity references, forcing the plaintiff to

22  either go to the Court with a discovery dispute early in the

23  case or wait an additional 30 days, which we did, to get a

24  set of invalidity charts in return.

25          Now, having those charts less than 30 days which

Case 1:09-cv-00867-LPS   Document 642-1   Filed 12/28/12   Page 31 of 217 PageID #: 16530
Case 1:10-cv-01067-LPS   Document 162   Filed 11/23/11   Page 27 of 33 PageID #: 1276

27

1    still merely lists a number of references without charting

2    them at all, defendants ask plaintiff to elect claims to an

3    unreasonable small number before we had sufficient discovery.

4    Defendants argue they want us to elect the small number of

5    claims when the claim construction hearing is set for next

6    August.

7           Reducing the number of claims at issue, contrary

8    to what Mr. Roberts indicated, doesn't necessarily correlate

9    to the number of claim terms in dispute and merely listing

10   off phrases from a particular patent doesn't show that it

11   does.

12          I suggest, your Honor, what we do is proceed

13   in the case, get some discovery underway, produce some

14   documents, take some depositions and see where we are next

15   spring.

16          We haven't indicated a willingness to address

17   this issue, but at a more appropriate time next year, after

18   discovery has progressed, we would ask that you address the

19   issue at that time, if it is necessary.  Restricting to five

20   claims per patent or 20 overall really is something that

21   unprecedented.  I've been in a lot of patent litigations and

22   have never seen that even defendants ask for but certainly

23   not receive a limit to that few number of products.

24          What we ultimately will be trying in this case

25   and how the Court manages its docket and the parties manages

Case 1:09-cv-00080-LPS Document 642-2 Filed 12/28/12 Page 32 of 217 PageID #: 16573
Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 28 of 33 PageID #: 1273

28

1    its docket will be determined later.  Mr. Roberts and the

2    other defendant counsel will have to produce the documents

3    regardless, you know, the number of claims that are at

4    issue in this case.  I suggest we should consider this issue

5    amongst ourselves down the road next spring and then we

6    will, if we need to, which I hope we don't, we can come back

7    to you at that time.

8            THE COURT:  I think you unintentionally misspoke.

9    You suggested maybe they're trying to limit you to the number

10   of products you have accused.

11           MS. TAYLOR:  I'm sorry, your Honor.  I meant

12   the number of claims as, you know, whether it's on a per

13   patent basis or, in response to your question, the sheer

14   number of claims.

15           I don't think the number of claims that is in

16   this case now is an unreasonable number, certainly not when

17   we haven't had any document discovery done or deposition

18   discovery done.

19           THE COURT:  Right.  But they're not asking you

20   at this point to reduce your number of claims asserted at

21   all.  They want to give you six months before you have to do

22   it.  And, I had understood from your letter that that was a

23   process that you were willing to engage in.

24           Whether or not you are willing to engage in it,

25   to the extent I'm considering requiring you to do it, what

Case 1:09-cv-00080-LPS Document 642-1 Filed 12/28/12 Page 33 of 217 PageID #: 16532
Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 29 of 33 PageID #: 1278

29

1      would be the unfair prejudice of six months from now having

2      to reduce the number of asserted claims?

3                  MS. TAYLOR:  You read our responsive letter.

4      Preferably, in the event the Court thinks it's appropriate

5      to consider this issue now, we did offer to go to 12 claims

6      per patent by April 7th, which is a date two months after

7      the document production is supposed to be substantially

8      complete.

9                  Assuming that defendants meet that deadline,

10     then we're willing to go ahead and elect 12 claims per

11     patent by April 7th.  But the idea that it would go down to

12     some number drastically lower than that I don't think will

13     save the parties or the Court work in any way, and I think

14     it's premature to address that at this point, to go to some

15     number as low as five per patent.

16                 THE COURT:  You also argued that to do so would

17     be unprecedented, but I believe there was a recent Federal

18     Circuit decision, *stamp.com*, that I think, as I understood

19     it, affirmed a District Court order with a limit of I think

20     a total of maybe 15 claims being asserted across multiple

21     patents.

22                 Are you familiar with that or can you help me

23     understand your contention that it would be unprecedented

24     for the Court to do something consistent with what the

25     defendants are asking?

Case 1:09-cv-00080-LPS Document 642-2 Filed 12/28/12 Page 34 of 217 PageID #: 16533
Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 30 of 33 PageID #: 1279

30

1          MS. TAYLOR:  Your Honor, I'm not familiar with

2     that particular decision.  I apologize.  But I don't know at

3     what point the Court required that.  There are courts that

4     are presiding over patent litigation to ask the parties

5     to elect the claims.  I know in certain Districts, the

6     claims that are not elected are preserved to be tried at a

7     later date.

8          I don't know if that is what we're talking about

9     here.  We haven't had that discussion with the defendants.

10    But I also think, I don't know what the timing was in that

11    decision.  Most jurisdictions I'm aware of claim election,

12    they happen at a date many times after the Markman or just

13    before the Markman proceeding.

14         THE COURT:  Okay.  Is there anything else,

15    Ms. Taylor?

16         MS. TAYLOR:  Nothing from me, your Honor.

17         THE COURT:  Okay.  Mr. Roberts.

18         MR. ROBERTS:  No, your Honor.  I think your

19    Honor has the point exactly.

20         THE COURT:  If you would, address that question

21    about if I am to restrict them, what happens to the other

22    claims?  Are they preserved to be tried in another date or

23    are you asking me to say they're done with them forever?

24         MR. ROBERTS:  So, your Honor, I haven't looked

25    at that issue in detail.  I assume that the Federal Circuit

Case 1:09-cv-00080-LPS Document 642-1 Filed 12/28/12 Page 35 of 217 PageID #: 16534
Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 31 of 33 PageID #: 1280

31

1  has addressed that. Certainly, whatever the Federal

2  Circuit has suggested is appropriate, we're amenable to.

3          THE COURT: Here is my ruling.

4          On this one, I largely agree with the defendants

5  position. Therefore, I am going to require the plaintiff

6  to reduce the number of asserted claims in this case by

7  April 7th of 2012, to reduce the number of asserted claims

8  to no more than a total of 20, which can be allocated among

9  the four patents in suit however plaintiff wishes. And,

10         Further, I'm going to impose at this point a limit

11  in advance of the Markman hearing in that in connection with

12  the Markman process, leading to the hearing, the Court will

13  construe no more than a total of 20 disputed claim terms.

14         The Court understands that there may be more

15  than 20 disputed claim terms among the parties, and, if so,

16  the Court understands that it has an obligation to resolve

17  the remaining disputes by the time the case is submitted to

18  the jury. But in connection with the Markman hearing and

19  the Markman process, again, the Court is going to limit its

20  consideration and its resolution to a total of 20 disputed

21  claim terms.

22         In the Court's view, these rulings adequately and

23  effectively and reasonably balance the competing interests

24  among the parties as well as the Court's interest, indeed,

25  need for judicial economy, and these rulings are intended to

Case 1:09-cv-00080-LPS Document 642-2 Filed 12/28/12 Page 36 of 217 PageID #: 16535
Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 32 of 33 PageID #: 1281

32

1    and, the Court believes, do accomplish all of that.

2              On this issue that was just raised at the last

3    moment about what happens to the other claims in the patents

4    in suit beyond the 20 that the case will be limited to in

5    April, I'm not making any ruling on that.  The issue has not

6    been briefed and I don't mean by today's ruling to make any

7    determination on that issue.

8              I don't want more argument on these issues but

9    are there any questions about what I have ruled, Mr. Roberts?

10             MR. ROBERTS:  No, your Honor.  Thank you.  The

11   only question is would your Honor like supplemental briefing

12   at some point on what the effects on the other claims ought

13   to be, and, if so, when?

14             THE COURT:  I'm not asking for anything at this

15   point.  I'm going to hope that when you all go back and

16   consult Federal Circuit law that you all come to the same

17   conclusion on what the answer is.  If you do have a dispute

18   on it, then one or both of you should send me a letter and

19   tell me you have that dispute, if you think it is something

20   I need to address, and do it at the time you think I need to

21   address it.

22             Is there anything else, Mr. Roberts?

23             MR. ROBERTS:  No, your Honor.  Thank you.  That

24   sounds reasonable.

25             THE COURT:  And Ms. Taylor?

Case 1:09-cv-00080-LPS Document 642-1 Filed 12/28/12 Page 37 of 217 PageID #: 16536
Case 1:10-cv-01067-LPS Document 162 Filed 11/23/11 Page 33 of 33 PageID #: 1282

33

1          MS. TAYLOR:  Thank you, your Honor.

2          THE COURT:  Okay.  Thank you all very much.

3    Good-bye.

4          (Telephone conference ends at 12:13 p.m.)

5

6          I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.

7

8                              /s Brian P. Gaffigan
                              Official Court Reporter
9                              U.S. District Court

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT C

Case 1:09-cv-00525-LPS Document 642-1 Filed 12/28/12 Page 39 of 317 PageID #: 16538
Case 1:09-cv-00525-LPS Document 88 Filed 09/09/10 Page 1 of 29 PageID #: 1175

1

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                               - - -
        PERSONALIZED USER MODEL, L.L.P.,
 4                                          :    CIVIL ACTION
                    Plaintiff,              :
 5                                          :
                         v.                 :
 6                                          :
        GOOGLE, INC.,                       :
 7                                          :    NO. 09-525-LPS
                    Defendant.
 8                               - - -

 9                         Wilmington, Delaware
                         Wednesday, September 8, 2010
10                         TELEPHONE CONFERENCE

11                               - - -

12      BEFORE:         HONORABLE LEONARD P. STARK, U.S.D.C.J.

13                               - - -
        APPEARANCES:
14

15              MORRIS NICHOLS ARSHT & TUNNELL, LLP
                BY:  KAREN JACOBS LOUDEN, ESQ.
16
                     and
17
                SONNENSCHEIN NATH & ROSENTHAL, LLP
18              BY:  MARC S. FRIEDMAN, ESQ.
                     (New York, New York)
19
                     and
20
                SONNENSCHEIN NATH & ROSENTHAL, LLP
21              BY:  MARK C. NELSON, ESQ.
                     (Dallas, Texas)
22
                     and
23

24
                               Brian P. Gaffigan
25                             Registered Merit Reporter
```

Case 1:09-cv-00085-LPS  Document 642-1  Filed 12/28/12  Page 40 of 217 PageID #: 16539
Case 1:09-cv-00525-LPS  Document 88  Filed 09/09/10  Page 2 of 29 PageID #: 1176

2

1    APPEARANCES:  (Continued)

2

3              SONNENSCHEIN NATH & ROSENTHAL,LLP
               BY:  JENNIFER D. BENNETT, ESQ.
4                   (Palo Alto, California)

5                        Counsel for Plaintiff

6

7              POTTER ANDERSON & CORROON, LLP
               BY:  RICHARD L. HORWITZ, ESQ.
8
                    and
9
               QUINN EMANUEL URQUHART & SULLIVAN, LLP
10             BY:  DAVID A. PERLSON, ESQ., and
                    EUGENE NOVIKOV, ESQ.
11                  (San Francisco, California)

12                       Counsel for Defendant

13

14

15                       - oOo -

16               P R O C E E D I N G S

17          (REPORTER'S NOTE:  The following telephone

18   conference was held in chambers, beginning at 10:08 a.m.)

19          THE COURT:  Good morning, everybody.  This is

20   Judge Stark.  Who is there, please?

21          MS. JACOBS LOUDEN:  Good morning, your Honor.

22   For the plaintiff, this is Karen Jacobs Louden for Morris

23   Nichols; and I have on the line with me Marc Friedman, Mark

24   Nelson and Jennifer Bennett from the Sonnenschein firm.

25          THE COURT:  Okay.

Case 1:09-cv-00805-LPS Document 642-1 Filed 12/28/12 Page 41 of 217 PageID #: 16540
Case 1:09-cv-00525-LPS Document 88 Filed 09/09/10 Page 3 of 29 PageID #: 1177

3

1          MR. HORWITZ:  Good morning, your Honor.  It's

2     Rich Horwitz at Potter Anderson for the defendant; and with

3     me from Quinn Emanuel, David Perlson, and Eugene Novikov.

4          THE COURT:  Okay.  Good morning to you as well.

5          That's everybody, correct?

6          MS. JACOBS LOUDEN:  Yes, your Honor.

7          THE COURT:  Okay.  So for the record -- and I do

8     have a court reporter here today -- this is our case of

9     Personalized User Model, LLP v Google Inc.  It's our Civil

10    Action 09-525-LPS; and we're here today to discuss a number

11    of discovery disputes between the parties that are set out

12    in the series of four letters.

13          Of course, I've read the letters, but I do want

14    to give you all a chance to supplement what you have written

15    with any additional argument, and each side is complaining

16    about certain things.  I think it is probably best to

17    address them all together.  So what I will do is first give

18    the plaintiff an opportunity to address all the issues in

19    dispute, and then give the defendant that same opportunity;

20    and you can each have a brief rebuttal, if need be.

21          So let me turn it over to the plaintiff.

22          MS. JACOBS LOUDEN:  Thank you, your Honor.  Mark

23    Nelson will present the issues for the plaintiff.  Then I'll

24    address the bifurcation issue when he is done.

25          THE COURT:  Okay.

Case 1:09-md-00085-LPS Document 642-1 Filed 12/28/12 Page 42 of 217 PageID #: 16541
Case 1:09-cv-00525-LPS Document 88 Filed 09/09/10 Page 4 of 29 PageID #: 1178

4

1          MR. NELSON:  Good morning, your Honor.

2          THE COURT:  Good morning.

3          MR. NELSON:  I guess we view the issues here as

4     very interrelated.  Part of the central issue here seems to

5     be the number of claims, and really not an "if" the number

6     is going to be reduced but a "when."  And with that, I want

7     to talk about the invalidity contentions first because they

8     play into sort of the timing of the reduction of claims.

9          And the parties, as you probably gathered

10    through the correspondence, there has been ongoing, you

11    know, efforts to get additional discovery.  Those efforts

12    continue, and Google has recently agreed to produce

13    documents and source code pursuant to the whole series of

14    letters that were parts of Exhibit 4 and Exhibit 5.

15          We sent a letter, I think it was yesterday, it

16    may have been Monday but I think it was yesterday, in an

17    effort to further see if we could reduce the dispute and

18    reduce the number of claims given the information that we

19    had.

20          We sent a letter to Google further reducing the

21    number from what was 67 or 68 claims down to I think now

22    what is 36 claims that remain in issue.  However, we don't

23    think we should have to reduce it further because of

24    basically the lack of information that we still don't have;

25    and that gets me into the invalidity contentions; and so we

Case 1:09-cv-00080-LPS Document 642-1 Filed 12/28/12 Page 43 of 217 PageID #: 16542
Case 1:09-cv-00525-LPS Document 88 Filed 09/09/10 Page 5 of 29 PageID #: 1179

5

1    thought we had a deal where we would provide infringement

2    contentions on the 16th of July; and then on the 27th of

3    August, Google would provide us invalidity contentions for

4    that group of claims.

5             We went through and we did our part.  We got

6    really the first meaningful productions of source code and

7    documents in May.  We worked like crazy to chart 68 claims;

8    and while Google points to a few claims that we reserved

9    our right to add information to because we didn't have the

10   code necessary at that time, we felt, to do a full blown

11   chart but we had good faith belief that those claims were

12   infringed, there is a few that we were not able to chart.

13            Then basically the night before the contentions

14   are due, we got from Google that they weren't going to

15   produce the invalidity contentions and basically their

16   letter sets forth three arguments.

17            The first is, you know, we've provided the art

18   so you don't need the contentions.

19            I think that argument is just a nonstarter.  If

20   that were the law, you wouldn't have to do infringement

21   contentions or invalidity contentions.  The parties would

22   just say you guys got the documents, go figure it out.

23            Their second argument is there really wasn't

24   an agreement because they made it contingent on sort of

25   their approval of the contentions.

1          And, again, I don't think that was the intent.

2   I mean our side worked very hard to provide very detailed

3   charts which Google attached for all of these claims and, we

4   felt we're entitled to understand their invalidity position

5   for all of these claims.

6          The third argument is really, well, since even

7   PUM admits that we're going to reduce the claims further for

8   trial, you know, just reduce them now because it's a waste

9   of time for Google to chart claims that aren't ultimately

10  going to be asserted.

11         And I mean I think that's where the real rub is,

12  is that we don't want to be forced to make choices in the

13  dark about what claims were ultimately going to assert at

14  trial.  The Court hasn't had a Markman yet.  We don't have

15  all their documents.  We've written innumerable letters

16  asking for very specific source code which they've now

17  agreed to produce, you know, in the middle of this month;

18  and we don't think limiting us -- well, going back to the

19  invalidity contentions first.  We believe that going into

20  the Markman process and with the further reduction to 36

21  claims, that there is absolutely no reason why we should

22  not be entitled, prior to Markman and prior to reducing

23  the claim number further, to understand their invalidity

24  positions in full.

25         THE COURT:  All right.  Mr. Nelson.

Case 1:09-cv-00085-LPS Document 642-1 Filed 12/28/12 Page 45 of 217 PageID #: 16544
Case 1:09-cv-00525-LPS Document 38 Filed 09/09/10 Page 7 of 29 PageID #: 1181

7

1      MR. NELSON:  And that is really -- oh, go ahead.

2      THE COURT:  So your position today is you

3  want to continue to assert 36 claims until you get their

4  invalidity contentions in response to the 36 claims or

5  still you're looking for responses to the 67 claims?

6      MR. NELSON:  No, our position is we only --

7  since we reduced the number further, we only need their

8  invalidity position for the 36 claims at this point.

9      THE COURT:  And of those 36, how many of them

10 are not actually charted, are just merely a reservation of

11 rights?

12     MR. NELSON:  I don't know the precise answer to

13 that, but I can tell you that of the group that they listed

14 that were not charted for invalidity, they listed four claims,

15 I think it was like 7 and 8 and then the corresponding

16 method claims of the '040 patent, well, those are Markush

17 claims that had a large number of elements.  We charted

18 several of those elements so I don't think those claims

19 should count as not being charted.

20         So at most of the 36 that were listed, that

21 remain, even assuming that all of the ones they list as not

22 being charted are among the 36, which I'm not 100 percent

23 sure is correct, at most then it would be five or six that

24 were not charted.

25     THE COURT:  Okay.  And if I were to do something

Case 1:09-cv-00086-LPS Document 642-1 Filed 12/28/12 Page 46 of 217 PageID #: 16545
Case 1:09-cv-00525-LPS Document 88 Filed 09/09/10 Page 8 of 29 PageID #: 1182

8

1   like require them to respond with their invalidity

2   contentions to those among the 36 that you have charted and

3   then give you some small amount of time after that to reduce

4   your number of asserted claims to 10, what types of time

5   frames would you suggest I plug in for those two steps, and

6   what would that do to the current Markman schedule?

7           MR. NELSON:  Well, Your Honor, we would like to

8   have -- we think 10 is a little bit of an arbitrary number,

9   first of all.

10          But, secondly, we would like to have the benefit

11  of the Court's Markman ruling as well before we make our

12  final cuts to those asserted at trial.  We certainly feel

13  that Google infringes all of the 36 but understand that it's

14  not going to be practical to try 36 claims.  What we would

15  like is to be an able to further reduce it one more time to

16  a number less than; and I mean a meaningful reduction, I

17  don't mean 35 or something; you know, after we've gotten the

18  invalidity contentions and after we've gotten additional

19  discovery that they promised and had a time to evaluate that.

20          THE COURT:  Then, what do you propose I do to

21  make sure that the Markman process then doesn't get out of

22  control and you all ask me to, you know, construe 150 claim

23  terms?

24          MR. NELSON:  Well, we've got a little bit of

25  play in the schedule, your Honor, with the Markman.  It's my

Case 1:09-cv-00805-LPS Document 642-3 Filed 12/28/12 Page 47 of 217 PageID #: 16546
Case 1:09-cv-00525-LPS Document 88 Filed 09/09/10 Page 9 of 29 PageID #: 1183

9

1    understanding that we don't have a date in December for the

2    actual hearing.  One possible suggestion would be to push

3    the briefing off for some, you know, not too lengthy a time,

4    that would allow us to get their invalidity contentions and

5    get their discovery and evaluate it and then make one more

6    cut of claims prior to going into the Markman procedure.

7    That would be a meaningful cut but not limiting us to 10.

8             THE COURT:  Okay.  We'll come back to you,

9    but unless you have anything quick to add, I want to hear

10   from Ms. Jacobs Louden and then move on to hear from the

11   defendants.

12            MR. NELSON:  Okay.  I haven't addressed the

13   deposition issue.  Does your Honor want to just take that

14   separate?

15            THE COURT:  Oh, you're right.  I didn't realize,

16   right, you were going to address that.  Move on to that one

17   then.

18            MR. NELSON:  Okay.  I mean our position on that

19   is pretty straightforward, is that typically when inventors

20   are offered for more than a seven-hour deposition, it's

21   considered a single deposition.  It's not considered, you

22   know, you get two bites.  You get to take the inventor early

23   and then wait until the end of the case and take him again.

24            It's our position that that is what the

25   parties intended all along.  I point out what was attached

Case 1:09-cv-00625-LPS Document 642-1 Filed 12/28/12 Page 48 of 217 PageID #: 16547
Case 1:09-cv-00625-LPS Document 83 Filed 09/09/10 Page 10 of 23 PageID #: 1184

10

1    as Exhibit 8 to PUM's briefing; and that is one of the draft

2    scheduling orders that went back and forth.  In that draft

3    order, on page 2, it says each of the named inventors may be

4    deposed 12 hours; and then will plaintiff be producing the

5    inventor in Germany, and that is underlined as an addition.

6          That is then sent to Google.  And after a series

7    of correspondence, it looks like on page 2 of the e-mail

8    chain, David Perlson responds that his red lines would most

9    likely just address any scheduling conference and some

10   discovery points and perhaps try to add some additional time

11   to dates to account for the claim construction ruling.

12         There is no evidence that anybody was thinking

13   you get two seven-hour days to take whenever you want to

14   take them.  So it's our position that it's 14 hours, it's

15   a single deposition.  That is the way it's normally done,

16   and that is the way it should be done here.

17         THE COURT:  Of course, the language that you all

18   agreed on, though, is two seven-hour depositions.  Normally,

19   what I would have seen is, you know, a deposition up to

20   14 hours or 14 hours of deposition time.  So your view is

21   the specific language, "two seven-hours depositions" with no

22   reference to when those two have to happen, should in this

23   case be interpreted to mean two back-to-back days.

24         MR. NELSON:  That is correct, your Honor.  It's

25   our position that was the understanding.  The language is

Case 1:09-cv-00665-LPS Document 642-1 Filed 12/28/12 Page 49 of 217 PageID #: 16548
Case 1:09-cv-00625-LPS Document 83 Filed 09/03/10 Page 11 of 23 PageID #: 1135

11

1    what it says, but it also doesn't say that the two

2    seven-hour days must be, you know, months apart.

3              THE COURT:  Okay.  Let me turn to Ms. Jacobs

4    Louden then.

5              MS. JACOBS LOUDEN:  Thank you, your Honor.  I'll

6    address PUM's request that damages and willfulness not be

7    bifurcated and that we have an unitary proceeding here.

8              I'll start with how the issue came about in the

9    first place, which is that the Court entered a scheduling

10   order in April of this year.  There was no scheduling

11   conference, there was no argument.  The parties submitted a

12   scheduling order pursuant to Judge Farnan's order.  The

13   scheduling order had a few competing provisions.  They did

14   not contain any argument.  There was no discussion of

15   particular circumstances.

16             Judge Farnan ultimately entered an order in

17   April that got the case started but doesn't finish it.

18   Mr. Nelson mentioned that there is no Markman hearing, no

19   pretrial conference or trial date.  That isn't surprising

20   given that Judge Farnan was due to retire in a few months,

21   so it was really a scheduling order that was meant to get

22   things started.

23             It also adopted Google's provision that the case

24   be bifurcated in terms of damages and willfulness, but it

25   was for discovery and trial.

Case 1:09-cv-00625-LPS Document 643-1 Filed 12/28/12 Page 50 of 217 PageID #: 16549
Case 1:09-cv-00625-LPS Document 83 Filed 09/09/10 Page 12 of 25 PageID #: 1136

12

1    Immediately after that order came down, we wrote

2    to the Court to explain why we thought bifurcation was both

3    unnecessary and prejudicial under the particular facts of

4    this case; and there was, as your Honor has seen, several

5    letters exchanged on that.  I note that Google argues now

6    that it wasn't full briefing, but, of course, I find that a

7    little bit ironic that there, of course, was no briefing at

8    all when the order was initially entered.

9    Probably the most important factor here is that

10   the inventors here are trying to run a small business.  They

11   made and marketed personalized search products.  They put

12   Google on notice; and Google ignored them and wouldn't

13   engage.  They couldn't succeed in the marketplace because

14   of Google's dominance; and they now sell other products,

15   voice recognition products.

16   But the Court's order has the effect of both

17   doubling the time and expense by making this case into two

18   proceedings rather than one and prolonging the time that PUM

19   is kept out of the market and denied compensation for the

20   infringement.  This really is a circumstance where justice

21   delayed is justice denied in this type of David-and-Goliath

22   situation; and, of course, the magnified expense that Google

23   does in double proceedings greatly benefits Google.

24   This case is really not so complicated that

25   there is any real efficiency to be gained by bifurcation.

Case 1:09-cv-00083-LPS Document 642-1 Filed 12/28/12 Page 51 of 217 PageID #: 16550
Case 1:09-cv-00083-LPS Document 83 Filed 09/09/10 Page 13 of 29 PageID #: 1137

13

1   It's not a multiparty case.  There is just the two parties.

2   There are three related patents.  Much of the evidence will

3   come in any way from commercial success or inducement.  What

4   really happens here is by not getting the damages discovery,

5   settlement is really hampered, and although Google has said

6   it would provide some financial discovery for settlement

7   purposes, of course, there is a big difference about what

8   kind of information you get through discovery versus the

9   hand-selected information that you might get pursuant to a

10  Rule 408 discussion.

11          So now that the case is in your Honor's hands,

12  it's really a question of how the case will be managed going

13  forward.  It was in transition mode when the scheduling

14  order was entered this spring.  We look forward to putting

15  some meat on the bones so we can get a Markman date with

16  your Honor; and that feeds in with what Mr. Nelson was

17  talking about in terms of when we can go through this

18  process of getting full discovery and then whittling down

19  the claims.

20          But we would very much like to proceed on a

21  unitary basis.  We think that can happen without really

22  adjusting the schedule.  We have until the end of February

23  to complete fact discovery, so we have five months to go,

24  and so we don't think any change is needed; but we would

25  like to see the case move forward with dates for Markman

Case 1:09-cv-00825-LPS Document 643-1 Filed 12/28/12 Page 52 of 217 PageID #: 16551
Case 1:09-cv-00825-LPS Document 83 Filed 03/03/10 Page 14 of 29 PageID #: 1188

14

1    and a pretrial and trial date and have discovery go forward

2    on all issues.

3              THE COURT:  All right.  But you agree, do you

4    not, that you flagged the issue for Judge Farnan in your

5    cover letter.  You flagged it for him in the proposed

6    scheduling order.  He ruled against you in that he entered

7    a scheduling order which required bifurcation; and then you

8    didn't file a motion for reconsideration, you filed this

9    letter, and that did not prompt Judge Farnan to do anything

10   further.

11             Given all that, on the merits, if this were in

12   front of me on a blank slate, even if I might agree with

13   you, how is it that you meet the high burden that I should

14   apply in this type of context to go back and revisit

15   something that Judge Farnan already decided?

16             MS. JACOBS LOUDEN:  Well, your Honor, I guess

17   we were considering it in the context of a scheduling order

18   that had no briefing, no hearing, no presentation and our

19   letter in a way was asking for a conference to be able to

20   discuss those issues with him.  We all know how busy Judge

21   Farnan was, as he was finishing his practice; and we, of

22   course, can't get into his mind to know whether the fact

23   he didn't address the letter was intentional or just as a

24   result of the many matters he had before him.  But our

25   letter was by way of a request to have a hearing on the

Case 1:09-cv-00825-LPS Document 642-1 Filed 12/28/12 Page 53 of 217 PageID #: 16552
Case 1:09-cv-00825-LPS Document 83 Filed 09/09/10 Page 15 of 29 PageID #: 1189

15

1    matter so that we can discuss the particular circumstances

2    of bifurcation in this case.  Of course, it is the law that

3    it is the party who is seeking to bifurcate who bears the

4    burden and Google has never done that.

5              THE COURT:  All right.  Let me turn it over to

6    Google to address all those issues, please.

7              MR. PERLSON:  Good morning, your Honor.  This is

8    David Perlson.  I'll be handling it first.

9              First of all, on the number of claims and

10   invalidity contentions, I agree those issues sort of come

11   together so I'll address them together.

12             I think the proposal that you made on or the

13   suggestion you had made about the taking from 36 to 10 was

14   a good one and certainly would be acceptable to Google.  I

15   think had the claims been reduced to 36 earlier, perhaps

16   there wouldn't have been a dispute or perhaps it would have

17   been a different one.

18             We've, you know, never refused to provide

19   invalidity contentions.  We simply didn't think it was fair

20   or necessary or made any sense for us to chart all sorts of

21   claims that weren't going to ever see the light of day.  And

22   I think that the reduction to 36 claims yesterday shows that

23   it wouldn't have made any sense to chart all those other

24   claims.

25             So we're willing to chart the 36 or 38, whatever

Case 1:09-cv-00025-LPS Document 643-1 Filed 12/28/12 Page 54 of 217 PageID #: 16553
Case 1:09-cv-00025-LPS Document 83 Filed 03/03/10 Page 16 of 25 PageID #: 1190

16

1  the exact number is, and if -- you know, I'm not exactly

2  sure what the play is in the schedule.  I think there is

3  probably some room for movement of additional time.  I

4  think, though, that the reduction should be down to 10; and

5  I think that that is a fair number.  We've cited a number

6  of cases where it's shown that that is a typical number

7  asserted.

8          And even 10, you know, it's unlikely that even

9  10 claims would ultimately be asserted at trial.  So it's

10  not like they'd have to pick everything that they would use

11  at trial.  I mean, look, you know, to keep the jury's

12  attention, realistically, it probably would be more like

13  four or five that would eventually make it.

14          So cutting down to 10 at this point I think

15  would be perfectly fair.  I mean, you know, I don't think

16  that plaintiff necessarily even needs our invalidity

17  contentions to figure that out.  They're the plaintiff and

18  they should be able to figure out the claims that they want

19  to assert for their case.  But we're happy to move forward

20  on the schedule as you have suggested.

21          THE COURT:  And how long, reasonably, do you

22  need to respond to the 36 now?

23          MR. PERLSON:  Well, the one thing, your Honor, I

24  don't know is there are some claims that have many, many

25  elements.  I don't know which of those were out.  I just

1 haven't had a chance to look at the specific 36 claims.  I

2 would think that, you know, three or four weeks would be

3 sufficient to do that for 36 or 38.  It could be less.  I

4 just haven't had a chance to look at the particular claims

5 that are going to be at issue.

6     THE COURT:  And if I gave you three weeks to

7 respond and gave them two weeks after that to reduce the

8 number of asserted claims to 10, what does that do to the

9 Markman schedule from Google's perspective?

10     MR. PERLSON:  Well, I think we -- I'm sorry.

11     THE COURT:  I was just going to say if it does

12 anything.

13     MR. PERLSON:  Yes.  I think we would need to

14 move the briefing a little because that would -- I think

15 that that five-week period would end after the time in which

16 the opening briefs are currently due.  I definitely think it

17 makes sense to have those 10 claims at hand before we start

18 briefing, because I think at this point, you know, we're

19 at the point where defendants are at about 40, when we had

20 identified -- I think we identified 50 terms; and I think

21 they had -- that is maybe down to 40 with the reduction to

22 36; and I would be hopeful that we would be able to further

23 reduce that if we get down to 10, plus, hopefully, we can

24 agree on some terms.

25     But I definitely don't think it makes sense for

Case 1:09-cv-00025-EPS Document 64-1 Filed 12/28/12 Page 56 of 217 PageID #: 16255
Case 1:09-cv-00025-EPS Document 63 Filed 09/03/10 Page 16 of 23 PageID #: 1192

18

1       the Court or the parties to engage in the opening briefs

2       until we get to that 10.  From our perspective, we're fine

3       with coming up with a schedule that bumps it back a little.

4       I think there is enough room to do that.

5               THE COURT:  Okay.

6               MR. PERLSON:  So I don't think, unless the Court

7       has any further questioning, I don't think we have anything

8       further on the number of claims in the invalidity contentions.

9               THE COURT:  That's fine.  You can move on.

10              MR. PERLSON:  For the inventor depos, I think

11      that your Honor really made the point that I was going to

12      make, in that the order says what it says.  It says two

13      seven-hour depositions, and that was the point.  We wouldn't

14      have agreed to one 14-hour deposition.  It doesn't say that.

15      And I think the fact that it was changed from one 12-hour

16      deposition to two seven-hour depositions shows exactly what

17      our intent was.  That we didn't want it just one deposition.

18              So the change that plaintiff points to in their

19      response I think actually shows the agreement to be what we

20      say it was and what the plain language of the order says.

21      You know, I think that the plain language of the order is

22      really the clearest thing on the point.

23              THE COURT:  And what if I don't agree on the

24      clear language?  It's certainly an unusual interpretation or

25      an unusual provision.  Why do you need to separate in time

Case 1:09-cv-000825-EPS Document 642-1 Filed 12/28/12 Page 57 of 217 PageID #:16556
Case 1:09-cv-000825-EPS Document 83 Filed 09/09/10 Page 19 of 23 PageID #:1193

19

1    these inventor depositions?  Why should I be amenable to

2    you doing that?

3           MR. PERLSON:  Well, I think that part of the

4    reason why we wanted to do this and why we have actually

5    done it in other cases, or at least it has turned out that

6    way, whether by agreement or otherwise, is that, first, you

7    know, oftentimes at the beginning of the case, one of the

8    things that we want to talk about with inventors is, you

9    know, what they invented, what these claim terms mean, that

10   kind of thing.  Then oftentimes, you get an inventor saying,

11   well, I don't know what it means.  It's an issue for the

12   Court to decide.  Then later on, there is a construction,

13   and then the inventor is able to get up and say, you know,

14   what they invented based on the Court's construction and

15   point out the fact they didn't have that at the time of

16   their earlier testimony.  So that's one point, one reason

17   why it makes sense to take them both at the beginning.

18          Also, two of the named inventors here are

19   essentially the plaintiff of the spinoff company that was

20   created solely for the purpose of this litigation and

21   really shouldn't be much of an issue of burden for these

22   two individuals who are likely driving this litigation and

23   presumably will be seeking millions of dollars against

24   Google; and so as a matter of fairness, I think it's not

25   unreasonable to have them appear twice, as was the

Case 1:09-cv-000025-LPS Document 643-1 Filed 12/08/13 Page 58 of 217 PageID #:16557
Case 1:09-cv-000025-LPS Document 83 Filed 09/09/10 Page 20 of 25 PageID #:1194

20

1    agreement.

2           Then, finally, another reason to do it is that

3    discovery is ongoing.  We've gotten some discovery from

4    plaintiff.  We think there is more out there just as, you

5    know, presumably they think so, although obviously we

6    disagree with their characterization.  To the extent that

7    other discovery occurs later and we find out different

8    things, we'd like to be able to take a second deposition

9    as to that.

10          But, you know, the main point is that this is

11   what was agreed to and it's part of the negotiation of the

12   terms; and, you know, we gave some things, they gave some

13   things; and for plaintiff to come in now and try to assert a

14   different agreement is we think completely unfair.  I think

15   the history shows that it is really someone came in later

16   who wasn't involved in the earlier negotiations and says,

17   why did we agree to this?  Let's not agree to it.

18          I mean even when they proposed the dates, it

19   seemed like that they recognized that we weren't tied to

20   having two days.  If they did, then they would have proposed

21   two days.

22          THE COURT:  And briefly on bifurcation.

23          MR. PERLSON:  Your Honor, I think that this

24   issue was before Judge Farnan multiple times.  The second

25   time was a procedurally improper letter.  They should have

Case 1:09-cv-000625-LPS Document 643-1 Filed 12/28/12 Page 59 of 217 PageID #: 16558
Case 1:09-cv-000625-LPS Document 83 Filed 09/09/10 Page 21 of 29 PageID #: 1195

21

1    filed a motion for reconsideration, they didn't, and now

2    it's unreasonable for them to now ask you to try to do what

3    he correctly refused to do procedurally.

4         They certainly haven't met their burden to

5    show why any ruling that Judge Farnan made was so grossly

6    improper that it would require you to do this.  As Your

7    Honor knows, bifurcation is a pretty typical thing.

8         Finally, I'll note that the facts that

9    plaintiff's counsel laid out on, you know, this delay and

10   things -- justice delayed I think is just completely false.

11   What actually happened here, your Honor, is that plaintiff

12   or this Utopy, which is spun-off PUM, which is the plaintiff,

13   worked on this personalized technology in mostly 2000 and

14   for whatever reason decided not to pursue it, and it had

15   nothing to do with what Google was or wasn't doing.

16        Years later, they did contact Google, but from

17   a document we've seen, it seems like they were looking at

18   Google as a potential target for their patents back in 2005,

19   and yet they didn't bring their lawsuit until 2009.  So

20   there is no justice delayed here.  Plaintiff could have

21   brought their claims long ago if they felt they had a

22   basis to bring them.  For whatever reason, they waited and

23   apparently felt they had a claim to bring at the time they

24   did; and this David-and-Goliath type stuff is just

25   completely inappropriate and has nothing to do with the

Case 1:09-cv-00825-LPS Document 642-1 Filed 12/28/12 Page 60 of 217 PageID #: 16559
Case 1:09-cv-00825-LPS Document 83 Filed 03/03/10 Page 22 of 23 PageID #: 1196

22

1    merits of the issue here.

2              THE COURT:  Okay.  Thank you.

3              Anything further from the plaintiff?

4              MR. NELSON:  Yes, your Honor.  This is Mark

5    Nelson.  I'd like to respond just briefly.

6              With respect to the claim term invalidity chart

7    issue, I think that we're in agreement with Google with

8    respect to the play in the schedule.

9              I think the last part that remains here is the

10   number of claims.  I'll point out the cases that Google

11   cite, particularly **Fenster** and some of the others, they all

12   talk about limiting the plaintiff to 10 claims after the

13   close of discovery, after Markman ruling, so that the

14   plaintiff really has the opportunity to fully evaluate the

15   evidence and pick the ones that it is going to go to trial

16   with.  Our position is that limiting us to 10 sort of

17   pre-Markman is a little bit unfair.

18             We're certainly committed to reducing the number

19   further; and, you know, 15 to 20 might be more reasonable;

20   but, you know, until the Markman ruling comes out and we

21   know sort of what the Court has construed some of these

22   terms to mean, you know, most of the case law that we've

23   seen, **High Point**, for example, that we've cited in our

24   letter, doesn't force those reductions that early.

25             I'll point out the timing.  We received the

Case 1:09-cv-00025-EPS  Document 64-1  Filed 12/28/12  Page 61 of 217 PageID #: 16560
Case 1:09-cv-00025-EPS  Document 83  Filed 09/09/10  Page 23 of 29 PageID #: 1197

23

1    first meaningful production from Google in mid-May.  We then

2    reduced from the original set of claims from 88 on July 1st

3    to 67 on July 16th and now on September 7th to 36.  And so

4    we're not trying to overburden Google or anything like that.

5    We're trying to get to the point where we can assert our

6    best claims based on all the known information in this

7    lawsuit.  So if the concern is, well, how to make the

8    Markman manageable, a lot of that is dealt with or can be

9    dealt with by limiting the number of terms to be construed.

10            A lot of the courts with patent rule

11   jurisdiction, with patent rules put limits on the number of

12   terms because defendant can always list every word in the

13   claim and create a huge Markman headache, but just because

14   the fact a word exists in the claim doesn't necessarily

15   mean that it needs to be construed.  So if the concern is

16   that way, you know, we'd be open to some limitations on

17   the number of terms to be construed as well as opposed to

18   limiting us to just 10 claims going into the Markman process.

19   So that is sort of my point on at.

20            With respect to the depositions issue, the

21   scheduling order I believe says two seven-hour days, not two

22   seven-hour depositions.  And, you know, we think that the

23   parties did understand that it meant 14 hours of depositions

24   total and not two days.

25            The other issue there is, you know, Google's

1    counsel speaks of fairness.  They have taken the position

2    that they will only produce their witnesses once regardless,

3    whether it be 30(b)(6) or 30(b)(1) or anything else.

4              Now, we may challenge that position at some

5    point with respect to certain witnesses, but it seems odd

6    that they want two bites at our inventors, you know, in an

7    issue that we certainly think the parties understood meant

8    one single 14-hour deposition at max and yet they'll only

9    produce their own witnesses, you know, one time, you know,

10   presumably for seven hours.

11             And so, you know, we just disagree; and the way

12   these are normally done in patent cases where the inventors

13   get extra time, it's usually one deposition.  You know, we

14   certainly think that is what was contemplated here and think

15   that that is what it should be.

16             THE COURT:  Okay.  And anything briefly on

17   bifurcation?

18             MS. JACOBS LOUDEN:  Very briefly, your Honor.

19             What we didn't hear in the response is really

20   any argument of what bifurcation is appropriate here, and

21   certainly there can't be any.  He just said.  It's really

22   a question of whether your Honor will have two separate

23   cases with two separate discovery periods or whether we go

24   forward with a single discovery period where damages and

25   willfulness could be addressed at the same time in our

Case 1:09-cv-00665-LPS Document 642-1 Filed 12/28/12 Page 25 of 217 PageID #: 16562
Case 1:09-cv-00665-LPS Document 83 Filed 03/03/10 Page 25 of 29 PageID #: 1195

25

1    existing schedule.  It's not overly complicated; and now

2    that the case is in your camp, I would think entering a

3    scheduling order that sets forth those dates and a Markman

4    and pretrial conference is the way to proceed.

5              THE COURT:  Okay.

6              MR. PERLMAN:  Your Honor, this is Dave Perlman.

7    Can I address one thing?

8              THE COURT:  Just briefly.

9              MR. PERLMAN:  Yes.  I think if you look at the

10   **Fenster** case, it wasn't -- the reduction to claims was not

11   done after the close of fact discovery, and I think that the

12   order reducing the number of claims actually came before

13   the Markman hearing.  I think that that is important as a

14   factual point of view in plaintiff's attempt to distinguish

15   these cases.  And as far as limiting the claim terms at

16   issue, I mean the number of terms at issue is directly

17   related to the claims; and the way to limit it, as courts

18   have routinely recognized, is through the amount of claims

19   asserted.

20             If plaintiff thinks we have asserted too many

21   terms, we can address it at that point, but I don't think

22   that will be an issue if we're down to 10.

23             MR. NELSON:  Your Honor, just briefly on **Fenster**.

24             THE COURT:  No.  Mr. Nelson, I've heard enough.

25   Thank you.

Case 1:09-cv-00025-EPS Document 64-1 Filed 12/28/12 Page 24 of 217 PageID #: 16563
Case 1:09-cv-00025-EPS Document 85 Filed 03/09/10 Page 26 of 29 PageID #: 1200

26

1        MR. NELSON:  Thank you.

2        THE COURT:  Let me, because I only have a

3    couple more minutes with you all and I'm ready to give you

4    my rulings.

5        First, on the related issues essentially of

6    plaintiff's motion to compel gobble Google to respond to the

7    now, I guess it is, 36 infringement contentions and the

8    defendant's request that the plaintiff reduce the number of

9    asserted claims, all of which in my view are tied up with

10   how we're going to proceed in an orderly fashion through

11   Markman and then ultimately to trial.

12       What I am doing is modifying the scheduling

13   order such as to require Google to respond with its

14   invalidity contentions in response to the now 36 asserted

15   claims that have been charted by the plaintiff, and Google

16   has 21 days from today to do that, so three weeks.

17       Within 10 days after Google does so, the plaintiff

18   will reduce the asserted claims to no more than 15.

19       What I further want the parties to do is, in

20   response to these rulings, is to meet and confer and propose

21   to the Court a modification to the scheduling order which

22   sets out the procedures and timing for identifying and

23   briefing a total of no more than 12 claim terms for the

24   Court to construe at a Markman hearing.  After we get your

25   proposals as to the timing of the Markman briefing process,

Case 1:09-cv-00625-LPS Document 84-1 Filed 12/08/13 Page 25 of 217 PageID #: 16564
Case 1:09-cv-00625-LPS Document 83 Filed 09/09/13 Page 27 of 29 PageID #: 1201

27

1    we'll set a Markman hearing date.

2            In my view, all of this reasonably accommodates

3    the competing interests not only of both parties but also of

4    the Court and ultimately of the jury.  The Court can only do

5    so much.  We can only handle so many disputes.  The jury can

6    only be expected to work through so many asserted claims;

7    and I certainly would hope but am not at this time ordering

8    that the number of asserted claims get reduced further as we

9    proceed to trial.  I'm not requiring that at this time.

10           I recognize I have an obligation before the case

11   is submitted to the jury to construe whatever claim terms

12   are meaningfully in dispute at that point, so if it turns

13   out that further claims construction is necessary later in

14   the case, if need be, we'll do that.

15           My hope further is that the issues of invalidity

16   and infringement for all the claims at issue in this case

17   can be resolved in a single trial.  If it turns out that

18   that becomes impossible because somehow the case remains too

19   large, then we'll just have to just deal with that further

20   down the road.

21           So that's my ruling on those first two related

22   disputes.

23           With respect to plaintiff's request to modify

24   the scheduling order to the extent the scheduling order

25   bifurcates this case as between essentially liability issues

Case 1:09-cv-00825-LPS Document 84-1 Filed 12/28/12 Page 26 of 217 PageID #: 1265
Case 1:09-cv-00825-LPS Document 83 Filed 03/09/10 Page 26 of 29 PageID #: 1202

28

1    and damages issues, I'm denying plaintiff's request.  It's

2    very explicit, of course, and not disputed that it is

3    explicit in the scheduling order by Judge Farnan that the

4    bifurcation provision is there.  The dispute was flagged

5    by Judge Farnan in the cover letter that accompanied the

6    parties' proposed scheduling orders.  It's also flagged for

7    Judge Farnan in the proposed scheduling orders themselves.

8         I have every reason to believe that Judge Farnan

9    gave careful consideration to what was before him, and I'm

10   certainly not inclined to revisit his decision.  There was

11   no timely motion for reconsideration.

12        The letter was filed and certainly had a great

13   deal of argument in it, but I must presume that because

14   either what happened was because it wasn't filed as a

15   motion, it was perhaps overlooked by Judge Farnan, and that

16   would be understandable since it wasn't filed as a motion,

17   and a motion today would be untimely, or, alternatively,

18   it was reviewed by Judge Farnan and he determined that it

19   lacked merit.  Either way, I'm not revisiting his decision

20   and the case will remain bifurcated.

21        Finally, on the dispute as to the depositions of

22   the inventors, this is a difficult call but I'm ultimately

23   going to rely on the language that is in the parties'

24   agreement:  two seven-hour days.  There is nothing in that

25   language that says that the two days have to be consecutive

Case 1:09-cv-00008-LPS Document 643-1 Filed 12/28/12 Page 67 of 217 PageID #: 16566
Case 1:09-cv-00025-LPS Document 88 Filed 09/09/10 Page 29 of 29 PageID #: 1203

29

1    or even near one another, and I'm not persuaded that the

2    interpretation that Google puts on that language is one that

3    will unduly and unfairly burden the plaintiff.

4           There is lots of time left in discovery to allow

5    for Google's interpretation to be implemented by depositions

6    that don't happen to be right next to each other, so I'm

7    ruling for Google on that one.

8           I would like to or I am ordering that the

9    parties meet and confer as a result of my rulings today and

10   submit to me your hopefully joint proposal for what this

11   does to the scheduling order and get that to me within a

12   week of today; and then, as I say, we'll take a look at that

13   and we'll get you a Markman hearing date after that.

14          No further argument, but I want to make sure I

15   was clear in what I have ruled here.

16          Any questions, Mr. Nelson?

17          MR. NELSON:  No, your Honor.

18          THE COURT:  And Mr. Perlson?

19          MR. PERLMAN:  No further questions, your Honor.

20   Thank you.

21          THE COURT:  Okay.  Thank you, counsel.

22   Good-bye.

23          (Telephone conference ends at 10:52 a.m.)

24

25

# EXHIBIT D

1

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3                        - - -

 4   NUVASIVE, INC.,              :  CIVIL ACTION
                                  :
 5           Plaintiff,           :
                                  :
 6        v.                      :
                                  :
 7   GLOBUS MEDICAL, INC.,        :
                                  :  NO. 10-849-LPS
 8           Defendant.           :
                                     - - -
 9
                        Wilmington, Delaware
10                 Thursday, November 3, 2011
                       TELEPHONE CONFERENCE
11
                          - - -
12
     BEFORE:    HONORABLE LEONARD P. STARK, U.S.D.C.J.
13
                          - - -
14   APPEARANCES:

15
                FISH & RICHARDSON, P.C.
16              BY:  TARA D. ELLIOTT, ESQ.

17                   and

18              FISH & RICHARDSON, P.C.
                BY:  MICHAEL A. AMON, ESQ.
19                   (San Diego, California)

20                   Counsel for NuVasive Inc.

21
                POTTER, ANDERSON & CORROON, LLP
22              BY:  RICHARD L. HORWITZ, ESQ.

23                   and

24

25                              Brian P. Gaffigan
                                Registered Merit Reporter
```

2

```
 1    APPEARANCES (Continued):

 2
                  WINSTON & STRAWN, LLP
 3                BY:   SHANE A. NELSON, ESQ.
                        (Houston, Texas)
 4
                          Counsel on behalf of Globus Medical, Inc.
 5

 6

 7

 8                           - oOo -

 9                 P R O C E E D I N G S

10        (REPORTER'S NOTE:  The following telephone

11   conference was held in chambers, beginning at 1:50 p.m.)

12        THE COURT:   Good afternoon, everybody.  This is

13   Judge Stark.  Who is there, please?

14        MR. HORWITZ:  Good afternoon, your Honor.  It's

15   Rich Horwitz in Wilmington for Globus; and with me is Shane

16   Nelson from Winston & Strawn.

17        THE COURT:   Okay.

18        MS. ELLIOTT:  Good afternoon, your Honor.  This

19   is Tara Elliott with Fish & Richardson on behalf of the

20   plaintiff NuVasive; and I have with me my counsel, Michael

21   Amon from the San Diego office.

22        THE COURT:   That is everybody, correct?

23        MR. HORWITZ:  Yes, your Honor.

24        THE COURT:   All right.  I have a court reporter

25   here with me; and this is our case of NuVasive Inc. versus
```

1    Globus medical Inc., our Civil Action No. 10-849-LPS.

2             Today's call is to address the request from

3    defendant Globus to require the plaintiff to reduce the

4    number of asserted claims.

5             Having reviewed the letters, let me tell you

6    what my inclination is but certainly subject to hearing

7    whatever else you want me to think and whatever assistance I

8    can get from you on this call.

9             My inclination is to do something along the

10   lines of what is proposed by NuVasive in its letter which

11   would mean something along the lines, or what I am

12   contemplating doing is:

13            First, reducing the number of claims asserted;

14            Second, reducing the number of terms disputed

15   that we will construe in connection with the Markman

16   process, which I know is ongoing; and,

17            Also placing a limit on the number of prior art

18   references that can be asserted as a basis for invalidating

19   patents in suit.

20            So I'm inclined to do all three of those things,

21   make this case more manageable for all of you and for me,

22   and I'm interested in primarily the timing of doing all of

23   that and how extensive a reduction to impose.

24            So with that, let me turn it over to the parties

25   to tell me whatever it is you want me to hear.  We'll start

1    first with Globus as you are the moving party today.

2              MR. HORWITZ:  Your Honor, this is Rich Horwitz.

3              I'll start, and Mr. Nelson might join in given

4    the guidance that we have already heard from the Court.

5              As far as doing all three, we don't have a problem

6    with that.  We think the timing should be different for

7    certain of those elements, and we think the first thing that

8    should happen is there should be a reduction in the number of

9    claims asserted both because of the Markman process and also

10   because of the other issues that are upcoming in this case.

11             For instance, just two weeks from now, on

12   November 16, we're supposed to do our noninfringement

13   contentions.  We don't think it's appropriate for us to

14   have to do those contentions on all 55 claims that have

15   been raised by the plaintiff.

16             So we think the first step would be to reduce

17   the number of claims.  We've suggested from 55 to 15.  We

18   still stand on that suggestion.  We think that should be

19   done now or very soon so that it will streamline the process

20   for not just Markman but for the case as a whole going

21   forward.

22             I just want to emphasize that this comes up now

23   because we're kind of in the middle of the Markman process,

24   but the focus shouldn't be necessarily on Markman.  It only

25   comes up now because it was just recently when the plaintiff

5

1   expanded the asserted claims in the end of September, and
2   it just so happened that it was around the time that the
3   Markman exchange was going on, so that is why it kind of got
4   focused here.
5           So that is our position on the claims that are
6   asserted.  We think that should happen now.
7           As far as limiting the number of terms that are
8   in dispute, we're in a little bit of a difficult situation
9   here, your Honor.  We alluded to it just briefly in the
10  papers that were filed.  Frankly, I haven't seen a case like
11  this before, and I'm not going to get into a lot of details
12  about it.  But in the Markman briefs that were filed, we
13  filed a brief with our positions and the plaintiff filed a
14  brief that kind of gave the typical background of the
15  invention and some claim construction principles and
16  basically said everything should have its plain and ordinary
17  meaning, so I'm not sure what we're going to be up against
18  once they finally say anything other than that, if they ever
19  say anything other than that.
20          So we're a little bit in the dark on the claim
21  terms in dispute issue, although I will say that we were
22  able to address the terms that we felt were in dispute given
23  the page limits that the parties agreed to and your Honor
24  so ordered.  So I'm not sure that that is as big an issue
25  right now.  Mr. Nelson might want to chime in when I'm done

6

1    and say something else about that.

2              On the invalidity contentions, your Honor,

3    frankly we don't think it's appropriate to address that now.

4    They never filed an opening letter so we never filed a

5    response letter so that we could give you our full position

6    on this issue.  But I will tell you this much right now.

7              Based on my experience, the invalidity

8    contention or pieces of prior art reduction never happens

9    this early in a case.  It always happens much later in a

10   case.  Usually, it's not only after the claims have been

11   limited to some extent but it's also after a Markman

12   decision has come out so that you know what you are facing,

13   so you know what claims are at issue, and you know what the

14   construction of those claims are.

15             It would be highly prejudicial for us to be

16   limited in our invalidity contentions at this time, so we

17   would ask that that just be put off.  And,

18             We didn't put this in our papers, your Honor,

19   because we never filed a response paper, but we have been

20   following another litigation that NuVasive is in with

21   Medtronic which is out in California, and it's the exact

22   same NuVasive team and so they will be able to address this,

23   but it's my understanding that in that case, NuVasive relied

24   on hundreds of pieces of prior art to invalidate the

25   Medtronic patent, one is prior art to the NuVasive patent

7

1    in this suit.  And,

2                In that case, in June, the final invalidity

3    contentions included approximately 120 references for the

4    three patents, and 82 of those references were for the

5    retractor-related patents which is the prior art to the

6    patent in this suit.

7                As of the end of July of this year, in their 282

8    statement, they relied on 206 pieces of prior art, and the

9    trial was in September of this year, your Honor.

10               We're nowhere in that time frame now, and we

11   don't think that they should be imposed in this case.  We're

12   not aware of any case where these kind of restrictions have

13   been imposed on invalidity contentions and the number of

14   prior art references anywhere near as early as they're

15   seeking to do in this case.  So we think that should be put

16   off until long after they reduce the number of claims and

17   also long after the Court issues its Markman order, whenever

18   that will be in the future.

19               THE COURT:  Okay.  Thank you.

20               Mr. Nelson, did you want to add anything?

21               MR. NELSON:  I think Mr. Horwitz did a good job.

22   I might add something later on, but for now I'm good.

23               THE COURT:  Thank you.  Let me hear from the

24   plaintiff.

25               MR. AMON:  Your Honor, this is Mike Amon.

8

1          Starting with the issue of claim construction, as
2    we raised in our papers, in our responsive brief, the number
3    of terms that Globus has put up for claim construction is not
4    tied and there is no direct correlation to the number of
5    asserted claims.
6          In fact, your Honor, out of the 25 terms that
7    Globus has proposed for claim construction, all of them can
8    be found in just eight claims.  So there is no guarantee of
9    any kind that if you were to limit the number of asserted
10   claims at this stage, that would in any way significantly
11   reduce the Court's or the party's burden for claim construction.
12         On that same point, of all the claims asserted,
13   55 asserted claims, only four of them are independent.  My
14   point in raising that, your Honor, is that even if we were
15   to choose to go with purely independent claims in this case,
16   we would still have to prove up that the defendants meet all
17   the limitations of the independent claims; and, again, that
18   doesn't eliminate the need to construe the terms of the
19   independent claims that Globus has put forward.  So I don't
20   believe, and NuVasive doesn't believe, that there is any
21   benefits by reducing the number of asserted claims for claim
22   construction purposes.
23         With respect to reducing the number of asserted
24   claims and what NuVasive views as a corresponding burden on
25   it of reducing the number of invalidity contentions, you

1    know, I think Mr. Horwitz arguments apply equally both ways.

2         We think by limiting the number of asserted

3    claims now, that would prejudice NuVasive from the benefit

4    of additional discovery which we anticipate taking over the

5    next couple of months.  And as Globus just articulated, we

6    would very much like to have the benefit of the Court's

7    claim construction in choosing which claims to go forward

8    with.

9         But we don't think that that is absolutely

10   necessary.  Our proposal contemplates giving us the ability

11   to take additional discovery and, at a period of time 30

12   days prior to opening expert reports, to limit the number

13   of asserted claims.

14        We recognize that it will be beneficial and more

15   appropriate for Globus to limit the number of invalidity

16   prior art after we have limited or reduced the number of

17   asserted claims, and our proposal contemplates that.  So

18   with respect to timing, we think that the time for limiting

19   number of asserted claims should be at some time in the

20   future after we have had the ability to take additional fact

21   discovery that will further shape and define our case, your

22   Honor.

23             THE COURT:  Okay.  Is that it?

24             MR. NELSON:  Yes.  I don't know if you have any

25   questions for us, your Honor.

```
 1            THE COURT:  No, not as this point.

 2            Mr. Horwitz, is there anything else you want to

 3   say?

 4            MR. HORWITZ:  Yes.  Just a couple more.

 5            As I think I said before, the focus isn't just

 6   on the Markman process.  I think we're all in agreement on

 7   that in terms of the number of claims at issue.  But we

 8   still have a serious concern about the effect of this on

 9   the rest of discovery.  I mention in particular the

10   noninfringement contentions that we would have to do in two

11   weeks on the 55 claims.  And,

12            I'm not sure what they think the additional

13   discovery is going to do for them.  In fact, in looking at

14   their infringement contentions that they have given us even

15   on the newly asserted claims which they gave us at the end

16   of September, there are none of those claims where their

17   contentions are based exclusively on the recent depositions

18   and other things that they have taken.  Primarily, it was

19   all based on information that they had long ago.  And, I

20   will just give you one example.

21            The newly asserted claim 9 in the '840 patent

22   relies primarily on the same evidence of the previously

23   asserted claims on the '840 patent.  I think there were

24   eight claims before and now they've added, I don't know, it

25   looks like about 18 or 20 or 19 more claims.
```

11

```
 1              So I don't think they need any more time.  I

 2    think they may want some more time to drag things out and to

 3    keep open all of their options, but in terms of efficiency

 4    and narrowing the case and avoiding disputes, we think that

 5    the time is ripe to do that now.  And,

 6              On the invalidity side, I really didn't hear

 7    anything to rebut my comments and my understanding of when

 8    that typically happens in cases or any reason to change that

 9    kind of a process where it's much later in the case.

10              So that's all I have, your Honor.

11              THE COURT:  Okay.

12              MR. AMON:  Your Honor, if I could address a few

13    more points?

14              THE COURT:  Is this Mr. Amon?

15              MR. AMON:  Yes, it is.  I'm sorry.

16              THE COURT:  Go ahead.

17              MR. AMON:  With respect to the invalidity

18    contentions, again, it's a balancing of burdens.

19              We have provided detailed contentions and provided

20    them evidence to the documents produced and to deposition

21    testimony taken of why we believe Globus products and surgical

22    technique infringe our asserted patents.

23              It sounds like Globus is just wanting to not to

24    have to respond to an interrogatory asking them to provide

25    their noninfringement positions.  I mean I understand them
```

1    not wanting to spend resources on that, but that doesn't

2    mean that they don't have to do it.

3              We have evidence in support of our asserted

4    claims, and we think that additional discovery will provide

5    us the ability to further refine and make the proper

6    election going forward.  But, again, we think requires

7    additional time.

8              With respect to the invalidity contentions,

9    again, it's a matter of equity, your Honor.  If you look

10   at their invalidity contentions which are attached as an

11   exhibit to our responsive letter brief, you can see that

12   they have provided over 110 different combinations that are

13   uncharted.  They've just said combine A with B with C and

14   that is one combination, and they did that 110 different times.

15   In addition, they provided more than 400 backup references

16   and have reserved the right to add additional references.

17             We have no way of determining what their

18   invalidity case will look like given the lack of specificity

19   in their invalidity contentions.

20             THE COURT:  All right.  Mr. Amon, what about

21   the procedural argument that they didn't really have a fair

22   chance to respond to this since evidently it was not clear

23   that that was going to be part of what was in dispute today?

24             MR. AMON:  Your Honor, we raised that issue with

25   them during the meet and confer.  It was also part of our

1   proposal to Globus during the meet and confer process that we

2   would limit the number of asserted claims and, thereafter,

3   within a two-week time frame, we would ask that they limit

4   the number of prior art invalidity sources.  So that they were

5   caught off guard, it seems a little disingenuous to me.

6            MR. HORWITZ:  Ah.

7            THE COURT:  Hold on a second, Mr. Horwitz.

8            Mr. Amon, you propose in your letter that

9   NuVasive would reduce the number of asserted claims by

10   30 days before opening expert reports are due.  Do you have

11   that date in front of you?

12            MR. AMON:  I believe opening expert reports are

13   due February 17th, your Honor, if memory serves.

14            THE COURT:  Okay.  Thank you.

15            All right.  Mr. Horwitz, you may go ahead.

16            MR. HORWITZ:  Yes.  Your Honor, on the

17   invalidity point, a couple of points.

18            There are hundreds of prior art references that

19   are listed on the face of the patents in suit, so it's not

20   our fault that there is crowded art in this area.  They

21   realized that when they tried to get these patents.

22            No. 1.  If they've felt that they had an

23   affirmative issue that they wanted to bring to the Court on

24   the limitation of prior art references, they should have

25   filed an opening letter.  They didn't.  So it's a fact, we

1    haven't responded to that in writing.  We're doing what we

2    can on the phone today.

3              They haven't responded to the very similar

4    case that they've just gone through where they were in

5    our position where they had hundreds of references that

6    they were relying on right up until the time before trial.

7              Your Honor, if we had to limit the primary

8    number of references that we would rely on but not the

9    combinations, I'm not going to go that far because I don't

10   think that is appropriate, we could limit the number of

11   primary references in our expert reports to, say, 25

12   references.  We would be willing to do that.

13             Now, the one point that I want to flag for your

14   Honor right now, and I don't know how this I going to shake

15   out, and I know we've had these issues in other cases and

16   it might affect this, and that is we're in the middle of

17   Markman briefing now.  We're going to have the argument.

18   Mr. Amon just said the opening briefs are due in February,

19   and if we don't have a decision by then, that may affect the

20   timing.  There may be some request to see if we can extend.

21             I'm just not sure where that is going to shake

22   out when we get there but we would be willing to limit

23   around that time to, say, 25 references.

24             THE COURT:  As you sit here, Mr. Horwitz, you

25   don't have reason to doubt that February 12th or thereabouts

1    is the date for the opening expert reports?

2              MR. HORWITZ:  I can --

3              MR. AMON:  Your Honor, this is Mike Amon.  I

4    have the order open now, and I can confirm that it is

5    February 17th for opening expert reports.

6              THE COURT:  Okay.  Thank you for that.

7              So, Mr. Horwitz, you are offering at this point

8    to reduce the number of prior art references by some time,

9    I'm not sure when, before February 17th or just on

10   February 17th in your report?

11             MR. HORWITZ:  In our report.

12             THE COURT:  Okay.  Mr. Amon, do you want to

13   address that real quick?  That offer?

14             MR. AMON:  Yes, your Honor, I think that, again,

15   that doesn't properly balance the equities.  It's better

16   than not limiting them.  I will say that.  But we would

17   still urge that if we're going to be required to limit the

18   number of asserted claims prior to the filing of expert

19   reports, the same should apply to Globus limiting the number

20   of prior art sources for invalidity contentions.  And,

21             Again, it goes to the burden of having to

22   prepare expert reports and responsive positions.

23             MR. HORWITZ:  Your Honor, the last word on that.

24   This is Rich Horwitz again.

25             The burdens aren't the same, your Honor.  They

1    need to provide a reasonable number of claims that we can go

2    forward with even for our contentions before expert reports.

3    That is why we raised this issue when we did.

4              When we have our noninfringement contentions, I

5    mean, your Honor, we have our noninfringement contentions

6    due in two weeks.  They won't have to respond on invalidity

7    until they see our expert reports.  They have a pretty good

8    idea of what we're relying on from our contentions, and

9    they'll have a better idea then.  And,

10             Still, I haven't heard anything where Mr. Amon

11   has suggested that the equities that he is requesting here

12   are supported by any of the cases that either side has

13   discussed, and the typical pattern that this Court and other

14   courts have done, which is to require some narrowing of the

15   asserted claims much earlier and then, frankly, when we get

16   close to trial -- and I know we have done this with your

17   Honor before, even in the context of a pretrial conference,

18   where the parties say at that point, yes, we're going to

19   limit, we're going to "really" limit now, we're going to

20   "really" limit our number of the claims that we're going to

21   go forward on, and we're going to "really" limit our number

22   of prior art references.

23             But they're not apples and apples, they're

24   apples and oranges, so we don't think we should be held to

25   the same timetable that they should be held consistent with

1    the practice in this court and other courts.

2              THE COURT:  Okay.

3              MR. AMON:  Your Honor, this is Mike Amon.  If I

4    may, just one point.

5              THE COURT:  Go ahead.

6              MR. AMON:  I take issue with Mr. Horwitz's

7    position that we can determine where they're coming from on

8    validity given the breadth of their invalidity contentions

9    as they stand now.

10             That is the only point I want to raise.

11             THE COURT:  Okay.  Thank you.

12             Well, let me tell you what we are going to do.

13             In my view, the dispute that is clearly and

14   fully before me is simply the request by Globus that the

15   Court order a reduction in the number of asserted claims.

16   The request is that they be reduced from 55 to 15 and that

17   they be done some time before November 18th.

18             I'm going to grant in part and deny in part that

19   request.

20             I am going to require that the plaintiff

21   reduce the number of asserted claims to 15, which is five

22   per patent, although the number 15 did not need to be met by

23   five per patent.  It can be a total of 15 however allocated

24   among the patents in suit as plaintiff wishes.  And,

25             I'm not going to make the plaintiff do that in

1    the next week or two.  I am going to give them approximately

2    60 days from now to do it.  I'll give them until January

3    15th, 2012 to do it.

4           In the Court's view, this balances the party's

5    competing interests as well as the Court's interest in

6    managing this case and all of its other cases in an

7    effective and reasonable and efficient manner.

8           I recognize that this ruling requires, as a

9    consequence, that the defendant will have to provide its

10   noninfringement contentions with respect to all 55 asserted

11   claims that are currently in the case.  In the Court's view,

12   given how the case has developed and where we are now, that

13   is not inappropriate.  Therefore, that burden is on the

14   defendant and it will have to meet that burden.

15          While I recognize that the parties view it as

16   essentially coincidental that this dispute arose in the

17   middle of the ongoing Markman process, the Court is very

18   focused on the Markman process.  Having had a chance to look

19   at your case a bit in the course of preparing for today, the

20   Court is going to, and hereby does, reduce the number of

21   claim terms that are in dispute -- that is, that are not

22   in dispute but the number of disputes that the Court will

23   resolve in connection with the ongoing Markman process.

24          We will resolve no greater than 15 disputes with

25   respect to claim terms in connection with the upcoming

19

1   Markman hearing.

2           Therefore, in your upcoming answering claim

3   construction briefs, you need, and should, only address a

4   maximum of 15 disputes.  And, I'm going to direct the

5   parties to meet and confer and to agree on that list of 15

6   and advise the Court of that list of 15 no later than next

7   Wednesday.

8           Again, while I understand there may be

9   additional disputed terms beyond the 15, it's my view that

10  I am not obligated to resolve every claim dispute that the

11  parties have in connection with the Markman process.  I need

12  to resolve them all by the time I charge the jury but, of

13  course, that is a long time away, and there is no guarantee

14  whatsoever, as counsel who have practiced in front of me

15  know, there is no guarantee as to when you will get a

16  Markman ruling, and you should assume for purposes of plan

17  that you will not have a Markman ruling before your expert

18  reports are due, although you may have one but you should

19  assume you won't.

20          All else being equal, the fewer disputes we have

21  to resolve in connection with the Markman process, the more

22  efficient we can be in doing so, and that is part of what

23  motivates the ruling today with respect to the number of

24  disputes that the Court will resolve in connection with the

25  Markman.

```
 1              Finally, in terms of whether the number of prior
 2   art references are going to be reduced by court order at
 3   this time, I'm not entering any order today.  Nothing about
 4   what I am saying today constitutes an order directing the
 5   defendant to reduce the number of asserted prior art references.
 6              However, that being said, everybody recognizes,
 7   including defendant, that the number of prior art references
 8   is going to have to be reduced, just as a matter of practical-
 9   ity.  And, it's going to need to be done in a timely manner,
10   but I am not going to impose any specific schedule or number
11   at this time.
12              If the plaintiff wishes to ask the Court to
13   impose a specific reduction and a specific time frame for
14   doing that, then you are hereby authorized to file a letter
15   on that issue due one week before the Markman hearing, and
16   if such a letter comes in, the defendant is given the
17   opportunity to respond to that letter.  I'll make that
18   letter due within two days of the plaintiff's letter and
19   that issue as to the timing by which I should reduce the
20   number of asserted prior art references and the timing for
21   doing it will be addressed as part of the Markman hearing,
22   if I do get that dispute.
23              I don't want to have any more argument, but I
24   have said quite a lot and want to make sure I have been
25   sufficiently clear.
```

1               Are there any questions, Mr. Horwitz?

2               MR. HORWITZ:  Your Honor, no questions, but I

3       do still want to keep up the flag that I mentioned, that

4       because of the way plaintiff chose to file their opening

5       brief on Markman, I'm not sure whether we're going to come

6       back to you for more relief either in connection with the

7       report that we give next week or some time after their

8       responsive brief is filed so that everybody will be in a

9       position of having all the arguments in front of the Court

10      by the time we get there for the Markman hearing.

11              THE COURT:  Okay.  Duly noted.  We'll see what

12      happens on that.

13              Is there anything else, Mr. Horwitz or Mr. Nelson?

14              MR. NELSON:  No, your Honor.

15              THE COURT:  Okay.  Mr. Amon?

16              MR. AMON:  Your Honor, just one question.

17              So there is no need for us, if we are interested

18      in filing that letter, to call the Court in the future to

19      get a hearing date on moving to limit the number of prior

20      art sources?  We can just submit the letter up to one week

21      prior to the Markman hearing; correct?

22              THE COURT:  That is exactly right.  Yes.

23              Is there anything else?

24              MS. ELLIOTT:  Your Honor, this is Tara Elliott.

25      If I may ask one question of clarification?

1                THE COURT:  Yes.

2                MS. ELLIOTT:  Your Honor permitted an

3    enlargements of the number of pages for briefing.  I think

4    that request is predicated on the number of terms that were

5    submitted by Globus.  Does your Honor still wish to have

6    that size or volume of briefing or would your Honor want to

7    address that in light of your order of today?

8                THE COURT:  I appreciate you raising it, but I

9    have given you the number of pages, so if either side thinks

10   you need them, you may do so.  Obviously, just address the

11   15 terms however.

12               Is there anything else?

13               MS. ELLIOTT:  No, your Honor.  Thank you.

14               THE COURT:  All right.  Thank you all very much.

15   Good-bye.

16               (Telephone conference ends at 2:22 p.m.)

17

18        I hereby certify the foregoing is a true and accurate
     transcript from my stenographic notes in the proceeding.
19

20                              /s Brian P. Gaffigan
                              Official Court Reporter
21                              U.S. District Court

22

23

24

25

# EXHIBIT E

Case 1:09-cv-000634-LPS Document 642-5 Filed 04/22/12 Page 93 of 217 PageID #: 16592
Case 1:10-cv-00389-LPS Document 105 Filed 09/20/11 Page 1 of 37 PageID #: 1593

1

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -

     SOFTVIEW LLC,
 4                                      :    CIVIL ACTION
                 Plaintiff,             :
 5                                      :
                    v.                  :
 6                                      :
     APPLE INC., and AT&T MOBILITY LLC, :
 7                                      :    NO. 10-389 (LPS)
                 Defendants.
 8                              - - -

 9                         Wilmington, Delaware
                         Tuesday, September 6, 2011
10                         Telephone Conference

11                              - - -

12   BEFORE:       HONORABLE LEONARD P. STARK, U.S.D.C.J.

13   APPEARANCES:                - - -

14
                 BLANK ROME, LLP
15               BY:  STEVEN L. CAPONI, ESQ.

16                    and

17               IRELL & MANELLA
                 BY:  AMIR NAINI, ESQ., and
18                    SAMUEL K. LU, ESQ.
                      (Los Angeles, California)
19
                         Counsel for Plaintiff
20

21               POTTER, ANDERSON & CORROON, LLP
                 BY:  DAVID E. MOORE, ESQ.
22
                      and
23

24
                                   Brian P. Gaffigan
25                                 Registered Merit Reporter
```

Case 1:09-cv-00008-LPS Document 642-1 Filed 03/22/12 Page 94 of 217 PageID #: 16593
Case 1:10-cv-00389-LPS Document 105 Filed 09/20/11 Page 2 of 37 PageID #: 1594

2

1    APPEARANCES:  (Continued)

2

3                    GIBSON DUNN & CRUTCHER, LLC
                     BY:  JOSH A. KREVITT, ESQ.,
4                         (New York, New York)

5                         and

6                    GIBSON DUNN & CRUTCHER, LLC
                     BY:  H. MARK LYON, ESQ.,
7                         STUART M. ROSENBERG, ESQ., and
                          ALISON WATKINS, ESQ.
8                         (Palo Alto, California)

9                         Counsel for Defendants

10

11

12                          - oOo -

13                    P R O C E E D I N G S

14           (REPORTER'S NOTE:  The following telephone

15    conference was held in chambers, beginning at 3:48 p.m.)

16           THE COURT:  Good afternoon, counsel.  This is

17    Judge Stark.  Who is there, please?

18           MR. MOORE:  Good afternoon, your Honor.  On

19    behalf of the defendants, it is David Moore at Potter

20    Anderson.  With me on the line from Gibson Dunn are Josh

21    Krevitt, Mark Lyon, Stuart Rosenberg and Alison Watkins.

22           THE COURT:  Okay.  Thank you.

23           MR. CAPONI:  Good afternoon, your Honor.  It's

24    Steve Caponi from Blank Rome for the plaintiff, and with me

25    today is Amir Naini.

Case 1:09-cv-000345-PSP Document 642-5 Filed 06/22/12 Page 95 of 217 PageID #: 16594
Case 1:10-cv-00389-LPS Document 105 Filed 09/20/11 Page 3 of 37 PageID #: 1595

3

  1                    THE COURT:  All right.  And I have --

  2                    MR. NAINI:  Your Honor, Sam Lu is on the line as

  3      well.

  4                    THE COURT:  For plaintiff?

  5                    MR. NAINI:  Yes.

  6                    THE COURT:  Okay.  That's everybody, right?

  7                    (The attorneys respond, "yes, your Honor.")

  8                    THE COURT:  So I have a court reporter with me.

  9      For the record, it is our case of SoftView LLC versus Apple

 10      Inc. et al, Civil Action No. 10-389-LPS.

 11                    The purpose of this call is to discuss two

 12      disputes that have arisen between the parties:  First,

 13      with respect to certain document custodians of Apple; and,

 14      second, whether to require a reduction in the number of

 15      claim terms being asserted.

 16                    Let me take up the discovery issue about

 17      documents first.  I'll hear from both sides about that, and

 18      then we'll move on to the asserted claims issues.  The

 19      plaintiff is the complaining party on the documents, so let

 20      me hear from you first, please.

 21                    MR. NAINI:  Thank you, Your Honor.  This is Amir

 22      Naini for plaintiff SoftView.

 23                    We brought this motion because we reached an

 24      impasse with respect to the question of whether the defendant

 25      Apple will collect documents from certain software developers

Case 1:09-cv-000389-EPS  Document 642-5  Filed 04/22/12  Page 96 of 217 PageID #: 16595
Case 1:10-cv-00389-EPS  Document 105  Filed 09/20/11  Page 4 of 37 PageID #: 1596

4

1    that are employed at Apple.  To understand the dispute, I

2    first want to lay out a short summary of what our current

3    understanding is about how Apple's software is built.  This

4    will be a very high level description, but I think it will set

5    the context for why we think these custodian documents need

6    to be collected.

7           Apple software appears to be built modularly.

8    What this means is there are, for example, for any application

9    like Mobile Safari, there are going to be software components

10   that lie under it that maybe are shared across applications

11   but that perform certain functions that just about any

12   application is going to have to perform in some way.  Some

13   of the software components that we've been focused on are

14   called WebKit, Quartz and Cocoa Touch.  They are involved with

15   implementing the functions of rendering or drawing on the

16   screen, the functions of responding to Touch-It on the accused

17   devices screen, and panning and zooming; in other words,

18   manipulating the content of the display.

19          We had publicly available information at our

20   disposal when we were preparing our document request in this

21   case that were served last December.  We included the names

22   of the custodians that we had found that we felt were highly

23   likely to have relevant information.

24          When Apple disclosed the custodians that it was

25   collecting from to us in its e-discovery disclosures, they

Case 1:09-cv-00039-JPS Document 642-15 Filed 03/22/12 Page 97 of 217 PageID #:16596
Case 1:10-cv-00389-EPS Document 105 Filed 03/20/11 Page 5 of 37 PageID #:1597

5

1    admitted all but one of those individuals that we had put

2    into our RFPs.  When we started to discuss with them why

3    they had omitted the individuals that we had identified,

4    they agreed to collect from one of them, David Hyatt, which

5    we believe there shouldn't have ever been a dispute about.

6    He is a key developer of WebKit, which is the rendering or

7    drawing engine that Mobile Safari uses to draw web pages,

8    and rendering web pages is a key technical aspect of this

9    case.

10              In any event, that is no longer in dispute; and a

11    couple of other custodians that we had identified, Apple has

12    now agreed to collect from, but there are a number of

13    remaining custodians for which they have not agreed to collect

14    from.  We believe, based on our discussions, we still believe

15    that they are highly likely to have relevant documents.

16              To be clear, this motion is not about any

17    particular RFP or breadth concerns that Apple may have.  We

18    are currently discussing with them the concerns they have

19    about the breadth of any particular document request, but we

20    have reached an impasse on the basic question of whether the

21    documents from these individual custodians who appear to be

22    involved with core software components that are relevant to

23    this case, whether their documents should be searched,

24    should be collected, so that we know -- so that Apple will

25    know, through that search, whether there are documents that

Case 1:09-cv-00080-PSO Document 642-5 Filed 03/22/12 Page 98 of 217 PageID #: 16597
Case 1:10-cv-00389-EPS Document 105 Filed 09/20/11 Page 6 of 37 PageID #: 1598

6

1    need to be produced in this case or logged on a privilege log.

2            THE COURT:  So, Mr. Naini, your position is that

3    the documents should not be searched from only folks who

4    worked on Mobile Safari; correct?

5            MR. NAINI:  Right.  That approach to the

6    question of whether an individual should be a custodian is

7    going to necessarily, based on our discussions with Apple,

8    cut out what we feel are highly relevant documents about how

9    core functionality is implemented in the underlying pieces

10   of software.  So if there is core functionality in, for

11   example, Quartz, that is relevant to the patented claims but

12   the document doesn't also concern Mobile Safari explicitly,

13   that appears to be falling outside the scope of Apple's

14   collection and production in this case even if that core

15   functionality is relevant to the SoftView patent claims and

16   relevant to the functionality in Mobile Safari.

17            So, in other words, if I can try to put it more

18   simply, the general solutions to the problems that are at

19   the core of this case appear to be falling outside the scope

20   of Apple collection because they are general solutions,

21   they're not Mobile Safari specific.

22            THE COURT:  I want to understand.  You made an

23   effort it seems to make the dispute before me today narrow

24   and perhaps narrower than the dispute you actually have with

25   Apple.  That is, you just want me to decide if Apple even

Case 1:09-cv-00080-LPS Document 642-5 Filed 03/22/12 Page 99 of 217 PageID #: 16598
Case 1:10-cv-00389-LPS Document 105 Filed 09/20/11 Page 7 of 37 PageID #: 1599

7

1    has to look at documents among these seven custodians.  You

2    are not asking me to deem the different functionalities

3    relevant, and you are not asking me to determine if there

4    might be too great a burden even if they are relevant?

5              MR. NAINI:  That is correct.  The motion we

6    brought before the Court today is with respect to these

7    particular custodians.  We do believe a ruling on this motion

8    is going to aid the parties going forward on questions of

9    relevance, but we didn't consider the overarching question of

10   relevance and burden with respect to document requests as

11   opposed to collection from these particular custodians ripe

12   for this Court to decide.

13             THE COURT:  So, for instance, do you have a

14   response to what Apple writes on page 2 of their letter, at

15   the end of the last full paragraph?  They argue that to

16   produce all documents created or revised by an employee like

17   Darin Adler, who works primarily on Mobile Safari and

18   WebKit, that relates to WebKit or Mobile Safari would result

19   in producing thousands of documents that say nothing about

20   the accused technology in this case, as Apple has confirmed

21   during its review of Darin Adler's documents.

22             Are those concerns raised in that sentence just

23   things you are saying I shouldn't even think about at this

24   point?

25             MR. NAINI:  I think that they are concerns that

Case 1:09-cv-00080-bBS BDocument 642-15 Filed 12/20/11 Page 100 of 217 PageID #:10599
Case 1:10-cv-00389-LPS Document 105 Filed 09/20/11 Page 8 of 37 PageID #: 1600

8

1    one needs to think about when thinking about custodians.

2    To be clear, Darin Adler is a custodian in this case, and

3    his documents, our understanding is that they have been

4    collected, but this complaint here is about overbreadth of

5    a particular RFP.  We're currently in discussions with Apple

6    about exactly what the breadth of their document collection

7    review and production will be, but questions like whether

8    PDF viewing and the manipulation of PDF content as it is

9    implemented in core software and then reflected in PDF

10   viewing.  If that is going to be relevant, it is going to

11   answer questions about whether particular documents from

12   any particular individual like Darin Adler are going to be

13   produced because they are relevant.

14                  THE COURT:  All right.  Thank you.

15                  Let me hear from Apple, please.

16                  MR. LYON:  Thank you, your Honor.  It's Mark

17   Lyon for defendants Apple and AT&T.

18                  With respect, let me just say I think there are

19   a few misconceptions that I would like to address, if I

20   could.

21                  The first is sort of a misconception about the

22   scope of the case that we've got, from what plaintiffs are

23   characterizing it.  This technology is very focused, as I

24   believe you know, your Honor.  It is focused really on this

25   panning and zooming in a mobile context in web applications.

Case 1:09-cv-00080-LPS Document 642-15 Filed 12/02/12 Page 101 of 217 PageID #: 16600
Case 1:10-cv-00389-LPS Document 105 Filed 09/20/11 Page 9 of 37 PageID #: 1601

9

1      It's a narrow aspect.  Plaintiffs don't claim to have

2      invented browsers or mobile browsers.  They haven't even

3      invented the concept of panning and zooming at all.  It's

4      just a very specific way of doing it that allows the web

5      content to be shown more clearly.

6              So one of the things we keep hearing about is

7      core software components.  Core software components the

8      plaintiffs are talking about are things like iOS, which is

9      the operating system for the entire mobile device, which

10     incorporates functionalities that are greatly beyond what

11     we are talking about.  It is things like Safari, which

12     itself is a browser and does incorporates many of these

13     capabilities but also incorporates many other technologies.

14             So what the concern is, is a number of these

15     custodians that we're talking about have worked on aspects

16     of iOS or Safari or even WebKit, which is a web interface

17     program that works as part of the browser Safari and other

18     types of browsers but they didn't work necessarily on

19     anything that has to do with this case.

20             For example, one of the comments that Mr. Naini

21     made at the beginning of his discussion was talking about

22     that they are seeking these documents from software developers.

23     Many of these folks that they talked about, in fact, a lot

24     of them, aren't even software developers, they are evangelists.

25     These are types of people within Apple that works with

Case 1:09-cv-00080-LPS Document 642-15 Filed 12/29/12 Page 102 of 217 PageID #: 16601
Case 2:10-cv-00389-LPS Document 105 Filed 09/20/11 Page 10 of 37 PageID #: 1002

10

1     customers, they work with the engineers, they help develop

2     applications and things, but they don't actually write code.

3     They don't develop any software themselves.

4               A good example is Alan Schaffer who is a gaming

5     technology at evangelist.  He works on games and helps

6     application developers develop games but doesn't work on

7     the code that goes underneath those.

8               The same thing with when you talk to Bill

9     Dudney, who is an applications framework evangelist that

10    helps develop applications.  These are people that we have

11    talked to.

12              I think I should step back and make sure that

13    your Honor understands that we have not just looked at a few

14    people that we thought touched directly Mobile Safari as to

15    panning.  We did look at people who worked at Mobile Safari

16    in general.  We looked at people who worked on some of the

17    aspects of panning and zooming outside of Mobile Safari,

18    to the extent that it would be relevant here.  And we have

19    talked with a number of our internal people and identified

20    the people that we thought had the relevant documents or

21    would have documents that might lead to admissible evidence

22    in this case.

23              The reason why we're resisting the custodians

24    that plaintiffs are pushing is that these are people who we

25    have determined really have a very low likelihood of having

Case 1:09-cv-00290-LPS Document 642-1 Filed 12/28/12 Page 103 of 217 PageID #: 16602
Case 1:10-cv-00389-LPS Document 105 Filed 09/20/11 Page 11 of 37 PageID #: 1609

11

1    anything relevant at this point.  The two or three people

2    that plaintiffs pointed out to us after our document

3    production was substantially completed in judgment, David

4    Hyatt and others, we did take a look at and realized that,

5    yes, in fact, perhaps we had been a little too strict on

6    those, and so we did actually reproduce some documents from

7    them subsequently.  Plus, there was prior work that we had

8    done.  We also had produced a number of documents as part

9    of earlier productions; that we just went back and realized

10   we inadvertently characterized them as privileged, so we

11   produced some of those.

12        But I think the issue here is really one of

13   scope of discovery, and that's I think the focus.  Plaintiffs

14   would like to turn this into a very broad ranging fishing

15   expedition, but if we focus the discovery on the areas that

16   are likely to be relevant here, then the custodians we

17   search, which is already a dozen or so people, are the ones

18   that are most likely to have that information.  These other

19   people are not.

20        THE COURT:  But, Mr. Lyon, are you able to

21   represent that it is very unlikely that any of these seven

22   people will have in their possession or control any document

23   relating to panning or zooming?

24        MR. LYON:  I don't think I can make that broad

25   of a representation, your Honor, without having reviewed it.

Case 1:09-cv-00080-LPS Document 642-1 Filed 12/28/12 Page 104 of 217 PageID #: 16603
Case 2:10-cv-00389-LPS Document 105 Filed 09/20/11 Page 12 of 37 PageID #: 1604

12

 1    I can say that they are very unlikely to have anything that

 2    is not duplicative of what other people have had or that

 3    would be at all helpful in this case with respect to panning

 4    and zooming since these custodians are not people who work

 5    directly in that area.  They are not people who directly

 6    develop WebKit or Safari or these applications in the areas

 7    that we are talking about.  They work in other areas.

 8            They might be involved in some other applications

 9    in which panning and zooming are irrelevant, but the claims

10    that we're talking here the plaintiffs have asserted are all

11    talking about the context of a web browser.  It is taking an

12    HTML page or a web content and displaying it in a way that

13    allows you to pan and zoom but still maintain the integrity

14    of the page.

15            THE COURT:  Well, it is that last point that

16    concerns me.  Mobile Safari is the mobile browser; correct?

17            MR. LYON:  Correct.

18            THE COURT:  So let's take another one of these

19    programs or core functions.  What did you say, iOS?

20            MR. LYON:  Correct.

21            THE COURT:  That would be one?  Does that have a

22    panning and zooming capability?

23            MR. LYON:  As part of iOS itself, it does not.

24    It is the operating system under itself, so it wouldn't,

25    itself, provide the panning and zooming capabilities.

Case 1:09-cv-00080-LPS Document 642-15 Filed 12/28/12 Page 105 of 217 PageID #: 16604
Case 1:10-cv-00389-EPS Document 105 Filed 09/20/11 Page 13 of 37 PageID #: 1605

13

1      There are programs that some of these other

2   custodians work on, such as video games and other types of

3   aspects that do have the ability to zoom around or pan

4   around.

5      What you would find is -- maybe I can step

6   back and explain a little bit.  iOS consists of a number

7   of components, some of which are core graphics and core

8   animation.  Core graphics and core animation are components

9   of iOS that provide the displays, if you will, of what you

10  are seeing on the screen.  WebKit and Safari work with core

11  graphics and core animation to provide the display you are

12  seeing and provide any panning or zooming that is going on.

13      When we have done our review and identified

14  custodians and core documents, we're looking at not just

15  Safari itself, we're also looking at WebKit and core

16  graphics and core animation to find the people that are

17  working in those areas within these components that would

18  relate to panning or zooming capabilities or things that

19  would be of relevance here.  There are other parts of core

20  graphics and other parts of core animation that don't have

21  any relevance to panning and zooming that are just

22  displaying the pixels on a page, for example.

23      So that's the approach we have taken.  We have

24  not tried to be too restrictive; but at the same token, if

25  we were to open this up and say anybody who has touched core

Case 1:09-cv-00290-LPS Document 642-1 Filed 12/28/12 Page 106 of 217 PageID #:16605
Case 2:10-cv-00389-LPS Document 105 Filed 09/20/11 Page 14 of 37 PageID #:1606

14

1  graphics or anybody who has touched WebKit, it would be too

2  large a number of custodians and the volume, particularly

3  given the breadth of the request that we have received,

4  would be enormous.

5  　　　　THE COURT:  But if I ordered you to treat as

6  custodians anybody who touched zooming or panning, would

7  that include some or all of these seven people that are at

8  issue today?

9  　　　　MR. LYON:  In any application, your Honor?

10  　　　　THE COURT:  Correct.

11  　　　　MR. LYON:  I think it would -- there would be

12  some subset of these people that would be within that group.

13  Yes, I believe that is correct.

14  　　　　THE COURT:  And the plaintiff is asking me not

15  to even consider at this point burden or really even the

16  complete range of what is relevant here, I guess thinking

17  that they are going to work that out with you, depending on

18  what I rule today.  Do you have any reaction to that?

19  　　　　MR. LYON:  I think the request themselves are

20  very, very broad on their face.  I think it is going to be

21  difficult to see how we could keep this at a reasonable

22  amount of discovery.  We have already produced over half a

23  million pages, not counting all the source code for these

24  files that we produced from the existing custodian.  And if

25  we increase the number of custodians too greatly, I am

Case 1:09-cv-000804-PSP Document 642-1 Filed 12/28/12 Page 107 of 217 PageID #:16606
Case 2:10-cv-00389-EPS Document 105 Filed 09/20/11 Page 13 of 37 PageID #:1007

15

```
 1    concerned that we would be back in the ballpark of having

 2    another large production that we would have to do.

 3             THE COURT:  Okay.  Is there anything else from

 4    Apple or AT&T then?

 5             MR. LYON:  I think that is it, your Honor.

 6    Thank you.

 7             THE COURT:  Is there anything further, Mr. Naini?

 8             MR. NAINI:  Just one comment.

 9             Since Mr. Schaffer was discussed as an example,

10    and Mr. Lyon pointed out that he is what is called an

11    evangelist at Apple, I just wanted to make clear that we had

12    identified Mr. Schaffer because he had worked on graphics,

13    and he previously worked on graphics before his current

14    position as an evangelist.  And we pointed out documents in

15    our August 5th letter which is attached as an exhibit to the

16    letter to the Court where Mr. Shaffer is on e-mails that are

17    directly related to zooming and panning.

18             So, again, we did select these individual and

19    then confirm these individuals by looking at the documents

20    that Apple did produce; and we're trying to be very focused

21    in our request.

22             MR. LYON:  Your Honor, may I briefly respond to

23    that, briefly?

24             THE COURT:  Yes.

25             MR. LYON:  I just want to say that the documents
```

Case 1:09-cv-00080-LPS Document 642-1 Filed 12/28/12 Page 108 of 217 PageID #: 16607
Case 1:10-cv-00389-LPS Document 105 Filed 09/20/11 Page 16 of 37 PageID #: 1609

16

1   that we are talking about were discussions about need of

2   applications that iPhone had and were not anything to do

3   with web applications or how anything that would be accused

4   here perform panning, scaling or zooming.  It is really just

5   graphics we are talking about specific to games and various

6   other applications.

7          Beyond that, I have nothing further, your Honor.

8          THE COURT:  Okay.  Thank you.

9          Well, let me give you my ruling, and it is only

10  as clear as the dispute is.  It is an unusual dispute since

11  the plaintiff is carefully not asking me to rule on all the

12  possible objections that it seems are or will be raised by

13  Apple.

14         I am asked today only to determine if these seven

15  identified custodians need to be considered custodians from

16  whom documents may potentially have to be produced.  And on

17  that very narrow question, I agree with the plaintiff.  I

18  am not persuaded from what I have heard today that none of

19  those seven custodians need to even be asked or their files

20  don't even need to be looked at.  I am not convinced of that.

21         It seems to me that if some or all of those

22  seven in their work have touched, for lack of a better word,

23  the functionalities of panning or zooming or scaling that

24  were mentioned on the call today, then they potentially have

25  relevant discoverable documents.

Case 1:09-cv-00890-LPS Document 642-1 Filed 12/28/12 Page 109 of 217 PageID #: 16608
Case 1:10-cv-00389-LPS Document 105 Filed 09/20/11 Page 17 of 37 PageID #: 1609

17

1          I am not ruling on whether, nonetheless, it

2    would be unduly burdensome to ask those custodians to look

3    for such documents.  And I am not saying, for instance,

4    that any document relating in any way, say, to WebKit is

5    necessarily relevant to this case.

6          My ruling I think is fairly narrow.  I hope it

7    is helpful.  It is what was asked of me from plaintiff.

8    And I do hope you will be able to resolve the rest of the

9    dispute on your own.  But if not, then I am confident you

10   will be back before me sooner rather than later.

11         Let's move on to the next issue, which has to

12   do with the number of asserted claims and whether the

13   plaintiff should be made to reduce those, and, if so, on

14   what schedule.

15         This is an issue raised by the defendant, so I

16   will hear first from the defendants.

17         MR. KREVITT:  Thank you, your Honor.  This is

18   Josh Krevitt.  I will address this issue.

19         We submitted letters, of course, your Honor, so

20   I will be happy to address any specific questions your Honor

21   may have.  Maybe it would be useful if I provide just brief

22   background of how we get to where we are and why we think

23   what we are proposing makes sense.

24         What we are proposing, of course, is that the

25   plaintiff be required to limit the number of asserted claims

Case 1:09-cv-00290-LPS Document 642-1 Filed 12/28/12 Page 110 of 217 PageID #: 16609
Case 1:10-cv-00389-LPS Document 105 Filed 09/20/11 Page 18 of 37 PageID #: 1610

18

1    in this case to 10 claims, and that they be required to do

2    so by September 14th.  That is not an arbitrary date, and I

3    will explain in a moment why we are proposing that date.

4            There are two patents in this case, your Honor.

5    They are related patents.  At this time and throughout the

6    year plus that this case has been pending, the plaintiff has

7    been asserting over 350 claims.  It is virtually every

8    claim in the two patents.  I think there are 400 claims or

9    something around 400 claims and they are asserting 351.

10           In February, your Honor may recall, we had a

11   conference with the Court regarding a scheduling order for

12   this case.  At that time, the defendants proposed that there

13   be dates put into the schedule itself for the reduction of

14   the number of asserted claims, and there was some argument

15   on that issue before your Honor in February.

16           At that time, your Honor may recall, the Court

17   declined to put a specific date or a specific number for the

18   reduction of claims but made very clear -- I don't think the

19   Court could have been any clearer -- that 350 claims was way

20   too many.  In fact, that is your Honor's exact language, and

21   we quoted it in our letter.  Your Honor said that 350 claims

22   is at least an order of magnitude too many, and that pretty

23   soon the plaintiff is going to have to reduce the number of

24   asserted claims.  Certainly, we'll have to take significant

25   reduction some time before Markman.

Case 1:09-cv-00083-LPS Document 642-1 Filed 12/28/12 Page 114 of 217 PageID #: 16610
Case 1:10-cv-00389-LPS Document 105 Filed 09/20/11 Page 19 of 37 PageID #: 1611

19

1          That was back in February.

2          At this time, your Honor, we have a Markman

3    scheduled that is set to begin with the exchange of claim

4    terms and proposed constructions on October 12th.  That is

5    pursuant to a stipulation the parties submitted to the Court

6    and which the Court entered on Tuesday, August 16th.  So

7    the Markman process is set to begin soon, and we proposed

8    September 14th as the date for the reduction of asserted

9    claims because that is four weeks before the Markman process

10   is set to begin.

11         In SoftView's letter, the plaintiff's letter to

12   the Court in connection with this hearing, the issues have

13   become isolated, I think.  SoftView states that they agree

14   -- and this is right in the first paragraph of their letter

15   -- that there should be a reduction in the number of asserted

16   claims.  We disagree, and I'll get to this in a moment as to

17   what that number should be.  We propose 10, of course, and

18   SoftView proposes 60.

19         But SoftView agrees there should be a reduction

20   in the number of asserted claims and that that reduction

21   should take place three weeks before the exchange of terms

22   for construction.  As I said a moment ago, our proposal is

23   that the reduction take place four weeks before the exchange

24   of terms for construction.  So the parties are very, very

25   close on that question and, of course, would not have

Case 1:09-cv-00008-LPS Document 642-1 Filed 12/28/12 Page 112 of 217 PageID #: 16611
Case 2:10-cv-00389-LPS Document 105 Filed 09/20/11 Page 20 of 37 PageID #: 1612

20

1    burdened your Honor with this call if we were fighting about

2    one week.

3           If SoftView's proposal were adopted, rather

4    than September 14th, three weeks before the exchange of

5    proposed constructions would be September 21st.  While

6    we think September 14th is more appropriate, obviously

7    defendants would be prepared to live with September 21st,

8    which is three weeks before the exchange, as SoftView

9    proposes.

10          So the only dispute then, your Honor, is --

11   and SoftView says this also explicitly -- is the number,

12   whether it should be 60 or it should be 10 or it should be

13   some other number, and the timing.

14          The question as to the timing, let me address

15   first, briefly, should not be in dispute at all, given

16   that what I just said, that SoftView itself concedes that

17   the reduction should take place weeks before the exchange

18   of proposed constructions; and we have a date for that on

19   the calender, pursuant to a Court Order of this Court.

20          What SoftView says instead is that nobody takes

21   that date seriously.  That we all know that date is going

22   to get moved.  That, in fact, frankly, in an incredible

23   statement, SoftView says that defendants have no intention

24   of adhering to that date.

25          That is simply not true, your Honor.  I don't

Case 1:09-cv-00809-LPS Document 642-1 Filed 12/28/12 Page 113 of 217 PageID #: 16612
Case 1:10-cv-00389-LPS Document 105 Filed 09/20/11 Page 21 of 37 PageID #: 1615

21

1    know how we could have no intention of adhering to a Court

2    ordered date in any event; but in this case, we have no

3    intention of not adhering to the dates that the Court has

4    said for the claim construction process.  Those dates were

5    agreed to and submitted in a stipulation.  SoftView wanted

6    those dates to be much longer, meaning the dates to be

7    pushed out much farther.  Defendants refused and were

8    willing only to go as far as to what was submitted to your

9    Honor in the stipulation, and defendants were willing to do

10   that only in exchange for an agreement that SoftView would

11   supplement its infringement contentions.

12            So we have dates on the calender.  The first

13   one, as I said, is October 12th for the exchange of proposed

14   constructions.  Defendants will adhere to that, absent some

15   change in the schedule, of course.  And so SoftView says

16   the reduction of claims should take place three weeks before

17   that date.  That would be September 21st.  We think it

18   should be September 14th, but it is the dispute on the

19   timing.

20            Even aside from the Markman process, your Honor,

21   I just want to add one point briefly.  Virtually all of

22   SoftView's letter is devoted to timing in connection with

23   the Markman process; but even aside from the Markman

24   process, the time for the reduction of claims is now.  It

25   is a tremendous burden for defendants to have to develop

Case 1:09-cv-00008-LPS Document 642-1 Filed 12/28/12 Page 114 of 217 PageID #: 16613
Case 1:10-cv-00389-LPS Document 105 Filed 09/20/11 Page 22 of 37 PageID #: 1614

22

1   noninfringement arguments concerning hundreds of claims that

2   will never be at issue in this case; invalidity positions,

3   search for prior art, eventually chart all of the prior art,

4   again, for hundreds of claims that we all know will never be

5   at issue in this case.  It affects damages analyses as well

6   because any claims that aren't in the case will affect the

7   subject matter that would not be subject to a damages

8   calculation in assessing the value of the claims that are

9   asserted.

10          So while the parties and particularly SoftView

11  have focused on the Markman process, it is extremely pre-

12  judicial and burdensome for defendants to have to continue

13  to litigate against, as I said, hundreds of claims, many

14  hundreds of claims that everybody knows and agrees will not

15  be at issue in the case.

16          With respect to the amount of claims, we

17  proposed 10.  There are two related patents, as I said.  The

18  number 10 is consistent with or more favorable to SoftView

19  than the other cases in this District.  As Your Honor knows

20  in the Personalized User Model case that your Honor ruled on

21  in September of last year, there were 36 claims asserted

22  across three patents, and your Honor, pre-Markman, before

23  the Markman process began, ordered the plaintiff to reduce

24  the number of claims to 15.  That's, of course, five per

25  patent, and that is what we're proposing in this case,

Case 1:09-cv-00008-LPS Document 642-1 Filed 12/28/12 Page 115 of 217 PageID #: 16614
Case 1:10-cv-00389-LPS Document 105 Filed 09/20/11 Page 23 of 37 PageID #: 1615

23

1      because there are two patents.

2            Judge Farnan regularly required plaintiffs to

3      reduce the number of claims to numbers much lower than what

4      we are proposing here consistently before Markman.

5            In one case, the Fenster case which we cite, of

6      course, Judge Farnan was involved in a case in which eight

7      unrelated patents were asserted, and Judge Farnan required

8      the plaintiff to reduce the number of claims to 10 -- 10

9      claims for eight unrelated patents.  SoftView, for what its

10     worth, doesn't address the Personalized User Model case that

11     your Honor decided or the Fenster case, both of which are

12     discussed in our letter and both of which are consistent

13     with the proposal that we have for plaintiff to be required

14     to reduce the number of claims to 10.

15           The only other thing that plaintiff addresses in

16     its letter, which I will mention briefly, your Honor, and

17     then pause in case your Honor has questions at this point,

18     is with respect to the defendant's document production.

19           The date for substantial completion of documents

20     was July 20th.  In SoftView's letter, they suggest that

21     Apple and AT&T let that date pass and continued to produce

22     documents long after that date.

23           While it is true that some documents were

24     produced after that date, the reality is very different.  By

25     within a few days of July 20th, there were a few straggler

Case 1:09-cv-00290-LPS Document 642-1 Filed 12/28/12 Page 116 of 217 PageID #: 16615
Case 2:10-cv-00389-LPS Document 105 Filed 09/20/11 Page 24 of 37 PageID #: 1616

24

1    documents, but less than a week of July 20th, the date

2    for substantial completion, the defendants had produced

3    approximately 97 percent of the documents they have produced

4    in this case, and that is not including the source code that

5    had been made available more than a month earlier.  So the

6    notion that the date for substantial completion came and

7    went and defendants didn't take it seriously or that

8    SoftView didn't have and doesn't have all the material it

9    needs to make the reduction of claims is simply wrong, your

10   Honor.

11        THE COURT:  Mr. Krevitt, one thing you didn't

12   talk about but the Court often does is limit the number of

13   disputed terms to be addressed in the initial round of

14   Markman proceedings.

15        MR. KREVITT:  Yes.

16        THE COURT:  Address where that would leave your

17   request if the Court said you are about to start Markman.

18   The Court will construe no more than, let's say, 10 disputed

19   claim terms.  What, if anything, would that do to your

20   request that the number of asserted claims also be reduced

21   at this time?

22        MR. KREVITT:  Well, your Honor, while the number

23   of asserted claims obviously has an impact on the number of

24   asserted terms for construction, it does not follow that if

25   your Honor simply reduces the number of terms to construe,

Case 1:09-cv-00008-LPS Document 642-1 Filed 12/28/12 Page 117 of 217 PageID #: 16616
Case 1:10-cv-00389-LPS Document 105 Filed 09/20/11 Page 25 of 37 PageID #: 1611

25

1    it is unnecessary to reduce the number of claims for a

2    variety of reasons.

3            First, different claims use different terms.

4    There, of course, given the fact that the patents are

5    related, is some overlap in the terms, but there are many,

6    many terms that appear in some claims that do not appear in

7    other claims.  So reducing the number of terms would not

8    eliminate the number of claim construction disputes.

9            As Your Honor knows, as your Honor explicitly

10   said in our February conference, the Court is required,

11   pursuant to Federal Circuit law, at some point, certainly

12   not in an initial Markman, to construe all of the terms for

13   which there is a legitimate dispute.  So by allowing the

14   plaintiff to continue to assert so many claims, it would not

15   ultimately reduce in a meaningful way the number of disputed

16   terms that ultimately would have to be decided in this case.

17           In addition, your Honor, and this is why I

18   emphasize the fact that it is the need to reduce the asserted

19   claims and not just limited to Markman, keeping the number of

20   asserted claims high, even at 60, would require defendants to

21   develop noninfringement positions with respect to, at 60,

22   dozens and dozens of claims that will never be at issue in the

23   case and search for and develop invalidity positions also with

24   respect to dozens and dozens of claims that will not be at

25   issue.

Case 1:09-cv-00809-LPS Document 642-1 Filed 12/28/12 Page 118 of 217 PageID #: 16617
Case 1:10-cv-00389-LPS Document 105 Filed 09/20/11 Page 26 of 37 PageID #: 1610

26

1          That is why, your Honor, as a consequence, that

2     virtually every court that addresses this question does not

3     simply reduce the number of disputed terms to construe, but

4     rather requires the plaintiff to reduce the number of

5     asserted claims.

6          Just, for example, your Honor, in the <u>Broadcom</u>

7     case which both parties cite, and which I know something

8     about, having represented the defendant in the case, the

9     plaintiff in that case made exactly the argument that your

10    Honor just posited.  And Judge Selna of the Central District

11    of California rejected the argument, noting that while, of

12    course, there is some correlation, the prejudice associated

13    with having to litigate hundreds of claims is just simply

14    unfair to the defendants, particularly when everyone knows

15    that the plaintiff will, in time, reduce the number of

16    asserted claims for trial.

17         As a consequence, in the <u>Broadcom</u> case, just to

18    complete the story, there were 11 patents asserted and 200

19    claims -- just under 200 claims, and Judge Selna limited the

20    plaintiff to 20 claims across 11 patents -- 20 claims across

21    11 patents.

22         Again, your Honor, we're urging that the

23    plaintiffs be limited to 10 claims across two related

24    patents.  In the <u>Broadcom</u> case, the patents were not

25    related, or certainly not all of the patents were related.

Case 1:09-cv-00080-LPS Document 642-1 Filed 12/28/12 Page 119 of 217 PageID #: 16618
Case 1:10-cv-00389-LPS Document 105 Filed 09/20/11 Page 27 of 37 PageID #: 1619

27

1          THE COURT:  Okay.  Thank you.  Let me give some

2    time to the plaintiff here.

3          Go ahead.

4          MR. NAINI:  Your Honor, I wanted to focus on

5    responding to particular things that defendants put forth

6    because the Court has our letters and knows what the overall

7    dispute is about.  I'll focus on particular issues.

8          One is the notion of prejudice and which

9    prejudices or potential prejudices need to be taken account

10   of when deciding a question like this.

11         Of course it's burdensome.  There is burden

12   associated with litigation and with responding to assertions

13   of patent infringement.  And the more claims there are, it

14   is not disputed the more claims there are at play at any

15   particular time, the more work there is to be done at that

16   particular time to take account of them.  But there is also

17   prejudice to patentees when they get to a point in a case

18   where they need to withdraw asserted claims.  That is why it

19   is not done at the beginning of a case, and that is why the

20   timing of it is important.

21         When one reads decisions where courts are

22   addressing this question and considering both the question

23   of timing and question of the number of claims, one gets a

24   notion, I think at least I do, that the court is concerned

25   not only with dealing with manageability of the claims but

Case 1:09-cv-00898-LPS Document 642-1 Filed 12/28/12 Page 120 of 217 PageID #: 16619
Case 2:10-cv-00389-LPS Document 105 Filed 09/20/11 Page 28 of 37 PageID #: 1620

28

1      also fairness and taking into account how the parties have

2      behaved.

3              In the _Fenster_ case, there were late additions

4      to the patentee's case, late in fact discovery, things that

5      were coloring the decision there.  And in other cases, there

6      are circumstances where the parties have behaved in a way

7      that doesn't lend credence to their desire to keep claims in

8      the case.

9              For example, if they don't chart all of their

10     asserted claims with infringement charts, then one can't be

11     expected to let them keep asserting all the claims that

12     they, themselves haven't gotten around to charting at that

13     point in the case.  And a reduction maybe early in the case

14     courts consider are warranted here.

15             SoftView charted all of its claims.  It charted

16     them at the outset of fact discovery in this case.  We have

17     now, before Markman, have proposed to withdraw 82 percent of

18     our claims, to get down to 60, before the Markman process

19     even begins, so this will be months before the Markman

20     hearing and before the first exchange.  Now we are down to

21     the question of exactly what the timing will be in the

22     context of the case schedule.

23             I am sorry that Mr. Krevitt took umbrage at the

24     language in our letter, but I think he simply misinterpreted

25     it.  We were not suggesting that the defendants would violate

Case 1:09-cv-00008-LPS Document 642-15 Filed 12/28/12 Page 121 of 217 PageID #: 16620
Case 2:10-cv-00389-LPS Document 105 Filed 09/20/11 Page 29 of 37 PageID #: 1621

29

1    a court order.  What we were suggesting, based on what

2    Mr. Krevitt himself told me at meet and confers, is that

3    we expected that they would approach SoftView for another

4    stipulation and that we would submit that stipulation to the

5    Court.  They never told us that they won't do that.  That they

6    fully intend to proceed on the claim construction schedule

7    that is in force in this case; and it is why we expected that

8    they would, at some point soon, approach us about a stipulated

9    extension.

10            I asked them in a meet and confer, point blank,

11    please tell us now if your intention is to proceed on the

12    current schedule and not to talk to us about submitting a

13    joint stipulation.  And I simply didn't get a response to

14    that question, leading me to conclude that they may approach

15    us with a request for a joint stipulation.

16            So for the reasons that we discussed in the

17    letter, for the reasons of the pending motion to amend which

18    may end parties that are going to be very concerned about

19    claim construction in this case, we fully expect that that

20    claim construction schedule will change, and that is why we

21    made a proposal that would be tied to the claim construction

22    schedule the parties intended to proceed on, not -- and this

23    is separate and apart from the insinuation that we were

24    suggesting the parties would violate a court order.  We were

25    not insinuating that.

Case 1:09-cv-00008-LPS Document 642-1 Filed 12/28/12 Page 132 of 217 PageID #: 16621
Case 1:10-cv-00389-LPS Document 105 Filed 09/20/11 Page 36 of 37 PageID #: 1622

30

```
 1          So the proposal for SoftView is to reduce

 2   before Markman activities begin, but we need a commitment

 3   from defendant about what schedule is actually going to be

 4   something that the parties proceed under.  And if it is the

 5   current schedule, then that is what we need to hear.  I

 6   don't expect that that is what we will hear because of all

 7   the things that we have discussed and that are in the

 8   letters.

 9          With respect to the number of claims, it is a

10   large reduction.  It is 60 claims.  It won't be the last

11   reduction.  Ten claims is much more in line with the number

12   that one gets in a final reduction for a triable number, and

13   we're not at that stage of the case.

14          In addition to that, we have significant discovery

15   disputes.  I understand that we have a dispute over their

16   significance even.  But we consider them significant discovery

17   disputes, one of which was ruled on today, the rest of which

18   we are meeting and conferring on, and we want to bring closure

19   on quickly so we can proceed.

20          But if a September 14th or September 21st date

21   is hardwired into the calender, regardless of what happens

22   with respect to any joint stipulations to move the rest of

23   the calender, it is going to come in the midst of SoftView

24   trying to get the information that SoftView considers highly

25   relevant to its infringement contentions and other issues,
```

Case 1:09-cv-00008-LPS Document 642-1 Filed 12/28/12 Page 123 of 217 PageID #: 16622
Case 1:10-cv-00389-LPS Document 105 Filed 09/20/11 Page 31 of 37 PageID #: 1629

31

```
1    and for no benefit.  If claim construction is something that

2    is not going to happen in October, it does not make sense to

3    hardwire a date in September given the state of the case.

4                THE COURT:  Mr. Naini, is there anything you

5    want to say about whether the Court should limit the number

6    of claim terms that will be construed at the initial Markman

7    process?

8                MR. NAINI:  SoftView would be agreeable to that

9    sort of approach.  I think that it would give the parties

10   guidance in terms of how to approach the initial exchange

11   and proposed constructions and in that respect would reduce

12   the burden on everybody so we that don't exchange 100 claim

13   terms.

14               THE COURT:  Thank you.

15               Mr. Krevitt, did you have something else to add?

16               MR. KREVITT:  Just briefly, your Honor.  Then,

17   of course, we would be happy to address any questions that

18   your Honor may have.

19               With respect to limiting the number of claim

20   terms, let me address the question you just posed to

21   SoftView's counsel.

22               We, too, would be willing to consider any

23   reasonable limits on the number of claim terms to be

24   construed in an initial Markman.  It may make sense for the

25   parties to first exchange the proposed terms.  It may be
```

Case 1:09-cv-000804-PES Document 642-1 Filed 12/28/12 Page 124 of 217 PageID #: 16623
Case 2:10-cv-00389-EPS Document 105 Filed 09/20/11 Page 32 of 37 PageID #: 1624

32

1    that, I think unlikely, but that there is only a few terms

2    or sufficiently low number of terms that a limit may not be

3    necessary, but the parties can certainly address that

4    question at that time.

5            With respect to limiting the number of asserted

6    claims, obviously, the parties have viewed that separately,

7    and SoftView's counsel again conceded that they agree there

8    should be a reduction in asserted claims and that they're

9    willing to do that before the Markman process begins.

10           The only question on timing that you heard, your

11   Honor, is that the dates may move for the Markman process.

12   Your Honor, of course, obviously is free to do whatever your

13   Honor wishes to do with respect to timing issues, and it may

14   be that a motion is filed by SoftView with respect to those

15   dates or that SoftView approaches the defendants.

16           I will tell you, though, your Honor, we have a

17   Court Order for a Markman process set to begin October 12th.

18   The defendants fully intend to comply with those dates and

19   proceed with those dates.  Given that fact, and given the

20   statements in SoftView's letter, and again on this call

21   today, that they are willing to limit the number of asserted

22   claims three weeks before that date, that is, September 21st,

23   and we, as I say, we propose September 14th, obviously, that

24   is not a colossal difference between September 14th and

25   September 21st, but the reasoning that was spelled out in

Case 1:09-cv-00898-LPS Document 642-1 Filed 12/28/12 Page 125 of 217 PageID #: 16624
Case 1:10-cv-00389-LPS Document 105 Filed 09/20/11 Page 33 of 37 PageID #: 1625

33

1    their letter and that you heard about again today, that the

2    dates are going to move.

3         The defendants intend to proceed under the current

4    Markman schedule, so that reasoning for not proceeding with

5    the reduction of asserted claims, which everyone agrees has to

6    take place before Markman, from our perspective, doesn't exist.

7         And, of course, that is consistent with your

8    Honor's own statements in February when your Honor said that

9    there would be a significant reduction in the number of

10   asserted claims before Markman.  Your Honor then went on to

11   also address a number of the asserted terms but made clear

12   there would have to be a significant reduction in the number

13   of asserted claims before the Markman process.  Those issues

14   were separate.

15        And, finally, with respect to the number,

16   SoftView's counsel just said 10 is more in line with

17   reductions set for trial.  That simply is just not true.  As

18   all of the cases that I mentioned on this call and cited in

19   our letter make clear, your Honor's own decision was before

20   Markman in the Personalized User Model case, from reducing

21   to five claims per patent, exactly what we're proposing this

22   case, which I am sure will not be a surprise to your Honor,

23   is not a coincidence.

24        In the Fenster case, Judge Farnan limited the

25   plaintiffs before Markman.

Case 1:09-cv-00008-LPS Document 642-1 Filed 12/28/12 Page 126 of 217 PageID #: 16625
Case 1:10-cv-00389-LPS Document 105 Filed 09/20/11 Page 34 of 37 PageID #: 1626

34

1          In the Stamps.com case, which the Federal

2     Circuit addressed very recently, the plaintiff had asserted

3     629 claims over 11 patents; and the District Court, before

4     Markman, limited the plaintiff to 15 claims.

5          We had a typographical error incidently in our

6     letter, your Honor, for which I apologize.  We said 11

7     claims.  The real number was 15.  But it was 15 claims over

8     11 patents, a reduction from 629 claims, which the Federal

9     Circuit upheld.

10          So that is all done, all of those limitations

11    are routinely done before Markman and are done to the kinds

12    of numbers that are more favorable to a defendant than the

13    defendants are proposing in this case.

14          So for those reasons, given that everyone, the

15    Court previously, the plaintiff on this call and in their

16    letter have agreed that there should be a reduction in the

17    number of asserted claims before Markman, and that we have a

18    Markman process to begin October 14th, we would respectfully

19    request that your Honor order SoftView to limit the number

20    of asserted claims at least three weeks -- we would prefer

21    four weeks, but at least three weeks before the October 12

22    date, and that the reduction of asserted claims be to 10.

23          THE COURT:  Thank you.  This is a discretionary

24    decision and, therefore, has got to be decided on case

25    specific factors and is not always going to be precisely the

Case 1:09-cv-00080-LPS Document 642-1 Filed 12/28/12 Page 127 of 217 PageID #: 16626
Case 1:10-cv-00389-LPS Document 105 Filed 09/20/11 Page 35 of 37 PageID #: 1626

35

1   same in each case.

2          Having thought about and having heard the

3   argument and looked at the materials beforehand and really

4   considered that there are so, so many asserted claims here,

5   350, and that there has been no reduction yet, and that

6   everybody is in agreement that some time prior to Markman

7   there needs to be substantial reduction, having factored

8   all of that in, in this particular case, my ruling is that

9   the plaintiff is hereby directed to reduce the number of

10  asserted claims to no more than a total of 20 -- 20 asserted

11  claims by no later than three weeks before the start of the

12  Markman process, which I am told by both parties is currently

13  set for October 12th.  There will need to be a further

14  reduction of asserted claims some time later in the case.

15         Also, the Court is also hereby ordering that

16  the parties are limited to present at the initial Markman

17  hearing no greater than a total of 15 disputed patent claim

18  terms.  Again, as was discussed in February, the Court

19  recognizes it ultimately has an obligation some time prior

20  to charging the jury to resolve any material disputes with

21  regard to construction of claim terms and claims, but that

22  does not, in the Court's view, mean that everything needs to

23  be decided at the Markman hearing at this point in the case.

24         So the parties are limited to asking the Court

25  to construe no more than 15 disputed terms.  Of course, if

Case 1:09-cv-00290-LPS Document 642-1 Filed 12/28/12 Page 128 of 217 PageID #: 16627
Case 2:10-cv-00389-LPS Document 105 Filed 09/20/11 Page 36 of 37 PageID #: 1628

36

1    you don't need 15, that's fine.  You are not obligated to

2    ask the Court to resolve 15.

3         All of these decisions are based on the

4    scheduled as it currently exists, and I don't have before me

5    any request to modify the schedule at this time.  If I do

6    get such a request, I will consider it when I get it, but my

7    ruling, again, is to reduce the number of asserted claims to

8    no more than a total of 20.  They can be broken down between

9    the two patents in whatever way that the plaintiff wishes,

10   but no more than a total of 20 by no later than three weeks

11   prior to the start of Markman process.

12        I don't want any more argument, but let me make

13   sure I have been clear on what I have ruled on both issues

14   and make sure there are no questions at this time.

15        First, Mr. Naini.

16        MR. NAINI:  Your Honor, just as a housekeeping

17   matter and because it affects a date on the case schedule.

18   I wanted to ask if the Court can tell the parties anything

19   about when it might rule on the pending motion to amend to

20   add additional parties.

21        THE COURT:  I don't have anything to tell you

22   other than that I am aware of the motion.

23        Is there anything else, Mr. Naini?

24        MR. NAINI:  No.  Thank you, your Honor.

25        THE COURT:  Mr. Krevitt?

Case 1:09-cv-00804-PS Document 642-1 Filed 12/28/12 Page 129 of 217 PageID #:16628
Case 2:10-cv-00389-EPS Document 105 Filed 09/20/11 Page 37 of 37 PageID #:1629

37

1          MR. KREVITT:  No, your Honor.  Thank you.

2          THE COURT:  And Mr. Lyon, anything?

3          MR. LYON:  Nothing for me, your Honor.

4          THE COURT:  Thank you all very much.  Good-bye.

5          (The attorneys respond, "Thank you, your Honor.")

6          (Telephone conference ends at 4:40 p.m.)

7

8      I hereby certify the foregoing is a true and accurate
   transcript from my stenographic notes in the proceeding.

9

10

                    /s Brian P. Gaffigan
11                 Official Court Reporter
                   U. S. District Court
12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT F

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| HIGH POINT SARL,             ) | |
|                     ) | |
|            **Plaintiff,**       ) | |
|                     ) | |
| **v.**                     ) | |
|                     )      **No. 09-2269-CM-DJW** | |
|                     ) | |
| **SPRINT NEXTEL CORP., et al.,**   ) | |
|                     ) | |
|          **Defendants.**      ) | |

## <u>MEMORANDUM AND ORDER</u>

Plaintiff High Point Sarl ("plaintiff"), a Luxembourg company, filed this patent infringement action against defendants Sprint Nextel Corporation; Sprint Spectrum L.P.; SprintCom, Inc.; Sprint Communications Company L.P.; Sprint Solutions, Inc.; APC PCS, LLP; APC Realty and Equipment Company, LLC; and STC Two LLC (collectively "Sprint" or "defendant").  Plaintiff originally filed this case on December 29, 2008 in the United States District Court for the Eastern District of Virginia.  The case was transferred to this district on May 18, 2009.  Plaintiff alleges that defendants' CDMA cellular telephone networks are infringing on four patents that it holds.  Plaintiff seeks a declaratory judgment of infringement; a permanent injunction against defendants; a declaration that this is an exceptional case under 35 U.S.C. § 285 and an award of attorney's fees; actual damages not less than a reasonable royalty under 35 U.S.C. § 284; treble damages under 35 U.S.C. § 284; and interest and costs under 35 U.S.C. § 284.  (Doc. 1.)  Defendants counterclaim for a declaratory judgment of invalidity and/or non-infringement as to each of the four patents.  (Doc. 225.)  The case is before the court on Sprint's Renewed Motion to Limit The Number of Asserted Patent Claims (Doc. 370).  For the following reasons, the court grants the motion and makes other

rulings as set forth below.

## I.     Factual and Procedural Background

Plaintiff, as the assignee of the four patents at issue,[1] alleges that defendants have been and are now willfully "infringing, inducing infringement, and/or contributing to the infringement" of each of these patents by "making, using, importing, offering for sale, and/or selling in the United States wireless networks and services embodying the patented invention."  (Doc. 1, at 8–10.)

Plaintiff's original complaint asserted all 178 patent claims in these four patents.   After the exchange of initial discovery, plaintiff reduced its assertions to 125 claims, as set out in an 800-page analysis of its infringement contentions, provided to defendant in August of 2009.  (Doc. 197, at 201; Doc. 201, at 2.)

In December, 2009, defendants filed a Cross Motion to Limit Asserted Number of Patent Claims (Doc. 197), asking the court to limit plaintiff to 10 asserted patent claims, and to require plaintiff to articulate its infringement contentions with respect to those claims.

In a Memorandum and Order dated March 29, 2010, this court denied the motion without prejudice, concluding that, although the litigation was "unwieldy," such limitation would be premature where the discovery cut-off was not imminent; a general scheduling order had only recently been entered; and there had been no firm direction from the court relating to claim construction.  Notably, plaintiff anticipated that only "a limited and manageable number of claim terms [would] actually [be] in dispute and [would] require a construction"  (Doc. 240) (quoting Doc.

---

[1]  According to plaintiff's complaint, United States Patent No. 5,195,090 (the "'090 patent") contains 57 claims.  (Doc. 1-3, at 1.)  Patent No. 5,305,308 (the "'308 patent") contains 33 claims. (Doc. 1-6, at 1.)  Patent No. 5,184,347 (the "'347 patent") contains 46 claims.  (Doc. 2, at 1.)  Patent No. 5,195,091 (the "'091 patent") contains 42 claims.  (Doc. 2-3, at 1.)

201, at 6.))

In accord with the court's order, Judge Waxse entered a claim construction schedule that set deadlines for certain exchanges, disclosures, briefs, and other proceedings in addition to those already required by the federal rules, local rules, and the scheduling order previously entered in this case (Doc. 247.)

Despite the court's admonition that the parties "limit the terms they ultimately submit for construction" (Doc. 240, at 7); and despite the extensive disclosures, exchanges, and months of discovery that have occurred since the court's order, plaintiff is still asserting 117 claims. Moreover, from this court's review of plaintiff's claim construction brief, there appear to be well over sixty (60) disputed terms as to which the parties seek construction.  (Doc. 394.)

Defendant filed this renewed motion, again asking the court to limit plaintiff's assertions under the four patents to be limited to ten (10) claims.  (Doc. 371, at 4 (citing *Broadcom v. EmulezCorp.*, No. 09-CV-1058-JVS-AN, slip op. at 9 (C. D. Cal. June 30, 2010))).

Plaintiff again asserts that such a limitation would be premature (because discovery is still ongoing), and prejudicial (because it would operate as a defacto dismissal of potential claims). Plaintiff asks the court instead to, *inter alia*, reduce the number of claim terms for construction to 10, and to "enter a scheduling order . . . to assist [the parties] in narrowing the issues for disposition at *Markman* and . . . for trial."[2]  (Doc. 397, at 3.)

---

[2]  Plaintiff now proposes that the court (1) require the parties "to meet and confer with an eye towards identifying the key issues before the Court"; (2) limit the number of claim terms to 10 claim terms for construction, and if the parties cannot agree, they each pick five terms; (3) require plaintiff to provide updated infringement contentions on August 13, 2010, and defendant to provide supplemental non-infringement contentions on August 27, 2010; at which time (4) plaintiff will reduce its asserted claims to 60 claims.  Plaintiff also suggests that the court take up, at the *Markman* hearing, the status of third-party productions and pending discovery-related motions.  Plaintiff then asserts that, if productions are substantially complete, plaintiff will reduce its claims to 45, and to 25

(continued...)

## II.      Judgment Standard

The standard of judgment governing this court's review of defendant's motion is, as noted in its March 29, 2010 Memorandum and Order, one of discretion.  Ever-mindful of constitutional obligations as well as applicable statutes and rules, the court approaches the instant motion with the goal of securing the just, speedy, and inexpensive determination of this action.  Fed. R. Civ. P. 1.

## III.     Discussion

### A.      Limiting Claims, Claim Terms

This court may preemptively limit the number of claim terms that the court will construe, or the number of patent claims a plaintiff will be allowed to assert.  *See Stamps.com, Inc., v. Endicia, Inc.*, No. CV 06-7499-ODW, 2009 WL 2576371, at *3  (C.D. Cal. May 21, 2009) (in case with 600 claims at issue in eleven patents, and where plaintiff asserted 400 claims infringed, court ordered that number of "claims at trial would be limited to fifteen or so," and limited expert discovery to thirty claims); *Hearing Components, Inc. v. Shure, Inc.*, No. 9:07CV104, 2008 WL 2485426, at *1 (E. D. Tex. June 13, 2008) (ordering, *sua sponte*, the parties to limit to ten the number of claim terms to be construed, and to select three representative claims from each patent); *IP Cleaning S.p.A v. Annovi Reverberi, S.p.A*, No. 08-cv-147-bbc, 2006 WL 5925609, at *1 (W. D. Wis. Oct. 26, 2006) (ruling that, regardless of how many patents and patent claims were asserted, the court would only construe 16 claim terms);   *Fenster Family Patent Holdings, Inc., v. Siemens Med. Solutions USA, Inc.*, No. Civ. A 04-0038 JJF, 2005 WL 2304190, at *3 (D. Del. Sept. 20, 2005) (finding plaintiff's assertion of 90 claims and 49 allegedly infringing products "unreasonable"; arbitrarily limiting plaintiff to 10 claims and 5 products).

---

[2]  (...continued)
by the close of discovery.

The court agrees with defendants that this litigation is still unwieldy.  Although the court's March 29, 2010 Memorandum and Order agreed with plaintiff that such a limitation would be premature, that order along with the scheduling order subsequently entered (Doc. 247), set out "a detailed and aggressive scheduling order relating to claim construction" that was designed to assist the parties in identifying the critical issues for construction, and to narrow the scope of the litigation. (Doc. 240, at 6.)  The court declines plaintiff's invitation to repeat this process.  The deadlines set for the following have passed: (1) Defendants' disclosure of Preliminary Non-Infringement, Unenforceability, and Invalidity Contentions for 5 claims per patent (20 in all); (2) Defendants' disclosure of Preliminary Non-Infringement, Unenforceability, and Invalidity Contentions for remainder of Asserted Claims; (3) Exchange of Proposed Terms and Claim Elements for Construction; (4) Exchange of Preliminary Claim Construction with Intrinsic Evidence and Extrinsic Evidence; Joint Claim Construction and Prehearing Statement after meet and confer; (5) and Plaintiff's Claim Construction Brief.  The discovery cut-off date has recently been extended, by joint motion of the parties, from August 10, 2010, to December 17, 2010.  (Docs. 374, 380.)

Currently, all that is left for purposes of claim construction is defendants' responsive brief and plaintiff's reply.  The *Markman* hearing is set for September 22, 2010, and the parties' final contentions are due four weeks from the date of the court's order on claim construction.

The time for identifying critical issues and for narrowing the scope of the litigation, if not passed, is now.  In this case, the court believes it is appropriate, at this stage, for plaintiff to identify twenty (20) claims, from any or all of the four patents, that are representative of the claims at issue in the litigation.

For the same reasons, the court agrees with plaintiff that the number of terms should be limited to those most critical to plaintiff's claims and defendants' noninfringement counterclaims.

The parties represent that there are no terms that would be outcome determinative.  The parties are directed to identify no more than twenty (20) claim terms for the court to construe.  These will likely be terms that would be unfamiliar or confusing to a jury, or which are unclear or ambiguous in the context of the patent claim.  *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997); *Orion IP, LLC v. Staples, Inc.*, 406 F. Supp. 2d 717, 738 (E.D. Tex. 2005) ("'[A]lthough every word used in a claim has a meaning, not every word requires a construction.'"); *Grantley Patent Holdings, Ltd. v. Clear Channel Commc'ns, Inc.*, No. 9:06CV259, 2008 WL 112119, at *4 (E.D. Tex. Jan. 8, 2008).  If the parties cannot agree on twenty distinct terms to present to the court for construction, plaintiff shall identify one term, defendants shall identify two terms, plaintiff shall identify one term, defendants shall identify one term, and the parties will continue to alternate choosing terms until each party has identified ten (10) terms for the court to construe.

The goal of the *Markman* hearing is to provide guidance as to the court's construction of the most critical or often-repeated claim terms and, thus, provide a roadmap with respect to the direction any additional claim construction might take.  The court believes that the approach outlined above, including limitation of the claims at issue, will accomplish this goal.

The court's strategy for streamlining the claim construction process is different, however, from avoiding the process altogether, or from engaging in a defacto dismissal of plaintiff's asserted claims.  *Ormco Corp. v. Align Tech., Inc.*, 498 F.3d 1307, 1321 n.2 (Fed. Cir. 2007), *cert. denied*, 128 S. Ct. 2430 (2008) (O'Malley, J., concurring in part and dissenting in part).  By directing plaintiff to identify a limited number of claims, and the parties to limit the terms for construction, the court does not absolutely preclude, at this point, plaintiff from asserting any of the 97-some remaining claims or disputing terms later in the litigation.  *See Auto. Tech. Intern., Inc. v. Delphi Corp.*, No. 08-CB-11048, 2009 WL 211039, at *2 (E. D. Mich. Jan. 28, 2009) (limiting plaintiff to a

-6-

total of 26 representative claims from the five patents at issue, but rejecting defendant's argument that limitation precluded plaintiff from asserting remaining claims later in litigation).   It is the court's belief that resolution of issues regarding the representative claims, including disputed terms therein, will lead to an orderly, likely stipulated, resolution of any remaining claims.  The reason for limiting the number of claims to a select group of representative claims is to streamline the issues for the court and eventually for trial.  Plaintiff should endeavor to choose as representative claims that are believed to encompass all, or a majority, of the issues material to this litigation, *i.e.*, the representative claims selected should truly be representative and therefore assist in streamlining the viable issues for litigation.  The court will not foreclose the possibility, at this stage, that further litigation or construction may be necessary as to one or more of the remaining 97-some claims, or terms contained therein.  This may be particularly true where, as here, defendants have asserted a declaratory judgment counterclaim challenging the validity of the claims.  *See, e.g., Dayco Prod., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1371 (Fed. Cir. 2003).  However, the court will rely upon counsels' Rule 11 obligations, when the time comes, to determine whether additional litigation is necessary.

This court acknowledges the complexity of this case, both in terms of its scope and its subject matter.  The court is—for lack of a better word—disappointed that the case remains unmanageably broad in its scope, but is confident that requiring the parties to engage in the above-outlined measures will significantly assist in facilitating a determination of this action in accord with the principles of Rule 1.  Fed. R. Civ. P. 1.

The court recognizes that the orders set out above will require plaintiff to modify its *Markman* brief.  Indeed, the claim construction schedule must be modified to accommodate the orders set out herein, and to ensure the parties each have a full and fair opportunity to present their

arguments relating to claim construction.  The court directs the parties to work with Judge Waxse to accomplish this goal.  The *Markman* hearing will be continued from September 22, 2010, to January 26, 2011, at 9:00 a.m.  Additionally, the court does not anticipate addressing third-party production or pending discovery-related motions at the *Markman* hearing.  If necessary, the parties should address these issues with Judge Waxse by way of status conference or otherwise.

 **IT IS THEREFORE ORDERED** that defendants' Renewed Motion to Limit the Number of Asserted Patent Claims (Doc. 370) is granted.

 **IT IS FURTHER ORDERED** that plaintiff is directed to identify no more than twenty (20) claims, from any or all of the four patents, that are representative of the claims at issue in the litigation.

 **IT IS FURTHER ORDERED** the parties are directed to identify no more than twenty (20) claim terms for the court to construe.  If the parties cannot agree on twenty distinct terms to present to the court for construction, plaintiff shall identify one term, defendants shall identify two terms, plaintiff shall identify one term, defendants shall identify one term, and so on, alternating until each party has identified ten (10) terms for the court to construe.

 **IT IS FURTHER ORDERED** that the *Markman* hearing will be continued from September 22, 2010, to January 26, 2011, at 9:00 a.m.

 **IT IS FURTHER ORDERED** that the parties shall meet with Judge Waxse to modify the claim construction schedule as necessary in light of the court's orders herein.

 Dated this <u>18th</u> day of August, 2010, at Kansas City, Kansas.

        **s/ Carlos Murguia**
        **CARLOS MURGUIA**
        **United States District Judge**

# EXHIBIT G

US007530955B2

(12) **United States Patent** (10) Patent No.: **US 7,530,955 B2**

Diab et al. (45) **Date of Patent:** **May 12, 2009**

(54) **SIGNAL PROCESSING APPARATUS**

(75) Inventors: **Mohamed K. Diab**, Laguna Niguel, CA (US); **Esmaiel Kiani-Azarbayjany**, Laguna Niguel, CA (US); **Ibrahim M. Elfadel**, Laguna Niguel, CA (US); **Rex J. McCarthy**, Mission Viejo, CA (US); **Walter M. Weber**, Los Angeles, CA (US); **Robert A. Smith**, Corona, CA (US)

(73) Assignee: **Masimo Corporation**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1099 days.

(21) Appl. No.: **10/838,814**

(22) Filed: **May 4, 2004**

(65) **Prior Publication Data**

US 2004/0210146 A1 Oct. 21, 2004

**Related U.S. Application Data**

(60) Division of application No. 10/062,859, filed on Jan. 30, 2002, now abandoned, which is a continuation of application No. 09/195,791, filed on Nov. 17, 1998, now Pat. No. 7,328,053, which is a continuation of application No. 08/859,837, filed on May 16, 1997, now Pat. No. 6,157,850, which is a continuation of application No. 08/320,154, filed on Oct. 7, 1994, now Pat. No. 5,632,272.

(51) **Int. Cl.**
*A61B 5/024* (2006.01)
*A61B 5/1455* (2006.01)

(52) **U.S. Cl.** ...................................... **600/502**; 600/324

(58) **Field of Classification Search** ................. 600/310, 600/322, 323, 330, 336, 502, 324
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| 3,638,640 | A | 2/1972 | Shaw |
| 3,647,299 | A | 3/1972 | Lavallee |
| 3,704,706 | A | 12/1972 | Herczfeld et al. |

(Continued)

FOREIGN PATENT DOCUMENTS

DE 33 28 862 A1 2/1985

(Continued)

OTHER PUBLICATIONS

Braun, S., et al., "*Mechanical Signature Analysis—Theory and Applications,*" pp. 142-145, 202-203 (1986).

(Continued)

*Primary Examiner*—Eric F Winakur
(74) *Attorney, Agent, or Firm*—Knobbe, Martens, Olson & Bear LLP

(57) **ABSTRACT**

The present invention involves method and apparatus for analyzing measured signals that are modeled as containing primary and secondary portions. Coefficients relate the two signals according to a model defined in accordance with the present invention. In one embodiment, the present invention involves utilizing a transformation which evaluates a plurality of possible signal coefficients in order to find appropriate coefficients. Alternatively, the present invention involves using statistical functions or Fourier transform and windowing techniques to determine the coefficients relating to two measured signals. Use of this invention is described in particular detail with respect to blood oximetry measurements.

**10 Claims, 37 Drawing Sheets**



**US 7,530,955 B2**

Page 2

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,991,277 A | 11/1976 | Hirata |
| 3,998,550 A | 12/1976 | Konishi et al. |
| 4,038,536 A | 7/1977 | Feintuch |
| 4,063,551 A | 12/1977 | Sweeney |
| 4,086,915 A | 5/1978 | Kofsky et al. |
| 4,095,117 A | 6/1978 | Nagy |
| 4,157,708 A | 6/1979 | Imura |
| 4,238,746 A | 12/1980 | McCool et al. |
| 4,243,935 A | 1/1981 | McCool et al. |
| 4,266,554 A | 5/1981 | Hamaguri |
| 4,305,398 A | 12/1981 | Sawa |
| 4,407,290 A | 10/1983 | Wilber |
| 4,446,871 A | 5/1984 | Imura |
| 4,458,691 A | 7/1984 | Netravali |
| 4,519,396 A | 5/1985 | Epstein et al. |
| 4,537,200 A | 8/1985 | Widrow |
| 4,582,068 A | 4/1986 | Phillipps et al. |
| 4,586,513 A | 5/1986 | Hamaguri |
| 4,617,589 A | 10/1986 | Weckenbrock |
| 4,649,505 A | 3/1987 | Zinser, Jr. et al. |
| 4,653,498 A | 3/1987 | New, Jr. et al. |
| 4,667,680 A | 5/1987 | Ellis |
| 4,694,833 A | 9/1987 | Hamaguri |
| 4,714,341 A | 12/1987 | Hamaguri et al. |
| 4,723,294 A | 2/1988 | Taguchi |
| 4,751,931 A | 6/1988 | Briller et al. |
| 4,773,422 A | 9/1988 | Isaacson et al. |
| 4,781,200 A | 11/1988 | Baker |
| 4,793,361 A | 12/1988 | DuFault |
| 4,796,636 A | 1/1989 | Branstetter et al. |
| 4,799,486 A | 1/1989 | DuFault |
| 4,799,493 A | 1/1989 | DuFault |
| 4,800,495 A | 1/1989 | Smith |
| 4,800,885 A | 1/1989 | Johnson |
| 4,802,486 A | 2/1989 | Goodman et al. |
| 4,807,631 A | 2/1989 | Hersh et al. |
| 4,819,646 A | 4/1989 | Cheung et al. |
| 4,819,752 A | 4/1989 | Zelin |
| 4,824,242 A | 4/1989 | Frick et al. |
| 4,848,901 A | 7/1989 | Hood, Jr. |
| 4,858,199 A | 8/1989 | Griffith |
| 4,859,056 A | 8/1989 | Prosser et al. |
| 4,860,759 A | 8/1989 | Kahn et al. |
| 4,863,265 A | 9/1989 | Flower et al. |
| 4,867,571 A | 9/1989 | Frick et al. |
| 4,869,253 A | 9/1989 | Craig, Jr. et al. |
| 4,869,254 A | 9/1989 | Stone et al. |
| 4,883,353 A | 11/1989 | Hausman et al. |
| 4,883,356 A | 11/1989 | deMey, II |
| 4,892,101 A | 1/1990 | Cheung et al. |
| 4,907,594 A | 3/1990 | Muz |
| 4,911,167 A | 3/1990 | Coreman et al. |
| 4,913,150 A | 4/1990 | Cheung et al. |
| 4,927,264 A | 5/1990 | Shiga et al. |
| 4,928,692 A | 5/1990 | Goodman et al. |
| 4,934,372 A | 6/1990 | Corenman et al. |
| 4,942,877 A | 7/1990 | Sakai et al. |
| 4,948,248 A | 8/1990 | Lehman |
| 4,949,710 A | 8/1990 | Dorsett et al. |
| 4,951,680 A | 8/1990 | Kirk et al. |
| 4,955,379 A | 9/1990 | Hall |
| 4,956,867 A | 9/1990 | Zurek et al. |
| 4,960,126 A | 10/1990 | Conlon et al. |
| 4,967,571 A | 11/1990 | Sporri |
| 5,036,857 A | 8/1991 | Semmlow et al. |
| 5,040,201 A | 8/1991 | Slump |
| 5,041,187 A | 8/1991 | Hink et al. |
| 5,042,499 A | 8/1991 | Frank et al. |
| 5,054,495 A | 10/1991 | Uemura et al. |
| 5,057,695 A | 10/1991 | Hirao et al. |
| 5,243,993 A | 9/1993 | Alexander et al. |
| 5,246,002 A | 9/1993 | Prosser |
| 5,259,381 A | 11/1993 | Cheung et al. |
| 5,273,036 A | 12/1993 | Kronberg et al. |
| 5,337,744 A | 8/1994 | Branigan |
| 5,368,026 A | 11/1994 | Swedlow et al. |
| 5,379,774 A | 1/1995 | Nishimura et al. |
| 5,431,170 A | 7/1995 | Mathews |
| 5,452,717 A | 9/1995 | Branigan et al. |
| 5,458,128 A | 10/1995 | Polanyi et al. |
| RE35,122 E | 12/1995 | Corenman et al. |
| 5,482,036 A | 1/1996 | Diab et al. |
| 5,490,505 A | 2/1996 | Diab et al. |
| 5,494,032 A | 2/1996 | Robinson et al. |
| 5,632,272 A | 5/1997 | Diab et al. |
| 5,638,816 A | 6/1997 | Kiani-Azarbayjany et al. |
| 5,638,818 A | 6/1997 | Diab et al. |
| 5,645,440 A | 7/1997 | Tobler et al. |
| 5,662,105 A | 9/1997 | Tien |
| 5,685,299 A | 11/1997 | Diab et al. |
| D393,830 S | 4/1998 | Tobler et al. |
| 5,743,262 A | 4/1998 | Lepper, Jr. et al. |
| 5,758,644 A | 6/1998 | Diab et al. |
| 5,760,910 A | 6/1998 | Lepper, Jr. et al. |
| 5,769,785 A | 6/1998 | Diab et al. |
| 5,782,757 A | 7/1998 | Diab et al. |
| 5,823,950 A | 10/1998 | Diab et al. |
| 5,842,981 A | 12/1998 | Larsen et al. |
| 5,853,364 A | 12/1998 | Baker, Jr. et al. |
| 5,860,919 A | 1/1999 | Kiani-Azarbayjany et al. |
| 5,890,929 A | 4/1999 | Mills et al. |
| 5,919,134 A | 7/1999 | Diab |
| 5,934,277 A | 8/1999 | Mortz |
| 5,934,925 A | 8/1999 | Tobler et al. |
| 5,940,182 A | 8/1999 | Lepper, Jr. et al. |
| 5,995,855 A | 11/1999 | Kiani et al. |
| 5,997,343 A | 12/1999 | Mills et al. |
| 6,002,952 A | 12/1999 | Diab et al. |
| 6,011,986 A | 1/2000 | Diab et al. |
| 6,036,642 A | 3/2000 | Diab et al. |
| 6,067,462 A | 5/2000 | Diab et al. |
| 6,081,735 A | 6/2000 | Diab et al. |
| 6,083,172 A | 7/2000 | Baker, Jr. et al. |
| 6,088,607 A | 7/2000 | Diab et al. |
| 6,110,522 A | 8/2000 | Lepper, Jr. et al. |
| 6,151,516 A | 11/2000 | Kiani-Azarbayjany et al. |
| 6,152,754 A | 11/2000 | Gerhardt et al. |
| 6,157,850 A | 12/2000 | Diab et al. |
| 6,165,005 A | 12/2000 | Mills et al. |
| 6,184,521 B1 | 2/2001 | Coffin, IV et al. |
| 6,206,830 B1 | 3/2001 | Diab et al. |
| 6,229,856 B1 | 5/2001 | Diab et al. |
| 6,236,872 B1 | 5/2001 | Diab et al. |
| 6,256,523 B1 | 7/2001 | Diab et al. |
| 6,263,222 B1 | 7/2001 | Diab et al. |
| 6,278,522 B1 | 8/2001 | Lepper, Jr. et al. |
| 6,280,213 B1 | 8/2001 | Tobler et al. |
| 6,285,896 B1 | 9/2001 | Tobler et al. |
| 6,334,065 B1 | 12/2001 | Al-Ali et al. |
| 6,349,228 B1 | 2/2002 | Kiani et al. |
| 6,360,114 B1 | 3/2002 | Diab et al. |
| 6,371,921 B1 | 4/2002 | Caro et al. |
| 6,377,829 B1 | 4/2002 | Al-Ali |
| 6,388,240 B2 | 5/2002 | Schulz et al. |
| 6,397,091 B2 | 5/2002 | Diab et al. |
| 6,411,833 B1 | 6/2002 | Baker, Jr. et al. |
| 6,430,525 B1 | 8/2002 | Weber et al. |
| 6,463,311 B1 | 10/2002 | Diab |
| 6,470,199 B1 | 10/2002 | Kopotic et al. |
| 6,501,975 B2 | 12/2002 | Diab et al. |
| 6,515,273 B2 | 2/2003 | Al-Ali |
| 6,525,386 B1 | 2/2003 | Mills et al. |
| 6,526,300 B1 | 2/2003 | Kiani et al. |
| 6,541,756 B2 | 4/2003 | Schulz et al. |

**US 7,530,955 B2**

Page 3

| | | | | |
|---|---|---|---|---|
| 6,542,764 | B1 | 4/2003 | Al-Ali et al. | |
| 6,580,086 | B1 | 6/2003 | Schulz et al. | |
| 6,584,336 | B1 | 6/2003 | Ali et al. | |
| 6,597,933 | B2 | 7/2003 | Kiani et al. | |
| 6,606,511 | B1 | 8/2003 | Ali et al. | |
| 6,632,181 | B2 | 10/2003 | Flaherty et al. | |
| 6,640,116 | B2 | 10/2003 | Diab | |
| 6,643,530 | B2 | 11/2003 | Diab et al. | |
| 6,650,917 | B2 | 11/2003 | Diab et al. | |
| 6,654,624 | B2 | 11/2003 | Diab et al. | |
| 6,658,276 | B2 | 12/2003 | Kianl et al. | |
| 6,671,531 | B2 | 12/2003 | Al-Ali et al. | |
| 6,678,543 | B2 | 1/2004 | Diab et al. | |
| 6,684,090 | B2 | 1/2004 | Ali et al. | |
| 6,697,656 | B1 | 2/2004 | Al-Ali | |
| 6,697,658 | B2 | 2/2004 | Al-Ali | |
| RE38,454 | E | 3/2004 | Diab et al. | |
| 6,699,194 | B1 | 3/2004 | Diab et al. | |
| 6,714,804 | B2 | 3/2004 | Al-Ali et al. | |
| RE38,492 | E | 4/2004 | Diab et al. | |
| 6,725,075 | B2 | 4/2004 | Al-Ali | |
| 7,215,984 | B2 * | 5/2007 | Diab et al. | .................. 600/323 |
| 7,215,986 | B2 * | 5/2007 | Diab et al. | .................. 600/336 |
| 2002/0077536 | A1 | 6/2002 | Diab et al. | |
| 2002/0128544 | A1 | 9/2002 | Diab et al. | |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 102 816 | 3/1984 |
| EP | 0261 789 | 3/1988 |
| EP | 0271 340 | 6/1988 |
| EP | 0 335 357 | 3/1989 |
| EP | 0 341 327 A1 | 11/1989 |
| EP | 0 359 206 B1 | 3/1995 |
| EP | 0 760 223 A1 | 8/1995 |
| EP | 0 761 159 B1 | 8/1996 |
| GB | 2 166 326 A | 4/1986 |
| GB | 2 235 288 A | 2/1991 |
| JP | A-63-171539 | 7/1988 |
| SU | 1674798 | 9/1991 |
| WO | 92/15955 | 9/1992 |
| WO | WO 97/00041 | 1/1997 |
| WO | WO 98/42249 | 10/1998 |
| WO | WO 98/43071 | 10/1998 |

OTHER PUBLICATIONS

Brown, D.P., "*Evaluation of Pulse Oximeters Using Theoretical Models and Experimental Studies*," Master Thesis, University of Washington, (Nov. 25, 1987).

Chen, J., et al., "Adaptive System for Processing of Electrogastric Signals," *Images of the Twenty-First Centry*, vol. 11, pp. 698-699, Seattle, WA, Nov. 9-12, 1989.

Cohen, A., "*Volume I: Time and Frequency Domains Analysis*," *Biomedical Signal Processing*, CRC Press, Inc., Boca Raton, FL, pp. 152-159.

European Search Report, dated Sep. 1999.

Ferrara, E.R., "*Fetal Electrocardiogram Enhancement by Time-Sequenced Adaptive Filtering*," *IEEE Transactions on Biomedical Engineering*, vol. BME-29, No. 6, Jun. 1982.

Glover, Jr., J.R., "*Adaptive Noise Canceling of Sinussoidal Interferences*," A Dissertation Submitted to the Department of Electrical Engineering and the Committee on Graduate Studies of Stanford University in Partial Fulfillment of the Requirements for the Degree of Doctor of Philosophy, pp. iii-82 (1975).

Harris, et al., "*Digital Signal Processing with Efficient Polyphase Recursive All-Pass Filter*," International Conference, Florence, Italy, (Sep. 26, 1991).

Hendry, S.D., "*Computation of Harmonic Comb Filter Weights*," *IEEE Transactions on Signal Processing*, vol. 41, No. 4, Apr. 1993.

Jingzheng, O., et al., "*Digital Processing of High-Resolution Electrocardiograms-Detection of His Purkinje Activity From the Body Surface*," *Biomedizinische Technik*, vol. 33, No. 10, pp. 224-230, Berlin, Germany, Oct. 1, 1988.

Kilmasauska, C., "*Neural Nets and Noise Filtering*," Dr. Dobb's Journal, pp. 32, (Jan. 1989).

Li, G., "*A Stable and Efficient Adaptive Notch Filter for Direct Frequency Estimation*," *IEEE Transactions on Signal Processing*, vol. 45, No. 8, Aug. 1987.

Meinikof, S., "*Neural Networks for Signal Processing: A Case Study*," Dr. Dobb's Journal, pp. 36-37, (Jan. 1989).

Mook, G.A., et al., "*Spectrophotometric Determination of Oxygen Saturation of Blood Independent of Presence of Idocyanine Green*," *Cardiovascular Research*, vol. 13, pp. 233-237 (1979).

Mook, G.A., et al., "*Wavelength dependency of the spectrophotometric determination of blood oxygen saturation*," *Clinical Chemistry Acta*, vol. 26, pp. 170-173 (1969).

Nehorai, A., "*Adaptive Comb Filtering for Harmonic Signal Enhancement*," *IEEE Transactions on Acoustics, Speech, and Signal Processing*, vol. ASSP-34, No. 5, Oct. 1986.

Nehorai, A., "*A Minimal Parameter Adaptive Notch Filter With Constrained Poles and Zeros*," *IEE Transactions on Acoustics, Speech, and Signal Processing*, vol. ASSP-33, No. 4, Aug. 1985.

Neuman, M.R., "*Pulse Oximetry: Physical Priciples, Technical Realization and Present Limitations*," Continuous Transcutaneous Monitoring, pp. 135-144, Plenum Press, New York (1987).

Pau, L.F., "*Acoustic and Vibration Monitoring*," Failure Diagnosis and Performance Monitoring, Chapter 13, pp. 295-299.

Rabiner, L., et al., "*Theory and Application of Digital signal processing*," p. 260, (1975).

Severinghaus, M.D., J.W., "*Pulse Oximetry Uses and Limitations*," pp. 104, ADA Convention, New Orleans (1989).

Strobach, P., "*Single Section Least Squares Adaptive Notch Filter*," *IEEE Transactions on Signal Processing*, vol. 43, No. 8, Aug. 1995.

Tremper, K.K., et al., "*Pulse Oximetry: Technical Aspects of Machine Design*," Advances on Oxygen Monitoring, pp. 137-153, (1987).

Varanini, M., et al. "*A Two Channel Adaptive Filtering Approach for Recognition of the QRS Morphology*," pp. 141-144, Proceedings of the Computers in Cardiology Meeting, Venice, Institute of Electrical and Electronics Engineers, Sep. 23-26, 1991.

Widrow, B., "*Adaptive Signal Processing*," Prentice Hall, Englewood, NJ (1985).

Widrow, B., "*Adaptive Noise Canceling: Principles and Applications*," Proceedings of IEEE, vol. 63, No. 12, Dec. 1975.

Wukitsch, M.W., et al., "*Pulse Oximetry: Analysis Theory, Technology, and Practice*," Journal of Clinical Monitoring, vol. 4, No. 4, pp. 290-301 (Oct. 1988).

Yelderman, M., et al., "*Sodium Nitroprusside Infusion By Adaptive Control*," Adaptive Control by Inverse Modeling, Conference Record: 12th Asilosor Conference 90 (1978).

Yu, C., et al., "*Improvement in Arterial Oxygen Control Using Multiple Model Adaptive Control Procedures*," pp. 878-883.

United States District Court—Civil Minutes, Case No. SA CV 99-1245 AHS (Anx), *Masimo v. Mallinckrodt and Nellcor Puritan Bennett*, Dated Oct. 4, 2000.

United States Court of Appeals for the Federal Circuit—Opinion, Case No. 01-1028, -1084, *Masimo v. Mallinckrodt, Inc. and Nellcor Puritan Bennett, Inc.*, Decided Aug. 8, 2001.

Findings of Fact and Conclusion of Law Regarding Masimo's Motion for Preliminary Injunction, *Masimo v. Mallinckrodt Inc., et al.*, U.S. District Court, Central District of California (Southern Division), Civil Action No. SA-CV-99-1245 AHS (Anx), filed Nov. 2, 2000 (REDACTED).

Nellcor's and Mallinckrodt's Amended and Supplemental Answer and Counterclaims to Masimo Corporation's First Amended Complaint in Case No. CV-01-7293-MRP (AJWx).

Non-Confidential Reply Brief of Defendants-Cross Appellants Mallinckrodt Inc. and Nellcor Puritan Bennett, Inc. dated Feb. 22, 2001.

Nellcor's and Mallinckrodt's Reply Claim Construction Brief on the Patents-In-Suit dated Oct. 18, 2002.

Nellcor's and Mallinckrodt's Opening Claim Construction Brief on the Patents-In-Suit dated Sep. 16, 2002.

Non-Confidential Brief of Defendants-Cross Appellants Mallinckrodt Inc. and Nellcor Puritan Bennett, Inc. dated Jan. 22, 2001.

Non-Confidential Brief of Plaintiff-Appellant Masimo Corporation dated Dec. 8, 2000.

Non-Confidential Reply Brief of Plaintiff-Appellant Masimo Corporation dated Feb. 6, 2001.

Memorandum of Decision and Order Re: Claim Construction; Motion to Strike Masimo's Declarations dated Feb. 27, 2003.

Copending U.S. Appl. No. 09/195,791, filed Nov. 17, 1998, and pending claims.

Copending U.S. Appl. No. 10/005,631, filed Dec. 4, 2001, and pending claims.

U.S. District Court, Central District of California (Western Division—Los Angeles) Civil Docket for Case #: 2:00-cv-06506-MRP-AJW.

U.S. District Court, Central District of California (Western Division—Los Angeles) Civil Docket for Case #: 2:01-cv-07292-MRP-AJW.

U.S. District Court, Central District of California (Western Division—Los Angeles) Civil Docket for Case #: 2:01-cv-07293-MRP-AJW.

Complaint for Patent Infringement of U.S. Patent Nos. 6,206,830 B1 and 6,157,850; Demand for Jury Trial, dated Jul. 6, 2001.

Nellcor's and Mallinckrodt's Amended and Supplemental Answer and Counterclaims to Masimo Corporation's First Amended Complaint in Case No. CV-01-7292 MRP (AJWx), dated May 31, 2002.

Masimo's Reply to Nellcor's and Mallinckrodt's Amended and Supplemental Answer and Counterclaims to Masimo's First Amended Complaint in Case No. CV-01-7292 MRP (AJWx), dated Aug. 27, 2002.

Complaint for Patent Infringement of U.S. Patent Nos. 4,653,498, 5,078,136 and Re. 36,000, dated Nov. 17, 1999.

Defendant Masimo Corp.'s Answer and Counterclaims, dated Dec. 8, 1999.

Mallinckrodt's and Nellcor's Reply to Counterclaims of Masimo; Demand for Jury Trial, dated Dec. 28, 1999.

Mallinckrodt's and Nellcor's Amendment Complaint for Patent Infringement of U.S. Patent Nos. 4,653,498, 5,078,136, Re. 35,122 and Re. 36,000; Demand for Jury Trial, dated Jan. 24, 2000.

Defendant Masimo Corp.'s Amended Answer and Counterclaims, dated Feb. 7, 2000.

Nellcor's Reply to Amended Counterclaims of Masimo Corporation, dated Feb. 22, 2000.

Mallinckrodt's and Nellcor's Second Amended Complaint for Patent Infringement of U.S. Patent Nos. 4,621,643, 4,653,498, 4,700,708, 5,078,247, Re. 35,122 and Re. 36,000; Demand for Jury Trial, dated Oct. 13, 2000.

Masimo Corp.'s Answer to Plaintiffs' Second Amended Complaint and Counterclaims; Demand for Jury Trial, dated Nov. 2, 2000.

Mallinckrodt Inc.'s and Nellcor Puritan Bennett, Inc.'s Reply to Counterclaims of Masimo Corporation; Demand for Jury Trial, dated Dec. 1, 2000.

Nellcor's and Mallinckrodt's First Amended and Supplemental Reply and Counterclaims to Counterclaims of Masimo Corporation, dated May 31, 2002.

Masimo's Reply to Nellcor's and Mallinckrodt's First Amended and Supplemental Reply and Counterclaims to Counterclaims of Masimo, dated Aug. 27, 2002.

Nellcor's Third Amended Complaint for Patent Infringement of U.S. Patent Nos. 4,621,643, 4,653,498, 4,700,708, 5,078,136, 5,807,247 and Re. 36,000; Demand for Jury Trial, dated Jul. 31, 2002.

Masimo's Answer to Counterclaims to Nellcor's Third Amended Complaint for Patent Infringement; Demand for Jury Trial, dated Aug. 27, 2002.

Complaint for Patent Infringement of U.S. Patent No. 5,490,505; Demand for Jury Trial, dated Oct. 8, 1999, entered Oct. 15, 1999.

Mallinckrodt's and Nellcor's Answer and Counterclaims, dated Nov. 1, 1999.

Plaintiff's Masimo Corp.'s Reply to Defendants' Counterclaims, dated Nov. 22, 1999.

Amended Complaint for Patent Infringement of U.S. Patent Nos. 5,490,505 and 6,036,642; Demand for Jury Trial, dated Apr. 5, 2000, entered Apr. 18, 2000.

Answer to First Amended Complaint and Amended Counterclaim; Demand for Jury Trial, dated May 1, 2000.

Plaintiff Masimo Corp.'s Reply to Defendants' First Amended Counterclaims; Demand for Jury Trial, dated May 18, 2000.

Nellcor's and Mallinckrodt's Amended and Supplemental Answer to Counterclaims to Masimo Corporation's First Amended Complaint in Case No. CV-01-7293-MRP (AJWx), dated May 31, 2002.

Masimo's Reply to Nellcor's and Mallinckrodt's Amended and Supplemental Answer and Counterclaims to Masimo's First Amended Complaint in Case No. -01-7293 MRP (AJWx), dated Aug. 27, 2002.

Memorandum of Decision re: Mallinckrodt and Nellcor's Motion for Summary Judgement of Invalidity of Claim 19 of U.S. Patent No. 5,490,505.

Defendant's Mallinckrodt's and Nellcor's Statement of Uncontroverted Facts and Conclusions of Law.

Judgement in Masimo Corp. v. Mallinckrodt Inc., Court of Appeals for the Federal Circuit No. 01-1038, dated Aug. 8, 2001, entered Oct. 17, 2001.

Final Judgment, entered Aug. 6, 2004.

Memorandum of Decision and Order Re: Post-Trial Motions, dated Jul. 12, 2004, entered Jul. 14, 2004.

Memorandum and Points and Authorities in Support of Mallinckrodt's and Nellcor's Motion for Summary Judgment of Invalidity of Claim 19 of U.S. Patent No. 5,490,505, dated Aug. 30, 2000.

Masimo's Opposition to Defendants' Motion for Summary Judgment for Summary Judgment of Invalidity of Claim 19 of U.S. Patent No. 5,490,505, dated Sep. 21, 2000.

Reply Memorandum and Points and Authorities in Support of Mallinckrodt's and Nellcor's Motion for Summary Judgment of Invalidity of U.S. Patent No. 5,490,505, dated Oct. 13, 2000.

Brief of Plaintiff-Appellant Masimo Corporation, dated Dec. 8, 2000.

Non-Confidential Brief of Defendants-Cross Appellants Mallinckrodt inc and Nellcor Puritan Bennett, Inc., dated Jan. 22, 2001.

Masimo Corp's Initial Claim Construction on Its Asserted Patents, dated Jun. 21, 2002.

Declaration of Jack Goldberg in Support of Masimo Corp.'s Initial Claim Construction on Its Asserted Patents, dated Jun. 21, 2002.

Notice of Errata and Corrected Appendices for Mallinckrodt's and Nellcor's Statement Regarding Disputed Claim Terms of the Asserted Patents, dated Sep. 12, 2002 (Final Version).

Expert Declaration of Robert T. Stone Re: Masimo's Patent-In-Suit, dated Jul. 18, 2002.

Masimo Corp.'s Opening Memorandum of Claim Construction, dated Sep. 16, 2002.

Masimo Corp.'s Memorandum on Claim Construction, dated Oct. 18, 2002.

Nellcor's Trial Brief on Indefiniteness, dated Mar. 23, 2004.

Masimo's Trial Brief of Indefiniteness, dated Mar. 24, 2004.

Nellcor's Trial Brief re Inequitable Conduct, dated Mar. 23, 2004.

Masimo's Trial Brief regarding Inequitable Conduct, dated Mar. 24, 2004.

Nellcor's Memorandum of Points and Authorities in Support of: (1) Argument on Bench Trial and (2) Renewed Motion for Judgment as a Matter of Law or Alternatively, a New Trial.

Masimo's Memorndum of Points and Authorities in Opposition to Nellcor's (1) Argument on Bench Trial and (2) Renewed Motion for Judgment as a Matter of Law or for a New Trial.

Memorandum of Points and Authorities in Support of Masimo's Motion for (1) Judgment as a Matter of Law that Nellcor Literally Infringes Claim 17 of the '850 Patent and Claims 16 and 23 of the '222 Patent; (2) A Permanent Injunction; (3) An Accounting for Infringing Sales Occuring in 2004; and (4) Prejudgment Interest.

Nellcor's Opposition to Masimo's Motion for Judgment as a Matter of Law and Other Post-Trial Issues.

Brief of Defendant-Appellant Masimo Corporation.

Confidential Brief of Plaintiffs-Cross Appellants Mallinckrodt, inc. and Nellcor Puritan Bennett, Inc.

Letter to Mr. Hornbaly, Clerk of Fed. Cir., indicating that the parties agreed that the Confidential Brief (Ref. No. 106) do not need to remain confidential.

Reply Brief of Defendant-Appellant Masimo Corporation.

## US 7,530,955 B2

Page 5

Reply Brief of Plaintiffs-Cross Appellants Mallinckrodt, Inc. and Nellcor Puritan Bennett, Inc.

Nellcor's Response to Masimo's First Set of Interrogatories in the Consolidated Case to Mallinckrodt Inc. and Nellcor Puritan Bennett, Inc. (Nos. 1-8), dated Aug. 23, 2002.

Nellcor's Supplemental Response to Masimo's First Set of Interrogatories in the Consolidated Case (No. 2), dated Jun. 24, 2003.

Nellcor's Revised and Corrected Supplemental Response to Masimo's First Set of Interrogatories in the Consolidated Case (No. 2), dated Jun. 25, 2003.

Service Manual: Nellcor -100 Pulse Oximeter, 5 button model, Copyright 1993.

J. Corenman Computation Notebook, marked Jun. 23, 1982-Jun. 22, 1983.

N-100 Source Code, Copyright 1983-86.

N-100, Source Code, Copyright 1976-87.

"Welcome to the World of Nellcor Pulse Oximetry," Nellcor brochure, in 16 pages, undated.

"Oximax, Sensor Conversion Step," Nellcor brochure, copyright 1997.

"Motion-tolerant SpO₂," Philips brochure, undated.

"Introducing New Hand-Held Digital Pulse Oximeter and Sensor with Patented Technologies," Philips, printed from internet site "http://www.oximetersonline.com", 1 page.

"Novametrix Announces FDA Clearance of New Pulse Oximeter," Mar. 2, 2000 Press release in 2 pages.

"Detax-Ohmeda Announces New Products at the American Society of Anesthesiologist, New Orleans," downloaded from internet in 3 pages.

"OSI Systems Announces FDA 510k Approval of First All Digital Pulse Oximeter Monitor," showing date of Apr. 23, 2001 in 2 pages.

Alaris Medical Systems, "Summary of Safety and Effectiveness" in 3 pages.

Letter to Alaris Medical Systems from Dept. of Health & Human Services, showing date of Sep. 11, 2002 in 3 pages.

BCI 510(k) FDA Submission 2000-2002.

Datex-Ohmeda 510(k) FDA Submission 2000-2002.

Dolphin 510(k) FDA Submission 2002.

Fukuda Denshi 510(k) FDA Submissions 2001.

Nellcor Puritan Bennett 510(k) FDA Submission 1999-2002.

Nonin Medical 510(k) FDA Submission 2000.

OSI Medical 510(k) FDA Submission 2001.

Siemens Medical 510(k) FDA Submissions 2002.

SIMS BCI, Inc. 510(k) FDA Submissions 2001.

"Nellcor's Next Great Move Undated, Pulse Oximetry with ECG Synchronization . . . for Reduced Artifact," undated.

Operator's Manual, Nellcor N-200 Pulse Oximeter, Copyright 1987.

C. Baker; "Design Summary and Evaluation of Saturation Arbitrator," undated.

C. Baker & T. Yorkey, "Two Wavelength Saturation Algorithms," dated Sep. 14, 1994.

N-200 Oximeter Summary Sheets, Design History Records, dated Jul. 1987-Oct. 1987.

PcSat Source Code.

Directory listing and source code for Decsub, dated 1991-92.

Nellcor engineering order #1104 re N-100 C/D program assy, listing a date of Mar. 3, 1986.

Arye Nehorai, "A Minimal Parameter Adaptive Notch Filter With Constrained Poles and Zeros," IEEE Transactions on Acoustics, Speech and Signal Processing, vol. ASSP-22 No. 4, Aug. 1985.

Nehorai, Arye, "Adaptive Comb Filtering for Harmonic Signal Enhancement," IEEE Transaction of Acoustics, Speech and Signal Processing, Oct. 1986.

Hendry, S.D., "Computation of Harmonic Comb Filter Weights," IEEE Transactions on Signal Processing, Apr. 1993.

C. Baker & T. Yorkey, "O4 Summary" Nellcor, listing a date of Aug. 5, 1994.

M. Jopling, P. Mannheimer & D. Bebout; "Issues In The Laboratory Evaluation Of Pulse Oximeter Performance"; Anesthesia & Analgesia, vol. 94, Copyright 2001.

Nellcor Engineering Order, listing date of Mar. 15, 1989.

Nellcor's Sales & Shipment Records Mar. 1989 to Mar. 1990.

C. Baker and T. Yorkey, "O4 Two Wavelength Saturation Algorithms," listing date of Sep. 14, 1994.

Declaration of Clark R. Baker, dated Aug. 15, 2000.

Declaration of Thomas J. Yorkey, dated Aug. 20, 2000.

P. Mannheimer and D. Bebout, "A Critical Review of Motion in Pulse Oximetry," undated.

Tobin, Pologe and Batchelder, "A Characterization of Motion Affecting Pulse Oximetry in 350 Patients," Anesthesia & Analgesia, vol. 94, Copyright 2001.

R. Brown and P. Hwang, "Introduction to Random Signals and Applied Kalman Filtering," 2nd Ed., John Wiley & Sons, Inc., New York, Copyright 1992.

IEEE 100, "The Authoritative Dictionary of IEEE Standards Terms," 7th ed., IEEE Press Publications, Copyright 2000.

Haykin, S., "Adaptive Filter Theory," 1st ed., Prentice-Hall, Inc., 1986.

Haykin, S., "Adaptive Filter Theory," 2d ed., Prentice-Hall, Inc., 1991.

Clark R. Baker and Thomas J. Yorkey, "Calculation of Pulse Rate in Pulse Oximetry," dated Oct. 4, 1993.

Clark R. Baker and Thomas J. Yorkey, "A Proposal for PostProcessing and Display for O4 Saturation and Pulse-Rate Algorithms," dated Oct. 4, 1993.

Description of PCSat; dated Oct. 16, 1991.

Corresponding Source Code.

Pulse Oximetry The Next Generation, dated Dec. 7, 1992.

Flewelling, Ross, "Oximetry Technology: Strategies for New Development," listing date of Feb. 1995.

"Safety Monitoring in the Regular Inpatient Care Area—National Sales Meeting," listing date of 1992.

Swedlow, "Pulse Oximetry," undated.

Five Generations of Nellcor Oximetry, undated.

Letter from T. Ulatowski (FDA) to G. To (Nellcor Puritan Bennett, Inc.) with Nellcor 510(k) enclosures, dated Sep. 24, 2002.

"Technology Development Projects," Dec. 1991.

Next Generation Oximeter Handwritten notes.

Yorkey, T., "Signal Processing Technology Development Projects—Fall 92," listing date of Nov. 5, 1992.

Yorky, T., "Multiple Time Samples in Pulse Oximetry," listing date of Oct. 14, 1992.

"Potential Areas for New Technology Development—Nellcor—1992," listing date of Sep. 1, 1992.

Source Code.

Carleton, Penny M., et al. Assessment of Effectiveness of Flexible Monitoring System for Non-ICU Transitional Patients, 1998.

M. Jopling, P. Mannheimer & D. Bebout, "Issues in the Laboratory Evaluation of Pulse Oximeter Performance," STA-ISLAPO Meeting Supplement, pp. S62-S68, Copyright 2001.

N-595 Combined motion and low perfusion study, undated.

Saturation Arcana.

Memo from C. Baker to T. Yorkey re: "Pulse Oximetry Next Generation (PONG)," dated Dec. 7, 1992.

T. Yorkey Computation Book, listing dates of Mar. 12, 1993-Nov. 5, 1994.

Sayed et al., "A State-Space Approach To Adaptive RLS Filtering," IEEE Signal Processing Magazine, Jul. 1994.

Nellcor brochure for N-395 Pulse Oximeter with Oxismart XL and SatSeconds, undated.

N-395 Pulse Oximeter Brochure, undated.

OxiMax N595 Pulse Oximeter Service Manual, undated.

O4 Software 1994 Technology Devel. Dept., listing date of Oct. 4, 1994.

Barker S, "Motion Resistant Pulse Oximetry: Comparison of New and Old Models," Anesthesia and Analgesia, 2002; 95: 967-972.

Barker SJ, Shah NK, "The Effects of Motion on the Performance of Pulse Oximeters in Volunteers," Anesthesiology, 1997; 86(1): 101-108.

OEM 601 Module-Dolphin ONE Products, undated.

Dolphin Medical Integration Manual, OEM-601 Module, listing date of Dec. 16, 2002.

Datex—Ohmeda News Flash—TruTrak+ technology provides improved SpO2 readings during clinical patient motion, dated Oct. 16, 2002.

## US 7,530,955 B2

Page 6

Novametrix Pulse Oximetry Program; Presented to Sisters of St. Joseph of Orange, undated.
"Motion-tolerant SpO2 with maximum choice," Philips, undated.
"Probe," Agilent Technologies, Winter 2001.
"CMS 2002 Acute Care Patient Monitoring System," Philips, undated.
Viridia CMS 2000 Product Information, Agilent, New SpO2 Algorithm, undated.
Richard G. Aseltine, Jr., Siegfried Kaestle, Ph.D. and Rolf Neumann, "New Motion Resistant SpO2-Algorithm by Frequency Domain Signal Analysis," Agilent Technologies, undated.
510(k) Notification; Infinity MicrO2 + Pulse Oximeter, dated Jul. 23, 2002.
Tremper KK, Barker SJ., "Pulse Oximetry," Anesthesiology 1989:70:98-108.
Baker and Yorkey, Nellcor O4 Algorithm Summary, undated.
Letter to FDA re 510(k) N-200 Labeling Modification, dated Sep. 23, 2002.
Baker, 04 Software Technology Development Department, listing date of 1994.
IEEE Transactions on Acoustics, Speech, and Signal Processing, dated Apr. 1983.
Alan S. Willsky, "Digital Signal Processing and Control and Estimation Theory: Points of Tangency, Areas of Intersection, and Parallel," dated 1979.
Nellcor Requirements, Marketing Product, MP 404, listing date of Aug. 22, 1995.
Flexible Monitoring Clinical Environment, listing date of 1992.
Trial Transcript in *Masimo Corporation* v. *Mallinckrodt, Inc., et al*, CV 99-1245-AHS, Sep. 25, 2000 (pp. 1-50).
Trial Transcript in *Mallinckrodt, Inc., et al* v. *Masimo Corporation*, CV 00-6506 MRP, Feb. 18, 2004 (pp. 1-111).
Trial Transcript in *Mallinckrodt, Inc., et al* v. *Masimo Corporation*, CV 00-6506 MRP, Feb. 19, 2004 (pp. 112-235).
Trial Transcript in *Mallinckrodt, Inc., et al* v. *Masimo Corporation*, CV 00-6506 MRP, Feb. 20, 2004 (pp. 237-320).
Trial Transcript in *Mallinckrodt, Inc., et al* v. *Masimo Corporation*, CV 00-6506 MRP, Feb. 23, 2004 (pp. 427-625).
Trial Transcript in *Mallinckrodt, Inc., et al* v. *Masimo Corporation*, CV 00-6506 MRP, Feb. 24, 2004 (pp. 626-806).
Trial Transcript in *Mallinckrodt, Inc., et al* v. *Masimo Corporation*, CV 00-6506 MRP, Feb. 25, 2004 (pp. 807-902).
Trial Transcript in *Mallinckrodt, Inc., et al* v. *Masimo Corporation*, CV 00-6506 MRP, Feb. 26, 2004 (pp. 943-1128).
Trial Transcript in *Mallinckrodt, Inc., et al* v. *Masimo Corporation*, CV 00-6506 MRP, Feb. 27, 2004 (pp. 1214-1281).
Trial Transcript in *Mallinckrodt, Inc., et al* v. *Masimo Corporation*, CV 00-6506 MRP, Mar. 1, 2004 (pp. 1282-1469).
Trial Transcript in *Mallinckrodt, Inc., et al* v. *Masimo Corporation*, CV 00-6506 MRP, Mar. 2, 2004 (pp. 1470-1617).
Trial Transcript in *Mallinckrodt, Inc., et al* v. *Masimo Corporation*, CV 00-6506 MRP, Mar. 3, 2004 (pp. 1618-1795).
Trial Transcript in *Mallinckrodt, Inc., et al* v. *Masimo Corporation*, CV 00-6506 MRP, Mar. 4, 2004 (pp. 1796-1986).
Trial Transcript in *Mallinckrodt, Inc., et al* v. *Masimo Corporation*, CV 00-6506 MRP, Mar. 5, 2004 (pp. 1987-2145).
Trial Transcript in *Mallinckrodt, Inc., et al* v. *Masimo Corporation*, CV 00-6506 MRP, Mar. 8, 2004 (pp. 2146-2346).
Trial Transcript in *Mallinckrodt, Inc., et al* v. *Masimo Corporation*, CV 00-6506 MRP, Mar. 9, 2004 (pp. 2347-2528).
Trial Transcript in *Mallinckrodt, Inc., et al* v. *Masimo Corporation*, CV 00-6506 MRP, Mar. 10, 2004 (pp. 2529-2663).
Trial Transcript in *Mallinckrodt, Inc., et al* v. *Masimo Corporation*, CV 00-6506 MRP, Mar. 11, 2004 (pp. 2664-2801).
Trial Transcript in *Mallinckrodt, Inc., et al* v. *Masimo Corporation*, CV 00-6506 MRP, Mar. 15, 2004 (pp. 2802-2860).
Trial Transcript in *Mallinckrodt, Inc., et al* v. *Masimo Corporation*, CV 00-6506 MRP, Mar. 16, 2004 (pp. 2861-3036).
Trial Transcript in *Mallinckrodt, Inc., et al* v. *Masimo Corporation*, CV 00-6506 MRP, Mar. 17, 2004 (pp. 3037-3244).
Trial Transcript in *Mallinckrodt, Inc., et al* v. *Masimo Corporation*, CV 00-6506 MRP, Mar. 18, 2004 (pp. 3245-3416).

Trial Transcript in *Mallinckrodt, Inc., et al* v. *Masimo Corporation*, CV 00-6506 MRP, Mar. 19, 2004 (pp. 3417-3515).
Trial Transcript in *Mallinckrodt, Inc., et al* v. *Masimo Corporation*, CV 00-6506 MRP, Mar. 22, 2004 (pp. 3603-3715).
Trial Transcript in *Mallinckrodt, Inc., et al* v. *Masimo Corporation*, CV 00-6506 MRP, Mar. 23, 2004 (pp. 3716-3828).
Trial Transcript in *Mallinckrodt, Inc., et al* v. *Masimo Corporation*, CV 00-6506 MRP, Mar. 24, 2004 (pp. 3829-3983).
Trial Transcript in *Mallinckrodt, Inc., et al* v. *Masimo Corporation*, CV 00-6506 MRP, Mar. 25, 2004 (pp. 3984-4054).
Hearing Transcript in *Mallinckrodt, Inc., et al* v. *Masimo Corporation*, CV 00-6506 MRP, Dec. 16, 2002.
Hearing Transcript in *Mallinckrodt, Inc., et al* v. *Masimo Corporation*, CV 00-6506 MRP, Jun. 18, 2004.
Blitt, M.D., Casey D., "Monitoring in Anesthesia and Critical Care Medicine," Monitoring and Patient Safety, Second Edition, Chapter 4, pp. 33-48, 1990.
Yelderman, M., et al. "ECG Enhancement by Adaptive Cancellation of Electrosurgical Interference," IEEE Transactions on Biomedical Engineering, vol. BME-30 No. 7, Jul. 1983.
Rearden, Jr., R.S., et al., "Biomedical Sciences Instrumentation," Some Digital Signal Processing Methods for Detecting Fat Particles in Blood, vol. 12, pp. 47-50, 1976.
"Nellcor N-100 And N-10 Pulse Oximeters, Plus Interchangeable Sensors," undated.
"Nellcor Redefines Pulse Oximetry. Introducing the Nellcor N-200 with ECG Synchronization," undated.
W. Byrne, P. Flynn, R. Zapp & M. Siegel, "Adaptive Filter Processing in Microwave Remote Heart Monitors," IEEE Transactions on Biomedical Engineering, vol. BME-33, No. 7, pp. 717-726, Jul. 1986.
J. Giolma, "Defining Respiratory Epochs Using an Adaptive AR Filter," ISA Paper #89-0236, pp. 227-232, 1989.
R. Jane, P. Laguna, P. Caminal & H. Rix, "Adaptive Filtering of High-Resolution ECG Signals," IEEE Proceedings, Computers In Cardiology, pp. 347-350, Sep. 23-26, 1990.
T. Kao, K. Wu, B. Yu & J. Hung, "Digital Signal Enhancement of the Abdominal Fetal ECG," IEEE Engineering in Medicine & Biology Society 11th Annual Int'l Conf., 1989.
P. Hamilton & W. Tompkins, "Adaptive Matched Filtering for QRS Detection," IEEE Engineering in Medicine & Biology Society 10th Annual Int'l Conf., 1988.
Y. Park, B. Cho, N. Kim, W. Kim S. Park & D. Youn, "A Fetal ECG Signal Monitoring System Using Digital Signal Processor," ISCAS'88, pp. 2391-2394, 1988.
L. Lum & P. Cheung, "Evaluation of Pulse Oximetry with EKG Synchronization," IEEE Engineering in Medicine & Biology Society 10th Annual Int'l Conf., Nov. 4-7, 1988.
K. Lin & W. Chang, "Adaptive Noise Reduction for Pulmonary Artery Blood Pressure," IEEE Engineering in Medicine & Biology Society 10th Annual Int'l Conf., Nov. 4-7, 1988.
M. Ogino, "The Advantages of a New Technology Pulse Oximeter in Neonatal Care," Neonatal Intensive Care, 2002 Abstract No. 36.
"Masimo Current News," printed from internet site www.masimo.com/news/news.htm on or around Aug. 9, 2000.
Chapter 6: The LMS Algorithm, Adaptive Algorithms and Structure Part III, undated.
"Nellcor N-200 Leads Beyond Pulse Oximetry," undated.
Operator's Manual—Nellcor N-200 Pulse Oximeter; 1992.
"N-200 Pulse Oximeter with C-Lock ECG Synchronization," undated.
Supplemental Response to Plaintiff Masimo's First Set of Interrogatories to Defendant Mallinckrodt Inc. Pursuant to FED.R.CIV.P. 26(e).
Nellcor's Second Supplemental Response to Masimo's First Set of Interrogatories in Consolidated Case (No. 2), dated Jul. 14, 2003.
Addendum to Nellcor's Second Supplemental Response to Masimo's First Set of Interrogatories in the Consolidated Case (No. 2), dated Jul. 15, 2003.
Second Addendum to Nellcor's Second Supplemental Response to Masimo's First Set of Interrogatories in the Consolidated Case (No. 2), dated Aug. 10, 2003.

**US 7,530,955 B2**

Page 7

Third Addendum to Nellcor's Second Supplemental Response to Masimo's First Set of Interrogatories in the Consolidated Case (No. 2), dated Aug. 13, 003.

Nellcor's Oct. 13, 2003 Supplemental and Revised Response to Masimo's First Set of Interrogatories in the Consolidated Case (No. 2), dated Oct. 13, 2003.

U.S. States Court of Appeals for the Federal Circuit, Opinion, decided Sep. 7, 2005.

* cited by examiner



*FIG. 1*



BONE
MUSCLE
TISSUE
ARTERIAL BLOOD
VENOUS BLOOD

*FIG. 2*



*FIG. 3*

$S = s + n$



*FIG. 4A*



$$S_{\lambda b} = s_{\lambda b} + n_{\lambda b}$$

$$S_{\lambda a} = s_{\lambda a} + n_{\lambda a}$$

$$s'(t) = s_{\lambda a}(t) - r_v s_{\lambda b}(t)$$

*FIG. 4B*



FIG. 5A



FIG. 5B



*FIG. 5C*





*FIG. 7A*



FIG. 7B



FIG. 7C



FIG. 8



FIG. 8A



*FIG. 9*



*FIG. 9A*



FIG. 10



FIG. 10A



FIG. 11



*FIG. 11A*



*FIG. 12*

FIG. 13



FIG. 14

FIG. 15



FIG. 16



*FIG. 17*



*FIG. 18*



*FIG. 19*



FIG. 20



FIG. 21



*FIG. 21A*



*FIG. 22*



*FIG. 23*



FIG. 24



FIG. 25A



*FIG. 25B*

Case 1:09-cv-00080-LPS   Document 642-1   Filed 12/28/12   Page 180 of 217 PageID #: 16679



*FIG. 25C*



*FIG. 26*



*FIG. 27*



*FIG. 28*



*FIG. 29*



*FIG. 30*



FIG. 31

US 7,530,955 B2

**1**

## SIGNAL PROCESSING APPARATUS

### REFERENCE TO PRIOR RELATED APPLICATION

This application is a divisional of application Ser. No. 10/062,859, filed on Jan. 30, 2002, now abandoned which is a continuation of application Ser. No. 09/195,791, filed Nov. 17, 1998, now U.S. Pat. No. 7,328,053 which is a continuation of application Ser. No. 08/859,837, filed May 16, 1997 (now U.S. Pat. No. 6,157,850), which is a continuation of application Ser. No. 08/320,154, filed Oct. 7, 1994 (now U.S. Pat. No. 5,632,272 issued May 27, 1997).

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to the field of signal processing. More specifically, the present invention relates to the processing of measured signals, containing a primary signal portion and a secondary signal portion, for the removal or derivation of either the primary or secondary signal portion when little is known about either of these components. More particularly, the present invention relates to modeling the measured signals in a novel way which facilitates minimizing the correlation between the primary signal portion and the secondary signal portion in order to produce a primary and/or secondary signal. The present invention is especially useful for physiological monitoring systems including blood oxygen saturation systems.

2. Description of the Related Art

Signal processors are typically employed to remove or derive either the primary or secondary signal portion from a composite measured signal including a primary signal portion and a secondary signal portion. For example, a composite signal may contain noise and desirable portions. If the secondary signal portion occupies a different frequency spectrum than the primary signal portion, then conventional filtering techniques such as low pass, band pass, and high pass filtering are available to remove or derive either the primary or the secondary signal portion from the total signal. Fixed single or multiple notch filters could also be employed if the primary and/or secondary signal portion(s) exist at a fixed frequency(s).

It is often the case that an overlap in frequency spectrum between the primary and secondary signal portions exists. Complicating matters further, the statistical properties of one or both of the primary and secondary signal portions change with time. In such cases, conventional filtering techniques are ineffective in extracting either the primary or secondary signal. If, however, a description of either the primary or secondary signal portion can be derived, correlation canceling, such as adaptive noise canceling, can be employed to remove either the primary or secondary signal portion of the signal isolating the other portion. In other words, given sufficient information about one of the signal portions, that signal portion can be extracted.

Conventional correlation cancelers, such as adaptive noise cancelers, dynamically change their transfer function to adapt to and remove portions of a composite signal. However, correlation cancelers require either a secondary reference or a primary reference which correlates to either the secondary signal portion only or the primary signal portion only. For instance, for a measured signal containing noise and desirable signal, the noise can be removed with a correlation canceler if a noise reference is available. This is often the case. Although the amplitude of the reference signals are not necessarily the

**2**

same as the amplitude of the corresponding primary or secondary signal portions, they have a frequency spectrum which is similar to that of the primary or secondary signal portions.

In many cases, nothing or very little is known about the secondary and/or primary signal portions. One area where measured signals comprising a primary signal portion and a secondary signal portion about which no information can easily be determined is physiological monitoring. Physiological monitoring generally involves measured signals derived from a physiological system, such as the human body. Measurements which are typically taken with physiological monitoring systems include electrocardiographs, blood pressure, blood gas saturation (such as oxygen saturation), capnographs, other blood constituent monitoring, heart rate, respiration rate, electro-encephalograph (EEG) and depth of anesthesia, for example. Other types of measurements include those which measure the pressure and quantity of a substance within the body such as cardiac output, venous oxygen saturation, arterial oxygen saturation, bilirubin, total hemoglobin, breathalyzer testing, drug testing, cholesterol testing, glucose testing, extra vasation, and carbon dioxide testing, protein testing, carbon monoxide testing, and other in-vivo measurements, for example. Complications arising in these measurements are often due to motion of the patient, both external and internal (muscle movement, vessel movement, and probe movement, for example), during the measurement process.

Many types of physiological measurements can be made by using the known properties of energy attenuation as a selected form of energy passes through a medium.

A blood gas monitor is one example of a physiological monitoring system which is based upon the measurement of energy attenuated by biological tissues or substances. Blood gas monitors transmit light into the test medium and measure the attenuation of the light as a function of time. The output signal of a blood gas monitor which is sensitive to the arterial blood flow contains a component which is a waveform representative of the patient's arterial pulse. This type of signal, which contains a component related to the patient's pulse, is called a plethysmographic wave, and is shown in FIG. **1** as curve s. Plethysmographic waveforms are used in blood gas saturation measurements. As the heart beats, the amount of blood in the arteries increases and decreases, causing increases and decreases in energy attenuation, illustrated by the cyclic wave s in FIG. **1**.

Typically, a digit such as a finger, an ear lobe, or other portion of the body where blood flows close to the skin, is employed as the medium through which light energy is transmitted for blood gas attenuation measurements. The finger comprises skin, fat, bone, muscle, etc., shown schematically in FIG. **2**, each of which attenuates energy incident on the finger in a generally predictable and constant manner. However, when fleshy portions of the finger are compressed erratically, for example by motion of the finger, energy attenuation becomes erratic.

An example of a more realistic measured waveform S is shown in FIG. **3**, illustrating the effect of motion. The primary plethysmographic waveform portion of the signal s is the waveform representative of the pulse, corresponding to the sawtooth-like pattern wave in FIG. **1**. The large, secondary motion-induced excursions in signal amplitude obscure the primary plethysmographic signal s. Even small variations in amplitude make it difficult to distinguish the primary signal component s in the presence of a secondary signal component n.

A pulse oximeter is a type of blood gas monitor which non-invasively measures the arterial saturation of oxygen in

US 7,530,955 B2

**3**

the blood. The pumping of the heat forces freshly oxygenated blood into the arteries causing greater energy attenuation. As well understood in the art, the arterial saturation of oxygenated blood may be determined from the depth of the valleys relative to the peaks of two plethysmographic waveforms measured at separate wavelengths. Patient movement introduces motion artifacts to the composite signal as illustrated in the plethysmographic waveform illustrated in FIG. **3**. These motion artifacts distort the measured signal.

### SUMMARY OF THE INVENTION

This invention provides improvements upon the methods and apparatus disclosed in U.S. patent application Ser. No. 08/132,812, filed Oct. 6, 1993, entitled Signal Processing Apparatus, which earlier application has been assigned to the assignee of the instant application. The present invention involves several different embodiments using the novel signal model in accordance with the present invention to isolate either a primary signal portion or a secondary signal portion of a composite measured signal. In one embodiment, a signal processor acquires a first measured signal and a second measured signal that is correlated to the first measured signal. The first signal comprises a first primary signal portion and a first secondary signal portion. The second signal comprises a second primary signal portion and a second secondary signal portion. The signals may be acquired by propagating energy through a medium and measuring an attenuated signal after transmission or reflection. Alternatively, the signals may be acquired by measuring energy generated by the medium.

In one embodiment, the first and second measured signals are processed to generate a secondary reference which does not contain the primary signal portions from either of the first or second measured signals. This secondary reference is correlated to the secondary signal portion of each of the first and second measured signals. The secondary reference is used to remove the secondary portion of each of the first and second measured signals via a correlation canceler, such as an adaptive noise canceler. The correlation canceler is a device which takes a first and second input and removes from the first input all signal components which are correlated to the second input. Any unit which performs or nearly performs this function is herein considered to be a correlation canceler.

An adaptive correlation canceler can be described by analogy to a dynamic multiple notch filter which dynamically changes its transfer function in response to a reference signal and the measured signals to remove frequencies from the measured signals that are also present in the reference signal. Thus, a typical adaptive correlation canceler receives the signal from which it is desired to remove a component and receives a reference signal of the undesired portion. The output of the correlation canceler is a good approximation to the desired signal with the undesired component removed.

Alternatively, the first and second measured signals may be processed to generate a primary reference which does not contain the secondary signal portions from either of the first or second measured signals. The primary reference may then be used to remove the primary portion of each of the first and second measured signals via a correlation canceler. The output of the correlation canceler is a good approximation to the secondary signal with the primary signal removed and may be used for subsequent processing in the same instrument or an auxiliary instrument. In this capacity, the approximation to the secondary signal may be used as a reference signal for input to a second correlation canceler together with either the first or second measured signals for computation of, respectively, either the first or second primary signal portions.

**4**

Physiological monitors can benefit from signal processors of the present invention. Often in physiological measurements a first signal comprising a first primary portion and a first secondary portion and a second signal comprising a second primary portion and a second secondary portion are acquired. The signals may be acquired by propagating energy through a patient's body (or a material which is derived from the body, such as breath, blood, or tissue, for example) or inside a vessel and measuring an attenuated signal after transmission or reflection. Alternatively, the signal may be acquired by measuring energy generated by a patient's body, such as in electrocardiography. The signals are processed via the signal processor of the present invention to acquire either a secondary reference or a primary reference which is input to a correlation canceler, such as an adaptive noise canceler.

One physiological monitoring apparatus which benefits from the present invention is a monitoring system which determines a signal which is representative of the arterial pulse, called a plethysmographic wave. This signal can be used in blood pressure calculations, blood constituent measurements, etc. A specific example of such a use is in pulse oximetry. Pulse oximetry involves determining the saturation of oxygen in the blood. In this configuration, the primary portion of the signal is the arterial blood contribution to attenuation of energy as it passes through a portion of the body where blood flows close to the skin. The pumping of the heart causes blood flow to increase and decrease in the arteries in a periodic fashion, causing periodic attenuation wherein the periodic waveform is the plethysmographic waveform representative of the arterial pulse. The secondary portion is noise. In accordance with the present invention, the measured signals are modeled such that this secondary portion of the signal is related to the venous blood contribution to attenuation of energy as it passes through the body. The secondary portion also includes artifacts due to patient movement which causes the venous blood to flow in an unpredictable manner, causing unpredictable attenuation and corrupting the otherwise periodic plethysmographic waveform. Respiration also causes the secondary or noise portion to vary, although typically at a lower frequency than the patients pulse rate. Accordingly, the measured signal which forms a plethysmographic waveform is modeled in accordance with the present invention such that the primary portion of the signal is representative of arterial blood contribution to attenuation and the secondary portion is due to several other parameters.

A physiological monitor particularly adapted to pulse oximetry oxygen saturation measurement comprises two light emitting diodes (LED's) which emit light at different wavelengths to produce first and second signals. A detector registers the attenuation of the two different energy signals after each passes through an absorptive media, for example a digit such as a finger, or an earlobe. The attenuated signals generally comprise both primary (arterial attenuator) and secondary (noise) signal portions. A static filtering system, such as a bandpass filter, removes a portion of the secondary signal which is outside of a known bandwidth of interest, leaving an erratic or random secondary signal portion, often caused by motion and often difficult to remove, along with the primary signal portion.

A processor in accordance with one embodiment of the present invention removes the primary signal portions from the measured signals yielding a secondary reference which is a combination of the remaining secondary signal portions. The secondary reference is correlated to both of the secondary signal portions. The secondary reference and at least one of the measured signals are input to a correlation canceler, such as an adaptive noise canceler, which removes the random or

US 7,530,955 B2

5

erratic portion of the secondary signal. This yields a good approximation to a primary plethysmographic signal as measured at one of the measured signal wavelengths. As is known in the art, quantitative measurements of the amount of oxygenated arterial blood in the body can be determined from the plethysmographic signal in a variety of ways.

The processor of the present invention may also remove the secondary signal portions from the measured signals yielding a primary reference which is a combination of the remaining primary signal portions. The primary reference is correlated to both of the primary signal portions. The primary reference and at least one of the measured signals are input to a correlation canceler which removes the primary portions of the measured signals. This yields a good approximation to the secondary signal at one of the measured signal wavelengths. This signal may be useful for removing secondary signals from an auxiliary instrument as well as determining venous blood oxygen saturation.

In accordance with the signal model of the present invention, the two measured signals each having primary and secondary signal portions can be related by coefficients. By relating the two equations with respect to coefficients defined in accordance with the present invention, the coefficients provide information about the arterial oxygen saturation and about the noise (the venous oxygen saturation and other parameters). In accordance with this aspect of the present invention, the coefficients can be determined by minimizing the correlation between the primary and secondary signal portions as defined in the model. Accordingly, the signal model of the present invention can be utilized in many ways in order to obtain information about the measured signals as will be further apparent in the detailed description of the preferred embodiments.

One aspect of the present invention is a method for use in a signal processor in a signal processor for processing at least two measured signals $S_1$ and $S_2$ each containing a primary signal portion s and a secondary signal portion n, the signals $S_1$ and $S_2$ being in accordance with the following relationship:

$$S_1 = s_1 + n_1$$

$$S_2 = s_2 + n_2$$

where $s_1$ and $s_2$, and $n_1$ and $n_2$ are related by:

$$s_1 = r_a s_2 \text{ and } n_1 = r_v n_2$$

and where $r_a$ and $r_v$ are coefficients.

The method comprises a number of steps. A value of coefficient $r_a$ is determined at which minimize correlation between $s_1$ and $n_1$. Then, at least one of the first and second signals is processed using the determined value for $r_a$ to significantly reduce n from at least one of the first or second measured signal to form a clean signal.

In one embodiment, the clean signal is displayed on a display. In another embodiment, wherein the first and second signals are physiological signals, the method further comprises the step of processing the clean signal to determine a physiological parameter from the first or second measured signals. In one embodiment, the parameter is arterial oxygen saturation. In another embodiment, the parameter is an ECG signal. In yet another embodiment, wherein the first portion of the measured signals is indicative of a heart plethysmograph, the method further comprises the step of calculating the pulse rate.

Another aspect of the present invention involves a physiological monitor. The monitor has a first input configured to receive a first measured signal $S_1$ having a primary portion, $s_1$,

6

and a secondary portion $n_1$. The monitor also has a second input configured to received a second measured signal $S_2$ having a primary portion $s_2$ and a secondary portion $n_2$. Advantageously, the first and the second measured signals $S_1$ and $S_2$ are in accordance with the following relationship:

$$S_1 = s_1 + n_1$$

$$S_2 = s_2 + n_2$$

where $s_1$ and $s_2$, and $n_1$ and $n_2$ are related by:

$$s_1 = r_a s_2 \text{ and } n_1 = r_v n_2$$

and where $r_a$ and $r_v$ are coefficients.

The monitor further has a scan reference processor, the scan reference processor responds to a plurality of possible values for $r_a$ to multiply the second measured signal by each of the possible values for $r_a$ and for each of the resulting values, to subtract the resulting values from the first measured signal to provide a plurality of output signals. A correlation canceler having a first input configured to receive the first measured signal, and having a second input configured to receive the plurality of output signals from the saturation scan reference processor, provides a plurality of output vectors corresponding to the correlation cancellation between the plurality of output signals and the first measured signal. An integrator having an input configured to receive the plurality of output vectors from the correlation canceler is responsive to the plurality of output vectors to determine a corresponding power for each output vector. An extremum detector is coupled at its input to the output of the integrator. The extremum detector is responsive to the corresponding power for each output vector to detect a selected power.

In one embodiment, the plurality of possible values correspond to a plurality of possible values for a selected blood constituent. In one embodiment the, the selected blood constituent is arterial blood oxygen saturation. In another embodiment, the selected blood constituent is venous blood oxygen saturation. In yet another embodiment, the selected blood constituent is carbon monoxide.

Another aspect of the present invention involves a physiological monitor. The monitor has a first input configured to receive a first measured signal $S_1$ having a primary portion, $s_1$, and a secondary portion, $n_1$. The monitor also has a second input configured to received a second measured signal $S_2$ having a primary portion $s_2$ and a secondary portion $n_2$. The first and the second measured signals $S_1$ and $S_2$ are in accordance with the following relationship:

$$S_1 = s_1 + n_1$$

$$S_2 = s_2 + n_2$$

where $s_1$ and $s_2$, and $n_1$ and $n_2$ are related by:

$$s_1 = r_a s_2 \text{ and } n_1 = r_v n_s$$

and where $r_a$ and $r_v$ are coefficients.

A transform module is responsive to the first and the second measured signals and responsive to a plurality of possible values for $r_a$ to provide at least one power curve as an output. An extremum calculation module is responsive to the at least one power curve to select a value for $r_a$ which minimizes the correlation between s and n, and to calculate from the value

7

for $r_a$ a corresponding saturation value as an output. A display module is responsive to the output of saturation calculation to display the saturation value.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** illustrates an ideal plethysmographic waveform.

FIG. **2** schematically illustrates a typical finger.

FIG. **3** illustrates a plethysmographic waveform which includes a motion-induced erratic signal portion.

FIG. **4**a illustrates a schematic diagram of a physiological monitor to compute primary physiological signals.

FIG. **4**b illustrates a schematic diagram of a physiological monitor to compute secondary signals.

FIG. **5**a illustrates an example of an adaptive noise canceler which could be employed in a physiological monitor, to compute primary physiological signals.

FIG. **5**b illustrates an example of an adaptive noise canceler which could be employed in a physiological monitor, to compute secondary motion artifact signals.

FIG. **5**c illustrates the transfer function of a multiple notch filter.

FIG. **6**a illustrates a schematic of absorbing material comprising N constituents within the absorbing material.

FIG. **6**b illustrates another schematic of absorbing material comprising N constituents, including one mixed layer, within the absorbing material.

FIG. **6**c illustrates another schematic of absorbing material comprising N constituents, including two mixed layers, within the absorbing material.

FIG. **7**a illustrates a schematic diagram of a monitor, to compute primary and secondary signals in accordance with one aspect of the present invention.

FIG. **7**b illustrates the ideal correlation canceler energy or power output as a function of the signal coefficients $r_1$, $r_2$, . . . $r_n$. In this particular example, $r_3=r_a$ and $r_7=r_v$.

FIG. **7**c illustrates the non-ideal correlation canceler energy or power output as a function of the signal coefficients $r_1$, $r_2$, . . . $r_n$. In this particular example, $r_3=r_a$ and $r_7=r_v$.

FIG. **8** is a schematic model of a joint process estimator comprising a least-squares lattice predictor and a regression filter.

FIG. **8**a is a schematic model of a joint process estimator comprising a QRD least-squares lattice (LSL) predictor and a regression filter.

FIG. **9** is a flowchart representing a subroutine for implementing in software a joint process estimator as modeled in FIG. **8**.

FIG. **9**a is a flowchart representing a subroutine for implementing in software a joint process estimator as modeled in FIG. **8**a.

FIG. **10** is a schematic model of a joint process estimator with a least-squares lattice predictor and two regression filters.

FIG. **10**a is a schematic model of a joint process estimator with a QRD least-squares lattice predictor and two regression filters.

FIG. **11** is an example of a physiological monitor in accordance with the teachings of one aspect of the present invention.

FIG. **11**a illustrates an example of a low noise emitter current driver with accompanying digital to analog converter.

FIG. **12** illustrates the front end analog signal conditioning circuitry and the analog to digital conversion circuitry of the physiological monitor of FIG. **11**.

FIG. **13** illustrates further detail of the digital signal processing circuitry of FIG. **11**.

8

FIG. **14** illustrates additional detail of the operations performed by the digital signal processing circuitry of FIG. **11**.

FIG. **15** illustrates additional detail regarding the demodulation module of FIG. **14**.

FIG. **16** illustrates additional detail regarding the decimation module of FIG. **14**.

FIG. **17** represents a more detailed block diagram of the operations of the statistics module of FIG. **14**.

FIG. **18** illustrates a block diagram of the operations of one embodiment of the saturation transform module of FIG. **14**.

FIG. **19** illustrates a block diagram of the operation of the saturation calculation module of FIG. **14**.

FIG. **20** illustrates a block diagram of the operations of the pulse rate calculation module of FIG. **14**.

FIG. **21** illustrates a block diagram of the operations of the motion artifact suppression module of FIG. **20**.

FIG. **21**a illustrates an alternative block diagram for the operations of the motion artifact suppression module of FIG. **20**.

FIG. **22** illustrates a saturation transform curve in accordance with the principles of the present invention.

FIG. **23** illustrates a block diagram of an alternative embodiment to the saturation transform in order to obtain a saturation value.

FIG. **24** illustrates a histogram saturation transform in accordance with the alternative embodiment of FIG. **23**.

FIGS. **25**A-**25**C illustrate yet another alternative embodiment in order to obtain the saturation.

FIG. **26** illustrates a signal measured at a red wavelength $\lambda a=\lambda red=660$ nm for use in a processor of the present invention for determining the secondary reference n'(t) or the primary reference s'(t) and for use in a correlation canceler. The measured signal comprises a primary portion $s_{\lambda a}(t)$ and a secondary portion $n_{\lambda a}(t)$.

FIG. **27** illustrates a signal measured at an infrared wavelength $\lambda b=\lambda_{IR}=910$ nm for use in a processor of the present invention for determining the secondary reference n'(t) or the primary reference s'(t) and for use in a correlation canceler. The measured signal comprises a primary portion $s_{\lambda b}(t)$ and a secondary portion $n_{\lambda b}(t)$.

FIG. **28** illustrates the secondary reference n'(t) determined by a processor of the present invention.

FIG. **29** illustrates a good approximation $s''_{\lambda a}(t)$ to the primary portion $s_{\lambda a}(t)$ of the signal $S_{\lambda a}(t)$ measured at $\lambda a=\lambda red=660$ nm estimated by correlation cancellation with a secondary reference n'(t).

FIG. **30** illustrates a good approximation $s''_{\lambda b}(t)$ to the primary portion $s_{\lambda b}(t)$ of the signal $S_{\lambda b}(t)$ measured at $\lambda b=\lambda IR=910$ nm estimated by correlation cancellation with a secondary reference n'(t).

FIG. **31** depicts a set of 3 concentric electrodes, i.e., a tripolar electrode sensor, to derive electrocardiography (ECG) signals, denoted as $S_1$, $S_2$ and $S_3$, for use with the present invention. Each of the ECG signals contains a primary portion and a secondary portion.

DETAILED DESCRIPTION OF THE INVENTION

The present invention involves a system which utilizes first and second measured signals that each contain a primary signal portion and a secondary signal portion. In other words, given a first and second composite signals $S_1(t)=s_1(t)+n_1(t)$ and $S_2(t)=s_2(t)+n_2(t)$, the system of the present invention can be used to isolate either the primary signal portion s(t) or the secondary signal portion n(t). Following processing, the output of the system provides a good approximation n''(t) to the

US 7,530,955 B2

9

secondary signal portion n(t) or a good approximation s"(t) to the primary signal portion s(t).

The system of the present invention is particularly useful where the primary and/or secondary signal portion n(t) may contain one or more of a constant portion, a predictable portion, an erratic portion, a random portion, etc. The primary signal approximation s"(t) or secondary signal approximation n"(t) is derived by removing as many of the secondary signal portions n(t) or primary signal portions s(t) from the composite signal S(t) as possible. The remaining signal forms either the primary signal approximation s"(t) or secondary signal approximation n"(t), respectively. The constant portion and predictable portion of the secondary signal n(t) are easily removed with traditional filtering techniques, such as simple subtraction, low pass, band pass, and high pass filtering. The erratic portion is more difficult to remove due to its unpredictable nature. If something is known about the erratic signal, even statistically, it could be removed, at least partially, from the measured signal via traditional filtering techniques. However, often no information is known about the erratic portion of the secondary signal n(t). In this case, traditional filtering techniques are usually insufficient.

In order to remove the secondary signal n(t), a signal model in accordance with the present invention is defined as follows for the first and second measured signals $S_1$ and $S_2$:

$$S_1 = s_1 + n_1$$

$$S_2 = s_2 + n_2$$

with $s_1 = r_a s_2$ and $n_1 = r_v n_2$ or

$$r_a = \frac{s_1}{s_2} \text{ and } n_1 = \frac{n_1}{n_2}$$

where $s_1$ and $n_1$ are at least somewhat (preferably substantially) uncorrelated and $s_2$ and $n_2$ are at least somewhat (preferably substantially) uncorrelated. The first and second measured signals $S_1$ and $S_2$ are related by correlation coefficients $r_a$ and $r_v$ as defined above. The use and selection of these coefficients is described in further detail below.

In accordance with one aspect of the present invention, this signal model is used in combination with a correlation canceler, such as an adaptive noise canceler, to remove or derive the erratic portion of the measured signals.

Generally, a correlation canceler has two signal inputs and one output. One of the inputs is either the secondary reference n'(t) or the primary reference s'(t) which are correlated, respectively, to the secondary signal portions n(t) and the primary signal portions s(t) present in the composite signal S(t). The other input is for the composite signal S(t). Ideally, the output of the correlation canceler s"(t) or n"(t) corresponds, respectively, to the primary signal s(t) or the secondary signal n(t) portions only. Often, the most difficult task in the application of correlation cancelers is determining the reference signals n'(t) and s'(t) which are correlated to the secondary n(t) and primary s(t) portions, respectively, of the measured signal S(t) since, as discussed above, these portions are quite difficult to isolate from the measured signal S(t). In the signal processor of the present invention, either a secondary reference n'(t) or a primary reference s'(t) is determined from two composite signals measured simultaneously, or nearly simultaneously, at two different wavelengths, λa and λb.

A block diagram of a generic monitor incorporating a signal processor according to the present invention, and a

10

correlation canceler is shown in FIGS. 4a and 4b. Two measured signals, $S_{\lambda a}(t)$ and $S_{\lambda b}(t)$, are acquired by a detector 20. One skilled in the art will realize that for some physiological measurements, more than one detector may be advantageous. Each signal is conditioned by a signal conditioner 22a and 22b. Conditioning includes, but is not limited to, such procedures as filtering the signals to remove constant portions and amplifying the signals for ease of manipulation. The signals are then converted to digital data by an analog-to-digital converter 24a and 24b. The first measured signal $S_{\lambda a}(t)$ comprises a first primary signal portion, labeled herein $s_{\lambda a}(t)$, and a first secondary signal portion, labeled herein $n_{\lambda a}(t)$. The second measured signal $S_{\lambda b}(t)$ is at least partially correlated to the first measured signal $S_{\lambda a}(t)$ and comprises a second primary signal portion, labeled herein $s_{\lambda b}(t)$, and a second secondary signal portion, labeled herein $n_{\lambda b}(t)$. Typically the first and second secondary signal portions, $n_{\lambda a}(t)$ and $n_{\lambda b}(t)$, are uncorrelated and/or erratic with respect to the primary signal portions $s_{\lambda a}(t)$ and $s_{\lambda b}(t)$. The secondary signal portions $n_{\lambda a}(t)$ and $n_{\lambda b}(t)$ are often caused by motion of a patient in physiological measurements.

The signals $S_{\lambda a}(t)$ and $S_{\lambda b}(t)$ are input to a reference processor 26. The reference processor 26 multiplies the second measured signal $S_{\lambda b}(t)$ by either a factor $r_a = s_{\lambda a}(t)/s_{\lambda b}(t)$ or a factor $r_v = n_{\lambda a}(t)/n_{\lambda b}(t)$ and then subtracts the second measured signal $S_{\lambda b}(t)$ from the first measured signal $S_{\lambda a}(t)$. The signal coefficient factors $r_a$ and $r_v$ are determined to cause either the primary signal portions $s_{\lambda a}(t)$ and $s_{\lambda b}(t)$ or the secondary signal portions $n_{\lambda a}(t)$ and $n_{\lambda b}(t)$ to cancel, respectively, when the two signals $S_{\lambda a}(t)$ and $S_{\lambda b}(t)$ are subtracted. Thus, the output of the reference processor 26 is either a secondary reference signal n'(t)=$n_{\lambda a}(t)$−$r_a n_{\lambda b}(t)$, in FIG. 4a, which is correlated to both of the secondary signal portions $n_{\lambda a}(t)$ and $n_{\lambda b}(t)$ or a primary reference signal s'(t)=$s_{\lambda a}(t)$−$r_v s_{\lambda b}(t)$, in FIG. 4b, which is correlated to both of the primary signal portions $s_{\lambda a}(t)$ and $s_{\lambda b}(t)$. A reference signal n'(t) or s'(t) is input, along with one of the measured signals $S_{\lambda a}(t)$ or $S_{\lambda b}(t)$, to a correlation canceler 27 which uses the reference signal n'(t) or s'(t) to remove either the secondary signal portions $n_{\lambda a}(t)$ or $n_{\lambda b}(t)$ or the primary signal portions $s_{\lambda a}(t)$ or $s_{\lambda b}(t)$ from the measured signal $S_{\lambda a}(t)$ or $S_{\lambda b}(t)$. The output of the correlation canceler 27 is a good primary signal approximation s"(t) or secondary signal approximation n"(t). In one embodiment, the approximation s"(t) or n"(t) is displayed on a display 28.

In one embodiment, an adaptive noise canceler 30, an example of which is shown in block diagram form in FIG. 5a, is employed as the correlation canceler 27, to remove either one of the erratic, secondary signal portions $n_{\lambda a}(t)$ and $n_{\lambda b}(t)$ from the first and second signals $S_{\lambda a}(t)$ and $S_{\lambda b}(t)$. The adaptive noise canceler 30 in FIG. 5a has as one input a sample of the secondary reference n'(t) which is correlated to the secondary signal portions $n_{\lambda a}(t)$ and $n_{\lambda b}(t)$. The secondary reference n'(t) is determined from the two measured signals $S_{\lambda a}(t)$ and $S_{\lambda b}(t)$ by the processor 26 of the present invention as described herein. A second input to the adaptive noise canceler, is a sample of either the first or second composite measured signals $S_{\lambda a}(t)$=$s_{\lambda a}(t)$+$n_{\lambda a}(t)$ or $S_{\lambda b}(t)$=$s_{\lambda b}(t)$+$n_{\lambda b}(t)$.

The adaptive noise canceler 30, in FIG. 5b, may also be employed to remove either one of primary signal portions $s_{\lambda a}(t)$ and $s_{\lambda b}(t)$ from the first and second measured signals $S_{\lambda a}(t)$ and $S_{\lambda b}(t)$. The adaptive noise canceler 30 has as one input a sample of the primary reference s'(t) which is correlated to the primary signal portions $s_{\lambda a}(t)$ and $s_{\lambda b}(t)$. The primary reference s'(t) is determined from the two measured signals $S_{\lambda a}(t)$ and $S_{\lambda b}(t)$ by the processor 26 of the present invention as described herein. A second input to the adaptive

11

noise canceler **30** is a sample of either the first or second measured signals $S_{\lambda,a}(t)=s_{\lambda,a}(t)+n_{\lambda,a}(t)$ or $S_{\lambda,b}(t)=s_{\lambda,b}(t)+n_{\lambda,b}(t)$.

The adaptive noise canceler **30** functions to remove frequencies common to both the reference $n'(t)$ or $s'(t)$ and the measured signal $S_{\lambda,a}(t)$ or $S_{\lambda,b}(t)$. Since the reference signals are correlated to either the secondary signal portions $n_{\lambda,a}(t)$ and $n_{\lambda,b}(t)$ or the primary signal portions $s_{\lambda,a}(t)$ and $s_{\lambda,b}(t)$, the reference signals will be correspondingly erratic or well behaved. The adaptive noise canceler **30** acts in a manner which may be analogized to a dynamic multiple notch filter based on the spectral distribution of the reference signal $n'(t)$ or $s'(t)$.

FIG. **5**c illustrates an exemplary transfer function of a multiple notch filter. The notches, or dips in the amplitude of the transfer function, indicate frequencies which are attenuated or removed when a signal passes through the notch filter. The output of the notch filter is the composite signal having frequencies at which a notch is present removed. In the analogy to an adaptive noise canceler **30**, the frequencies at which notches are present change continuously based upon the inputs to the adaptive noise canceler **30**.

The adaptive noise canceler **30** (FIGS. **5**a and **5**b) produces an output signal, labeled herein as $s''_{\lambda,a}(t)$, $s''_{\lambda,b}(t)$, $n''_{\lambda,a}(t)$ or $n''_{\lambda,b}(t)$ which is fed back to an internal processor **32** within the adaptive noise canceler **30**. The internal processor **32** automatically adjusts its own transfer function according to a predetermined algorithm such that the output of the internal processor **32** labeled $b_{\lambda}(t)$ in FIGS. **5**a and $c_{\lambda}(t)$ in FIG. **5**b, closely resembles either the secondary signal portion $n_{\lambda,a}(t)$ or $n_{\lambda,b}(t)$ or the primary signal portion $s_{\lambda,a}(t)$ or $s_{\lambda,b}(t)$. The output $b_{\lambda}(t)$ of the internal processor **32** in FIG. **5**a is subtracted from the measured signal, $S_{\lambda,a}(t)$ or $S_{\lambda,b}(t)$, yielding a signal output $s''_{\lambda,a}(t)=s_{\lambda,a}(t)+n_{\lambda,a}(t)-b_{\lambda,a}(t)$ or a signal output $s''_{\lambda,b}(t)=s_{\lambda,b}(t)+n_{\lambda,b}(t)-b_{\lambda,b}(t)$. The internal processor optimizes $s''_{\lambda,a}(t)$ or $s''_{\lambda,b}(t)$ such that $s''_{\lambda,a}(t)$ or $s''_{\lambda,b}(t)$ is approximately equal to the primary signal $s_{\lambda,a}(t)$ or $s_{\lambda,b}(t)$, respectively. The output $c_{\lambda}(t)$ of the internal processor **32** in FIG. **5**b is subtracted from the measured signal, $S_{\lambda,a}(t)$ or $S_{\lambda,b}(t)$, yielding a signal output given by $n''_{\lambda,a}(t)=s_{\lambda,a}(t)+n_{\lambda,a}(t)-c_{\lambda,a}(t)$ or a signal output given by $n''_{\lambda,b}(t)=s_{\lambda,b}(t)+n_{\lambda,b}(t)-c_{\lambda,b}(t)$. The internal processor optimizes $n''_{\lambda,a}(t)$ or $n''_{\lambda,b}(t)$ such that $n''_{\lambda,a}(t)$ or $n''_{\lambda,b}(t)$ is approximately equal to the secondary signal portion $n_{\lambda,a}(t)$ or $n_{\lambda,b}(t)$, respectively.

One algorithm which may be used for the adjustment of the transfer function of the internal processor **32** is a least-squares algorithm, as described in Chapter 6 and Chapter 12 of the book *Adaptive Signal Processing* by Bernard Widrow and Samuel Stearns, published by Prentice Hall, copyright 1985. This entire book, including Chapters 6 and 12, is hereby incorporated herein by reference.

Adaptive processors **30** in FIGS. **5**a and **5**b have been successfully applied to a number of problems including antenna sidelobe canceling, pattern recognition, the elimination of periodic interference in general, and the elimination of echoes on long distance telephone transmission lines. However, considerable ingenuity is often required to find a suitable reference signal $n'(t)$ or $s'(t)$ since the portions $n_{\lambda,a}(t)$, $n_{\lambda,b}(t)$, $s_{\lambda,a}(t)$ and $s_{\lambda,b}(t)$ cannot easily be separated from the measured composite signals $s_{\lambda,a}(t)$ and $s_{\lambda,b}(t)$. If either the actual secondary portion $n_{\lambda,a}(t)$ or $n_{\lambda,b}(t)$ or the primary

12

portion $s_{\lambda,a}(t)$ or $s_{\lambda,b}(t)$ were a priori available, techniques such as correlation cancellation would not be necessary.

### Generalized Determination of Primary and Secondary Reference Signals

An explanation which describes how the reference signals $n'(t)$ and $s'(t)$ may be determined follows. A first signal is measured at, for example, a wavelength $\lambda a$, by a detector yielding a signal $S_{\lambda,a}(t)$:

$$S_{\lambda,a}(t)=s_{\lambda,a}(t)+n_{\lambda,a}(t) \tag{1}$$

where $s_{\lambda,a}(t)$ is the primary signal portion and $n_{\lambda,a}(t)$ is the secondary signal portion.

A similar measurement is taken simultaneously, or nearly simultaneously, at a different wavelength, $\lambda b$, yielding:

$$S_{\lambda,b}(t)=s_{\lambda,b}(t)+n_{\lambda,b}(t) \tag{2}$$

Note that as long as the measurements, $S_{\lambda,a}(t)$ and $S_{\lambda,b}(t)$, are taken substantially simultaneously, the secondary signal components, $n_{\lambda,a}(t)$ and $n_{\lambda,b}(t)$, are correlated because any random or erratic functions affect each measurement in nearly the same fashion. The substantially predictable primary signal components, $s_{\lambda,a}(t)$ and $s_{\lambda,b}(t)$, are also correlated to one another.

To obtain the reference signals $n'(t)$ and $s'(t)$, the measured signals $S_{\lambda,a}(t)$ and $S_{\lambda,b}(t)$ are transformed to eliminate, respectively, the primary or secondary signal components. In accordance with the present invention one way of doing this is to find proportionality constants, $r_a$ and $r_v$, between the primary signal portions $s_{\lambda,a}(t)$ and $s_{\lambda,b}(t)$ and the secondary signal portions $n_{\lambda,a}(t)$ and $n_{\lambda,b}(t)$ such that the signals can be modeled as follows:

$$s_{\lambda,a}(t)=r_a s_{\lambda,b}(t)$$
$$n_{\lambda,a}(t)=r_v n_{\lambda,b}(t) \tag{3}$$

In accordance with the inventive signal model of the present invention, these proportionality relationships can be satisfied in many measurements, including but not limited to absorption measurements and physiological measurements. Additionally, in accordance with the signal model of the present invention, in most measurements, the proportionality constants $r_a$ and $r_v$ can be determined such that:

$$n_{\lambda,a}(t) \neq r_a n_{\lambda,b}(t)$$
$$s_{\lambda,a}(t) \neq r_v s_{\lambda,b}(t). \tag{4}$$

Multiplying equation (2) by $r_a$ and then subtracting equation (2) from equation (1) results in a single equation wherein the primary signal terms $s_{\lambda,a}(t)$ and $s_{\lambda,b}(t)$ cancel:

$$n'(t)=S_{\lambda,a}(t)-r_a S_{\lambda,b}(t)=n_{\lambda,a}(t)-r_a n_{\lambda,b}(t); \tag{5a}$$

a non-zero signal which is correlated to each secondary signal portion $n_{\lambda,a}(t)$ and $n_{\lambda,b}(t)$ and can be used as the secondary reference $n'(t)$ in a correlation canceler such as an adaptive noise canceler.

Multiplying equation (2) by $r_v$ and then subtracting equation (2) from equation (1) results in a single equation wherein the secondary signal terms $n_{\lambda,a}(t)$ and $n_{\lambda,b}(t)$ cancel, leaving:

$$s'(t)=S_{\lambda,a}(t)-r_v S_{\lambda,b}(t)=s_{\lambda,a}(t)-r_v s_{\lambda,b}(t); \tag{5b}$$

a non-zero signal which is correlated to each of the primary signal portions $s_{\lambda,a}(t)$ and $s_{\lambda,b}(t)$ and can be used as the signal reference $s'(t)$ in a correlation canceler such as an adaptive noise canceler.

US 7,530,955 B2

13

### Example of Determination of Primary and Secondary Reference Signals in an Absorptive System

Correlation canceling is particularly useful in a large number of measurements generally described as absorption measurements. An example of an absorption type monitor which can advantageously employ correlation canceling, such as adaptive noise canceling, based upon a reference $n'(t)$ or $s'(t)$ determined by a processor of the present invention is one which determines the concentration of an energy absorbing constituent within an absorbing material when the material is subject to change. Such changes can be caused by forces about which information is desired or primary, or alternatively, by random or erratic secondary forces such as a mechanical force on the material. Random or erratic interference, such as motion, generates secondary components in the measured signal. These secondary components can be removed or derived by the correlation canceler if a suitable secondary reference $n'(t)$ or primary reference $s'(t)$ is known.

A schematic N constituent absorbing material comprising a container **42** having N different absorbing constituents, labeled $A_1, A_2, A_3, \ldots A_N$, is shown in FIG. **6a**. The constituents $A_1$ through $A_N$ in FIG. **6a** are arranged in a generally orderly, layered fashion within the container **42**. An example of a particular type of absorptive system is one in which light energy passes through the container **42** and is absorbed according to the generalized Beer-Lambert Law of light absorption. For light of wavelength $\lambda a$, this attenuation may be approximated by:

$$I = I_o \exp\left(-\sum_{i=1}^{N} \epsilon_{i,\lambda a} c_i x_i\right) \qquad (6)$$

Initially transforming the signal by taking the natural logarithm of both sides and manipulating terms, the signal is transformed such that the signal components are combined by addition rather than multiplication, i.e.:

$$S_{\lambda a} = \ln(I_o / I) = \sum_{i=1}^{N} \epsilon_{i,\lambda a} c_i x_i \qquad (7)$$

where $I_0$ is the incident light energy intensity; I is the transmitted light energy intensity; $\epsilon_{i,\lambda a}$ is the absorption coefficient of the $i^{th}$ constituent at the wavelength $\lambda a$; $x_i(t)$ is the optical path length of $i^{th}$ layer, i.e., the thickness of material of the $i^{th}$ layer through which optical energy passes; and $c_i(t)$ is the concentration of the $i^{th}$ constituent in the volume associated with the thickness $x_i(t)$. The absorption coefficients $\epsilon_1$ through $\epsilon_N$ are known values which are constant at each wavelength. Most concentrations $c_1(t)$ through $c_N(t)$ are typically unknown, as are most of the optical path lengths $x_i(t)$ of each layer. The total optical path length is the sum of each of the individual optical path lengths $x_i(t)$ of each layer.

When the material is not subject to any forces which cause change in the thicknesses of the layers, the optical path length of each layer, $x_i(t)$, is generally constant. This results in an generally constant attenuation of the optical energy and thus, a generally constant offset in the measured signal. Typically, this offset portion of the signal is of little interest since knowledge about a force which perturbs the material is usually

14

desired. Any signal portion outside of a known bandwidth of interest, including the constant undesired signal portion resulting from the generally constant absorption of the constituents when not subject to change, is removed. This is easily accomplished by traditional band pass filtering techniques. However, when the material is subject to forces, each layer of constituents may be affected by the perturbation differently than other layers. Some perturbations of the optical path lengths of each layer $x_i(t)$ may result in excursions in the measured signal which represent desired or primary information. Other perturbations of the optical path length of each layer $x_i(t)$ cause undesired or secondary excursions which mask primary information in the measured signal. Secondary signal components associated with secondary excursions must also be removed to obtain primary information from the measured signal. Similarly, the ability to compute secondary signal components caused by secondary excursions directly allows one to obtain primary signal components from the measured signal via simple subtraction, or correlation cancellation techniques.

The correlation canceler may selectively remove from the composite signal, measured after being transmitted through or reflected from the absorbing material, either the secondary or the primary signal components caused by forces which perturb or change the material differently than other forces which perturbed or changed the material to cause respectively, either the primary or secondary signal component. For the purposes of illustration, it will be assumed that the portion of the measured signal which is deemed to be the primary signal $s_{\lambda a}(t)$ is the attenuation term $\epsilon_5 c_5 x_5(t)$ associated with a constituent of interest, namely $A_5$, and that the layer of constituent $A_5$ is affected by perturbations different than each of the layers of other constituents $A_1$ through $A_4$ and $A_6$ through $A_N$. An example of such a situation is when layer $A_5$ is subject to forces about which information is deemed to be primary and, additionally, the entire material is subject to forces which affect each of the layers. In this case, since the total force affecting the layer of constituent $A_5$ is different than the total forces affecting each of the other layers and information is deemed to be primary about the forces and resultant perturbation of the layer of constituent $A_5$, attenuation terms due to constituents $A_1$ through $A_4$ and $A_6$ through $A_N$ make up the secondary signal portion $n_{\lambda a}(t)$. Even if the additional forces which affect the entire material cause the same perturbation in each layer, including the layer of $A_5$, the total forces on the layer of constituent $A_5$ cause it to have different total perturbation than each of the other layers of constituents $A_1$ through $A_4$ and $A_6$ through $A_N$.

It is often the case that the total perturbation affecting the layers associated with the secondary signal components is caused by random or erratic forces. This causes the thickness of layers to change erratically and the optical path length of each layer, $x_i(t)$, to change erratically, thereby producing a random or erratic secondary signal component $n_{\lambda a}(t)$. However, regardless of whether or not the secondary signal portion $n_{\lambda a}(t)$ is erratic, the secondary signal component $n_{\lambda a}(t)$ can be either removed or derived via a correlation canceler, such as an adaptive noise canceler, having as one input, respectively, a secondary reference $n'(t)$ or a primary reference $s'(t)$ determined by a processor of the present invention as long as the perturbation on layers other than the layer of constituent $A_5$ is different than the perturbation on the layer of constituent $A_5$. The correlation canceler yields a good approximation to either the primary signal $s_{\lambda a}(t)$ or the secondary signal $n_{\lambda a}(t)$. In the event that an approximation to the primary signal is obtained, the concentration of the constituent of interest, $c_5(t)$, can often be determined since in some physiological

US 7,530,955 B2

15

measurements, the thickness of the primary signal component, $x_5(t)$ in this example, is known or can be determined.

The correlation canceler utilizes either the secondary reference $n'(t)$ or the primary reference $s'(t)$ determined from two substantially simultaneously measured signals $S_{\lambda a}(t)$ and $S_{\lambda b}$ (t). $S_{\lambda a}(t)$ is determined as above in equation (7). $S_{\lambda b}(t)$ is determined similarly at a different wavelength $\lambda b$. To find either the secondary reference $n'(t)$ or the primary reference $s'(t)$, attenuated transmitted energy is measured at the two different wavelengths $\lambda a$ and $\lambda b$ and transformed via logarithmic conversion. The signals $S_{\lambda a}(t)$ and $S_{\lambda b}(t)$ can then be written (logarithm converted) as:

$$S_{\lambda a}(t) = \epsilon_{5,\lambda a} c_5 x_5(t) + \sum_{i=1}^{4} \epsilon_{i,\lambda a} c_i x_i + \sum_{i=6}^{N} \epsilon_{i,\lambda a} c_i x_i \quad (8)$$

$$S_{\lambda a}(t) = \epsilon_{5,\lambda a} c_5 x_5(t) + n_{\lambda a}(t) \quad (9)$$

$$S_{\lambda b}(t) = \epsilon_{5,\lambda b} c_5 x_5(t) + \sum_{i=1}^{4} \epsilon_{i,\lambda b} c_i x_i + \sum_{i=6}^{N} \epsilon_{i,\lambda b} c_i x_i \quad (10)$$

$$S_{\lambda b}(t) = \epsilon_{5,\lambda b} c_5 x_5(t) + n_{\lambda b}(t) \quad (11)$$

Further transformations of the signals are the proportionality relationships in accordance with the signal model of the present invention defining $r_a$ and $r_v$, similar to equation (3), which allows determination of a noise reference $n'(t)$ and a primary reference $s'(t)$. These are:

$$\epsilon_{5,\lambda a} = r_a \epsilon_{5,\lambda b} \quad (12a)$$

$$n_{\lambda a} = r_v n_{\lambda b} \quad (12b)$$

where

$$n_{\lambda a} \neq r_a n_{\lambda b} \quad (13a)$$

$$\epsilon_{5,\lambda a} \neq r_v \epsilon_{5,\lambda b} \quad (13b)$$

It is often the case that both equations (12) and (13) can be simultaneously satisfied. Multiplying equation (11) by $r_a$ and subtracting the result from equation (9) yields a non-zero secondary reference which is a linear sum of secondary signal components:

$$n'(t) = S_{\lambda a}(t) - r_a S_{\lambda b}(t) \quad (14a)$$

$$= n_{\lambda a}(t) - r_a n_{\lambda b}(t)$$

$$= \sum_{i=1}^{4} \epsilon_{i,\lambda a} c_i x_i(t) + \sum_{i=6}^{N} \epsilon_{i,\lambda a} c_i x_i(t) - \quad (15a)$$

$$\sum_{i=1}^{4} r_a \epsilon_{i,\lambda b} c_i x_i(t) + \sum_{i=6}^{N} r_a \epsilon_{i,\lambda b} c_i x_i(t)$$

$$= \sum_{i=1}^{4} c_i x_i(t) [\epsilon_{i,\lambda a} - r_a \epsilon_{i,\lambda a} - r_a \epsilon_{i,\lambda b}] + \quad (16a)$$

$$\sum_{i=6}^{N} c_i x_i(t) [\epsilon_{1,\lambda a} - r_a \epsilon_{i,\lambda b}]$$

16

Multiplying equation (11) by $r_v$ and subtracting the result from equation (9) yields a primary reference which is a linear sum of primary signal components:

$$s'(t) = S_{\lambda a}(t) - r_v S_{\lambda b}(t) = s_{\lambda a}(t) - r_v s_{\lambda b}(t) \quad (14b)$$

$$= c_5 x_5(t) \epsilon_{5,\lambda a} - r_v c_5 x_5(t) \epsilon_{5,\lambda b} \quad (15b)$$

$$= c_5 x_5(t) [\epsilon_{5,\lambda a} - r_v \epsilon_{5,\lambda b}]. \quad (16b)$$

A sample of either the secondary reference $n'(t)$ or the primary reference $s'(t)$, and a sample of either measured signal $S_{\lambda a}(t)$ or $S_{\lambda b}(t)$, are input to a correlation canceler 27, such as an adaptive noise canceler 30, an example of which is shown in FIGS. 5a and 5b and a preferred example of which is discussed herein under the heading PREFERRED CORRELATION CANCELER USING A JOINT PROCESS ESTIMATOR IMPLEMENTATION. The correlation canceler 27 removes either the secondary portion $n_{\lambda a}(t)$ or $n_{\lambda b}(t)$, or the primary portions, $s_{\lambda a}(t)$ or $s_{\lambda b}(t)$, of the measured signal yielding a good approximation to either the primary signals $s''_{\lambda a}(t) = \epsilon_{5,\lambda a} c_5 x_5(t)$ or $s''_{\lambda b}(t) = \epsilon_{5,\lambda b} c_5 x_5(t)$ or the secondary signals $n''_{\lambda a}(t) = n_{\lambda a}(t)$ or $n''_{\lambda b}(t) = n_{\lambda b}(t)$. In the event that the primary signals are obtained, the concentration $c_5(t)$ may then be determined from the approximation to the primary signal $s''_{\lambda a}(t)$ or $s''_{\lambda b}(t)$ according to:

$$c_5(t) \approx s''_{\lambda a}(t) / \epsilon_{5,\lambda a} x_5(t) \quad (17a)$$

or

$$c_5(t) \approx s''_{\lambda b}(t) / \epsilon_{5,\lambda b} x_5(t) \quad (17b)$$

As discussed previously, the absorption coefficients are constant at each wavelength $\lambda a$ and $\lambda b$ and the thickness of the primary signal component, $x_5(t)$ in this example, is often known or can be determined as a function of time, thereby allowing calculation of the concentration $c_5(t)$ of constituent $A_5$.

Determination of Concentration or Saturation in a Volume Containing More than One Constituent

Referring to FIG. 6b, another material having N different constituents arranged in layers is shown. In this material, two constituents $A_5$ and $A_6$ are found within one layer having thickness $x_{5,6}(t) = x_5(t) + x_6(t)$, located generally randomly within the layer. This is analogous to combining the layers of constituents $A_5$ and $A_6$ in FIG. 6a. A combination of layers, such as the combination of layers of constituents $A_5$ and $A_6$, is feasible when the two layers are under the same total forces which result in the same change of the optical path lengths $x_5(t)$ and $x_6(t)$ of the layers.

Often it is desirable to find the concentration or the saturation, i.e., a percent concentration, of one constituent within a given thickness which contains more than one constituent and is subject to unique forces. A determination of the concentration or the saturation of a constituent within a given volume may be made with any number of constituents in the volume subject to the same total forces and therefore under the same perturbation or change. To determine the saturation of one constituent in a volume comprising many constituents, as many measured signals as there are constituents which absorb incident light energy are necessary. It will be understood that constituents which do not absorb light energy are not consequential in the determination of saturation. To determine the concentration, as many signals as there are constitu-

US 7,530,955 B2

17

ents which absorb incident light energy are necessary as well as information about the sum of concentrations.

It is often the case that a thickness under unique motion contains only two constituents. For example, it may be desirable to know the concentration or saturation of $A_5$ within a given volume which contains $A_5$ and $A_6$. In this case, the primary signals $s_{\lambda a}(t)$ and $s_{\lambda b}(t)$ comprise terms related to both $A_5$ and $A_6$ so that a determination of the concentration or saturation of $A_5$ or $A_6$ in the volume may be made. A determination of saturation is discussed herein. It will be understood that the concentration of $A_5$ in a volume containing both $A_5$ and $A_6$ could also be determined if it is known that $A_5 + A_6 = 1$, i.e., that there are no constituents in the volume which do not absorb incident light energy at the particular measurement wavelengths chosen. The measured signals $S_{\lambda a}$ (t) and $S_{\lambda b}(t)$ can be written (logarithm converted) as:

$$S_{\lambda a}(t) = \varepsilon_{5,\lambda a} c_5 x_{5,6}(t) + \varepsilon_{6,\lambda a} c_6 x_{5,6}(t) + n_{\lambda a}(t) \tag{18a}$$

$$= s_{\lambda a}(t) + n_{\lambda a}(t) \tag{18b}$$

$$S_{\lambda b}(t) = \varepsilon_{5,\lambda b} c_5 x_{5,6}(t) + \varepsilon_{6,\lambda b} c_6 x_{5,6}(t) + n_{\lambda b}(t) \tag{19a}$$

$$= s_{\lambda b}(t) + n_{\lambda b}(t). \tag{19b}$$

It is also often the case that there may be two or more thicknesses within a medium each containing the same two constituents but each experiencing a separate motion as in FIG. 6c. For example, it may be desirable to know the concentration or saturation of $A_5$ within a given volume which contains $A_5$ and $A_6$ as well as the concentration or saturation of $A_3$ within a given volume which contains $A_3$ and $A_4$, $A_3$ and $A_4$ having the same constituency as $A_5$ and $A_6$ respectively. In this case, the primary signals $s_{\lambda a}(t)$ and $s_{\lambda b}(t)$ again comprise terms related to both $A_5$ and $A_6$ and portions of the secondary signals $n_{\lambda a}(t)$ and $n_{\lambda b}(t)$ comprise terms related to both $A_3$ and $A_4$. The layers, $A_3$ and $A_4$, do not enter into the primary equation because they are assumed to be perturbed by a different frequency, or random or erratic secondary forces which are uncorrelated with the primary force. Since constituents 3 and 5 as well as constituents 4 and 6 are taken to be the same, they have the same absorption coefficients (i.e., $\varepsilon_{3,\lambda a} = \varepsilon_{5,\lambda a}$; $\varepsilon_{3,\lambda b} = \varepsilon_{5,\lambda b}$; $\varepsilon_{4,\lambda a} = \varepsilon_{6,\lambda a}$ and $\varepsilon_{4,\lambda b} = \varepsilon_{6,\lambda b}$. Generally speaking, however, $A_3$ and $A_4$ will have different concentrations than $A_5$ and $A_6$ and will therefore have a different saturation. Consequently a single constituent within a medium may have one or more saturations associated with it. The primary and secondary signals according to this model may be written as:

$$s_{\lambda a}(t) = [\varepsilon_{5,\lambda a} c_5 + \varepsilon_{6,\lambda a} c_6] x_{5,6}(t) \tag{20a}$$

$$n_{\lambda a}(t) = [\varepsilon_{5,\lambda a} c_3 + \varepsilon_{6,\lambda a} c_4] x_{3,4}(t) + \sum_{i=1}^{2} \varepsilon_{i,\lambda a} c_i x_i(t) + \sum_{i=7}^{n} \varepsilon_{i,\lambda a} c_i x_i(t) \tag{20b}$$

$$n_{\lambda a}(t) = [\varepsilon_{5,\lambda a} c_3 + \varepsilon_{6,\lambda a} c_4] x_{3,4}(t) + n_{\lambda a}(t) \tag{20c}$$

$$s_{\lambda b}(t) = [\varepsilon_{5,\lambda b} c_5 + \varepsilon_{6,\lambda b} c_6] x_{5,6}(t) \tag{21a}$$

18

-continued

$$n_{\lambda b}(t) = [\varepsilon_{5,\lambda b} c_3 + \varepsilon_{6,\lambda b} c_4] x_{3,4}(t) + \sum_{i=1}^{2} \varepsilon_{i,\lambda b} c_i x_i(t) + \sum_{i=7}^{N} \varepsilon_{i,\lambda b} c_i x_i(t). \tag{21b}$$

$$n_{\lambda b}(t) = [\varepsilon_{5,\lambda b} c_3 + \varepsilon_{6,\lambda b} c_4] x_{3,4}(t) + n_{\lambda b}(t) \tag{21c}$$

where signals $n_{\lambda a}(t)$ and $n_{\lambda b}(t)$ are similar to the secondary signals $n_{\lambda a}(t)$ and $n_{\lambda b}(t)$ except for the omission of the 3, 4 layer.

Any signal portions whether primary or secondary, outside of a known bandwidth of interest, including the constant undesired secondary signal portion resulting from the generally constant absorption of the constituents when not under perturbation, should be removed to determine an approximation to either the primary signal or the secondary signal within the bandwidth of interest. This is easily accomplished by traditional band pass filtering techniques. As in the previous example, it is often the case that the total perturbation or change affecting the layers associated with the secondary signal components is caused by random or erratic forces, causing the thickness of each layer, or the optical path length of each layer, $x_i(t)$, to change erratically, producing a random or erratic secondary signal component $n_{\lambda a}(t)$. Regardless of whether or not the secondary signal portion $n_{\lambda a}(t)$ is erratic, the secondary signal component $n_{\lambda a}(t)$ can be removed or derived via a correlation canceler, such as an adaptive noise canceler, having as one input a secondary reference n'(t) or a primary reference s'(t) determined by a processor of the present invention as long as the perturbation in layers other than the layer of constituents $A_5$ and $A_6$ is different than the perturbation in the layer of constituents $A_5$ and $A_6$. Either the erratic secondary signal components $n_{\lambda a}(t)$ and $n_{\lambda b}(t)$ or the primary components $s_{\lambda a}(t)$ and $s_{\lambda b}(t)$ may advantageously be removed from equations (18) and (19), or alternatively equations (20) and (21), by a correlation canceler. The correlation canceler, again, requires a sample of either the primary reference s'(t) or the secondary reference n'(t) and a sample of either of the composite signals $S_{\lambda a}(t)$ or $S_{\lambda b}(t)$ of equations (18) and (19).

### Determination of Primary and Secondary Reference Signals for Saturation Measurements

One method for determining reference signals s'(t) or n'(t) from the measured signals $S_{\lambda a}(t)$ and $S_{\lambda b}(t)$ in accordance with one aspect of the invention is what will be referred to as the constant saturation approach. In this approach, it is assumed that the saturation of $A_5$ in the volume containing $A_5$ and $A_6$ and the saturation of $A_3$ in the volume containing $A_3$ and $A_4$ remains relatively constant over some period of time, i.e.:

$$\text{Saturation}(A_5(t)) = c_5(t)/[c_5(t) + c_6(t)] \tag{22a}$$

$$\text{Saturation}(A_3(t)) = c_3(t)/[c_3(t) + c_4(t)] \tag{22b}$$

$$\text{Saturation}(A_5(t)) = \{1 + [c_6(t)/c_5(t)]\}^{-1} \tag{23a}$$

$$\text{Saturation}(A_3(t)) = \{1 + [c_4(t)/c_3(t)]\}^{-1} \tag{23b}$$

are substantially constant over many samples of the measured signals $S_{\lambda a}$ and $S_{\lambda b}$. This assumption is accurate over many samples since saturation generally changes relatively slowly in physiological systems.

US 7,530,955 B2

19

The constant saturation assumption is equivalent to assuming that:

$$c_5(t)/c_6(t)=\text{constant}_1 \tag{24a}$$

$$c_3(t)/c_4(t)=\text{constant}_2 \tag{24b}$$

since the only other term in equations (23a) and (23b) is a constant, namely the numeral 1.

Using this assumption, the proportionality constants $r_a$ and $r_v$ which allow determination of the secondary reference signal n'(t) and the primary reference signal s'(t) in the constant saturation method are:

$$r_a = \frac{\varepsilon_{5,\lambda a}c_5 \dots x_{5,6}(t) + \varepsilon_{6,\lambda a}c_6 x_{5,6}(t)}{\varepsilon_{5,\lambda b}c_5 x_{5,6}(t) + \varepsilon_{6,\lambda b}c_6 x_{5,6}(t)} \tag{25a}$$

$$= s_{\lambda a}(t)/s_{\lambda b}(t) \tag{26a}$$

$$= \frac{\varepsilon_{5,\lambda a}c_5 + \varepsilon_{6,\lambda a}c_6}{\varepsilon_{5,\lambda b}c_5 + \varepsilon_{6,\lambda b}c_6} \tag{27a}$$

$$= \frac{\varepsilon_{5,\lambda a}(c_5/c_6) + \varepsilon_{6,\lambda a}}{\varepsilon_{5,\lambda b}(c_5/c_6) + \varepsilon_{6,\lambda b}} \tag{28a}$$

$$\approx s''_{\lambda a}(t)/s''_{\lambda b}(t) = constant_3; \text{ where} \tag{29a}$$

$$n_{\lambda a}(t) \neq r_a(t)n_{\lambda b}(t) \tag{30a}$$

and

$$r_v = \frac{\varepsilon_{5,\lambda a}c_3 \cdot x_{3,4}(t) + \varepsilon_{6,\lambda a}c_4 x_{3,4}(t)}{\varepsilon_{5,\lambda b}c_3 x_{3,4}(t) + \varepsilon_{6,\lambda b}c_4 x_{3,4}(t))} \tag{25b}$$

$$= n_{\lambda a}(t)/n_{\lambda b}(t) \tag{26b}$$

$$= \frac{\varepsilon_{5,\lambda a}c_3 + \varepsilon_{6,\lambda a}c_4}{\varepsilon_{5,\lambda b}c_3 + \varepsilon_{6,\lambda b}c_4} \tag{27b}$$

$$= \frac{\varepsilon_{5,\lambda a}(c_3/c_4) + \varepsilon_{6,\lambda a}}{\varepsilon_{5,\lambda b}(c_3/c_4) + \varepsilon_{6,\lambda b}} \tag{28b}$$

$$\approx n''_{\lambda a}(t)/n''_{\lambda b}(t) = constant_4; \text{ where} \tag{29b}$$

$$s_{\lambda a}(t) \neq r_v(t)s_{\lambda b}(t). \tag{30b}$$

In accordance with the present invention, it is often the case that both equations (26) and (30) can be simultaneously satisfied to determine the proportionality constants $r_a$ and $r_v$. Additionally, the absorption coefficients at each wavelength $\varepsilon_{5,\lambda a}$, $\varepsilon_{6,\lambda a}$, $\varepsilon_{5,\lambda b}$, and $\varepsilon_{6,\lambda b}$ are constant and the central assumption of the constant saturation method is that $c_5(t)/c_6$ (t) and $c_3(t)/c_4(t)$ are constant over many sample periods. Thus, new proportionality constants $r_a$ and $r_v$ may be determined every few samples from new approximations to either the primary or secondary signal as output from the correlation canceler. Thus, the approximations to either the primary signals $s_{\lambda a}(t)$ and $s_{\lambda b}(t)$ or the secondary signals $n_{\lambda a}(t)$ and $n_{\lambda b}(t)$, found by the correlation canceler for a substantially immediately preceding set of samples of the measured signals $S_{\lambda a}(t)$ and $S_{\lambda b}(t)$ are used in a processor of the present invention for calculating the proportionality constants, $r_a$ and $r_v$, for the next set of samples of the measured signals $S_{\lambda a}(t)$ and $S_{\lambda b}(t)$.

Multiplying equation (19) by $r_a$ and subtracting the resulting equation from equation (18) yields a non-zero secondary reference signal:

$$n'(t)=S_{\lambda a}(t)-r_a S_{\lambda b}(t)=n_{\lambda a}(t)-r_a n_{\lambda b}(t). \tag{31a}$$

20

Multiplying equation (19) by $r_v$ and subtracting the resulting equation from equation (18) yields a non-zero primary reference signal:

$$s'(t)=S_{\lambda a}(t)-r_v S_{\lambda b}(t)=s_{\lambda a}(t)-r_v s_{\lambda b}(t). \tag{31b}$$

When using the constant saturation method in patient monitoring, initial proportionality coefficients can be determined as further explained below. It is not necessary for the patient to remain motionless even for an initialization period. With values for the proportionality coefficients $r_a$ and $r_v$ determined, a correlation canceler may be utilized with a secondary reference n'(t) or a primary reference s'(t).

Determination of Signal Coefficients for Primary and Secondary Reference Signals using the Constant Saturation Method

In accordance with one aspect of the present invention, the reference processor 26 of FIG. 4a and FIG. 4b of the present invention may be configured to multiply the second assumed signal $S_{\lambda b}(t)=s_{\lambda b}(t)+n_{\lambda b}(t)$ by each of a plurality of signal coefficients $r_1, r_2, \dots r_n$ and then subtract each result from the first measured signal $S_{\lambda a}(t)=s_{\lambda a}(t)+n_{\lambda a}(t)$ to obtain a plurality of reference signals

$$R'(r, t)=s_{\lambda a}(t)-rs_{\lambda b}(t)+n_{\lambda a}(t)-rn_{\lambda b}(t) \tag{32}$$

for $r=r_1, r_2, \dots r_n$ as shown in FIG. 7a. In other words, a plurality of signal coefficients are chosen to represent a cross section of possible signal coefficients.

In order to determine either the primary reference s'(t) or the secondary reference n'(t) from the above plurality of reference signals of equation (32), signal coefficients $r_a$ and $r_v$ are determined from the plurality of assumed signal coefficients $r_1, r_2, \dots r_n$. The coefficients $r_a$ and $r_v$ are selected such that they cause either the primary signal portions $s_{\lambda a}(t)$ and $s_{\lambda b}(t)$ or the secondary signal portions $n_{\lambda a}(t)$ and $n_{\lambda b}(t)$ to cancel or nearly cancel when they are substituted into the reference function R'(r, t), e.g.

$$s_{\lambda a}(t)=r_a s_{\lambda b}(t) \tag{33a}$$

$$n_{\lambda a}(t)=r_v n_{\lambda b}(t) \tag{33b}$$

$$n'(t)=R'(r_a, t)=n_{\lambda a}(t)-r_a n_{\lambda b}(t) \tag{33c}$$

$$s'(t)=R'(r_v, t)=s_{\lambda a}(t)-r_v s_{\lambda b}(t). \tag{33d}$$

In other words, coefficients $r_a$ and $r_v$ are selected at values which reflect the minimum of correlation between the primary signal portions and the secondary signal portions. In practice, one does not usually have significant prior information about either the primary signal portions $s_{\lambda a}(t)$ and $s_{\lambda b}(t)$ or the secondary signal portions $n_{\lambda a}(t)$ and $n_{\lambda b}(t)$ of the measured signals $S_{\lambda a}(t)$ and $S_{\lambda b}(t)$. The lack of this information makes it difficult to determine which of the plurality of coefficients $r_1, r_2, \dots r_n$ correspond to the signal coefficients $r_a=s_{\lambda a}(t)/s_{\lambda b}(t)$ and $r_v=n_{\lambda a}(t)/n_{\lambda b}(t)$.

One approach to determine the signal coefficients $r_a$ and $r_v$ from the plurality of coefficients $r_1, r_2, \dots r_n$ employs the use of a correlation canceler 27, such as an adaptive noise canceler, which takes a first input which corresponds to one of the measured signals $S_{\lambda a}(t)$ or $S_{\lambda b}(t)$ and takes a second input which corresponds to successively each one of the plurality of reference signals $R'(r_1, t), R'(r_2, t), \dots, R'(r_n, t)$, as shown in FIG. 7a. For each of the reference signals $R'(r_1, t), R'(r_2, t), \dots, R'(r_n, t)$ the corresponding output of the correlation canceler 27 is input to a "squares" operation 28 which squares the output of the correlation canceler 27. The output of the

US 7,530,955 B2

21

squares operation **28** is provided to an integrator **29** for forming a cumulative output signal (a summation of the squares). The cumulative output signal is subsequently input to an extremum detector **31**. The purpose of the extremum detector **31** is to chose signal coefficients $r_a$ and $r_v$ from the set $r_1$, $r_2, \ldots r_n$ by observing which provide a maximum in the cumulative output signal as in FIGS. 7b and 7c. In other words, coefficients which provide a maximum integrated output, such as energy or power, from the correlation canceler **27** correspond to the signal coefficients $r_a$ and $r_v$ which relate to a minimum correlation between the primary signal portions and the secondary signal portions in accordance with the signal model of the present invention. One could also configure a system geometry which would require one to locate the coefficients from the set $r_1, r_2, \ldots r_n$ which provide a minimum or inflection in the cumulative output signal to identify the signal coefficients $r_a$ and $r_v$.

Use of a plurality of coefficients in the processor of the present invention in conjunction with a correlation canceler **27** to determine the signal coefficients $r_a$ and $r_v$ may be demonstrated by using the properties of correlation cancellation. If x, y and z are taken to be any collection of three time varying signals, then the properties of some correlation cancelers C(x, y) may be defined as follows:

Property (1) $C(x,y)=0$ for x,y correlated     (34a)

Property (2) $C(x,y)=x$ for x,y uncorrelated     (34b)

Property (3) $C(x+y,z)=C(x,z)+C(y,z)$     (34c)

With properties (1), (2) and (3) it is easy to demonstrate that the energy or power output of a correlation canceler with a first input which corresponds to one of the measured signals $S_{\lambda a}(t)$ or $S_{\lambda b}(t)$ and a second input which corresponds successively each one of a plurality of reference signals $R'(r_1, t), R'(r_2, t), \ldots, R'(r_n, t)$ can determine the signal coefficients $r_a$ and $r_v$ needed to produce the primary reference s'(t) and secondary reference n'(t). If we take as a first input to the correlation canceler the measured signal $S_{\lambda a}(t)$ and as a second input the plurality of reference signals $R'(r_1, t), R'(r_2, t), \ldots, R'(r_n, t)$ then the outputs of the correlation canceler $C(S_{\lambda a}(t), R'(r_j, t))$ for $j=1, 2, \ldots, n$ may be written as

$C(s_{\lambda a}(t)+n_{\lambda a}(t), s_{\lambda a}(t)-r_j s_{\lambda b}(t)+n_{\lambda a}(t)-r_j n_{\lambda b}(t))$     (35)

where $j=1, 2, \ldots, n$ and we have used the expressions

$R'(r, t)=S_{\lambda a}(t)-rS_{\lambda b}(t)$     (36)

$S_{\lambda a}(t)=s_{\lambda a}(t)+n_{\lambda a}(t)$     (37a)

$S_{\lambda b}(t)=s_{\lambda b}(t)+n_{\lambda b}(t).$     (37b)

The use of property (3) allows one to expand equation (35) into two terms

$C(S_{\lambda a}(t), R'(r, t))=C(s_{\lambda a}(t), s_{\lambda a}(t)-rs_{\lambda b}(t)+n_{\lambda a}(t)-rn_{\lambda b}(t))+C(n_{\lambda a}(t), s_{\lambda a}(t)-rs_{\lambda b}(t)+n_{\lambda a}(t)-rn_{\lambda b}(t))$     (38)

so that upon use of properties (1) and (2) the correlation canceler output is given by

$C(S_{\lambda a}(t), R'(r_j, t))=s_{\lambda a}(t)\delta(r_j-r_a)+n_{\lambda a}(t)\delta(r_j-r_v)$     (39)

where $\delta(x)$ is the unit impulse function

$\delta(x)=0$ if $x \neq 0$

$\delta(x)=1$ if $x=0.$     (40)

22

The time variable, t, of the correlation canceler output $C(S_{\lambda a}(t), R'(r_j, t))$ may be eliminated by computing its energy or power. The energy of the correlation canceler output is given by

$$E_{\lambda a}(r_j) = \int C^2(S_{\lambda a}(t), R'(r_j, t))dt \qquad (41a)$$
$$= \delta(r_j-r_a)\int s_{\lambda a}^2(t)dt + \delta(r_j-r_v)\int n_{\lambda a}^2(t)dt.$$

It should be understood that one could, equally well, have chosen the measured signal $S_{\lambda b}(t)$ as the first input to the correlation canceler and the plurality of reference signals $R'(r_1, t), R'(r_2, t), \ldots, R'(r_n, t)$ as the second input. In this event, the correlation canceler energy output is

$$E_{\lambda b}(r_j) = \int C^2(S_{\lambda b}(t), R'(r, t))dt \qquad (41b)$$
$$= \delta(r_j-r_a)\int s_{\lambda b}^2(t)dt + \delta(r_j-r_v)\int n_{\lambda b}^2(t)dt.$$

It should also be understood that in practical situations the use of discrete time measurement signals may be employed as well as continuous time measurement signals. A system which performs a discrete transform (e.g., a saturation transform in the present example) in accordance with the present invention is described with reference to FIGS. 11-22. In the event that discrete time measurement signals are used, integration approximation methods such as the trapezoid rule, midpoint rule, Tick's rule, Simpson's approximation or other techniques may be used to compute the correlation canceler energy or power output. In the discrete time measurement signal case, the energy output of the correlation canceler may be written, using the trapezoid rule, as

$$E_{\lambda a}(r_j) = \delta(r_j-r_a)\Delta t \left\{ \sum_{i=0}^{n} s_{\lambda a}^2(t_i) - 0.5(s_{\lambda a}^2(t_0) + s_{\lambda a}^2(t_n)) \right\} + \qquad (42a)$$
$$\delta(r_j-r_v)\Delta t \left\{ \sum_{i=0}^{n} n_{\lambda a}^2(t_i) - 0.5(n_{\lambda a}^2(t_0) + n_{\lambda a}^2(t_n)) \right\}$$

$$E_{\lambda b}(r) = \delta(r_j-r_a)\Delta t \left\{ \sum_{i=0}^{n} s_{\lambda b}^2(t_i) - 0.5(s_{\lambda b}^2(t_0) + s_{\lambda b}^2(t_n)) \right\} + \qquad (42b)$$
$$\delta(r_j-r_v)\Delta t \left\{ \sum_{i=0}^{n} n_{\lambda b}^2(t_i) - 0.5(n_{\lambda b}^2(t_0) + n_{\lambda b}^2(t_n)) \right\}$$

where $t_i$ is the $i^{th}$ discrete time, $t_0$ is the initial time, $t_n$ is the final time and $\Delta t$ is the time between discrete time measurement samples.

The energy functions given above, and shown in FIG. 7b, indicate that the correlation canceler output is usually zero due to correlation between the measured signal $S_{\lambda a}(t)$ or $S_{\lambda b}(t)$ and many of the plurality of reference signals $R'(r_1, t), R'(r_2, t), \ldots, R'(r_n, t)$. However, the energy functions are non zero at values of $r_j$ which correspond to cancellation of either the primary signal portions $s_{\lambda a}(t)$ and $s_{\lambda b}(t)$ or the secondary signal portions $n_{\lambda a}(t)$ and $n_{\lambda b}(t)$ in the reference signal $R'(r_j, t)$. These values correspond to the signal coefficients $r_a$ and $r_v$.

It should be understood that there may be instances in time when either the primary signal portions $s_{\lambda a}(t)$ and $s_{\lambda b}(t)$ or the secondary signal portions $n_{\lambda a}(t)$ and $n_{\lambda b}(t)$ are identically

US 7,530,955 B2

23

zero or nearly zero. In these cases, only one signal coefficient value will provide maximum energy or power output of the correlation canceler.

Since there may be more than one signal coefficient value which provides maximum correlation canceler energy or power output, an ambiguity may arise. It may not be immediately obvious which signal coefficient together with the reference function $R'(r, t)$ provides either the primary or secondary reference. In such cases, it is necessary to consider the constraints of the physical system at hand. For example, in pulse oximetry, it is known that arterial blood, whose signature is the primary plethysmographic wave, has greater oxygen saturation than various blood, whose signature is the secondary erratic or random signal. Consequently, in pulse oximetry, the ratio of the primary signals due to arterial pulsation $r_a = s_{\lambda,a}(t)/s_{\lambda,b}(t)$ is the smaller of the two signal coefficient values while the ratio of the secondary signals due to mainly venous blood dynamics $r_v = n_{\lambda,a}(t)/n_{\lambda,b}(t)$ is the larger of the two signal coefficient value, assuming $\lambda a = 660$ nm and $\lambda b = 910$ nm.

It should also be understood that in practical implementations of the plurality of reference signals and cross correlator technique, the ideal features listed as properties (1), (2) and (3) above will not be precisely satisfied but will be approximations thereof. Therefore, in practical implementations of this embodiment of the present invention, the correlation canceler energy curves depicted in FIG. 7b will not consist of infinitely narrow delta functions but will have finite width associated with them as depicted in FIG. 7c.

It should also be understood that it is possible to have more than two signal coefficient values which produce maximum energy or power output from a correlation canceler. This situation arises when the measured signals each contain more than two components each of which are related by a ratio as follows:

$$s_{\lambda a}(t) = \sum_{i=0}^{n} f_{\lambda a,i}(t) \tag{43}$$

$$s_{\lambda b}(t) = \sum_{i=0}^{n} f_{\lambda b,i}(t)$$

where

$$f_{\lambda a,i}(t) = r_i f_{\lambda b,i}(t) \; i = 1, \ldots, n \; r_i \neq r_j.$$

Thus, reference signal techniques together with a correlation cancellation, such as an adaptive noise canceler, can be employed to decompose a signal into two or more signal components each of which is related by a ratio.

### Preferred Correlation Canceler using a Joint Process Estimator Implementation

Once either the secondary reference $n'(t)$ or the primary reference $s'(t)$ is determined by the processor of the present invention, the correlation canceler can be implemented in either hardware or software. The preferred implementation of a correlation canceler is that of an adaptive noise canceler using a joint process estimator.

The least mean squares (LMS) implementation of the internal processor 32 described above in conjunction with the adaptive noise canceler of FIG. 5a and FIG. 5b is relatively easy to implement, but lacks the speed of adaptation desirable for most physiological monitoring applications of the present invention. Thus, a faster approach for adaptive noise cancel-

24

ing, called a least-squares lattice joint process estimator model, is used in one embodiment. A joint process estimator 60 is shown diagrammatically in FIG. 8 and is described in detail in Chapter 9 of *Adaptive Filter Theory* by Simon Haykin, published by Prentice-Hall, copyright 1986. This entire book, including Chapter 9, is hereby incorporated herein by reference.

The function of the joint process estimator is to remove either the secondary signal portions $n_{\lambda,a}(t)$ or $n_{\lambda,b}(t)$ or the primary signal portions $s_{\lambda,a}(t)$ or $s_{\lambda,b}(t)$ from the measured signals $S_{\lambda,a}(t)$ or $S_{\lambda,b}(t)$, yielding either a primary signal approximation $s''_{\lambda,a}(t)$ or $s''_{\lambda,b}(t)$ or a secondary signal approximation $n''_{\lambda,a}(t)$ or $n''_{\lambda,b}(t)$. Thus, the joint process estimator estimates either the value of the primary signals $s_{\lambda,a}(t)$ or $s_{\lambda,b}(t)$ or the secondary signals $n_{\lambda,a}(t)$ or $n_{\lambda,b}(t)$. The inputs to the joint process estimator 60 are either the secondary reference $n'(t)$ or the primary reference $s'(t)$ and the composite measured signal $S_{\lambda,a}(t)$ or $S_{\lambda,b}(t)$. The output is a good approximation to the signal $S_{\lambda,a}(t)$ or $S_{\lambda,b}(t)$ with either the secondary signal or the primary signal removed, i.e. a good approximation to either $s_{\lambda,a}(t)$, $s_{\lambda,b}(t)$, $n_{\lambda,a}(t)$ or $n_{\lambda,b}(t)$.

The joint process estimator 60 of FIG. 8 utilizes, in conjunction, a least square lattice predictor 70 and a regression filter 80. Either the secondary reference $n'(t)$ or the primary reference $s'(t)$ is input to the least square lattice predictor 70 while the measured signal $S_{\lambda,a}(t)$ or $S_{\lambda,b}(t)$ is input to the regression filter 80. For simplicity in the following description, $S_{\lambda,a}(t)$ will be the measured signal from which either the primary portion $s_{\lambda,a}(t)$ or the secondary portion $n_{\lambda,a}(t)$ will be estimated by the joint process estimator 60. However, it will be noted that $S_{\lambda,b}(t)$ could also be input to the regression filter 80 and the primary portion $s_{\lambda,b}(t)$ or the secondary portion $n_{\lambda,b}(t)$ of this signal could be estimated.

The joint process estimator 60 removes all frequencies that are present in both the reference $n'(t)$ or $s'(t)$, and the measured signal $S_{\lambda,a}(t)$. The secondary signal portion $n_{\lambda,a}(t)$ usually comprises frequencies unrelated to those of the primary signal portion $s_{\lambda,a}(t)$. It is improbable that the secondary signal portion $n_{\lambda,a}(t)$ would be of exactly the same spectral content as the primary signal portion $s_{\lambda,a}(t)$. However, in the unlikely event that the spectral content of $s_{\lambda,a}(t)$ and $n_{\lambda,a}(t)$ are similar, this approach will not yield accurate results. Functionally, the joint process estimator 60 compares the reference input signal $n'(t)$ or $s'(t)$, which is correlated to either the secondary signal portion $n_{\lambda,a}(t)$ or the primary signal portion $s_{\lambda,a}(t)$, and input signal $S_{\lambda,a}(t)$ and removes all frequencies which are identical. Thus, the joint process estimator 60 acts as a dynamic multiple notch filter to remove those frequencies in the secondary signal component $n_{\lambda,a}(t)$ as they change erratically with the motion of the patient or those frequencies in the primary signal component $s_{\lambda,a}(t)$ as they change with the arterial pulsation of the patient. This yields a signal having substantially the same spectral content and amplitude as either the primary signal $s_{\lambda,a}(t)$ or the secondary signal $n_{\lambda,a}(t)$. Thus, the output $s''_{\lambda,a}(t)$ or $n''_{\lambda,a}(t)$ of the joint process estimator 60 is a very good approximation to either the primary signal $s_{\lambda,a}(t)$ or the secondary signal $n_{\lambda,a}(t)$.

The joint process estimator 60 can be divided into stages, beginning with a zero-stage and terminating in an $m^{th}$-stage, as shown in FIG. 8. Each stage, except for the zero-stage, is identical to every other stage. The zero-stage is an input stage for the joint process estimator 60. The first stage through the $m^{th}$-stage work on the signal produced in the immediately previous stage, i.e., the $(m-1)^{th}$-stage, such that a good primary signal approximation $s''_{\lambda,a}(t)$ or secondary signal approximation $n''_{\lambda,a}(t)$ is produced as output from the $m^{th}$-stage.

US 7,530,955 B2

25

The least-squares lattice predictor **70** comprises registers **90** and **92**, summing elements **100** and **102**, and delay elements **110**. The registers **90** and **92** contain multiplicative values of a forward reflection coefficient $\Gamma_{f,m}(t)$ and a backward reflection coefficient $\Gamma_{b,m}(t)$ which multiply the reference signal n'(t) or s'(t) and signals derived from the reference signal n'(t) or s'(t). Each stage of the least-squares lattice predictor outputs a forward prediction error $f_m(t)$ and a backward prediction error $b_m(t)$. The subscript m is indicative of the stage.

For each set of samples, i.e. one sample of the reference signal n'(t) or s'(t) derived substantially simultaneously with one sample of the measured signal $S_{\lambda a}(t)$, the sample of the reference signal n'(t) or s'(t) is input to the least-squares lattice predictor **70**. The zero-stage forward prediction error $f_0(t)$ and the zero-stage backward prediction error $b_0(t)$ are set equal to the reference signal n'(t) or s'(t). The backward prediction error $b_0(t)$ is delayed by one sample period by the delay element **110** in the first stage of the least-squares lattice predictor **70**. Thus, the immediately previous value of the reference n'(t) or s'(t) is used in calculations involving the first-stage delay element **110**. The zero-stage forward prediction error is added to the negative of the delayed zero-stage backward prediction error $b_0(t-1)$ multiplied by the forward reflection coefficient value $\Gamma_{f,1}(t)$ register **90** value, to produce a first-stage forward prediction error $f_1(t)$. Additionally, the zero-stage forward prediction error $f_0(t)$ is multiplied by the backward reflection coefficient $\Gamma_{b,1}(t)$ register **92** value and added to the delayed zero-stage backward prediction error $b_0(t-1)$ to produce a first-stage backward prediction error $b_1(t)$. In each subsequent stage, m, of the least square lattice predictor **70**, the previous forward and backward prediction error values, $f_{m-1}(t)$ and $b_{m-1}(t-1)$, the backward prediction error being delayed by one sample period, are used to produce values of the forward and backward prediction errors for the present stage, $f_m(t)$ and $b_m(t)$.

The backward prediction error $b_m(t)$ is fed to the concurrent stage, m, of the regression filter **80**. There it is input to a register **96**, which contains a multiplicative regression coefficient value $\kappa_{m,\lambda a}(t)$. For example, in the zero-stage of the regression filter **80**, the zero-stage backward prediction error $b_0(t)$ is multiplied by the zero-stage regression coefficient $\kappa_{0,\lambda a}(t)$ register **96** value and subtracted from the measured value of the signal $S_{\lambda a}(t)$ at a summing element **106** to produce a first stage estimation error signal $e_{1,\lambda a}(t)$. The first-stage estimation error signal $e_{1,\lambda a}(t)$ is a first approximation to either the primary signal or the secondary signal. This first-stage estimation error signal $e_{1,\lambda a}(t)$ is input to the first-stage of the regression filter **80**. The first-stage backward prediction error $b_1(t)$, multiplied by the first-stage regression coefficient $\kappa_{1,\lambda a}(t)$ register **96** value is subtracted from the first-stage estimation error signal $e_{1,\lambda a}(t)$ to produce the second-stage estimation error signal $e_{2,\lambda a}(t)$. The second-stage estimation error signal $e_{2,\lambda a}(t)$ is a second, somewhat better approximation to either the primary signal $s_{\lambda a}(t)$ or the secondary signal $n_{\lambda a}(t)$.

The same processes are repeated in the least-squares lattice predictor **70** and the regression filter **80** for each stage until a good approximation $e_{m,\lambda a}(t)$, to either the primary signal $s_{\lambda a}(t)$ or the secondary signal $n_{\lambda a}(t)$ is determined. Each of the signals discussed above, including the forward prediction error $f_m(t)$, the backward prediction error $b_m(t)$, the estimation error signal $e_{m,\lambda a}(t)$, is necessary to calculate the forward reflection coefficient $\Gamma_{f,m}(t)$, the backward reflection coefficient $\Gamma_{b,m}(t)$, and the regression coefficient $\kappa_{m,\lambda a}(t)$ register **90**, **92**, and **96** values in each stage, m. In addition to the forward prediction error $f_m(t)$, the backward prediction error $b_m(t)$, and the estimation error $e_{m,\lambda a}(t)$ signals, a number of

26

intermediate variables, not shown in FIG. **8** but based on the values labeled in FIG. **8**, are required to calculate the forward reflection coefficient $\Gamma_{f,m}(t)$, the backward reflection coefficient $\Gamma_{b,m}(t)$, and the regression coefficient $\kappa_{m,\lambda a}(t)$ register **90**,**92**, and **96** values.

Intermediate variables include a weighted sum of the forward prediction error squares $\Im_m(t)$, a weighted sum of the backward prediction error squares $\beta_m(t)$, a scalar parameter $\Delta_m(t)$, a conversion factor $\gamma_m(t)$, and another scalar parameter $\rho_{m,\lambda a}(t)$. The weighted sum of the forward prediction errors $\Im_m(t)$ is defined as:

$$\Im_m(t) = \sum_{i=1}^{t} \lambda^{t-i} |f_m(i)|^2; \tag{44}$$

where $\lambda$ without a wavelength identifier, a or b, is a constant multiplicative value unrelated to wavelength and is typically less than or equal to one, i.e., $\lambda \leq 1$. The weighted sum of the backward prediction errors $\beta_m(t)$ is defined as:

$$\beta_m(t) = \sum_{i=1}^{t} \lambda^{t-i} |b_m(i)|^2 \tag{45}$$

where $\lambda$ again, without a wavelength identifier, a or b, is a constant multiplicative value unrelated to wavelength and is typically less than or equal to one, i.e., $\lambda \leq 1$. These weighted sum intermediate error signals can be manipulated such that they are more easily solved for, as described in Chapter 9, § 9.3 of the Haykin book referenced above and defined hereinafter in equations (59) and (60).

Description of the Joint Process Estimator

The operation of the joint process estimator **60** is as follows. When the joint process estimator **60** is turned on, the initial values of intermediate variables and signals including the parameter $\Delta_{m-1}(t)$, the weighted sum of the forward prediction error signals $\Im_{m-1}(t)$, the weighted sum of the backward prediction error signals $\beta_{m-1}(t)$, the parameter $\rho_{m,\lambda a}(t)$, and the zero-stage estimation error $e_{0,\lambda a}(t)$ are initialized, some to zero and some to a small positive number $\delta$:

$$\Delta_{m-1}(0) = 0; \tag{46}$$

$$\Im_{m-1}(0) = \delta; \tag{47}$$

$$\beta_{m-1}(0) = \delta; \tag{48}$$

$$\rho_{m-1}(0) = 0; \tag{49}$$

$$e_{0,\lambda a}(t) = S_{\lambda a}(t) \text{ for } t \geq 0. \tag{50}$$

After initialization, a simultaneous sample of the measured signal $S_{\lambda a}(t)$ or $S_{\lambda b}(t)$ and either the secondary reference n'(t) or the primary reference s'(t) are input to the joint process estimator **60**, as shown in FIG. **8**. The forward and backward prediction error signals $f_0(t)$ and $b_0(t)$, and intermediate variables including the weighted sums of the forward and back

27

ward error signals $\Im_0(t)$ and $\beta_0(t)$, and the conversion factor $\gamma_0(t)$ are calculated for the zero-stage according to:

$$f_0(t) = b_0(t) = n'(t) \tag{51}$$

$$\Im_0(t) = \beta_0(t) = \lambda \Im_0(t-1) + |n'(t)|^2 \tag{52a}$$

$$\gamma_0(t-1) = 1 \tag{53a}$$

if a secondary reference n'(t) is used or according to:

$$f_0(t) = b_0(t) = s'(t) \tag{51b}$$

$$\Im_0(t) = \beta_0(t) = \lambda \Im_0(t-1) + |s'(t)|^2 \tag{52b}$$

$$\gamma_0(t-1) = 1 \tag{53b}$$

if a primary reference s'(t) is used where λ, again, without a wavelength identifier, a or b, is a constant multiplicative value unrelated to wavelength.

Forward reflection coefficient $\Gamma_{f,m}(t)$, backward reflection coefficient $\Gamma_{b,m}(t)$, and regression coefficient $\kappa_{m,\lambda a}(t)$ register 90, 92 and 96 values in each stage thereafter are set according to the output of the previous stage. The forward reflection coefficient $\Gamma_{f,1}(t)$, backward reflection coefficient $\Gamma_{b,1}(t)$, and regression coefficient $\kappa_{1,\lambda a}(t)$ register 90, 92 and 96 values in the first stage are thus set according to the algorithm using values in the zero-stage of the joint process estimator 60. In each stage, m≧1, intermediate values and register values including the parameter $\Delta_{m-1}(t)$; the forward reflection coefficient $\Gamma_{f,m}(t)$ register 90 value; the backward reflection coefficient $\Gamma_{b,m}(t)$ register 92 value; the forward and backward error signals $f_m(t)$ and $b_m(t)$; the weighted sum of squared forward prediction errors $\Im_{f,m}(t)$, as manipulated in § 9.3 of the Haykin book; the weighted sum of squared backward prediction errors $\beta_{b,m}(t)$, as manipulated in § 9.3 of the Haykin book; the conversion factor $\gamma_m(t)$; the parameter $\rho_{m,\lambda a}(t)$; the regression coefficient $\kappa_{m,\lambda a}(t)$ register 96 value; and the estimation error $e_{m+1,\lambda a}(t)$ value are set according to:

$$\Delta_{m-1}(t) = \lambda \Delta_{m-1}(t-1) + \{b_{m-1}(t-1) f^*_{m-1}(t) / \gamma_{m-1}(t)\} \tag{54}$$

$$\Gamma_{f,m}(t) = -\{\Delta_{m-1}(t) / \beta_{m-1}(t-1)\} \tag{55}$$

$$\Gamma_{b,m}(t) = -\{\Delta^*_{m-1}(t) / \Im_{m-1}(t)\} \tag{56}$$

$$f_m(t) = f_{m-1}(t) + \Gamma^*_{f,m}(t) b_{m-1}(t-1) \tag{57}$$

$$b_m(t) = b_{m-1}(t-1) + \Gamma^*_{b,m}(t) f_{m-1}(t) \tag{58}$$

$$\Im_m(t) = \Im_{m-1}(t) - \{|\Delta_{m-1}(t)|^2 / \beta_{m-1}(t-1)\} \tag{59}$$

$$\beta_m(t) = \beta_{m-1}(t-1) - \{|\Delta_{m-1}(t)|^2 / \Im_{m-1}(t)\} \tag{60}$$

$$\gamma_m(t-1) = \gamma_{m-1}(t-1) - \{|b_{m-1}(t-1)|^2 / \beta_{m-1}(t-1)\} \tag{61}$$

$$\rho_{m,\lambda a}(t) = \lambda \rho_{m,\lambda a}(t-1) + \{b_m(t) e^*_{m,\lambda a}(t) / \gamma_m(t)\} \tag{62}$$

$$\kappa_{m,\lambda a}(t) = \{\rho_{m,\lambda a}(t) / \beta_m(t)\} \tag{63}$$

$$e_{m+1,\lambda a}(t) = e_{m,\lambda a}(t) - \kappa^*_m(t) b_m(t) \tag{64}$$

where a (*) denotes a complex conjugate.

These equations cause the error signals $f_m(t)$, $b_m(t)$, $e_{m,\lambda a}(t)$ to be squared or to be multiplied by one another, in effect squaring the errors, and creating new intermediate error values, such as $\Delta_{m-1}(t)$. The error signals and the intermediate error values are recursively tied together, as shown in the above equations (54) through (64). They interact to minimize the error signals in the next stage.

28

After a good approximation to either the primary signal $s_{\lambda a}(t)$ or the secondary signal $n_{\lambda a}(t)$ has been determined by the joint process estimator 60, a next set of samples, including a sample of the measured signal $S_{\lambda a}(t)$ and a sample of either the secondary reference n'(t) or the primary reference s'(t), are input to the joint process estimator 60. The re-initialization process does not re-occur, such that the forward and backward reflection coefficient $\Gamma_{f,m}(t)$ and $\Gamma_{b,m}(t)$ register 90, 92 values and the regression coefficient $\kappa_{m,\lambda a}(t)$ register 96 value reflect the multiplicative values required to estimate either the primary signal portion $s_{\lambda a}(t)$ or the secondary signal portion $n_{\lambda a}(t)$ of the sample of $S_{\lambda a}(t)$ input previously. Thus, information from previous samples is used to estimate either the primary or secondary signal portion of a present set of samples in each stage.

In a more numerically stable and preferred embodiment of the above described joint process estimator, a normalized joint process estimator is used. This version of the joint process estimator normalizes several variables of the above-described joint process estimator such that the normalized variables fall between −1 and 1. The derivation of the normalized joint process estimator is motivated in the Haykin text as problem 12 on page 640 by redefining the variables defined according to the following conditions:

$$\overline{f}_m(t) = \frac{f_m(t)}{\sqrt{\Im_m(t)\gamma_m(t-1)}}$$

$$\overline{b}(t) = \frac{b_m(t)}{\sqrt{\beta_m(t)\gamma_m(t)}}$$

$$\overline{\Delta}_m(t) = \frac{\Delta_m(t)}{\sqrt{\Im_m(t)\beta_m(t-1)}}$$

This transformation allows the conversion of Equations (54)-(64) to the following normalized equations:

$$\overline{\Delta}_m(t) = \overline{\Delta}_{m-1}(t-1)[1 - |f_{m-1}(t)|^2]^{1/2}[1|\overline{b}_{m-1}(t-1)|^2]^{1/2} + \overline{b}_{m-1}(t-1)\overline{f}_{m-1}(t)$$

$$\overline{b}_m(t) = \frac{[\overline{b}_{m-1}(t-1) - \overline{\Delta}_m(t)\overline{f}_{m-1}(t)]}{[1 - |\overline{\Delta}_{m-1}(t)|^2]^{1/2}[1 - |\overline{f}_{m-1}(t)|^2]^{1/2}}$$

$$\overline{f}_m(t) = \frac{[\overline{f}_{m-1}(t) - \overline{\Delta}_{m-1}(t)\overline{b}_{m-1}(t-1)]}{[1 - |\overline{\Delta}_{m-1}(t)|^2]^{1/2}[1 - |\overline{b}_{m-1}(t-1)|^2]^{1/2}}$$

$$\beta_m(t) = [1 - |\overline{\Delta}_{m-1}(t)|^2]\beta_{m-1}(t-1)$$

$$\gamma_m(t) = \gamma_{m-1}(t)[1 - |\overline{b}_{m-1}(t)|^2]$$

$$\rho_m(t) = \lambda \cdot \left[\frac{\gamma_m(t)\beta_m(t-1)}{\gamma_m(t-1)\beta_m(t)}\right]^{1/2} \rho_m(t-1) + \overline{b}_m(t)\varepsilon_m(t)$$

$$\varepsilon_{m+1,\lambda a}(t) = \varepsilon_{m,\lambda a}(t) - \rho_m(t)\overline{b}_m(t)$$

Initialization of Normalized Joint Process Estimator

Let N(t) be defined as the reference noise input at time index n and U(t) be defined as combined signal plus noise input at time index t the following equations apply (see Haykin, p. 619):

US 7,530,955 B2

<div style="columns">

**29**

1. To initialize the algorithm, at time t=0 set

$$\overline{\Delta}_{m-1}(0)=0$$

$$\beta_{m-1}(0)=\delta=10^{-6}$$

$$\gamma_0(0)=1$$

2. At each instant $t \geqq 1$, generate the various zeroth-order variables as follows:

$$\gamma_0((t-1))=1$$

$$\beta_0(t)=\lambda\beta_0(t-1)+N^2(t)$$

$$\overline{b}_0(t) = \overline{f}_0(t) = \frac{N(t)}{\sqrt{\beta_0(t)}}$$

3. For regression filtering, initialize the algorithm by setting at time index t=0

$$\rho_m(0)=0$$

4. At each instant $t \geqq 1$, generate the zeroth-order variable

$$\epsilon_0(t)=U(t).$$

Accordingly, a normalized joint process estimator can be used for a more stable system.

In yet another embodiment, the correlation cancellation is performed with a QRD algorithm as shown diagrammatically in FIG. **8**a and as described in detail in Chapter 18 of *Adaptive Filter Theory* by Simon Haykin, published by Prentice-Hall, copyright 1986.

The following equations adapted from the Haykin book correspond to the QRD-LSL diagram of FIG. **8**a (also adapted from the Haykin book).

Computations

a. Predictions: For time t=1, 2, . . . , and prediction order m=1, 2, . . . , M, where M is the final prediction order, compute:

$$\beta_{m-1}(t-1)=\lambda\beta_{m-1}(t-2)+|\epsilon_{b,m-1}(t-1)|^2$$

$$c_{b,m-1}(t+1) = \frac{\lambda^{1/2}\beta_{m-1}^{1/2}(t-2)}{\beta_{m-1}^{1/2}(t-1)}$$

$$s_{b,m-1}(t-1) = \frac{\varepsilon_{b,m-1}^*(t-1)}{\beta_{m-1}^{1/2}(t-1)}$$

$$\epsilon_{f,m}(t)=c_{b,m-1}(t-1)\epsilon_{f,m-1}(t)-s^*_{b,m-1}(t-1)\lambda^{1/2}\pi^*_{f,m-1}(t-1)$$

$$\pi^*_{f,m-1}(t)=c_{b,m-1}(t-1)\lambda^{1/2}\pi^*_{f,m-1}(t-1)+s_{b,m-1}(t-1)\epsilon_{f,m-1}(t)$$

$$\gamma_m^{1/2}(t-1)=c_{b,m-1}(t-1)\gamma_{m-1}^{1/2}(t-1)$$

$$\mathfrak{I}_{m-1}(t)=\lambda\mathfrak{I}_{m-1}(t-1)+|\epsilon_{f,m-1}(t)|^2$$

$$c_{f,m-1} = \frac{\lambda^{1/2}\mathfrak{I}_{m-1}^{1/2}(t-1)}{\mathfrak{I}_{m-1}^{1/2}(t)}$$

$$s_{f,m-1}(t) = \frac{\varepsilon_{f,m-1}^*(t)}{\mathfrak{I}_{m-1}^{1/2}(t)}$$

**30**

$$\epsilon_{b,m}(t)=c_{f,m-1}(t)\epsilon_{b,m-1}(t-1)-s^*_{f,m-1}(t)\lambda^{1/2}\pi^*_{b,m-1}(t-1)$$

$$\pi^*_{b,m-1}(t)=c_{f,m-1}(t)\lambda_{1/2}\pi^*_{b,m-1}(t-1)+s_{f,m-1}(t)\epsilon_{b,m-1}(t-1)$$

b. Filtering: For order m=0, 1, . . . , M−1; and time t=1, 2, . . . , compute

$$\beta_m(t)=\lambda\beta_m(t-1)+|\epsilon_{b,m}(t)|^2$$

$$c_{b,m}(t) = \frac{\lambda^{1/2}\beta_m^{1/2}(t-1)}{\beta_m^{1/2}(t)}$$

$$s_{b,m}(t) = \frac{\varepsilon_{b,m}^*(t)}{\beta_m^{1/2}(t)}$$

$$\epsilon_{m+1}(t)=c_{b,m}(t)\epsilon_m(t)-s^*_{b,m}(t)\lambda^{1/2}\rho^*_m(t-1)$$

$$\rho^*_m(t)=c_{b,m}(t)\lambda^{1/2}\rho^*_m(t-1)+s_{b,m}(t)\epsilon_m(t)$$

$$\gamma_{m+1}^{1/2}(t)=c_{b,m}(t)\gamma_m^{1/2}(t)$$

$$\epsilon_{m+1}(t)=\lambda_{m+1}^{1/2}(t)\epsilon_{m+1}(t)$$

5. Initialization

a. Auxiliary parameter initialization: for order m=1, 2, . . . , M, set

$$\pi_{f,m-1}(0)=\pi_{b,m-1}(0)=0$$

$$\rho_m(0)=0$$

b. Soft constraint initialization: For order m=0, 1, . . . , M, set

$$\beta_m(-1)=\delta$$

$$\mathfrak{I}_m(0)=\delta$$

where δ is a small positive constant.

c. Data initialization: For t=1, 2, . . . , compute

$$\epsilon_{f,0}(t)=\epsilon_{b,0}(t)=\mu(t)$$

$$\epsilon_0(t)=d(t)$$

$$\gamma_0(t)=1$$

where μ(t) is the input and d(t) is the desired response at time t.

Flowchart of Joint Process Estimator

In a signal processor, such as a physiological monitor incorporating a reference processor of the present invention to determine a reference n'(t) or s'(t) for input to a correlation canceler, a joint process estimator **60** type adaptive noise canceler is generally implemented via a software program having an iterative loop. One iteration of the loop is analogous to a single stage of the joint process estimator as shown in FIG. **8**. Thus, if a loop is iterated m times, it is equivalent to an m stage joint process estimator **60**.

A flow chart of a subroutine to estimate the primary signal portion $s_{\lambda,a}(t)$ or the secondary signal portion $n_{\lambda,a}(t)$ of a measured composite signal, $S_{\lambda,a}(t)$ is shown in FIG. **9**. The flow chart illustrates the function of a reference processor for determining either the secondary reference n'(t) or the primary reference s'(t). The flowchart for the joint process estimator is implemented in software.

A one-time initialization is performed when the physiological monitor is powered-on, as indicated by an "INI-

</div>

US 7,530,955 B2

31

TIALIZE NOISE CANCELER" action block **120**. The initialization sets all registers **90**, **92**, and **96** and delay element variables **110** to the values described above in equations (46) thrmiioh (50)

Next, a set of simultaneous samples of the composite measured signals $S_{\lambda,a}(t)$ and $S_{\lambda,b}(t)$ is input to the subroutine represented by the flowchart in FIG. **9**. Then a time update of each of the delay element program variables occurs, as indicated in a "TIME UPDATE OF $[Z^{-1}]$ ELEMENTS" action block **130**. The value stored in each of the delay element variables **110** is set to the value at the input of the delay element variable **110**. Thus, the zero-stage backward prediction error $b_0(t)$ is stored as the first-stage delay element variable, and the first-stage backward prediction error $b_1(t)$ is stored as the second-stage delay element variable, and so on.

Then, using the set of measured signal samples $S_{\lambda,a}(t)$ and $S_{\lambda,b}(t)$, the reference signal is obtained using the ratiometric or the constant saturation methods described above. This is indicated by a "CALCULATE REFERENCE [n'(t) or s'(t)] FOR TWO MEASURED SIGNAL SAMPLES" action block **140**.

A zero-stage order update is performed next as indicated in a "ZERO-STAGE UPDATE" action block **150**. The zero-stage backward prediction error $b_0(t)$, and the zero-stage forward prediction error $f_0(t)$ are set equal to the value of the reference signal $n'(t)$ or $s'(t)$. Additionally, the weighted sum of the forward prediction errors $\Im_m(t)$ and the weighted sum of backward prediction errors $\beta_m(t)$ are set equal to the value defined in equations (47) and (48).

Next, a loop counter, m, is initialized as indicated in a "m=0" action block **160**. A maximum value of m, defining the total number of stages to be used by the subroutine corresponding to the flowchart in FIG. **9**, is also defined. Typically, the loop is constructed such that it stops iterating once a criterion for convergence upon a best approximation to either the primary signal or the secondary signal has been met by the joint process estimator **60**. Additionally, a maximum number of loop iterations may be chosen at which the loop stops iteration. In a preferred embodiment of a physiological monitor of the present invention, a maximum number of iterations, m=6 to m=10, is advantageously chosen.

Within the loop, the forward and backward reflection coefficient $\Gamma_{f,m}(t)$ and $\Gamma_{b,m}(t)$ register **90** and **92** values in the least-squares lattice filter are calculated first, as indicated by the "ORDER UPDATE MTH CELL OF LSL-LATTICE" action block **170** in FIG. **9**. This requires calculation of intermediate variable and signal values used in determining register **90**, **92**, and **96** values in the present stage, the next stage, and in the regression filter **80**.

The calculation of regression filter register **96** value $\kappa_{m,\lambda,a}$ (t) is performed next, indicated by the "ORDER UPDATE MTH STAGE OF REGRESSION FILTER(S)" action block **180**. The two order update action blocks **170** and **180** are performed in sequence m times, until m has reached its predetermined maximum (in the preferred embodiment, m=6 to m=10) or a solution has been converged upon, as indicated by a YES path from a "DONE" decision block **190**. In a computer subroutine, convergence is determined by checking if the weighted sums of the forward and backward prediction errors $\Im_m(t)$ and $\beta_m(t)$ are less than a small positive number. An output is calculated next, as indicated by a "CALCULATE OUTPUT" action block **200**. The output is a good approximation to either the primary signal or secondary signal, as determined by the reference processor **26** and joint process estimator **60** subroutine corresponding to the flow chart of FIG. **9**. This is displayed (or used in a calculation in another subroutine), as indicated by a "TO DISPLAY" action block **210**.

32

A new set of samples of the two measured signals $S_{\lambda,a}(t)$ and $S_{\lambda,b}(t)$ is input to the processor and joint process estimator **60** adaptive noise canceler subroutine corresponding to the flowchart of FIG. **9** and the process reiterates for these samples. Note, however, that the initialization process does not re-occur. New sets of measured signal samples $S_{\lambda,a}(t)$ and $S_{\lambda,b}(t)$ are continuously input to the reference processor **26** and joint process estimator adaptive noise canceler subroutine. The output forms a chain of samples which is representative of a continuous wave. This waveform is a good approximation to either the primary signal waveform $s_{\lambda,a}(t)$ or the secondary waveform $n_{\lambda,a}(t)$ at wavelength $\lambda$a. The waveform may also be a good approximation to either the primary signal waveform $s_{\lambda,b}(t)$ or the secondary waveform $n''_{\lambda,b}(t)$ at wavelength $\lambda$b.

A corresponding flowchart for the QRD algorithm of FIG. **8**$a$ is depicted in FIG. **9**$a$, with reference numeral corresponding in number with an 'a' extension

### Calculation of Saturation from Correlation Canceler Output

Physiological monitors may use the approximation of the primary signals $s''_{\lambda,a}(t)$ or $s''_{\lambda,b}(t)$ or the secondary signals $n''_{\lambda,a}(t)$ or $n''_{\lambda,b}(t)$ to calculate another quality, such as the saturation of one constituent in a volume containing that constituent plus one or more other constituents. Generally, such calculations require information about either a primary or secondary signal at two wavelengths. For example, the constant saturation method requires a good approximation of the primary signal portions $S_{\lambda,a}(t)$ and $S_{\lambda,b}(t)$ of both measured signals $S_{\lambda,a}(t)$ and $S_{\lambda,b}(t)$. The arterial saturation is determined from the approximations to both signals, i.e. $s''_{\lambda,a}(t)$ and $s''_{\lambda,b}$ (t). The constant saturation method also requires a good approximation of the secondary signal portions $n_{\lambda,a}(t)$ or $n_{\lambda,b}$ (t). An estimate of the venous saturation may be determined from the approximations to these signals i.e. $n''_{\lambda,a}(t)$ and $n''_{\lambda,b}$ (t)

A joint process estimator **60** having two regression filters **80**$a$ and **80**$b$ is shown in FIG. **10**. A first regression filter **80**$a$ accepts a measured signal $S_{\lambda,a}(t)$. A second regression filter **80**$b$ accepts a measured signal $S_{\lambda,b}(t)$ for a use of the constant saturation method to determine the reference signal $n'(t)$ or $s'(t)$. The first and second regression filters **80**$a$ and **80**$b$ are independent. The backward prediction error $b_m(t)$ is input to each regression filter **80**$a$ and **80**$b$, the input for the second regression filter **80**$b$ bypassing the first regression filter **80**$a$.

The second regression filter **80**$b$ comprises registers **98**, and summing elements **108** arranged similarly to those in the first regression filter **80**$a$. The second regression filter **80**$b$ operates via an additional intermediate variable in conjunction with those defined by equations (54) through (64), i.e.:

$$\rho_{m,\lambda,b}(t) = \lambda \rho_{m,\lambda,b}(t-1) + \{b_m(t)e^*_{m,\lambda,b}(t)/\gamma_m(t)\}; \text{ and} \qquad (65)$$

$$\rho_{0,\lambda,b}(0) = 0. \qquad (66)$$

The second regression filter **80**$b$ has an error signal value defined similar to the first regression filter error signal values, $e_{m,\lambda,b}(t)$, i.e.:

$$e_{m+1,\lambda,b}(t) = e_{m,\lambda,b}(t) - \kappa^*_{m,\lambda,b}(t)b_m(t); \text{ and} \qquad (67)$$

$$e_{0,\lambda,b}(t) = S_{\lambda,b}(t) \text{ for } t \geq 0. \qquad (68)$$

US 7,530,955 B2

33

The second regression filter has a regression coefficient $\kappa_{m,\lambda,b}$ (t) register $98$ value defined similarly to the first regression filter error signal values, i.e.:

$$\kappa_{m,\lambda,b}(t)=\{\rho_{m,\lambda,b}(t)/\beta_m(t)\}; \text{ or} \tag{69}$$

These values are used in conjunction with those intermediate variable values, signal values, register and register values defined in equations (46) through (64). These signals are calculated in an order defined by placing the additional signals immediately adjacent a similar signal for the wavelength $\lambda$a.

For the constant saturation method, $S_{\lambda,b}(t)$ is input to the second regression filter $80b$. The output is then a good approximation to the primary signal $s''_{\lambda,b}(t)$ or secondary signal $s''_{\lambda,b}(t)$.

The addition of the second regression filter $80b$ does not substantially change the computer program subroutine represented by the flowchart of FIG. $9$. Instead of an order update of the $m^{th}$ stage of only one regression filter, an order update of the $m^{th}$ stage of both regression filters $80a$ and $80b$ is performed. This is characterized by the plural designation in the "ORDER UPDATE OF $m^{th}$ STAGE OF REGRESSION FILTER(S)" activity block $180$ in FIG. $9$. Since the regression filters $80a$ and $80b$ operate independently, independent calculations can be performed in the reference processor and joint process estimator $60$ adaptive noise canceler subroutine modeled by the flowchart of FIG. $9$.

An alternative diagram for the joint process estimator of FIG. $10$, using the QRD algorithm and having two regression filters is shown in FIG. $10a$. This type of joint process estimator would be used for correlation cancellation using the QRD algorithm described in the Haykin book.

### Calculation of Saturation

Once good approximations to the primary signal portions $s''_{\lambda,a}(t)$ and $s''_{\lambda,b}(t)$ or the secondary signal portion, $n''_{\lambda,a}(t)$ and $n''_{\lambda,b}(t)$, have been determined by the joint process estimator $60$, the saturation of $A_5$ in a volume containing $A_5$ and $A_6$, for example, may be calculated according to various known methods. Mathematically, the approximations to the primary signals can be written in terms of $\lambda$a and $\lambda$b, as:

$$s''_{\lambda a}(t)\approx\varepsilon_{5,\lambda,a}c_5 x_{5,6}(t)+\varepsilon_{6,\lambda,a}c_6 x_{5,6}(t); \text{ and} \tag{70}$$

$$s''_{\lambda b}(t)\approx\varepsilon_{5,\lambda,b}c_5 x_{5,6}(t)+\varepsilon_{6,\lambda,b}c_6 x_{5,6}(t) \tag{71}$$

Equations (70) and (71) are equivalent to two equations having three unknowns, namely $c_5(t)$, $c_6(t)$ and $x_{5,6}(t)$. The saturation can be determined by acquiring approximations to the primary or secondary signal portions at two different, yet proximate times $t_1$ and $t_2$ over which the saturation of $A_5$ in the volume containing $A_5$ and $A_6$ and the saturation of $A_3$ in the volume containing $A_3$ and $A_4$ does not change substantially. For example, for the primary signals estimated at times $t_1$ and $t_2$:

$$s''_{\lambda a}(t_1)\approx\varepsilon_{5,\lambda,a}c_5 x_{5,6}(t_1)+\varepsilon_{6,\lambda,a}c_6 x_{5,6}(t_1) \tag{72}$$

$$s''_{\lambda b}(t_1)\approx\varepsilon_{5,\lambda,b}c_5 x_{5,6}(t_1)+\varepsilon_{6,\lambda,b}c_6 x_{5,6}(t_1) \tag{73}$$

$$s''_{\lambda a}(t_2)\approx\varepsilon_{5,\lambda,a}c_5 x_{5,6}(t_2)+\varepsilon_{6,\lambda,a}c_6 x_{5,6}(t_2) \tag{74}$$

$$s''_{\lambda b}(t_2)\approx\varepsilon_{5,\lambda,b}c_5 x_{5,6}(t_2)+\varepsilon_{6,\lambda,b}c_6 x_{5,6}(t_2) \tag{75}$$

34

Then, difference signals may be determined which relate the signals of equations (72) through (75), i.e.:

$$\Delta s_{\lambda a}=s''_{\lambda,a}(t_1)-s''_{\lambda,a}(t_2)\approx\varepsilon_{5,\lambda,a}c_5\Delta x+\varepsilon_{6,\lambda,a}c_6\Delta x; \text{ and} \tag{76}$$

$$\Delta s_{\lambda b}=s''_{\lambda,b}(t_1)-s''_{\lambda,b}(t_2)\approx\varepsilon_{5,\lambda,b}c_5\Delta x+\varepsilon_{6,\lambda,b}c_6\Delta x; \tag{77}$$

where $\Delta x=x_{5,6}(t_1)-x_{5,6}(t_2)$. The average saturation at time $t=(t_1+t_2)/2$ is:

$$\text{Saturation}(t) = c_5(t) / [c_5(t) + c_6(t)] \tag{78}$$

$$= \frac{\varepsilon_{6,\lambda a} - \varepsilon_{6,\lambda b}(\Delta s_{\lambda a} / \Delta s_{\lambda b})}{\varepsilon_{6,\lambda a} - \varepsilon_{5,\lambda a}(\varepsilon_{6,\lambda b} - \varepsilon_{5,\lambda b})(\Delta s_{\lambda a} / \Delta s_{\lambda b})} \tag{79}$$

It will be understood that the $\Delta x$ term drops out from the saturation calculation because of the division. Thus, knowledge of the thickness of the primary constituents is not required to calculate saturation.

### Pulse Oximetry Measurements

A specific example of a physiological monitor utilizing a processor of the present invention to determine a secondary reference $n'(t)$ for input to a correlation canceler that removes erratic motion-induced secondary signal portions is a pulse oximeter. Pulse oximetry may also be performed utilizing a processor of the present invention to determine a primary signal reference $s'(t)$ which may be used for display purposes or for input to a correlation canceler to derive information about patient movement and venous blood oxygen saturation.

A pulse oximeter typically causes energy to propagate through a medium where blood flows close to the surface for example, an ear lobe, or a digit such as a finger, a forehead or a fetus' scalp. An attenuated signal is measured after propagation through or reflected from the medium. The pulse oximeter estimates the saturation of oxygenated blood.

Freshly oxygenated blood is pumped at high pressure from the heart into the arteries for use by the body. The volume of blood in the arteries varies with the heartbeat, giving rise to a variation in absorption of energy at the rate of the heartbeat, or the pulse.

Oxygen depleted, or deoxygenated, blood is returned to the heart by the veins along with unused oxygenated blood. The volume of blood in the veins varies with the rate of breathing, which is typically much slower than the heartbeat. Thus, when there is no motion induced variation in the thickness of the veins, venous blood causes a low frequency variation in absorption of energy. When there is motion induced variation in the thickness of the veins, the low frequency variation in absorption is coupled with the erratic variation in absorption due to motion artifact.

In absorption measurements using the transmission of energy through a medium, two light emitting diodes (LED's) are positioned on one side of a portion of the body where blood flows close to the surface, such as a finger, and a photodetector is positioned on the opposite side of the finger. Typically, in pulse oximetry measurements, one LED emits a visible wavelength, preferably red, and the other LED emits an infrared wavelength. However, one skilled in the art will realize that other wavelength combinations could be used. The finger comprises skin, tissue, muscle, both arterial blood and venous blood, fat, etc., each of which absorbs light energy differently due to different absorption coefficients, different concentrations, different thicknesses, and changing optical pathlengths. When the patient is not moving, absorption is

US 7,530,955 B2

35

substantially constant except for the flow of blood. The constant attenuation can be determined and subtracted from the signal via traditional filtering techniques. When the patient moves, this causes perturbation such as changing optical pathlength due to movement of background fluids (e.g., venous blood having a different saturation than the arterial blood). Therefore, the measured signal becomes erratic. Erratic motion induced noise typically cannot be predetermined and/or subtracted from the measured signal via traditional filtering techniques. Thus, determining the oxygen saturation of arterial blood and venous blood becomes more difficult.

A schematic of a physiological monitor for pulse oximetry is shown in FIGS. 11-13. FIG. 11 depicts a general hardware block diagram of a pulse oximeter 299. A sensor 300 has two light emitters 301 and 302 such as LED's. One LED 301 emitting light of red wavelengths and another LED 302 emitting light of infrared wavelengths are placed adjacent a finger 310. A photodetector 320, which produces an electrical signal corresponding to the attenuated visible and infrared light energy signals is located opposite the LED's 301 and 302. The photodetector 320 is connected to front end analog signal conditioning circuity 330.

The front end analog signal conditioning circuitry 330 has outputs coupled to analog to digital conversion circuit 332. The analog to digital conversion circuitry 332 has outputs coupled to a digital signal processing system 334. The digital signal processing system 334 provides the desired parameters as outputs for a display 336. Outputs for display are, for example, blood oxygen saturation, heart rate, and a clean plethysmographic waveform.

The signal processing system also provides an emitter current control output 337 to a digital-to-analog converter circuit 338 which provides control information for light emitter drivers 340. The light emitter drivers 340 couple to the light emitters 301, 302. The digital signal processing system 334 also provides a gain control output 342 for the front end analog signal conditioning circuity 330.

FIG. 11a illustrates a preferred embodiment for the combination of the emitter drivers 340 and the digital to analog conversion circuit 338. As depicted in FIG. 11a, the driver comprises first and second input latches 321, 322, a synchronizing latch 323, a voltage reference 324, a digital to analog conversion circuit 325, first and second switch banks 326, 327, first and second voltage to current converters 328, 329 and the LED emitters 301, 302 corresponding to the LED emitters 301, 302 of FIG. 11.

The preferred driver depicted in FIG. 11a is advantageous in that the present inventors recognized that much of the noise in the oximeter 299 of FIG. 11 is caused by the LED emitters 301, 302. Therefore, the emitter driver circuit of FIG. 11a is designed to minimize the noise from the emitters 301, 302. The first and second input latches 321, 324 are connected directly to the DSP bus. Therefore, these latches significantly minimizes the bandwidth (resulting in noise) present on the DSP bus which passes through to the driver circuitry of FIG. 11a. The output of the first and second input latches only changes when these latched detect their address on the DSP bus. The first input latch receives the setting for the digital to analog converter circuit 325. The second input latch receives switching control data for the switch banks 326, 327. The synchronizing latch accepts the synchronizing pulses which maintain synchronization between the activation of emitters 301, 302 and the analog to digital conversion circuit 332.

The voltage reference is also chosen as a low noise DC voltage reference for the digital to analog conversion circuit 325. In addition, in the present embodiment, the voltage ref-

36

erence has an lowpass output filter with a very low corner frequency (e.g., 1 Hz in the present embodiment). The digital to analog converter 325 also has a lowpass filter at its output with a very low corner frequency (e.g., 1 Hz). The digital to analog converter provides signals for each of the emitters 301, 302.

In the present embodiment, the output of the voltage to current converters 328, 329 are switched such that with the emitters 301, 302 connected in back-to-back configuration, only one emitter is active an any given time. In addition, the voltage to current converter for the inactive emitter is switched off at its input as well, such that it is completely deactivated. This reduces noise from the switching and voltage to current conversion circuitry. In the present embodiment, low noise voltage to current converters are selected (e.g., Op 27 Op Amps), and the feedback loop is configured to have a low pass filter to reduce noise. In the present embodiment, the low pass filtering function of the voltage to current converter 328, 329 has a corner frequency of just above 625 Hz, which is the switching speed for the emitters, as further discussed below. Accordingly, the preferred driver circuit of FIG. 11a, minimizes the noise of the emitters 301, 302.

In general, the red and infrared light emitters 301, 302 each emits energy which is absorbed by the finger 310 and received by the photodetector 320. The photodetector 320 produces an electrical signal which corresponds to the intensity of the light energy striking the photodetector 320. The front end analog signal conditioning circuitry 330 receives the intensity signals and filters and conditions these signals as further described below for further processing. The resultant signals are provided to the analog-to-digital conversion circuitry 332 which converts the analog signals to digital signals for further processing by the digital signal processing system 334. The digital signal processing system 334 utilizes the two signals in order to provide a what will be called herein a "saturation transform." It should be understood, that for parameters other than blood saturation monitoring, the saturation transform could be better termed as a concentration transform, in-vivo transform, or the like, depending on the desired parameter. The term saturation transform is used to describe an operation which converts the sample data from time domain to saturation domain values as will be apparent from the discussion below. In the present embodiment, the output of the digital signal processing system 334 provides clean plethysmographic waveforms of the detected signals and provides values for oxygen saturation and pulse rate to the display 336.

It should be understood that in different embodiments of the present invention, one or more of the outputs may be provided. The digital signal processing system 334 also provides control for driving the light emitters 301, 302 with an emitter current control signal on the emitter current control output 337. This value is a digital value which is converted by the digital-to-analog conversion circuit 338 which provides a control signal to the emitter current drivers 340. The emitter current drivers 340 provide the appropriate current drive for the red emitter 301 and the infrared emitter 302. Further detail of the operation of the physiological monitor for pulse oximetry is explained below. In the present embodiment, the light emitters are driven via the emitter current driver 340 to provide light transmission with digital modulation at 625 Hz. In the present embodiment, the light emitters 301, 302 are driven at a power level which provides an acceptable intensity for detection by the detector and for conditioning by the front end analog signal conditioning circuitry 330. Once this energy level is determined for a given patient by the digital signal processing system 334, the current level for the red and infrared emitters is maintained constant. It should be understood,

US 7,530,955 B2

37

however, that the current could be adjusted for changes in the ambient room light and other changes which would effect the voltage input to the front end analog signal conditioning circuitry 330. In the present invention, the red and infrared light emitters are modulated as follows: for one complete 625 Hz red cycle, the red emitter 301 is activated for the first quarter cycle, and off for the remaining three-quarters cycle; for one complete 625 Hz infrared cycle, the infrared light emitter 302 is activated for one quarter cycle and is off for the remaining three-quarters cycle. In order to only receive one signal at a time, the emitters are cycled on and off alternatively, in sequence, with each only active for a quarter cycle per 625 Hz cycle and a quarter cycle separating the active times.

The light signal is attenuated (amplitude modulated) by the pumping of blood through the finger 310 (or other sample medium). The attenuated (amplitude modulated) signal is detected by the photodetector 320 at the 625 Hz carrier frequency for the red and infrared light. Because only a single photodetector is used, the photodetector 320 receives both the red and infrared signals to form a composite time division signal.

The composite time division signal is provided to the front analog signal conditioning circuitry 330. Additional detail regarding the front end analog signal conditioning circuitry 330 and the analog to digital converter circuit 332 is illustrated in FIG. 12. As depicted in FIG. 12, the front end circuitry 302 has a preamplifier 342, a high pass filter 344, an amplifier 346, a programmable gain amplifier 348, and a low pass filter 350. The preamplifier 342 is a transimpedance amplifier that converts the composite current signal from the photodetector 320 to a corresponding voltage signal, and amplifies the signal. In the present embodiment, the preamplifier has a predetermined gain to boost the signal amplitude for ease of processing. In the present embodiment, the source voltages for the preamplifier 342 are −15 VDC and +15 VDC. As will be understood, the attenuated signal contains a component representing ambient light as well as the component representing the infrared or the red light as the case may be in time. If there is light in the vicinity of the sensor 300 other than the red and infrared light, this ambient light is detected by the photodetector 320. Accordingly, the gain of the preamplifier is selected in order to prevent the ambient light in the signal from saturating the preamplifier under normal and reasonable operating conditions.

In the present embodiment, the preamplifier 342 comprises an Analog Devices AD743JR OpAmp. This transimpedance amplifier is particularly advantageous in that it exhibits several desired features for the system described, such as: low equivalent input voltage noise, low equivalent input current noise, low input bias current, high gain bandwidth product, low total harmonic distortion, high common mode rejection, high open loop gain, and a high power supply rejection ratio.

The output of the preamplifier 342 couples as an input to the high pass filter 344. The output of the preamplifier also provides a first input 346 to the analog to digital conversion circuit 332. In the present embodiment, the high pass filter 344 is a single-pole filter with a corner frequency of about ½-1 Hz. However, the corner frequency is readily raised to about 90 Hz in one embodiment. As will be understood, the 625 Hz carrier frequency of the red and infrared signals is well above a 90 Hz corner frequency. The high-pass filter 344 has an output coupled as an input to an amplifier 346. In the present embodiment, the amplifier 346 comprises a unity gain amplifier. However, the gain of the amplifier 346 is adjustable by the variation of a single resistor. The gain of the amplifier 346

38

would be increased if the gain of the preamplifier 342 is decreased to compensate for the effects of ambient light.

The output of the amplifier 346 provides an input to a programmable gain amplifier 348. The programmable gain amplifier 348 also accepts a programming input from the digital signal processing system 334 on a gain control signal line 343. The gain of the programmable gain amplifier 348 is digitally programmable. The gain is adjusted dynamically at initialization or sensor placement for changes in the medium under test from patient to patient. For example, the signal from different fingers differs somewhat. Therefore, a dynamically adjustable amplifier is provided by the programmable gain amplifier 348 in order to obtain a signal suitable for processing.

The programmable gain amplifier is also advantageous in an alternative embodiment in which the emitter drive current is held constant. In the present embodiment, the emitter drive current is adjusted for each patient in order to obtain the proper dynamic range at the input of the analog to digital conversion circuit 332. However, changing the emitter drive current can alter the emitter wavelength, which in turn affects the end result in oximetry calculations. Accordingly, it would be advantageous to fix the emitter drive current for all patients. In an alternative embodiment of the present invention, the programmable gain amplifier can be adjusted by the DSP in order to obtain a signal at the input to the analog to digital conversion circuit which is properly within the dynamic range (+3v to −3v in the present embodiment) of the analog to digital conversion circuit 332. In this manner, the emitter drive current could be fixed for all patients, eliminating the wavelength shift due to emitter current drive changes.

The output of the programmable gain amplifier 348 couples as an input to a low-pass filter 350. Advantageously, the low pass filter 350 is a single-pole filter with a corner frequency of approximately 10 Khz in the present embodiment. This low pass filter provides anti-aliasing in the present embodiment.

The output of the low-pass filter 350 provides a second input 352 to the analog-to-digital conversion circuit 332. FIG. 12 also depicts additional defect of the analog-to-digital conversion circuit. In the present embodiment, the analog-to-digital conversion circuit 332 comprises a first analog-to-digital converter 354 and a second analog-to-digital converter 356. Advantageously, the first analog-to-digital converter 354 accepts input from the first input 346 to the analog-to-digital conversion circuit 332, and the second analog to digital converter 356 accepts input on the second input 352 to the analog-log-to-digital conversion circuitry 332.

In one advantageous embodiment, the first analog-to-digital converter 354 is a diagnostic analog-to-digital converter. The diagnostic task (performed by the digital signal processing system) is to read the output of the detector as amplified by the preamplifier 342 in order to determine if the signal is saturating the input to the high-pass filter 344. In the present embodiment, if the input to the high pass filter 344 becomes saturated, the front end analog signal conditioning circuits 330 provides a '0' output. Alternatively, the first analog-to-digital converter 354 remains unused.

The second analog-to-digital converter 352 accepts the conditioned composite analog signal from the front end signal conditioning circuitry 330 and converts the signal to digital form. In the present embodiment, the second analog to digital converter 356 comprises a single-channel, delta-sigma converter. In the present embodiment, a Crystal Semiconductor CS5317-KS delta-sigma analog to digital converter is used. Such a converter is advantageous in that it is low cost, and exhibits low noise characteristics. More specifically, a

US 7,530,955 B2

39                                                40

delta-sigma converter consists of two major portions, a noise modulator and a decimation filter. The selected converter uses a second order analog delta-sigma modulator to provide noise shaping. Noise shaping refers to changing the noise spectrum from a flat response to a response where noise at the lower frequencies has been reduced by increasing noise at higher frequencies. The decimation filter then cuts out the reshaped, higher frequency noise to provide 16-bit performance at a lower frequency. The present converter samples the data 128 times for every 16 bit data word that it produces. In this manner, the converter provides excellent noise rejection, dynamic range and low harmonic distortion, that help in critical measurement situations like low perfusion and electrocautery.

In addition, by using a single-channel converter, there is no need to tune two or more channels to each other. The delta-sigma converter is also advantageous in that it exhibits noise shaping, for improved noise control. An exemplary analog to digital converter is a Crystal Semiconductor CS5317. In the present embodiment, the second analog to digital converter **356** samples the signal at a 20 Khz sample rate. The output of the second analog to digital converter **356** provides data samples at 20 Khz to the digital signal processing system **334** (FIG. **11**).

The digital signal processing system **334** is illustrated in additional detail in FIG. **13**. In the present embodiment, the digital signal processing system comprises a microcontroller **360**, a digital signal processor **362**, a program memory **364**, a sample buffer **366**, a data memory **368**, a read only memory **370** and communication registers **372**. In the present embodiment, the digital signal processor **362** is an Analog Devices AD 21020. In the present embodiment, the microcontroller **360** comprises a Motorola 68HC05, with built in program memory. In the present embodiment, the sample buffer **366** is a buffer which accepts the 20 Khz sample data from the analog to digital conversion circuit **332** for storage in the data memory **368**. In the present embodiment, the data memory **368** comprises 32 KWords (words being 40 bits in the present embodiment) of static random access memory.

The microcontroller **360** is connected to the DSP **362** via a conventional JTAG Tap line. The microcontroller **360** transmits the boot loader for the DSP **362** to the program memory **364** via the Tap line, and then allows the DSP **362** to boot from the program memory **364**. The boot loader in program memory **364** then causes the transfer of the operating instructions for the DSP **362** from the read only memory **370** to the program memory **364**. Advantageously, the program memory **364** is a very high speed memory for the DSP **362**.

The microcontroller **360** provides the emitter current control and gain control signals via the communications register **372**.

FIGS. **14-20** depict functional block diagrams of the operations of the pulse oximeter **299** carried out by the digital signal processing system **334**. The signal processing functions described below are carried out by the DSP **362** in the present embodiment with the microcontroller **360** providing system management. In the present embodiment, the operation is software/firmware controlled. FIG. **14** depicts a generalized functional block diagram for the operations performed on the 20 Khz sample data entering the digital signal processing system **334**. As illustrated in FIG. **14**, a demodulation, as represented in a demodulation module **400**, is first performed. Decimation, as represented in a decimation module **402** is then performed on the resulting data. Certain statistics are calculated, as represented in a statistics module **404** and a saturation transform is performed, as represented in a saturation transform module **406**, on the data resulting from

the decimation operation. The data subjected to the statistics operations and the data subjected to the saturation transform operations are forwarded to saturation operations, as represented by a saturation calculation module **408** and pulse rate operations, as represented in a pulse rate calculation module **410**.

In general, the demodulation operation separates the red and infrared signals from the composite signal and removes the 625 Hz carrier frequency, leaving raw data points. The raw data points are provided at 625 Hz intervals to the decimation operation which reduces the samples by an order of 10 to samples at 62.5 Hz. The decimation operation also provides some filtering on the samples. The resulting data is subjected to statistics and to the saturation transform operations in order to calculate a saturation value which is very tolerant to motion artifacts and other noise in the signal. The saturation value is ascertained in the saturation calculation module **408**, and a pulse rate and a clean plethysmographic waveform is obtained through the pulse rate module **410**. Additional detail regarding the various operations is provided in connection with FIGS. **15-21**.

FIG. **15** illustrates the operation of the demodulation module **400**. The modulated signal format is depicted in FIG. **15**. One full 625 Hz cycle of the composite signal is depicted in FIG. **15** with the first quarter cycle being the active red light plus ambient light signal, the second quarter cycle being an ambient light signal, the third quarter cycle being the active infrared plus ambient light signal, and the fourth quarter cycle being an ambient light signal. As depicted in FIG. **15**, with a 20 KHz sampling frequency, the single full cycle at 625 Hz described above comprises 32 samples of 20 KHz data, eight samples relating to red plus ambient light, eight samples relating to ambient light, eight samples relating to infrared plus ambient light, and finally eight samples related to ambient light.

Because the signal processing system **334** controls the activation of the light emitters **300**, **302**, the entire system is synchronous. The data is synchronously divided (and thereby demodulated) into four 8-sample packets, with a time division demultiplexing operation as represented in a demultiplexing module **421**. One eight-sample packet **422** represents the red plus ambient light signal; a second eight-sample packet **424** represents an ambient light signal; a third eight-sample packet **426** represents the attenuated infrared light plus ambient light signal; and a fourth eight-sample packet **428** represents the ambient light signal. A select signal synchronously controls the demultiplexing operation so as to divide the time-division multiplexed composite signal at the input of the demultiplexer **421** into its four subparts.

A sum of the last four samples from each packet is then calculated, as represented in the summing operations **430**, **432**, **434**, **436** of FIG. **15**. In the present embodiment, the last four samples are used because a low pass filter in the analog to digital converter **356** of the present embodiment has a settling time. Thus, collecting the last four samples from each 8-sample packet allows the previous signal to clear. This summing operation provides an integration operation which enhances noise immunity. The sum of the respective ambient light samples is then subtracted from the sum of the red and infrared samples, as represented in the subtraction modules **438**, **440**. The subtraction operation provides some attenuation of the ambient light signal present in the data. In the present embodiment, it has been found that approximately 20 dB attenuation of the ambient light is provided by the operations of the subtraction modules **438**, **440**. The resultant red and infrared sum values are divided by four, as represented in

US 7,530,955 B2

41

the divide by four modules **442**, **444**. Each resultant value provides one sample each of the red and infrared signals at 625 Hz.

It should be understood that the 625 Hz carrier frequency has been removed by the demodulation operation **400**. The 625 Hz sample data at the output of the demodulation operation **400** is sample data without the carrier frequency. In order to satisfy Nyquist sampling requirements, less than 20 Hz is needed (understanding that the human pulse is about 25 to 250 beats per minute, or about 0.4 Hz-4 Hz). Accordingly, the 625 Hz resolution is reduced to 62.5 Hz in the decimation operation.

FIG. **16** illustrates the operations of the decimation module **402**. The red and infrared sample data is provided at 625 Hz to respective red and infrared buffer/filters **450**, **452**. In the present embodiment, the red and infrared buffer/filters are 519 samples deep. Advantageously, the buffer filters **450**, **452** function as continuous first-in, first-out buffers. The 519 samples are subjected to low-pass filtering. Preferably, the low-pass filtering has a cutoff frequency of approximately 7.5 Hz with attenuation of approximately—110 dB. The buffer/filters **450**, **452** form a Finite Impulse Response (FIR) filter with coefficients for 519 taps. In order to reduce the sample frequency by ten, the low-pass filter calculation is performed every ten samples, as represented in respective red and infrared decimation by 10 modules **454**, **456**. In other words, with the transfer of each new ten samples into the buffer/filters **450**, **452**, a new low pass filter calculation is performed by multiplying the impulse response (coefficients) by the 519 filter taps. Each filter calculation provides one output sample for respective red and infrared output buffers **458**, **460**. In the present embodiment, the red and infrared output buffers **458**, **460** are also continuous FIFO buffers that hold 570 samples of data. The 570 samples provide respective infrared and red samples or packets (also denoted "snapshot" herein) of 570 samples. As depicted in FIG. **14**, the output buffers provide sample data for the statistics operation module **404**, saturation transform module **406**, and the pulse rate module **410**.

FIG. **17** illustrates additional functional operation details of the statistics module **404**. In summary, the statistics module **404** provides first order oximetry calculations and RMS signal values for the red and infrared channels. The statistics module also provides a cross-correlation output which indicates a cross-correlation between the red and infrared signals.

As represented in FIG. **17**, the statistics operation accepts two packets of samples (e.g., 570 samples at 62.5 Hz in the present embodiment) representing the attenuated infrared and red signals, with the carrier frequency removed. The respective packets for infrared and red signals are normalized with a log function, as represented in the Log modules **480**, **482**. The normalization is followed by removal of the DC portion of the signals, as represented in the DC Removal modules **484**, **486**. In the present embodiment, the DC removal involves ascertaining the DC value of the first one of the samples (or the mean of the first several or the mean of an entire snapshot) from each of the respective red and infrared snapshots, and removing this DC value from all samples in the respective packets.

Once the DC signal is removed, the signals are subjected to bandpass filtering, as represented in red and infrared Bandpass Filter modules **488**, **490**. In the present embodiment, with 570 samples in each packet, the bandpass filters are configured with 301 taps to provide a FIR filter with a linear phase response and little or no distortion. In the present embodiment, the bandpass filter has a pass band from 34 beats/minute to 250 beats/minute. The 301 taps slide over the 570 samples in order to obtain 270 filtered samples represent-

42

ing the filtered red signal and 270 filtered samples representing the filtered infrared signal. In an ideal case, the bandpass filters **488**, **490** remove the DC in the signal. However, the DC removal operations **484**, **486** assist in DC removal in the present embodiment.

After filtering, the last 120 samples from each packet (of now 270 samples in the present embodiment) are selected for further processing as represented in Select Last 120 Samples modules **492**, **494**. The last 120 samples are selected because, in the present embodiment, the first 150 samples fall within the settling time for the Saturation Transfer module **406**, which processes the same data packets, as further discussed below.

Conventional saturation equation calculations are performed on the red and infrared 120-sample packets. In the present embodiment, the conventional saturation calculations are performed in two different ways. For one calculation, the 120-sample packets are processed to obtain their overall RMS value, as represented in the first red and infrared RMS modules **496**, **498**. The resultant RMS values for red and infrared signals provide input values to a first RED_RMS/IR_RMS ratio operation **500**, which provides the RMS red value to RMS infrared value ratio as an input to a saturation equation module **502**. As well understood in the art, the ratio of the intensity of red to infrared attenuated light as detected for known red and infrared wavelengths (typically $\lambda_{red}$=650 nm and $\lambda_{IR}$=910 nm) relates to the oxygen saturation of the patient. Accordingly, the saturation equation module **502** represents a conventional look-up table or the like which, for predetermined ratios, provides known saturation values at its output **504**. The red and infrared RMS values are also provided as outputs of the statistics operations module **404**.

In addition to the conventional saturation operation **502**, the 120-sample packets are subjected to a cross-correlation operation as represented in a first cross-correlation module **506**. The first cross-correlation module **506** determines if good correlation exists between the infrared and red signals. This cross correlation is advantageous for detecting defective or otherwise malfunctioning detectors. The cross correlation is also advantageous in detecting when the signal model (i.e., the model of Equations (1)-(3)) is satisfied. If correlation becomes too low between the two channels, the signal model is not met. In order to determine this, the normalized cross correlation can be computed by the cross-correlation module **506** for each snapshot of data. One such correlation function is as follows:

$$\frac{\sum s_1 s_2}{\sqrt{\sum s_1^2 s_2^2}}$$

If the cross correlation is too low, the oximeter **299** provides a warning (e.g., audible, visual, etc.) to the operator. In the present embodiment, if a selected snapshot yields a normalized correlation of less than 0.75, the snapshot does not qualify. Signals which satisfy the signal model will have a correlation greater than the threshold.

The red and infrared 120-sample packets are also subjected to a second saturation operation and cross correlation in the same manner as described above, except the 120 samples are divided into 5 equal bins of samples (i.e., 5 bins of 24 samples each). The RMS, ratio, saturation, and cross correlation operations are performed on a bin-by-bin basis. These operations are represented in the Divide Into Five Equal Bins modules **510**, **512**, the second red and infrared RMS modules

US 7,530,955 B2

43

514, 516, the second RED-RMS/IR-RMS ratio module 518, the second saturation equation module 520 and the second cross correlation module 522 in FIG. 17.

FIG. 18 illustrates additional detail regarding the saturation transform module 406 depicted in FIG. 14. As illustrated in FIG. 18, the saturation transform module 406 comprises a reference processor 530, a correlation canceler 531, a master power curve module 554, and a bin power curve module 533. The saturation transform module 406 can be correlated to FIG. 7a which has a reference processor 26 and a correlation canceler 27 and an integrator 29 to provide a power curve for separate signal coefficients as depicted in FIG. 7c. The saturation transform module 406 obtains a saturation spectrum from the snapshots of data. In other words, the saturation transform 406 provides information of the saturation values present in the snapshots.

As depicted in FIG. 18, the reference processor 530 for the saturation transform module 406 has a saturation equation module 532, a reference generator module 534, a DC removal module 536 and a bandpass filter module 538. The red and infrared 570-sample packets from the decimation operation are provided to the reference processor 530. In addition, a plurality of possible saturation values (the "saturation axis scan") are provided as input to the saturation reference processor 530. In the present embodiment, 117 saturation values are provided as the saturation axis scan. In a preferred embodiment, the 117 saturation values range uniformly from a blood oxygen saturation of 34.8 to 105.0. Accordingly, in the present embodiment, the 117 saturation values provide an axis scan for the reference processor 530 which generates a reference signal for use by the correlation canceler 531. In other words, the reference processor is provided with each of the saturation values, and a resultant reference signal is generated corresponding to the saturation value. The correlation canceler is formed by a joint process estimator 550 and a low pass filter 552 in the present embodiment.

It should be understood that the scan values could be chosen to provide higher or lower resolution than 117 scan values. The scan values could also be non-uniformly spaced.

As illustrated in FIG. 18, the saturation equation module 532 accepts the saturation axis scan values as an input and provides a ratio "$r_n$" as an output. In comparison to the general discussion of FIG. 7a-7c, this ratio "$r_n$" corresponds to the plurality of scan value discussed above in general. The saturation equation simply provides a known ratio "r" (red/infrared) corresponding to the saturation value received as an input.

The ratio "$r_n$" is provided as an input to the reference generator 534, as are the red and infrared sample packets. The reference generator 534 multiplies either the red or infrared samples by the ratio "$r_n$" and subtracts the value from the infrared or red samples, respectively. For instance, in the present embodiment, the reference generator 534 multiplies the red samples by the ratio "$r_n$" and subtracts this value from the infrared samples. The resulting values become the output of the reference generator 534. This operation is completed for each of the saturation scan values (e.g., 117 possible values in the present embodiment). Accordingly, the resultant data can be described as 117 reference signal vectors of 570 data points each, hereinafter referred to as the reference signal vectors. This data can be stored in an array or the like.

In other words, assuming that the red and infrared sample packets represent the red $S_{red}(t)$ and infrared $S_{IR}(t)$ measured signals which have primary s(t) and secondary n(t) signal

44

portions, the output of the reference generator becomes the secondary reference signal n'(t), which complies with the signal model defined above, as follows:

$$n'(t) = s_{IR}(t) - r_n s_{red}(t)$$

In the present embodiment, the reference signal vectors and the infrared signal are provided as input to the DC removal module 536 of the reference processor 530. The DC removal module 536, like the DC removal modules 484, 486 in the statistics module 404, ascertains the DC value of the first of the samples for the respective inputs (or mean of the first several or all samples in a packet) and subtracts the respective DC baseline from the sample values. The resulting sample values are subjected to a bandpass filter 538.

The bandpass filter 538 of the reference processor 530 performs the same type of filtering as the bandpass filters 488, 490 of the statistics module 404. Accordingly, each set of 570 samples subjected to bandpass filtering results in 270 remaining samples. The resulting data at a first output 542 of the bandpass filter 538 is one vector of 270 samples (representing the filtered infrared signal in the present embodiment). The resulting data at a second output 540 of the bandpass filter 538, therefore, is 117 reference signal vectors of 270 data points each, corresponding to each of the saturation axis scan values provided to the saturation reference processor 530.

It should be understood that the red and infrared sample packets may be switched in their use in the reference processor 530. In addition, it should be understood that the DC removal module 536 and the bandpass filter module 538 can be executed prior to input of the data to the reference processor 530 because the calculations performed in the reference processor are linear. This results in a significant processing economy.

The outputs of the reference processor 530 provide first and second inputs to a joint process estimator 550 of the type described above with reference to FIG. 8. The first input to the joint process estimator 550 is the 270-sample packet representing the infrared signal in the present embodiment. This signal contains primary and secondary signal portions. The second input to the joint process estimator is the 117 reference signal vectors of 270 samples each.

The joint process estimator also receives a lambda input 543, a minimum error input 544 and a number of cells configuration input 545. These parameters are well understood in the art. The lambda parameter is often called the "forgetting parameter" for a joint process estimator. The lambda input 543 provides control for the rate of cancellation for the joint process estimator. In the present embodiment, lambda is set to a low value such as 0.8. Because statistics of the signal are non-stationary, a low value improves tracking. The minimum error input 544 provides an initialization parameter (conventionally known as the "initialization value") for the joint process estimator 550. In the present embodiment, the minimum error value is $10^{-6}$. This initialization parameter prevents the joint process estimator 500 from dividing by zero upon initial calculations. The number of cells input 545 to the joint process estimator 550 configures the number of cells for the joint process estimator. In the present embodiment, the number of cells for the saturation transform operation 406 is six. As well understood in the art, for each sine wave, the joint process estimator requires two cells. If there are two sine waves in the 35-250 beats/minute range, six cells allows for the two heart beat sine waves and one noise sine wave.

The joint process estimator 550 subjects the first input vector on the first input 542 to a correlation cancellation based upon each of the plurality of reference signal vectors provided in the second input 540 to the correlation canceler 531 (all 117

US 7,530,955 B2

45

reference vectors in sequence in the present embodiment). The correlation cancellation results in a single output vector for each of the 117 reference vectors. Each output vector represents the information that the first input vector and the corresponding reference signal vector do not have in common. The resulting output vectors are provided as an output to the joint process estimator, and subjected to the low pass filter module 552. In the present embodiment, the low pass filter 552 comprises a FIR filter with 25 taps and with a corner frequency of 10 Hz with the sampling frequency of 62.5 Hz (i.e., at the decimation frequency).

The joint process estimator 550 of the present embodiment has a settling time of 150 data points. Therefore, the last 120 data points from each 270 point output vector are used for further processing. In the present embodiment, the output vectors are further processed together as a whole, and are divided into a plurality of bins of equal number of data points. As depicted in FIG. 18, the output vectors are provided to a master power curve module 554 and to a Divide into five Equal Bins module 556. The Divide into Five Equal Bins module 556 divides each of the output vectors into five bins of equal number of data points (e.g. with 120 data points per vector, each bin has 24 data points). Each bin is then provided to the Bin Power Curves module 558.

The Master Power Curve module 554 performs a saturation transform as follows: for each output vector, the sum of the squares of the data points is ascertained. This provides a sum of squares value corresponding to each output vector (each output vector corresponding to one of the saturation scan values). These values provide the basis for a master power curve 555, as further represented in FIG. 22. The horizontal axis of the power curve represents the saturation axis scan values and the vertical axis represents the sum of squares value (or output energy) for each output vector. In other words, as depicted in FIG. 22, each of the sum of squares could be plotted with the magnitude of the sum of squares value plotted on the vertical "energy output" axis at the point on the horizontal axis of the corresponding saturation scan value which generated that output vector. This results in a master power curve 558, an example of which is depicted in FIG. 22. This provides a saturation transform in which the spectral content of the attenuated energy is examined by looking at every possible saturation value and examining the output value for the assumed saturation value. As will be understood, where the first and second inputs to the correlation canceler 531 are mostly correlated, the sum of squares for the corresponding output vector of the correlation canceler 531 will be very low. Conversely, where the correlation between the first and second inputs to the correlation canceler 531 are not significantly correlated, the sum of squares of the output vector will be high. Accordingly, where the spectral content of the reference signal and the first input to the correlation canceler are made up mostly of physiological (e.g., movement of venous blood due to respiration) and non-physiological (e.g., motion induced) noise, the output energy will be low. Where the spectral content of the reference signal and the first input to the correlation canceler are not correlated, the output energy will be much higher.

A corresponding transform is completed by the Bin Power Curves module 558, except a saturation transform power curve is generated for each bin. The resulting power curves are provided as the outputs of the saturation transform module 406.

In general, in accordance with the signal model of the present invention, there will be two peaks in the power curves, as depicted in FIG. 22. One peak corresponds to the arterial oxygen saturation of the blood, and one peak corresponds to

46

the venous oxygen concentration of the blood. With reference to the signal model of the present invention, the peak corresponding to the highest saturation value (not necessarily the peak with the greatest magnitude) corresponds to the proportionality coefficient $r_a$. In other words, the proportionality coefficient $r_a$ corresponds to the red/infrared ratio which will be measured for the arterial saturation. Similarly, peak that corresponds to the lowest saturation value (not necessarily the peak with the lowest magnitude) will generally correspond to the venous oxygen saturation, which corresponds to the proportionality coefficient $r_v$ in the signal model of the present invention. Therefore, the proportionality coefficient $r_v$ will be a red/infrared ratio corresponding to the venous oxygen saturation.

In order to obtain arterial oxygen saturation, the peak in the power curves corresponding to the highest saturation value could be selected. However, to improve confidence in the value, further processing is completed. FIG. 19 illustrates the operation of the saturation calculation module 408 based upon the output of the saturation transform module 406 and the output of the statistics module 404. As depicted in FIG. 19, the bin power curves and the bin statistics are provided to the saturation calculation module 408. In the present embodiment, the master power curves are not provided to the saturation module 408 but can be displayed for a visual check on system operation. The bin statistics contain the red and infrared RMS values, the seed saturation value, and a value representing the cross-correlation between the red and infrared signals from the statistics module 404.

The saturation calculation module 408 first determines a plurality of bin attributes as represented by the Compute Bin Attributes module 560. The Compute Bin Attributes module 560 collects a data bin from the information from the bin power curves and the information from the bin statistics. In the present embodiment, this operation involves placing the saturation value of the peak from each power curve corresponding to the highest saturation value in the data bin. In the present embodiment, the selection of the highest peak is performed by first computing the first derivative of the power curve in question by convolving the power curve with a smoothing differentiator filter function. In the present embodiment, the smoothing differentiator filter function (using a FIR filter) has the following coefficients:

0.014964670230367
0.098294046682706
0.204468276324813
2.717182664241813
5.704485606695227
0.000000000000000
−5.704482606695227
−2.717182664241813
−0.204468276324813
−0.098294046682706
−0.014964670230367

This filter performs the differentiation and smoothing. Next, each point in the original power curve in question is evaluated and determined to be a possible peak if the following conditions are met: (1) the point is at least 2% of the maximum value in the power curve; (2) the value of the first derivative changes from greater than zero to less than or equal to zero. For each point that is found to be a possible peak, the neighboring points are examined and the largest of the three points is considered to be the true peak.

The peak width for these selected peaks is also calculated. The peak width of a power curve in question is computed by summing all the points in the power curve and subtracting the

**47**

product of the minimum value in the power curve and the number of points in the power curve. In the present embodiment, the peak width calculation is applied to each of the bin power curves. The maximum value is selected as the peak width.

In addition, the infrared RMS value from the entire snapshot, the red RMS value, the seed saturation value for each bin, and the cross correlation between the red and infrared signals from the statistics module 404 are also placed in the data bin. The attributes are then used to determine whether the data bin consists of acceptable data, as represented in a Bin Qualifying Logic module 562.

If the correlation between the red and infrared signals is too low, the bin is discarded. If the saturation value of the selected peak for a given bin is lower than the seed saturation for the same bin, the peak is replaced with the seed saturation value. If either red or infrared RMS value is below a very small threshold, the bins are all discarded, and no saturation value is provided, because the measured signals are considered to be too small to obtain meaningful data. If no bins contain acceptable data, the exception handling module 563 provides a message to the display 336 that the data is erroneous.

If some bins qualify, those bins that qualify as having acceptable data are selected, and those that do not qualify are replaced with the average of the bins that are accepted. Each bin is given a time stamp in order to maintain the time sequence. A voter operation 565 examines each of the bins and selects the three highest saturation values. These values are forwarded to a clip and smooth operation 566.

The clip and smooth operation 566 basically performs averaging with a low pass filter. The low pass filter provides adjustable smoothing as selected by a Select Smoothing Filter module 568. The Select Smoothing Filter module 568 performs its operation based upon a confidence determination performed by a High Confidence Test module 570. The high confidence test is an examination of the peak width for the bin power curves. The width of the peaks provides some indication of motion by the patient—wider peaks indicating motion. Therefore, if the peaks are wide, the smoothing filter is slowed down. If peaks are narrow, the smoothing filter speed is increased. Accordingly, the smoothing filter 566 is adjusted based on the confidence level. The output of the clip and smooth module 566 provides the oxygen saturation values in accordance with the present invention.

In the presently preferred embodiment, the clip and smooth filter 566 takes each new saturation value and compares it to the current saturation value. If the magnitude of the difference is less than 16 (percent oxygen saturation) then the value is pass. Otherwise, if the new saturation value is less than the filtered saturation value, the new saturation value is changed to 16 less than the filtered saturation value. If the new saturation value is greater than the filtered saturation value, then the new saturation value is changed to 16 more than the filtered saturation value.

During high confidence (no motion), the smoothing filter is a simple one-pole or exponential smoothing filter which is computed as follows:

$$y(n)=0.6*x(n)+0.4*y(n-1)$$

where $x(n)$ is the clipped new saturation value, and $y(n)$ is the filtered saturation value.

During motion condition, a three-pole IIR (infinite impulse response) filter is used. Its characteristics are controlled by three time constants $t_a$, $t_b$, and $t_c$ with values of 0.985, 0.900,

**48**

and 0.94 respectively. The coefficients for a direct form I, IIR filter are computed from these time constants using the following relationships:

$$a_0=0$$
$$a_1=t_b+(t_c)(t_a+t_b)$$
$$a_2=(-t_b)(t_c)(t_a+t_b+(tc)(t_a))$$
$$a_3=(t_b)^2(t_c)^2(t_a)$$
$$b_0=1-t_b-(t_c)(t_a+(t_c)(t_b))$$
$$b_1=2(t_b)(t_c)(t_a-1)$$
$$b_2=(t_b)(t_c)(t_b+(t_c)(t_a)-(t_b)(t_c)(t_a)-t_a)$$

FIGS. 20 and 21 illustrate the pulse rate module 410 (FIG. 14) in greater detail. As illustrated in FIG. 20, the heart rate module 410 has a transient removal and bandpass filter module 578, a motion artifact suppression module 580, a saturation equation module 582, a motion status module 584, first and second spectral estimation modules 586, 588, a spectrum analysis module 590, a slew rate limiting module 592, an output filter 594, and an output filter coefficient module 596.

As further depicted in FIG. 20, the heart rate module 410 accepts the infrared and red 570-sample snapshots from the output of the decimation module 402. The heart rate module 410 further accepts the saturation value which is output from the saturation calculation module 408. In addition, the maximum peak width as calculated by the confidence test module 570 (same as peak width calculation described above) is also provided as an input to the heart rate module 410. The infrared and red sample packets, the saturation value and the output of the motion status module 584 are provided to the motion artifact suppression module 580.

The average peak width value provides an input to a motion status module 584. In the present embodiment, if the peaks are wide, this is taken as an indication of motion. If motion is not detected, spectral estimation on the signals is carried out directly without motion artifact suppression.

In the case of motion, motion artifacts are suppressed using the motion artifact suppression module 580. The motion artifact suppression module 580 is nearly identical to the saturation transform module 406. The motion artifact suppression module 580 provides an output which connects as an input to the second spectral estimation module 588. The first and second spectral estimation modules 586, 588 have outputs which provide inputs to the spectrum analysis module 590. The spectrum analysis module 590 also receives an input which is the output of the motion status module 584. The output of the spectrum analysis module 590 is the initial heart rate determination of the heart rate module 410 and is provided as input to the slew rate limiting module 592. The slew rate limiting module 592 connects to the output filter 594. The output filter 594 also receives an input from the output filter coefficient module 596. The output filter 594 provides the filtered heart rate for the display 336 (FIG. 11).

In the case of no motion, one of the signals (the infrared signal in the present embodiment) is subjected to DC removal and bandpass filtering as represented in the DC removal and bandpass filter module 578. The DC removal and bandpass filter module 578 provide the same filtering as the DC removal and bandpass filter modules 536, 538. During no motion conditions, the filtered infrared signal is provided to the first spectral estimation module 586.

In the present embodiment, the spectral estimation comprises a Chirp Z transform that provides a frequency spectrum

of heart rate information. The Chirp Z transform is used rather than a conventional Fourier Transform because a frequency range for the desired output can be designated in a Chirp Z transform. Accordingly, in the present embodiment, a frequency spectrum of the heart rate is provided between 30 and 250 beats/minute. In the present embodiment, the frequency spectrum is provided to a spectrum analysis module **590** which selects the first harmonic from the spectrum as the pulse rate. Usually, the first harmonic is the peak in the frequency spectrum that has the greatest magnitude and represents the pulse rate. However, in certain conditions, the second or third harmonic can exhibit the greater magnitude. With this understanding, in order to select the first harmonic, the first peak that has an amplitude of at least ½oth of the largest peak in the spectrum is selected). This minimizes the possibility of selecting as the heart rate a peak in the Chirp Z transform caused by noise.

In the case of motion, a motion artifact suppression is completed on the snapshot with the motion artifact suppression module **580**. The motion artifact suppression module **580** is depicted in greater detail in FIG. **21**. As can be seen in FIG. **21**, the motion artifact suppression module **580** is nearly identical to the saturation transform module **406** (FIG. **18**). Accordingly, the motion artifact suppression module has a motion artifact reference processor **570** and a motion artifact correlation canceler **571**.

The motion artifact reference processor **570** is the same as the reference processor **530** of the saturation transform module **406**. However, the reference processor **570** utilizes the saturation value from the saturation module **408**, rather than completing an entire saturation transform with the 117 saturation scan values. The reference processor **570**, therefore, has a saturation equation module **581**, a reference generator **582**, a DC removal module **583**, and a bandpass filter module **585**. These modules are the same as corresponding modules in the saturation transform reference processor **530**. In the present embodiment, the saturation equation module **581** receives the arterial saturation value from the saturation calculation module **408** rather than doing a saturation axis scan as in the saturation transform module **406**. This is because the arterial saturation has been selected, and there is no need to perform an axis scan. Accordingly, the output of the saturation equation module **581** corresponds to the proportionality constant $r_a$ (i.e., the expected red to infrared ratio for the arterial saturation value). Otherwise, the reference processor **570** performs the same function as the reference processor **530** of the saturation transform module **406**.

The motion artifact correlation canceler **571** is also similar to the saturation transform correlation canceler **531** (FIG. **18**). However, the motion artifact suppression correlation canceler **571** uses a slightly different motion artifact joint process estimator **572**. Accordingly, the motion artifact suppression correlation canceler **571** has a joint process estimator **572** and a low-pass filter **573**. The motion artifact joint process estimator **572** differs from the saturation transform joint process estimator **550** in that there are a different number of cells (between 6 and 10 in the present embodiment), as selected by the Number of Cells input **574**, in that the forgetting parameter differs (0.98 in the present embodiment), and in that the time delay due to adaptation differs. The low-pass filter **573** is the same as the low pass filter **552** of the saturation transform correlation canceler **531**.

Because only one saturation value is provided to the reference processor, only one output vector of 270 samples results at the output of the motion artifact suppression correlation canceler **571** for each input packet of 570 samples. In the present embodiment, where the infrared wavelength is pro-

vided as a first input toe the correlation canceler, the output of the correlation canceler **571** provides a clean infrared waveform. It should be understood that, as described above, the infrared and red wavelength signals could be switched such that a clean red waveform is provided at the output of the motion artifact suppression correlation canceler **571**. The output of the correlation canceler **571** is a clean waveform because the actual saturation value of the patient is known which allows the reference processor **570** to generate a noise reference for inputting to the correlation canceler **571** as the reference signal. The clean waveform at the output of the motion artifact suppression module **580** is a clean plethysmograph waveform which can be forwarded to the display **336**.

As described above, an alternative joint process estimator uses the QRD least squares lattice approach (FIGS. **8**a, **9**a and **10**a). Accordingly, the joint process estimator **573** (as well as the joint process estimator **550**) could be replaced with a joint process estimator executing the QRD least squares lattice operation.

FIG. **21**a depicts an alternative embodiment of the motion artifact suppression module with a joint process estimator **572**a replacing the joint process estimator **572**. The joint process estimator **572**a comprises a QRD least squares lattice system as in FIG. **10**a. In accordance with this embodiment, different initialization parameters are used as necessary for the QRD algorithm.

The initialization parameters are referenced in FIG. **21**a as "Number of Cells," "Lambda," "MinSumErr," "GamsInit," and "SumErrInit." Number of Cells and Lambda correspond to like parameters in the joint process estimator **572**. GamsInit corresponds to the γ initialization variable for all stages except the zero order stage, which as set forth in the QRD equations above is initialized to '1'. SummErrInit provides the δinitialization parameter referenced above in the QRD equations. In order to avoid overflow, the larger of the actual calculated denominator in each division in the QRD equations and MinSumErr is used. In the present embodiment, the preferred initialization parameters are as follows:

Number of Cells=6
Lambda=0.8
MinSumErr=11002
GamsInit=$10^{-2}$
SumErrInit=$10^{-6}$.

The clean waveform output from the motion artifact suppression module **580** also provides an input to the second spectral estimation module **588**. The second spectral estimation module **588** performs the same Chirp Z transform as the first spectral estimation module **586**. In the case of no motion, the output from the first spectral estimation module **586** is provided to the spectrum analysis module **586**; in the case of motion, the output from the second spectral estimation module **588** is provided to a spectrum analysis module **590**. The spectrum analysis module **590** examines the frequency spectrum from the appropriate spectral estimation module to determine the pulse rate. In the case of motion, the spectrum analysis module **590** selects the peak in the spectrum with the highest amplitude, because the motion artifact suppression module **580** attenuates all other frequencies to a value below the actual heart rate peak. In the case of no motion, the spectrum analysis module selects the first harmonic in the spectrum as the heart rate as described above.

The output of the spectrum analysis module **590** provides the raw heart rate as an input to the slew rate limiting module **592**, which provides an input to an output filter **594**. In the present embodiment, the slew rate limiting module **592** prevents changes greater that 20 beats/minute per 2 second interval.

US 7,530,955 B2

51

The output filter **594** comprises an exponential smoothing filter similar to the exponential smoothing filter described above with respect to the clip and smooth filter **566**. The output filter is controlled via an output filter coefficient module **596**. If motion is large, this filter is slowed down, if there is little or no motion, this filter can sample much faster and still maintain a clean value. The output from the output filter **594** is the pulse of the patient, which is advantageously provided to the display **336**.

Alternative To Saturation Transform Module—Bank Of Filters

An alternative to the saturation transform of the saturation transform module **406** can be implemented with a bank of filters as depicted in FIG. **23**. As seen in FIG. **23**, two banks of filters, a first filter bank **600** and a second filter bank **602** are provided. The first filter bank **600** receives a first measured signal $S_{\lambda b}(t)$ (the infrared signal samples in the present embodiment) on a corresponding first filter bank input **604**, and the second filter bank **602** receives a second measured signal $S_{\lambda a}(t)$ (the red samples in the present embodiment) on a corresponding second filter bank input **606**. In a preferred embodiment, the first and second filter banks utilize static recursive polyphase bandpass filters with fixed center frequencies and corner frequencies. Recursive polyphase filters are described in an article Harris, et. al. "Digital Signal Processing With Efficient Polyphase Recursive All-Pass filters" attached hereto as Appendix A. However, adaptive implementations are also possible. In the present implementation, the recursive polyphase bandpass filter elements are each designed to include a specific center frequency and bandwidth.

There are N filter elements in each filter bank. Each of the filter elements in the first filter bank **600** have a matching (i.e., same center frequency and bandwidth) filter element in the second filter bank **602**. The center frequencies and the corner frequencies of N elements are each designed to occupy N frequency ranges, 0 to $F_1$, $F_1$-$F_2$, $F_2$-$F_3$, $F_3$-$F_4$ . . . $F_{N-1}$-$F_N$ as shown in FIG. **23**.

It should be understood that the number of filter elements can range from 1 to infinity. However, in the present embodiment, there are approximately 120 separate filter elements with center frequencies spread evenly across a frequency range of 25 beats/minute-250 beats/minute.

The outputs of the filters contain information about the primary and secondary signals for the first and second measured signals (red and infrared in the present example) at the specified frequencies. The outputs for each pair of matching filters (one in the first filter bank **600** and one in the second filter bank **602**) are provided to saturation determination modules **610**. FIG. **23** depicts only one saturation determination module **610** for ease of illustration. However, a saturation determination module can be provided for each matched pair of filter elements for parallel processing. Each saturation determination module has a ratio module **616** and a saturation equation module **618**.

The ratio module **616** forms a ratio of the second output to the first output. For instance, in the present example, a ratio of each red RMS value to each corresponding infrared RMS value (Red/IR) is completed in the ratio module **616**. The output of the ratio module **616** provides an input to the saturation equation module **618** which references a corresponding saturation value for the input ratio.

The output of the saturation equation modules **618** are collected (as represented in the histogram module **620**) for each of the matched filter pairs. However, the data collected is initially a function of frequency and saturation. In order to

52

form a saturation transform curve similar to the curve depicted in FIG. **22**, a histogram or the like is generated as in FIG. **24**. The horizontal axis represents the saturation value, and the vertical axis represents a summation of the number of points (outputs from the saturation equation modules **618**) collected at each saturation value. In other words, if the output of the saturation equation module **618** for ten different matched filter pairs indicates a saturation value of 98%, then a point in the histogram of FIG. **24** would reflect a value of 10 at 98% saturation. This results in a curve similar to the saturation transform curve of FIG. **22**. This operation is completed in the histogram module **620**.

The results of the histogram provide a power curve similar to the power curve of FIG. **22**. Accordingly, the arterial saturation can be calculated from the histogram by selecting the peak (greatest number of occurrences in the area of interest) corresponding to the highest saturation value (e.g., the peak 'c' in Figure peaks corresponding to the highest saturation value peak. Similarly, the venous or background saturation can be determined from the histogram by selecting the peak corresponding to the lowest saturation value (e.g., the peak 'd' in FIG. **24**), in a manner similar to the processing in the saturation calculation module **408**.

It should be understood that as an alternative to the histogram, the output saturation (not necessarily a peak in the histogram) corresponding to the highest saturation value could be selected as the arterial saturation with the corresponding ratio representing $r_a$. Similarly, the output saturation corresponding to the lowest saturation value could be selected as the venous or background saturation with the corresponding ratio representing $r_v$. For example, in this embodiment, the entry 'a' in the histogram of FIG. **24** would be chosen as the arterial saturation and the entry in the histogram 'b' with the lowest saturation value would be chosen as the venous or background saturation.

Alternative Determination of Coefficients $R_a$ and $R_v$

As explained above, in accordance with the present invention, primary and secondary signal portions, particularly for pulse oximetry, can be modeled as follows:

$$S_{red}=s_1 n_1 \text{(red)} \tag{89}$$

$$S_{IR}=s_2 n_2 \text{ (infrared)} \tag{90}$$

$$s_1=r_a s_2 \text{ and } n_1=r_v n_2 \tag{91}$$

Substituting Equation (91) into Equation (89) provides the following:

$$S_{red}=r_a s_2 r_v n_2 \text{ (red)} \tag{92}$$

Note that $S_{red}$ and $S_{IR}$ are used in the model of equations (89)-(92). This is because the discussion below is particularly directed to blood oximetry. $S_{red}$ and $S_{IR}$ correspond to $S_1$ and $S_2$ in the preceding text, and the discussion that follows could be generalized for any measure signal $S_1$ and $S_2$.

As explained above, determining $r_a$ and $r_v$ (which correspond to arterial and venous blood oxygen saturation via a saturation equation) can be accomplished using the saturation transform described above doing a scan of many possible coefficients. Another method to obtain $r_a$ and $r_v$ based on red and infrared data is to look for $r_a$ and $r_v$ which minimize the correlation between $s_k$ and $n_k$, assuming $s_k$ is at least some

US 7,530,955 B2

53 54

what (and preferably substantially) uncorrelated with $n_k$ (where k=1 or 2). These values can be found by minimizing the following statistical calculation function for k=2:

$$Correlation = (s_2, n_2) = \left| \sum_i s_2(S_{red_i}, S_{IR_i}, r_a, r_v)\, n_2(S_{red_i}, S_{IR_i}, r_a, r_v) \right| \quad (93)$$

where i represents time.

It should be understood that other correlation functions such as a normalized correlation could also be used.

Minimizing this quantity often provides a unique pair of $r_a$ and $r_v$ if the noise component is uncorrelated to the desired signal component. Minimizing this quantity can be accomplished by solving Equations (90) and (92) for $s_2$ and $n_2$, and finding the minimum of the correlation for possible values of $r_a$ and $r_v$. Solving for $s_2$ and $n_2$ provides the following:

$$\begin{pmatrix} S_{red} \\ S_{IR} \end{pmatrix} = \begin{pmatrix} r_a & r_v \\ 1 & 1 \end{pmatrix} \begin{pmatrix} s_2 \\ n_2 \end{pmatrix}$$

inverting the two-by-two matrix provides:

Thus,

$$\begin{pmatrix} r_a & r_v \\ 1 & 1 \end{pmatrix}^{-1} = \frac{1}{r_a r_v} \begin{pmatrix} 1 & -r_v \\ -1 & r_a \end{pmatrix}$$

$$\begin{pmatrix} s_2 \\ n_2 \end{pmatrix} = \frac{1}{r_a - r_v} \begin{pmatrix} 1 & -r_v \\ -1 & r_a \end{pmatrix} \begin{pmatrix} S_{red} \\ S_{IR} \end{pmatrix}$$

or:

$$s_2 = \frac{1}{r_a - r_v}(s_{red} - r_v s_{IR})$$

$$n_2 = \frac{1}{r_a - r_v}(-s_{red} + r_a s_{IR})$$

Preferably, the correlation of equation (93) is enhanced with a user specified window function as follows:

$$Correlation(s_2, n_2) = \left| \sum_{i=1}^{N} w_i s_2(S_{red_i}, S_{IR_i}, r_a, r_v)\, n_2(S_{red_i}, S_{IR_i}, r_a, r_v) \right| \quad (93a)$$

The Blackman Window is the presently preferred embodiment. It should be understood that there are many additional functions which minimize the correlation between signal and noise. The function above is simply one. Thus,

$$Correlation(s_2, n_2) = \left| \sum_{i=1}^{N} \left[ \frac{w_i}{(r_a - r_v)^2} (s_{red_i} - r_v s_{IR_i}) (-s_{red_i} - r_a s_{IR_i}) \right] \right| \quad (93b)$$

-continued

$$= \frac{1}{(r_a - r_v)^2} \left| \begin{array}{c} -\sum_{i=1}^{N} (s_{red_i})^2 w_i + (r_a + r_v) \\ \sum_{i=1}^{N} s_{IR_i} s_{red_i} w_i + \sum_{i=1}^{N} (s_{IR_i})^2 w_i \end{array} \right|$$

In order to implement the minimization on a plurality of discrete data points, the sum of the squares of the red sample points, the sum of the squares of the infrared sample points, and the sum of the product of the red times the infrared sample points are first calculated (including the window function, $w_i$):

$$RR = \sum_{i=1}^{n} (S_{red_i})^2 w_i$$

$$II = \sum_{i=1}^{n} (S_{IR_i})^2 w_i$$

$$IRR = \sum_{i=1}^{N} (S_{IR})(S_{red_i}) w_i$$

These values are used in the correlation equation (93b). Thus, the correlation equation becomes an equation in terms of two variables, $r_a$ and $r_v$. To obtain $r_a$ and $r_v$, an exhaustive scan is executed for a good cross-section of possible values for $r_a$ and $r_v$ (e.g., 20-50 values each corresponding to saturation values ranging from 30-105). The minimum of the correlation function is then selected and the values of $r_a$ and $r_v$ which resulted in the minimum are chosen as $r_a$ and $r_v$.

Once $r_a$ and $r_v$ have been obtained, arterial oxygen saturation and venous oxygen saturation can be determined by provided $r_a$ and $r_v$ to a saturation equation, such as the saturation equation 502 of the statistics module 404 which provides an oxygen saturation value corresponding to the ratios $r_a$ and $r_v$.

In a further implementation to obtain $r_a$ and $r_v$, the same signal model set forth above is again used. In order to determine $r_a$ and $r_v$ in accordance with this implementation, the energy in the signal $s_2$ is maximized under the constraint that $s_2$ is uncorrelated with $n_2$. Again, this implementation is based upon minimizing the correlation between s and n and on the signal model of the present invention where the signal s relates to the arterial pulse and the signal n is the noise (containing information on the venous blood, as well as motion artifacts and other noise); $r_a$ is the ratio (RED/IR) related to arterial saturation and $r_v$ is the ratio (RED/IR) related to venous saturation. Accordingly, in this implementation of the present invention, $r_a$ and $r_v$ are determined such that the energy of the signal $s_2$ is maximized where $s_2$ and $n_2$ are uncorrelated. The energy of the signal $s_2$ is given by the following equation:

$$ENERGY(s_2) = \frac{1}{(r_a - r_v)^2} \sum_{i=1}^{N} (s_{red} - r_v s_{IR})^2 \quad (94)$$

$$= \frac{1}{(r_a - r_v)^2} \sum_{i=1}^{N} (s_{red_i}^2) - 2r_v \sum_{i=1}^{N} (s_{red_i} s_{IR_i}) + r_v^2 \sum_{i=1}^{N} (s_{IR_i}^2) \quad (95)$$

US 7,530,955 B2

55 56

-continued

$$= \frac{1}{(r_a - r_v)^2} [R_1 - 2r_v R_{1,2} + r_v^2 R_2] \qquad (96)$$

where $R_1$ is the energy of the red signal, $R_2$ is the energy of the infrared signal and $R_{1,2}$ is the correlation between the red and infrared signals.

The correlation between $s_2$ and $n_2$ is given by

$$\text{Correlation}(s_2, n_2) = \frac{1}{(r_a - r_v)^2} \sum_{i=1}^{N} (S_{red_i} - r_v S_{ir_i})(-S_{red_i} - r_a S_{IR_i}) \qquad (97)$$

$$= \frac{1}{(r_a - r_v)^2} [-R_1 + (r_a + r_v)R_{1,2} - r_v r_a R_2]$$

As explained above, the constraint is that $s_k$ and $n_k$ ($k=2$ for the present example) are uncorrelated. This "decorrelation constraint" is obtained by setting the correlation of Equation (97) to zero as follows:

$$-R_1 + (r_a + r_v)R_{12} - r_a r_v R_2 = 0 \qquad (98)$$

In other words, the goal is to maximize equation (94) under the constraint of equation (98).

In order to obtain the goal, a cost function is defined (e.g., a Lagrangian optimization in the present embodiment) as follows:

$$J(r_a, r_v, \mu) = \qquad (99)$$

$$\frac{1}{(r_a - r_v)^2} [R_1 - 2r_v R_{1,2} + r_v^2 R_2 + \mu(-R_1 + (r_a + r_v)R_{1,2} - r_a r_v R_2)]$$

where $\mu$ is the Lagrange multiplier. Finding the value of $r_a$, $r_v$ and $\mu$ that solve the cost function can be accomplished using a constrained optimization method such as described in Luenberger, *Linear & Nonlinear Programming*, Addison-Wesley, 2d Ed., 1984.

Along the same lines, if we assume that the red and infrared signals $S_{red}$ and $S_{IR}$ are non-static, the functions $R_1$, $R_2$ and $R_{1,2}$ defined above are time dependent. Accordingly, with two equations, two unknowns can be obtained by expressing the decorrelation constraint set forth in equation (98) at two different times. The decorrelation constraint can be expressed at two different times, $t_1$ and $t_2$, as follows:

$$-R_1(t_1) + (r_a + r_v)R_{12}(t_1) - r_a r_v R_2(t_1) = 0 \qquad (100)$$

$$-R_1(t_2) + (r_a + r_v)R_{12}(t_2) - r_a r_v R_2(t_2) = 0 \qquad (101)$$

Because equations (100) and (101) are non-linear in $r_a$ and $r_v$, a change of variables allows the use of linear techniques to solve these two equations. Accordingly, with $x = r_a + r_v$; $y = r_a r_v$; equations (100) and (101) become

$$R_{12}(t_1)x - R_2(t_1)y = R_1(t_1) \qquad (102)$$

$$R_{12}(t_2)x - R_2(t_2)y = R_1(t_2) \qquad (103)$$

These equation (102) and (103) can be solved for x and y. Then, solving for $r_a$ and $r_v$ from the changes of variables equations provides the following:

$$r_v + \frac{y}{r_v} = x \Rightarrow r_v^2 - x r_v + y = 0 \qquad (104)$$

Solving equation (104) results in two values for $r_v$. In the present embodiment, the $r_v$ value that results in $x^2 - r_v y > 0$ is selected. If both values of $r_v$ result in $x^2 - r_v y > 0$, the $r_v$ that maximizes the energy of $s_2$ (Energy($s_2$)) at $t_2$ is selected. $r_v$ is then substituted into the equations above to obtain $r_a$. Alternatively $r_a$ can be found directly in the same manner $r_v$ was determined.

Alternative To Saturation Transform—Complex FFT

The blood oxygen saturation, pulse rate and a clean plethysmographic waveform of a patient can also be obtained using the signal model of the present invention using a complex FFT, as explained further with reference to FIGS. **25A-25C**. In general, by utilizing the signal model of equations (89)-(92) with two measured signals, each with a first portion and a second portion, where the first portion represents a desired portion of the signal and the second portion represents the undesired portion of the signal, and where the measured signals can be correlated with coefficients $r_a$ and $r_v$, a fast saturation transform on a discrete basis can be used on the sample points from the output of the decimation operation **402**.

FIG. **25A** corresponds generally to FIG. **14**, with the fast saturation transform replacing the previously described saturation transform. In other words, the operations of FIG. **25A** can replace the operations of FIG. **14**. As depicted in FIG. **25A**, the fast saturation transform is represented in a fast saturation transform/pulse rate calculation module **630**. As in FIG. **14**, the outputs are arterial oxygen saturation, a clean plethysmographic waveform, and pulse rate. FIGS. **25B** and **25C** illustrate additional detail regarding the fast saturation transform/pulse rate calculation module **630**. As depicted in FIG. **25B**, the fast saturation transform module **630** has infrared log and red log modules **640**, **642** to perform a log normalization as in the infrared and red log modules **480**, **482** of FIG. **17**. Similarly, there are infrared DC removal and red DC removal modules **644**, **646**. In addition, there are infrared and red high-pass filter modules **645**, **647**, window function modules **648**, **640**, complex FFT modules **652**, **654**, select modules **653**, **655**, magnitude modules **656**, **658**, threshold modules **660**, **662**, a point-by-point ratio module **670**, a saturation equation module **672**, and a select saturation module **680**. There are also phase modules **690**, **692**, a phase difference module **694**, and a phase threshold module **696**. The output of the select saturation module **680** provides the arterial saturation on an arterial saturation output line **682**.

In this alternative embodiment, the snapshot for red and infrared signals is 562 samples from the decimation module **402**. The infrared DC removal module **644** and the red DC removal module **646** are slightly different from the infrared and red DC removal modules **484**, **486** of FIG. **17**. In the infrared and red DC removal modules **644**, **646** of FIG. **25B**, the mean of all 563 sample points for each respective channel is calculated. This mean is then removed from each individual sample point in the respective snapshot in order to remove the baseline DC from each sample. The outputs of the infrared and red DC removal modules **644**, **646** provide inputs to respective infrared high-pass filter module **645** and red high-pass filter module **647**.

US 7,530,955 B2

57                                              58

The high-pass filter modules **645**, **647** comprise FIR filters with 51 taps for coefficients. Preferably, the high-pass filters comprise Chebychev filters with a side-lobe level parameter of 30 and a corner frequency of 0.5 Hz (i.e., 30 beats/minute). It will be understood that this filter could be varied for performance. With 562 sample points entering the high-pass filters, and with 51 taps for coefficients, there are 512 samples provided from these respective infrared and red snapshots at the output of the high-pass filter modules. The output of the high-pass filter modules provides an input to the window function modules **648**, **650** for each respective channel.

The window function modules **648**, **650** perform a conventional windowing function. A Kaiser windowing function is used in the present embodiment. The functions throughout FIG. **25**B maintain a point-by-point analysis. In the present embodiment, the time bandwidth product for the Kaiser window function is 7. The output of the window function modules provides an input to the respective complex Fast Fourier Transform (FFT) modules **652**, **654**.

The complex FFT modules **652**, **654** perform complex FFTs on respective infrared and red channels on the data snapshots. The data from the complex FFTs is then analyzed in two paths, once which examines the magnitude and one which examines the phase from the complex FFT data points. However, prior to further processing, the data is provided to respective infrared and red select modules **653**, **655** because the output of the FFT operation will provide repetitive information from 0-½ the sampling rate and from ½ the sampling rate to the sampling rate. The select modules select only samples from 0-½ the sampling rate (e.g., 0-31.25 Hz in the present embodiment) and then select from those samples to cover a frequency range of the heart rate and one or more harmonics of the heart rate. In the present embodiment, samples which fall in the frequency range of 20 beats per minute to 500 beats per minute are selected. This value can be varied in order to obtain harmonics of the heart rate as desired. Accordingly, the output of the select modules results in less than 256 samples. In the present embodiment, the sample points 2-68 of the outputs of the FFTs are utilized for further processing.

In the first path of processing, the output from the select modules **653**, **655** are provided to respective infrared and red magnitude modules **656**, **658**. The magnitude modules **656**, **658** perform a magnitude function wherein the magnitude on a point-by-point basis of the complex FFT points is selected for each of the respective channels. The outputs of the magnitude modules **656**, **658** provide an input to infrared and red threshold modules **660**, **662**.

The threshold modules **660**, **662** examine the sample points, on a point-by-point basis, to select those points where the magnitude of an individual point is above a particular threshold which is set as a percentage of the maximum magnitude detected among all the remaining points in the snapshots. In the present embodiment, the percentage for the threshold operation is selected as 1% of the maximum magnitude.

After thresholding, the data points are forwarded to a point-by-point ratio module **670**. The point-by-point ratio module takes the red over infrared ratio of the values on a point-by-point basis. However, a further test is performed to qualify the points for which a ratio is taken. As seen in FIG. **25**B, the sample points output from the select modules **653**, **655** are also provided to infrared and red phase modules **690**, **692**. The phase modules **690**, **692** select the phase value from the complex FFT points. The output of the phase modules **690**, **692** is then presented to a phase difference module **694**.

The phase difference module **694** calculates the difference in phase between the corresponding data points from the phase modules **690**, **692**. If the magnitude of the phase difference between any two corresponding points is less than a particular threshold (e.g., 0.1 radians) in the present embodiment), then the sample points qualify. If the phase of two corresponding sample points is too far apart, then the sample points are not used. The output of the phase threshold module **696** provides an enable input to the RED/IR rate module **670**. Accordingly, in order for the ratio of a particular pair of sample points to be taken, the three tests are executed:

1. the red sample must pass the red threshold **660**;
2. the infrared sample must pass the infrared threshold **662**; and
3. the phase between the two points must be less than the predefined threshold as determined in the phase threshold **696**.

For those sample points which qualify, a ratio is taken in the ratio module **670**. For those points which do not qualify, the saturation is set to zero at the output of the saturation equation **672**.

The resulting ratios are provided to a saturation equation module which is the same as the saturation equation modules **502**, **520** in the statistics module **504**. In other words, the saturation equation module **672** accepts the ratio on a point-by-point basis and provides as an output a corresponding saturation value corresponding to the discrete ratio points. The saturation points output from the saturation equation module **672** provide a series of saturation points which could be plotted as saturation with respect to frequency. The frequency reference was entered into the points at the complex FFT stage.

The arterial (and the venous) saturation can then be selected, as represented in the select arterial saturation module **680**, in one of two methods according to the present invention. According to one method, the arterial saturation value can be selected simply as the point corresponding to the largest saturation value for all points output from the saturation equation module **672** for a packet. Alternatively, a histogram similar to the histogram of FIG. **22** can be generated in which the number of saturation values at different frequencies (points) are summed to form a histogram of the number of occurrences for each particular saturation value. In either method, the arterial saturation can be obtained and provided as an output to the select arterial saturation module on the arterial saturation output line **682**. In order to obtain the venous saturation, the minimum arterial saturation value, of points that exhibit non-zero value, is selected rather than the maximum arterial saturation value. The saturation can be provided to the display **336**.

The fast saturation transform information can also be used to provide the pulse rate and the clean plethysmographic wave form as further illustrated in FIG. **25**C. In order to obtain the pulse rate and a clean plethysmographic wave form, several additional functions are necessary. As seen in FIG. **25**C, the pulse rate and clean plethysmographic wave form are determined using a window function module **700**, a spectrum analysis module **702** and an inverse window function module **704**.

As depicted in FIG. **25**C, the input to the window function module **700** is obtained from the output of the complex FFT modules **652** or **654**. In the present embodiment, only one measured signal is necessary. Another input to the window function module **700** is the arterial saturation obtained from the output of the select arterial saturation module **680**.

The window function module performs a windowing function selected to pass those frequencies that significantly cor-

US 7,530,955 B2

59

relate to the frequencies which exhibited saturation values very close to the arterial saturation value. In the present embodiment, the following windowing function is selected:

$$1 - \left[\frac{SAT_{art} - SAT_n}{100}\right]^{15} \tag{105}$$

where $SAT_n$ equals the saturation value corresponding to each particular frequency for the sample points and $SAT_{art}$ represents the arterial saturation as chosen at the output of the select arterial saturation module **680**. This window function is applied to the window function input representing the complex FFT of either the red or the infrared signal. The output of the window function module **700** is a red or infrared signal represented with a frequency spectrum as determined by the FFT, with motion artifacts removed by the windowing function. It should be understood that many possible window functions can be provided. In addition, with the window function described above, it should be understood that using a higher power will provide more noise suppression.

In order to obtain pulse rate, the output points from the window function module **700** are provided to a spectrum analysis module **702**. The spectrum analysis module **702** is the same as the spectrum analysis module **590** of FIG. **20**. In other words, the spectrum analysis module **702** determines the pulse rate by determining the first harmonic in the frequency spectrum represented by the output points of the windowing function **700**. The output of spectrum analysis module **702** is the pulse rate.

In order to obtain a clean plethysmographic waveform, the output of the windowing function **700** is applied to an inverse window function module **704**. The inverse window function module **704** completes an inverse of the Kaiser window function of the window function module **648** or **650** of FIG. **25B**. In other words, the inverse window function **704** does a point-by-point inverse of the Kaiser function for points that are still defined. The output is a clean plethysmographic waveform.

Accordingly, by using a complex FFT and windowing functions, the noise can be suppressed from the plethysmographic waveform in order to obtain the arterial saturation, the pulse rate, and a clean plethysmographic waveform. It should be understood that although the above description relates to operations primarily in the frequency domain, operations that obtain similar results could also be accomplished in the time domain.

Relation to Generalized Equations

The measurements described for pulse oximetry above are now related back to the more generalized discussion above. The signals (logarithm converted) transmitted through the finger **310** at each wavelength $\lambda a$ and $\lambda b$ are:

$$S_{\lambda a}(t) = S_{\lambda red1}(t) = \epsilon_{HbO2,\lambda a}c^A_{HbO2}x^A(t) + \epsilon_{Hb,\lambda a}c^A_{Hb}x^A(t) + \epsilon_{HbO2,\lambda a}c^V_{HbO2}x^V(t) + \epsilon_{Hb,\lambda a}c^V_{Hb}x^V(t) + n_{\lambda a}(t); \tag{105a}$$

$$S_{\lambda a}(t) = \epsilon_{HbO2,\lambda a}c^A_{HbO2}x^A(t) + \epsilon_{Hb,\lambda a}c^A_{Hb}x^A(t) + n_{\lambda a}(t); \tag{105b}$$

$$S_{\lambda a}(t) = s_{\lambda a}(t) + n_{\lambda a}(t); \tag{105c}$$

$$S_{\lambda b}(t) = S_{\lambda red2}(t) = \epsilon_{HbO2,\lambda b}c^A_{HbO2}x^A(t) + \epsilon_{Hb,\lambda b}c^A_{Hb}x^A(t) + \epsilon_{HbO2,\lambda b}c^V_{HbO2}x^V(t) + \epsilon_{Hb,\lambda b}c^V_{Hb}x^V(t) + n_{\lambda b}(t); \tag{106a}$$

$$S_{\lambda b}(t) = \epsilon_{HbO2,\lambda b}c^A_{HbO2}x^A(t) + \epsilon_{Hb,\lambda b}c^A_{Hb}x^A(t) + n_{\lambda b}(t) \tag{106b}$$

$$S_{\lambda b}(t) = s_{\lambda b}(t) + n_{\lambda b}(t); \tag{106c}$$

The variables above are best understood as correlated to FIG. **6**c as follows: assume the layer in FIG. **6**c containing $A_3$

60

and $A_4$ represents venous blood in the test medium, with $A_3$ representing deoxygenated hemoglobin (Hb) and $A_4$ representing oxygenated hemoglobin (HBO2) in the venous blood. Similarly, assume that the layer in FIG. **6**c containing $A_5$ and $A_6$ represents arterial blood in the test medium, with $A_5$ representing deoxygenated hemoglobin (Hb) and $A_6$ representing oxygenated hemoglobin (HBO2) in the arterial blood. Accordingly, $c^V HbO2$ represents the concentration of oxygenated hemoglobin in the venous blood, $c^V Hb$ represents the concentration of deoxygenated hemoglobin in the venous blood, $x^V$ represents the thickness of the venous blood (e.g. the thickness the layer containing $A_3$ and $A_4$). Similarly, $c^A HbO2$ represents the concentration of oxygenated hemoglobin in the arterial blood, $c^A Hb$ represents the concentration of deoxygenated hemoglobin in the arterial blood, and $x^A$ represents the thickness of the arterial blood (e.g., the thickness of the layer containing $A_5$ and $A_6$)

The wavelengths chosen are typically one in the visible red range, i.e., $\lambda a$, and one in the infrared range, i.e., $\lambda b$. Typical wavelength values chosen are $\lambda a = 660$ nm and $\lambda b = 910$ nm. In accordance with the constant saturation method, it is assumed that $c^A_{HbO2}(t)/c^A_{Hb}(t) = \text{constant}_1$ and $c^V_{HbO2}(t)/c^V_{Hb}(t) = \text{constant}_2$. The oxygen saturation of arterial and venous blood changes slowly, if at all, with respect to the sample rate, making this a valid assumption. The proportionality coefficients for equations (105) and (106) can then be written as:

$$r_a(t) = \frac{\epsilon_{HbO2,\lambda a}c^A_{HbO2}x(t) + \epsilon_{Hb,\lambda a}c_{Hb}x(t)}{\epsilon_{HbO2,\lambda b}c^A_{HbO2}x(t) + \epsilon_{Hb,\lambda b}c_{Hb}x(t)} * \tag{107}$$

$$s_{\lambda a}(t) = r_a(t)s_{\lambda b}(t) \tag{108a}$$

$$n_{\lambda a}(t) = r_a(t)n_{\lambda b}(t) \tag{109a}$$

$$n_{\lambda a}(t) = r_v(t)n_{\lambda b}(t) \tag{108b}$$

$$s_{\lambda a}(t) = r_v(t)s_{\lambda b}(t) \tag{109b}$$

In pulse oximetry, it is typically the case that both equations (108) and (109) can be satisfied simultaneously.

Multiplying equation (106) by $r_a(t)$ and then subtracting equation (106) from equation (105), a non-zero secondary reference signal $n'(t)$ is determined by:

$$n'(t) = S_{\lambda a}(t) - r_a(t)S_{\lambda b}(t) \tag{110a}$$

$$= \epsilon_{HbO2,\lambda a}c^V_{HbO2}x^V(t) + \epsilon_{Hb,\lambda a}c^V_{Hb}x^V(t) + n_{\lambda a}(t) - r_a(t)[\epsilon_{HbO2,\lambda b}c^V_{HbO2}x^V(t) + \epsilon_{Hb,\lambda b}c^V_{Hb}x^V(t) + n_{\lambda b}(t)] \tag{111a}$$

Multiplying equation (106) by $r_v(t)$ and then subtracting equation (106) from equation (105), a non-zero primary reference signal $s'(t)$ is determined by:

$$s'(t) = S_{\lambda a}(t) - r_v(t)S_{\lambda b}(t) \tag{110b}$$

$$= s_{\lambda a}(t) - r_v(t)s_{\lambda b}(t) \tag{111b}$$

The constant saturation assumption does not cause the venous contribution to the absorption to be canceled along with the primary signal portions $s_{\lambda a}(t)$ and $s_{\lambda b}(t)$. Thus, frequencies associated with both the low frequency modulated absorption due to venous absorption when the patient is still

US 7,530,955 B2

61

and the modulated absorption due to venous absorption when the patient is moving are represented in the secondary reference signal n'(t). Thus, the correlation canceler or other methods described above remove or derive both erratically modulated absorption due to venous blood in the finger under motion and the constant low frequency cyclic absorption of venous blood.

To illustrate the operation of the oximeter of FIG. 11 to obtain clean waveform, FIGS. 26 and 27 depict signals measured for input to a reference processor of the present invention which employs the constant saturation method, i.e., the signals $S_{\lambda a}(t)=S_{\lambda,red}(t)$ and $S_{\lambda b}(t)=S_{\lambda IR}(t)$. A first segment 26a and 27a of each of the signals is relatively undisturbed by motion artifact, i.e., the patient did not move substantially during the time period in which these segments were measured. These segments 26a and 27a are thus generally representative of the primary plethysmographic waveform at each of the measured wavelengths. A second segment 26b and 27b of each of the signals is affected by motion artifact, i.e., the patient did move during the time period in which these segments were measured. Each of these segments 26b and 27b shows large motion induced excursions in the measured signal. A third segment 26c and 27c of each of the signals is again relatively unaffected by motion artifact and is thus generally representative of the primary plethysmographic waveform at each of the measured wavelengths.

FIG. 28 shows the secondary reference signal n'(t)=$n_{\lambda a}(t)$–$r_a n_{\lambda b}(t)$, as determined by a reference processor of the present invention. Again, the secondary reference signal n'(t) is correlated to the secondary signal portions $n_a$ and $n_b$. Thus, a first segment 28a of the secondary reference signal n'(t) is generally flat, corresponding to the fact that there is very little motion induced noise in the first segments 26a and 27a of each signal. A second segment 28b of the secondary reference signal n'(t) exhibits large excursions, corresponding to the large motion induced excursions in each of the measured signals. A third segment 28c of the noise reference signal n'(t) is generally flat, again corresponding to the lack of motion artifact in the third segments 26c and 27c of each measured signal.

It should also be understood that a reference processor could be utilized in order to obtain the primary reference signal s'(t)=$s_{\lambda a}$–$r_v s_{\lambda b}(t)$. The primary reference signal s'(t) would be generally indicative of the plethysmograph waveform.

FIGS. 29 and 30 show the approximations $s''_{\lambda a}(t)$ and $s''_{\lambda b}$(t) to the primary signals $s_{\lambda a}(t)$ and $s_{\lambda b}(t)$ as estimated by a correlation canceler using a secondary reference signal n'(t). Note that the scale of FIGS. 26 through 30 is not the same for each figure to better illustrate changes in each signal. FIGS. 29 and 30 illustrate the effect of correlation cancellation using the secondary reference signal n'(t) as determined by the reference processor. Segments 29b and 30b are not dominated by motion induced noise as were segments 26b and 27b of the measured signals. Additionally, segments 29a, 30a, 29c, and 30c have not been substantially changed from the measured signal segments 26a, 27a, 26c, and 27c where there was no motion induced noise.

It should be understood that approximation $n''_{\lambda a}(t)$ and $n''_{\lambda b}(t)$ to the secondary signals $n_{\lambda a}(t)$ and $n_{\lambda b}(t)$ as estimated

62

by a correlation canceler using a primary reference signal s'(t) can also be determined in accordance with the present invention.

### Method for Estimating Primary and Secondary Signal Portions of Measured Signals in a Pulse Oximeter

Implementing the various embodiments of the correlation canceler described above in software is relatively straightforward given the equations set forth above, and the detailed description above. However, a copy of a computer program subroutine, written in the C programming language, which calculates a primary reference s'(t) using the constant saturation method and, using a joint process estimator 572 which implements a joint process estimator using the equations (54)-(64) is set forth in Appendix B. This joint process estimator estimates a good approximation to the primary signal portions of two measured signals, each having a primary portion which is correlated to the primary reference signal s'(t) and a secondary portion which is correlated to the secondary reference signal n'(t). This subroutine is another way to implement the steps illustrated in the flowchart of FIG. 9 for a monitor particularly adapted for pulse oximetry. The two signals are measured at two different wavelengths λa and λb, where λa is typically in the visible region and λb is typically in the infrared region. For example, in one embodiment of the present invention, tailored specifically to perform pulse oximetry using the constant saturation method, λa=660 nm and λb=940 nm.

The correspondence of the program variables to the variables defined in equations (54)-(64) in the discussion of the joint process estimator is as follows:

$\Delta_m(t)=nc[m].Delta$

$\Gamma_{f,m}(t)=nc[m].fref$

$\Gamma_{b,m}(t)=nc[m].bref$

$f_m(t)=nc[m].ferr$

$b_m(t)=nc[m].berr$

$\Im_m(t)=nc[m].Fswsqr$

$\beta_m(t)=nc[m].Bswsqr$

$\gamma_m(t)=nc[m].Gamma$

$\rho_{m,\lambda a}(t)=nc[m].Roh\_a$

$\rho_{m,\lambda b}(t)=nc[m].Roh\_b$

$e_{m,\lambda a}(t)=nc[m].err\_a$

$e_{m,\lambda b}(t)=nc[m].err\_b$

$\kappa_{m,\lambda a}(t)=nc[m].K\_a$

$\kappa_{m,\lambda b}(t)=nc[m].K\_b$

A first portion of the program performs the initialization of the registers 90, 92, 96, and 98 and intermediate variable values as in the "INITIALIZED CORRELATION CANCELER" action block 120. A second portion of the program performs the time updates of the delay element variables 110 with the value at the input of each delay element variable 110 is stored in the delay element variable 110 as in the "TIME UPDATE OF LEFT [$Z^{-1}$] ELEMENTS" action block 130.

US 7,530,955 B2

63

The calculation of saturation is performed in a separate module. Various methods for calculation of the oxygen saturation are known to those skilled in the art. One such calculation is described in the articles by G. A. Mook, et al, and Michael R. Neuman cited above. Once the concentration of oxygenated hemoglobin and deoxygenated hemoglobin are determined, the value of the saturation is determined similarly to equations (72) through (79) wherein measurements at times $t_1$ and $t_2$ are made at different, yet proximate times over which the saturation is relatively constant. For pulse oximetry, the average saturation at time $t = (t_1 + t_2)/2$ is then determined by:

$$Sat_{arterial}(t) = \frac{C_{HbO2}^A(t)}{C_{HbO2}^A(t) + C_{Hb}^A(t)} \qquad (112a)$$

$$= \frac{\epsilon_{Hb,\lambda b} - \epsilon_{Hb,\lambda a}(\Delta S_{\lambda a}/\Delta S_{\lambda b})}{\epsilon_{HB,\lambda a} - \epsilon_{Hb02,\lambda a} - (\epsilon_{HB,\lambda b} - \epsilon_{Hb02,\lambda b})(\Delta S_{\lambda a}/\Delta S_{\lambda b})} \qquad (112b)$$

$$Sat_{venous}(t) = \frac{C_{HbO2}^V(t)}{C_{HbO2}^V(t) + C_{Hb}^V(t)} \qquad (113a)$$

$$= \frac{\epsilon_{Hb,\lambda a} - \epsilon_{Hb,\lambda a}(\Delta n_{\lambda a}/\Delta n_{\lambda b})}{\epsilon_{HB,\lambda a} - \epsilon_{Hb02,\lambda a} - (\epsilon_{HB,\lambda b} - \epsilon_{Hb02,\lambda b})(\Delta n_{\lambda a}/\Delta n_{\lambda b})} \qquad (113b)$$

A third portion of the subroutine calculates the primary reference or secondary reference, as in the "CALCULATE PRIMARY OR SECONDARY REFERENCE (s'(t) or n'(t)) FOR TWO MEASURED SIGNAL SAMPLES" action block **140** for the signals $S_{\lambda a}(t)$ and $S_{\lambda b}(t)$ using the proportionality constants $r_a(t)$ and $r_v(t)$ determined by the constant saturation method as in equation (3). The saturation is calculated in a separate subroutine and a value of $r_a(t)$ or $r_v(t)$ is imported to the present subroutine for estimating either the primary portions $s_{\lambda a}(t)$ and $s_{\lambda b}(t)$ or the secondary portions $n_{\lambda a}(t)$ and $n_{\lambda b}(t)$ of the composite measured signals $S_{\lambda a}(t)$ and $S_{\lambda b}(t)$.

A fourth portion of the program performs Z-stage update as in the "ZERO STAGE UPDATE" action block **150** where the Z-stage forward prediction error $F_o(t)$ and Z-stage backward prediction error $b_o(t)$ are set equal to the value of the reference signal n'(t) or s'(t) just calculated. Additionally zero-stage values of intermediate variables $\Im_o$ and $\beta_o(t)$(nc[m].Fswsqr and nc[m].Bswsqr in the program) are calculated for use in setting registers **90**, **92**, **96**, and **98** values in the least-squares lattice predictor **70** in the regression filters **80**a and **80**b.

A fifth portion of the program is an iterative loop wherein the loop counter, M, is reset to zero with a maximum of m=NC_CELLS, as in the "m=0" action block **160** in FIG. 9. NC_CELLS is a predetermined maximum value of iterations for the loop. A typical value for NC_CELLS is between 6 and 10, for example. The conditions of the loop are set such that the loop iterates a minimum of five times and continues to iterate until a test for conversion is met or m=NC_CELLS. The test for conversion is whether or not the sum of the weighted sum of four prediction errors plus the weighted sum of backward prediction errors is less than a small number, typically 0.00001 (i.e., $\Im_m(t) + \beta m(t) \leq 0.00001$).

A sixth portion of the program calculates the forward and backward reflection coefficient $\Gamma_{m,f}(t)$ and $\Gamma_{m,b}(t)$ register **90** and **92** values (nc[m].fref and nc[m].bref in the program) as in the "ORDER UPDATE $m^{th}$-STAGE OF LSL-PREDICTOR" action block **170**. Then forward and backward prediction errors $f_m(t)$ and $b_m(t)$ (nc[m].ferr and nc[m].berr in the program) are calculated. Additionally, intermediate variables $\Im_m(t)$, $\beta_m(t)$, and $\gamma(t)$ (nc[m].Fswsqr, nc[m].Bswsqr, nc[m]. gamma in the program) are calculated. The first cycle of the

64

loop uses the value for nc[0].Fswsqr and nc[0].Bswsqr calculated in the ZERO STAGE UPDATE portion of the program.

A seventh portion of the program, still within the loop begun in the fifth portion of the program, calculates the regression coefficient register **96** and **98** values $\kappa_{m,\lambda a}(t)$ and $\kappa_{m,\lambda b}(t)$ (nc[m].K_a and nc[m].K_b in the program) in both regression filters, as in the "ORDER UPDATE $m^{th}$ STAGE OF REGRESSION FILTER(S)" action block **180**. Intermediate error signals and variables $e_{m,\lambda a}(t)$, $e_{m,\lambda b}(t)$, $\rho_{m,\lambda a}(t)$, and $\rho_{m,\lambda b}(t)$ (nc[m].err_a and nc[m].err_b, nc[m].roh_a, and nc[m].roh_b in the subroutine) are also calculated.

The loop iterates until the test for convergence is passed. The test for convergence of the joint process estimator is performed each time the loop iterates analogously to the "DONE" action block **190**. If the sum of the weighted sums of the forward and backward prediction errors $\Im_m(t) + \beta_m(t)$ is less than or equal to 0.00001, the loop terminates. Otherwise, sixth and seventh portions of the program repeat.

The output of the present subroutine is a good approximation to the primary signals $s''_{\lambda a}(t)$ and $s''_{\lambda b}(t)$ or the secondary signals $n''_{\lambda a}(t)$ and $n''_{\lambda b}(t)$ for the set of samples $S_{\lambda a}(t)$ and $S_{\lambda b}(t)$ input to the program. After approximations to the primary signal portions or the secondary signals portions of many sets of measured signal samples are estimated by the joint process estimator, a compilation of the outputs provides waves which are good approximations to the plethysmographic wave or motion artifact at each wavelength, $\lambda a$ and $\lambda b$.

It should be understood that the subroutine of Appendix B is merely one embodiment which implements the equations (54)-(64). Although implementation of the normalized and QRD-LSL equations is also straightforward, a subroutine for the normalized equations is attached as Appendix C, and a subroutine for the QRD-LSL algorithm is attached as Appendix D.

While one embodiment of a physiological monitor incorporating a processor of the present invention for use in a correlation canceler, such as an adaptive noise canceler, to remove or derive primary and secondary components from a physiological measurement has been described in the form of a pulse oximeter, it will be obvious to one skilled in the art that other types of physiological monitors may also employ the above described techniques.

Furthermore, the signal processing techniques described in the present invention may be used to compute the arterial and venous blood oxygen saturations of a physiological system on a continuous or nearly continuous time basis. These calculations may be performed, regardless of whether or not the physiological system undergoes voluntary motion.

Furthermore, it will be understood that transformations of measured signals other than logarithmic conversion and determination of a proportionality factor which allows removal or derivation of the primary or secondary signal portions for determination of a reference signal are possible. Additionally, although the proportionality factor r has been described herein as a ratio of a portion of a first signal to a portion of a second signal, a similar proportionality constant determined as a ratio of a portion of a second signal to a portion of a first signal could equally well be utilized in the processor of the present invention. In the latter case, a secondary reference signal would generally resemble $n'(t) = n_{\lambda b}(t) - rn_{\lambda a}(t)$.

Furthermore, it will be understood that correlation cancellation techniques other than joint process estimation may be used together with the reference signals of the present inven-

US 7,530,955 B2

65

tion. These may include but are not limited to least mean square algorithms, wavelet transforms, spectral estimation techniques, neural networks, Weiner and Kalman filters among others.

One skilled in the art will realize that many different types of physiological monitors may employ the teachings of the present invention. Other types of physiological monitors include, but are in not limited to, electro cardiographs, blood pressure monitors, blood constituent monitors (other than oxygen saturation) monitors, capnographs, heart rate monitors, respiration monitors, or depth of anesthesia monitors. Additionally, monitors which measure the pressure and quantity of a substance within the body such as a breathalizer, a drug monitor, a cholesterol monitor, a glucose monitor, a carbon dioxide monitor, a glucose monitor, or a carbon monoxide monitor may also employ the above described techniques.

Furthermore, one skilled in the art will realize that the above described techniques of primary or secondary signal removal or derivation from a composite signal including both primary and secondary components can also be performed on electrocardiography (ECG) signals which are derived from positions on the body which are close and highly correlated to each other. It should be understood that a tripolar Laplacian electrode sensor such as that depicted in FIG. **31** which is a modification of a bipolar Laplacian electrode sensor discussed in the article "Body Surface Laplacian ECG Mapping" by Bin He and Richard J. Cohen contained in the journal IEEE Transactions on Biomedical Engineering, Vol. 39, No. 11, November 1992 could be used as an ECG sensor. It must also be understood that there are a myriad of possible ECG sensor geometry's that may be used to satisfy the requirements of the present invention. The same type of sensor could also be used for EEG and EMG measurements.

Furthermore, one skilled in the art will realize that the above described techniques can also be performed on signals made up of reflected energy, rather than transmitted energy. One skilled in the art will also realize that a primary or secondary portion of a measured signal of any type of energy, including but not limited to sound energy, X-ray energy, gamma ray energy, or light energy can be estimated by the techniques described above. Thus, one skilled in the art will realize that the techniques of the present invention can be applied in such monitors as those using ultrasound where a signal is transmitted through a portion of the body and reflected back from within the body back through this portion of the body. Additionally, monitors such as echo cardiographs may also utilize the techniques of the present invention since they too rely on transmission and reflection.

While the present invention has been described in terms of a physiological monitor, one skilled in the art will realize that the signal processing techniques of the present invention can be applied in many areas, including but not limited to the processing of a physiological signal. The present invention may be applied in any situation where a signal processor comprising a detector receives a first signal which includes a first primary signal portion and a first secondary signal portion and a second signal which includes a second primary signal portion and a second secondary signal portion. Thus, the signal processor of the present invention is readily applicable to numerous signal processing areas.

What is claimed is:

**1**. A method of determining pulse rate comprising:

receiving first and second intensity signals from a light-sensitive detector which detects light of at least first and second wavelengths attenuated by body tissue carrying pulsing blood;

66

electronically determining using one or more signal processing devices of a patient monitor, at least two values corresponding to pulse rate based upon at least two different methods of processing the physiological signals; and

electronically determining using one or more signal processing devices of a patient monitor, a resulting value for pulse rate from the at least two values corresponding to pulse rate, wherein one of the different methods of processing comprises a self optimizing algorithm.

**2**. The method of claim **1**, wherein the self optimizing algorithm comprises a least squares algorithm.

**3**. The method of claim **1**, comprising outputting a measurement of pulse rate indicative of said resulting value of said pulse rate.

**4**. The method of claim **3**, wherein said outputting comprises outputting to a display device said measurement of said pulse rate.

**5**. A method of determining pulse rate comprising:

sensing physiological signals resulting from the attenuation of light of at least first and second wavelengths by body tissue carrying pulsing blood;

electronically determining using one or more signal processing devices of a patient monitor, at least two values corresponding to pulse rate based upon at least two alternative methods of processing the sensed physiological signals from at least one of the first and second wavelengths; and

electronically determining using one or more signal processing devices of a patient monitor, a resulting value for pulse rate from the at least two values corresponding to pulse rate, wherein the step of determining comprises selecting at least one of the at least two values based on a determination of confidence in the accuracy of physiological signals.

**6**. The method of claim **5**, comprising outputting a measurement of pulse rate indicative of said resulting value of said pulse rate.

**7**. The method of claim **6**, wherein said outputting comprises outputting to a display device said measurement of said pulse rate.

**8**. A method of determining pulse rate comprising:

sensing physiological signals resulting from the attenuation of light of at least first and second wavelengths by body tissue carrying pulsing blood;

electronically determining using one or more signal processing devices of a patient monitor, at least two values corresponding to pulse rate based upon at least two alternative methods of processing the sensed physiological signals from at least one of the first and second wavelengths; and

electronically determining using one or more signal processing devices of a patient monitor, a resulting value for pulse rate from the at least two values corresponding to pulse rate, wherein determining a resulting value comprises averaging the at least two values and wherein said step of averaging comprises averaging over a time window, wherein said window is increased for potential of said physiological parameter having a lower confidence

US 7,530,955 B2

**67**

of accuracy and decreased for potential values of said physiological parameter having a higher confidence of accuracy.

**9**. The method of claim **8**, comprising outputting a measurement of pulse rate indicative of said resulting value of said pulse rate.

**68**

**10**. The method of claim **9**, wherein said outputting comprises outputting to a display device said measurement of said pulse rate.

\* \* \* \* \*