# EXHIBIT I

1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MASIMO CORP.,                    )
                                 )
          Plaintiff,             )
                                 )  C.A. No. 09-00080-LPS-MPT
v.                               )
                                 )
PHILIPS ELECTRONICS              )
NORTH AMERICA CORP.,             )
                                 )
          Defendant.             )

Wednesday, December 21, 2011
9:00 a.m.
Teleconference in Chambers

844 King Street
Wilmington, Delaware

BEFORE:  THE HONORABLE MARY PAT THYNGE
         United States District Court Magistrate Judge

APPEARANCES:

     MORRIS NICHOLS ARSHT & TUNNELL, LLP
     BY:  JULIA HEANEY, ESQ.

          -and-

     KNOBBE MARTENS OLSON & BEAR, LLP
     BY:  JOSEPH R. RE, ESQ.
     BY:  STEPHEN C. JENSEN, ESQ.
     BY:  MICHELLE ARMOND, ESQ.

               Counsel for the Plaintiff

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware 19801
(302) 658-6697  FAX (302) 658-8418

2

APPEARANCES CONTINUED:

POTTER, ANDERSON & CORROON, LLP
BY:  DAVID E. MOORE, ESQ.

     -and-

MAYER BROWN
BY:  BRIAN A. ROSENTHAL, ESQ.
BY:  ALAN M. GRIMALDI, ESQ.
BY:  ANN MARIE PHILLIPS, ESQ.

          Counsel for the Defendant

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware 19801
(302) 658-6697  FAX (302) 658-8418

3

1     THE COURT:  Good morning, counsel.
2          (Everyone said, Good morning, Your
3  Honor.)
4     THE COURT:  Before we begin, let
5  me introduce Heather who's the court reporter
6  today.  She's from Hawkins.
7          And my understanding is we've got
8  some issues to discuss today and we'll see how
9  far and what solutions we potentially come up
10 with.
11         Before we begin, though, as a
12 reminder, counsel, I'm going to get
13 introductions from everybody.  And also, that
14 would you please repeat or indicate reintroduce
15 yourself each team you talk?
16         So let's get started.  Who is on
17 the line on behalf of Masimo?
18    MS. HEANEY:  Your Honor, this is
19 Julie Heaney from Morris Nichols.  And from
20 Knobbe Martens, Joe Re, Steve Jensen and
21 Michelle Armond are on.
22    MR. MOORE:  On behalf of Philips,
23 Your Honor, David Moore at Potter Anderson.
24         With me on the line from Mayer

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware 19801
(302) 658-6697  FAX (302) 658-8418

4

1  Brown are Alan Grimaldi, Brian Rosenthal and Ann
2  Marie Phillips.
3     THE COURT:  Good morning to all
4  of you.
5     MR. MOORE:  Good morning.
6     THE COURT:  There's a couple
7  issues that have been brought up by the parties
8  in this.  What I'm going to do is basically
9  allow you to briefly explain and go into maybe a
10 little more detail than what you had in your
11 letters.
12         And then I'm going to have a
13 discussion with you about it.  So I'm going to
14 give you a chance to talk briefly, and I
15 emphasize the word briefly.  And then I'll ask
16 some questions.
17         But I'm going to let both of you
18 talk.  That is, finish up your presentation,
19 because this is kind of a little different
20 discovery-dispute-type issue.
21         So on the side of Masimo, since
22 it's their motion, who's going to be doing the
23 talking, please?
24    MR. RE:  I will, Your Honor.  This

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware 19801
(302) 658-6697  FAX (302) 658-8418

5

1  is Joe Re from Knobbe Martens.
2        THE COURT:   All right, Joe.
3        MR. RE:  Good morning.
4        THE COURT:   Good morning to you.
5  You may begin.
6        MR. RE: Yes.  I think, as is clear
7  in our letter, our goal is simply to resuscitate
8  the proceedings on what we call the limbo
9  patents or at least the family of patents
10  remaining, the patents that haven't been
11  construed.
12        Now, this is not a redo.  The
13  Court never stayed any proceedings on the
14  unselected patents.
15        The Court's order of October 4th
16  didn't address those original patents, or how or
17  when we were going to deal with those patents.
18        And all we are asking for is that
19  the parties wrap up any discovery, and that we
20  at least prepare and move on to get a Markman
21  proceeding scheduled on at least the family of
22  patents that are the ones that are related to
23  the patents that have already been construed.
24        Thus, then if we do this, then and

6

1  only then would we be in a position to do the
2  proper analysis of what patents should be
3  grouped together for any trial, rather than
4  where we currently stand facing the future
5  proceedings merely based on the number of
6  patents at issue as Philips has been arguing.
7        Now, having read the letters from
8  both the parties, I think Philips agrees, or at
9  least it's a non-dispute that it will be more
10  efficient to group patents for trial based on
11  the actual subject matter.
12        Proceeding with the discovery and
13  the Markman, on at least the family-related
14  patents, would allow the Court to group patents
15  based on subject matter.  And the way I see it,
16  there are two real families of patents.
17        And the families -- and the first
18  family are the parallel calculation patents,
19  which includes the unselected '850 patent and
20  the selected construed '984 patent.
21        The other part of this first
22  family are the frequency domain patents, which
23  include the selected '272 patent, which has been
24  construed and the unselected '154 patent.

7

1        And the so-called second family is
2  the pulse rate patents.  That is the unselected
3  '952 patent and the selected construed '194
4  patent.
5        And, in my view, Philips simply
6  ignores the overlapping subject matter of the
7  patents and really has no proposal for how to
8  resolve them.
9        THE COURT:   Before --
10        MR. RE:  And we think this is a
11  convenient time to wrap up discovery because the
12  case is essentially inactive.
13        THE COURT:   Joe, before you go
14  on, I know I said I wouldn't interrupt you, but
15  the patents that you just identified, are they
16  only Masimo patents or do they include Philips'
17  patents?
18        MR. RE: The ones I identified take
19  care of the Masimo patents.  I think the parties
20  are in agreement that there would be one patent
21  of Philips' patents that would be a family
22  patent.
23        So, in Philips' patent, I think to
24  be fair, if we include the rest of the family as

8

1  I defined it, I think Philips' '550 patent is
2  currently in limbo status.  But that would be
3  related to the '991 patent on the wide dynamic
4  range or pulse by pulse validation.
5        So in fairness to Philips, I think
6  on the proposal that I am recommending, that
7  their '550 patent should be included.
8        And now, I've dealt with both
9  parties' patents on a family by family basis.
10  Now, the parties are clearly disagreeing on how
11  much discovery really needs to be done to
12  complete discovery on the family patents.
13        But the one thing that is clear is
14  that there has been substantial discovery
15  already and much of that discovery has related
16  to the unselected patents.  It was virtually
17  impossible to conduct discovery in this case on
18  the type of selection of the patents that were
19  selected for claim construction because the
20  facts just don't correspond to the patents as
21  they were selected for claim construction.
22        But I think it's clear from the
23  Masimo side that Masimo needs little, if any,
24  further discovery.  And, in fact, if Philips

**9**

1   wanted to agree that discovery was closed, we'd
2   be willing to agree with that as well.
3            Now, Philips doesn't need a lot of
4   discovery, which is basically what I got from
5   their letter.  And if that is true, if Philips
6   really does not need extensive discovery as they
7   say, I think that that's all the more reason to
8   get started now.
9            Now, I'd like to move on to what I
10  view to the issues on the claim construction.
11  We submitted -- there's very few claims for
12  claim construction, very few terms that need to
13  be construed on the remaining family patents.
14  And Philips does not dispute that in their
15  letter.
16           And on the Masimo family patents,
17  I count only five terms that need construction.
18  And on the Philips' family patents, I count only
19  three regular terms.  And the rest are all means
20  plus function and I count up to nine of those.
21           And the parties have already
22  submitted to the Court all of their proposed
23  constructions and identification of all of the
24  supporting evidence.  That is not disputed.

**11**

1   with this case regardless of whether there's
2   been a stay in the past or not.  All of the
3   factors say that we should go forward.
4            And there's no doubt that Masimo
5   would be prejudiced.  There's no doubt that
6   judicial economy would be served.
7            It's clear Philips has not pointed
8   to any hardship or inequity if we go forward.
9   And the length of the stay, as I mentioned,
10  Philips' stay is indefinite, and thus, unlawful.
11           And so that was merely really my
12  main part for the purpose of this call and it
13  really came to a head when I saw Philips'
14  consolidation brief where it basically argued
15  that to Judge Stark before this case was
16  consolidated or transferred to you.  Their
17  position was very clear.
18           They took the position that you
19  had already stayed the unselected patents and I
20  wanted that clarified as soon as possible.  So
21  that's basically our position.
22           And if there's any further
23  questions.  But I'll sit tight and let
24  Mr. Rosenthal respond.

**10**

1            And having studied Philips' brief,
2   their three-page letter yesterday, they really
3   provide no legitimate reason to further delay
4   this case.  And, in fact, the delay that Philips
5   is proposing is identical to the type of delay
6   Mr. Rosenthal and I discussed.
7            And it's essentially an indefinite
8   delay of all further progress in the case
9   sitting around waiting for just a final
10  construction on the four -- on the selected
11  patents.
12           In fact, Philips even suggests
13  that the delay could last until after the first
14  trial, or after the PO trial or even after
15  Philips' defense is resolved, which is put in
16  their letter at Page 3.
17           And then Philips wants this choice
18  made after the first trial.  And we find that
19  that's unacceptable and Philips is giving no
20  reason for that type of delay.
21           And as we pointed out in our
22  letter, and we go through the actual stay
23  factors in the controlling case law, and it's
24  clear that all four factors favor moving forward

**12**

1            THE COURT:   Well, is it going to
2   be Mr. Rosenthal responding or someone else?
3            MR. ROSENTHAL:  Yes, Your Honor.
4   It will be me.
5            THE COURT:   All right. Go ahead,
6   please.
7            MR. ROSENTHAL:  Thank you, Your
8   Honor.
9            First of all, I guess what
10  precipitated Masimo's request in this instance
11  was our characterization of the status of the
12  non-selected patents as having been effectively
13  stayed.  It's our view that that was made very
14  clear from the Court's October 2010 order
15  limiting the number of patents going forward,
16  was made clear in subsequent telephone
17  conferences that the parties had with the Court,
18  was made clear by the fact that neither party
19  pursued discovery related to the non-selected
20  patents, was made clear by the fact that Masimo,
21  in fact, asked for discovery back that related
22  only to the non-selected patents, was made clear
23  even by Mr. Re in a deposition where he talked
24  about the patents being discovered as the four

13

1 patents that were selected.
2     So Masimo's now trying to
3 characterize their request as being surprised
4 that the patents it selected for claim
5 construction are, in fact, the patents that are
6 going forward for trial. And had it known that
7 it was selected patents for trial, it would have
8 selected based on familial relationships.
9     THE COURT: Before you go on,
10 Brian, I just want to confirm something, though,
11 in your representation to me. And that is, when
12 you talk about the activities by Masimo's side
13 of the fence in your dissertation about asking
14 for discovery back, and limiting depositions and
15 other matters, didn't that occur after the Court
16 required, after I required you to make your
17 selection of patents?
18     In other words, prior to the time
19 I required you to do that, discovery had been
20 going on with all the patents that were left in
21 the case, all the remaining 14 patents left in
22 the case?
23     MR. ROSENTHAL: Yes, Your Honor.
24 That's absolutely right.

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware 19801
(302) 658-6697  FAX (302) 658-8418

14

1     Before the Court narrowed the case
2 and before the parties independently narrowed
3 the case, just before that, discovery proceeded
4 and on all the patents.
5     Now, that discovery consisted
6 entirely of document production.
7     THE COURT: Okay. And that's for
8 the patents that we'll call, I'll say, are in
9 limbo versus the patents -- of the 14 patents
10 that we have, the seven patents that are
11 remaining in limbo, at least in this case, the
12 only thing that you completed discovery on those
13 was just through document production?
14     MR. ROSENTHAL: That's correct.
15     THE COURT: All right. Thank
16 you.
17     MR. ROSENTHAL: You're welcome.
18 No depositions were taken related to those
19 patents.
20     Mr. Re, in his dissertation, and
21 also in Masimo's letter mentioned that there
22 were overlapping subject matter, that there were
23 certainly some lines of questioning in various
24 depositions related to the parties' relationship

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware 19801
(302) 658-6697  FAX (302) 658-8418

15

1 that I would agree are not patent specific.
2     But as the Court is aware, there's
3 a whole set of discovery that needs to be taken
4 specific to the particular patents. Inventors
5 need to be deposed, asked about the invention
6 that is the subject matter of the claim, about
7 the work leading up to those inventions, written
8 description issues.
9     The business people have to be
10 deposed to talk about the importance of the
11 invention to the products, to talk about what is
12 available or not available in the market as
13 competing substitutes for those particular
14 features.
15     And I'm not intending to be
16 remotely exhaustive. There's a whole host of
17 patent discovery that goes on in the patent case
18 that is specific to the inventions that are
19 claimed.
20     So in order to go forward with
21 this case would require a lot of discovery.
22 We've essentially done no discovery other than
23 the fact that documents have been produced on
24 these particular patents.

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware 19801
(302) 658-6697  FAX (302) 658-8418

16

1     So Masimo's arguments that Mr. Re
2 just articulated are no different than the
3 arguments that it made back in October, which is
4 that it doesn't want to have to go forward with
5 fewer than all of the patents it wants to.
6     There's no question that narrowing
7 the case from both parties' perspective caused
8 the parties to have to make decisions about
9 which patents were going to be presented at
10 trial, at least in the first instance. And
11 that's what the parties did.
12     Now, the claims that they
13 construed, it's clear from the Court's claim
14 construction on at least two and maybe more of
15 Masimo' patents that they're going to have an
16 extremely difficult time with their infringement
17 case. And it's not surprising that Masimo wants
18 to go back and now add to the pile of their
19 patents, patents that they didn't originally
20 select and try again on those.
21     But the fact is that the arguments
22 that are being made now are no different than
23 the arguments that they made in the first
24 instance. And there is no reason to go back and

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware 19801
(302) 658-6697  FAX (302) 658-8418

**17**

1  redo how the Court has determined to go forward
2  in this case, which was to narrow the issues to
3  have the parties in control of which patents
4  were selected to go forward and go forward on
5  that basis.
6          Now, for all of those reasons, the
7  reasons of narrowing the issues for the jury to
8  deal with, we don't think that there's any
9  reason to revisit that question at this time.
10         One of the things that Mr. Re said
11  was that Philips agreeing that the patents
12  should be grouped by subject matter for trial.
13  I don't know where that's coming from.  That's
14  not something that we've ever stated.
15         We had to make decisions when we
16  were forced to narrow and agreed that they ought
17  to be forced to collectively narrow the case
18  about which patents we were going to proceed on.
19  And there were instances where we decided, okay,
20  of this patent family, this is the patent that
21  we want to go forward on first.
22         And the parties made those
23  decisions based on all kinds of factors like how
24  long the term was, like the strength of their

**18**

1  position, I'm sure, and made those decisions.
2  And to go back on that now seems like nothing
3  more than just a reversal of the Court's
4  direction here.
5          The other point that Mr. Re made,
6  both to me in the meet and confer and again
7  today, is that there's no reason not to go
8  forward with those patents because the parties
9  aren't doing anything right now.
10         First of all, as soon as the Court
11  issues an order on the parties' respective
12  objections on the claim construction, this case
13  is going to go into high gear and we're going to
14  have expert reports and summary judgment and
15  trial.
16         And so while it's true that we are
17  currently waiting for that order, that's no
18  reason to start a process that the Court already
19  determined ought to wait until resolution of the
20  first set of patents.
21         If we are going to go forward on
22  something, it would also make sense that we go
23  forward on issues that are necessary to resolve
24  the patents that are currently being litigated.

**19**

1  Masimo has successfully stayed Philips' misuse
2  defense to the patents that it's asserting.  And
3  the Court stayed those pending resolution of the
4  liability phase, or at least the patent issues
5  on those patents.
6          If Masimo is restless and wants to
7  go forward with something in this case, it would
8  make more sense to go forward with something
9  that will actually lead to an ultimate
10  resolution of liability on the patents that are
11  at issue.  So I don't think that the vacuum in
12  the schedule is any reason for us to go back and
13  start having additional Markman hearings,
14  additional discovery on all those unselected
15  patents.
16         On the Markman point, my count is
17  a little different.  I counted a total of, I
18  think, 15 terms from the patents that Masimo is
19  seeking to unstay or to go forward on that are
20  related familial to the patents that were
21  selected that the parties have disputes about.
22         THE COURT:  Are you limiting the
23  15 terms to just the Masimo patents or do those
24  also include the Philips' patents?

**20**

1          MR. ROSENTHAL:  Those included
2  Philips, but I am limiting it to only the --
3  Masimo has asked for only familially-related
4  patents to be -- to go forward.  So I've counted
5  up the disputed claim groups or claim term
6  groups for those familially-related patents
7  unselected group for both Masimo and Philips.
8          THE COURT:   And my understanding
9  on those familial-related groups, we're talking
10  about three additional Masimo patents and one
11  additional Philips' patent, at least the way
12  Mr. Re presented it.
13         MR. ROSENTHAL:  That's how we
14  understand it as well.  I think their thought is
15  here that they can get three additional patents
16  by using this family grouping and that would
17  bring in three Masimo patents and only one
18  Philips' patent.
19         So --
20         THE COURT:   And so that would
21  still leave, by my math calculations, three and
22  one is four.  And that would still leave three
23  patents out there out of the seven that are
24  remaining; correct?

## 21

1    MR. ROSENTHAL:  That's correct.
2    THE COURT: Which would -- you
3  know, I don't know exactly what Masimo has in
4  mind for those, but presumably that would
5  require then a third round of discovery and
6  claim construction.
7    Did you have anything -- I
8  interrupted you, Brian.  Did you have anything
9  else that you wished to add?
10    MR. ROSENTHAL:  No.  I was -- I
11  had just finished.
12    THE COURT:   Okay.  I had a couple
13  thoughts on this, counsel.  And I do have a
14  couple questions.
15    Well, there is one question and I
16  recognize that we've got a separate case out
17  there, the case that was filed this year.  And I
18  don't want to get into great detail on that.
19    It's not my intent to do that,
20  because I haven't had a chance to look at the
21  briefing and see how that fits in with the
22  request for consolidation and stay by Philips.
23    But the patent or patents that are
24  in the second case, the 11-742 case, how do they

## 22

1  fit in, if at all, to the patents that have been
2  construed in this case and the patents that have
3  not been construed in this case?
4    And are we dealing with cross
5  patents that Masimo raised patent, then Philips
6  responded by raising patents against Masimo?  I
7  have no idea.
8    MR. ROSENTHAL:  This is Brian
9  Rosenthal.  I think I can address all of that.
10    The two patents that are asserted
11  in the second case are in the same patent family
12  as the '272 patents that Masimo's asserted in
13  this case and the '850 patent that Masimo
14  asserted in this case.
15    It's a long and complicated family
16  history of these patents, but both of them
17  ultimately claim priority back to the '272
18  patent.  And the '955 patent in particular
19  claims priority back to the '850 patent, --
20    THE COURT:   Now, the --
21    MR. ROSENTHAL:  -- which has not
22  been selected.
23    THE COURT:   The '955 patent that
24  you're talking about, is that one of the patents

## 23

1  that's raised in the second case?
2    MR. ROSENTHAL:  That's correct.
3  So there's two patents, the '955 and the '400.
4    The '955 patent -- I'm going to
5  skip a couple of steps, but the '955 patent
6  ultimately goes back to the '850, which then
7  goes back to the '272.
8    MR. RE: If I may add one point,
9  Your Honor, to that, and I agree with everything
10  Mr. Rosenthal just said.  But as far as the
11  claimed subject matter is concerned, you have to
12  go one step a little deeper to really appreciate
13  the inventions that are actually the subject
14  matter of the claim, the two patents in the new
15  suit, the '400 patent and the '955 patent.
16    And they relate to what we call
17  the parallel calculation.  And the parallel
18  calculations are also in the '984 patent, which
19  is a construed patent, and the '850, which is
20  one of the family patents that are the subject
21  of this call.
22    So this is the -- this is why --
23  the reason why we have an issue, and Philips
24  doesn't have it as much on their side, is Masimo

## 24

1  is the inventor on all of these patents.  These
2  are ongoing research and development efforts all
3  done by Masimo.
4    Whereas on the Philips' side,
5  Philips' patents, many of them are not Philips'
6  inventions.  They are purchased patents.  So
7  they don't own the portfolio, where Masimo is
8  the creator of its own portfolio.
9    So this is why there's still
10  prosecution going on on the Masimo side.  And
11  this is why there's more recently issued
12  patents.
13    But these two new patents are
14  parallel calculation patents and they would fall
15  in the subject matter of the '984 and the '850.
16    THE COURT: I have another question
17  for counsel on one of the issues that I think,
18  Brian, you raised -- or that was not that you
19  raised, that was actually raised by Joe, but it
20  does play into this.
21    If the assumption is that only
22  seven patents are going to be used for trial,
23  and my recollection is there was something like
24  22 claims that had to be construed out of those

25

1  seven patents, am I correct on that, or was
2  there more?  I can't recall.
3          I really can't recall.
4          MR. ROSENTHAL:  I don't remember
5  the number of terms.
6          THE COURT:   Well, we know it was
7  in excess of ten and 15.  I'm sorry.  I
8  interrupted you.
9          But I know it was in excess of ten
10  or 15.
11         MR. ROSENTHAL:  Yes, that's for
12  sure.
13         THE COURT:   And it could have
14  been as much as 30, I just can't recall.
15         But for some reason, 22, 23 sticks
16  out in my mind because I remember at the claim
17  construction hearing that I think I made the
18  remark, If it's going to take an hour for each
19  claim, we don't have enough hours in the day to
20  get this done.
21         So, but if only seven patents go
22  to trial, which was my intent to make it much
23  more reasonable for the jury to understand, and
24  then maybe you have another trial with the other

26

1  seven patents, certainly this Court could do
2  serial trials.  And certainly the Court could,
3  after the patents were decided or after -- in
4  fact, that option was left open, I think, in my
5  decision on the patent -- on the issue of patent
6  misuse and anti-trust, that there could be then
7  brief discovery taken even on that area and get
8  that case, that part of the case scheduled for
9  trial.
10         It just means that it would be
11  different juries making the decision.  And I
12  know that may be bothersome to counsel, but I
13  don't think that's necessarily problematic.
14         In the interim, everything
15  arguably could be held in abeyance, to some
16  extent.  In other words, the first case that
17  goes to trial could be held in abeyance for the
18  purposes of what needs to be done on appeal and
19  have this done in serial format, so that there's
20  not this intent to have -- let's go up to the
21  Fed Circuit and wait forever before and get
22  claim construction from them, because we all
23  know that's going to happen in any event.
24         But that's also the parties'

27

1  choice.  If they don't like our construction
2  down here and Judge Stark agrees with me, I have
3  a pretty good idea which claim terms are
4  probably going to be appealed or there's going
5  to be a disagreement later on.
6          And I'll just potentially continue
7  on, but that all depends upon the outcome of the
8  case.  But my intent was to try to have
9  something manageable when I made the
10  recommendation of seven patents, particularly
11  when, in our discussions, it was abundantly
12  apparent to me that those seven patents just
13  didn't need a claim term each that were going to
14  be needed to be construed.
15         As an aside, counsel, in
16  discussing some of these issues like this with
17  other judges on this bench, it is becoming more
18  and more acute, the judges are becoming more and
19  more acutely aware of the problems that are
20  arising when, in multiple patent disputes and
21  multiple, multiple patents being brought up in
22  one case.
23         We're not criticizing.  That's
24  fine.

28

1          But that also means an exponential
2  growth in the number of claim terms that need to
3  be construed.  And I know that more and more
4  judges on this bench are considering limiting
5  the claim terms to make it a manageable and
6  understandable trial for the jury.
7          So my approach originally was
8  let's see how the parties can work out and
9  reduce the number of patents that needed to go
10  to trial.  When I felt the number that you got
11  down to from 25 to 14 was also unrealistic, I
12  asked for you to reduce it even further.
13         And I arbitrarily chose, based
14  upon the number of patents each side had
15  originally raised, who would get four and who
16  would get three.  But certainly the Court did
17  not dictate which four or which three the
18  parties wanted to select.
19         And that was motivated in hopes to
20  reduce the number of claims terms that would
21  have to be construed, and therefore, have an
22  impact on the trial itself.  That is, make the
23  trial more manageable and understandable for the
24  jury, so you don't end up with a month-long

29

1 trial.
2 But you actually end up with a
3 trial that is going to get to the heart of
4 certain issues. And I'm assuming, maybe rightly
5 or wrongly, that when the patents were selected
6 by the parties, a whole host of reasons went
7 into that in that selection process. Not the
8 least of which was the feeling of your strength,
9 the feeling of the strength that you had on the
10 arguments that you raised.
11 The only thing that's changed
12 realistically since that decision by me was made
13 was the fact that I came up with a claim
14 construction. And now the spin begins.
15 And now you have an insight into
16 how the claims that you selected and said to me
17 were in dispute in those seven patents were
18 going to be construed, and whether those type of
19 terms also exist in the other seven patents that
20 are now out there that are just being held out
21 there.
22 I don't know, because I haven't
23 looked at those patents and studied them
24 recently. But I have a feeling that the claim

31

1 on infringement, noninfringement, invalidity and
2 validity.
3 And we can go along and get that
4 discovery completed and then have another
5 discussion about what we do next if there hasn't
6 been a claim construction by Judge Stark yet, an
7 analysis or an opinion on the objections that
8 are filed.
9 Whenever that occurs, even if
10 discovery is ongoing with the experts, I would
11 always leave the avenue open for you to be
12 allowed to revisit your expert reports if there
13 should be any change in the claim construction
14 terms in the terms that I've already construed
15 by Judge Stark's decision.
16 And I would stop at the point,
17 however, in this analysis on this approach of
18 not requiring to file motions for summary
19 judgment, at least revisit that issue to find
20 out if we'll take that next step.
21 But one way to do it, as I said,
22 is to continue on with the discovery based upon
23 my claim construction and move forward in that
24 regard as far as the experts are concerned.

30

1 construction had some influence on this
2 analysis.
3 The other aspect that I think has
4 probably had an influence is that it's taken a
5 little while to get this claim construction
6 completed, in the sense that you do not have a
7 decision yet from the District Court Judge on
8 whether he agrees with your objections raised
9 against my claim construction.
10 So there's a couple ways that I
11 think that this can be handled.
12 One, we could continue on with the
13 discovery process on the seven patents that are
14 out there operating from the assumption that my
15 claim -- because the only thing you've got right
16 now is my claim construction. And despite the
17 fact that you have filed objections to it, it is
18 what's out there. And it is a way for you to
19 direct your experts.
20 There's two ways that that can be
21 done or a couple ways that could be done.
22 One, the experts apply the claim
23 terms, as I've indicated that they're supposed
24 to be construed, and come up with their opinions

32

1 Another way of doing the experts
2 is you can do it in the alternative. And I
3 guess it would be a three-way split depending,
4 because I can't remember if there's any terms,
5 any construction that I gave to terms that
6 neither one of you had, you know, or have your
7 experts do it.
8 In the alternative, the term, the
9 way that I construed it and the term that you
10 wanted it to be construed. I don't know whether
11 that's the most productive way to do things, but
12 that's always a possibility.
13 So that's one suggestion on how to
14 manage this process. And moving forward
15 because, as you know, with the new order that
16 was issued by this Court on the utilization of
17 Magistrate Judges, it is really kind of left --
18 it is left to my discretion when we have what is
19 a case-dispositive situation.
20 And I don't think claim
21 construction fully fits into that, but it
22 probably would be considered more case
23 dispositive than not as to how we end up
24 proceeding in the future. So that's an approach

33

1  that I would be willing to strongly consider.
2       MR. ROSENTHAL:  This is Brian
3  Rosenthal.  It's not an approach that we had
4  contemplated, but I think it's one that I think
5  would be very attractive and meet the desires of
6  both parties to go forward with this case.  We
7  certainly have no objection at all.
8       Of the two variants of that
9  option, I think the more efficient and better
10 option would be for the parties to move forward
11 with expert discovery based on the claim
12 constructions in Your Honor's report and
13 recommendation without doing alternative claim
14 constructions.
15      And then if there are some tweaks
16 or changes that Judge Stark makes afterwards,
17 that we can then adjust those as required.  I
18 think that would probably be more efficient than
19 doing alternatives on everything.
20      THE COURT:  Well, that would have
21 been my preference, but I would certainly be
22 willing to listen to the voting and get the
23 input by counsel in that regard.
24      And, Joe, you haven't had a chance

34

1  to talk on that.
2       MR. RE:  Thank you, Your Honor.
3  That is not our goal and I don't think that is
4  the best alternative.  Our goal was in order to
5  get the patents ready so that they could be
6  grouped by subject matter.
7       I feel I must comment on the point
8  you made about the selection of the patents and
9  our strategies.  I want the Court to know that we
10 selected the patents for claim construction
11 hoping that the claim construction ruling would
12 resolve as many claim construction issues as
13 possible.  I did not select the patents for claim
14 construction based upon which ones made the best
15 sense for trial.
16      And I remember when you asked us
17 just to pick the best ones we could for claim
18 construction and that's what I did.  So I did
19 not do an analysis based on subject matter and
20 what would make the most sense for presentation.
21      So, as it stands right now, our
22 goal was to make sure that discovery was
23 completed so that the Court could subsequently
24 group the patents by subject matter so that we

35

1  could have trials that make sense.
2       As it stands right now, basically
3  the presentation would be like a piece of Swiss
4  cheese because many of the patents are
5  continuation patents of the very same patents
6  that are currently in the selected group.  So
7  the discovery that we wanted was fact discovery
8  to finish, and that's what I still think makes
9  the absolute best sense, regardless of the
10 Markman issues.
11      With regard to the Markman issues,
12 the Court made the point that we, the parties,
13 are repositioning because of the Markman ruling.
14 I can tell you that is not the case.
15      And, in fact, the Markman ruling,
16 for example, resolved all the issues on the '194
17 patent, because it did -- the '194 patent, there
18 are no Markman issues on the '952 patent.
19      So the '952 patent, which is a
20 family patent, has no terms for claim
21 construction.  So if Markman is the guiding
22 factor, why aren't we finishing preparing the
23 case on the '952, which has no Markman rulings
24 left?

36

1       So I want the Court to know and I
2  still think the goal should be based on grouping
3  based on subject matter, so that the trial can
4  be shorter and more efficient, rather than
5  having possibly multiple trials on identical
6  subject matter, which is where I think we're
7  heading if we just think the issue is discovery
8  of the experts and the Markman issue.
9       So my vote is not to do that.  My
10 vote is to actually get the cases ready so that
11 the patents can be grouped by subject matter,
12 which is clearly the guiding force.
13      And any issues concerning trial
14 presentation, or consolidation, or stay or
15 whatever would have to be dictated by the
16 subject matter.  And I'm afraid that the Court's
17 band-aid approach just doesn't address that
18 fundamental issue, and it still has not been
19 addressed based on subject matter.
20      THE COURT:  Well, I don't -- I'm
21 going to say this, Joe:  I don't think that --
22 I'm not -- I'm not disagreeing necessarily on
23 your approach concerning subject matter.
24      But my feeling is this:  If we go

37

1  that route, if I decide to go that route, I
2  don't think that the patents by Philips, the
3  remaining -- that the remaining three patents
4  sitting out there should be orphaned, because
5  that doesn't --
6         MR. RE: Fine.
7         THE COURT:   No.  No.  No.
8         Let me finish, because that's what
9  I was getting to.  What's being suggested is
10 being suggested because what you're suggesting,
11 like you're supposed to do as to what you think
12 primarily benefits Masimo.  I understand that.
13        You may be advising the Court that
14 you consider this to be a good approach because
15 it's based upon subject matter.  And it may be.
16        It may be.  I'm not saying it
17 isn't necessarily.
18        I'm just saying that that also
19 puts us in a situation of having a third
20 approach, a third set of discovery.  And I'm not
21 going to do that.  I'm not going to piecemeal it
22 out that far.
23        So, in your situation, Brian, your
24 whole argument is basically effectively this

38

1  Court put in a stay.  I'm not saying that that
2  may have been the effect, but I didn't make the
3  decision that there was a stay.
4         But what extent of discovery -- I
5  mean, what type of -- how extensive do you think
6  the discovery, Brian, will be necessary on the
7  remaining seven patents?
8         MR. ROSENTHAL:  If we went forward
9  on the remaining seven patents, we would
10 essentially be -- I don't know how many we
11 took -- about 300 hours of depositions between
12 us over the -- on the first seven patents.
13        I don't think it would be quite
14 that extensive.  It's hard for me to estimate,
15 but we've got new inventors.  There's completely
16 new products at issue with respect to the seven
17 patents.
18        There are inventors that have been
19 deposed, but haven't been deposed about the
20 specific patents.  I think all of the business
21 people would have to be redeposed.
22        So I hesitate to estimate, but if
23 we took 300 hours of deposition in the first
24 seven patents, I would estimate about 200 hours

39

1  of depositions to do the second seven.
2         You know, the discovery period
3  between the time the document collection was
4  production was finished in 2010 and the end of
5  discovery, which got extended out to June, you
6  know, was a better part of a year.  I think that
7  would have to be replicated.
8         THE COURT: Did you return the
9  documents and did I require you to return the
10 documents or information that Masimo had
11 provided to you on the seven patents that have
12 not been construed?
13        MR. ROSENTHAL:  Not all of them.
14 On one of the patents that Philips asserted,
15 which we asserted against Masimo's rainbow
16 technology, which is a little different than
17 some of the other technologies that are at issue
18 in the selected patents, for that patent, once
19 the selections were made, Masimo wrote to us and
20 said, Since that's no longer currently at issue
21 in this case, send us back all the source code
22 related to that technology.
23        So we've returned that discovery.
24 That was not done by Court order.  We just

40

1  agreed, because it wasn't currently at issue
2  with the idea that when it's time to take up
3  that issue, that we would then seek that
4  discovery again.
5         THE COURT:   What I'm going to
6  require counsel to do is to do some homework.
7  And we'll have a discussion after the first of
8  the year when I return.
9         I want a schedule for doing the
10 expert discovery for the seven patents that have
11 been construed based upon my construction, and
12 not doing it in the alternative.  With the
13 understanding that should Judge Stark make any
14 modifications to my claim construction, and
15 expert discovery had already started or had been
16 completed or well along the way, or even you'd
17 be given additional time or what was necessary
18 to be able to modify those reports, and
19 obviously, take what discovery would be
20 necessary such as getting the experts redeposed.
21 I want a schedule for that.
22        I also want a proposed discovery
23 schedule only for the remaining seven patents
24 and what would be necessary.  So counsel can

41

1 work out those schedules.
2 And I want two separate sets of
3 schedules because it's going to be -- another
4 approach that I can take is:  Let's get this
5 case moving along, the present aspect of this
6 part of this case, the first seven patents.
7 And then see how we may go on with
8 the other seven patents.  But I'm not going to
9 orphan any of them.
10 I also want to know -- make a
11 representation -- I want counsel to make a
12 representation either by letter, a joint letter
13 as to the number of claim terms and identify
14 those claim terms that are in the remaining
15 seven patents that they think are probably going
16 to be in dispute.
17 MR. RE: That's understood, Your
18 Honor.
19 THE COURT:  All right.  Let's talk
20 about -- do we have -- are we getting together
21 again?
22 MR. ROSENTHAL:  Your Honor, yes.
23 Actually it's on my agenda of things I wanted to
24 raise.

43

1 MR. ROSENTHAL:  Without commenting
2 on whether that's a likely result of that
3 meeting or anything, at a minimum I'm going to
4 be engaged in that meeting.  And I also need to
5 be present for that discovery conference.
6 So with the Court's indulgence,
7 we'd like to see if we can find a different
8 date.
9 THE COURT:   All right.  And let
10 me tell you, I don't have a problem doing that
11 and I am probably the last person on this bench
12 that would interfere with any type of settlement
13 discussions.
14 To the extent that -- if that's
15 what is occurring, if you want, somebody wants
16 to pick up the phone and call me, that's fine
17 for that day, too.
18 All right.  Since I've got
19 everybody on the line, unfortunately, the next
20 date that I would have available for a
21 discovery, and it's a discovery dispute issue,
22 and I'm not certain at this stage -- I'm
23 wondering what's left as far as:  Is this a
24 discovery dispute issue for the 12th?

42

1 We have a telephone conference
2 that was scheduled for January 13th on a
3 discovery issue that Philips has that yesterday
4 was moved up to January 12th.
5 THE COURT:   Let me explain,
6 Brian.  Before -- Brian, before you go on, let
7 me explain why.
8 MR. ROSENTHAL:  Sure.
9 THE COURT:  My husband's having
10 surgery and it was unexpected.  So that's the
11 reason why I changed the day.
12 MR. ROSENTHAL:  We completely
13 understand.  Unfortunately, that date is the
14 date that Mr. Kiani and Ms. Disanzo are going to
15 be meeting to discuss the case in California.
16 And I'm going to be accompanying Ms. Disanzo,
17 and I understand Mr. Jensen is going to be
18 accompanying Mr. Kiani.
19 THE COURT:  Is there an intent to
20 try to see if we can get this case resolved?  Is
21 that what the discussion is for?
22 MR. ROSENTHAL:  That is the state
23 of intent.
24 THE COURT:  Okay.

44

1 MR. ROSENTHAL:  It is.  Without
2 going into the merits, essentially we -- the
3 Court ordered additional discovery to be taken
4 on the Marinow issue, if you recall that.
5 THE COURT:  Yes.  Yes.  Yes.
6 MR. ROSENTHAL:  And Philips
7 conducted that discovery, and based on that
8 discovery wants to revisit the question of
9 whether the Marinow testimony ought to be
10 precluded or whether the Court ought to examine
11 in camera some document that has not been
12 produced in this.
13 THE COURT:   Okay.  I'm going to
14 have to go back and check on this and refresh my
15 recollection.
16 But I could do this on Thursday
17 the 26th.
18 MR. ROSENTHAL:  Of January?
19 THE COURT:  Of January.  I'm
20 sorry.  I cannot get you in any earlier than
21 that.
22 MR. ROSENTHAL:  Your Honor, that
23 works for Philips' side.  And I would only
24 suggest that since we also have the

45

1 consolidation motion that we expect to be fully
2 briefed this week and also the question that the
3 Court just gave to the parties, maybe we could
4 put both of those issues in that same
5 discussion.
6     THE COURT:   Well, let me just try
7 to understand what you're suggesting with this
8 consolidation motion aspect of it.  I don't have
9 a problem putting in the same discussion about
10 the scheduling, what I've just indicated here
11 about the scheduling order.
12     It may be finished.  You may be
13 finished briefing it.  The question is whether I
14 will have finished reading it.
15     Was the suggestion that you're
16 making, Brian, to do an oral argument at that
17 time?
18     MR. ROSENTHAL:  To the extent that
19 the Court wants to have an oral argument on
20 that, that was the suggestion.  And the only
21 reason I suggest it is because while the issues
22 are distinct, they are somewhat related in our
23 view.
24     THE COURT:   Well, they are

46

1 related to the extent that Philips, from what I
2 can tell from the title and the brief, the very
3 brief overview that I looked at was you wanted
4 to consolidate these two patents that were
5 brought up by Masimo in the second case with the
6 first case and then stay everything but the
7 seven patents that had been previously
8 construed.
9     That's the reading I got.  So am I
10 correct on that read?
11     MR. ROSENTHAL:  Yes.  That's what
12 we're asking.
13     And we thought that the discussion
14 actually had some relationship to the discussion
15 of how to proceed on the seven patents.
16     THE COURT:   Oh, I realize it
17 does.  I realize it does.
18     And to the extent that it relates
19 to the discussion on the seven patents, I don't
20 really want an oral argument at this stage.  I
21 don't know if I'm going to need one.
22     In part, what I'm potentially
23 suggesting here could have a direct effect on
24 what you briefed already on this point.  To the

47

1 extent that there's an overlap in the second
2 case with the concept of the consolidation --
3 let me just back up a little bit before I go on
4 with that.
5     Joe, is your side objecting to
6 consolidating the two cases?  Not staying.  I
7 know that you're definitely objecting to
8 staying, but are you objecting to consolidating?
9     MR. RE: No.  That is correct.
10     We do not object to consolidating
11 if it causes no further delay of the first case.
12 That's correct.
13     THE COURT:   Okay.  Your concern
14 is the stay aspect.
15     How come you guys --
16     MR. RE: Yeah.
17     THE COURT:   How come you guys
18 wrote so much on it, then?
19     MR. RE: I think a lot of it has
20 been taken care of today because the premise of
21 the motion is that the Court's already stayed
22 the other seven.  And I think -- I think the
23 premise of the motion, I think, is no longer
24 there.

48

1     So I don't think it needs full
2 extended argument anymore on the consolidation,
3 because we've, in essence, taken care of a lot
4 of it today.
5     THE COURT:   Well, I don't know
6 whether I agree or disagree with you on that
7 because I haven't read it.  And there's been --
8 to the extent that there is a stay aspect of
9 that about why everything should be stayed and
10 how it dovetails into that, I will allow you to
11 address that point.
12     But to me it's incorporated, to
13 some extent, into what we're doing right now.  I
14 don't want you to automatically assume that
15 because I'm asking for a scheduling order on the
16 remaining seven patents, which of course now
17 would grow to nine in that circumstance if
18 there's a consolidation from the first case.
19     See, that's part of the problem
20 I'm having.  You're actually going to end up
21 with nine patents that if the Court
22 consolidates, you'd actually end up with nine
23 patents involved; right?
24     MR. RE: That's correct, Your

49

1  Honor.
2       THE COURT:   And there's been no
3  discovery or nothing that's been taken on those
4  two patents.  I mean, at least in this case, of
5  the 14 that were totally involved, there has
6  been some discovery taken on the seven that have
7  not been construed on the two.
8       MR. RE:  Discovery applies to all.
9  I can't say that we take discovery exclusively
10 on one group of patents over the other.
11      But there has been no discovery
12 specifically directed to the two new patents in
13 the second case.  That's correct.
14      THE COURT:   And how are the
15 inventors the same in the -- the two patents in
16 the new case, the inventors that are involved in
17 those patents, are they the same as the
18 inventors involved in the 14 patents?
19      MR. RE:  Yes, they are, Your Honor.
20 In fact, the parties have agreed to a schedule
21 in the second case, assuming it would go on its
22 own track.
23      THE COURT:   Well, maybe you ought
24 to look at that, at least up through the concept

51

1  patents that haven't been construed and the two
2  patents, the two new patents in the 2011 case,
3  and see how that could potentially fit in, and
4  if it does make sense to go on with those in
5  that way.
6       Indicating to me that there isn't
7  a dispute on consolidation says to me that the
8  parties find that would potentially be helpful.
9  The question is whether they find it would
10 potentially be helpful having the remaining
11 seven patents in this case and the two
12 consolidated and possibly going on with
13 discovery.
14      Going on, at least getting through
15 discovery in those cases, the fact aspects of
16 discovery.
17      MR. RE:  I understand, Your Honor.
18 We agree with that approach.
19      MR. ROSENTHAL:  Philips also
20 believes that whatever happens to the seven
21 non-selected patents, the two new patents seem
22 to be appropriately grouped with those seven.
23      THE COURT:   Okay.  That helps.
24 That helps a lot.

50

1  of discovery, because that's what I've asked you
2  to do for the seven patents.  Maybe that should
3  be looked at for the two patents in the new
4  case.
5       At least go through the discovery,
6  and to the extent that you're capable, and I
7  know this is a little bit awkward, best estimate
8  as to what additional claim terms would be
9  required because of the introduction of those
10 two patents being consolidated into the present
11 case, the 09-080 case.
12      I'm not trying to complicate
13 things.  I'm just trying to figure out what's
14 going to work best and what makes sense in the
15 long run.
16      And I'm also not making a
17 determination that by allowing -- if I allow
18 discovery in those next seven patents, that
19 suddenly that necessarily changes which patents
20 could potentially end up going to trial.
21      I'm just trying to find out all
22 the aspects of the schedule, all the scheduling
23 aspects, at least through discovery for the
24 second group of patents.  That is, the seven

52

1       Thank you.  So why don't you add
2  those two in there.  And this may also kind of
3  eliminate, except on your arguments for stay,
4  may kind of eliminate a good percentage of what
5  you've already briefed.
6       But I was talking to you about the
7  26th to get together.  And I didn't get -- and,
8  Joe, I didn't give you an opportunity to respond
9  with that.
10      I mean, Brian's request to move it
11 because I moved it from the 13th to the 16th.
12      MR. RE:  I am out of town that day,
13 but I could do it if it's later in the day.
14      THE COURT:   I can do it later in
15 the day.  Joe, where are you located?
16      Are you in California or here?
17      MR. RE:  I am in California.
18      THE COURT:   That's what I
19 thought.  Okay.
20      And, Brian, you're local; right?
21 I mean, local, you're East Coast?
22      MR. ROSENTHAL:  Yes.
23      THE COURT:   Okay.  I could
24 certainly do it later in the day.  I could do

53

1 it, for example, at -- well, when you say "later
2 in the day", Joe, what time would more likely
3 work for you?
4 　　　　MR. RE: The later the better, but
5 I recognize you are three hours ahead of me.
6 　　　　THE COURT:   Yeah. Well, how
7 about if you give me Pacific Time and I'll tell
8 you if that works Eastern Time.
9 　　　　MR. RE: How about 4:30 your time,
10 1:30 my time?
11 　　　　THE COURT:   4:30 is fine my time.
12 Does that work for you, Brian?
13 　　　　MR. ROSENTHAL: Yes, Your Honor.
14 　　　　THE COURT:   Okay. All right.
15 　　　　We'll schedule it for 4:30 on
16 Thursday the 26th. And I don't know who wants
17 to organize the call, because it seems to me now
18 the issues have kind of blended together. So
19 both of you got the argument.
20 　　　　This was your nickel that you had
21 to do today, Joe?
22 　　　　MR. RE: I think it was Julie's
23 nickel.
24 　　　　MS. HEANEY:  Right.

54

1 　　　　THE COURT:   It was your side of
2 the fence. It was Masimo's nickel?
3 　　　　MR. RE: Yes, Your Honor. It was
4 Masimo.
5 　　　　THE COURT:   Okay. We'll make it
6 Philips' nickel,
7 　　　　MR. MOORE:  We'll go ahead and
8 organize the call.
9 　　　　THE COURT:   Thank you, Dave. And
10 I'm assuming we're going to definitely need a
11 court reporter. We'll make sure a court
12 reporter is here and available.
13 　　　　So we'll do it at 4:30, so that
14 means that the 12th is now cancelled.
15 　　　　MR. ROSENTHAL:  Thank you, Your
16 Honor. Appreciate it.
17 　　　　THE COURT:   Now, let me ask you
18 this:  I'm going to get a few submissions from
19 you.
20 　　　　One, a proposed schedule for the
21 remainder of the seven patents. That proposed
22 schedule for discovery expert discovery and the
23 remainder of the seven patents. On the patents
24 that have already been construed.

55

1 　　　　A scheduling order for those
2 patents that have not been construed, at least
3 going through discovery. And that would be the
4 seven that haven't been construed, plus the
5 other two to be from the new case to be
6 consolidated with that, assuming consolidation.
7 　　　　For that grouping, also, that for
8 those nine patents, a decent good estimate as to
9 how many claim terms you think you will need to
10 be construed out of those nine patents.
11 　　　　And now for the discovery dispute
12 issue, I've already got the briefs. I'm going
13 to have the briefs on the issue of the stay.
14 　　　　So what do you need to -- and then
15 you're going to also give me a discovery dispute
16 submission; right, as well because there's the
17 argument -- there's the argument that you
18 raised, Brian, that you normally get the three
19 page --
20 　　　　MR. ROSENTHAL:  That's correct,
21 Your Honor.
22 　　　　THE COURT:   I just wanted to
23 understand what was going to be provided to me.
24 　　　　That means, then, for the

56

1 discovery dispute aspect of this discussion,
2 that you'll need to do your submissions on the
3 24th and 25th. I would like, though, for you to
4 have in your proposal for the scheduling orders,
5 the estimation of the number of claim terms.
6 　　　　And please break out in that
7 estimation straight claim terms and what Joe
8 affectionately called regular claim terms versus
9 mean plus function, so I have an idea about
10 that. And I think that you could get that
11 information to me by the 17th.
12 　　　　Now, I'm not going to do a
13 separate order in this case. Hopefully the
14 summary that I do at the end is enough.
15 　　　　I'll just issue an order
16 indicating that the transcript for today will
17 serve as an order of the Court. Heather, as I
18 said, is from Hawkins and she can provide you
19 with a copy of the transcript. And, Heather,
20 I'm going to need one.
21 　　　　Do you need Heather's telephone
22 number to communicate with her?
23 　　　　MS. HEANEY:  We have that, Your
24 Honor,

57

1          MR. MOORE:  We have that as well.
2          THE COURT:   Well, all of you
3   have -- and I am not politically correct.  This
4   does not go on the record.
5          (Following a discussion held off
6   the record:)
7          THE COURT:   Take care, counsel.
8          MR. RE: Thank you, Your Honor.
9   Merry Christmas.
10          MR. MOORE:  Happy Holidays, Judge.
11          (Teleconference concluded at 11:12
12   a.m.)
13
14
15
16
17
18
19
20
21
22
23
24

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware 19801
(302) 658-6697  FAX (302) 658-8418

---

58

1   State of Delaware )
                     )
2   New Castle County )

3

4

5          CERTIFICATE OF REPORTER

6

7          I, Heather M. Triozzi, Registered

8   Professional Reporter, Certified Shorthand Reporter,

9   and Notary Public, do hereby certify that the

10   foregoing record, Pages 1 to 58 inclusive, is a true

11   and accurate transcript of my stenographic notes

12   taken on December 22, 2011, in the above-captioned

13   matter.

14

15          IN WITNESS WHEREOF, I have hereunto set my

16   hand and seal this 21st day of December, 2011, at

17   Wilmington.

18

19

20          _____        _____

21          Heather M. Triozzi, RPR, CSR
            Cert. No. 184-PS

22

23

24

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware 19801
(302) 658-6697  FAX (302) 658-8418

# EXHIBIT J

# Direct Ancestors of Masimo's Asserted Patents
## ('060 Application Family)





### Direct Ancestors of Masimo's Asserted Patents
### ('952 Patent and '175 Application Families)

# EXHIBIT K

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MASIMO CORPORATION,          )
                             )
          Plaintiff,         )
                             ) C.A. No. 09-80-LPS-MPT
v.                           )
                             )
PHILIPS ELECTRONICS NORTH    )
AMERICA CORPORATION,         )
                             )
          Defendant.         )

Friday, October 12, 2012
10:31 a.m.
Teleconference in Chambers

844 King Street
Wilmington, Delaware

BEFORE:  THE HONORABLE MARY PAT THYNGE
         United States District Court Magistrate

APPEARANCES:

     MORRIS NICHOLS ARSHT & TUNNELL, LLP
     BY:  JULIE HEANEY, ESQ.

          -and-

     KNOBBE MARTENS
     BY:  JOSEPH R. RE, ESQ.
     BY:  STEPHEN W. LARSON, ESQ.

          Counsel for the Plaintiff

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

**Page 2**

1   APPEARANCES CONTINUED:

2

         POTTER ANDERSON & CORROON, LLP
3        BY:  DAVID E. MOORE, ESQ.

4             -and-

5        MAYER BROWN
         BY:  BRIAN ROSENTHAL, ESQ.
6        BY:  ALAN M. GRIMALDI, ESQ.

7             Counsel for the Defendants

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
10:33:42  24

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

**Page 3**

10:33:42   1        THE COURT: Good morning, counsel.

10:33:42   2        MR. MOORE:  Good morning, Your
10:28:50   3   Honor. David Moore from Potter Anderson.  And
10:28:53   4   Julie Heaney is on the line as well.

10:28:53   5        MS. HEANEY:  How are you, Your
10:28:54   6   Honor?

10:28:54   7        THE COURT:  Okay. But I'm assuming
10:28:56   8   somebody else other than just the two of you are
10:29:04   9   on the line.

10:29:05  10        MR. MOORE:  With me is Alan Grimaldi
10:29:06  11   and Brian Rosenthal.

10:29:07  12        THE COURT:  All right.  Good
10:29:08  13   morning to you three.

10:29:12  14        MS. HEANEY: Good morning, Your
10:29:15  15   Honor.  And Joe Re and Steve
10:29:19  16   Larson from Knobbe Martens are on from our side.

10:29:23  17        THE COURT:  Good morning to you as
10:29:25  18   well.

10:29:25  19        And who we have as our court
10:29:27  20   reporter today is from Hawkins, and her name is
10:29:29  21   Heather.

10:29:30  22        Just as a reminder, even though
10:29:32  23   sometimes I recognize the voices, I'll just
10:29:36  24   remind you, counsel, just to say who you are

Hawkins Reporting Service

715 N. King Street - Wilmington, Delaware  19801

302-658-6697

**Page 4**

10:29:38   1   before you make your comments.

10:29:42   2        My understanding is that this is a
10:29:44   3   request by Philips to change the date in which to
10:29:50   4   move back the date in which it was to provide its
10:29:55   5   reliance on advice of counsel.  And so I'm
10:30:03   6   assuming that Philips will make its argument
10:30:05   7   first.  Then I'll listen to Massimo's argument.

10:30:07   8        And who will be doing the commenting
10:30:13   9   or the argument on behalf of Philips?

10:30:17  10        MR. ROSENTHAL:  Your Honor, it's
10:30:18  11   Brian Rosenthal.  I will.

10:30:20  12        THE COURT:  Why don't you start
10:30:20  13   then, Brian.

10:30:22  14        MR. ROSENTHAL: Thank you.  So, when
10:30:25  15   the schedule was entered in this case, and just
10:30:30  16   to remind Your Honor we're talking about now the
10:30:34  17   four patents that were not selected in the
10:30:36  18   original case, along with the three new patents
10:30:39  19   that Masimo asserted in the second case, which
10:30:42  20   has now all been consolidated. So we're talking
10:30:44  21   about seven.

10:30:45  22        THE COURT:  I thought there were
10:30:46  23   nine.

10:30:48  24        MR. ROSENTHAL: There were patents as

Hawkins Reporting Service

715 N. King Street - Wilmington, Delaware  19801

302-658-6697

5

10:30:49 1 well that Philips had asserted, and some of those
10:30:52 2 have been dropped by agreement of the parties.
10:30:55 3         THE COURT:   All right.
10:30:56 4         MR. ROSENTHAL: There's still one
10:30:57 5 left.  So if my math is right, there's a total of
10:31:01 6 seven Masimo patents and one Philips' patent in
10:31:04 7 this second trench.
10:31:06 8         THE COURT:   All right.
10:31:07 9         MR. ROSENTHAL: And so the issue
10:31:09 10 right now is the decision about whether or not,
10:31:12 11 at least in Philips' case, whether Philips will
10:31:15 12 rely on advice of counsel with respect to those
10:31:19 13 seven patents that have been asserted against it.
10:31:22 14         THE COURT:   Before you go on,
10:31:23 15 Brian, I'm assuming, because I did not go back
10:31:26 16 and check the Scheduling Order -- I thought I'd
10:31:29 17 just have a Friday surprise as to what it said.
10:31:32 18         But any way, there was obviously a
10:31:35 19 date that you pointed out in the submission that,
10:31:39 20 I think, was October 9th.  Yes?
10:31:43 21         MR. ROSENTHAL: Yes, Your Honor.  And
10:31:45 22 Masimo was gracious enough to let us at least
10:31:48 23 delay that until we had this conversation with
10:31:50 24 Your Honor.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

6

10:31:51 1         THE COURT:   But my understanding is
10:31:53 2 the current date for disclosure of whether a
10:31:56 3 party was going to be relying on advice of
10:31:59 4 counsel, I'm assuming that date of October 9th,
10:32:02 5 and you tell me if I'm right or wrong on that,
10:32:04 6 applied to both Masimo and Philips.
10:32:07 7         MR. ROSENTHAL: That is correct.
10:32:08 8         THE COURT:   And did Masimo provide
10:32:11 9 whether it was relying on advice of counsel on
10:32:15 10 October 9th or has that been pushed back just in
10:32:18 11 case I make a change?
10:32:20 12         MR. ROSENTHAL: Go ahead, Joe.
10:32:24 13         MR. RE:  Your Honor, this is Joe Re.
10:32:27 14 Masimo is not waiving on the one asserted patent,
10:32:30 15 so the date was academic for Masimo.
10:32:33 16         THE COURT:   All right.  Thank you.
10:32:35 17         But, in any event, you advised
10:32:37 18 whether you were waiving or not?
10:32:40 19         MR. ROSENTHAL: Yeah, we are not.
10:32:41 20         THE COURT:   Okay.
10:32:42 21         MR. RE:  But we did agree, in order
10:32:43 22 to make today's discussion relevant, to postpone
10:32:47 23 the date until today.
10:32:50 24         THE COURT:   All right.  Thank you.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

7

10:32:51 1         Brian, please continue.
10:32:55 2         MR. ROSENTHAL: Okay.  Thank you,
10:32:56 3 Your Honor.
10:32:57 4         So that's the background.  The
10:33:02 5 question is:  Now, that we have presented, there
10:33:08 6 have been a couple of cases that, in our view,
10:33:11 7 really inform how the willfulness determination
10:33:15 8 should be resolved by the Court.  There were two
10:33:17 9 cases in particular earlier this year.
10:33:19 10         The first was a Judge Stark decision
10:33:21 11 in the Tarkus versus Adobe case, which was
10:33:26 12 sometime during the summer when Judge Stark was
10:33:28 13 presented with a summary judgment motion for no
10:33:31 14 willfulness, and made the determination that, in
10:33:37 15 view of the closeness of the questions on summary
10:33:41 16 judgment with respect to noninfringement and in
10:33:44 17 view of the fact that the defendants had raised
10:33:46 18 credible, hard-thought claim construction issues
10:33:50 19 that could have gone the other way, even though
10:33:53 20 they didn't, in view of those facts from the
10:33:58 21 Tarkus case, that there's an objectively high
10:34:00 22 risk of infringement if a valid patent was not
10:34:03 23 met.
10:34:04 24         And that, therefore, the Court

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

8

10:34:06 1 granted summary judgment of no willful
10:34:08 2 infringement on the theory that you can't send to
10:34:12 3 the jury the question of subjective knowledge of
10:34:16 4 an objectively high risk unless you first
10:34:19 5 determine that there is an objectively high risk.
10:34:21 6         And so, it was very informative to
10:34:24 7 see how Judge Stark approached the question of
10:34:26 8 willfulness.  And, in part, that approach is what
10:34:31 9 guided the way that we approached our summary
10:34:34 10 judgment motion of no willfulness that we filed
10:34:37 11 that is about to be fully briefed at the end of
10:34:39 12 next week.
10:34:40 13         The other case that came down, I
10:34:42 14 think it was just a week or two after Judge
10:34:44 15 Stark's decision, was the Bard v. W.L. Gore
10:34:48 16 decision from the Federal Circuit.  The Federal
10:34:52 17 Circuit makes explicit that the determination of
10:34:55 18 the objective prong is a matter exclusively in
10:34:59 19 the province of the Court.
10:35:00 20         THE COURT:   Yes.
10:35:01 21         MR. ROSENTHAL: And that you cannot
10:35:02 22 send the question of subjective, the subjective
10:35:04 23 prong to the jury until there's been a
10:35:06 24 determination that the objective prong is met.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

9

10:35:10 1    Those two cases, in our view, really
10:35:13 2  inform how willfulness determinations are made in
10:35:18 3  the Court.  And very importantly, our view,
10:35:22 4  Philips' view of that law is that opinions and
10:35:27 5  what Philips, in this case, subjectively believed
10:35:31 6  about the merits of various defenses is not
10:35:34 7  relevant to the first prong.
10:35:37 8    C.J. actually says the state of mind
10:35:39 9  is not relevant to the first prong.  And these
10:35:41 10  cases kind of implement that in a way that we
10:35:45 11  think ought to be implemented in this case.
10:35:47 12    Without going into the merits of
10:35:49 13  Philips' view on these cases and how this applies
10:35:53 14  to the Masimo I case, we're now faced with a
10:35:56 15  situation where we feel as though we're only a
10:35:59 16  couple months away from getting some very
10:36:02 17  specific guidance from this Court in this case
10:36:05 18  about how it's going to treat willfulness
10:36:08 19  allegations.
10:36:09 20    And if the Court is going to follow
10:36:12 21  the model of the Tarkus case, Judge Stark's
10:36:15 22  opinion, and what we think the implication of the
10:36:19 23  Bard v. W.L. Gore case is and resolve the
10:36:22 24  question of objective prong at the stage of
Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

10

10:36:26 1  summary judgment, then that is a really important
10:36:29 2  factor that Philips is going to consider when it
10:36:33 3  considers this very important weighted question
10:36:36 4  about whether to waive advice of counsel.
10:36:38 5    Now, if we were close to the end of
10:36:40 6  discovery and Masimo II, then we'd just have to
10:36:44 7  live with that then.  But we're not.
10:36:46 8    The close of discovery in Masimo II
10:36:48 9  is in June of next year.  We've got eight or nine
10:36:51 10  months, eight months or nine months until that
10:36:53 11  happens, in view of the fact that discovery is so
10:36:58 12  far from being concluded, and in view of the fact
10:37:01 13  that this question is such an important question.
10:37:04 14    THE COURT:   Well, let me back up,
10:37:05 15  and this is what I'm trying to understand, Brian:
10:37:08 16  You keep emphasizing it's an important question,
10:37:11 17  and I recognize that certain case law may have
10:37:15 18  come down post the time period in which the
10:37:21 19  Order, albeit the parties agreed to before, the
10:37:24 20  Court in certain aspects agreed to before the
10:37:26 21  Court entered an Order.  I had some choices to
10:37:28 22  make as to whose schedule I was necessarily going
10:37:30 23  to apply.
10:37:33 24    You knew about the Seagate opinion.
Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

11

10:37:38 1  You knew about the obligation that basically the
10:37:44 2  subjective intent on the first prong, well,
10:37:47 3  doesn't matter.
10:37:48 4    I think I sort of acknowledged that,
10:37:49 5  to some degree, in the Honeywell case back in
10:37:52 6  2008.  I also reaffirmed that analysis in the
10:37:58 7  Cordance case.  That's a more recent opinion, but
10:38:00 8  it still was decided in 2009.
10:38:05 9    I'm trying to figure -- what I don't
10:38:07 10  understand, and maybe I'm missing the point on,
10:38:10 11  is why the fact that a Court -- that Judge Stark
10:38:17 12  said, This is something that can be decided on
10:38:19 13  summary judgment and I did in the Honeywell case
10:38:23 14  decide that willfulness would not go to the jury
10:38:26 15  on a certain analysis, why these cases that came
10:38:35 16  down in 2012 and in the summer of 2012 affect or
10:38:42 17  how they affect, how they are so pertinent to
10:38:45 18  your decision.
10:38:46 19    I mean, before you would be -- it's
10:38:48 20  always been commonly known that deciding whether
10:38:51 21  you're going to rely upon advice of counsel is an
10:38:55 22  important decision by a patentee because of the
10:38:59 23  implications it has with attorney-client
10:39:02 24  privilege, attorney work product, a whole host of
Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

12

10:39:04 1  other issues as well.
10:39:05 2    I don't see -- I'm trying to
10:39:09 3  understand why these decisions, how these
10:39:11 4  decisions fit into that analysis and why it makes
10:39:15 5  it more acute than what it was prior to the time
10:39:18 6  the decisions came down.
10:39:20 7    MR. ROSENTHAL: Understood, Your
10:39:21 8  Honor.  I think that there are two responses to
10:39:23 9  that.
10:39:23 10    Number one, and before I get to
10:39:26 11  those, I agree that when we proposed our schedule
10:39:30 12  and Masimo proposed its competing schedule, we
10:39:34 13  both agreed that the advice of counsel waiver
10:39:37 14  decision would be at this stage of discovery.
10:39:40 15  Albeit we had different dates.
10:39:41 16    THE COURT:  Yes.
10:39:42 17    MR. ROSENTHAL: Well, relatively
10:39:44 18  speaking, we both had the same proposal with
10:39:46 19  respect to when in the schedule.
10:39:48 20    THE COURT:  Yes.
10:39:49 21    MR. ROSENTHAL: When we made that
10:39:51 22  agreement and that proposal, we understood that
10:39:55 23  there was a two-prong analysis for Seagate, of
10:39:59 24  course.  But what wasn't entirely clear from the
Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

13

10:40:02 1  Federal Circuit's perspective was whether the
10:40:05 2  question of the objective determination was a
10:40:09 3  mixed question of law that you need to have the
10:40:11 4  jury's input on first and then the judge decides,
10:40:15 5  you know, how you treat this question of whether
10:40:18 6  you submit the subjective prong to the jury, even
10:40:21 7  when there is a question about the objective
10:40:24 8  prong.  And there were cases going both ways on
10:40:27 9  that.
10:40:27 10        And what really changed in the
10:40:30 11 summer of this year is that the Federal
10:40:36 12 Circuit -- yes, there are cases that have said
10:40:37 13 that it's a mixed question of law and some cases
10:40:40 14 have found that you can ask the question to the
10:40:43 15 jury on the subjective issue.
10:40:45 16       We are making this very clear.  You
10:40:47 17 can't go to the jury on a subjective prong until
10:40:50 18 you've established the objective prong, number
10:40:53 19 one.
10:40:53 20       And number two, the objective prong,
10:40:56 21 despite being a mixed question of law and fact,
10:40:58 22 is entirely in the province of the Court.  And
10:41:01 23 those determinations have never been made that
10:41:03 24 clearly before.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

14

10:41:06 1        The second thing is the Tarkus
10:41:07 2  decision laid a framework for how and under what
10:41:13 3  circumstances that objective determination, as a
10:41:14 4  matter of law, could be made at the summary
10:41:17 5  judgment stage. We certainly recognize that cases
10:41:20 6  in the past have found in willfulness in the
10:41:22 7  summary judgment stage.
10:41:24 8        What was different about the Tarkus
10:41:26 9  decision is that Judge Stark specifically
10:41:29 10 recognized that there were disputes about the
10:41:32 11 noninfringement arguments, but that those
10:41:34 12 noninfringement arguments were credible enough
10:41:37 13 that, as a matter of law, that precluded a
10:41:40 14 finding of the objective prong being satisfied.
10:41:43 15 And that was a somewhat different approach than
10:41:45 16 what we've seen in the past.
10:41:46 17       And it did inform things. So, from
10:41:49 18 the perspective of what changed, that's what
10:41:51 19 changed.
10:41:52 20       The other thing that's different is
10:41:54 21 or why we're asking now instead of at the time we
10:41:59 22 were making the requests for the schedule is that
10:42:02 23 now we happen to be in the situation where we're
10:42:05 24 still very early in the discovery process and we

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

15

10:42:08 1  really are, in our view, very close to finding
10:42:12 2  out how this Court is going to resolve this
10:42:14 3  question in this case.
10:42:15 4        And there's no question, Masimo and
10:42:18 5  Philips have different views about how this law
10:42:20 6  ought to be applied.  But our expectation is that
10:42:25 7  one of our views is going to be adopted by the
10:42:29 8  Court or maybe there will be a different view,
10:42:32 9  but we'll get input from the Court in relatively
10:42:35 10 short order as to Masimo II, such that without
10:42:39 11 any prejudice to anyone, without any prejudice to
10:42:43 12 the schedule in Masimo II, without delaying the
10:42:45 13 close of discovery, we'll have some input on
10:42:50 14 whether we're reading this law right.
10:42:52 15       And we didn't know that we were
10:42:54 16 going to be in that stage and have the potential
10:42:58 17 to have that resolved.  And it seems to us that
10:43:02 18 because there's no prejudice in moving the date,
10:43:05 19 if we can do so and allow this Court to provide
10:43:09 20 its opinion on how this law ought to be
10:43:12 21 interpreted in this context, that's going to be
10:43:14 22 such a crucial input into Philips' decision.
10:43:18 23 It's very likely to sway them one way or the
10:43:20 24 other.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

16

10:43:20 1        THE COURT:   Well, you keep saying
10:43:22 2  there is going to be no prejudice.  My
10:43:24 3  understanding from what you said is that, I
10:43:26 4  guess, discovery closes sometime in, what, the
10:43:31 5  summer of 2013?
10:43:33 6        MR. ROSENTHAL: Yes.  There's a
10:43:34 7  deadline for discovery closing in, I think, June.
10:43:37 8  And January is the scheduled date for the
10:43:41 9  conclusion of document production.
11:10:56 10       THE COURT:   All right.  So document
11:10:56 11 production occurs in January, end of January.  So
11:10:56 12 your assumption is that once you get your reply
11:10:56 13 brief in, you're going to have a decision from
11:10:56 14 this Court when?
11:10:56 15       MR. ROSENTHAL: I don't want to make
11:10:56 16 any assumption about that.  But my -- you know,
11:10:56 17 and I really don't.  I don't want to presume
11:10:56 18 anything there.
11:10:56 19       But what I actually proposed to
11:10:56 20 Masimo was if we're worried about how long a
11:10:56 21 decision might take or worried about imposing
11:10:56 22 upon the Court any thoughts from us about when it
11:10:56 23 should be, I would be very happy putting a date
11:10:56 24 in the calendar, a date certain in the calendar

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

17

11:10:56 1   for when we have to make this decision. May it
11:10:56 2   be January, February, March, still plenty of time
11:10:56 3   for us to produce whatever documents need to be
11:10:56 4   produced in response to the waiver and have
11:10:56 5   plenty of time to have whatever depositions need
11:10:56 6   to happen as a result.
11:10:56 7           THE COURT:   Well, see that was --
11:10:56 8           MR. ROSENTHAL:  If it turns out
11:10:56 9   that's too late or that's too early, I should
11:10:56 10  say, and we don't yet have a decision, fine.  But
11:10:56 11  my hope would be that by that time, we would have
11:10:56 12  something.
11:10:56 13          THE COURT:   Well, how the Court has
11:10:56 14  necessarily approached the analysis of the
11:10:56 15  various motions that have been filed -- backing
11:10:56 16  up a little bit, and I just want to ask about the
11:10:56 17  summary judgment motion on no willfulness.
11:10:56 18          I'm assuming that, from what I can
11:10:56 19  recall from what's been filed in this matter
11:10:56 20  regarding noninfringement -- well, if I look at
11:10:56 21  all the motions that have been filed by Philips
11:10:56 22  in this matter, which would include the
11:10:56 23  noninfringement motions as well as the invalidity
11:10:56 24  motions for summary judgment, if I granted all of

18

11:10:56 1   Philips' motions in its favor, are there any
11:10:56 2   claims left in the case that have not been
11:10:56 3   addressed?  Any claims left from Masimo's patents
11:10:56 4   in the case that would make the no willful
11:10:56 5   infringement argument still relevant?
11:10:56 6           MR. ROSENTHAL:  I believe the answer
11:10:56 7   to that is, no, Your Honor.  I think that if you
11:10:56 8   resolved all four of those motions in Philips'
11:10:56 9   favor, that would resolve liability on Masimo's
11:10:56 10  patents.  We'd still have to deal with Masimo's
11:10:56 11  motions on Philips' patents.
11:10:56 12          THE COURT:   Oh, that I understand.
11:10:56 13  I'm just looking at it from one perspective.
11:10:56 14          MR. ROSENTHAL:  I believe that that
11:10:56 15  would obviate the willfulness motion.  It would
11:10:56 16  also obviate the damages motion --
11:10:56 17          THE COURT:   Yeah.
11:10:56 18          MR. ROSENTHAL:  -- as it pertains to
11:10:56 19  Masimo's damages case.
11:10:56 20          THE COURT:   That's what I thought,
11:10:56 21  because I do -- I do not recall seeing a counter
11:10:56 22  motion from Masimo on noninfringement.  I mean,
11:10:56 23  on -- excuse me, not noninfringement.  No
11:10:56 24  willfulness.

19

11:10:56 1           MR. ROSENTHAL:  That's correct.
11:10:56 2           THE COURT:   Yeah.  So my
11:10:56 3   recollection of what I read of the motions that
11:10:56 4   were filed by Philips was that the Court, if the
11:10:56 5   Court was trying to do this in some type of
11:10:56 6   orderly fashion, the approach would be to look at
11:10:56 7   the liability arguments first before you actually
11:10:56 8   got to the arguments that related to damages.
11:10:56 9           MR. ROSENTHAL:  Yeah, exactly right,
11:10:56 10  Your Honor.  And I think we may have even
11:10:56 11  included a sentence to that effect in the letter
11:10:56 12  that the Court asked for which was, you know,
11:10:56 13  just for two reasons.
11:10:56 14          Number one, obviously, if you decide
11:10:56 15  those motions in Philips' favor, you don't have
11:10:56 16  to address the willfulness motion.  But even if
11:10:56 17  there are some aspects of those motions that you
11:10:56 18  didn't agree with Philips on, it would inform the
11:10:56 19  question of willfulness.
11:10:56 20          THE COURT:   I recognize that.  Yes.
11:10:56 21  Yes.
11:10:56 22          MR. ROSENTHAL:  That's correct, Your
11:10:56 23  Honor.
11:10:56 24          THE COURT:   Okay.  And my other

20

11:10:56 1   concern, which I think you have indicated may
11:10:56 2   have resolved, is that any decision that I made
11:10:56 3   here today, if I made a decision and granted what
11:10:56 4   you were requesting, at least in part, and I
11:10:56 5   didn't get, the Court did not -- the Court was
11:10:56 6   unable to get opinions out as rapidly as the
11:10:56 7   parties would have hoped, then I would be faced
11:10:56 8   with the fact that we could be backing up, and
11:10:56 9   putting a huge crunch and making it more acute
11:10:56 10  from Masimo's perspective of potential prejudice
11:10:56 11  because they now do not have this discovery.
11:10:56 12          And their hedging or cutoff dates
11:10:56 13  for certain aspects of discovery is looming or
11:10:56 14  has passed.  So that was another concern.
11:10:56 15          The other concern that I have,
11:10:56 16  frankly, or the other issue out there that I kind
11:10:56 17  of threw out to both of you -- and, Joe, I'll let
11:10:56 18  you answer this after Brian's completed his
11:11:03 19  discussion -- is, realistically, this case isn't
11:11:03 20  going to move along at any rapid pace, to some
11:11:03 21  extent.  Because I would strongly suspect that
11:11:03 22  what's going to happen in Masimo II is the same
11:11:03 23  thing that's happened in Masimo I.
11:11:03 24          That the parties that choose, if

21

11:11:03 1 they are dissatisfied with anything that the
11:11:03 2 Court has done, to exercise their right to take
11:11:03 3 what I call or refer to as the internal appeal.
11:11:03 4 That is, to file objections.
11:11:03 5 And, in fact, I believe in the
11:11:03 6 Scheduling Order from Masimo II, we've built in
11:11:03 7 that concern. In other words, the dates for when
11:11:03 8 certain events are to occur are dependent upon
11:11:03 9 when there's a final decision, for example, on
11:11:03 10 claim construction, I believe, before summary
11:11:03 11 judgment motions are filed.
11:11:03 12 And so, there's this domino effect
11:11:03 13 that's already built into this Scheduling Order.
11:11:03 14 So that has an effect on how I look at this as
11:11:03 15 well.
11:11:03 16 You keep saying, Brian, there's no
11:11:03 17 prejudice. And I'm trying to understand, well,
11:11:03 18 what your disagreement is with the arguments that
11:11:03 19 are raised by Masimo that they are being
11:11:03 20 prejudiced.
11:11:03 21 MR. ROSENTHAL: Well, Your Honor, our
11:11:03 22 response to that is at the end of the day, the
11:11:03 23 close of discovery is June of 2013.
11:11:03 24 THE COURT: Mm-hmm.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware 19801
302-658-6697

22

11:11:03 1 MR. ROSENTHAL: And there is nothing
11:11:03 2 that we are proposing or want to propose here
11:11:03 3 that would change that date or back Masimo up to
11:11:03 4 the point that it's difficult to meet that
11:11:03 5 deadline.
11:11:03 6 So we are fully prepared to complete
11:11:03 7 all of our document production by January, the
11:11:03 8 January document deadline. I'll note that there
11:11:03 9 has not been any exchange of documents yet in
11:11:03 10 this case other than that which was already
11:11:03 11 exchanged for the four originally asserted
11:11:03 12 patents.
11:11:03 13 We have not yet received
11:11:03 14 infringement contentions from Masimo on the three
11:11:03 15 new patents. We are at an early stage.
11:11:03 16 Now, with respect to prejudice,
11:11:03 17 whatever date the Court says, whether it's
11:11:03 18 contingent on a decision on the willfulness
11:11:03 19 motion or if it's a date certain, we will be able
11:11:03 20 to very quickly thereafter, if Philips decides to
11:11:03 21 waive on opinions of counsel, very shortly
11:11:03 22 thereafter, within a matter of a week or two,
11:11:03 23 produce all of the documents.
11:11:03 24 And there's not that many. It's a

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware 19801
302-658-6697

23

11:11:03 1 fairly small set of documents that relate to the
11:11:03 2 opinions of counsel.
11:11:03 3 And very shortly thereafter,
11:11:03 4 schedule whatever depositions would be necessary
11:11:03 5 to address those opinions.
11:11:03 6 So, I mean, even if we set that date
11:11:03 7 in March, we would still have April, May, June,
11:11:03 8 three months to take whatever depositions are
11:11:03 9 necessary as a result of Philips' decision to
11:11:03 10 waive.
11:11:03 11 So, I don't feel like there's any
11:11:03 12 real prejudice there, although certainly Masimo
11:11:03 13 would prefer to have these documents and these
11:11:03 14 depositions earlier. We understand that.
11:11:03 15 We just feel like it should be
11:11:03 16 balanced against the fact that if -- and it's an
11:11:03 17 important decision, also. By the way, I don't
11:11:03 18 think this is insignificant.
11:11:03 19 You'll probably recall from the last
11:11:03 20 case, we had a lot of discovery disputes over the
11:11:03 21 scope of waiver, over, you know, what's
11:11:03 22 appropriate, what's not, taking depositions
11:11:03 23 again. Masimo's letter has suggested that those
11:11:03 24 issues have all been resolved. That's my hope as

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware 19801
302-658-6697

24

11:11:03 1 well, subject to, I think, one or two that are
11:11:03 2 still pending. That's my hope as well.
11:11:03 3 But our experience tells us that
11:11:03 4 we're likely to have a lot of discovery disputes
11:11:03 5 over the scope of waiver issues that would also
11:11:03 6 be avoided if Philips ultimately decides not to
11:11:03 7 waive.
11:11:03 8 THE COURT: Well, my recollection
11:11:03 9 is there's at least -- what the parties told me
11:11:03 10 not too long ago and reiterated in the Footnote 2
11:11:03 11 of Masimo's letters, I'm aware of only one waiver
11:11:03 12 issue that has been readdressed. And that will
11:11:03 13 be the third time it will be readdressed with my
11:11:03 14 in camera review of certain Philips' documents.
11:11:03 15 So that's the only dispute that I'm
11:11:03 16 aware of that has been discussed, reviewed. I
11:11:03 17 didn't give -- I didn't give a prior decision on
11:11:03 18 it, but it's now been resurrected again.
11:11:03 19 MR. ROSENTHAL: It is also our
11:11:03 20 understanding that's the only dispute remaining
11:11:03 21 with respect to the scope of waiver in the first
11:11:03 22 case. I'm concerned that, you know -- and if
11:11:03 23 this is what happened, so be it. But I am
11:11:03 24 concerned that when and if we waive in the second

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware 19801
302-658-6697

25

1 case, we're going to face a new set of challenges
2 given the history between the parties.
3         But I guess my point there, and it's
4 not a big part of our argument, but my point
5 there is that it is another consideration if the
6 guidance of Court on the willfulness motion is
7 such that Philips determines not to waive on
8 these new set of patents.  That will also have
9 the other benefit of avoiding potential discovery
10 issues with respect to the scope of waiver.
11         THE COURT:  Can't you apply or use
12 what you already know from the Fed Circuit and
13 from Judge Stark and recognize that this -- well,
14 this Court obviously would be following the Fed
15 Circuit's analysis and its determination.
16         MR. ROSENTHAL: I think so.  And
17 that, you know, we are confident that we're
18 reading the Fed Circuit precedent and Judge
19 Stark's approach correctly.
20         But there is a fairly significant
21 disagreement between the parties about the impact
22 of those decisions that's set forth in the
23 willfulness motion. And it seems like Masimo and
24 Philips have very different views about what the
Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

26

1 role of the Court is at the summary judgment
2 stage in determining the objective progress in
3 Seagate.
4         So while I'm confident we can
5 correctly read those decisions and interpret what
6 the Court's likely to do, there is a dispute.
7 And I would hate to be in a situation where I
8 advised the client, we think that this is
9 properly resolved at a summary judgment stage;
10 and therefore, we think that the risk involved
11 with not waiving are insignificant.
12         And then to find out just a couple
13 months later that the Court is taking a different
14 view that we think is the appropriate view with
15 respect to the summary judgment question.  That's
16 really the prejudice to Philips that I'm worried
17 about.
18         THE COURT:  But that exists in
19 practically every case that you could possibly
20 imagine.
21         MR. ROSENTHAL: Absolutely.  I mean,
22 it's very rare.
23         I mean, it's not -- I understand
24 that.  We can't just say, Oh, we'd like to see
Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

27

1 how courts resolve issues before we proceed.  We
2 understand that.
3         But we happen to be in a situation
4 in this case where, with a minor adjustment in
5 this particular aspect of discovery, one aspect
6 of discovery, pushing it to a later portion of
7 discovery with very little, in our view,
8 prejudice, we can't avoid the situation where
9 we're making this decision without having the
10 guidance of the Court.
11         That's a rare thing that we have the
12 ability to move something without prejudice when
13 we know that a very similar issue is about to be
14 addressed by the same Court on very similar
15 facts.
16         THE COURT:  Okay.  Do you have any
17 additional argument, Brian?
18         MR. ROSENTHAL: No, Your Honor.
19 Thank you.
20         THE COURT:  All right.  Thank you.
21         Joe, are you going to be making the
22 argument from your side of the fence or someone
23 else?
24         MR. RE:  I will, Your Honor.
Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

28

1         THE COURT:  Okay.  Before you
2 start, though, Joe, you know, what if I say,
3 fine; I happen to feel that this makes some
4 sense?
5         And I say, But I'm not going to let
6 it go on forever.  Let's just push it back to
7 February or March.
8         MR. RE:  Well, you then have done
9 exactly what I was concerned about when I
10 acquiesced to the consolidation.  I was always
11 concerned that Philips would use the
12 consolidation to piggyback the limbo patent to
13 the Masimo II patents.  And that's exactly what's
14 occurring here.
15         The unfairness is very apparent to
16 me.  That's a fundamental level, because we had
17 this precise discussion how unfair it would be to
18 further drag the limbo patents, along with the
19 Masimo II patents.
20         The limbo patents were asserted in
21 February of 2009.  And I have a fundamental
22 disagreement with thinking or pretending that
23 June 2012 decision has something to do with what
24 we are talking about today.
Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

29

1    There's no relationship.  What
2  happened here was that we filed our opposition
3  brief to the summary judgment motion on
4  willfulness, and now Philips is not so confident.
5    Because when you look at all the
6  cases that have been interpreted, Bard or really
7  interpreted, Powell, because Powell is really the
8  case of some significance, much more than Bard.
9    But if you just look at the cases
10  that have interpreted Bard and putting Bard in
11  your Lexus Westlaw --
12    THE COURT:   I've got it.  I've got
13  Bard and I've got Powell.
14    MR. RE:  Yes.  But if you put in
15  Bard and see what the Courts have said about
16  Bard, you will see that there are ten decisions
17  as of today.  All ten reject Brian's theory about
18  what Bard says.
19    All ten say willfulness goes to the
20  jury.  All ten, including the case argued by
21  Royal Philips, Royal Philips, the parent of the
22  defendants in this case argued, and I quote,
23  "whether or not defendants had reasonable
24  position on claim construction, noninfringement,

31

1    But in other occasions when it
2  relies on the question of fact or if there's
3  mixed questions of law and fact, Powell makes it
4  very clear, as does Bard, that the issue goes to
5  the jury.
6    And all ten District Court cases
7  think Bard was -- which, by the way, was June
8  14th.  So we're having this discussion in
9  October, not in June or July.
10    But the June 14th decision in Bard,
11  as interpreted by all these courts, and I have
12  all ten citations in front of me with quotations
13  from all the cases, every one of them says, That
14  is not a proper argument.
15    And if it's the case, the case must
16  go to the jury.  And though the Court may be the
17  final arbiter on the first prong, which is what
18  Bard said, that final arbitration occurs after
19  trial when the record has been fully developed.
20  And a fully developed trial is where the record
21  is developed.
22    And so it is impossible, as these
23  courts say, to do what Brian is suggesting.  So
24  Brian's reading of the cases is incorrect as all

30

1  invalidity are issues for the jury."  And that
2  argument carried the day in the Southern District
3  of New York on August 23th.
4    So I think what's happened here, we
5  only cited some of them in our brief, is that
6  Brian's reading of Powell, and Bard and all he
7  gleams from Tarkus is absolutely incorrect.
8    And the easiest way to show that is
9  if you look at the only sentence quoted from any
10  case in Brian's letter, it's a quote from Powell,
11  a 2011 decision.  You'll note there's no
12  quotation from Bard.
13    And if you go and look at the
14  sentence that Philips quoted in their letter, you
15  will see how that sentence was taken completely
16  out of context.
17    And all the Court needs to do is
18  read the whole paragraph that contains the
19  sentence that is quoted in the letter, and you
20  will see that it is Powell, not Bard.  It was
21  Powell that explained that the only time that the
22  Court could possibly take it away from the jury
23  is when the objective prong inches solely on an
24  issue of law.

32

1  the courts have said.  And so this whole -- it's
2  a total ruse, in my opinion, to think we're
3  discussing this because of some recent case law.
4    The Court is absolutely correct.
5  The prongs have been divided out in 2007.
6    And it was Powell in 2011 that made
7  it clear, not as Brian said, but that the jury
8  gets to decide all the issues of law and facts at
9  trial.  And only afterwards would the Court
10  become the final arbiter.
11    I completely disagree on
12  Mr. Rosenthal's view of the case law, because he
13  has no support whatsoever.  And all the support
14  is on our side.
15    Now, and so that's what prompted the
16  tiering.  Now, the tiering was prompted by our
17  opposition brief, not by anything that occurred
18  in June.  Because if it occurred in June, believe
19  me, we would have been on the call with the Court
20  in June.
21    I also want to make a couple points
22  clear in regard to the Court's questions about
23  the current summary judgment motions.  The
24  current summary judgment motions pertain to the

33

1  patents that are not at issue in this hearing.
2          THE COURT:   I understand.  Joe.
3  Joe.
4          MR. RE:  Yes.
5          THE COURT:   I truly understand
6  that.  My questions that I was asking Brian was
7  going to the fact that if it -- I'm not saying
8  that's the case.
9          I was saying, Assume this, that I
10 decided that Philips was right on its motions,
11 does the Court even get to the issue of
12 willfulness?  That was my concern.
13         MR. RE:  It is in the first case.
14         THE COURT:   Yes, in the first case.
15 I understand that's in the first case, because --
16         MR. RE:  But --
17         THE COURT:   -- Philips is relating
18 back to the Court as it feels it's going to get
19 some direction from the Court in the first case
20 to decide what to do in the second case.  I
21 understand that.
22         MR. RE:  And then -- well, then I'm
23 having trouble seeing what the guidance would be,
24 because these are different patents and they have

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

34

1  apparently a different set of opinions and
2  different theory or whatever.  Otherwise, I don't
3  see what the guidance would be if we're talking
4  about a different set of facts pertaining to the
5  other patents.
6          THE COURT:   Where the two of you
7  clearly disagree, Joe, and in that analysis --
8  and I'm not making the determination right now.
9  I'll make it when I decide the motion of who's
10 right and who's wrong -- is how far the Trial
11 Court can go in deciding whether willfulness will
12 ever go to the jury on a summary judgment motion.
13 That's where the dispute is between you and
14 Philips?
15         MR. RE:  That is definitely correct.
16         THE COURT:   And that then
17 influences both arguments on whether this Court
18 should modify the Scheduling Order in the second
19 case when it has -- because of the potential
20 advice that you would get from me by how I decide
21 the willfulness argument in the first case.
22         MR. RE:  That is correct.  And that,
23 what you just said, Philips was fully aware of at
24 the time that we put together the schedule.  So to

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

35

1  the extent that is true, and Philips really needs
2  to know what you're going to say on the five
3  summary judgment motions that need to be decided
4  first before they can make a decision, they knew
5  that.
6          Everybody knew that at the time.  We
7  agreed to the schedule and we fought over the
8  schedule.
9          And what I'm saying is any
10 intervening event since then, which is simply
11 Bard and Tarkus, could not have changed that
12 calculus.  We all knew the dates would be running
13 concurrently.
14         And when we had this debate, I
15 remember the Court asking Mr. Rosenthal:  Well,
16 how many patent cases do you handle at once?  And
17 he responded, Oh, 15 to 20.
18         And then the Court made its ruling,
19 Well, then you can handle these two cases running
20 concurrently.  Essentially that's what happened.
21         So whatever truthfulness there is to
22 the fact that it would be really nice to have the
23 Court's ruling before making an additional
24 decision, which I don't doubt the Court's

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

36

1  decision within a case before you make additional
2  decisions.  Every client wants that.
3          The point is it didn't change from
4  the last time we were talking to the Court on the
5  Masimo II schedule.  Bard and Tarkus have nothing
6  whatsoever to do with that discussion.
7          And to the extent Bard could have
8  possibly suggested a change in the law, every
9  Court, and Brian knows this, every Court since
10 Bard has agreed with Masimo that the issue has to
11 go to the jury, unless you have the rare
12 situation you might have had in Tarkus.  And by
13 the way, Tarkus was before Bard.
14         THE COURT:   I know that.  I know
15 the dates were -- I know the difference in the
16 dates.  I saw that, too.
17         Tarkus and Bard were two of the
18 cases that I didn't get a chance to get through.
19 Powell, and I was looking at Page 1236 in the
20 Powell case that you asked me to basically
21 evaluate and the context in which it was said.
22         MR. RE:  Yes.  And the sentence that
23 follows, I think it's very clear if you look at
24 the sentence that was quoted by Philips, you will

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

37

1   see the sentence preceding it raises the question
2   when the resolution of that particular issue or
3   defense is a matter of law.  Okay.
4          THE COURT:   I'm trying to find it.
5   Okay.  I found it.
6          MR. RE:  Yes.  You have the Federal
7   Reporter.  It's the 123610, Notes 21 to 25.
8          THE COURT:   Okay.
9          MR. RE:  And the top question, the
10  top sentence explains, When the resolution of
11  that particular issue or defense is a matter of
12  law, then they give Philips' sentence.  But then
13  the next sentence says, When the resolution of a
14  particular matter, particular issue or defense is
15  a factual matter, however, for the resolution or
16  reliance on that issue, your defense is
17  reasonableness, the objective prong is properly
18  considered by the jury.
19         It's the sentence after the quoted
20  sentence which completely undercuts
21  Mr. Rosenthal's use of the sentence in Powell.
22  This is the law.
23         This is the law and it's been the
24  law at least since November 2011.  And our

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

38

1   discussion with the Court occurred after November
2   2011.
3          And so, if you read all of Powell,
4   it's very clear if you have the rare circumstance
5   where the sole issue, let's say, is the
6   reasonableness of a claim construction, and
7   everybody agrees that that determines whether
8   there's infringement or not, if you have that
9   rare circumstance, then you might fit under
10  Tarkus.  And then, of course, the Court can
11  decide the reasonableness of a claim construction
12  as a matter of law.
13         But that's the rare case.  The more
14  common case is like ours and depends, and the ten
15  District Court cases that follow Bard that all
16  explain that, in a typical case, you're going to
17  have factual issues as well.  And, of course, we
18  have lots of factual issues on willfulness.
19         And those factual issues have to be
20  decided first before the Court becomes the final
21  arbiter on the objective prong.  So, I think
22  Mr. Rosenthal is just reading too much into the
23  Federal Circuit cases, as if they're really
24  discussing summary judgment practice.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

39

1          That's not what they're discussing
2   at all.  What they're really discussing is that
3   the Court remains the final arbiter.  That the
4   final arbitration occurs after the trial with a
5   completely, fully developed record.
6          That's the law and no one has said
7   anything to the contrary until this letter I
8   received a couple days ago.
9          THE COURT:   Well, I'm just looking
10  also at the Bard decision.
11         MR. ROSENTHAL: Your Honor, on Page
12  107 of the Bard decision, they address Powell.
13         THE COURT:   I know that they do.
14  But, wait.
15         What I was looking at, and I
16  couldn't remember, was whether the decision in
17  Bard dealt with a motion for summary judgment.
18  Because I know the decision in Powell was what
19  happened at the trial level.
20         MR. RE: It was Bard, Your Honor.
21  This is Mr. Re.
22         THE COURT:   It was also at the
23  trial level, too?  Because I'm trying to find
24  that.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

40

1          MR. RE:  Yeah.  There was a full
2   trial in Bard.
3          Bard was on rehearing and Bard, what
4   happened in Bard is the argument occurred before
5   Powell came out.  This rehearing petition solely
6   dealt with the fact that Powell was an
7   intervening decision between oral argument and
8   the decision in Bard.
9          And Bard simply adopts Powell.  And
10  if you go to page -- the page Brian referred to,
11  1007, Headnote 3, 4, it makes the exact thing,
12  same dichotomy that I just explained.
13         The first sentence is when it's a
14  legal, a purely legal question of law, and then
15  the next sentence says the same thing.  Same
16  thing Powell does.
17         When the objective prong turns on
18  fact questions as related, for example, to
19  anticipation, or on legal questions, dependent on
20  the underlying facts as related, for example, to
21  questions of obviousness, the judge remains the
22  final arbiter of whether the defense was
23  reasonable, even when the underlying fact
24  question is sent to the jury.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

41

11:12:32  1          Again, Bard could not be more clear
11:12:36  2  that they are referring to the Court's role after
11:12:40  3  trial, after the development of a fully completed
11:12:44  4  record. And that's what every District Court has
11:12:49  5  interpreted Bard since it came out in June.
11:12:53  6          THE COURT:   Wait a minute.
11:12:54  7          MR. ROSENTHAL: I object on that
11:12:56  8  interpretation of Bard.
11:12:58  9          MR. RE: I didn't interrupt you,
11:12:59 10  Brian.
11:13:00 11          MR. ROSENTHAL:  I don't mean to
11:13:01 12  interrupt.  I just want to respond whenever
11:13:03 13  appropriate.
11:13:03 14          THE COURT:   You'll get the
11:13:05 15  opportunity to do so.
11:13:06 16          MR. ROSENTHAL: Thank you, Your
11:13:07 17  Honor.
11:13:07 18          THE COURT:   Are you finished, Joe?
11:13:09 19          MR. RE:  Well, I was -- I'm finished
11:13:11 20  on the legal point, the legal discussion.
11:13:13 21          To just simply show that what's
11:13:17 22  really prompting this motion is really not Bard
11:13:21 23  or Tarkus at all.  It was really our opposition
11:13:24 24  brief.

          Hawkins Reporting Service
       715 N. King Street - Wilmington, Delaware  19801
                  302-658-6697

42

11:13:25  1          And, therefore, you can see the
11:13:27  2  unfairness of now deciding to change the date
11:13:31  3  after they were pretty much settled after a lot
11:13:35  4  of briefing and discussion with the Court.
11:13:37  5          I do want to comment on the
11:13:38  6  discovery issue and really more thoroughly answer
11:13:42  7  your question about your delaying until February
11:13:44  8  or March.  If that happens, virtually nothing
11:13:48  9  will be happening in the case.
11:13:49 10          All of the key witnesses -- and I
11:13:52 11  deposed some of them myself, all of the key
11:13:54 12  witnesses all were somewhat involved in the
11:13:59 13  preparation of these so-called exculpatory
11:14:04 14  opinions.
11:14:04 15          We do not want to have to take their
11:14:06 16  depositions two and three times.  We've taken
11:14:09 17  them once already.  Because of the way the case
11:14:11 18  is spaced, I don't want to have to go through
11:14:14 19  that again.
11:14:14 20          So, all we want is Philips to make
11:14:18 21  the decision.  We're not saying waive.  We're not
11:14:20 22  saying don't waive. Just make a decision, so that
11:14:24 23  we can proceed.
11:14:25 24          The remaining discovery is mostly

          Hawkins Reporting Service
       715 N. King Street - Wilmington, Delaware  19801
                  302-658-6697

43

11:14:29  1  pertaining to the opinions.  We've already
11:14:31  2  exchanged all the documents.  They've had our
11:14:33  3  contentions on the limbo patents for over two
11:14:36  4  years.
11:14:36  5          You'll notice that their letter is
11:14:39  6  not really asking for anymore information from
11:14:41  7  Masimo.  They have all the information they need
11:14:43  8  from us.  They know our contentions until the
11:14:47  9  cows go home.
11:14:47 10          But the real remaining discovery is
11:14:52 11  to fill some of these holes, and I referred to it
11:14:54 12  as swiss cheese in the prior hearing.  Some of
11:14:56 13  the holes, because of the very torturous methods
11:15:00 14  in which the privilege was asserted in this case.
11:15:03 15          And, obviously, Philips went way out
11:15:07 16  of its way to withhold some things and produce
11:15:10 17  others on grounds I still don't really
11:15:13 18  understand.
11:15:13 19          And now, all we're trying to do is
11:15:16 20  fill those holes.  It's up to Philips to fill
11:15:20 21  those holes.  It's their decision to make, and
11:15:22 22  that decision is holding up the case.
11:15:25 23          So if the answer to your question is
11:15:29 24  if the dates were delayed until March, nothing

          Hawkins Reporting Service
       715 N. King Street - Wilmington, Delaware  19801
                  302-658-6697

44

11:15:31  1  else would happen after we file our reply brief.
11:15:33  2          And, by the way, that's another
11:15:34  3  point.  The willfulness brief, the willfulness
11:15:39  4  motion is still pending and still being briefed.
11:15:42  5          So I don't -- I also think it's kind
11:15:44  6  of unfair that I'm here telling about all the
11:15:46  7  case law and all the interpretation of Bard when
11:15:49  8  now Brian can take that into consideration in
11:15:52  9  writing his reply brief, which is due next
11:15:54 10  Friday.
11:15:56 11          This is another angle of unfairness
11:15:59 12  in having this hearing today rather than in the
11:16:01 13  summer. But if the delay were to occur, there
11:16:04 14  would be nothing else happening after the filing
11:16:07 15  of the reply brief next week, because I don't
11:16:10 16  want to take those depositions at least two more
11:16:12 17  times just to get through the patent case.
11:16:15 18          And so, that's really the answer to
11:16:17 19  your question.  It would be six months of
11:16:20 20  absolute downtime in a case that should be
11:16:23 21  wrapping up the discovery.
11:16:30 22          And with that said, I think the
11:16:32 23  Court knows how I feel about the further delay.
11:16:34 24  And I'm in a little bit of hot water to begin

          Hawkins Reporting Service
       715 N. King Street - Wilmington, Delaware  19801
                  302-658-6697

45

11:16:37 1 with, because my client thinks that I didn't
11:16:40 2 speak up enough to prevent all this delay. So I
11:16:43 3 would really appreciate, for my own personal
11:16:46 4 reasons, if we would have as small a delay, as
11:16:52 5 least as possible.
11:16:52 6         THE COURT: Well, then your client
11:16:54 7 should have been mad for the last two years,
11:16:56 8 because your argument, as you prefaced it to
11:16:59 9 begin with, Joe, was where the anger for Masimo
11:17:03 10 is is that this case got split to begin with.
11:17:06 11         And, also, the case is being
11:17:11 12 predominantly managed by a Magistrate Judge,
11:17:14 13 which introduces delay in and of itself, because
11:17:16 14 the parties make choices in that regard,
11:17:20 15 including doing what they have the right to do.
11:17:22 16 And that is filing objections.
11:17:25 17         So the delay is a factor, but I
11:17:28 18 understand what your concern is in this regard.
11:17:31 19 And that is, in the end, it's like what you're
11:17:34 20 saying to me is, Judge, look at the cases.
11:17:39 21 You're going to be making a decision eventually,
11:17:42 22 whenever that happens, on the willfulness
11:17:44 23 argument.
11:17:44 24         This was all out here, to some

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

46

11:17:47 1 extent, before. It's a natural risk we take in
11:17:52 2 every Scheduling Order that we enter into.
11:17:55 3         And there's just not a legitimate
11:17:59 4 reason expressed by Philips to change the
11:18:04 5 Scheduling Order for this purpose.
11:18:07 6         MR. RE: I totally agree with
11:18:08 7 everything you just said, Judge.
11:18:10 8         THE COURT: Well, that's how I'm
11:18:11 9 reading your argument.
11:18:13 10         MR. RE: Yes, in a nutshell, well
11:18:16 11 said.
11:18:16 12         THE COURT: All right. Brian, I
11:18:20 13 understand that you have some concerns about how
11:18:23 14 Joe represented the case law.
11:18:25 15         MR. ROSENTHAL: Yes, Your Honor. I
11:18:28 16 have just three very short points.
11:18:29 17         On the Bard case, first, I wanted to
11:18:33 18 dispel any notion, as a matter of fact, that our
11:18:37 19 decision to bring this issue to the Court had
11:18:39 20 anything whatsoever to do with the opposition
11:18:44 21 that Masimo filed.
11:18:45 22         I will tell you I'm the person that
11:18:47 23 said we should try to see if we should delay
11:18:50 24 this. And I made that decision before I ever

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

47

11:18:54 1 read Masimo's opposition to the willfulness
11:18:57 2 opposition. I haven't even finished reading
11:18:59 3 their willfulness opposition, to be honest.
11:19:01 4         THE COURT: Well, that's okay. I
11:19:02 5 haven't started reading it.
11:19:04 6         MR. ROSENTHAL: Well, I figured this
11:19:05 7 much since the briefing is not finished. But I
11:19:08 8 do want to, just as a matter of fact, dispel any
11:19:11 9 notion whatsoever that Joe kept saying that the
11:19:13 10 reason we did this is because of the opposition
11:19:15 11 brief. Absolutely not true.
11:19:17 12         THE COURT: But let's go back to
11:19:19 13 this. Where Joe has some legitimate argument is
11:19:22 14 that the Powell case came out in November 2011.
11:19:28 15 The Tarkus case came out in June 2012.
11:19:32 16         And the Bard case, you're right,
11:19:36 17 came out roughly a week after the Tarkus case.
11:19:39 18 And this issue was sent to me really just before
11:19:45 19 the cutoff date of October 9th.
11:19:49 20         MR. ROSENTHAL: And, Your Honor,
11:19:50 21 that wasn't strategic. That was -- we should
11:19:52 22 have brought it to the Court's attention sooner.
11:19:54 23         I think as we were looking ahead to
11:19:57 24 the calendar in Masimo II, we realized how

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

48

11:19:59 1 quickly that date was coming up upon us. And as
11:20:02 2 we started to make that determination, we
11:20:04 3 realized, Geeh, we're in a situation where we're
11:20:08 4 going to get guidance from the Court on this very
11:20:11 5 question, applied to slightly different facts,
11:20:13 6 but on the same very same question that Joe
11:20:15 7 talked for ten minutes about, how his view and
11:20:18 8 our view is different about the role of the Court
11:20:20 9 in summary judgment.
11:20:21 10         That's exactly our point.
11:20:23 11         THE COURT: Yeah.
11:20:23 12         MR. ROSENTHAL: We have a very
11:20:25 13 different view of Bard, and we have a very
11:20:27 14 different view of the Tarkus decision. Joe seems
11:20:32 15 to be saying that Judge Stark just decided Tarkus
11:20:34 16 incorrectly because the Tarkus decision said --
11:20:37 17 explicitly says, on the one hand, there were
11:20:40 18 reasonable claim construction positions.
11:20:42 19         But, as a matter of law, would have
11:20:44 20 provided noninfringement arguments, but secondary
11:20:47 21 credible noninfringement arguments and listed, I
11:20:50 22 think, three or four of those that preclude a
11:20:52 23 finding that there was an objectively high risk.
11:20:55 24         And what Joe is saying is that that

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

49

11:20:57 1  analysis was wrong.  So what we have is a clear
11:21:00 2  dispute as between us and Masimo on how the Court
11:21:03 3  ought to be handling willfulness on summary
11:21:06 4  judgment.  I think on that point everybody is in
11:21:08 5  agreement that we all dispute how to do that.
11:21:10 6         And that's exactly the point.  We
11:21:12 7  should have come to the Court sooner on this.
11:21:14 8         I think we should have come to the
11:21:16 9  Court when Tarkus was decided, when the Bard case
11:21:20 10 was decided.  We were focused -- our energy was
11:21:24 11 focused on getting all of our summary judgment
11:21:27 12 motions ready.
11:21:28 13        We should have been looking ahead
11:21:31 14 more in the schedule of what impact those
11:21:35 15 decisions might have.  And for that, you know, I
11:21:36 16 apologize.
11:21:36 17        But this is not strategic.  This was
11:21:38 18 not done in any way for any reason other than the
11:21:42 19 fact that we realized, as we're advising our
11:21:46 20 clients, they're asking us what is the Court
11:21:48 21 likely to do in this scenario.
11:21:50 22        And like any case, we always have to
11:21:52 23 guess the differences.  We're going to have some
11:21:53 24 guidance from the Court on that question.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

50

11:21:55 1         I also wanted to counter -- and by
11:21:59 2  the way, I'm sorry.  To answer your question
11:22:01 3  directly, Your Honor, on the Bard case, the Bard
11:22:03 4  case specifically discusses the Powell case in
11:22:06 5  that quote that Joe read from.
11:22:09 6         THE COURT:   I'm trying to --
11:22:11 7         MR. ROSENTHAL: It doesn't hold at
11:22:13 8  all that it has to be sent to the jury.  It
11:22:16 9  doesn't hold that the underlying factual dispute
11:22:20 10 has to be sent to the jury.
11:22:21 11        What it says is when it's sent to
11:22:22 12 the jury, the question of the reasonableness of
11:22:26 13 the defenses is still ultimately determined by
11:22:29 14 the judge.  And that is slightly different and,
11:22:33 15 in my mind, substantially different than what
11:22:35 16 Powell said.
11:22:36 17        Powell said on that page -- I think
11:22:37 18 it was 1136.
11:22:39 19        THE COURT:   Yeah, 1236.
11:22:40 20        MR. ROSENTHAL: That the
11:22:42 21 reasonableness goes to the jury.  The question of
11:22:45 22 the reasonableness, when it's a fact issue, goes
11:22:48 23 to the jury.  Bard held the opposite.
11:22:50 24        It said, even when the underlying

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

51

11:22:52 1  factual issues go to the jury, the decision about
11:22:55 2  the reasonableness of the defenses is made by the
11:22:58 3  judge.
11:22:59 4         That's a very big difference.  The
11:23:02 5  reasonableness is determined by the judge.  And
11:23:04 6  if the judge is ultimately going to determine the
11:23:07 7  reasonableness of defenses, there is absolutely
11:23:09 8  nothing to preclude the judge from viewing the
11:23:12 9  defenses at the stage of summary judgment and
11:23:15 10 determining those defenses are reasonable.  And
11:23:17 11 that's exactly what Judge Stark did in Tarkus.
11:23:20 12        So there's absolutely a dispute here
11:23:22 13 about how to interpret this law.  I get that.
11:23:24 14        But to say that all Bard did was
11:23:28 15 restate and reaffirm what Powell said is just
11:23:31 16 wrong.  Bard specifically says that the question
11:23:34 17 of reasonableness has to be determined by the
11:23:36 18 judge, not the jury.  That's what Powell says.
11:23:40 19        The other two points that I want to
11:23:42 20 make are on this idea that we've had their
11:23:45 21 contentions until the cows come home.  With
11:23:47 22 respect to four of the patents, we have their
11:23:49 23 contentions with respect to three of the patents.
11:23:52 24 We don't even have their infringement

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

52

11:23:54 1  contentions.
11:23:54 2         I've been asking Masimo on one of
11:23:58 3  the patents what they intend infringes, since the
11:24:00 4  very, I think, the month the case was filed.  We
11:24:03 5  said, We have no idea what you could possibly be
11:24:06 6  accusing.
11:24:06 7         And, finally, they told us what it
11:24:08 8  was.  We took it out of our product.  We said,
11:24:10 9  Okay.  It's gone.
11:24:11 10        Can we drop the case?  They said,
11:24:12 11 No, it's not good enough.
11:24:14 12        And we said, Well, tell us what it
11:24:15 13 is that's still in the product that infringes.
11:24:19 14 They refuse to answer that.  We have no idea, not
11:24:21 15 a clue what they are accusing of infringing the
11:24:24 16 '400 patent.
11:24:25 17        I think we're going to be getting
11:24:27 18 infringement contentions from them shortly, and
11:24:29 19 that will help inform that.  But the idea that we
11:24:33 20 know everything about what their contentions is
11:24:36 21 is simply not true.
11:24:38 22        And then, finally, this point that
11:24:40 23 nothing else would happen in the case for six
11:24:43 24 months is wrong.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

53

11:24:44 1    First of all, we have a fair amount
11:24:48 2 of document production to get through.  We have
11:24:50 3 not received documents from Masimo to reproduce
11:24:53 4 documents that they took back.
11:24:55 5    THE COURT:  Well, let me ask --
11:24:56 6 hold on.  Let me ask you this:  When is the
11:24:59 7 cutoff for document production?
11:25:01 8    MR. ROSENTHAL:  It's January
11:25:02 9 something.  It's a date in January, which I'll
11:25:07 10 get in just a second.
11:25:09 11    MR. RE:  January 14th.
11:25:10 12    THE COURT:  Okay.  So it's January
11:25:11 13 14th for cutoff for document production.  Right?
11:25:15 14    MR. ROSENTHAL:  Correct, Your Honor.
11:25:16 15    MR. RE:  Yes.
11:25:16 16    THE COURT:  And I'm going to assume
11:25:17 17 that you're not scheduling depositions before the
11:25:22 18 document -- until after the document production
11:25:24 19 is completed; right.
11:25:26 20    MR. ROSENTHAL:  That would be our
11:25:27 21 assumption and consistent with how we did things
11:25:30 22 in the last case.
11:25:31 23    THE COURT:  Well, yeah.
11:25:32 24    MR. RE:  I think if I knew this

55

11:26:43 1 privilege on advice of counsel and stuff like
11:26:48 2 that on the willfulness issue is some area where
11:26:50 3 it could be more segregated, than it can with the
11:26:53 4 other types of issues that you face in this, that
11:26:55 5 the parties face in this case on the patents.
11:26:59 6    MR. ROSENTHAL:  I think that's fair,
11:27:00 7 Your Honor.  There are a set of documents that
11:27:03 8 would be produced if we waived on advice of
11:27:06 9 counsel that are specific only to the seven
11:27:08 10 patents that are at issue in that part of the
11:27:11 11 case.
11:27:11 12    There is a whole set of other
11:27:13 13 discovery, though, that would have to happen with
11:27:15 14 regardless.  We would have to and are planning to
11:27:19 15 depose all of the inventors of those patents.
11:27:21 16 We're planning to do that after the close of
11:27:25 17 document discovery.
11:27:26 18    We have yet to receive from Masimo
11:27:28 19 many of the documents that pertain to their
11:27:31 20 products that are accused of infringing the
11:27:34 21 Philips' patent related to their rainbow
11:27:36 22 technology.  I don't think we've received a
11:27:38 23 document production in this case on that.
11:27:40 24    We have to go and talk to their

54

11:25:35 1 issue was behind us, I'd take them tomorrow, if I
11:25:37 2 knew this issue was behind us.
11:25:39 3    THE COURT:  So what you are saying
11:25:40 4 to me, Joe, is you'll take depositions before you
11:25:42 5 have the documents and then turn to me and say,
11:25:45 6 We need to have other depositions?
11:25:47 7    MR. RE:  No.  It's because the
11:25:48 8 documents have essentially already been produced.
11:25:50 9 It's very hard to think that the documents are so
11:25:55 10 segregable by subject matter.
11:25:57 11    So, I believe in my heart of hearts,
11:25:59 12 all the supplemental document has been, in fact,
11:26:03 13 exchanged.  And the only area where this
11:26:06 14 segregation is occurring appears to be in this
11:26:07 15 area of the privilege.
11:26:08 16    THE COURT:  Well, I would think in
11:26:11 17 an area that there could be segregation is just
11:26:14 18 this point.  Correct?
11:26:20 19    MR. RE:  More likely than
11:26:22 20 segregating than other types of issues involved
11:26:25 21 in the case necessarily being able to be
11:26:32 22 segregated.  I would think on the issue of
11:26:34 23 waiver, not waiver, but on the issue of whether
11:26:36 24 you're going to waive your attorney-client

56

11:27:44 1 marketing people and to their business people,
11:27:47 2 and depose those folks related to the specific
11:27:50 3 issues and specific features that are claimed in
11:27:54 4 the seven patents, and also to depose them about
11:27:58 5 the features that are infringing or accusing the
11:28:01 6 Philips' patents.
11:28:02 7    There's a significant amount of
11:28:03 8 discovery that is absolutely unrelated to this
11:28:05 9 question of willfulness and the question of
11:28:07 10 waiver.  There are, I'm going to guess, and I
11:28:10 11 don't mean to hold ourselves to this, because I
11:28:13 12 don't know, but I'm going to guess there's a
11:28:15 13 banker's box of documents or something like that
11:28:18 14 that would relate to willfulness and advice of
11:28:20 15 counsel that would have to be produced.
11:28:22 16    That's what we're talking about.
11:28:24 17 And then there would be a handful of witnesses
11:28:26 18 that have knowledge of those documents.  That's
11:28:28 19 what we're talking about is the idea of putting
11:28:30 20 that closer to the end in the last three months
11:28:33 21 of discovery rather than now.  It doesn't seem to
11:28:35 22 be that big of a shift.
11:28:37 23    There's a lot of other stuff that's
11:28:38 24 going to happen in this case.

57

11:28:41 1   THE COURT:   Most of which I've got
11:28:42 2   to believe is not going to happen until after you
11:28:44 3   get the documents.
11:28:47 4   MR. RE:   Your Honor.
11:28:48 5   THE COURT:   Yes.
11:28:49 6   MR. RE:   I couldn't tell who that
11:28:50 7   question was for, but the amount of discovery
11:28:53 8   that Philips has to take is absolutely irrelevant
11:28:57 9   to the discussion we're having today, because
11:28:59 10   that, of course, is not going to involve the
11:29:02 11   privileged documents.
11:29:03 12   THE COURT:   I recognize that.  But
11:29:04 13   what I'm saying is even if they -- this is what
11:29:09 14   I'm hearing, okay, and this is what I'm hearing.
11:29:13 15   If they determine that, for example, tomorrow I
11:29:17 16   say to them, No, I'm not going to allow this to
11:29:19 17   be extended, it's going to be part of it, they've
11:29:22 18   got until June -- until January 14th in which to
11:29:25 19   produce those documents.
11:29:26 20   They don't have to produce them
11:29:27 21   right away.  It's all part of that production.
11:29:30 22   All part of the production of all
11:29:32 23   the issues that are involved, so they can wait
11:29:36 24   until January 14th, 2013 to produce.  And I

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

58

11:29:40 1   sincerely doubt in that circumstance, Joe, you're
11:29:43 2   going to be taking depositions of those
11:29:45 3   individuals before then.
11:29:46 4   MR. RE:   Well, I disagree.  That's
11:29:49 5   the deadline for producing any other documents
11:29:52 6   you may rely on in a case.
11:29:53 7   But we served document requests on
11:29:56 8   Philips and received no documents.  I had no idea
11:30:00 9   that the last day to produce documents allows you
11:30:03 10   to withhold documents until --
11:30:04 11   THE COURT:   Oh, no.  I'm not
11:30:06 12   suggesting that they be withheld.  I'm not
11:30:08 13   suggesting that.
11:30:08 14   But I'm saying there can be some
11:30:10 15   argument there that these documents could be
11:30:12 16   delayed for that long.  I'm not saying that it's
11:30:12 17   the last day.
11:30:16 18   The last day necessarily would be
11:30:19 19   the last day that documents have to be produced,
11:30:22 20   are supposed to be produced.  You may have
11:30:24 21   document requests.  You didn't tell them that
11:30:27 22   before.
11:30:29 23   MR. RE:   Yeah.  We served document
11:30:30 24   requests in May and still have not received

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

59

11:30:33 1   documents back from Philips, because that's --
11:30:34 2   because the vast majority of the remaining
11:30:36 3   documents to produce are associated with this
11:30:38 4   privilege issue.
11:30:40 5   And so until we get this issue
11:30:42 6   resolved, the case really is in a bit of a
11:30:45 7   standstill.  But the parties -- and this is the
11:30:47 8   real problem with the generalization on this
11:30:50 9   phone call, Brian's arguments make absolutely no
11:30:55 10   sense with regard to the limbo patents.
11:30:58 11   THE COURT:   Well, hold on.  Hold
11:30:59 12   on.
11:30:59 13   Both the limbo patents and the new
11:31:03 14   patents that were added in the case are now all
11:31:06 15   in Masimo II; correct?  No.
11:31:09 16   MR. RE:   Yes.  That is correct.
11:40:17 17   THE COURT:   That is correct.  They
11:40:17 18   are in Masimo II.
11:40:17 19   In other words, I took the patents
11:40:17 20   that you added and we made them part of Masimo
11:40:17 21   II.  And I think I consolidated the cases.
11:40:17 22   For heaven's sake, we've still got
11:40:17 23   the 09-80 number that's being applied.  But what
11:40:17 24   we've done is we've done 09-80 in two stages.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

60

11:40:17 1   So that's the reason why it's Masimo
11:40:17 2   II.  So the limbo patents and these new patents
11:40:17 3   are all part of this.
11:40:17 4   In fact, the limbo patents and the
11:40:17 5   new patents that were added in the 11-742 matter
11:40:17 6   were put together in this, in the 09-80 case and
11:40:17 7   are the second stage of the 09-80 case.  And the
11:40:17 8   discovery for both are going along.
11:40:17 9   MR. RE:   That is correct, but that's
11:40:17 10   not the dispute.
11:40:17 11   THE COURT:   Okay.  I understand
11:40:17 12   that, but you keep bringing it up.
11:40:17 13   So I don't understand the
11:40:17 14   significance of what's going on, because you keep
11:40:17 15   making the argument that somehow there was by --
11:40:17 16   if the Court modifies this schedule in any way,
11:40:17 17   shape or form in what you're saying, not just on
11:40:17 18   this issue, but in any way, shape or form, we are
11:40:17 19   now introducing more delay to my original case.
11:40:17 20   And that delay was inherent once I divided the
11:40:17 21   case that way, the 09-80 case originally.
11:40:17 22   And I'm not revisiting that issue.
11:40:17 23   That's all I'm saying.
11:40:17 24   MR. RE:   Judge, I'm not asking you

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

61

1  to revisit. Matter of fact, I'm the party asking
2  you to not revisit, particularly the schedule.
3       I think let's stick to the schedule
4  that the Court ordered after extensive debate,
5  and argument and brief writing. So I'm not the
6  party asking to revisit anything. I want to
7  stick to the schedule.
8       THE COURT:   Well, I recognize that
9  you want to stick with the schedule, but it's
10  been brought up repeatedly in this argument
11  today, and I think and I have a total disconnect
12  with it, that the limbo patents, that are now no
13  longer in limbo. They've got a schedule,
14       MR. RE: My point, Your Honor, if I
15  may, was that the limbo patents, which are no
16  longer in limbo, the discovery on those is
17  essentially complete. We've already exchanged
18  our document contentions.
19       I mean, our documents on all those,
20  on all those patents we've already exchanged our
21  contentions two years ago on those patents. I was
22  just simply trying to make the point that we
23  can't generalize about the discovery only, unless
24  we are specific as to whether we are talking

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

62

1  about the former limbo patents or the two new
2  added patents, which were the original Masimo II
3  patents.
4       That was my only point. And so, all
5  I wanted to make clear was that the arguments
6  about the discovery that we've been talking about
7  are really not applicable to the former limbo
8  patents. That was my only point.
9       The limbo patents, for example, we
10  exchanged our contentions and documents on those
11  limbo patents back in 2010.
12       THE COURT:   Okay. That's fine.
13       And so you got all the information
14  that you need on the -- you are saying, as
15  Masimo, you got all the information that you need
16  or conveyed all the information that you need to
17  do on the limbo patents, and those limbo patents
18  still include Philips' patents; correct?
19       MR. RE: Well, right now there's only
20  one Philips' patent remaining.
21       THE COURT:   Okay. So, and you got,
22  at that time, all the information on the limbo
23  patents, and Philips' contention as to whether it
24  was going to waive its attorney-client privilege

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

63

1  and whether it was going to waive attorney advice
2  and opinion on Masimo's patents concerning
3  willfulness?
4       MR. RE:  No, Your Honor.
5       THE COURT:   That's what I thought.
6       MR. RE:  That's what we're
7  discussing today.
8       THE COURT:   Okay. They did not
9  waive. They did not tell you whether they were
10  going to waive or not.
11       MR. RE:  Right. And that's part of
12  today's hearing.
13       THE COURT:   I understand that, Joe.
14  So I still think you're mixing apples and
15  oranges.
16       I understand what you're saying and
17  about your arguments. I'm saying that I don't
18  consider the patents that we had before earlier
19  in this case in limbo anymore. I consider them
20  now to be part of the additional patents that you
21  added to -- that you brought in and in a separate
22  case.
23       And I'm putting those together in
24  one Scheduling Order. That's what I'm saying.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

64

1       MR. RE: That is true. That is
2  correct.
3       My only point was that Philips has
4  all the information it needed on the limbo
5  patents to decide whether Philips will waive or
6  not. Masimo doesn't.
7       Whatever information Masimo has is
8  irrelevant. The issue remaining here is whether
9  Philips waives or not.
10       THE COURT:   Yeah, I understand. I
11  truly do understand.
12       That's why I asked the question:
13  How many of the Philips patents are still left?
14       MR. RE:  But the point you made is a
15  good one. The limbo patents now are consolidated
16  with the Masimo II patents.
17       THE COURT:   That's right.
18       MR. RE:  And I agree to that. But I
19  agreed to it on one condition.
20       THE COURT:   Well, I decided to
21  consolidate the two, not solely because you were
22  willing to do that. I put them together because,
23  frankly, I was not going to have a three or
24  four-tiered Scheduling Order in this case.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

65

11:40:25 1   We already have a two-tiered
11:40:25 2   Scheduling Order. I was not going to have a
11:40:25 3   third one.
11:40:25 4        MR. RE: And I agreed to that. We
11:40:25 5   agreed.
11:40:25 6        That is the right thing to do. And
11:40:25 7   the Court decided that.
11:40:25 8        And it is now Brian that wants to
11:40:25 9   deviate from that decision and change the
11:40:25 10  schedule.
11:40:25 11       THE COURT: Well, okay. We haven't
11:40:25 12  gotten to the -- I understand what you're saying
11:40:25 13  and I understand this.
11:40:25 14       My view is basically this: I know
11:40:25 15  what you're arguing, Brian. I know that you
11:40:25 16  would like to have the Court's decision in that
11:40:25 17  regard without commenting upon the legal
11:40:25 18  arguments that I heard today, concerning what the
11:40:25 19  Bard case means in relationship to the Powell
11:40:25 20  case and how the Tarkus case fits in.
11:40:25 21       I'm not inclined to change the
11:40:25 22  schedule on this. It is, frankly, a risk that
11:40:25 23  you take in this regard.
11:40:25 24       Cases happen all the time.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

66

11:40:25 1   Decisions come down all the time.
11:40:25 2        I know you keep saying it's a unique
11:40:25 3   situation, and it may very well be. But I'm
11:40:25 4   going to leave the schedule as is, at least
11:40:25 5   give you some additional time to respond to this
11:40:25 6   because I know it's -- the 9th was the due date
11:40:26 7   for this. We are now at the 12th.
11:40:26 8        So when is Philips going to exercise
11:40:26 9   or advise -- what date is Philips looking for to
11:40:26 10  advise -- I'm basically denying Philips' motion.
11:40:26 11       So we've got to pick a new date as
11:40:26 12  to when you're going to advise Masimo of whether
11:40:26 13  you're going to --
11:40:26 14       MR. ROSENTHAL: Your Honor, a week
11:40:26 15  would be good just to inform the client about
11:40:26 16  this decision and see their infringement
11:40:26 17  contentions, which I think we're getting later
11:40:26 18  today. So a week would be fine.
11:40:26 19       THE COURT: So next Friday.
11:40:26 20       MR. ROSENTHAL: If that's acceptable
11:40:26 21  to Masimo.
11:40:26 22       THE COURT: Well, whether it's
11:40:26 23  acceptable to Masimo or not... What is Masimo's
11:40:26 24  feelings on it?

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

67

11:40:26 1        By next Friday is what I think Brian
11:40:26 2   is saying.
11:40:26 3        MR. RE: That's fine, Your Honor.
11:40:26 4   Masimo accepts the proposed date.
11:40:26 5        THE COURT: Okay. Are you going to
11:40:26 6   be providing your contention responses, too?
11:40:26 7        MR. RE: Yes, on the Masimo II
11:40:26 8   patents. Those are the only ones that really
11:40:26 9   needed contentions.
11:40:26 10       THE COURT: Okay. Those were the
11:40:26 11  ones that were added that came in the 11-742
11:40:26 12  case?
11:40:26 13       MR. RE: That's correct.
11:40:26 14       THE COURT: Okay. I just wanted to
11:40:26 15  understand.
11:40:26 16       So we're talking about the same
11:40:26 17  thing. So that's the ruling.
11:40:26 18       I do enjoy and appreciate your
11:40:26 19  arguments concerning the legal aspects, and I
11:40:26 20  always enjoy talking to this group. I really do.
11:40:26 21       MR. ROSENTHAL: Thank you, Your
11:40:26 22  Honor.
11:40:26 23       MR. RE: Thank you. Take care.
11:40:26 24       THE COURT: Have a good weekend.

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

68

11:40:26 1   Bye-bye.
11:40:26 2        (Teleconference was concluded at
11:40:26 3   11:41 a.m.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

69

```
 1   State of Delaware)
                     )
 2   New Castle County)

 3
                    CERTIFICATE OF REPORTER
 4

 5                   I, Heather M. Triozzi, Certified
     Professional Reporter, Registered Professional
 6   Reporter and Notary Public in the State of
     Delaware, do hereby certify that the foregoing
 7   record, Pages 1 to 69 inclusive, is a true and
     accurate transcript of my stenographic notes
 8   taken on October 12, 2012, in the above-captioned
     matter.

 9
                In witness whereof, I have hereunto
10   set my hand and seal this 23rd day of October,
     2012, at Wilmington.

11

12                   Heather M. Triozzi, CSR, RPR
                     Cert. No:  184-PS
13                   Exp:  Permanent

14


15


16
     DATED:  October 23, 2012
17

18


19


20


21


22


23


24
```

Hawkins Reporting Service
715 N. King Street - Wilmington, Delaware  19801
302-658-6697

# EXHIBIT L

# MAYER · BROWN

Mayer Brown LLP
1999 K Street, N.W.
Washington, D.C. 20006-1101

Main Tel +1 202 263 3000
Main Fax +1 202 263 3300
www.mayerbrown.com

November 10, 2012

<u>VIA EMAIL</u>

**Ann Marie Duffy**
Direct Tel +1 202 263 3418
Direct Fax 202 263 5318
aduffy@mayerbrown.com

Michelle E. Armond
Knobbe Martens Olson & Bear LLP
2040 Main Street
Fourteenth Floor
Irvine, CA 92614

Re:    <u>Masimo Corp. v. PENAC, et al., Case No. 1:09-
       cv-0080-LPS-MPT</u>

Dear Michelle:

I write in response to your letter of October 25, 2012 regarding discovery in *Masimo II*. We strongly disagree with Masimo's attempt to characterize Philips' responses to Masimo's discovery as grossly inadequate or deficient. The overwhelming majority of Masimo's interrogatories and document requests in the *Masimo II* case are directly to the so-called "limbo patents." Your colleague, Joe Re, stated during the October 12, 2012 telephonic hearing with the Court that "discovery on [the limbo patents] is essentially complete." Hearing Tr. at 61:14-18. Philips completed its document production with respect to those patents in 2010. The only new patents for which document production is necessary are the three Masimo patents asserted in *Masimo II*, the '955, '400 and '572. In contrast, Masimo has not produced a single document related to its own patents, despite being due to Philips on October 12, 2012.

Moreover, as we have repeatedly indicated, while document production on the so called "limbo patents" is complete, additional discovery including depositions, is needed on those patents as well as the newly asserted Masimo patents. As such, Philips can not fully supplement its interrogatory responses to identify all witnesses or persons with knowledge or even all relevant facts, nor will it state that it will not rely on any documents, things, or witnesses beyond those currently cited in its responses.

Below is a more thorough response to each of the issues raised in Masimo's October 25, 2012 letter.

### *Masimo's Interrogatory Nos. 1 and 2*

Masimo seeks supplementation of Philips' non-infringement and invalidity contentions on the so-called "limbo patents" and the full contentions for Masimo's newly asserted patents. We disagree with your characterization of our contentions on the "limbo patents" as superficial. Our responses are detailed and comprehensive. As discussed earlier, Masimo has failed to produce documents relevant and responsive to Philips' document requests on its newly asserted

Mayer Brown LLP operates in combination with other Mayer Brown entities with offices in Europe and Asia
and is associated with Tauil & Chequer Advogados, a Brazilian law partnership.
AMECURRENT 703904790.1 10-Nov-12 09:19

Mayer Brown LLP

Michelle E. Armond
November 10, 2012
Page 2

patents and depositions are still needed on all of the *Masimo II* patents.  As such, Philips will supplement its contentions on the "limbo patents" once the relevant deposition discovery is complete.

Moreover, Philips just received Masimo's infringement contentions on the newly asserted patents on October 12, 2012.  As such, Philips could not have provided its noninfringement or invalidity contentions on these patents prior to that date.  Your demand for an near-immediate response to Masimo's contentions is unreasonable.  Nonetheless, Philips will endeavor to provide its preliminary non-infringement and invalidity contentions, subject to further investigation, by November 12, 2012.

With respect to Philips' response to Masimo's Interrogatory No. 2, Philips' response with respect to the "limbo patents" is entirely in line with the Federal Rules of Civil Procedure and the Local Rules for the District of Delaware. It is also consistent with Masimo's responses to similar interrogatories in this litigation.  Philips will rely on one or more of the prior art references listed in its response for its invalidity defenses, including its Sections 102 and 103 defenses.

As set forth above, Philips will supplement shortly its responses to Interrogatories 1 and 2 with respect to the '955, '400 and '572 patents, for which Masimo only recently provided its own contentions.

### *Masimo's Interrogatory No. 3*

Masimo's Interrogatory Nos. 3 seeks, inter alia, the dates and circumstances surrounding Philips' firs awareness of each of Masimo's asserted patents.  Philips has provided a response to this Interrogatory.  However, as previously discussed, Masimo has failed to produce documents relevant and responsive to Philips' document requests on its newly asserted patents and depositions are still needed on all of the *Masimo II* patents.  As such, Philips will supplement its response to Interrogatory No. 3 once Masimo provides the relevant discovery.

Moreover, under the Federal Rules of Civil Procedure, Philips has the right to supplement its discovery through out the discovery period and up to trial as new information and documents are produced.  Philips will not nor does it need to confirm at this time that the documents, things and witnesses listed in its response to Interrogatory No. 3, or any of Masimo's interrogatories, are the only documents, things and witnesses Philips will rely on.

### *Masimo Interrogatory No. 4*

Philips will supplement its response to Interrogatory No. 4 shortly.  In an effort to narrow the case, based only on the information Philips has received to date, Philips will identify claims 10-13 as asserted, without prejudice.  We note that Masimo has not produced critical documents related to the accused features of the '745 patent.  You will recall that Philips returned (at Masimo's request) documents pertaining to the accused Rainbow features, and Masimo has not re-produced them or provided updated documents.  We expressly reserve our right to add claims

Mayer Brown LLP

Michelle E. Armond
November 10, 2012
Page 3

once Masimo produces such documents.  Philips will assert both literal infringement and doctrine of equivalents.  Philips will assert direct, induced and contributory infringement.

***Masimo Interrogatory No. 5***

Contrary to Masimo's assertion that Philips "has not responded to this interrogatory," Philips' answer that it would identify documents pursuant to Fed. R. Civ. 33(d) is entirely appropriate under the Federal Rules of Civil Procedure and the Local Rules of the District of Delaware.  That said, Philips will supplement its response to this interrogatory.

***Masimo Interrogatory No. 6***

Philips' response to Masimo's Interrogatory No. 6 is complete.  Philip does not assert that any of its products are covered by the '745 Patent.  As for non-Philips products, the only products Philips is currently aware of that are covered by the '745 Patent are Masimo's accused products, though we do not represent that Philips has performed any analysis of any third party products to make such a determination.

***Masimo Interrogatory No. 11***

It is unclear what supplementation Masimo is seeking for its  Interrogatory No. 11, which seeks all bases for Philips' contention that it has not willfully infringed the Masimo patents.  As Masimo states in its October 25 letter, Philips responded that it does not infringe the Masimo II Asserted Patents and that the Patents are invalid.  This response is entirely sufficient.  In any event, Philips intends to supplement its response to this interrogatory as discovery progresses.

***Masimo's Document Request Nos. 1-27, 29-99, 101-107, 152-155, 157-184, 187-201, 204, 208-211, 215-228, 230-234, 237-248, 250-251, 255-263, 266-284, 289, 291-292, 296, 298-299, 301-307, 311, 313-318, 326-327, 329, 336-337, 340-347, 349-350, and 355-365***

Masimo's assertion that "Philips has not produced a single document in response to these requests" is misleading.  The overwhelming majority of these document requests are directed to the so-called "limbo patents," for which Mr. Re has stated discovery "is essentially complete."  Philips completed its document production on the so-called "limbo" patents, including production on its '745 Patent in 2010.  The newly asserted patents in the *Masimo II* case are asserted against the same products and the same algorithm as the "limbo patents."  We will supplement our document production if any non-privileged documents are found that specifically relate to the three new patents.

With respect to those requests directed to documents and information regarding Philips' Accused Products, again, Philips produced hundreds of thousands of pages of documents directed to its accused products in this case by 2010.  In addition, Philips has produced relevant source code for its accused products.  As we have done in the past, we will update our document production to provide additional released versions of source code for the accused products as

Michelle E. Armond
November 10, 2012
Page 4

new versions are released.  To the extent Masimo is seeking specific documents, Philips is willing to meet-and-confer to discuss Masimo's specific requests.

With respect to those requests directed to damages related materials and documents, again, Philips has produced thousands of pages of documents and materials on its accused products.  To the extent limited supplementation of damages-related material is needed, Philips is willing to meet-and-confer with Masimo to discuss a schedule for the mutual exchange of such supplementation.

With respect to Document Request No. 26, to the extent Philips has identified any additional prior art, Philips will produce those documents on or before November 12, 2012.

With respect to Document Request Nos. 31-41, all of these requests are related to patents no longer at issue in the case, specifically the "Dixtal Patents."  If Masimo believes that documents responsive to these requests are somehow relevant to the case, Philips is willing to meet-and-confer with Masimo to discuss.

### Masimo's Document Request Nos. 185-86, 319-325, and 335

With respect to Document Request Nos. 185-86, as Masimo is aware, the parties reached agreement in 2010 regarding the types of financial documents that would be exchanged in this case.  The agreement narrowed the scope of documents that would be produced, thus rendering Document Request Nos. 185-186 too broad.  As stated herein, Philips is willing to meet-and-confer to discuss an agreeable date for mutual supplementation of such damages material.

With respect to Request Nos. 319-325, Philips confirms it has produced: (1) "all documents and things concerning any meetings between Masimo and Siegfried Kästle and/or Roy  Wallen" within its possession, custody and control responsive to Request No. 319; (2) all documents and things concerning the August 2001, 2006 and January 2007 communications and meetings between the parties responsive to Request Nos. 320-23; and (3) all license agreements and other documents specified in Request Nos. 324-25 regarding the '745 Patent that exist and are within its possession, custody and control.

With respect to Request No. 335, Philips has produced documents responsive to this request.  To the extent Philips discovers additional documents "relating to [its] efforts to compete against Masimo's pulse oximetry products, including, but not limited to, the manner in which you have promoted, marketed, or priced [its] products against Masimo" Philips will produce such documents at that time.

### Masimo's Document Request Nos. 202-203, 205-207, 212-213 and 328

With respect to Request Nos. 202-203, 205-207 and 212-213  as stated herein, Philips is willing to meet-and-confer to discuss an agreeable date for mutual supplementation of damages material.

Mayer Brown LLP

Michelle E. Armond
November 10, 2012
Page 5

With respect to Request No. 328, Philips maintains that this request is premature, as Philips has not yet identified all persons it expects to call as a witness at any hearing or trial in this action.

***Masimo's Document Request Nos. 100, 214, 235-236, 249, 264-65, 285-88, 290, 293-95, 297, 208-310, 312, 338-39, 348, 351-54, and 366-70***

Contrary to Masimo's assertion, Philips has not "refused to produce any responsive documents" for these Requests. First, most, if not all of these Requests, are exact duplicates of Requests served in *Masimo I*, in response to which Philips produced hundreds of thousands of pages of documents. Second, Philips has objected to these specific Requests on a variety of bases, as discussed below.

With respect to Document Request No. 100, as Masimo is well aware, the parties entered the April 16, 2010 Stipulation for Discovery on Patent Claims, which clearly states that "[t]he following testifying expert materials will be excluded from discovery in this case: testifying expert witnesses' notes, draft reports or declarations, and communications between a testifying expert witness and either counsel or a Party." As such, Philips will not produce materials responsive to this request. To the extent a testifying expert is retained, as provided for in the Stipulation, Philips will produce any retention agreements and materials relied up by any testifying expert witness in forming his or her opinions.

With respect to Request No. 214, Philips does not understand how documents responsive to this request, namely "documents sufficient to evidence the interest rate which you paid or received in connection with funds borrowed by or from you from 1999 to present" are relevant to this case. Philips is willing to meet-and-confer with Masimo regarding this Request.

With respect to Request Nos. 235-36, Philips maintains that documents related to Palmvue are not relevant to this case.

With respect to Request No. 249, as Philips stated on multiple occasions in 2010 and 2011, all documents received, sent, or authored by Alexander John-Scheder that are still within the possession, custody and control of Philips have been produced. Moreover, Philips has maintained that none of Mr. John-Scheder's documents are relevant to this case.

With respect to Request Nos. 264, 265, 288, 297, 312, 338, 339, 351, 352, 353, 354, 366-370, Philips does not understand how documents responsive to this request are relevant to this case. Philips is willing to meet-and-confer with Masimo regarding this Request.

With respect to Request No. 348, Philips does not presently intend to seek lost profits with respect to the '745 patent.

With respect to the remaining requests, Philips has already produced documents responsive to these requests. If there are specific documents Masimo seeks from Philips, Philips

Mayer Brown LLP

Michelle E. Armond
November 10, 2012
Page 6

is willing to meet-and-confer to discuss specific types or categories of documents Masimo
desires.

***Masimo's Document Request No. 156***

We will make responsive sample products are available for inspection at the Washington,
D.C. office of Mayer Brown LLP, 1999 K Street, N.W. Washington, D.C. 20006.  Please advise
if you would like to inspect them so we can make arrangements for a mutually agreeable time.

As discussed herein, Philips is willing to meet-and-confer regarding: (1) setting a
mutually agreeable date for the exchange of damages-related supplementation; (2) specific types
and categories of documents Masimo maintains are missing from Philips' production; and (3)
Request No. 229.  Philips is available for a meet-and-confer on November 12 at 3:00 p.m.
Eastern.

Sincerely,

Ann Marie Duffy

cc:    Alan M. Grimaldi
       Brian A. Rosenthal
       Steven Yovits

# EXHIBIT M

## Duffy, Ann Marie

| | |
|---|---|
| **From:** | Rosenthal, Brian A. |
| **Sent:** | Friday, December 21, 2012 3:41 PM |
| **To:** | Joe.Re; Michelle.Armond |
| **Cc:** | Duffy, Ann Marie; Grimaldi, Alan M.; Andrea, Brian K. |
| **Subject:** | RE: Masimo - claim narrowing |
| | |
| **Categories:** | Masimo Litigation |

Joe,

I appreciate your response and your questions, but you still have not answered our question.  Before the hearing, and again below, we have asked for Masimo's proposal to narrow claims.  We still haven't heard one.  If you intend to propose a way to narrow claims in your brief, we would like to know what your proposal is so we can address it in our paper.  Please let us know. Thanks.

Brian

**From:** Joe.Re [mailto:Joe.Re@knobbe.com]
**Sent:** Friday, December 21, 2012 3:32 PM
**To:** Rosenthal, Brian A.; Michelle.Armond
**Cc:** Duffy, Ann Marie; Grimaldi, Alan M.; Andrea, Brian K.
**Subject:** RE: Masimo - claim narrowing

Brian,

Thanks for the email.  As I stated at the hearing, if Philips is going to get the Court to force Masimo to drop claims, it should explain why its specific proposal has a logical basis with regard to the subject matter of each of the asserted claims/patents, as opposed to simply arguing for an arbitrary number.  Philips, being the party moving to limit the number of claims, should show that a smaller number of claims would make no substantive difference viz-a-viz the prior art and the accused technologies. So, for example, it seems to make sense to me that Philips, being the party with the burden to attack validity, as you mentioned at the hearing, would try to identify the groups of claims that it thinks best match the fewest references, so that any number proposed has some logic to the presentation of the evidence. I just wanted to avoid simple math that seemed to predominate the discussion in *Masimo I*.  Your email seems to continue to propagate that arbitrary method, as you even asked me "would you propose a specific number of ***claims per specification***."  That question represents the opposite of a subject-matter approach.  At the hearing, you suggested that in coming up with the number 30 for the claims to be asserted for all of Masimo's remaining patents, you took into account subject matter?  How?  Wasn't that arbitrarily based on some mathematical approach?  I look forward to your response to my questions.

Joe

**From:** Rosenthal, Brian A. [mailto:BRosenthal@mayerbrown.com]
**Sent:** Thursday, December 20, 2012 7:49 AM
**To:** Joe.Re; Michelle.Armond
**Cc:** Duffy, Ann Marie; Grimaldi, Alan M.; Andrea, Brian K.
**Subject:** Masimo - claim narrowing

Joe,

During the status conference yesterday, you indicated that Masimo would prefer that if the Court limits the number of asserted claims, it should do so by "subject matter" as opposed to doing so "mathematically." In order for us to address your request, we need to know how Masimo proposes a limitation should be placed by subject matter, if the Court is so inclined. For example, would you propose a specific number of claims per specification, or some other approach?  Please let us know your specific proposal by tomorrow if

1

possible to allow us sufficient time for us to address it in our brief.

Thanks,
Brian

Brian Rosenthal
Mayer Brown LLP
brosenthal@mayerbrown.com
202-263-3446

_____

IRS CIRCULAR 230 NOTICE. Any tax advice expressed above by Mayer Brown LLP was not intended or written to be used, and cannot be used, by any taxpayer to avoid U.S. federal tax penalties. If such advice was written or used to support the promotion or marketing of the matter addressed above, then each offeree should seek advice from an independent tax advisor.
This email and any files transmitted with it are intended solely for the use of the individual or entity to whom they are addressed. If you have received this email in error please notify the system manager. If you are not the named addressee you should not disseminate, distribute or copy this e-mail.

NOTICE: This email message is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

# EXHIBIT N

## UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
**United States Patent and Trademark Office**
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 95/002,183 | 09/12/2012 | 7,530,955 B2 | 11080153 | 1972 |

64735        7590        11/26/2012
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 MAIN STREET
FOURTEENTH FLOOR
IRVINE, CA 92614

| EXAMINER |
|---|
| NASSER, ROBERT L |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 11/26/2012 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A  (Rev. 04/07)

| Transmittal of Communication to Third Party Requester *Inter Partes* Reexamination | Control No. 95/002,183 | Patent Under Reexamination 7,530,955 B2 ET AL. | |
|---|---|---|---|
| | Examiner ROBERT NASSER | Art Unit 3992 | |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

┌─ (THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS) ─┐

JOHN S. PRATT, ESQ.
KILPATRICK, TOWNSEND & STOCKTON LLP
1100 PEACHTREE STREET
ATLANTA, GA 30309

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above-identified reexamination prceeding. 37 CFR 1.903.

Prior to the filing of a Notice of Appeal, each time the patent owner responds to this communication, the third party requester of the *inter partes* reexamination may once file written comments within a period of 30 days from the date of service of the patent owner's response. This 30-day time period is statutory (35 U.S.C. 314(b)(2)), and, as such, it <u>cannot</u> be extended. See also 37 CFR 1.947.

If an *ex parte* reexamination has been merged with the *inter partes* reexamination, no responsive submission by any *ex parte* third party requester is permitted.

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of the communication enclosed with this transmittal.

1

| *OFFICE ACTION IN* **INTER PARTES** *REEXAMINATION* | Control No. 95/002,183 | Patent Under Reexamination 7,530,955  B2 ET AL. |
|---|---|---|
| | Examiner ROBERT NASSER | Art Unit 3992 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address. --*

Responsive to the communication(s) filed by:
Patent Owner on _____
Third Party(ies) on _____

**RESPONSE TIMES ARE SET TO EXPIRE AS FOLLOWS:**

*For Patent Owner's Response*:
 2 MONTH(S) from the mailing date of this action. 37 CFR 1.945. EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.956.
*For Third Party Requester's Comments on the Patent Owner Response:*
 30 DAYS from the date of service of any patent owner's response. 37 CFR 1.947. NO EXTENSIONS OF TIME ARE PERMITTED. 35 U.S.C. 314(b)(2).

**All correspondence** relating to this inter partes reexamination proceeding should be directed to the **Central Reexamination Unit** at the mail, FAX, or hand-carry addresses given at the end of this Office action.

This action is not an Action Closing Prosecution under 37 CFR 1.949, nor is it a Right of Appeal Notice under 37 CFR 1.953.

**PART I. THE FOLLOWING ATTACHMENT(S) ARE PART OF THIS ACTION:**

1. ☐ Notice of References Cited by Examiner, PTO-892
2. ☐ Information Disclosure Citation, PTO/SB/08
3. ☐ _____

**PART II.  SUMMARY OF ACTION:**

1a. ☒ Claims 1-7 are subject to reexamination.
1b. ☒ Claims 8-10 are not subject to reexamination.
2. ☐ Claims _____ have been canceled.
3. ☐ Claims _____ are confirmed. [Unamended patent claims]
4. ☐ Claims _____ are patentable. [Amended or new claims]
5. ☒ Claims 1-7 are rejected.
6. ☐ Claims _____ are objected to.
7. ☐ The drawings filed on _____     ☐ are acceptable     ☐ are not acceptable.
8. ☐ The drawing correction request filed on _____ is:     ☐ approved.  ☐ disapproved.
9. ☐ Acknowledgment is made of the claim for priority under 35 U.S.C. 119 (a)-(d). The certified copy has:
      ☐ been received.     ☐ not been received.     ☐ been filed in Application/Control No 95002183.
10. ☐ Other _____

Application/Control Number: 95/002,183                                    Page 2
Art Unit: 3992

# *9Reexamination*

This action addresses claims 1-7 of United States Patent Number 7,530,955 to

Diab et al ("the '955 patent) for which it was determined that Reasonable Likelihood that

the requester would Prevail (RLP) was established by the request for *Inter Partes*

reexamination, filed 9/12/2012.

Reexamination was not requested on claims 8-10 and hence claims 8-10 are

outside of the scope of reexamination.

## Reference Cited In the Request

U.S. Patent No. 6,157,850 titled "Signal Processing Apparatus" to named inventors
Mohamed K Diab, *et al.,* issued December 5, 2000 and filed May 16, 1997 ("the '850
Patent")

U.S. Patent No. 7,215,984 titled "Signal Processing Apparatus" to named inventors
Mohamed K. Diab, *et al.,* issued May 8, 2007 and filed May 4, 2004 ("the '984 Patent")

U.S. Patent No. 7,496,393 titled "Signal Processing Apparatus" to named inventors
Mohamed K. Diab, *et al.,* issued February 24, 2009 and filed September 30, 2003
("The '393 Patent".)

U.S. Patent No. 5,853,364 titled "Method and Apparatus for Estimating Physiological
Parameters using Model-Based Adaptive Filtering" to named inventors Clark R.
Baker, Jr. and Thomas J. Yorkey, issued December 29, 1998 and filed June 7, 1996
("Baker").

International Application Publication WO 98/43071 titled "Method and Apparatus for
Arbitrating to Obtain Best Estimates for Blood Constituent Values and Rejecting
Harmonics" to applicant Nellcor Puritan Bennett Inc. and named inventors Clark R.
Baker, Jr. and Thomas J. Yorkey, published October 1, 1998 and filed March 21, 1997
("PCT '071").

U.S. Patent No. 4,911,167 titled "Method and Apparatus for Detecting Optical Pulses"
to named inventors James E. Corenman, *et al.,* issued March 27, 1990 and filed March
30, 1988 ("Corenman").

Application/Control Number: 95/002,183                                      Page 3
Art Unit: 3992

## Relevant Statutes

The following is a quotation of 35 U.S.C. 103(a) which forms the basis for all

obviousness rejections set forth in this Office action:

> (a) A patent may not be obtained though the invention is not identically disclosed or described as set
> forth in section 102 of this title, if the differences between the subject matter sought to be patented and
> the prior art are such that the subject matter as a whole would have been obvious at the time the
> invention was made to a person having ordinary skill in the art to which said subject matter pertains.
> Patentability shall not be negatived by the manner in which the invention was made.

## Effective Priority Date of the Claims

The '955 patent is a continuation of a series of cases dating back to October 7,

1994.  The requester on pages 8-11 offers an analysis showing the current claims are

only entitled to a priority date of January 30, 2002.  The examiner agrees with the

analysis provided, and incorporates the analysis on pages 8-11 by reference herein.

Specifically, the specification and drawings of the '955 patent do not provide support for

determining pulse rate using two different methods, as claimed.  However, as noted by

requester, the original claims in the '955 patent have the subject matter, and as such,

provide support.  The next case in the chain is 10/062859, filed January 30, 2002.

Again, while the specification and drawings fail to sufficient support the claims of the

'955 application, the original claims in 10/062859 arguably provide the support.  The

next case in the chain is 09/195791.  This application provides insufficient support for

determining pulse rate using two different methods, and as such, the claims 1-7 are not

entitled to priority back to 09/195791.  As such, the claims 1-7 are only entitled to at

Application/Control Number: 95/002,183                                        Page 4
Art Unit: 3992

most a date of January 30, 2002, making both Baker and PCT '071 are available as

prior art.


## Rejections

### Issue 1

**Claims 1-7 are rejected under 35 U.S.C. 102(b) as being anticipated by Baker (adopted).**

The rejection to claims 1-7 was proposed on pages 16-21, 25-31, 46-47, and 50-51 of the request.  The rejection is **adopted** as proposed in the request, and is hereby incorporated by reference with additional clarification.

The clarification is with respect to the rejection of claim 1.  Baker Jr. clearly determines pulse rate based on two different methods, including an adaptive comb filtering (ACF) method, and determines the pulse rate from the method with the highest confidence (see column 7, lines 12-16).  For claim 1, the issue is whether the ACF method is "self optimizing."  The ACF method is spelled out in detail in columns 15 and 16 of Baker.  The request baldly asserts that the method is self-optimizing, but does not explain the assertion in any detail.  However, examining the method in columns 15 and 16, it appears that the ACF method continuously adjusts the error and the coefficients used in the method, or "optimizes" the method for each iteration.  As such, it is the examiner's position that the method is self-optimizing.

Application/Control Number: 95/002,183                                        Page 5
Art Unit: 3992

**Issue 2**

**Claims 1 and 3-7 are rejected on the ground of nonstatutory obviousness-type double patenting as being unpatentable over claims 19 and 26 the '984 Patent in view of Corenman (adopted).**

The rejection to claims 5-7 was proposed on pages 21-25, 27, 28, 38-42, 48-49, and 52-53 of the request.  The rejection is **adopted** as proposed in the request and is hereby incorporated by reference.

**Issue 3**

**Claims 5-7 are rejected under 35 USC 102(b) as being anticipated by PCT '071 (adopted).**

The rejection to claims 5-7 was proposed on pages 31-33, 47, and 51 of the request.  The rejection is **adopted** as proposed in the request and is hereby incorporated by reference.

**Issue 5**

**Claims 5-7 are rejected on the ground of nonstatutory obviousness-type double patenting as being unpatentable over claim 6 of the '850 Patent in view of Corenman (adopted).**

The rejection to claims 5-7 was proposed on pages 36-38, 47-48, and 51-52 of the request.  The rejection is **adopted** as proposed in the request and is hereby incorporated by reference.

Application/Control Number: 95/002,183                                      Page 6
Art Unit: 3992

**Issue 6**

**Claims 5-7 are rejected on the ground of nonstatutory obviousness-type double patenting as being unpatentable over claim 43 of the '393 Patent in view of Corenman (adopted).**

The rejection to claims 5-7 was proposed on pages 43-46, 49-50, and 53-54 of the request.  The rejection is **adopted** as proposed in the request and is hereby incorporated by reference.

Application/Control Number: 95/002,183                                    Page 7
Art Unit: 3992

### *Amendment in Reexamination Proceedings*

Patent Owner is notified that any proposed amendment to the specification

and/or claims in this reexamination proceeding must comply with 37 CFR 1.530(d)-(j),

must be formally presented pursuant to 37 CFR 1.52(a) and (b), and must contain any

fees required by 37 CFR 1.20(c).

In order to ensure full consideration of any amendments, affidavits or

declarations, or other documents as evidence of patentability, such documents must be

submitted in response to this Office action.  Submissions after the next Office action,

which is intended to be an Action Closing Prosecution (ACP), will be governed by 37

CFR 1.116(b) and (d), which will be strictly enforced.


### *Service of Papers*

After filing of a request for inter partes reexamination by a third party requester,

any document filed by either the patent owner or the third party requester must be

served on every other party in the reexamination proceeding in the manner provided in

§ 1.248. Any document must reflect service or the document may be refused

consideration by the Office. The failure of the patent owner or the third party requester

to serve documents may result in their being refused consideration.  See 37 CFR 1.903

Application/Control Number: 95/002,183                                      Page 8
Art Unit: 3992

### Extensions of Time

Extensions of time under 37 CFR 1.136(a) will not be permitted in *inter partes*

reexamination proceedings because the provisions of 37 CFR 1.136 apply only to "an

applicant" and not to parties in a reexamination proceeding. Additionally, 35 U.S.C.

314(c) requires that *inter partes* reexamination proceedings "will be conducted with

special dispatch" (37 CFR 1.937). Patent owner extensions of time in *inter partes*

reexamination proceedings are provided for in 37 CFR 1.956. Extensions of time are not

available for third party requester comments, because a comment period of 30 days

from service of patent owner's response is set by statute. 35 USC 314(b)(3).

### Notification of Concurrent Proceedings

The patent owner is reminded of the continuing responsibility under 37 CFR 1.985 to

apprise the Office of any litigation activity, or other prior or concurrent proceeding,

involving Patent No. 7,530,955 throughout the course of this reexamination proceeding.

The third party requester is also reminded of the ability to similarly apprise the Office of

any such activity or proceeding throughout the course of this reexamination proceeding.

See MPEP § 2686 and 2686.04.

Application/Control Number: 95/002,183                                          Page 9
Art Unit: 3992

**All** correspondence relating to this *inter partes* reexamination proceeding should be directed as follows:

By **U.S. Postal Service Mail** to:

      Mail Stop *Inter Partes* Reexam
      ATTN:  Central Reexamination Unit
      Commissioner for Patents
      P.O. Box 1450
      Alexandria, VA  22313-1450

By FAX to:    (571) 273-9900
            Central Reexamination Unit

By hand to:  Customer Service Window
            Randolph Building
            401 Dulany St.
            Alexandria, VA  22314

By EFS:     Registered users may submit via the electronic filing system EFS-Web, at https://efs.uspto.gov/efile/myportal/efs-registered.

For EFS-Web transmissions, 37 CFR 1.8(a)(1)(i) (C) and (ii) states that correspondence (except for a request for reexamination and a corrected or replacement request for reexamination) will be considered timely filed if (a) it is transmitted via the Office's electronic filing system in accordance with 37 CFR 1.6(a)(4), and (b) includes a certificate of transmission for each piece of correspondence stating the date of transmission, which is prior to the expiration of the set period of time in the Office action.

Any inquiry concerning this communication or earlier communications from the Reexamination Legal Advisor or Examiner, or as to the status of this proceeding, should be directed to the Central Reexamination Unit at telephone number (571) 272-7705.

/Robert L. Nasser Jr/
Robert L. Nasser Jr.
CRU Examiner
AU 3992
(571) 272-4731


/FOF/


/A. J. F./
Andrew J. Fischer
Supervisory Patent Examiner, Art Unit 3992

# EXHIBIT O



UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/012,403 | 07/23/2012 | 6,263,222 B1 | 11080153 | 6079 |

7590          09/25/2012

STEPHEN C. JENSEN
KNOBBE MARTENS OLSON AND BEAR
620 NEWPORT CENTER DRIVE, SIXTEENTH FLOOR
NEWPORT BEACH, CA 92660

| EXAMINER |
|---|
| LIE, ANGELA M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 09/25/2012 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

PTOL-90A (Rev. 04/07)

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

Mayer Brown LLP
1999 K Street, NW
Washington, DC 20006

**MAILED**

SEP 2 5 2012

**CENTRAL REEXAMINATION UNIT**

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/012,403*.

PATENT NO. *6,263,222 B1 E*.

ART UNIT *3992*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

PTOL-465 (Rev.07-04)

| *Order Granting / Denying Request For Ex Parte Reexamination* | Control No. | Patent Under Reexamination |
|---|---|---|
| | 90/012,403 | 6,263,222  B1 E |
| | Examiner | Art Unit |
| | ANGELA M. LIE | 3992 |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed <u>23 July 2012</u> has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments:  a)☐  PTO-892,     b)☒  PTO/SB/08,     c)☐  Other: _____

1. ☒   The request for *ex parte* reexamination is GRANTED.

   RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional):  TWO MONTHS  from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

2. ☐   The request for *ex parte* reexamination is DENIED.

This decision is not appealable (35 U.S.C. 303(c)).  Requester may seek review by petition to the Commissioner under 37 CFR 1.181 within ONE MONTH from the mailing date of this communication (37 CFR 1.515(c)).  **EXTENSION OF TIME TO FILE SUCH A PETITION UNDER 37 CFR 1.181  ARE AVAILABLE ONLY BY PETITION TO SUSPEND OR WAIVE THE  REGULATIONS UNDER 37 CFR 1.183.**

In due course, a refund under 37 CFR 1.26 ( c ) will be made to requester:

   a) ☐  by Treasury check or,

   b) ☐  by credit to Deposit Account No. _____,  or

   c) ☐  by credit to a credit card account, unless otherwise notified (35 U.S.C. 303(c)).

| /ANGELA M LIE/ | | |
|---|---|---|
| Primary Examiner, Art Unit 3992 | | |

cc:Requester ( if third party requester )

Application/Control Number: 90/012,403                                    Page 2

Art Unit: 3992

### *Reexamination*

Claims 17 and 18 are pending in the Request for Reexamination dated July 23rd,

2012 (See PTO-1465).

### *DECISION ON REQUEST FOR REEXAMINATION*

A substantial new question of patentability affecting claims 17 and 18 (See PTO-

1465) of US Patent 6,263,222 to Diab et al. (the '222 patent, hereafter) is raised by the

request for ex parte reexamination.

### *Table of Contents*

The References ............................................................................2

Prosecution History ...................................................................2

Old Art viewed in the new light ................................................4

Substantial New Question of Patentability .....................................5

        A. Hall ...................................................................5

        B. Polson ...............................................................7

        C. Isaacson ............................................................8

        D. Corenman .........................................................10

        E. Sperinde ...........................................................11

        F. Flower ..............................................................13

NOTICE RE PATENT OWNER'S CORRESPONDENCE ADDRESS .....15

Conclusion ...............................................................................16

Application/Control Number: 90/012,403                                    Page 3
Art Unit: 3992

### The References

(1) Hall; US Patent No. 4,955,379; Date Filed: August 8, 1988; Date Published:
September 11, 1990.

(2) Polson, et al; US Patent No. 5,190,038; Date Filed: November 1, 1989; Date
Published March 2, 1993 (hereinafter Polson).

(3) Isaacson, et al; US Patent No. Re. 33,643; Date Filed: April 10, 1990; Date
Published: July 23, 1991 (hereinafter Isaacson).

(4) Corenman, et al; US Patent No. 4,911,167; Date Filed: March 30, 1988; Date
Published: March 27, 1990 (hereinafter Corenman).

(5) Sperinde; US Patent No. 4,623,248; Date Filed: February 16, 1983; Date
Published: November 18, 1986.

(6) Flower, et al; US Patent No. 4,863,265; Date Filed: October 16, 1997; Date
Published: September 5, 1989 (hereinafter Flower).

(7) Blitt; Monitoring in Anesthesia and Critical Care Medicine (2nd edition); Date
Published: 1990.

### Prosecution History

On March 20th, 2000, the Applicant filed claims along with remarks in response to
the Examiner's non-final rejection in which he rejected claims 39-44, 46, 47, 49, 50, 56-
61 and 64 under 35 U.S.C. 112 first paragraph because specification was silent about

Application/Control Number: 90/012,403                                          Page 4
Art Unit: 3992

term "tracks". In addition the Examiner has also rejected claims 39-44, 46, 47, 49, 50,

55 and 57-62 under 35 U.S.C. 112 second paragraph because few phrases in the

above listed claims appeared unclear, hence indefinite. Lastly, the Examiner rejected

claims 39-56 and 62-64 under 35 U.S.C. 102(e) as being anticipated by Robinson et al

(US Patent No. 5,494,032).

   In the amendment filed on March 20th, 2000, the Applicant added new claims 65-

78. Claims 48-50 and 56-61 have been canceled. Claims 51, 58 and 60 have been

amended to incorporate the limitations of claim 56.

   In response to this amendment, the Examiner again rejected claims 39-44, 51-55

and 62-71 (since claims 65-78 have been canceled, they should not be included in this

rejection) under 35 U.S.C. 112 second paragraph. Then the Examiner rejected claims

39-41 and 66-70 under 35 U.S.C. 102(b) as being anticipated by Frick (US Patent No.

4,824,242) and indicated that claims 42-44, 51-55, 62-65 and would be allowed if 35

U.S.C. 112 issues would be overcome and claims 45-47 and 72-78 were allowed.

   The Applicant responded with an amendment, wherein claims rejected under

102(b) have been canceled, claims objected to allowable but rejected under 112 second

have been amended to cure the deficiencies pointed out by the Examiner.

Consequently, the application has been placed in the condition for allowance.

   Although, the Examiner did not state clear reason for allowance, the content of

rejected claim 39 and allowed claim 72 (later renumbered to claim 17) is being

compared herein, to identify the allowable subject matter. It appears that the part that

distinguished the two claims, and triggered the allowance, reads as follows:

Application/Control Number: 90/012,403                                    Page 5
Art Unit: 3992

a signal processor responsive to the first and second intensity

signals to **calculate arterial oxygen saturation without**

**significant interference in the calculation from the motion**

**induced noise portion of the first and second intensity signals**,

as recited in claim 72.

The reexamination request is directed to claims 17 and 18, which were referred

to as claims 72 and 73 in the prosecution.


### *Old Art viewed in the new light*

Although, Corenman, Hall, Flower and Isaacson have been cited by the Patent

Owner during the prosecution of the original patent '222, there is no indication in the file

history that arguments submitted by the requestor have been previously considered by

the Examiner.

The fact that Corenman, Hall, Flower and Isaacson were cited on an IDS and

initialed by the examiner does not alone preclude reexamination based on that

reference.  MPEP § 2258.01 elaborates:

> The Office cannot presume that a prior art reference was previously
> relied upon or discussed in a prior Office proceeding if there is no basis in the
> written record to so conclude other than the examiner's initials or a check mark
> on a form PTO/SB/08A or 08B, or PTO/SB/42 (or on a form having a format
> equivalent to one of these forms) submitted with an information disclosure
> statement. Thus, any specific discussion of prior art must appear on the record of
> a prior related Office proceeding. Generalized statements such as the prior art is
> "cited to show the state of the art," "cited to show the background of the
> invention," or "cited of interest" would not preclude reexamination. The Office
> may conduct reexamination based on prior art that was cited but whose
> relevance to patentability of the claims was not discussed in any prior related
> Office proceeding.  MPEP § 2258.01.

Application/Control Number: 90/012,403                                      Page 6
Art Unit: 3992

Similarly, the fact that Corenman, Hall, Flower and Isaacson were cited on an

IDS and initialed by the examiner during prosecution of the '222 patent, does not alone

preclude reexamination based on those references.

### *Substantial New Question of Patentability*

**A. Hall <u>raises</u> a substantial new question of patentability as to claims 17
and 18.**

*(See Request Pages 10-16 and 37)*

<u>**With respect to the independent claims 17 and 18, Hall raises a**</u>

<u>**substantial new question of patentability because Hall teaches the**</u>

<u>**following new, non-cumulative technical feature that may raise a**</u>

<u>**substantial new question of patentability:**</u>

```
    17. A physiological monitor that computes arterial oxygen
saturation in tissue material having arterial and venous blood,
the physiological monitor comprising:

    a light emitter which emits light of at least first and
second wavelengths;

    a light detector responsive to light from said light emitter
which has passed through body tissue having arterial and venous
blood, said light detector providing at least first and second
intensity signals associated with said at least first and second
wavelengths, each of said first and second intensity signals
having, during motion of the tissue, at least a first signal
portion indicative of arterial blood and a second signal portion
indicative of motion induced noise; and
```

Application/Control Number: 90/012,403                                        Page 7

Art Unit: 3992

a signal processor responsive to the **first and second [1]**
**intensity signals to calculate arterial oxygen saturation [2]**
**without significant interference in the calculation from the**
**motion induced noise portion of the first and second intensity**
**signals [3]**.

**18.** The physiological monitor of claim 17, wherein said
motion induced noise is indicative of the attenuation due to
venous blood in the tissue during motion.

Hall's reference discloses the above features which may raise substantial
new question of patentability. The limitations [1] is taught in column 1, lines 22-25
wherein first wavelength given out by first LED corresponds to the first signal and
the second wavelength is associated with the second signal. Also as illustrated in
figure 5, red AC and ir (i.e. infrared) AC are fed into the system and then filtered
to remove unwanted noise, [2] column 1, lines 6-10, wherein pulse oximeters
function by measuring how much of the hemoglobin in blood is carrying oxygen
(i.e. oxygen saturation), column 3, line 37, [3] column 2, lines 50-53 and column
3, lines 32-39.

In regards to the dependent claim 18, by the virtue of its dependency on
claims 17, Hall raises a substantial new question of patentability as described
above.

Therefore, a reasonable examiner would find Hall's teachings to be
important in determining the patentability of claims 17 and 18 of the '222 patent.
The teachings of  Hall discussed herein are not cumulative to any written
discussion on the record of the teachings of the prior art, were not previously

Application/Control Number: 90/012,403                                          Page 8

Art Unit: 3992

considered nor addressed during a prior examination, and the same question

was not the subject of a final holding of invalidity in the Federal Courts.


**B. Polson <u>raises</u> a substantial new question of patentability as to claims 17 and 18.**

*(See Request Pages 16-20 and 37-38)*

<u>With respect to the independent claims 17 and 18, Polson raises a</u>

<u>substantial new question of patentability because Polson teaches the</u>

<u>following new, non-cumulative technical feature that may raise a</u>

<u>substantial new question of patentability:</u>

**17.** A physiological monitor that computes arterial oxygen saturation in tissue material having arterial and venous blood, the physiological monitor comprising:

a light emitter which emits light of at least first and second wavelengths;

a light detector responsive to light from said light emitter which has passed through body tissue having arterial and venous blood, said light detector providing at least first and second intensity signals associated with said at least first and second wavelengths, each of said first and second intensity signals having, during motion of the tissue, at least a first signal portion indicative of arterial blood and a second signal portion indicative of motion induced noise; and

a signal processor responsive to the <u>**first and second [1]**</u> <u>**intensity signals to calculate arterial oxygen saturation [2]**</u> <u>**without significant interference in the calculation from the**</u> <u>**motion induced noise portion of the first and second intensity**</u> <u>**signals [3]**</u>.

Application/Control Number: 90/012,403                                      Page 9
Art Unit: 3992

   **18.** The physiological monitor of claim 17, wherein said
motion induced noise is indicative of the attenuation due to
venous blood in the tissue during motion.

   Polson's reference discloses the above features which may raise

substantial new question of patentability. The limitations [1] is taught in column 2,

lines 15-17, wherein red and infrared correspond to first and second signals

respectively ,[2] is taught in column 3, lines 40-49, [3] column 14, lines 39-45.

   In regards to the dependent claim 18, by the virtue of its dependency on

claims 17, Polson raises a substantial new question of patentability as described

above.

   Therefore, a reasonable examiner would find Polson's teachings to be

important in determining the patentability of claims 17 and 18 of the '222 patent.

The teachings of  Polson discussed herein are not cumulative to any written

discussion on the record of the teachings of the prior art, were not previously

considered nor addressed during a prior examination, and the same question

was not the subject of a final holding of invalidity in the Federal Courts.


   **C. Isaacson <u>raises</u> a substantial new question of patentability as to claims
17 and 18.**


   *(See Request Pages 21-23 and 38)*

   **<u>With respect to the independent claims 17 and 18, Isaacson raises a</u>**

**<u>substantial new question of patentability because Isaascson teaches the</u>**

Application/Control Number: 90/012,403                    Page 10

Art Unit: 3992

**following new, non-cumulative technical feature that may raise a**

**substantial new question of patentability:**

**17.** A physiological monitor that computes arterial oxygen saturation in tissue material having arterial and venous blood, the physiological monitor comprising:

a light emitter which emits light of at least first and second wavelengths;

a light detector responsive to light from said light emitter which has passed through body tissue having arterial and venous blood, said light detector providing at least first and second intensity signals associated with said at least first and second wavelengths, each of said first and second intensity signals having, during motion of the tissue, at least a first signal portion indicative of arterial blood and a second signal portion indicative of motion induced noise; and

a signal processor responsive to the **first and second [1] intensity signals to calculate arterial oxygen saturation [2] without significant interference in the calculation from the motion induced noise portion of the first and second intensity signals [3]**.

**18.** The physiological monitor of claim 17, wherein said motion induced noise is indicative of the attenuation due to venous blood in the tissue during motion.

Isaacson's reference discloses the above features which may raise substantial new question of patentability. The limitations [1] is taught column 3, lines 33-37, wherein red and infrared light corresponds to first and second signals respectively, [2] is taught in column 3, lines 31-33, [3] column 5, lines 3-8.

In regards to the dependent claim 18, by the virtue of its dependency on claims 17, Isaacson raises a substantial new question of patentability as described above.

Therefore, a reasonable examiner would find Isaacson's teachings to be

important in determining the patentability of claims 17 and 18 of the '222 patent.

The teachings of Issacson discussed herein are not cumulative to any written

discussion on the record of the teachings of the prior art, were not previously

considered nor addressed during a prior examination, and the same question

was not the subject of a final holding of invalidity in the Federal Courts.

**D. Corenman <u>raises</u> a substantial new question of patentability as to claims 17 and 18.**

*(See Request Pages 23-27 and 38-39)*

<u>**With respect to the independent claims 17 and 18, Corenman raises a**</u>

<u>**substantial new question of patentability because Corenman teaches the**</u>

<u>**following new, non-cumulative technical feature that may raise a**</u>

<u>**substantial new question of patentability:**</u>

**17.** A physiological monitor that computes arterial oxygen
saturation in tissue material having arterial and venous blood,
the physiological monitor comprising:

a light emitter which emits light of at least first and
second wavelengths;

a light detector responsive to light from said light emitter
which has passed through body tissue having arterial and venous
blood, said light detector providing at least first and second
intensity signals associated with said at least first and second
wavelengths, each of said first and second intensity signals
having, during motion of the tissue, at least a first signal
portion indicative of arterial blood and a second signal portion
indicative of motion induced noise; and

Application/Control Number: 90/012,403                                    Page 12

Art Unit: 3992

   a signal processor responsive to the **first and second [1]**
**intensity signals to calculate arterial oxygen saturation [2]**
**without significant interference in the calculation from the**
**motion induced noise portion of the first and second intensity**
**signals [3]**.

   **18.** The physiological monitor of claim 17, wherein said
motion induced noise is indicative of the attenuation due to
venous blood in the tissue during motion.

        Corenman's reference discloses the above features which may raise

substantial new question of patentability. The limitations [1] is taught in column 5,

line 67 to column 6, line 6), wherein red and infrared correspond to first and

second signals respectively ,[2] is taught in column 6, lines 7-12, [3] see column

5, lines 21-25 and column 7, lines 26-39.

        In regards to the dependent claim 18, by the virtue of its dependency on

claims 17, Corenman raises a substantial new question of patentability as

described above.

        Therefore, a reasonable examiner would find Corenman's teachings to be

important in determining the patentability of claims 17 and 18 of the '222 patent.

The teachings of  Corenman discussed herein are not cumulative to any written

discussion on the record of the teachings of the prior art, were not previously

considered nor addressed during a prior examination, and the same question

was not the subject of a final holding of invalidity in the Federal Courts.


    **E. Sperinde _raises_ a substantial new question of patentability as to claims
17 and 18.**

Application/Control Number: 90/012,403                                    Page 13
Art Unit: 3992

*(See Request Pages 27-29 and 39)*

## With respect to the independent claims 17 and 18, Sperinde raises a substantial new question of patentability because Sperinde teaches the following new, non-cumulative technical feature that may raise a substantial new question of patentability:

**17.** A physiological monitor that computes arterial oxygen saturation in tissue material having arterial and venous blood, the physiological monitor comprising:

a light emitter which emits light of at least first and second wavelengths;

a light detector responsive to light from said light emitter which has passed through body tissue having arterial and venous blood, said light detector providing at least first and second intensity signals associated with said at least first and second wavelengths, each of said first and second intensity signals having, during motion of the tissue, at least a first signal portion indicative of arterial blood and a second signal portion indicative of motion induced noise; and

**a signal processor responsive to the first and second intensity signals [1] to calculate arterial oxygen saturation [2] without significant interference in the calculation from the motion induced noise portion of the first and second intensity signals [3].**

**18.** The physiological monitor of claim 17, wherein said motion induced noise is indicative of the attenuation due to venous blood in the tissue during motion.

Sperinde's reference discloses the above features which may raise

substantial new question of patentability. The limitations [1] is taught in column 8,

lines 43-56, wherein first and second wavelengths correspond to first and second

Application/Control Number: 90/012,403                                    Page 14
Art Unit: 3992

signals respectively ,[2] is taught in column 5, lines 33-37, [3] see column 2, lines

52-56 and column  5, lines 33-45.

In regards to the dependent claim 18, by the virtue of its dependency on

claims 17, Sperinde raises a substantial new question of patentability as

described above.

Therefore, a reasonable examiner would find Sperinde's teachings to be

important in determining the patentability of claims 17 and 18 of the '222 patent.

The teachings of Sperinde discussed herein are not cumulative to any written

discussion on the record of the teachings of the prior art, were not previously

considered nor addressed during a prior examination, and the same question

was not the subject of a final holding of invalidity in the Federal Courts.


**F.  Flower <u>raises</u> a substantial new question of patentability as to claims 17
and 18.**

*(See Request Pages 29-35 and 39-40)*

<u>With respect to the independent claims 17 and 18, Flower raises a</u>

<u>substantial new question of patentability because Flower teaches the</u>

<u>following new, non-cumulative technical feature that may raise a</u>

<u>substantial new question of patentability:</u>

```
    17. A physiological monitor that computes arterial oxygen
saturation in tissue material having arterial and venous blood,
the physiological monitor comprising:
```

Application/Control Number: 90/012,403　　　　　　　　　　　　Page 15
Art Unit: 3992

a light emitter which emits light of at least first and
second wavelengths;

a light detector responsive to light from said light emitter
which has passed through body tissue having arterial and venous
blood, said light detector providing at least first and second
intensity signals associated with said at least first and second
wavelengths, each of said first and second intensity signals
having, during motion of the tissue, at least a first signal
portion indicative of arterial blood and a second signal portion
indicative of motion induced noise; and

a signal processor responsive to the **first and second [1]
intensity signals to calculate arterial oxygen saturation [2]
without significant interference in the calculation from the
motion induced noise portion of the first and second intensity
signals [3]**.

**18.** The physiological monitor of claim 17, wherein said
motion induced noise is indicative of the attenuation due to
venous blood in the tissue during motion.

Flower's reference discloses the above features which may raise

substantial new question of patentability. The limitations [1] is taught in column 3,

lines 65-68, wherein red and infrared wavelengths could correspond to first and

second signals respectively ,[2] is taught in column 1, lines 64-68, [3] column 6,

lines 19-52.

In regards to the dependent claim 18, by the virtue of its dependency on

claims 17, Flower raises a substantial new question of patentability as described

above.

Therefore, a reasonable examiner would find Flower's teachings to be

important in determining the patentability of claims 17 and 18 of the '222 patent.

The teachings of Flower discussed herein are not cumulative to any written

Application/Control Number: 90/012,403                     Page 16
Art Unit: 3992

discussion on the record of the teachings of the prior art, were not previously

considered nor addressed during a prior examination, and the same question

was not the subject of a final holding of invalidity in the Federal Courts.


### NOTICE RE PATENT OWNER'S CORRESPONDENCE ADDRESS

Effective May 16, 2007, 37 CFR 1.33(c) has been revised to provide that: The

Patent owner's correspondence address for all communications in an ex parte

reexamination or an **inter partes** reexamination is designated as the correspondence

address of the patent.

Revisions and Technical Corrections Affecting Requirements for Ex Parte

and Inter Partes Reexamination, 72 FR 18892 (April, 16, 2007) (Final Rule)

**The correspondence address for any pending reexamination proceeding
not having the same correspondence address as that of the patent is, by way of
this revision to 37 CFR 1.33(c), <u>automatically changed to that of the patent file</u> as
of the effective date.**

This change is effective for any reexamination proceeding which is pending

before the Office as of May 16, 2007, <u>including the present reexamination proceeding,</u>

and to any reexamination proceeding which is filed after that date.

Parties are to take this change into account when filing papers, and direct

communications accordingly.

In the event the patent owner's correspondence address listed in the papers

(record) for the present proceeding is different from the correspondence address of the

patent, it is strongly encouraged that the patent owner affirmatively file a Notification of

Change of Correspondence Address in the reexamination proceeding and/or the patent

(depending on which address patent owner desires), to conform the address of the

proceeding with that of the patent and to clarify the record as to which address should

be used for correspondence.

Telephone Numbers for reexamination inquiries:

| | |
|---|---|
| Reexamination | (571) 272-7703 |
| Central Reexam Unit (CRU) | (571) 272-7705 |
| Reexamination Facisimile Transmission No. | (571) 273-9900 |

### Conclusion

Extensions of time under 37 CFR 1.136(a) will not be permitted in these

proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and

not to parties in a reexamination proceeding. Additionally, 35 U.S.C. 305 requires that

reexamination proceedings "will be conducted with special dispatch" (37 CFR 1.550(a)).

Extension of time in reexamination proceedings are provided for in 37 CFR 1.550(c).

After the filing of a request for reexamination by a third party requester, any document

filed by either the patent owner of the third party requester must be served on the other

party (or parties where two or more third-party-requester proceedings are merged) in

the reexamination proceeding in the manner provided in 37 CFR 1.248. See 37 CFR

1.550(f).

Application/Control Number: 90/012,403                                    Page 18
Art Unit: 3992

The patent owner is reminded of the continued responsibility under 37 CFR

1.565(a) to apprise the Office of any litigation activity, or other prior or concurrent

proceeding, throughout the course of this reexamination proceeding. The third party

requester is also reminded of the ability to similarly apprise the Office of any such

activity or proceeding throughout the course of this reexamination proceeding. See

MPEP § 2207, 2282 and 2286.

**All correspondence relating to this *ex parte* reexamination proceeding**

**should be directed:**

By EFS-Web: Registered Users may submit correspondence via EFS-Web, at
                https://efs.uspto.gov/efile/myportal/efs-registered.

By Mail to:    Mail Stop *Ex Parte* Reexam
                Central Reexamination Unit
                Commissioner for Patents
                United States Patent & Trademark Office
                P.O. Box 1450
                Alexandria, VA 22313-1450

By FAX to:     (571) 273-9900
                Central Reexamination Unit

By hand:       Customer Service Window
                Randolph Building
                401 Dulany Street
                Alexandria, VA 22314


EFS-Web offers the benefit of quick submission to the particular area of the

Office that needs to act on the correspondence.  Also, EFS-Web submissions are "soft-

scanned" (i.e., electronically uploaded) directly into the official file for the reexamination

Application/Control Number: 90/012,403                    Page 19
Art Unit: 3992

proceeding, which offers parties the opportunity to review the content of their

submission after the "soft scanning" process is complete.


Any inquiry concerning this communication should be directed to the Central

Reexamination Unit at telephone number 571-272-7705.


/ANGELA M LIE/

Primary Examiner, Art Unit 3992


Conferees:

/Luke S. Wassum/
Primary Examiner, Art Unit 3992

/Sudhanshu C Pathak/
Supervisory Patent Examiner, Art Unit 3992

PTO/SB/08a (07-09)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Substitute for form 1449/PTO | Complete if Known | |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** *(Use as many sheets as necessary)* | Application Number | 90/012403 |
| | Filing Date | 7/25/2012 |
| | First Named Inventor | Mohamed K. Diab |
| | Art Unit | 3992 |
| | Examiner Name | Angela M. Lie |
| Sheet 1 of 2 | Attorney Docket Number | 110801‑‑ |

### U. S. PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Document Number<br>Number-Kind Code[2] (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages or Relevant Figures Appear |
|---|---|---|---|---|---|
| A.M.L | 1 | US- 6,263,222 | 07/17/2001 | Mohamed K. Diab | |
| | 3 | US- 4,911,167 | 03/27/1990 | James E. Corenman | |
| | 4 | US- 4,623,248 | 11/18/1986 | John M. Sperinde | |
| | 5 | US- 4,955,379 | 09/11/1990 | Peter R. Hall | |
| | 6 | US- 5,190,038 | 03/02/1993 | Michael J. R. Polson | |
| | 7 | US- Re. 33,643 | 07/23/1991 | Phillip O. Isaacson | |
| | 9 | US- 4,863,265 | 10/16/1997 | Ronald J. Flower | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |
| | | US- | | | |

### FOREIGN PATENT DOCUMENTS

| Examiner Initials* | Cite No.[1] | Foreign Patent Document<br>Country Code[3] Number[4] Kind Code[5] (if known) | Publication Date MM-DD-YYYY | Name of Patentee or Applicant of Cited Document | Pages, Columns, Lines, Where Relevant Passages Or Relevant Figures Appear | T[6] |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

| Examiner Signature | /Angela M. Lie/ | Date Considered | 9/20/2012 |
|---|---|---|---|

*EXAMINER: In....her or not citation is in conformance with MPEP 609. Draw line through cit....considered. Include copy of this form with next communication to applicant. [1]Applicant's unique citation designation number (optional). [2]See Kinds Codes of USPTO Patent Documents at www.uspto.gov or MPEP 901.04. [3]Enter Office that issued the document, by the two-letter code (WIPO Standard ST.3). [4]For Japanese patent documents, the indication of the year of the reign of the Emperor must precede the serial number of the patent document. [5]Kind of document by the appropriate symbols as indicated on the document under WIPO Standard ST.16 if possible. [6]Applicant is to place a check mark here if English language Translation is attached.
This collection of information is required by 37 CFR 1.97 and 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 2 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.
If you need assistance in completing the form, call 1-800-PTO-9199 (1-800-786-9199) and select option 2.

PTO/SB/08b (07-09)
Approved for use through 07/31/2012. OMB 0651-0031
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it contains a valid OMB control number.

| Substitute for form 1449/PTO | Complete if Known | |
|---|---|---|
| **INFORMATION DISCLOSURE STATEMENT BY APPLICANT** *(Use as many sheets as necessary)* | Application Number | 08/943,511 |
| | Filing Date | October 6, 1997 |
| | First Named Inventor | Mohamed K. Diab |
| | Art Unit | |
| | Examiner Name | |
| Sheet 2 of 2 | Attorney Docket Number | 11080153 |

**NON PATENT LITERATURE DOCUMENTS**

| Examiner Initials* | Cite No.[1] | Include name of the author (in CAPITAL LETTERS), title of the article (when appropriate), title of the item (book, magazine, journal, serial, symposium, catalog, etc.), date, page(s), volume-issue number(s), publisher, city and/or country where published. | T[2] |
|---|---|---|---|
| A.M.L. | 8 | Blitt, Casey D., Monitoring in Anesthesia and Critical Case Medicine, (2d ed. 1990) | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

| Examiner Signature | Angela M. Lie | Date Considered | 9/20/2012 |
|---|---|---|---|

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609. Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.
1 Applicant's unique citation designation number (optional). 2 Applicant is to place a check mark here if English language Translation is attached.
This collection of information is required by 37 CFR 1.98. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 2 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 (1-800-786-9199) and select option 2.*

# EXHIBIT P

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/012,409 | 08/17/2012 | 6699194 | 11080153.2 | 1002 |

64735         7590         10/25/2012
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 MAIN STREET
FOURTEENTH FLOOR
IRVINE, CA 92614

| EXAMINER |
|---|
| GAGLIARDI, ALBERT J |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 10/25/2012 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

Mayer Brown LLP

1999 K Street NW

Office 1170

Washington, DC  20006

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/012,409*.

PATENT NO. *6699194*.

ART UNIT *3992*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

| *Order Granting / Denying Request For Ex Parte Reexamination* | Control No. | Patent Under Reexamination |
|---|---|---|
| | 90/012,409 | 6699194 |
| | Examiner | Art Unit |
| | Albert J. Gagliardi | 3992 |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed <u>17 August 2012</u> has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments: a)☐ PTO-892,        b)☒ PTO/SB/08,        c)☐ Other: _____

1. ☒   The request for *ex parte* reexamination is GRANTED.

RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional):  TWO MONTHS  from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted

2. ☐   The request for *ex parte* reexamination is DENIED.

This decision is not appealable (35 U.S.C. 303(c)).  Requester may seek review by petition to the Commissioner under 37 CFR 1.181 within ONE MONTH from the mailing date of this communication (37 CFR 1.515(c)). **EXTENSION OF TIME TO FILE SUCH A PETITION UNDER 37 CFR 1.181  ARE AVAILABLE ONLY BY PETITION TO SUSPEND OR WAIVE THE  REGULATIONS UNDER 37 CFR 1.183.**

In due course, a refund under 37 CFR 1.26 ( c ) will be made to requester:

a) ☐  by Treasury check or,

b) ☐  by credit to Deposit Account No. _____,  or

c) ☐  by credit to a credit card account, unless otherwise notified (35 U.S.C. 303(c)).

| /Albert  J Gagliardi/ Examiner, Art Unit 3992 | | |
|---|---|---|

cc:Requester ( if third party requester )

Application/Control Number: 90/012,409                                           Page 2

Art Unit: 3992

## DECISION GRANTING EX PARTE REEXAMINATION

*Decision on Request*

A substantial new question of patentability affecting claims 1-6, 8, 10-12, and 14-

22 of US Patent No. 6,669,194 to Diab *et al.* (hereafter *Diab* is raised by the Third Party

request for *ex parte* reexamination.

*Principal References Cited in the Request*

Seiko Epson Corp. – EP 645 117 (*Seiko or Seiko '117*)

Edger, Jr. *et al.* -- US 6,519,486 (*Edger*)

Secker *et al.* -- US 5,442,940 (*Secker*)

*Issue(s) Raised by Request*

Issue 1

The requester alleges (p. 12) that *Seiko '117* raises a substantial new question of

patentability regarding at least claims 1-6, 8, 10, 12, 15, and 17-22.

Issue 2

The requester alleges (p. 12) that that *Edger* raises a substantial new question of

patentability regarding at least claims 1-6, 8, 10-12 and 14-22.

Issue 3

The requester alleges (p. 13) that that *Seiko '117* in view of *Secker* raises a

substantial new question of patentability regarding at least claims 11, 14 and 16.

Application/Control Number: 90/012,409                                      Page 3

Art Unit: 3992

### The Diab Patent

The patent is generally directed to devices and methods for analyzing a spectral-domain dataset to determine a pulse rate.  Claim 1 is representative:

A physiological monitor for monitoring a pulserate of a living being, said monitor comprising a signal processor configured to:

transform a time-domain plethysmograph dataset into a spectral-domain dataset;

identify three or more spectral peaks at non-zero frequencies in said spectral domain dataset; and

sort said three or more spectral peaks according to one or more rules into one or more spectral peaks corresponding to a fundamental frequency and one or more harmonics of said fundamental frequency, and

estimate a pulserate from said fundamental frequency and said one or more harmonics.

### Pertinent Prosecution History

Claims 1-22 are the current claims in the *Diab* patent which issued March 2, 2004 from application 09/547,588 filed on April 11, 2000, which is a continuation of application 09/081,539 filed on May 19, 1998, now Patent No. 6,067,462, which is a division of application 08/834,194 file don April 14, 1997, now Patent No. 6,002,952.

Application/Control Number: 90/012,409                                          Page 4
Art Unit: 3992

Of the claims for which reexamination is requested, claims 1, 3, 4, 5 8, 10, 14, 15 16 and 17 are independent claims.

As originally filed, the *Diab* patent application included 30 claims wherein all but claim 1 were cancelled by a preliminary amendment. In a first Office Action (1/15/2002) the single claim was variously rejected under 35 U.S.C. §101 for double patenting; 35 U.S.C. § 112 2nd paragraph as indefinite; and 35 U.S.C. § 102 as anticipated by Albrecht *et al*.

In a subsequent Continued Prosecution Application (11/1/2002), claim 1 was cancelled and new claims 31-52 were added.

In a Non-Final rejection (12/10/2002), claims 31-34, 37-39 and 45 were rejected as being anticipated by Baker Jr. *et al.* – US 5,853,364 (*Baker*); and claims 35, 36, 40-44, 46-49 and 51-52 were and indicated as allowed or as containing allowable subject matter.

·Following an Amendment and Response (3/11/2003), which included arguments against the rejections in view of *Baker*, a second Non-Final rejection (5/16/2003) was issued wherein claims 31-33, 37-39 and 45 were rejected as being anticipated by Corenman *et al.* – US 4,911,167 (*Corenman*); and claims 34-36, 40-44, 46-49 and 51-52 were and indicated as allowed or as containing allowable subject matter.

In response to the second Non-Final rejection, applicant submitted an Amendment and Response (9/22/2003) which included amendments to some of the claims and arguments against the rejections in view of *Corenman*.

Subsequent to the response, a Notice of Allowance (10/20/2003) including an examiner's amendment was issued indicating each of claims 31-52 (claims 1-22 as renumbered) as allowed.

Application/Control Number: 90/012,409                                      Page 5
Art Unit: 3992

### *Substantial New Question of Patentability*

The basis for the allowability of the various claims of the *Diab* patent claims can generally be found in the examiner's Non-Final Action (12/10/2002) and applicant's Remarks (3/11/2003). While it is noted that many of the various independent and dependent claims were each generally considered allowable on the basis of one of more slight variations in the specific manner [i.e., rules] in which spectral peaks of a spectral domain dataset derived from a time-domain plethysmograph dataset [e.g., arterial blood pulse signal] are identified, sorted or classified, it is considered a new prior art reference or combination of references that teaches or suggests an apparatus or method for determining a pulse rate from spectral domain analysis of a plethysmograph signal, particularly a signal produced on the basis of light of a first and second frequency transmitted or reflected through a portion of a living being, which generally teaches the critical elements of identifying a plurality of spectral peaks in in the spectral domain dataset, and sorting or classifying the peaks according to a predetermined set of rules, wherein the rules correspond to one of more of the specific rules, or an obvious variation thereof, as recited in the various claims would be sufficient to raise a substantial new question of patentability.

### *Priority*

Requester has asserted (Request at pages 9-12) that the full subject matter of at least claims 1-6, 8, 10, 11, 14-22 (added by an amendment on July 11, 2002) are not supported by the application as originally filed on April 11, 2000 and therefore are not entitled to a filing date earlier than July 11, 2002.

Application/Control Number: 90/012,409                                         Page 6
Art Unit: 3992

The issue of whether claims are supported by the original disclosure is an issue under 35 U.S.C. 112, which is outside the scope of a reexamination proceeding except to the extent that it relates to matter added or deleted *in the reexamination* proceeding (see MPEP 2258 and 37 C.F.R. 1.552).

Despite the limited scope of *ex parte* reexamination, rejections may be made on the basis of intervening patents or printed publications where the patent claims under reexamination are entitled only to the filing date of the patent and are not supported by an earlier foreign or United States patent application whose filing date is claimed. For example, under 35 U.S.C. 120, the effective date of these claims would be the filing date of the application which resulted in the patent. Intervening patents or printed publications are available as prior art under *In re Ruscetta*, 255 F.2d 687, 118 USPQ 101 (CCPA 1958), and *In re van Langenhoven*, 458 F.2d 132, 173 USPQ 426 (CCPA 1972). See also MPEP § 201.11 and MPEP 2258.I.C.

In this case, the 6,699,194 *Diab* patent does claim priority as a continuation of application 09/081,539 filed on May 19, 1998. It is further noted that the disclosure of the 6,669,194 *Diab* patent and the parent application appear to be substantially identical. As such, it is considered that Requester's arguments (pages 9-12) with regard to the disclosure of the 6,699,194 *Diab* patent are equally applicable to the disclosure of the parent 09/081,539 application. Such arguments, incorporated herein by reference, are considered sufficient to establish a substantial new question with regard to the issue of whether the subject matter of at least claims 1-6, 8, 10, 11, and 14-22 is fully supported by the parent 09/081,539 application. As such, the effective priority date of at least

claims 1-6, 8, 10, 11, and 14-22 is taken to be April 11, 2000 (the filing date of the *Diab*

patent application).

### Detailed Analysis

Issue 1 – *Seiko*

The *Seiko* reference is new prior art.    *Seiko* teaches, among other things, an

apparatus for detecting blood pulse waves by analyzing a light signal transmitted through

or reflected from a living body wherein the determination is made on the basis of

relationships between the ratios of the amplitudes of frequency components (col. 1 line

48 to col 2, line 4).  In operation, the received time-domain data signals are converted to

frequency domain signals by Fourier transformation circuit (FFT-3) and the magnitudes

and ratios of major lines in the spectral data are compared in order to determine which

frequency corresponds to pulses and which correspond to body motion (col. 14, lines 6-

30).  More specifically, *Seiko* discloses

the critical elements of identifying

various spectral peaks (e.g., $S_1$, $S_2$, and

$M_1$ of Figs. 10(a) and 10(b)) wherein

the peaks are sorted into one or more

categories according to a set of rules to

determine at least a fundamental

frequency corresponding to arterial



blood pulses (col 14, lines 25-36).  Upon determining the fundamental frequency related

Application/Control Number: 90/012,409                                    Page 8
Art Unit: 3992

to arterial blood pulses, an active filter (10) is arranged to further extract the frequency $f_c$

(corresponding to the fundamental frequency and its harmonics up to fifth- or sixth-order)

(col. 14, lines 46-53) to estimate a pulse rate therefrom (col. 14, lines 33-36).

   *Seiko* further discloses that the comparison of major lines of the spectral data may

correspond to other components of the signal including a second order harmonic or any

other wave that can be discriminated clearly.

   Since this teaching is directly related to subject matter considered as the basis for

allowability of the patent claims, and corresponds to one of more of the specific rules, or

an obvious variation thereof, as recited in the various claims, it is considered that a

reasonable examiner would consider evaluation of the *Seiko* reference as important in

determining the patentability of the claims.  As such, it is agreed that the *Seiko* reference

raises a substantial new question of patentability with respect to at least claims 1-6, 8, 10,

12, 15, and 17-22 of the *Diab '194* patent.


Issue 2 – *Edger*

   The Edger reference is new prior art.  The Edger reference is available under 35

U.S.C. 102(e) (see discussion regarding priority above).

   Edger teaches, among other things, an apparatus for removing motion artifacts

(noise) from measured physiological signals related to heart rate and blood pulse

oximetry (col. 1, lines 22-36; col. 6, lines 2-8) by analyzing a light signal transmitted

through biological tissue wherein the determination is made on the basis of relationships

between the attenuation of the light (col. 2, lines 36-44).  Edger teaches that in operation,

received time-domain data signals are transformed into frequency domain data signals in

Application/Control Number: 90/012,409                                    Page 9
Art Unit: 3992

order to identify a plurality of candidate peaks, and analyzing each of the candidate peaks
to select a best frequency for the selected parameter to be measured, and outputting a
pulse rate and saturation from the best
frequency (col. 6, lines 9-37).



Edger                                    FIG. 1

More specifically, *Edger* discloses the
critical elements of identifying three or more
spectral peak candidates (col. 10, line 50) and
sorting the spectral peaks according to one or
more rules into one or more spectral peaks
corresponding to a fundamental frequency and
one or more harmonics thereof (col. 10, line 50
to col. 11, line 17), and estimating a pulserate
therefrom (col. 11, lines 18-28).   Since this
teaching is directly related to subject matter
considered as the basis for allowability of the
patent claims, and corresponds to one of more
of the specific rules, or an obvious variation thereof, as recited in the various claims, it is
considered that a reasonable examiner would consider evaluation of the *Seiko* reference
as important in determining the patentability of the claims.  As such, it is agreed that the
*Seiko* reference raises a substantial new question of patentability with respect to at least
claims 1-6, 8, 10-12, and 14-22 of the *Diab '194* patent.

Application/Control Number: 90/012,409                                                    Page 10
Art Unit: 3992

Issue 3 *Seiko* in view of *Secker*

    The *Secker* reference is new prior art.  *Secker* has been asserted in combination

with *Seiko* to teach or fairly suggest the additional subject matter of claims 11, 14 and 16.

In particular, claims 11, 14 and 16 are similar to other claims in the patent except for the

additional limitation wherein a pulse rate estimation is based at least in part of a "center

of mass calculation" being utilized in the process of identifying, sorting and classifying

the various spectral peaks of the spectral dataset.

    *Secker* teaches that it is well known in the art of physiological monitoring to

utilize a "center of mass" calculation as part of a rule based means for extracting,

validating, or classifying quantities derived from electronic signals, wherein the signals

may be evaluated on the basis of a center of mass calculation (abstract; col. 1, lines 5-20;

col. 5, lines 40-55; and col. 13, lines 16-24).

    Since this additional teaching is directly related to subject matter considered as an

additional basis for allowability of at least patent claims 11, 14 and 16, a reasonable

examiner would consider evaluation of the combination of the *Seiko* and *Secker*

references as important in determining the patentability of the claims.  As such, it is

agreed that the *Seiko* and *Secker* references raise a substantial new question of

patentability with respect to at least claims 11, 14 and 16 of *Diab* patent.


***Conclusion***

**Extensions of Time**

    Extensions of time under 37 CFR 1.136(a) will not be permitted in these

proceedings because the provisions of 37 CFR 1.136 apply only to "an applicant" and not

Application/Control Number: 90/012,409                                          Page 11
Art Unit: 3992

to parties in a reexamination proceeding.  Additionally, 35 U.S.C. 305 requires that *ex*

*parte* reexamination proceedings "will be conducted with special dispatch" (37

CFR 1.550(a)).  Extensions of time in ex parte reexamination proceedings are provided

for in 37 CFR 1.550(c).

**Waiver of Right to File Patent Owner Statement**

In a reexamination proceeding, Patent Owner may waive the right under 37 C.F.R. 1.530

to file a Patent Owner Statement.  The document needs to contain a statement that Patent

Owner waives the right under 37 C.F.R. 1.530 to file a Patent Owner Statement and proof

of service in the manner provided by 37 C.F.R. 1.248, if the request for reexamination

was made by a third party requester, see 37 C.F.R 1.550(f).  The Patent Owner may

consider using the following statement in a document waiving the right to file a Patent

Owner Statement:

> Patent Owner waives the right under 37 C.F.R. 1.530 to file a Patent Owner
>
> Statement.

**Amendment in Reexamination Proceedings**

Patent owner is notified that any proposed amendment to the specification and/or

claims in this reexamination proceeding must comply with 37 CFR 1.530(d)-(j), must be

formally presented pursuant to 37 CFR § 1.52(a) and (b), and must contain any fees

required by 37 CFR § 1.20(c).  See MPEP § 2250(IV) for examples to assist in the

preparation of proper proposed amendments in reexamination proceedings.

**Submissions**

If the patent owner fails to file a timely and appropriate response to any Office

action or any written statement of an interview required under 37 CFR § 1.560(b), the *ex*

Application/Control Number: 90/012,409                                    Page 12
Art Unit: 3992

*parte* reexamination proceeding will be terminated, and the Director will proceed to issue

a certificate under 37 CFR §1.570 in accordance with the last Office action.

**Service of Papers**

After the filing of a request for reexamination by a third party requester, any

document filed by either the patent owner or the third party requester must be served on

the other party (or parties where two or more third party requester proceedings are

merged) in the reexamination proceeding in the manner provided in 37 CFR 1.248.  See

37 CFR 1.550(f).

**Notification of Concurrent Proceedings**

The patent owner is reminded of the continuing responsibility under 37 CFR

1.565(a) to apprise the Office of any litigation activity, or other prior or concurrent

proceeding, involving Patent No. 6,699,194 throughout the course of this reexamination

proceeding.  The third party requester is also reminded of the ability to similarly apprise

the Office of any such activity or proceeding throughout the course of this reexamination

proceeding.  See MPEP §§ 2207, 2282 and 2286.

Application/Control Number: 90/012,409                                    Page 13
Art Unit: 3992

**All** correspondence relating to this ex *parte* reexamination proceeding should be directed:

By Mail to:    Mail Stop *Inter Partes* Reexam
Attn: Central Reexamination Unit
Commissioner of Patents
United States Patent & Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

By FAX to:  (571) 273-9900
                Central Reexamination Unit

By hand:        Customer Service Window
                Randolph Building
                401 Dulany Street
                Alexandria, VA 22314

Registered users of EFS-Web may alternatively submit such correspondence via the electronic filing system EFS-Web, at https://efs.uspto.gov/efile/myportal/efs-registered.

EFS-Web offers the benefit of quick submission to the particular area of the Office that needs to act on the correspondence. Also, EFS-Web submissions are "soft scanned" (i.e., electronically uploaded) directly into the official file for the reexamination proceeding, which offers parties the opportunity to review the content of their submissions after the "soft scanning" process is complete.

Any inquiry concerning this communication should be directed to the Central Reexamination Unit at telephone number (571) 272-7705.

Signed:                                              Conferees:

/Albert J Gagliardi/
Examiner, Art Unit 3992                              /Sudhanshu C Pathak/
                                                     Supervisory Patent Examiner, Art Unit
                                                     3992

                                                     /Anjan Deb/

                                                     Primary Examiner,  AU 3992

# EXHIBIT Q

 UNITED STATES PATENT AND TRADEMARK OFFICE

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NO. | FILING DATE | FIRST NAMED INVENTOR | ATTORNEY DOCKET NO. | CONFIRMATION NO. |
|---|---|---|---|---|
| 90/012,463 | 09/05/2012 | 7,215,984 B2 | 11080153 | 8786 |

64735          7590          10/10/2012
KNOBBE, MARTENS, OLSON & BEAR, LLP
2040 MAIN STREET
FOURTEENTH FLOOR
IRVINE, CA 92614

| EXAMINER |
|---|
| LIE, ANGELA M |

| ART UNIT | PAPER NUMBER |
|---|---|
| 3992 | |

| MAIL DATE | DELIVERY MODE |
|---|---|
| 10/10/2012 | PAPER |

**Please find below and/or attached an Office communication concerning this application or proceeding.**

The time period for reply, if any, is set in the attached communication.

 UNITED STATES PATENT AND TRADEMARK OFFICE

Commissioner for Patents
United States Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450
www.uspto.gov

**DO NOT USE IN PALM PRINTER**

(THIRD PARTY REQUESTER'S CORRESPONDENCE ADDRESS)

Mayer Brown LLP
1999 K street, NW
Washington, DC 20006

# *EX PARTE* REEXAMINATION COMMUNICATION TRANSMITTAL FORM

REEXAMINATION CONTROL NO. *90/012,463*.

PATENT NO. *7,215,984  B2 E*.

ART UNIT *3992*.

Enclosed is a copy of the latest communication from the United States Patent and Trademark Office in the above identified *ex parte* reexamination proceeding (37 CFR 1.550(f)).

Where this copy is supplied after the reply by requester, 37 CFR 1.535, or the time for filing a reply has passed, no submission on behalf of the *ex parte* reexamination requester will be acknowledged or considered (37 CFR 1.550(g)).

| *Order Granting / Denying Request For Ex Parte Reexamination* | Control No. | Patent Under Reexamination |
|---|---|---|
| | 90/012,463 | 7,215,984 B2 E |
| | Examiner | Art Unit |
| | ANGELA M. LIE | 3992 |

*--The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

The request for *ex parte* reexamination filed <u>05 September 2012</u> has been considered and a determination has been made. An identification of the claims, the references relied upon, and the rationale supporting the determination are attached.

Attachments: a)☐ PTO-892, b)☒ PTO/SB/08, c)☐ Other: _____

1. ☒ The request for *ex parte* reexamination is GRANTED.

RESPONSE TIMES ARE SET AS FOLLOWS:

For Patent Owner's Statement (Optional): TWO MONTHS from the mailing date of this communication (37 CFR 1.530 (b)). **EXTENSIONS OF TIME ARE GOVERNED BY 37 CFR 1.550(c).**

For Requester's Reply (optional): TWO MONTHS from the **date of service** of any timely filed Patent Owner's Statement (37 CFR 1.535). **NO EXTENSION OF THIS TIME PERIOD IS PERMITTED.** If Patent Owner does not file a timely statement under 37 CFR 1.530(b), then no reply by requester is permitted.

2. ☐ The request for *ex parte* reexamination is DENIED.

This decision is not appealable (35 U.S.C. 303(c)). Requester may seek review by petition to the Commissioner under 37 CFR 1.181 within ONE MONTH from the mailing date of this communication (37 CFR 1.515(c)). **EXTENSION OF TIME TO FILE SUCH A PETITION UNDER 37 CFR 1.181 ARE AVAILABLE ONLY BY PETITION TO SUSPEND OR WAIVE THE REGULATIONS UNDER 37 CFR 1.183.**

In due course, a refund under 37 CFR 1.26 ( c ) will be made to requester:

a) ☐ by Treasury check or,

b) ☐ by credit to Deposit Account No. _____ , or

c) ☐ by credit to a credit card account, unless otherwise notified (35 U.S.C. 303(c)).

| /ANGELA M LIE/ Primary Examiner, Art Unit 3992 | | |
|---|---|---|

cc:Requester ( if third party requester )

Application/Control Number: 90/012,463                                      Page 2
Art Unit: 3992

## *Reexamination*

Claims 1-5, 15-16, 19-20, 22, 52-54 are pending in the Request for Reexamination dated

April 27th, 2012 (See PTO-1465).

## *DECISION ON REQUEST FOR REEXAMINATION*

A substantial new question of patentability affecting claims 1-5, 15-16, 19-20, 22, 52-54

(See PTO-1465) of US Patent 7,215,984 to Diab et al. (the '984 patent, hereafter) is raised by the

request for ex parte reexamination.

## *Table of Contents*

The References ................................................................1

Prosecution History ..........................................................2

Old Art viewed in the new light ..............................................3

Substantial New Question of Patentability ....................................4

NOTICE RE PATENT OWNER'S CORRESPONDENCE ADDRESS ....17

Conclusion ..................................................................18

## *The References*

(1) Corenman et al; U.S. Patent No. 4,911,167; Date Filed: March 30, 1988; Date

Published: March 27, 1990 (Corenman hereinafter).

(2) Sperinde; US Patent No. 4,623,248; Date Filed: February 16, 1983; Date Published:

November 18, 1986.

Application/Control Number: 90/012,463                                    Page 3
Art Unit: 3992

(3) Hall; US Patent No. 4,955,379; Date Filed: August 8, 1988; Date Published:

September 11, 1990.

(4) Baxter International Inc., European Patent Publication No. EP0352923; Date Filed:

July 6, 1989 , Date Published: January 31st, 1990 .

(5) Ukawa, et al; US Patent No. 5,355,882; Date Filed: July 8, 1993; Date Published:

October 18, 1994 (hereinafter Ukawa).

(6) Prosser; US Patent No. 5,246,002; Date Filed: February 11, 1992; Date Published:

September 21, 1993.

### *Prosecution History*

The Application for the patent 7,215,984 has been filed on May 4th, 2004. The Applicant

filed preliminary amendment on December 13th, 2006 in which the claims 1, 2, 6, 15, 16, 26, 29,

31, 36, 46, 47 and 61 have been amended, claims 17, 20-24, 48, 51-54 and 62 have been

canceled and claims 65-72 have been added. In addition to the amendment, the Applicant also

supplied terminal disclaimer to avoid double patenting rejection. In response to the amendment,

the Examiner placed the application in condition for allowance. The reasons for allowance are as

follows:

*The Prior art does not teach or suggest a method or system that includes utilizing a first*

*or second (different) calculation technique to compute a value, wherein the value is qualified for*

*inclusion depending upon different conditions of first and second intensity signals or where the*

*utilizing is based at least in part on properties of the intensity signals.*

Application/Control Number: 90/012,463                                    Page 4
Art Unit: 3992

Furthermore, since some claims have been canceled, the claims lacking continuity have

been renumbered in the following manner: claims 18, 19, 25-47, 49, 50, 55-61 and 63-72 are

now claims 17, 18, 19-41, 42, 43, 44-47, 49, 50, 48 and 51-60 respectively.


### *Old Art viewed in the new light*

Although, Corenman, Hall and Prosser, have been cited by the Patent Owner

during the prosecution of the original patent '984, there is no indication in the file history

that arguments submitted by the requestor have been previously considered by the

Examiner.

The fact that Corenman, Hall and Prosser, were cited on an IDS and initialed by

the examiner during prosecution of the '984 patent does not alone preclude

reexamination based on that reference.  MPEP § 2258.01 elaborates:

> The Office cannot presume that a prior art reference was previously
> relied upon or discussed in a prior Office proceeding if there is no basis in the
> written record to so conclude other than the examiner's initials or a check mark
> on a form PTO/SB/08A or 08B, or PTO/SB/42 (or on a form having a format
> equivalent to one of these forms) submitted with an information disclosure
> statement. Thus, any specific discussion of prior art must appear on the record of
> a prior related Office proceeding. Generalized statements such as the prior art is
> "cited to show the state of the art," "cited to show the background of the
> invention," or "cited of interest" would not preclude reexamination. The Office
> may conduct reexamination based on prior art that was cited but whose
> relevance to patentability of the claims was not discussed in any prior related
> Office proceeding. MPEP § 2258.01.

Application/Control Number: 90/012,463                                   Page 5

Art Unit: 3992

*Substantial New Question of Patentability*

**A. The Request indicates that the Requester believes Corenman raises a substantial new question of patentability as to claims 1-5, 20, 22 and 52-53.**

*(See Request Pages 8-12, 26, 28-29, 32, 40, 42, 44-45 and 51-53)*

<u>With respect to the independent claims 1, 52 and 53 , Corenman raises a</u>

<u>substantial new question of patentability because Corenman teaches the following</u>

<u>new, non-cumulative technical feature that may raise a substantial new question of</u>

<u>patentability:</u>

<u>**Claim 1:**</u>

A physiological monitoring system including an optical probe configured to output one or more intensity signals representative of at least one physiological characteristic of body tissue, and a signal processing device configured to accept the one or more intensity signals and configured to determine a resulting value indicative of the at least one physiological characteristic, the physiological monitoring system comprising: an optical probe including a light-sensitive detector configured to detect light of at least first and second wavelengths attenuated by body tissue carrying pulsing blood and configured to output one or more intensity signals based on the detected light; and a signal processing device including: **a first calculator capable of utilizing a first calculation technique to determine at least a first ratio representative of at least one physiological characteristic of the pulsing blood [1] based on at least one of the one or more intensity signals generated from said detection of said light at said at least first and second wavelengths [2], a second calculator capable of utilizing a second calculation technique different from the first calculation technique, to determine at least a second ratio representative of the at least one physiological characteristic [3] based on at least one of the one or more intensity signals generated from said detection of said light at said at least first**

**and second wavelengths [4], and a processing module
configured to utilize at least one of the first and second
calculators to determine a resulting value indicative of
the at least one physiological characteristic [5]**.


## Claim 52:

A method of determining a physiological characteristic of
pulsing blood, the method comprising: receiving first and
second intensity signals from a light-sensitive detector
which detects light of at least first and second
wavelengths transmitted through body tissue carrying
pulsing blood; and **utilizing at least one of at least first
and second calculation techniques to determine a value
indicative of the physiological parameter based upon at
least one of the first and second intensity signals [1] and
[3], wherein the utilizing comprises qualifying the value
for inclusion, depending upon different conditions of the
first and second intensity signals [2], [4] and [5], and
wherein the first calculation technique is different from
the second calculation technique [3]**.


## Claim 53:

A physiological monitoring system comprising: a light-
sensitive detector which detects light of at least first
and second wavelengths attenuated by body tissue carrying
pulsing blood and outputs one or more intensity signals
based on the detected light, the one or more intensity
signals representative of at least one physiological
characteristic of the body tissue; and a signal processing
device which accepts the one or more intensity signals and
determines a resulting value indicative of the at least one
physiological characteristic, the signal processing device
including: **a first calculator capable of utilizing at first
calculation technique to determine at least a first value
representative of the at least one physiological
characteristic of the pulsing blood [1], a second
calculator capable of utilizing a second calculation
technique different from the first calculation technique,
to determine at least a second value representative of the**

Application/Control Number: 90/012,463                                    Page 7
Art Unit: 3992

> **at least one physiological characteristic [3], and a**
> **processing module which utilizes at least one of the first**
> **and second calculators to determine a resulting value**
> **indicative of the at least one physiological**
> **characteristic, said utilization based at least in part on**
> **a property of the one or more intensity signals [2], [4]**
> **and [5].**

Corenman's reference discloses the above features which may raise substantial new question of patentability. The limitations [1] is taught in column 17, lines 65 – column 18, lines 14, wherein first calculation technique corresponds to ECG synchronization mode , [2] in column 6, lines 7-12 and column 24, lines 1-44, [3] in column 17, line 65 – column 18, line 14, wherein second calculation technique corresponds to unintegrated mode,  [4] in column 2, lines 28-46, and [5] in column 17, line 65 – column 18, line 14, wherein there are two modes i.e. unintegrated and ECG.

In regards to the dependent claims 2-5, 20 and 22, by the virtue of their dependency on claim 1, Corenman raises a substantial new question of patentability as described above.

Therefore, a reasonable examiner would find Corenamn's teachings to be important in determining the patentability of claims 1-5, 20, 22 and 52-53 of the '984 patent. The teachings of  Corenamn discussed herein are not cumulative to any written discussion on the record of the teachings of the prior art, were not previously considered nor addressed during a prior examination, and the same question was not the subject of a final holding of invalidity in the Federal Courts.

**B. The Request indicates that the Requester believes Ukawa raises a substantial new question of patentability as to claims 1-5, 15-16, 19, 20, 22 and 52-54.**

Application/Control Number: 90/012,463                                    Page 8

Art Unit: 3992

*(See Request Pages 13-15, 26-28, 30, 32-34, 36-38, 40-41, 43, 46-48, 53-55 and 59-61   )*

**With respect to the independent claims 1, 52 and 53 , Ukawa raises a**

**substantial new question of patentability because Ukawa teaches the following new,**

**non-cumulative technical feature that may raise a substantial new question of**

**patentability:**

**Claim 1:**

A physiological monitoring system including an optical
probe configured to output one or more intensity signals
representative of at least one physiological characteristic
of body tissue, and a signal processing device configured
to accept the one or more intensity signals and configured
to determine a resulting value indicative of the at least
one physiological characteristic, the physiological
monitoring system comprising: an optical probe including a
light-sensitive detector configured to detect light of at
least first and second wavelengths attenuated by body
tissue carrying pulsing blood and configured to output one
or more intensity signals based on the detected light; and
a signal processing device including: **a first calculator**
**capable of utilizing a first calculation technique to**
**determine at least a first ratio representative of at least**
**one physiological characteristic of the pulsing blood [1]**
**based on at least one of the one or more intensity signals**
**generated from said detection of said light at said at**
**least first and second wavelengths [2], a second calculator**
**capable of utilizing a second calculation technique**
**different from the first calculation technique, to**
**determine at least a second ratio representative of the at**
**least one physiological characteristic [3] based on at**
**least one of the one or more intensity signals generated**
**from said detection of said light at said at least first**
**and second wavelengths [4], and a processing module**
**configured to utilize at least one of the first and second**
**calculators to determine a resulting value indicative of**
**the at least one physiological characteristic [5].**

### Claim 52:

A method of determining a physiological characteristic of pulsing blood, the method comprising: receiving first and second intensity signals from a light-sensitive detector which detects light of at least first and second wavelengths transmitted through body tissue carrying pulsing blood; and **utilizing at least one of at least first and second calculation techniques to determine a value indicative of the physiological parameter based upon at least one of the first and second intensity signals [1] and [3], wherein the utilizing comprises qualifying the value for inclusion, depending upon different conditions of the first and second intensity signals [2], [4] and [5], and wherein the first calculation technique is different from the second calculation technique [3]**.

### Claim 53:

A physiological monitoring system comprising: a light-sensitive detector which detects light of at least first and second wavelengths attenuated by body tissue carrying pulsing blood and outputs one or more intensity signals based on the detected light, the one or more intensity signals representative of at least one physiological characteristic of the body tissue; and a signal processing device which accepts the one or more intensity signals and determines a resulting value indicative of the at least one physiological characteristic, the signal processing device including: **a first calculator capable of utilizing at first calculation technique to determine at least a first value representative of the at least one physiological characteristic of the pulsing blood [1], a second calculator capable of utilizing a second calculation technique different from the first calculation technique, to determine at least a second value representative of the at least one physiological characteristic [3], and a processing module which utilizes at least one of the first and second calculators to determine a resulting value indicative of the at least one physiological characteristic, said utilization based at least in part on**

Application/Control Number: 90/012,463                                    Page 10
Art Unit: 3992

**a property of the one or more intensity signals [2], [4] and [5].**

Ukawa's reference discloses the above features which may raise substantial new question of patentability. The limitations [1] is taught in column 2, lines 30-35, [2] in column 2, lines 23-25, [3] in column 2, lines 46-49, [4] in column 2, lines 36-45, and [5] in column 2, lines 15-68, wherein physiological characteristics such as oxygen saturation are measured and calculated using first and/or second calculation means.

In regards to the dependent claims 2-5, 15-16, 19, 20, 22 and 54, by the virtue of their dependency on claims 1 and 53 respectively, Ukawa raises a substantial new question of patentability as described above.

Therefore, a reasonable examiner would find Ukawa's teachings to be important in determining the patentability of claims 1-5, 15-16, 19, 20, 22 and 52-54 of the '984 patent. The teachings of Ukawa discussed herein are not cumulative to any written discussion on the record of the teachings of the prior art, were not previously considered nor addressed during a prior examination, and the same question was not the subject of a final holding of invalidity in the Federal Courts.

**C. The Request indicates that the Requester believes Hall raises a substantial new question of patentability as to claims 1-5, 15, 19, 20, 22 and 52-53.**

*(See Request Pages 16-19, 27-30, 32-34, 38-39, 41, 43, 48-49 and 55-57)*

**With respect to the independent claims 1, 52 and 53 , Hall raises a substantial new question of patentability because Hall teaches the following new, non-cumulative technical feature that may raise a substantial new question of patentability:**

Application/Control Number: 90/012,463                              Page 11

Art Unit: 3992

## Claim 1:

A physiological monitoring system including an optical
probe configured to output one or more intensity signals
representative of at least one physiological characteristic
of body tissue, and a signal processing device configured
to accept the one or more intensity signals and configured
to determine a resulting value indicative of the at least
one physiological characteristic, the physiological
monitoring system comprising: an optical probe including a
light-sensitive detector configured to detect light of at
least first and second wavelengths attenuated by body
tissue carrying pulsing blood and configured to output one
or more intensity signals based on the detected light; and
a signal processing device including: **a first calculator
capable of utilizing a first calculation technique to
determine at least a first ratio representative of at least
one physiological characteristic of the pulsing blood [1]
based on at least one of the one or more intensity signals
generated from said detection of said light at said at
least first and second wavelengths [2], a second calculator
capable of utilizing a second calculation technique
different from the first calculation technique, to
determine at least a second ratio representative of the at
least one physiological characteristic [3] based on at
least one of the one or more intensity signals generated
from said detection of said light at said at least first
and second wavelengths [4], and a processing module
configured to utilize at least one of the first and second
calculators to determine a resulting value indicative of
the at least one physiological characteristic [5]**.

## Claim 52:

A method of determining a physiological characteristic of
pulsing blood, the method comprising: receiving first and
second intensity signals from a light-sensitive detector
which detects light of at least first and second
wavelengths transmitted through body tissue carrying
pulsing blood; and **utilizing at least one of at least first**

Application/Control Number: 90/012,463                                    Page 12
Art Unit: 3992

**and second calculation techniques to determine a value indicative of the physiological parameter based upon at least one of the first and second intensity signals [1] and [3], wherein the utilizing comprises qualifying the value for inclusion, depending upon different conditions of the first and second intensity signals [2], [4] and [5], and wherein the first calculation technique is different from the second calculation technique [3]**.


## Claim 53:

A physiological monitoring system comprising: a light-sensitive detector which detects light of at least first and second wavelengths attenuated by body tissue carrying pulsing blood and outputs one or more intensity signals based on the detected light, the one or more intensity signals representative of at least one physiological characteristic of the body tissue; and a signal processing device which accepts the one or more intensity signals and determines a resulting value indicative of the at least one physiological characteristic, the signal processing device including: **a first calculator capable of utilizing at first calculation technique to determine at least a first value representative of the at least one physiological characteristic of the pulsing blood [1], a second calculator capable of utilizing a second calculation technique different from the first calculation technique, to determine at least a second value representative of the at least one physiological characteristic [3], and a processing module which utilizes at least one of the first and second calculators to determine a resulting value indicative of the at least one physiological characteristic, said utilization based at least in part on a property of the one or more intensity signals [2], [4] and [5]**.


Hall's reference discloses the above features which may raise substantial new question of patentability. The limitations [1] is taught in column 3, lines 15-21, wherein

Application/Control Number: 90/012,463                                    Page 13
Art Unit: 3992

"normal oximeter algorithms" corresponds to the first calculation technique and column

1, lines 30-53 , [2] in column 1, lines 10-26, wherein red and infrared wavelengths are

used in the measurement, [3] in column 3, lines 21-39,  [4] in column 1, lines 10-26, and

[5] in column 3, lines 15-39, when there is no  movement artifact (i.e. patient stays still)

first calculation is used, otherwise the movement artifact is taken into account during

calculations resulting in the second calculation.

In regards to the dependent claims 2-5, 15-16, 19, 20 and 22, by the virtue of their

dependency on claim 1, Hall raises a substantial new question of patentability as

described above.

Therefore, a reasonable examiner would find Hall's teachings to be important in

determining the patentability of claims 1-5, 15-16, 19, 20, 22 and 52-53 of the '984

patent. The teachings of  Hall discussed herein are not cumulative to any written

discussion on the record of the teachings of the prior art, were not previously considered

nor addressed during a prior examination, and the same question was not the subject of a

final holding of invalidity in the Federal Courts.


**D. The Request indicates that the Requester believes EP '923 raises a substantial
new question of patentability as to claims 1-4, 15, 19, 22 and 52-53.**

*(See Request Pages 19-23, 27, 29-31, 34, 39-40, 43-44, 50-51 and 57-59)*

<u>**With respect to the independent claims 1, 52 and 53 , EP '923 raises a**</u>

<u>**substantial new question of patentability because EP '923 teaches the following new,**</u>

<u>**non-cumulative technical feature that may raise a substantial new question of**</u>

<u>**patentability:**</u>

**Claim 1:**


A physiological monitoring system including an optical
probe configured to output one or more intensity signals
representative of at least one physiological characteristic
of body tissue, and a signal processing device configured
to accept the one or more intensity signals and configured
to determine a resulting value indicative of the at least
one physiological characteristic, the physiological
monitoring system comprising: an optical probe including a
light-sensitive detector configured to detect light of at
least first and second wavelengths attenuated by body
tissue carrying pulsing blood and configured to output one
or more intensity signals based on the detected light; and
a signal processing device including: **a first calculator**
**capable of utilizing a first calculation technique to**
**determine at least a first ratio representative of at least**
**one physiological characteristic of the pulsing blood [1]**
**based on at least one of the one or more intensity signals**
**generated from said detection of said light at said at**
**least first and second wavelengths [2], a second calculator**
**capable of utilizing a second calculation technique**
**different from the first calculation technique, to**
**determine at least a second ratio representative of the at**
**least one physiological characteristic [3] based on at**
**least one of the one or more intensity signals generated**
**from said detection of said light at said at least first**
**and second wavelengths [4], and a processing module**
**configured to utilize at least one of the first and second**
**calculators to determine a resulting value indicative of**
**the at least one physiological characteristic [5]**.


**Claim 52:**

A method of determining a physiological characteristic of
pulsing blood, the method comprising: receiving first and
second intensity signals from a light-sensitive detector
which detects light of at least first and second
wavelengths transmitted through body tissue carrying
pulsing blood; and **utilizing at least one of at least first**

Application/Control Number: 90/012,463                                   Page 15

Art Unit: 3992

**and second calculation techniques to determine a value
indicative of the physiological parameter based upon at
least one of the first and second intensity signals [1] and
[3], wherein the utilizing comprises qualifying the value
for inclusion, depending upon different conditions of the
first and second intensity signals [2] and [4], and wherein
the first calculation technique is different from the
second calculation technique [3].**


**Claim 53:**

A physiological monitoring system comprising: a light-
sensitive detector which detects light of at least first
and second wavelengths attenuated by body tissue carrying
pulsing blood and outputs one or more intensity signals
based on the detected light, the one or more intensity
signals representative of at least one physiological
characteristic of the body tissue; and a signal processing
device which accepts the one or more intensity signals and
determines a resulting value indicative of the at least one
physiological characteristic, the signal processing device
including: **a first calculator capable of utilizing at first
calculation technique to determine at least a first value
representative of the at least one physiological
characteristic of the pulsing blood [1], a second
calculator capable of utilizing a second calculation
technique different from the first calculation technique,
to determine at least a second value representative of the
at least one physiological characteristic [3], and a
processing module which utilizes at least one of the first
and second calculators to determine a resulting value
indicative of the at least one physiological
characteristic, said utilization based at least in part on
a property of the one or more intensity signals [2] and
[4].**

EP '923 reference discloses the above features which may raise substantial new

question of patentability. The limitations [1] is taught on page 4, line 49 – page 5, line 1,

[2] on page 4, lines 45-49, wherein predetermined wavelengths are utilized to measure

oxygen saturation, [3] on page 5, lines 2-3 and page 6, line 58 to page 7, line 3,  [4] on

Application/Control Number: 90/012,463                                    Page 16
Art Unit: 3992

page 4, lines 45-49, wherein predetermined wavelengths are utilized to measure oxygen

saturation, and [5] on page 4, line 49 to page 5 line 3, when coefficient are known the

first algorithm recited on page 4 may be utilized, otherwise other algorithms are

employed .

In regards to the dependent claims 2-4, 15, 19 and 22, by the virtue of their

dependency on claim 1, EP '923 raises a substantial new question of patentability as

described above.

Therefore, a reasonable examiner would find EP '923 teachings to be important in

determining the patentability of claims 1-4, 15, 19, 22 and 52-53 of the '984 patent. The

teachings of EP '923 discussed herein are not cumulative to any written discussion on

the record of the teachings of the prior art, were not previously considered nor addressed

during a prior examination, and the same question was not the subject of a final holding

of invalidity in the Federal Courts.


**E. The Request indicates that the Requester believes Sperinde raises a substantial
new question of patentability as to claims 1-5 and 15**

*(See Request Pages 23-26, 27-29, 31, 33 and 35)*

<u>With respect to the independent claim 1, Sperinde raises a substantial new
question of patentability because Sperinde teaches the following new, non-
cumulative technical feature that may raise a substantial new question of
patentability:</u>


**<u>Claim 1:</u>**

A physiological monitoring system including an optical
probe configured to output one or more intensity signals
representative of at least one physiological characteristic
of body tissue, and a signal processing device configured
to accept the one or more intensity signals and configured
to determine a resulting value indicative of the at least
one physiological characteristic, the physiological
monitoring system comprising: an optical probe including a
light-sensitive detector configured to detect light of at
least first and second wavelengths attenuated by body
tissue carrying pulsing blood and configured to output one
or more intensity signals based on the detected light; and
a signal processing device including: **a first calculator
capable of utilizing a first calculation technique to
determine at least a first ratio representative of at least
one physiological characteristic of the pulsing blood [1]
based on at least one of the one or more intensity signals
generated from said detection of said light at said at
least first and second wavelengths [2], a second calculator
capable of utilizing a second calculation technique
different from the first calculation technique, to
determine at least a second ratio representative of the at
least one physiological characteristic [3] based on at
least one of the one or more intensity signals generated
from said detection of said light at said at least first
and second wavelengths [4], and a processing module
configured to utilize at least one of the first and second
calculators to determine a resulting value indicative of
the at least one physiological characteristic [5]**.

Sperinde's reference discloses the above features which may raise substantial new

question of patentability. The limitations [1] is taught in Figure 5A and column 9, lines

36-44 and Abstract, [2] in column 9, lines 17-22, wherein multiple light intensities are

utilized, [3] Figure 5B, wherein during venous mode another algorithm is used,  [4] in

column 9, lines 17-22, wherein multiple light intensities are utilized, and [5] Figures 5A

and 5B and column 9, line 51 to column 11, line 24, based on the mode different

calculations are used.

Application/Control Number: 90/012,463                              Page 18
Art Unit: 3992

In regards to the dependent claims 2-5 and 15, by the virtue of their dependency

on claims 1 and 53 respectively, Sperinde raises a substantial new question of

patentability as described above.

Therefore, a reasonable examiner would find Sperinde's teachings to be important

in determining the patentability of claims 1-5 and 15 of the '984 patent. The teachings of

Sperinde discussed herein are not cumulative to any written discussion on the record of

the teachings of the prior art, were not previously considered nor addressed during a prior

examination, and the same question was not the subject of a final holding of invalidity in

the Federal Courts.


### NOTICE RE PATENT OWNER'S CORRESPONDENCE ADDRESS

Effective May 16, 2007, 37 CFR 1.33(c) has been revised to provide that: The Patent

owner's correspondence address for all communications in an ex parte reexamination or an **inter**

**partes** reexamination is designated as the correspondence address of the patent.

Revisions and Technical Corrections Affecting Requirements for Ex Parte and

Inter Partes Reexamination, 72 FR 18892 (April, 16, 2007) (Final Rule)

**The correspondence address for any pending reexamination proceeding not having
the same correspondence address as that of the patent is, by way of this revision to 37 CFR
1.33(c), <u>automatically changed to that of the patent file</u> as of the effective date.**

This change is effective for any reexamination proceeding which is pending before the

Office as of May 16, 2007, <u>including the present reexamination proceeding</u>, and to any

reexamination proceeding which is filed after that date.

Application/Control Number: 90/012,463                                      Page 19
Art Unit: 3992

Parties are to take this change into account when filing papers, and direct

communications accordingly.

In the event the patent owner's correspondence address listed in the papers (record) for

the present proceeding is different from the correspondence address of the patent, it is strongly

encouraged that the patent owner affirmatively file a Notification of Change of Correspondence

Address in the reexamination proceeding and/or the patent (depending on which address patent

owner desires), to conform the address of the proceeding with that of the patent and to clarify the

record as to which address should be used for correspondence.

Telephone Numbers for reexamination inquiries:

Reexamination                                          (571) 272-7703

Central Reexam Unit (CRU)                     (571) 272-7705

Reexamination Facisimile Transmission No.        (571) 273-9900


### Conclusion

Extensions of time under 37 CFR 1.136(a) will not be permitted in these proceedings

because the provisions of 37 CFR 1.136 apply only to "an applicant" and not to parties in a

reexamination proceeding. Additionally, 35 U.S.C. 305 requires that reexamination proceedings

"will be conducted with special dispatch" (37 CFR 1.550(a)). Extension of time in reexamination

proceedings are provided for in 37 CFR 1.550(c). After the filing of a request for reexamination

by a third party requester, any document filed by either the patent owner of the third party

requester must be served on the other party (or parties where two or more third-party-requester

Application/Control Number: 90/012,463                                    Page 20
Art Unit: 3992

proceedings are merged) in the reexamination proceeding in the manner provided in 37 CFR

1.248. See 37 CFR 1.550(f).

The patent owner is reminded of the continued responsibility under 37 CFR 1.565(a) to

apprise the Office of any litigation activity, or other prior or concurrent proceeding, throughout

the course of this reexamination proceeding. The third party requester is also reminded of the

ability to similarly apprise the Office of any such activity or proceeding throughout the course of

this reexamination proceeding. See MPEP § 2207, 2282 and 2286.

**All correspondence relating to this *ex parte* reexamination proceeding should be**

**directed:**

By EFS-Web: Registered Users may submit correspondence via EFS-Web, at
        https://efs.uspto.gov/efile/myportal/efs-registered.

By Mail to:    Mail Stop *Ex Parte* Reexam
        Central Reexamination Unit
        Commissioner for Patents
        United States Patent & Trademark Office
        P.O. Box 1450
        Alexandria, VA 22313-1450

By FAX to:    (571) 273-9900
        Central Reexamination Unit

By hand:    Customer Service Window
        Randolph Building
        401 Dulany Street
        Alexandria, VA 22314


EFS-Web offers the benefit of quick submission to the particular area of the Office that

needs to act on the correspondence. Also, EFS-Web submissions are "soft-scanned" (i.e.,

electronically uploaded) directly into the official file for the reexamination proceeding, which

Application/Control Number: 90/012,463                                    Page 21
Art Unit: 3992

offers parties the opportunity to review the content of their submission after the "soft scanning"

process is complete.


Any inquiry concerning this communication should be directed to the Central

Reexamination Unit at telephone number 571-272-7705.


/ANGELA M LIE/

Primary Examiner, Art Unit 3992


Conferees:

/Luke S. Wassum/
Primary Examiner, Art Unit 3992

/Sudhanshu C Pathak/
Supervisory Patent Examiner, Art Unit 3992

# EXHIBIT R

Page 1

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

MASIMO CORP.,                          :
                                       :
          Plaintiff,                   :
                                       :C.A. No.
     v                                 :09-08 and
                                       :11-742-(LPS-MPT)
PHILIPS ELECS. N. AM. CORP., et al.,:(CONSOLIDATED)
                                       :
          Defendants.                  :

- - -

Wilmington, Delaware
Tuesday, December 18, 2012 at 4:00 p.m.
TELECONFERENCE

- - -

BEFORE:          HONORABLE MARY PAT THYNGE, U.S.M.J.

- - -

APPEARANCES:

          MORRIS, NICHOLS, ARSHT & TUNNELL
          BY:  JULIA HEANEY, ESQ.

               and

          KNOBBE MARTENS OLSON & BEAR
          BY:  MICHELLE E. ARMOND, ESQ.
          BY:  JOSEPH R. RE, ESQ.
          BY:  PERRY D. OLDHAM, ESQ.

               (Irvine, California)

Ellie Corbett Hannum,  Registered Merit Reporter

077c01ff-ad0a-4810-b67e-bf440f7b8400

| Page 2 | Page 4 |
|---|---|

**Page 2**

1  APPEARANCES: (Continued)
2
   POTTER ANDERSON & CORROON
3  BY:  DAVID E. MOORE, ESQ.
4    and
5  MAYER BROWN
   BY: ANN MARIE PHILLIPS, ESQ.
6  BY: ALAN GRIMALDI, ESQ.
   BY: STEVEN YOVITS, ESQ.
7  BY: BRIAN A. ROSENTHAL, ESQ.
8     (Washington, D.C.)
9  On behalf of the Defendants
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**Page 3**

1         - oOo -
2      P R O C E E D I N G S
3    (REPORTER'S NOTE:  The following teleconference
4  was held in the Judge's chambers, beginning at 4:00 p.m.)
5    THE COURT:  Good afternoon, Counsel.
6  This is Judge Thynge.
7      Who is on the line on behalf of Masimo,
8  please.
9    MS. HEANEY:  This is Julia Heaney.  With
10 me from Knobbe Martens is Joe Re, Michelle Armond and
11 Perry Oldham.
12   THE COURT:  Okay.  And Philips, who is
13 on the line for Philips, please?
14   MR. MOORE:  Good afternoon, Your Honor,
15 David Moore at Potter Anderson.  With me on the line are
16 Alan Grimaldi, Brian Rosenthal, Ann Marie Duffy and Steve
17 Yovits, Y-O-V-I-T-S.
18   THE COURT:  Thank you.  For your
19 information, we have Veritext here today taking down the
20 conference call, and Ellie Corbett is the court reporter
21 today.  I just want to remind counsel that as you speak,
22 although I think I recognize most of the voices, that may
23 not be the same for the court reporter, so please
24 reintroduce yourself each time you talk.

**Page 4**

1      I have had a chance to review your
2  submission to me.  So let's get discussing what are the
3  problems and what needs to be addressed.  Anybody want to
4  start?  I don't care who.
5      MR. RE:  Okay, Your Honor, this is Joe
6  Re for Masimo.  And I am happy to report that Masimo II
7  is plugging along.  That's the consolidated case.  And
8  the parties have already submitted to you our joint claim
9  construction chart for the patents in that case, and our
10 briefs are due February 4th, and the parties are
11 proceeding with discovery, and so we are perfectly
12 satisfied with the status of the case.  And it seems that
13 issues to be raised today have really been raised and put
14 forth by the folks at Philips.
15     THE COURT:  Well, one of the things, I
16 guess there was an issue, was the nature and format of
17 the technical tutorial to be submitted with the opening
18 claim constructions briefs.  So that was also to discuss
19 the extent to which the Court would like a DVD tutorial
20 as pursuant to the scheduling order.  That's one issue
21 that's apparently out there that both the parties agree
22 on and are looking for some guidance.
23     Your thoughts, Joe, on that.  Yes, I was
24 given a tutorial before.  That tutorial, I believe, was

**Page 5**

1  verbal, was it not, at the time we did the claim
2  construction?
3    MR. RE:  That's correct.
4    THE COURT:  I'm not asking for the
5  parties to go through unnecessary added expense.
6  Frankly, do I remember everything about that tutorial?
7  Yeah -- no.  I can go back and sit there and read the
8  transcript.  If the parties think a DVD would be helpful
9  and they would prefer to do it, that's fine.  You also
10 have the option at the time that we do the claim
11 construction to do a brief overview.  So I'm not
12 certain -- like I said, I'm not asking that the parties
13 end up having an added or huge expense on this, but if
14 you think that maybe giving it to me at the time of the
15 opening brief so I have an opportunity to review it
16 before we actually have the claim construction and
17 refresh my recollection, I don't have a problem with that
18 either.  I don't have a strong feeling one way or the
19 other is what I'm basically saying.
20     MR. RE:  Neither do we, Your Honor.
21 It's totally up to you.
22     THE COURT:  Well, you tell me whether
23 this is going to be an expensive endeavor or your
24 preference.  Do you want to do a DVD tutorial or would

2 (Pages 2 to 5)

077c01ff-ad0a-4810-b67e-bf440f7b8400

Page 6

1  you prefer to do a presentation at the time of the claim
2  construction?
3          MR. RE:  I prefer a presentation live
4  rather than trying to do it on a DVD.  A DVD does add
5  another expense.
6          MR. ROSENTHAL:  This is Brian Rosenthal.
7  I agree, that's the reason that we mentioned it.  If the
8  Court's preference was for a DVD, of course, I'm sure
9  Masimo and we would be fine to put it together, but I
10 think given the fact that there's at least some
11 familiarity from the last case I think there would be a
12 bit of repetition.  Obviously, it's not going to be fresh
13 in your mind.  Our sense is, if it's all the same for the
14 Court, it seems like a presentation live would be
15 adequate here from our perspective as well.
16         THE COURT:  Then that's fine with me,
17 Counsel.  All right.  So we got that out of the way.
18         There were some additional issues that I
19 believe Philips raised, including narrowing of Masimo I
20 and Masimo II, that is, reducing the amount of the
21 asserted claims, which I know that in one vein Masimo
22 objected to because it was dealing with Masimo I and this
23 is supposed to be dealing with Masimo II.
24         MR. ROSENTHAL:  Yes, Your Honor.  If it

Page 7

1  makes sense -- I'm not going to repeat what's in our
2  paper -- but if it makes sense, I can give you our views
3  on why we think this is the right time to deal with
4  Masimo II narrowing.  I can address Masimo I as well.  I
5  figure since we are talking about claim narrowing that
6  this is an appropriate juncture.  I certainly didn't
7  intend to highjack a Masimo II status conference by
8  talking about Masimo I issues.  And I know Masimo took
9  issue.  I thought it would be efficient to discuss them
10 at the same time rather than scheduling a separate call,
11 but I will handle that however the Court wants.
12         THE COURT:  Why don't we deal with
13 Masimo II at least first.  I haven't even thought about
14 whether we should be dealing with Masimo I.  The
15 arguments that potentially could be made for Masimo I
16 could be different than Masimo II because Masimo I is in
17 a completely different frame right now.  The Court is
18 involved in reviewing the briefs and preparing decisions
19 on summary judgment motions.  So we have gone through
20 claim construction.  And Masimo I, we have gone through
21 summary -- you have gone through your expert reports and
22 you have gone through your expert discovery and now you
23 are at the time with the summary judgment motions.  And,
24 frankly, I have got to believe that the arguments you are

Page 8

1  going to make in Masimo II could potentially conflict
2  with Masimo I, just based upon the status of the two
3  cases.
4          MR. ROSENTHAL:  Your Honor, you are
5  absolutely right.  The status us of the cases are very
6  different and the arguments as to why narrowing one and
7  narrowing the other is appropriate are a little
8  different.  The reason that they are a little linked is
9  just because of the genesis of this particular dispute.
10         We first approached Masimo right at the
11 time that we had filed summary judgment briefs.  And we
12 realized upon filing those briefs that there were a lot
13 of duplicative claims in Masimo I, and we were arguing
14 for prior art invalidity on many of those claims.  By our
15 count, I think it's something like 34 claims we are
16 arguing are invalid based on prior art.
17         And it occurred to us that there's a
18 whole lot of duplication and there's a whole lot of work
19 for the Court to do to analyze that on claims that
20 ultimately are very unlikely that would go to trial.  And
21 even if Masimo wanted to, we would argue it's not
22 appropriate to bring that many claims to trial.
23         So we approached Masimo at that time and
24 asked.  And what we were told was, "Why are you bringing

Page 9

1  this up now, we have already filed our briefs on summary
2  judgment?  It's going to look like we are withdrawing
3  issues because we are worried about the merits.  This
4  ought to have been raised far earlier in the case.  We
5  have already gone down the road on all of this stuff or
6  it ought to be raised right before trial."
7          We disagreed with that.  And by the way,
8  what I just recited we said in our paper, and Masimo says
9  that that didn't happen.  So I know there's a dispute
10 about that conversation.  But from our perspective,
11 Masimo was criticizing us for waiting until the summary
12 judgment process to start talking about claim narrowing.
13         So in Masimo II, we wanted to make sure
14 that we are raising these issues at the right time.  And
15 in particular, we want to raise them before the Court
16 engages in claim construction, before the parties engage
17 in extensive expert discovery, which, as you can tell
18 from the issues in Masimo I, is very expensive, and
19 consistent with what a lot of decisions in many courts
20 around the country, including several decisions in this
21 court, have done.
22         And what they have done -- and this is
23 the increasing trend -- is they've looked at just before
24 claim construction is an appropriate time to limit the

3 (Pages 6 to 9)

077c01ff-ad0a-4810-b67e-bf440f7b8400

1  scope of the case.  Very often the plaintiffs in these
2  circumstances will say, well, you know, it's too early
3  for me to start thinking about limiting my case because I
4  haven't taken full discovery and I haven't taken
5  depositions and I don't know all the facts about how the
6  accused products work.  And even in view of those
7  objections, we have cited a number of decisions, a couple
8  of Judge Stark's decisions, very recent ones, where there
9  has been a limitation, typically anywhere between four or
10 five claims per patent.  And that, even in view of
11 arguments that discovery hasn't progressed, we are in
12 actually an even more compelling situation here because
13 in this case we have gone through extensive discovery on
14 Philips' accused products.
15        All of the claims, all of the patents,
16 save one, of Masimo's seven asserted patents in Masimo II
17 are directed toward the fast algorithm.  It's the same
18 algorithm that's at issue in Masimo I.  Many of the
19 patents share the same specification.  Of the seven
20 patents that Masimo asserts in Masimo II, five of them
21 are a single specification, which is also at issue in
22 Masimo I.  One of them is another specification that's
23 also at issue in Masimo I.  And then there is an outlier.
24        But Masimo already has everything it

1  needs.  In fact, at two hearings Masimo told the Court
2  that on the patents that were not selected for Masimo I,
3  discovery is basically complete and that they would be
4  happy with no further discovery.  So we are in a
5  situation where, even more than the typical case, now is
6  the appropriate juncture to narrow Masimo II.  Masimo II
7  involves seven patents with 95 claims, 95 claims.
8        THE COURT:  I thought it involved nine.
9        MR. ROSENTHAL:  It actually involves --
10 sorry -- eight total patents, seven Masimo patents and
11 one Philips patent.
12        THE COURT:  Eight, I must have done the
13 math wrong.  I thought there were two Masimo patents that
14 were added to the seven.  I may be confused.
15        MR. ROSENTHAL:  There were at some
16 point -- your confusion is very warranted given the
17 procedural wranglings that have occurred.  There was at
18 some point more.  There were at some point, I believe, a
19 total of seven Masimo patents and a total of three
20 Philips patents, which brought the total to ten, but we
21 have since agreed to dismiss two of the Philips patents,
22 which brings the total down to eight.
23        THE COURT:  All right.  Thank you.
24        MR. ROSENTHAL:  The seven Masimo and one

1  Philips patent.
2        So in our patent, the Philips patents we
3  have already, as we did in Masimo I, we have already
4  narrowed our claim.  I think we are asserting four claims
5  of our patents.  And in Masimo I we were asserting one or
6  two claims of each of those patents.  Masimo has never
7  asserted, has never reduced voluntarily the asserted
8  claims in any of these cases.  In fact, since the first
9  time we were in claim construction, when Masimo II got
10 restarted, the first thing we got from Masimo was updated
11 infringement contentions where they added new claims.
12 They are going in the wrong direction.
13        So we had the situation where we have
14 got 95 claims asserted against us across seven patents.
15 We have looked at this Court's handling, and all the
16 judges that we have seen issue decisions on these sorts
17 of things, we looked at a couple, we cited a couple of
18 Judge Stark's decisions on this, and the trend certainly
19 seems to be that an appropriate number of claims per
20 patent is on the order of four or five.
21        We cited the Personalized User Model
22 case.  Masimo criticized us in the paper that we only
23 cited the agreed order.  We can cite the hearing
24 transcript, which was on September 8th, 2010, at page 26,

1  where this is clearly a disputed issue, and the
2  plaintiffs raise all the same arguments that Masimo
3  raised about it being premature and inappropriate.  Judge
4  Stark said this is an appropriate time to limit the
5  claim.  And I'm going to limit it from 36 claims down to
6  15.
7        We've cited the Stamps.com Federal
8  Circuit decision, where the Federal Circuit, just as it
9  had done in the In Re: Katz litigation, said it is
10 entirely within the Court's discretion to select
11 representative claims as long as there is a relief valve
12 that allows the plaintiff to seek leave to add additional
13 claims upon a showing of good cause.  And, of course, we
14 would want that release valve here.
15        But the Federal Circuit has made it
16 clear, and the trend in all district courts across the
17 country make it clear, that it's entirely appropriate at
18 this stage of the litigation to limit to a reasonable
19 number of claims, before claim construction, the
20 plaintiff's case, especially when you have got
21 overlapping subject matter, which is what we have here.
22 We have got five of the seven patents share the same
23 specification, and all asserted -- with six of the seven
24 patents are asserted against the same algorithm, which

4 (Pages 10 to 13)

077c01ff-ad0a-4810-b67e-bf440f7b8400

Page 14

1  Masimo knows everything they need to know about it.  They
2  have all of our source codes.  They have all of our
3  technical documents.  They said they don't need to take
4  any more depositions with respect, at least, to the four,
5  what Masimo calls, the limbo patents.  For all those
6  reasons, I think it's the appropriate time to limit this
7  case.
8          There is another -- and this is not the
9  thrust of our reasoning, but there is another practical
10  consideration here, which is we are about to engage in
11  claim construction on these 95 claims, and the parties
12  have identified 33 disputes in claim construction.
13  Masimo is trying to say, well, that's just because
14  Philips is trying to identify too many terms to construe.
15  We are dealing with 95 claims, and we have identified 33
16  issues.  Masimo's perspective is that four of the patents
17  don't even -- nothing needs to be construed in them.
18  That's a typical plaintiff's perspective:  Don't construe
19  any of the claims so we can argue whatever we want to the
20  jury.
21          It's not the fault of Philips for trying
22  to construe very technical terms; it's the fact that we
23  have so many claims to worry about that we are dealing
24  with so many claim constructions.  On top of that, their

Page 15

1  constructions, where we are offering a construction that
2  we assumed would be agreed -- like a period of time in a
3  claim is a none zero period of time.  They won't agree to
4  that.  They are arguing -- Masimo wants to reargue issues
5  that the Court has already decided in the first case like
6  does the comparison between the frequency domain values
7  have to be point by point or not.  That's already been
8  decided, and Masimo wants to reargue that.
9          There are a lot of the issues here that
10  are presented by virtue of the fact that we are dealing
11  with 95 claims.  And that really can't be avoided.
12  Masimo wants to say, well, just limit the number of claim
13  terms that can be construed.  That's a very typical
14  plaintiff's response.  Of course, the plaintiff wants to
15  have nothing construed or very few construed so it can
16  have flexibility.
17          So we really think that the weight of
18  authority and the trend in district court and specific
19  decisions of this court all give a lot of support for the
20  idea that we ought to be limiting to four or five per
21  patent.  And in this case, because we are so far along in
22  discovery, because Masimo already knows everything about
23  the algorithm, we have proposed a total of 30 claims over
24  the seven patents.

Page 16

1          THE COURT:  Let me ask you this, Brian,
2  would this backfire, that if I limited the claim terms
3  then all Masimo does is up the amount of terms it wants
4  construed?  If I eliminate the number of claims, then I
5  will up the amount of claim terms it wants construed?
6          MR. ROSENTHAL:  I don't think so, only
7  because Masimo's approach has always been you don't have
8  to construe our patents.  You don't have to construe
9  terms of our patents.  You could just leave them
10  unconstrued and let the jury decide what they mean.  So I
11  don't anticipate that a limitation would carry with it,
12  you know, the risk that Masimo would somehow try to
13  increase the number of terms it wants construed.  I think
14  Masimo wants to have virtually nothing construed.  That's
15  what's evident from the chart that it submitted in the
16  joint submission.
17          Another point is that we are very
18  willing to live within a limitation to a number of terms,
19  just as the Court did in Masimo I.  The Court limited the
20  parties to only 20 terms to be decided, and that was
21  across seven patents as opposed to eight.  And we are
22  very willing to live within that restriction, but not
23  with 95 claims that have been asserted.  If that number
24  gets reduced to 30 claims and the Court wants to impose a

Page 17

1  further limitation on the number of terms, I think that's
2  a very reasonable approach and very consistent with what
3  a lot of judges in this and other districts have done.
4          THE COURT:  All right.  Who is going to
5  be arguing?  Is it going to be you, Joe?
6          MR. RE:  Yes, it is, Your Honor.  Good
7  afternoon.
8          THE COURT:  Good afternoon.
9          MR. RE:  First of all, I just think this
10  is a pretty complicated subject to try to do in a status
11  conference like this, but I will do my best.  I think
12  this should have been done by motion.  If they really
13  think we have too many claims and they somehow want our
14  dropped claims to simply disappear -- none of the cited
15  cases explain what happens to the claims that somehow
16  are, just disappear into the ether.  I think they should
17  file a motion so we could adequately brief this.  That
18  was not our intent in filing this interim status report.
19          THE COURT:  And what type of schedule do
20  you see on that, and how many pages?
21          MR. RE:  Oh, I think a five- to ten-page
22  brief would be fine, with a week separating each brief.
23  But I also think the timing isn't right, because I think
24  it's very clear what Brian is hoping to accomplish.

5  (Pages 14 to 17)

077c01ff-ad0a-4810-b67e-bf440f7b8400

Page 18

1　Brian basically wants us to drop claims before we learn
2　some significant aspects of the case. For example, Brian
3　has asserted 135 prior art references against the
4　patents. They have only charted 19 of them with respect
5　to claims, which means 116 references are listed in their
6　discovery responses with no association or connection
7　with any claim whatsoever. So there is also
8　reexaminations that are going on. There's also the claim
9　construction that's going on.
10　　　　So what Brian basically wants is he
11　wants to force the issue now. He wants us to drop claims
12　when we have the least amount of possible information.
13　That's his goal. I don't think that's proper. And I do
14　think this should be done by briefing. But it does get
15　complicated.
16　　　　Let me explain another very important
17　point. You could drop most of the claims, as a matter of
18　fact, we did a calculation, you could drop three-quarters
19　of the claims and it wouldn't narrow the claim
20　construction issues one bit. So that is the claim
21　construction issues will have to be decided regardless of
22　going down to 30 claims. So getting us down to 30 claims
23　may not reduce a single claim construction term for the
24　Court.

Page 19

1　　　　THE COURT: Oh, the Court can do that
2　sua sponte.
3　　　　MR. RE: Could limit the number of
4　terms?
5　　　　THE COURT: Yes.
6　　　　MR. RE: Yes. And we both seem to agree
7　that the Court can pick a number of terms, just like we
8　did in the last case. But the real irony of this entire
9　discussion is the fact that it was Philips that sought to
10　consolidate the cases. It was Philips that added four
11　patents to the Masimo II case. And now it's Philips
12　saying there are too many patents and too many claims in
13　the case after Philips got what it wanted and got a
14　consolidation.
15　　　　And so what we are seeing here is a
16　repeated pattern of just slicing and dicing the case into
17　smaller and smaller components, which is what they want
18　to do. Instead of why weren't they just honest in their
19　motion to consolidate and say I want that to be
20　bifurcated and have three cases, which is where we are
21　going to end up going.
22　　　　This is a direct result of Philips
23　consolidating Masimo I, the limbo patents, and throwing
24　them in Masimo II and now saying there are too many

Page 20

1　patents and too many claims in Masimo II. Of course,
2　that's a direct result of consolidating from the first
3　case.
4　　　　THE COURT: But wait a minute, Joe.
5　When that started off originally, there were seven limbo
6　patents. And from what I recall -- seven limbo patents
7　total, and originally two patents that were in your
8　separate case that you brought in, quote, Masimo II,
9　originally. So when I did the consolidation, there were
10　nine patents from what I recall.
11　　　　MR. RE: Okay. Yes.
12　　　　THE COURT: We are now down to eight.
13　　　　MR. RE: Right.
14　　　　THE COURT: Okay.
15　　　　MR. RE: So right. The consolidation is
16　what brought the number drastically up. That was my
17　point.
18　　　　THE COURT: But what happened was in the
19　Masimo I you have 32 to 34 claim terms -- claims total,
20　not claim terms, but claims. In Masimo II, with one
21　extra patent, you have 95 claims?
22　　　　MR. RE: No, no. Masimo II originally
23　had three patents in it.
24　　　　THE COURT: No, no, no. Hold on, hold

Page 21

1　on. Just stay with me. In Masimo II, the way it stands
2　now with eight total patents, there are 95 claims brought
3　up by you that you are asserting that Philips infringes.
4　In Masimo I, with seven patents, I believe that there are
5　32 or 34 claims that have been asserted against Philips,
6　that Philips is accused of infringing. So by having one
7　extra patent overall right now in Masimo II, you are
8　saying that justifies an increase from 32, 34 or 36 to
9　95?
10　　　　MR. RE: No, I don't think that's
11　correct, Your Honor. I don't think that's how the math
12　worked out. I can't say specifically -- that's exactly
13　why I think it should be done by briefing. This is
14　pretty complicated for me to keep track of. I don't
15　think your numbers are correct. And it wasn't simply the
16　addition of one patent that made the number go to 95.
17　The 95 is spread over seven patents.
18　　　　THE COURT: And the 36 or 34 were spread
19　over seven patents, too, in Masimo I.
20　　　　MR. RE: No. I don't think that's
21　correct.
22　　　　THE COURT: Well, they are spread over
23　four patents of yours and three patents of Philips.
24　　　　MR. RE: No. The Philips patents are of

6 (Pages 18 to 21)

077c01ff-ad0a-4810-b67e-bf440f7b8400

Page 22

1  virtually no relevance at all to this discussion because
2  the Philips patents are down, I think, to one patent now.
3        THE COURT:  Yes, I understand in this
4  case.  I am trying to figure out how seven patents
5  warrant 95 claims.  I am going to tell you what is
6  happening on this court, just for your understanding.
7  Recently, in another case, one of the judges on this
8  court, who never, never has limited claim terms or claims
9  to be brought, got into a bind when trial approached and
10 found out that everything was supposed to go to trial.
11       One cure for this, frankly, is to do
12 what Judge Andrews does, and that is, you have got five
13 days to try the case.  Each side has X amount of hours to
14 do it.  That sort of really simplifies things.  And I
15 think you are going to face that definitely with Judge
16 Stark, maybe not five days, maybe you get as many as six,
17 and to try to educate a jury in that short a period of
18 time.
19       But I am concerned from the standpoint
20 of how much effort is potentially wasted by the number of
21 claim terms that are alleged to be in dispute and the
22 number of claims that are involved in the litigation.  So
23 I see it as a two-point prong.  I can solve both by
24 limiting the amount of claim terms that I have to

Page 23

1  construe and limiting the amount of claims that can go
2  forward.  And it can be a two-point prong.  And I know
3  it's not only done in this jurisdiction, I know it's done
4  in California.  I know it's done in other jurisdictions
5  who have faced the same type issues.
6        Now, I understand your concern about
7  maybe not having a chance to argue this fully at this
8  time because it's done in a ten-page or a six- or seven-
9  page -- six-page submission, but there were about three
10 or four pages -- three pages in which Masimo did respond
11 to Philips' additional issues complaining about, well,
12 you shouldn't have brought up Masimo I now, but let's
13 talk about Masimo II.
14       I know that there's still an edge with
15 the fact that you had the Court split the number of
16 patents that were going to be allowed to go forward
17 initially in Masimo I, and I know that's been a problem
18 and has bothered you from the point I did it until the
19 present.  I understand all of that.  But if you are going
20 to do submissions, I am going to limit you to seven
21 pages.
22       Brian, today is the 18th.  How much time
23 will you need, recognizing that we have got holidays in
24 between?

Page 24

1        MR. ROSENTHAL:  Well, so my instinct for
2  my team's sake is to give a little bit more time.  On the
3  other hand, I am very conscious of the time that we have
4  got claim construction briefs due at the beginning of
5  February.
6        THE COURT:  That's right.  And that's a
7  concern too.
8        MR. ROSENTHAL:  I think we all need to
9  be on the same page about what the limitations are and
10 give Masimo a fair opportunity to look at the patent
11 claims, if there is an order limiting the claims, so they
12 can make a decision.  So while I would normally want to
13 have -- and I don't think I could fairly say that we
14 ought to do it the day after Christmas or anything like
15 that, so...
16       THE COURT:  I'm not suggesting that.  I
17 am certainly not suggesting that.
18       MR. ROSENTHAL:  Normally, I would say I
19 want a week to do it, but the timing is wrong.
20       Ann Marie, you are on the line, do you
21 think that we could commit to late next week?  I just
22 don't know what --
23       THE COURT:  Friday of next week is what,
24 the 28th?

Page 25

1        MS. DUFFY:  We could do that.
2        THE COURT:  Okay.  You have got the
3  28th.
4        MR. ROSENTHAL:  Thank you.
5        THE COURT:  Then in your circumstance,
6  Joe, let me see, recognizing that we have two days off
7  for that.  So the --
8        MR. RE:  January 7th, Your Honor, would
9  be fine.
10       THE COURT:  I was going to give you
11 January 7th.  And that's all I want.  I just want opening
12 and answering.  That's all I think I need.
13       MR. ROSENTHAL:  And would the plan, Your
14 Honor, be to resolve it on the papers and this
15 discussion?
16       THE COURT:  Yes.  That's it.  And I know
17 that Ms. Corbett here will be very prompt in giving me --
18 because I trust Ellie to the nth degree in the accuracy
19 to which she does reporting, and I'm certain that both
20 sides are going to be ordering this.  If there is any
21 additional argument you wish to put on the record now,
22 now is your time to do that.
23       I will allow Brian to do it first and
24 then Joe you may respond.

7  (Pages 22 to 25)

077c01ff-ad0a-4810-b67e-bf440f7b8400

Page 26

1          MR. ROSENTHAL:  Thank you, Your Honor.
2   I only wanted to respond to a couple of points that Joe
3   made just to make our position clear.
4          Number 1, Joe said it in his paper and
5   he said it again today, we are not advocating for a third
6   phase here.  That's not what this is about.  And this is
7   exactly what was done in the In Re: Katz litigation that
8   the Federal Circuit approved.
9          THE COURT:  I'm sorry, did you cite that
10  case?
11         MR. ROSENTHAL:  No, I'm sorry.  It was
12  cited in the Stamps.com case.  It was, until Stamps.com
13  came out, the case that most people cited for
14  representative claims.  So let me give you the cite.  It
15  is In Re: Katz.
16         THE COURT:  K-A-T-Z?
17         MR. ROSENTHAL:  In Re: Katz, that's 639
18  F 3rd.  I have a pincite here, I want to get the full
19  cite.  I should have had that, Your Honor.
20         THE COURT:  Give me the pincite, that
21  should be enough, because even if I put that through
22  Westlaw or Lexis it will bring me to that page.
23         MR. ROSENTHAL:  I got it.  The full cite
24  is 639 F 3rd, 1303.

Page 27

1          THE COURT:  1303.
2          MR. ROSENTHAL:  And that's a Federal
3   Circuit 2011 decision.
4          THE COURT:  And I just want to make
5   sure, is it In Re: Katz, K-A-T-Z?
6          MR. ROSENTHAL:  Right.  It's Katz
7   Interactive Call Processing litigation.
8          THE COURT:  All right.
9          MR. ROSENTHAL:  And then the Stamps.com
10  case which came after the Katz case.
11         THE COURT:  You have that in your
12  submission.
13         MR. ROSENTHAL:  We do.  And both of
14  those cases stand for the same proposition that it is
15  entirely within the Court's discretion to have the
16  plaintiff's select as representative claims,
17  representative meaning that the plaintiff chooses which
18  claims are going to represent its rights with respect to
19  the asserted patents.  There's no third phase.  There is
20  no bifurcation.  There's no second bite at the apple.
21  These are the patents.  These are the claims.
22         And the only thing that the Federal
23  Circuit requires, both of those cases, is that there be,
24  what I call, a relief valve that in the event, down the

Page 28

1   road, for whatever reason they find claim construction or
2   further discovery or otherwise Masimo determines that
3   there's good cause to change the selected claims or
4   expand the selected claims that there be an opportunity
5   for Masimo to argue that such good cause exists.  And as
6   long as that limitation is placed, the Federal Circuit
7   has, in both of those cases, steadfastly approved
8   limitation to representative claims.  And that is what we
9   are seeking to do here in Masimo II is limit to
10  representative claims.
11         And so I just wanted to make that clear
12  in response to what Joe said.
13         The second thing is, Masimo has not in
14  its brief, nor today, done anything to distinguish our
15  situation from those situations.  For instance, the
16  Personalized User Model, the Google case that we cited,
17  we cited the order, but the hearing transcript, which was
18  in September of 2010 makes it very clear.
19         THE COURT:  Do you have the DI number
20  for the hearing transcript, by any chance?  The order was
21  DI104, but you are saying it was September, I believe,
22  8th for the hearing itself?
23         MR. ROSENTHAL:  Yes.  That was DI No.
24  88.

Page 29

1          THE COURT:  Thank you.
2          MR. ROSENTHAL:  And that was a hearing
3   held on September 8th, 2010.  And the page that the
4   discussion -- or at least the page that the order was
5   conveyed is on page 26.  There's discussion really
6   throughout that long hearing of this issue, but the issue
7   there was whether the plaintiff had to limit from 36
8   claims across three patents, which is about the same
9   ratio of claims to patents that we have here, a little
10  over ten, actually 13, but almost exactly what we have
11  here, about 13 claims per patent.  And Judge Stark
12  limited the plaintiff and ordered the plaintiff to limit
13  to 15 claims over three patents, which is five per
14  patent.  And that was forced to be done, ordered to be
15  done prior to claim construction.  And discovery was far
16  earlier in that case than the three years of discovery
17  that we have had in this case.  So I just wanted to point
18  out that that case remains unrebutted.
19         The other point that Joe made that I
20  wanted to address is this idea that limiting the number
21  of claims would not necessarily limit the number of claim
22  terms.  Well, of course, that's true.  If Masimo wanted
23  to be strategic in selecting claims that maximize the
24  number of claim terms, I suppose it's true.  There are

8  (Pages 26 to 29)

077c01ff-ad0a-4810-b67e-bf440f7b8400

Page 30

1    18 -- of the 33 issues that are under dispute, 18 of them
2    are present in only a single claim. So Masimo would have
3    to be pretty careful, but if they really wanted to do it
4    in such a way that it didn't eliminate claim construction
5    issues, I suppose they could.
6            But the fact is that if we are dealing
7    with 30, that order of magnitude of claims, limiting the
8    part of claim issues is not going to be a problem; I
9    really don't think it will be.
10           And then finally, the question about our
11   prior art and the idea that we haven't, somehow we
12   haven't provided prior art contentions sufficiently. We
13   charted 19 references, as Joe mentioned. Yes, we've
14   listed a lot of other prior art references, just like
15   Masimo did against our '535 patent. And they still have
16   an interrogatory response where they list tons of prior
17   art references. That's very typical.
18           We are very comfortable with saying we
19   are going to rely on the prior art references that we
20   chart. And if we ought to have a deadline where we have
21   to chart those that we will rely on, we would be fine
22   with that. We cited all the prior art that we are aware
23   of. We don't intend to rely on every one of those. If
24   there's some desire for us to select which of those we

Page 31

1    are going to rely on, we are fine doing that. We can do
2    it in very short order.
3            But again, with any of this stuff, we
4    are talking about narrowing the case at this stage with
5    an ability to change things if good cause exists, but
6    that the time is right, in our view, to change it or just
7    to narrow the case.
8            So the only other question that I have
9    for the Court was the Court mentioned seven pages. I
10   suppose that's a seven-page, doubled-space brief as
11   opposed to the seven-page letter form; is that right?
12           THE COURT: Yes. You are not going to
13   get 14 pages out of me.
14           MR. ROSENTHAL: No, I don't think we
15   need even seven pages, but I just wanted to make sure.
16   That's the only point I wanted to raise, Your Honor.
17           THE COURT: That's fine. And I will
18   use, as I repeated, I will use this transcript as well.
19           So, Joe, add arguments, respond to
20   however you wish to do it.
21           MR. RE: Yes. Thank you, Your Honor. I
22   do have several points I would like to make.
23           THE COURT: Sure.
24           MR. RE: First of all, yes, we do

Page 32

1    believe that narrowing should be bilateral. So, yes, I
2    would like to take Brian up on his offer to narrow the
3    references as well. It is totally unfair for any
4    narrowing of issues to be one way. So if there's any
5    narrowing, yes, they should drop all the extraneous
6    references and, yes, they should be limited on a number
7    of prior art references. And that is normal for
8    narrowing of claims to be accompanied with the defendant
9    narrowing on the number of references.
10           Secondly -- and I'm glad if Brian can do
11   that in short order, that would be very helpful.
12           THE COURT: Let me ask you, Joe, as far
13   as the short order aspect of it, when were you looking at
14   that to be done by?
15           MR. RE: It should be done
16   contemporaneously with this process. So if we are going
17   to get somehow narrowed in our number of claims, that
18   order should also proportionately narrow the number of
19   references they can rely upon. So as long as it's done
20   contemporaneous with any narrowing -- obviously, the
21   sooner the better, because it seems a bit unfair to do
22   this mathematically -- and that's my main objection to
23   the process, as I stated before, is that we should do
24   this based on the subject matter. But if you want to go

Page 33

1    the mathematical route, that's fine. But I would like
2    them to narrow their references so if I have to tell the
3    Court how many claims it should be, I should know which
4    references they are relying on.
5            So if Brian can do it in short order, I
6    would like him to do it before I submit my brief on
7    January 7th. That would be perfect.
8            The next point that Brian raised which
9    is an issue which I think requires clarification, and I
10   raised it with Brian on the phone call that we recently
11   had. He used the term "representative claims."
12           Now, that's a different technique.
13   That's where a claim rises or falls with many other
14   claims. And I raised that with Mr. Brian and
15   Mr. Grimaldi a week or so ago, and they flat out rejected
16   the representative claim process, which is a way of doing
17   this. And now I hear Brian proposing and representing
18   that the cases used the representative claim method. So
19   maybe we are talking past each other on what Brian means
20   by the phrase "representative claims."
21           The other new point that just came up in
22   Brian's representation as to what the case law requires,
23   and this would have gone a long way if he had raised it
24   in our phone conversation, is I like the concept of good

9  (Pages 30 to 33)

077c01ff-ad0a-4810-b67e-bf440f7b8400

1    cause. I would like the concept that we could raise
2    additional claims if, for example -- let's pretend, for
3    the sake of argument, in claim construction, a certain
4    claim construction wipes out a claim set. I think we
5    should have the opportunity to raise claims that better
6    accurately represent the invention in spite of some
7    event. The event, of course, I mention -- the reexams,
8    there are reexaminations going on right now that Philips
9    has filed. And if certain patents get wiped out, it
10   seems kind of silly to limit us to the number of claims
11   and not have a chance to adjust that depending on what
12   events occur subsequent to today.
13          THE COURT: I just want to point out to
14   you, Joe, on page 3 of Brian's submission he did mention
15   the Stamps.com case, which pointed out that the Court --
16   and that was really an egregious situation of 629
17   original claims, but because where the Court allowed for
18   the possibility of additional claims for good cause. He
19   did raise it. Now, whether he argued it in any detail, I
20   can't say that. I don't believe so. But at page 3 he
21   did point that out.
22          MR. RE: Yes, Your Honor. And again, I
23   didn't want to make this a full briefing, so I found it
24   surprising that Brian was taking shots at me that cases

1    stand unrebutted. I've never seen a Joint Status Report
2    turn into this kind of level of detail in responding to
3    each other's case.
4          But one thing the Court should be aware
5    of is you will note that in all the cases Brian has cited
6    where the judges have narrowed the number of claims, it
7    should be noted that in each of those cases these are
8    non-practicing entities asserting large patent portfolios
9    on products that they don't make. This is a completely
10   different situation when you have two competitors who are
11   leaders in the market where Masimo practices these
12   claimed inventions. This is a much different situation.
13         And what I generally object to about
14   this process is the extent to which it is done
15   mathematically. And I don't know if a seven-page
16   briefing will be enough for the parties to actually
17   discuss the substance of these inventions and why they
18   are separate and distinct inventions for purposes of
19   presenting the case.
20         And so I do not want this process to be
21   mathematical. That's why I really had a problem with the
22   last process that we went through before when it was done
23   pro rata. But now the other side, Philips has nothing to
24   give us back in return because they don't really have any

1    other patents left.
2         I also found it surprising how Brian
3    wanted to take credit for Philips dropping patents. They
4    dropped those patents on their own, with no consideration
5    in return, because Masimo has a covenant under those
6    patents. So I don't think it's fair for Philips to get
7    favor with the Court because they have been narrowing
8    issues. They narrowed issues because their case is
9    frivolous and they asserted patents that we had a
10   covenant on. So you don't get points for dropping
11   frivolous claims. And I wanted to make that point of
12   record.
13          THE COURT: Let's put it this way, Joe.
14   Honestly, when I listen to both sides' arguments, I
15   recognize that they are truthful, but not accurate --
16   yours and Brian's. Just like the briefs that were
17   submitted to me on the various motions for summary
18   judgment. They were truthful, but not accurate.
19         MR. RE: I assure you, Your Honor, that
20   my briefs are accurate, true and in good faith.
21         THE COURT: Well, I know they are
22   probably done in good faith by everybody. I believe that
23   what I am told is truthful as far as it goes. That's why
24   I say they are generally not accurate.

1         MR. RE: Okay.
2         THE COURT: I don't sit there -- and I,
3    frankly, ignore anything that suggests currying favor by
4    either one of you.
5         MR. RE: Okay. Well, I just wanted to
6    make it on the record that Philips unilaterally dropped
7    those other patents because Masimo has a covenant on
8    them. That has nothing to do with narrowing issues for
9    trial and the interest of the jury and the Court. It's a
10   completely separate subject. That's all I'm saying. And
11   I think Brian would agree with that sentiment.
12         The next point I would like to make,
13   Your Honor, is I got in a lot of hot water with my client
14   when we went through this process in Masimo I. And my
15   client did not like how the process was done
16   mathematically. All I ask for in this process is that it
17   be done with some logic to the subject matter at issue.
18         And that's what I hope we can accomplish
19   through this process, so that we stop just talking about
20   numbers in the abstract and that we really talk about the
21   subject matter. Otherwise, it's basically allowing
22   defendants to infringe lots of patents, and there's just
23   a process where they can't be held accountable because
24   there's just not enough claims that can be litigated.

077c01ff-ad0a-4810-b67e-bf440f7b8400

Page 38

1    And I totally agree with the Court that
2  in those cases that the Court was discussing earlier that
3  this is a process that should be done and is best done
4  when you have the final number, when you get the case
5  ready for trial.  And if the Court wants to limit the
6  amount of time for trial as a way of doing it, I'm
7  totally in favor of that as well.
8    But the part I'm trying to prevent is
9  Masimo selecting claims blindly, without all the
10 information, without the claim construction, without the
11 reexamination, without knowing what the prior art is
12 against each claim.  And that's the process that I'm
13 trying to make sure that we do this with some logical
14 basis in the subject matter, which you will notice in the
15 briefing that you received on the Joint Status Report
16 there's no discussion of the subject matter of any of the
17 inventions.  And that's the part I'm trying to prevent.
18    THE COURT:  Well, I didn't limit you on
19 what the submission would be, so certainly either one of
20 you could have made the argument about that and thrown in
21 some additional information.  But remember, Joe, when I
22 asked how many pages you need, you said five to ten.  So
23 you got seven.  I will give both of you ten if you
24 actually need it, but again, it's going to be double

Page 39

1  spaced.
2    MR. RE:  I prefer the ten because I
3  would like the subject of the subject matter to come up,
4  and I don't want to be in the position where Philips
5  doesn't discuss the subject matter and then it's all
6  throw onto my side.  Because I'm sure Philips could do it
7  in five pages because they don't want to discuss the
8  subject matter of each of the claim sets.
9    THE COURT:  Well, I do believe this, and
10 this is something that is becoming clearer and clearer to
11 me as I go on and become more involved, directly involved
12 in patent cases.  First of all, whether it is an NPE or
13 not, and I don't think in Stamps.com it was an NPE, the
14 Fed Circuit decision, I don't think whether it's an NPE
15 or not necessarily has -- it has some flavor to it, it
16 adds some flavor to the case, but the right to enforce
17 the patents exists whether you are an NPE or a practicing
18 entity.  The law or how you apply fairness shouldn't be
19 influenced by whether a party is an NPE or a practicing
20 entity.  I just want to point that out to you.
21    MR. RE:  My only point was obviously the
22 claim set takes on much greater significance to a client
23 that's actually practicing technology and competing head
24 to head.  So I'm just trying to make everyone aware of

Page 40

1  the difficulty I face with my client, which is why I was
2  in hot water the last time we went through this process.
3  My client is adamant that all his claim sets are very,
4  very important for very different reasons in the
5  marketplace.  That's an interest that NPEs can't really
6  raise.
7    I agree with the Court that the law is
8  the same, but what I'm talking about as far as the
9  interest of the parties with regard to claim sets can
10 really vary when you are a market participant.
11    THE COURT:  I understand.  But I'm
12 certain that every party who is out there who is a
13 practicing entity feels the same way, and every client
14 has got to develop some realistic views.
15    MR. RE:  I understand, Your Honor.
16    MR. ROSENTHAL:  Your Honor, this is
17 Brian.  Is it possible for me to just respond to the NPE
18 point because I think there's an important point to be
19 made there?
20    THE COURT:  Go ahead.
21    MR. ROSENTHAL:  The first line of the
22 decision of Stamps.com that reads Stamps.com and Endicia
23 are competing providers of Internet postage.  These were
24 market competitors, are market competitors.  The NPE

Page 41

1  argument is an absolute red herring.  It is an absolute
2  non-distinction over the cases.
3    THE COURT:  Well, that's what I had
4  said, Brian.  I didn't think the Stamps.Com versus
5  Endicia case would have been just from the names of the
6  companies and my familiarity with both of them.
7    MR. ROSENTHAL:  Right.  This idea that
8  there's somehow a distinction, they were limited to 15
9  claims across 11 patents, of which they selected 15
10 within eight patents.
11    The other point that Stamps.com makes
12 clear, and other cases, is this idea that we are seeking
13 a mathematical approach is wrong.  There are five patents
14 of the seven that are the same specification.  Every time
15 I have asked Joe in conversations about issues related to
16 these patents, he keeps saying, "I have got more where
17 that came from.  I have got more patents issuing every
18 day."  It's a numbers game.  It's entirely a numbers
19 game.  Masimo wants there to be 95 claims and seven
20 patents so it can -- and, of course, Masimo is going to
21 love a five-day trial if they have got 95 claims, because
22 they want to broad brush it.
23    We have to go through and prove why each
24 one of these claims, which are so similar to each other,

11 (Pages 38 to 41)

077c01ff-ad0a-4810-b67e-bf440f7b8400

Page 42

1  are invalid over the prior art.  That's what our
2  reexaminations say, the patent office keeps rejecting all
3  their claims.  You know, it is an incredible task to go
4  through claim by claim by claim.  And for Masimo to say,
5  or even suggest, that it's appropriate to go to a jury
6  and assert 95 claims and have the jury assess the
7  validity of 95 claims -- just think about that process --
8  it is absolutely inappropriate.  And we are looking at
9  this in terms of subject matter.  And if we want to talk
10  about a set of five claims or four claims per patent, if
11  we want to talk about four or five claims or some even
12  larger number per specification, that would be fine too.
13  But just because you get ten patents issued on the same
14  spec covering the same basic subject matter with
15  different words that the defendant has to pick apart with
16  the same prior art doesn't give some justification to
17  having 95 claims in front of the jury.
18        And we are happy to address, in a longer
19  brief, the interrelatedness of the claims and the accused
20  technology and the prior art and the claim terms and all
21  of those things, but the idea that each of these things
22  are independent inventions -- of course, it's supported
23  by the black letter law that every claim defines its own
24  invention.  Fine.  But the fact is that they have a whole

Page 43

1  lot of claims on one specification.  And then they have
2  two other specifications with -- they have asserted a
3  whole bunch of repetitive claims.  So the same is true of
4  Masimo I.  But we'll address that in our brief by subject
5  matter.  We are happy to take that up.
6        MR. RE:  Yes, we will do that in a
7  brief.  And, Your Honor, you can see why we talk past one
8  another.  I never said bring 95 claims to the jury.
9  Never.
10        THE COURT:  Okay.  There was one point
11  or one request that Joe made, Brian, about timing on your
12  part to be able to get matters or information done
13  regarding your invalidity.
14        MR. ROSENTHAL:  My invalidity
15  contentions?
16        THE COURT:  Yes.
17        MR. ROSENTHAL:  Your Honor, we are
18  continuing our investigation into some of the newer
19  patents.  We have actually, as Joe mentioned, we have filed
20  some reexamination requests.
21        THE COURT:  Yes.
22        MR. ROSENTHAL:  We have some idea of
23  what the prior art is.  And I guess what he is asking is
24  that we narrow this sometime prior to --

Page 44

1        THE COURT:  That's the request he is
2  making.
3        MR. ROSENTHAL:  I would be okay
4  making -- the way that I would like to see this happen,
5  and this is just, I think, fairness, is if we are talking
6  about claim construction briefs due on February 4th.
7        THE COURT:  Yes.
8        MR. ROSENTHAL:  I think whatever
9  narrowing is going to happen, both in terms of Masimo's
10  asserted claims and our prior art references, that ought
11  to be done in the middle of January, January 15th.  And
12  that gives the parties a little over two weeks.
13        THE COURT:  Let me put it this way:  Are
14  you looking for the narrowing to occur or the
15  finalization of that type of, sort of finalization of
16  that type of information to occur, after the Court makes
17  its ruling?
18        MR. ROSENTHAL:  I think that -- yes.
19  The ruling ought to -- in our view, we think that the
20  appropriate thing would be for the ruling to set forth a
21  requirement that both parties do whatever narrowing the
22  Court feels is appropriate by a date that occurs sometime
23  shortly after that order.
24        One of the challenges is if we choose

Page 45

1  what prior art we are going to rely on, and then Masimo
2  chooses patent claims that are, you know, chosen on the
3  basis of that prior art, chosen to be the best claims to
4  avoid that prior art, then we are going to have to go
5  back and reselect prior art references, if they choose
6  different claims than we are expecting.
7        THE COURT:  I understand that.
8        MR. ROSENTHAL:  To answer your question
9  directly, what I'm envisioning is an order that causes
10  both parties to narrow their case at the same time in mid
11  January, to give the parties enough time to do the claim
12  construction briefing by the beginning of February.
13        THE COURT:  Let's just talk about that.
14  The brief that I'm going to receive from Masimo isn't
15  going to occur -- I'm not going to receive it until
16  January 7th, and I'm not going to change those dates
17  simply because we are dealing with the holidays, which,
18  of course, leaves not much time to do it by mid January
19  for the Court to make its ruling.
20        My intent would be to schedule a date
21  and time for us to address this and give my ruling on it.
22  And, frankly, I was going to give myself a week -- if you
23  don't mind -- as far as that was concerned.
24        And then we can talk about the

12  (Pages 42 to 45)

077c01ff-ad0a-4810-b67e-bf440f7b8400

Page 46

1    following: The timing as to when the parties would have
2    to complete that process and maybe move out the briefing
3    a little bit to give -- because this is an issue that's
4    come up, it's something that, depending upon how the
5    Court decides -- if I say no, then everything -- if I
6    deny Philip's motion, then everything stays the same
7    because there's no reason to.  If I grant it, and come up
8    with an approach as far as that's concerned, then I am
9    willing to consider recognizing that that's on the heels
10   of when the brief is going to be due, to incorporate
11   enough time for the narrowing to occur and to also give
12   the parties enough time to be able to get their briefs
13   started.  So it may be pushing the briefing schedule out
14   a bit.  The Court will consider that in light of this
15   issue.
16          MR. ROSENTHAL:  That would be fine with
17   us, Your Honor.  I think there's some flexibility in the
18   briefing schedule that would still allow us to have the
19   hearing when it's scheduled for.
20          THE COURT:  When is the hearing
21   scheduled for?  That I forgot about.  Does anybody know?
22          MR. ROSENTHAL:  I am pulling that up.  I
23   think it's March 20.
24          THE COURT:  March 20?

Page 47

1          MR. ROSENTHAL:  Right.
2          THE COURT:  That's great, it's not on my
3    schedule.  It's not on my schedule.  You know what -- no,
4    it's not on my schedule.  That's lovely.  March 20 for
5    the Markman Hearing, right?  What time did I say?
6          MR. ROSENTHAL:  No time was specified,
7    Your Honor.
8          THE COURT:  No time was specified.
9          MR. ROSENTHAL:  No time was.  This was
10   order DI341.
11          THE COURT:  Depending upon that domino
12   effect, that may affect the date as to when we have that.
13   I don't know how much time was actually built in
14   previously.  I can't remember.
15          MR. ROSENTHAL:  It wasn't a lot.  I
16   think we had the briefs due on March 4, the responsive
17   briefs, and then the hearing just over two weeks later on
18   the 20th.
19          THE COURT:  Yes.  Well, we normally
20   start the hearings, I think, at around 9:30, so I will
21   say that it's going to be on Wednesday, the 20th, at
22   9:30.  But that may change as well as far as the date is
23   concerned.  And depending upon what we are looking at as
24   far as the number of either claims and/or claim terms

Page 48

1    that will be involved in this, that will dictate to me
2    how much time I am willing to give the parties.
3          All right.  The 20th is open on my
4    schedule, but I don't know why it ended up not being
5    included on my schedule, how it got missed.  I'm glad we
6    talked about that.  Everybody would have showed up, or at
7    least called, and said, "What time?" and I would have sat
8    there and said, "What do you mean?"  For some reason it
9    didn't make it on my calendar.  That was filed in Masimo
10   II, right?  But Masimo II and Masimo I are consolidated
11   so it should be in the 09-80 case, right?
12          MR. ROSENTHAL:  It was DI341 in the
13   09-80 case.  The caption shows both cases.  I don't know
14   for sure it was actually ordered in the other case, but
15   it was certainly ordered in the 09-80.
16          THE COURT:  But once it was
17   consolidated, I think the 09-80 was supposed to be the
18   lead case, was it not?
19          MR. ROSENTHAL:  Yes.
20          THE COURT:  Okay.  All right.  We have
21   got some stuff to do.  And let me just talk about a date
22   for us to have a teleconference on this issue that's been
23   raised.  I have got the 14th opened, the 14th opened of
24   January.  I'm probably going to make just a ruling rather

Page 49

1    than try to write something out, an order, because that I
2    know will take longer on my part.  So how is everybody
3    looking on the 14th?
4          MR. ROSENTHAL:  That's fine, Your Honor.
5          MR. RE:  Yes, it's fine for me, too,
6    Your Honor.
7          THE COURT:  Any time preferred, Counsel?
8          MR. RE:  Later in the day is obviously
9    better for us on the West Coast.  We appreciate having
10   this later today.
11          THE COURT:  I forgot, Joe, that you are
12   on the West Coast.
13          MR. RE:  We were ready at 6:30, just in
14   case.
15          MR. ROSENTHAL:  I think, if it works for
16   the Court's schedule, the afternoon is doable for us.
17          THE COURT:  We scheduled this at 2:00.
18   How about if we schedule 3:00 p.m. Eastern.
19          MR. RE:  That's fine, Your Honor.
20          THE COURT:  TC to be organized by
21   Philips.  And at that time I will just make the ruling.
22   I'm not going to be accepting any more arguments.
23          MR. ROSENTHAL:  And, Your Honor, this is
24   Brian again.  We would at some point like to be heard on,

13  (Pages 46 to 49)

077c01ff-ad0a-4810-b67e-bf440f7b8400

Page 50

1  if there's going to be a narrowing of prior art
2  references, the specifics of that and the fact that we
3  would like our narrowing to be able to take account of
4  the claims that are selected.
5          Is the right opportunity to argue that
6  now or will we have an opportunity to argue that on the
7  14th with respect to the timing of the narrowing?
8          THE COURT:  For Masimo I?
9          MR. ROSENTHAL:  For Masimo II.  The
10 timing of our narrowing of prior art.
11         THE COURT:  Oh, oh, oh, as far as that
12 is concerned, the timing -- what you had suggested was,
13 you gave a concept on the record right now of the way
14 Philips was thinking.
15         MR. ROSENTHAL:  Right, Your Honor.
16         THE COURT:  Yes.  I'm not making any
17 ruling now at this time on that, but we can discuss it on
18 the 14th, yes.
19         MR. ROSENTHAL:  Thank you, Your Honor.
20         MR. RE:  I would like to add that in the
21 cases that Brian cited, particularly that Judge Stark
22 decision in Intellectual Ventures, Judge Stark had the
23 defendant narrow the prior art first.  So if you want to
24 look at those cases and exactly what occurred, the

Page 51

1  narrowing of the prior art occurred before the narrowing
2  of the claim.
3          THE COURT:  Well, I'm sure you can
4  certainly bring that out to me, because I ran off the
5  cases, but I didn't read them all in detail.  So I have
6  them before me, but I skimmed them basically to confirm
7  that the principles that were outlined were correct.  So
8  we will talk at 3:00 p.m. Eastern time on the 14th.
9  Okay?
10         MR. ROSENTHAL:  Your Honor, this is
11 Brian.  I think that's fair, at least from our
12 perspective.  We do at some point want to raise the issue
13 of Masimo I and the number of claims there.  Our view was
14 that it would be an appropriate thing to do before the
15 Court rules on all those motions and goes through all
16 that work, but I guess we wanted the Court's guidance on
17 whether that's something that we will have an opportunity
18 to address.  And if so, how the Court would like to
19 address that question.
20         THE COURT:  Well, frankly, I am in the
21 process of drafting opinions right now on all of the
22 motions that have been filed.  The one area that I have
23 not reviewed heavily is the in limine motions that relate
24 to the motion on damages; but willfulness, laches and the

Page 52

1  rest are under consideration right now.  So it's a little
2  bit late to necessarily narrow it, because I don't know
3  what would have happened with the briefing if I narrowed
4  it now.  I really don't.
5          MR. ROSENTHAL:  And that's exactly the
6  guidance I was looking for.  I think in view of that it
7  doesn't make sense to narrow now.  Our goal was to reduce
8  your work.
9          We do just want to just put a flag up
10 that after summary judgment proceedings, whatever is left
11 of the case by that time, we do want to reserve our right
12 to discuss narrowing for trial.
13         THE COURT:  Oh, no, the narrowing for
14 trial isn't going to be a problem.  But, frankly,
15 whatever I do on the motions for summary judgment, I have
16 absolutely no doubt that objections will be filed.  I
17 think that's a realistic possibility.  And should that
18 occur, that's going to put more delay into this case.
19 And depending upon what Judge Stark does, based upon the
20 objections that are filed to any of my R and Rs, that
21 will directly affect what narrowing needs to be done,
22 right?
23         MR. ROSENTHAL:  That's right, Your
24 Honor.

Page 53

1          THE COURT:  Okay.  So since I have gone
2  along that far already on this case, I am just going to
3  just continue at this stage.
4          MR. ROSENTHAL:  Thank you, Your Honor.
5          MR. RE:  Thank you, Your Honor.
6          THE COURT:  Thank you.
7          MR. RE:  Merry Christmas, everyone.
8          MR. ROSENTHAL:  Merry Christmas.
9          THE COURT:  Merry Christmas and Happy
10 Hanukkah.
11         ALL COUNSEL:  Thank you, Your Honor.
12         (The teleconference concluded at 4:10
13 p.m.)
14
15
16
17
18
19
20
21
22
23
24

14  (Pages 50 to 53)

077c01ff-ad0a-4810-b67e-bf440f7b8400

Page 54

```
 1            C E R T I F I C A T E
 2
 3   STATE OF DELAWARE:
 4   NEW CASTLE COUNTY:
 5        I, Ellen Corbett Hannum, a Notary Public within and
 6   for the County and State aforesaid, do hereby certify
 7   that the foregoing teleconference was taken before me,
 8   pursuant to notice, at the time and place indicated; that
 9   the statements of participants were correctly recorded in
10   machine shorthand by me and thereafter transcribed under
11   my supervision with computer-aided transcription; that
12   the transcript is a true record of the statements made by
13   the participants; and that I am neither of counsel nor
14   kin to any party in said action, nor interested in the
15   outcome thereof.
16        WITNESS my hand and official seal this 18th day of
17   December A.D. 2012.
18
       _____
19       Ellen Corbett Hannum, RMR, CMRS
         Notary Public - Reporter
20       Delaware Certified Shorthand Reporter
         Certification No. 118-RPR, Expires 1-31-13
21
22
23
24
```

15 (Page 54)

077c01ff-ad0a-4810-b67e-bf440f7b8400

## A

**ability** 31:5
**able** 43:12 46:12 50:3
**absolute** 41:1,1
**absolutely** 8:5 42:8 52:16
**abstract** 37:20
**accepting** 49:22
**accompanied** 32:8
**accomplish** 17:24 37:18
**account** 50:3
**accountable** 37:23
**accuracy** 25:18
**accurate** 36:15,18 36:20,24
**accurately** 34:6
**accused** 10:6,14 21:6 42:19
**action** 54:14
**adamant** 40:3
**add** 6:4 13:12 31:19 50:20
**added** 5:5,13 11:14 12:11 19:10
**addition** 21:16
**additional** 6:18 13:12 23:11 25:21 34:2,18 38:21
**address** 7:4 29:20 42:18 43:4 45:21 51:18,19
**addressed** 4:3
**adds** 39:16
**adequate** 6:15
**adequately** 17:17
**adjust** 34:11
**advocating** 26:5
**affect** 47:12 52:21
**aforesaid** 54:6
**afternoon** 3:5,14 17:7,8 49:16
**ago** 33:15
**agree** 4:21 6:7 15:3 19:6 37:11 38:1 40:7

**agreed** 11:21 12:23 15:2
**ahead** 40:20
**al** 1:7
**Alan** 2:6 3:16
**algorithm** 10:17,18 13:24 15:23
**alleged** 22:21
**allow** 25:23 46:18
**allowed** 23:16 34:17
**allowing** 37:21
**allows** 13:12
**amount** 6:20 16:3,5 18:12 22:13,24 23:1 38:6
**analyze** 8:19
**Anderson** 2:2 3:15
**Andrews** 22:12
**and/or** 47:24
**Ann** 2:5 3:16 24:20
**answer** 45:8
**answering** 25:12
**anticipate** 16:11
**anybody** 4:3 46:21
**apart** 42:15
**apparently** 4:21
**APPEARANCES** 1:14 2:1
**apple** 27:20
**apply** 39:18
**appreciate** 49:9
**approach** 16:7 17:2 41:13 46:8
**approached** 8:10 8:23 22:9
**appropriate** 7:6 8:7,22 9:24 11:6 12:19 13:4,17 14:6 42:5 44:20 44:22 51:14
**approved** 26:8 28:7
**area** 51:22
**argue** 8:21 14:19 23:7 28:5 50:5,6
**argued** 34:19
**arguing** 8:13,16

15:4 17:5
**argument** 25:21 34:3 38:20 41:1
**arguments** 7:15,24 8:6 10:11 13:2 31:19 36:14 49:22
**Armond** 1:19 3:10
**ARSHT** 1:16
**art** 8:14,16 18:3 30:11,12,14,17,19 30:22 32:7 38:11 42:1,16,20 43:23 44:10 45:1,3,4,5 50:1,10,23 51:1
**asked** 8:24 38:22 41:15
**asking** 5:4,12 43:23
**aspect** 32:13
**aspects** 18:2
**assert** 42:6
**asserted** 6:21 10:16 12:7,7,14 13:23 13:24 16:23 18:3 21:5 27:19 36:9 43:2 44:10
**asserting** 12:4,5 21:3 35:8
**asserts** 10:20
**assess** 42:6
**assumed** 15:2
**association** 18:6
**assure** 36:19
**authority** 15:18
**avoid** 45:4
**avoided** 15:11
**aware** 30:22 35:4 39:24
**A.D** 54:17

## B

**back** 5:7 35:24 45:5
**backfire** 16:2
**based** 8:2,16 32:24 52:19
**basic** 42:14
**basically** 5:19 11:3 18:1,10 37:21

51:6
**basis** 38:14 45:3
**BEAR** 1:18
**becoming** 39:10
**beginning** 3:4 24:4 45:12
**behalf** 2:9 3:7
**believe** 4:24 6:19 7:24 11:18 21:4 28:21 32:1 34:20 36:22 39:9
**best** 17:11 38:3 45:3
**better** 32:21 34:5 49:9
**bifurcated** 19:20
**bifurcation** 27:20
**bilateral** 32:1
**bind** 22:9
**bit** 6:12 18:20 24:2 32:21 46:3,14 52:2
**bite** 27:20
**black** 42:23
**blindly** 38:9
**bothered** 23:18
**Brian** 2:7 3:16 6:6 16:1 17:24 18:1,2 18:10 23:22 25:23 32:2,10 33:5,8,10 33:14,17,19 34:24 35:5 36:2 37:11 40:17 41:4 43:11 49:24 50:21 51:11
**Brian's** 33:22 34:14 36:16
**brief** 5:11,15 17:17 17:22,22 28:14 31:10 33:6 42:19 43:4,7 45:14 46:10
**briefing** 18:14 21:13 34:23 35:16 38:15 45:12 46:2 46:13,18 52:3
**briefs** 4:10,18 7:18 8:11,12 9:1 24:4

36:16,20 44:6 46:12 47:16,17
**bring** 8:22 26:22 43:8 51:4
**bringing** 8:24
**brings** 11:22
**broad** 41:22
**brought** 11:20 20:8 20:16 21:2 22:9 23:12
**BROWN** 2:5
**brush** 41:22
**built** 47:13
**bunch** 43:3

## C

**C** 3:2 54:1,1
**calculation** 18:18
**calendar** 48:9
**California** 1:21 23:4
**call** 3:20 7:10 27:7 27:24 33:10
**called** 48:7
**calls** 14:5
**caption** 48:13
**care** 4:4
**careful** 30:3
**carry** 16:11
**case** 4:7,9,12 6:11 9:4 10:1,3,13 11:5 12:22 13:20 14:7 15:5,21 18:2 19:8 19:11,13,16 20:3 20:8 22:4,7,13 26:10,12,13 27:10 27:10 28:16 29:16 29:17,18 31:4,7 33:22 34:15 35:3 35:19 36:8 38:4 39:16 41:5 45:10 48:11,13,14,18 49:14 52:11,18 53:2
**cases** 8:3,5 12:8 17:15 19:10,20 27:14,23 28:7

33:18 34:24 35:5
35:7 38:2 39:12
41:2,12 48:13
50:21,24 51:5
**CASTLE** 54:4
**cause** 13:13 28:3,5
31:5 34:1,18
**causes** 45:9
**certain** 5:12 25:19
34:3,9 40:12
**certainly** 7:6 12:18
24:17 38:19 48:15
51:4
**Certification** 54:20
**Certified** 54:20
**certify** 54:6
**challenges** 44:24
**chambers** 3:4
**chance** 4:1 23:7
28:20 34:11
**change** 28:3 31:5,6
45:16 47:22
**chart** 4:9 16:15
20:30,21
**charted** 18:4 30:13
**choose** 44:24 45:5
**chooses** 27:17 45:2
**chosen** 45:2,3
**Christmas** 24:14
53:7,8,9
**Circuit** 13:8,8,15
26:8 27:3,23 28:6
39:14
**circumstance** 25:5
**circumstances** 10:2
**cite** 12:23 26:9,14
26:19,23
**cited** 10:7 12:17,21
12:23 13:7 17:14
26:12,13 28:16,17
30:22 35:5 50:21
**claim** 4:8,18 5:1,10
5:16 6:1 7:5,20
9:12,16,24 12:4,9
13:5,19 14:11,12
14:24 15:3,12
16:2,5 18:7,8,19

18:20,23 20:19,20
22:8,21,24 24:4
28:1 29:15,21,24
30:2,4,8 33:13,16
33:18 34:3,4,4
38:10,12 39:8,22
40:3,9 42:4,4,4,20
42:23 44:6 45:11
47:24 51:2
**claimed** 35:12
**claims** 6:21 8:13,14
8:15,19,22 10:10
10:15 11:7,7 12:4
12:6,8,11,14,19
13:5,11,13,19
14:11,15,19,23
15:11,23 16:4,23
16:24 17:13,14,15
18:1,5,11,17,19
18:22,22 19:12
20:1,19,20,21
21:2,5 22:5,8,22
23:1 24:11,11
26:14 27:16,18,21
28:3,4,8,10 29:8,9
29:11,13,21,23
30:7 32:8,17 33:3
33:11,14,20 34:2
34:5,10,17,18
35:6 36:11 37:24
38:9 41:9,19,21
41:24 42:3,6,7,10
42:10,11,17,19
43:1,3,8 44:10
45:2,3,6 47:24
50:4 51:13
**clarification** 33:9
**clear** 13:16,17
17:24 26:3 28:11
28:18 41:12
**clearer** 39:10,10
**clearly** 13:1
**client** 37:13,15
39:22 40:1,3,13
**CMRS** 54:19
**Coast** 49:9,12
**codes** 14:2

**come** 39:3 46:4,7
**comfortable** 30:18
**commit** 24:21
**companies** 41:6
**comparison** 15:6
**compelling** 10:12
**competing** 39:23
40:23
**competitors** 35:10
40:24,24
**complaining** 23:11
**complete** 11:3 46:2
**completely** 7:17
35:9 37:10
**complicated** 17:10
18:15 21:14
**components** 19:17
**computer-aided**
54:11
**concept** 33:24 34:1
50:13
**concern** 23:6 24:7
**concerned** 22:19
45:23 46:8 47:23
50:12
**concluded** 53:12
**conference** 3:20
7:7 17:11
**confirm** 51:6
**conflict** 8:1
**confused** 11:14
**confusion** 11:16
**connection** 18:6
**conscious** 24:3
**consider** 46:9,14
**consideration**
14:10 36:4 52:1
**consistent** 9:19
17:2
**consolidate** 19:10
19:19
**consolidated** 1:7
4:7 48:10,17
**consolidating**
19:23 20:2
**consolidation**
19:14 20:9,15

**construction** 4:9
5:2,11,16 6:2 7:20
9:16,24 12:9
13:19 14:11,12
15:1 18:9,20,21
18:23 24:4 28:1
29:15 30:4 34:3,4
38:10 44:6 45:12
**constructions** 4:18
14:24 15:1
**construe** 14:14,18
14:22 16:8,8 23:1
**construed** 14:17
15:13,15,15 16:4
16:5,13,14
**contemporaneous**
32:20
**contemporaneou...**
32:16
**contentions** 12:11
30:12 43:15
**continue** 53:3
**Continued** 2:1
**continuing** 43:18
**conversation** 9:10
33:24
**conversations**
41:15
**conveyed** 29:5
**Corbett** 1:24 3:20
25:17 54:5,19
**CORP** 1:4,7
**correct** 5:3 21:11
21:15,21 51:7
**correctly** 54:9
**CORROON** 2:2
**counsel** 3:5,21 6:17
49:7 53:11 54:13
**count** 8:15
**country** 9:20 13:17
**County** 54:4,6
**couple** 10:7 12:17
12:17 26:2
**course** 6:8 13:13
15:14 20:1 29:22
34:7 41:20 42:22
45:18

**court** 1:1 3:5,12,18
3:20,23 4:15,19
5:4,22 6:14,16
7:11,12,17 8:19
9:15,21 11:1,8,12
11:23 15:5,18,19
16:1,19,19,24
17:4,8,19 18:24
19:1,1,5,7 20:4,12
20:14,18,24 21:18
21:22 22:3,6,8
23:15 24:6,16,23
25:2,5,10,16 26:9
26:16,20 27:1,4,8
27:11 28:19 29:1
31:9,9,12,17,23
32:12 33:3 34:13
34:15,17 35:4
36:7,13,21 37:2,9
38:1,2,5,18 39:9
40:7,11,20 41:3
43:10,16,21 44:1
44:7,13,16,22
45:7,13,19 46:5
46:14,20,24 47:2
47:8,11,19 48:16
48:20 49:7,11,17
49:20 50:8,11,16
51:3,15,18,20
52:13 53:1,6,9
**courts** 9:19 13:16
**Court's** 6:8 12:15
13:10 27:15 49:16
51:16
**covenant** 36:5,10
37:7
**covering** 42:14
**credit** 36:3
**criticized** 12:22
**criticizing** 9:11
**cure** 22:11
**currying** 37:3
**C.A** 1:5

**D**

**D** 1:20 3:2
**damages** 51:24

**date** 44:22 45:20
  47:12,22 48:21
**dates** 45:16
**David** 2:3 3:15
**day** 24:14 41:18
  49:8 54:16
**days** 22:13,16 25:6
**deadline** 30:20
**deal** 7:3,12
**dealing** 6:22,23
  7:14 14:15,23
  15:10 30:6 45:17
**December** 1:10
  54:17
**decide** 16:10
**decided** 15:5,8
  16:20 18:21
**decides** 46:5
**decision** 13:8 24:12
  27:3 39:14 40:22
  50:22
**decisions** 7:18 9:19
  9:20 10:7,8 12:16
  12:18 15:19
**defendant** 32:8
  42:15 50:23
**defendants** 1:8 2:9
  37:22
**defines** 42:23
**definitely** 22:15
**degree** 25:18
**Delaware** 1:2,10
  54:3,20
**delay** 52:18
**deny** 46:6
**depending** 34:11
  46:4 47:11,23
  52:19
**depositions** 10:5
  14:4
**desire** 30:24
**detail** 34:19 35:2
  51:5
**determines** 28:2
**develop** 40:14
**DI** 28:19,23
**dicing** 19:16

**dictate** 48:1
**different** 7:16,17
  8:6,8 33:12 35:10
  35:12 40:4 42:15
  45:6
**difficulty** 40:1
**direct** 19:22 20:2
**directed** 10:17
**direction** 12:12
**directly** 39:11 45:9
  52:21
**disagreed** 9:7
**disappear** 17:14,16
**discovery** 4:11 7:22
  9:17 10:4,11,13
  11:3,4 15:22 18:6
  28:2 29:15,16
**discretion** 13:10
  27:15
**discuss** 4:18 7:9
  35:17 39:5,7
  50:17 52:12
**discussing** 4:2 38:2
**discussion** 19:9
  22:1 25:15 29:4,5
  38:16
**dismiss** 11:21
**dispute** 8:9 9:9
  22:21 30:1
**disputed** 13:1
**disputes** 14:12
**distinct** 35:18
**distinction** 41:8
**distinguish** 28:14
**district** 1:1,2 13:16
  15:18
**districts** 17:3
**DI104** 28:21
**DI341** 47:10 48:12
**doable** 49:16
**documents** 14:3
**doing** 31:1 33:16
  38:6
**domain** 15:6
**domino** 47:11
**double** 38:24
**doubled-space**

  31:10
**doubt** 52:16
**drafting** 51:21
**drastically** 20:16
**drop** 18:1,11,17,18
  32:5
**dropped** 17:14
  36:4 37:6
**dropping** 36:3,10
**due** 4:10 24:4 44:6
  46:10 47:16
**Duffy** 3:16 25:1
**duplication** 8:18
**duplicative** 8:13
**DVD** 4:19 5:8,24
  6:4,4,8
**D.C** 2:8

## E

**E** 1:19 2:3 3:2,2
  54:1,1
**earlier** 9:4 29:16
  38:2
**early** 10:2
**Eastern** 49:18 51:8
**edge** 23:14
**educate** 22:17
**effect** 47:12
**efficient** 7:9
**effort** 22:20
**egregious** 34:16
**eight** 11:10,12,22
  16:21 20:12 21:2
  41:10
**either** 5:18 37:4
  38:19 47:24
**ELECS** 1:7
**eliminate** 16:4 30:4
**Ellen** 54:5,19
**Ellie** 1:24 3:20
  25:18
**endeavor** 5:23
**ended** 48:4
**Endicia** 40:22 41:5
**enforce** 39:16
**engage** 9:16 14:10
**engages** 9:16

**entire** 19:8
**entirely** 13:10,17
  27:15 41:18
**entities** 35:8
**entity** 39:18,20
  40:13
**envisioning** 45:9
**especially** 13:20
**ESQ** 1:16,19,19,20
  2:3,5,6,6,7
**et** 1:7
**ether** 17:16
**event** 27:24 34:7,7
**events** 34:12
**everybody** 36:22
  48:6 49:2
**evident** 16:15
**exactly** 21:12 26:7
  29:10 50:24 52:5
**example** 18:2 34:2
**exists** 28:5 31:5
  39:17
**expand** 28:4
**expecting** 45:6
**expense** 5:5,13 6:5
**expensive** 5:23
  9:18
**expert** 7:21,22 9:17
**Expires** 54:20
**explain** 17:15
  18:16
**extensive** 9:17
  10:13
**extent** 4:19 35:14
**extra** 20:21 21:7
**extraneous** 32:5

## F

**F** 26:18,24 54:1
**face** 22:15 40:1
**faced** 23:5
**fact** 6:10 11:1 12:8
  14:22 15:10 18:18
  19:9 23:15 30:6
  42:24 50:2
**facts** 10:5
**fair** 24:10 36:6

  51:11
**fairly** 24:13
**fairness** 39:18 44:5
**faith** 36:20,22
**falls** 36:13,23
**familiarity** 6:11
  41:6
**far** 9:4 15:21 29:15
  32:12 36:23 40:8
  45:23 46:8 47:22
  47:24 50:11 53:2
**fast** 10:17
**fault** 14:21
**favor** 36:7 37:3
  38:7
**February** 4:10 24:5
  44:6 45:12
**Fed** 39:14
**Federal** 13:7,8,15
  26:8 27:2,22 28:6
**feeling** 5:18
**feels** 40:13 44:22
**figure** 7:5 22:4
**file** 17:17
**filed** 8:11 9:1 34:9
  43:19 48:9 51:22
  52:16,20
**filing** 8:12 17:18
**final** 38:4
**finalization** 44:15
  44:15
**finally** 30:10
**find** 28:1
**fine** 5:9 6:9,16
  17:22 25:9 30:21
  31:1,17 33:1
  42:12,24 46:16
  49:4,5,19
**first** 7:13 8:10 12:8
  12:10 15:5 17:9
  20:2 25:23 31:24
  39:12 40:21 50:23
**five** 10:10,20 12:20
  13:22 15:20 17:21
  22:12,16 29:13
  38:22 39:7 41:13
  42:10,11

**five-day** 41:21
**flag** 52:9
**flat** 33:15
**flavor** 39:15,16
**flexibility** 15:16
46:17
**folks** 4:14
**following** 3:3 46:1
**force** 18:11
**forced** 29:14
**foregoing** 54:7
**forgot** 46:21 49:11
**form** 31:11
**format** 4:16
**forth** 4:14 44:20
**forward** 23:2,16
**found** 22:10 34:23
36:2
**four** 10:9 12:4,20
14:4,16 15:20
19:10 21:23 23:10
42:10,11
**frame** 7:17
**frankly** 5:6 7:24
22:11 37:3 45:22
51:20 52:14
**frequency** 15:6
**fresh** 6:12
**Friday** 24:23
**frivolous** 36:9,11
**front** 42:17
**full** 10:4 26:18,23
34:23
**fully** 23:7
**further** 11:4 17:1
28:2

**G**

**G** 3:2
**game** 41:18,19
**generally** 35:13
36:24
**genesis** 8:9
**getting** 18:22
**give** 7:2 15:19 24:2
24:10 25:10 26:14
26:20 35:24 38:23

42:16 45:11,21,22
46:3,11 48:2
**given** 4:24 6:10
11:16
**gives** 44:12
**giving** 5:14 25:17
**glad** 32:10 48:5
**go** 5:5,7 8:20 21:16
32:24 39:11 40:20
41:23 42:3,5 45:4
**goal** 18:13 52:7
**goes** 36:23 51:15
**going** 5:23 6:12 7:1
8:1 9:2 12:12
13:5 17:4,5 18:8,9
18:22 19:21,21
22:5,15 23:16,19
23:20 25:10,20
27:18 30:8,19
31:1,12 32:16
34:8 38:24 41:20
44:9 45:1,4,14,15
45:15,16,22 46:10
47:21 48:24 49:22
50:1 52:14,18
53:2
**good** 3:5,14 13:13
17:6,8 28:3,5 31:5
33:24 34:18 36:20
36:22
**Google** 28:16
**grant** 46:7
**great** 47:2
**greater** 39:22
**Grimaldi** 2:6 3:16
33:15
**guess** 4:16 43:23
51:16
**guidance** 4:22
51:16 52:6

**H**

**hand** 24:3 54:16
**handle** 7:11
**handling** 12:15
**Hannum** 1:24 54:5

54:19
**Hanukkah** 53:10
**happen** 9:9 44:4,9
**happened** 20:18
52:3
**happening** 22:6
**happens** 17:15
**happy** 4:6 11:4
42:18 43:5 53:9
**head** 39:23,24
**Heaney** 1:16 3:9,9
**hear** 33:17
**heard** 49:24
**hearing** 12:23
28:17,20,22 29:2
29:6 46:19,20
47:5,17
**hearings** 11:1
47:20
**heavily** 51:23
**heels** 46:9
**held** 3:4 29:3 37:23
**helpful** 5:8 32:11
**herring** 41:1
**highjack** 7:7
**hold** 20:24,24
**holidays** 23:23
45:17
**honest** 19:18
**Honestly** 36:14
**Honor** 3:14 4:5
5:20 6:24 8:4
17:6 21:11 25:8
25:14 26:1,19
31:16,21 34:22
36:19 37:13 40:15
40:16 43:7,17
46:17 47:7 49:4,6
49:19,23 50:15,19
51:10 52:24 53:4
53:5,11
**HONORABLE**
1:13
**hope** 37:18
**hoping** 17:24
**hot** 37:13 40:2
**hours** 22:13

**huge** 5:13

**I**

**idea** 15:20 29:20
30:11 41:7,12
42:21 43:22
**identified** 14:12,15
**identify** 14:14
**ignore** 37:3
**II** 4:6 6:20,23 7:4,7
7:13,16 8:1 9:13
10:16,20 11:6,6
12:9 19:11,24
20:1,8,20,22 21:1
21:7 23:13 28:9
48:10,10 50:9
**important** 18:16
40:4,18
**impose** 16:24
**inappropriate** 13:3
42:8
**included** 48:5
**including** 6:19 9:20
**incorporate** 46:10
**increase** 16:13 21:8
**increasing** 9:23
**incredible** 42:3
**independent** 42:22
**indicated** 54:8
**influenced** 39:19
**information** 3:19
18:12 38:10,21
43:12 44:16
**infringe** 37:22
**infringement** 12:11
**infringes** 21:3
**infringing** 21:6
**initially** 23:17
**instance** 28:15
**instinct** 24:1
**Intellectual** 50:22
**intend** 7:7 30:23
**intent** 17:18 45:20
**Interactive** 27:7
**interest** 37:9 40:5,9
**interested** 54:14
**interim** 17:18

**Internet** 40:23
**interrelatedness**
42:19
**interrogatory**
30:16
**invalid** 8:16 42:1
**invalidity** 8:14
43:13,14
**invention** 34:6
42:24
**inventions** 35:12
35:17,18 38:17
42:22
**investigation** 43:18
**involved** 7:18 11:8
22:22 39:11,11
48:1
**involves** 11:7,9
**irony** 19:8
**Irvine** 1:21
**issue** 4:16,20 7:9
10:18,21,23 12:16
13:1 18:11 29:6,6
33:9 37:17 46:3
46:15 48:22 51:12
**issued** 42:13
**issues** 4:13 6:18 7:8
9:3,14,18 14:16
15:4,9 18:20,21
23:5,11 30:1,5,8
32:4 36:8,8 37:8
41:15
**issuing** 41:17

**J**

**January** 25:8,11
33:7 44:11,11
45:11,16,18 48:24
**Joe** 3:10 4:5,23
17:5 20:4 25:6,24
26:2,4 28:12
29:19 30:13 31:19
32:12 34:14 36:13
38:21 41:15 43:11
43:19 49:11
**joint** 4:8 16:16 35:1
38:15

**JOSEPH** 1:19
**Judge** 3:6 10:8
  12:18 13:3 22:12
  22:15 29:11 50:21
  50:22 52:19
**judges** 12:16 17:3
  22:7 35:6
**Judge's** 3:4
**judgment** 7:19,23
  8:11 9:2,12 36:18
  52:10,15
**Julia** 1:16 3:9
**juncture** 7:6 11:6
**jurisdiction** 23:3
**jurisdictions** 23:4
**jury** 14:20 16:10
  22:17 37:9 42:5,6
  42:17 43:8
**justification** 42:16
**justifies** 21:8

**K**

**Katz** 13:9 26:7,15
  26:17 27:5,6,10
**keep** 21:14
**keeps** 41:16 42:2
**kin** 54:14
**kind** 34:10 35:2
**Knobbe** 1:18 3:10
**know** 6:21 7:8 9:9
  10:2,5 14:1 16:12
  23:2,3,4,14,17
  24:22 25:16 33:3
  35:15 36:21 42:3
  45:2 46:21 47:3
  47:13 48:4,13
  49:2 52:2
**knowing** 38:11
**knows** 14:1 15:22
**K-A-T-Z** 26:16
  27:5

**L**

**laches** 51:24
**large** 35:8
**larger** 42:12
**late** 24:21 52:2
**law** 33:22 39:18

40:7 42:23
**lead** 48:18
**leaders** 35:11
**learn** 18:1
**leave** 13:12 16:9
**leaves** 45:18
**left** 36:1 52:10
**letter** 31:11 42:23
**let's** 4:2 23:12 34:2
  36:13 45:13
**level** 35:2
**Lexis** 26:22
**light** 46:14
**limbo** 14:5 19:23
  20:5,6
**limine** 51:23
**limit** 9:24 13:4,5,18
  14:6 15:12 19:3
  23:20 28:9 29:7
  29:12,21 34:10
  38:5,18
**limitation** 10:9
  16:11,18 17:1
  28:6,8
**limitations** 24:9
**limited** 16:2,19
  22:8 29:12 32:6
  41:8
**limiting** 10:3 15:20
  22:24 23:1 24:11
  29:20 30:7
**line** 3:7,13,15 24:20
  40:21
**linked** 8:8
**list** 30:16
**listed** 18:5 30:14
**listen** 36:14
**litigated** 37:24
**litigation** 13:9,18
  22:22 26:7 27:7
**little** 8:7,8 24:2
  29:9 44:12 46:3
  52:1
**live** 6:3,14 16:18,22
**logic** 37:17
**logical** 38:13
**long** 13:11 28:6

29:6 32:19 33:23
**longer** 42:18 49:2
**look** 9:2 24:10
  50:24
**looked** 9:23 12:15
  12:17
**looking** 4:22 32:13
  42:8 44:14 47:23
  49:3 52:6
**lot** 8:12,18,18 9:19
  15:9,19 17:3
  30:14 37:13 43:1
  47:15
**lots** 37:22
**love** 41:21
**lovely** 47:4
**LPS-MPT** 1:6

**M**

**machine** 54:10
**magnitude** 30:7
**main** 32:22
**making** 44:2,4
  50:16
**March** 46:23,24
  47:4,16
**Marie** 2:5 3:16
  24:20
**market** 35:11
  40:10,24,24
**marketplace** 40:5
**Markman** 47:5
**Martens** 1:18 3:10
**MARY** 1:13
**Masimo** 1:4 3:7 4:6
  4:6 6:9,19,20,21
  6:22,23 7:4,4,7,8
  7:8,13,14,15,16
  7:16,20 8:1,2,10
  8:13,21,23 9:8,11
  9:13,18 10:16,18
  10:20,20,22,23,24
  11:1,2,6,6,10,13
  11:19,24 12:3,5,6
  12:9,10,22 13:2
  14:1,5,13 15:4,8
  15:12,22 16:3,12

16:14,19 19:11,23
  19:24 20:1,8,19
  20:20,22 21:1,4,7
  21:19 23:10,12,13
  23:17 24:10 28:2
  28:5,9,13 29:22
  30:2,15 35:11
  36:5 37:7,14 38:9
  41:19,20 42:4
  43:4 45:1,14 48:9
  48:10,10 50:8,9
  51:13
**Masimo's** 10:16
  14:16 16:7 44:9
**math** 11:13 21:11
**mathematical** 33:1
  35:21 41:13
**mathematically**
  32:22 35:15 37:16
**matter** 13:21 18:17
  32:24 37:17,21
  38:14,16 39:3,5,8
  42:9,14 43:5
**matters** 43:12
**maximize** 29:23
**MAYER** 2:5
**mean** 16:10 48:8
**meaning** 27:17
**means** 18:5 33:19
**mention** 34:7,14
**mentioned** 6:7
  30:13 31:9 43:19
**Merit** 1:24
**merits** 9:3
**Merry** 53:7,8,9
**method** 33:18
**Michelle** 1:19 3:10
**mid** 45:10,18
**middle** 44:11
**mind** 6:13 45:23
**minute** 20:4
**missed** 48:5
**Model** 12:21 28:16
**Moore** 2:3 3:14,15
**MORRIS** 1:16
**motion** 17:12,17
  19:19 46:6 51:24

**motions** 7:19,23
  36:17 51:15,22,23
  52:15
**move** 46:2

**N**

**N** 1:7 3:2
**names** 41:5
**narrow** 11:6 18:19
  31:7 32:2,18 33:2
  43:24 45:10 50:23
  52:2,7
**narrowed** 12:4
  32:17 35:6 36:8
  52:3
**narrowing** 6:19 7:4
  7:5 8:6,7 9:12
  31:4 32:1,4,5,8,9
  32:20 36:7 37:8
  44:9,14,21 46:11
  50:1,3,7,10 51:1,1
  52:12,13,21
**nature** 4:16
**necessarily** 29:21
  39:15 52:2
**need** 14:1,3 23:23
  24:8 25:12 31:15
  38:22,24
**needs** 4:3 11:1
  14:17 52:21
**neither** 5:20 54:13
**never** 12:6,7 22:8,8
  35:1 43:8,9
**new** 12:11 33:21
  54:4
**newer** 43:18
**NICHOLS** 1:16
**nine** 11:8 20:10
**non-distinction**
  41:2
**non-practicing**
  35:8
**normal** 32:7
**normally** 24:12,18
  47:19
**Notary** 54:5,19
**note** 3:3 35:5

noted 35:7
notice 38:14 54:8
NPE 39:12,13,14
   39:17,19 40:17,24
NPEs 40:5
nth 25:18
number 10:7 12:19
   13:19 15:12 16:4
   16:13,18,23 17:1
   19:3,7 20:16
   21:16 22:20,22
   23:15 26:4 28:19
   29:20,21,24 32:6
   32:9,17,18 34:10
   35:6 38:4 42:12
   47:24 51:13
numbers 21:15
   37:20 41:18,18

O

O 3:2
object 35:13
objected 6:22
objection 32:22
objections 10:7
   52:16,20
obviously 6:12
   32:20 39:21 49:8
occur 34:12 44:14
   44:16 45:15 46:11
   52:18
occurred 8:17
   11:17 50:24 51:1
occurs 44:22
offer 32:2
offering 15:1
office 42:2
official 54:16
oh 17:21 19:1 50:11
   50:11,11 52:13
okay 3:12 4:5 20:11
   20:14 25:2 37:1,5
   43:10 44:3 48:20
   51:9 53:1
Oldham 1:20 3:11
OLSON 1:18
once 48:16

ones 10:8
oOo 3:1
open 48:3
opened 48:23,23
opening 4:17 5:15
   25:11
opinions 51:21
opportunity 5:15
   24:10 28:4 34:5
   50:5,6 51:17
opposed 16:21
   31:11
option 5:10
order 4:20 12:20
   12:23 24:11 28:17
   28:20 29:4 30:7
   31:2 32:11,13,18
   33:5 44:23 45:9
   47:10 49:1
ordered 29:12,14
   48:14,15
ordering 25:20
organized 49:20
original 34:17
originally 20:5,7,9
   20:22
other's 35:3
ought 9:4,6 15:20
   24:14 30:20 44:10
   44:19
outcome 54:15
outlier 10:23
outlined 51:7
overall 21:7
overlapping 13:21
overview 5:11

P

P 3:2
page 12:24 23:9
   24:9 26:22 29:3,4
   29:5 34:14,20
pages 17:20 23:10
   23:10,21 31:9,13
   31:15 38:22 39:7
paper 7:2 9:8 12:22
   26:4

papers 25:14
part 30:8 38:8,17
   43:12 49:2
participant 40:10
participants 54:9
   54:13
particular 8:9 9:15
particularly 50:21
parties 4:8,10,21
   5:5,8,12 9:16
   14:11 16:20 35:16
   40:9 44:12,21
   45:10,11 46:1,12
   48:2
party 39:19 40:12
   54:14
PAT 1:13
patent 10:10 11:11
   12:1,2,20 15:21
   20:21 21:7,16
   22:2 24:10 29:11
   29:14 30:15 35:8
   39:12 42:2,10
   45:2
patents 4:9 10:15
   10:16,19,20 11:2
   11:7,10,10,13,19
   11:20,21 12:2,5,6
   12:14 13:22,24
   14:5,16 15:24
   16:8,9,21 18:4
   19:11,12,23 20:1
   20:6,6,7,10,23
   21:2,4,17,19,23
   21:23,24 22:2,4
   23:16 27:19,21
   29:8,9,13 34:9
   36:1,3,4,6,9 37:7
   37:22 39:17 41:9
   41:10,13,16,17,20
   42:13 43:19
pattern 19:16
people 26:13
perfect 33:7
perfectly 4:11
period 15:2,3 22:17
Perry 1:20 3:11

Personalized 12:21
   28:16
perspective 6:15
   9:10 14:16,18
   51:12
phase 26:6 27:19
Philips 1:7 3:12,13
   4:14 6:19 10:14
   11:11,20,21 12:1
   12:2 14:14,21
   19:9,10,11,13,22
   21:3,5,6,23,24
   22:2 23:11 34:8
   35:23 36:3,6 37:6
   39:4,6 49:21
   50:14
Philip's 46:6
PHILLIPS 2:5
phone 33:10,24
phrase 33:20
pick 19:7 42:15
pincite 26:18,20
place 54:8
placed 28:6
plaintiff 1:5 13:12
   15:14 27:17 29:7
   29:12,12
plaintiffs 10:1 13:2
plaintiff's 13:20
   14:18 15:14 27:16
plan 25:13
please 3:8,13,23
plugging 4:7
point 11:16,18,18
   15:7,7 16:17
   18:17 20:17 23:18
   29:17,19 31:16
   33:8,21 34:13,21
   36:11 37:12 39:20
   39:21 40:18,18
   41:11 43:10 49:24
   51:12
pointed 34:15
points 26:2 31:22
   36:10
portfolios 35:8
position 26:3 39:4

possibility 34:18
   52:17
possible 18:12
   40:17
postage 40:23
potentially 7:15 8:1
   22:20
Potter 2:2 3:15
practical 14:9
practices 35:11
practicing 39:17,19
   39:23 40:13
prefer 5:9 6:1,3
   39:2
preference 5:24 6:8
preferred 49:7
premature 13:3
preparing 7:18
present 23:19 30:2
presentation 6:1,3
   6:14
presented 15:10
presenting 35:19
pretend 34:2
pretty 17:10 21:14
   30:3
prevent 38:8,17
previously 47:14
principles 51:7
prior 8:14,16 18:3
   29:15 30:11,12,14
   30:16,19,22 32:7
   38:11 42:1,16,20
   43:23,24 44:10
   45:1,3,4,5 50:1,10
   50:23 51:1
pro 35:23
probably 36:22
   48:24
problem 5:17
   23:17 30:8 35:21
   52:14
problems 4:3
procedural 11:17
proceeding 4:11
proceedings 52:10
process 9:12 32:16

32:23 33:16 35:14
35:20,22 37:14,15
37:16,19,23 38:3
38:12 40:2 42:7
46:2 51:21
**Processing** 27:7
**products** 10:6,14
35:9
**progressed** 10:11
**prompt** 25:17
**prong** 22:23 23:2
**proper** 18:13
**proportionately**
32:18
**proposed** 15:23
**proposing** 33:17
**proposition** 27:14
**prove** 41:23
**provided** 30:12
**providers** 40:23
**Public** 54:5,19
**pulling** 46:22
**purposes** 35:18
**pursuant** 4:20 54:8
**pushing** 46:13
**put** 4:13 6:9 25:21
26:21 36:13 44:13
52:9,18
**p.m** 1:10 3:4 49:18
51:8 53:13

**Q**

**question** 30:10
31:8 45:8 51:19
**quote** 20:8

**R**

**R** 1:19 3:2 52:20
54:1
**raise** 9:15 13:2
31:16 34:1,5,19
40:6 51:12
**raised** 4:13,13 6:19
9:4,6 13:3 33:8,10
33:14,23 48:23
**raising** 9:14
**ran** 51:4
**rata** 35:23

**ratio** 29:9
**read** 5:7 51:5
**reads** 40:22
**ready** 38:5 49:13
**real** 19:8
**realistic** 40:14
52:17
**realized** 8:12
**really** 4:13 15:11
15:17 17:12 22:14
29:5 30:3,9 34:16
35:21,24 37:20
40:5,10 52:4
**reargue** 15:4,8
**reason** 6:7 8:8 28:1
46:7 48:8
**reasonable** 13:18
17:2
**reasoning** 14:9
**reasons** 14:6 40:4
**recall** 20:6,10
**receive** 45:14,15
**received** 38:15
**recited** 9:8
**recognize** 3:22
36:15
**recognizing** 23:23
25:6 46:9
**recollection** 5:17
**record** 25:21 36:12
37:6 50:13 54:12
**recorded** 54:9
**red** 41:1
**reduce** 18:23 52:7
**reduced** 12:7 16:24
**reducing** 6:20
**reexamination**
38:11 43:20
**reexaminations**
18:8 34:8 42:2
**reexams** 34:7
**references** 18:3,5
30:13,14,17,19
32:3,6,7,9,19 33:2
33:4 44:10 45:5
50:2
**refresh** 5:17

**regard** 40:9
**regarding** 43:13
**regardless** 18:21
**Registered** 1:24
**reintroduce** 3:24
**rejected** 33:15
**rejecting** 42:2
**relate** 51:23
**related** 41:15
**release** 13:14
**relevance** 22:1
**relief** 13:11 27:24
**rely** 30:19,21,23
31:1 32:19 45:1
**relying** 33:4
**remains** 29:18
**remember** 5:6
38:21 47:14
**remind** 3:21
**repeat** 7:1
**repeated** 19:16
31:18
**repetition** 6:12
**repetitive** 43:3
**report** 4:6 17:18
35:1 38:15
**reporter** 1:24 3:20
3:23 54:19,20
**REPORTER'S** 3:3
**reporting** 25:19
**reports** 7:21
**represent** 27:18
34:6
**representation**
33:22
**representative**
13:11 26:14 27:16
27:17 28:8,10
33:11,16,18,20
**representing** 33:17
**request** 43:11 44:1
**requests** 43:20
**requirement** 44:21
**requires** 27:23 33:9
33:22
**reselect** 45:5
**reserve** 52:11

**resolve** 25:14
**respect** 14:4 18:4
27:18 50:7
**respond** 23:10
25:24 26:2 31:19
40:17
**responding** 35:2
**response** 15:14
28:12 30:16
**responses** 18:6
**responsive** 47:16
**rest** 52:1
**restarted** 12:10
**restriction** 16:22
**result** 19:22 20:2
**return** 35:24 36:5
**review** 4:1 5:15
**reviewed** 51:23
**reviewing** 7:18
**right** 6:17 7:3,17
8:5,10 9:6,14
11:23 17:4,23
20:13,15 21:7
24:6 27:6,8 31:6
31:11 34:8 39:16
41:7 47:1,5 48:3
48:10,11,20 50:5
50:13,15 51:21
52:1,11,22,23
**rights** 27:18
**rises** 33:13
**risk** 16:12
**RMR** 54:19
**road** 9:5 28:1
**Rosenthal** 2:7 3:16
6:6,6,24 8:4 11:9
11:15,24 16:6
24:1,8,18 25:4,13
26:1,11,17,23
27:2,6,9,13 28:23
29:2 31:14 40:16
40:21 41:7 43:14
43:17,22 44:3,8
44:18 45:8 46:16
46:22 47:1,6,9,15
48:12,19 49:4,15
49:23 50:9,15,19

51:10 52:5,23
53:4,8
**route** 33:1
**Rs** 52:20
**rules** 51:15
**ruling** 44:17,19,20
45:19,21 48:24
49:21 50:17

**S**

**S** 3:2
**sake** 24:2 34:3
**sat** 48:7
**satisfied** 4:12
**save** 10:16
**saying** 5:19 19:12
19:24 21:8 28:21
30:18 37:10 41:16
**says** 9:8
**schedule** 17:19
45:20 46:13,18
47:3,3,4 48:4,5
49:16,18
**scheduled** 46:19,21
49:17
**scheduling** 4:20
7:10
**scope** 10:1
**seal** 54:16
**second** 27:20 28:13
**Secondly** 32:10
**see** 17:20 22:23
25:6 43:7 44:4
**seeing** 19:15
**seek** 13:12
**seeking** 28:9 41:12
**seen** 12:16 35:1
**select** 13:10 27:16
30:24
**selected** 11:2 28:3,4
41:9 50:4
**selecting** 29:23
38:9
**sense** 6:13 7:1,2
52:7
**sentiment** 37:11
**separate** 7:10 20:8

35:18 37:10
**separating** 17:22
**September** 12:24
28:18,21 29:3
**set** 34:4 39:22
42:10 44:20
**sets** 39:8 40:3,9
**seven** 10:16,19 11:7
11:10,14,19,24
12:14 13:22,23
15:24 16:21 20:5
20:6 21:4,17,19
22:4 23:8,20 31:9
31:15 38:23 41:14
41:19
**seven-page** 31:10
31:11 35:15
**share** 10:19 13:22
**short** 22:17 31:2
32:11,13 33:5
**shorthand** 54:10
54:20
**shortly** 44:23
**shots** 34:24
**showed** 48:6
**showing** 13:13
**shows** 48:13
**side** 22:13 35:23
39:6
**sides** 25:20 36:14
**significance** 39:22
**significant** 18:2
**silly** 34:10
**similar** 41:24
**simplifies** 22:14
**simply** 17:14 21:15
45:17
**single** 10:21 18:23
30:2
**sit** 5:7 37:2
**situation** 10:12
11:5 12:13 28:15
34:16 35:10,12
**situations** 28:15
**six** 13:23 22:16
23:8
**six-page** 23:9

**skimmed** 51:6
**slicing** 19:16
**smaller** 19:17,17
**solve** 22:23
**sooner** 32:21
**sorry** 11:10 26:9,11
**sort** 22:14 44:15
**sorts** 12:16
**sought** 19:9
**source** 14:2
**spaced** 39:1
**speak** 3:21
**spec** 42:14
**specific** 15:18
**specifically** 21:12
**specification** 10:19
10:21,22 13:23
41:14 42:12 43:1
**specifications** 43:2
**specifics** 50:2
**specified** 47:6,8
**spite** 34:6
**split** 23:15
**sponte** 19:2
**spread** 21:17,18,22
**stage** 13:18 31:4
53:3
**Stamps.com** 13:7
26:12,12 27:9
34:15 39:13 40:22
40:22 41:4,11
**stand** 27:14 35:1
**standpoint** 22:19
**stands** 21:1
**Stark** 13:4 22:16
29:11 50:21,22
52:19
**Stark's** 10:8 12:18
**start** 4:4 9:12 10:3
47:20
**started** 20:5 46:13
**State** 54:3,6
**stated** 32:23
**statements** 54:9,12
**STATES** 1:1
**status** 4:12 7:7 8:2
8:5 17:10,18 35:1

38:15
**stay** 21:1
**stays** 46:6
**steadfastly** 28:7
**Steve** 3:16
**STEVEN** 2:6
**stop** 37:19
**strategic** 29:23
**strong** 5:18
**stuff** 9:5 31:3 48:21
**sua** 19:2
**subject** 13:21 17:10
32:24 37:10,17,21
38:14,16 39:3,3,5
39:8 42:9,14 43:4
**submission** 4:2
16:16 23:9 27:12
34:14 38:19
**submissions** 23:20
**submit** 33:6
**submitted** 4:8,17
16:15 36:17
**subsequent** 34:12
**substance** 35:17
**sufficiently** 30:12
**suggest** 42:5
**suggested** 50:12
**suggesting** 24:16
24:17
**suggests** 37:3
**summary** 7:19,21
7:23 8:11 9:1,11
36:17 52:10,15
**supervision** 54:11
**support** 15:19
**supported** 42:22
**suppose** 29:24 30:5
31:10
**supposed** 6:23
22:10 48:17
**sure** 6:8 9:13 27:5
31:15,23 38:13
39:6 48:14 51:3
**surprising** 34:24
36:2

_____

**T**

**T** 54:1,1
**take** 14:3 32:2 36:3
43:5 49:2 50:3
**taken** 10:4,4 54:7
**takes** 39:22
**talk** 3:24 23:13
37:20 42:9,11
43:7 45:13,24
48:21 51:8
**talked** 48:6
**talking** 7:5,8 9:12
31:4 33:19 37:19
40:8 44:5
**task** 42:3
**TC** 49:20
**team's** 24:2
**technical** 4:17 14:3
14:22
**technique** 33:12
**technology** 39:23
42:20
**teleconference** 1:11
3:3 48:22 53:12
54:7
**tell** 5:22 9:17 22:5
33:2
**ten** 11:20 29:10
38:22,23 39:2
42:13
**ten-page** 17:21
23:8
**term** 18:23 33:11
**terms** 14:14,22
15:13 16:2,3,5,9
16:13,18,20 17:1
19:4,7 20:19,20
22:8,21,24 29:22
29:24 42:9,20
44:9 47:24
**Thank** 3:18 11:23
25:4 26:1 29:1
31:21 50:19 53:4
53:5,6,11
**thereof** 54:15
**thing** 12:10 27:22
28:13 35:4 44:20
51:14

**things** 4:15 12:17
22:14 31:5 42:21
42:21
**think** 3:22 5:8,14
6:10,11 7:3 8:15
12:4 14:6 15:17
16:6,13 17:1,9,11
17:13,16,21,23,23
18:13,14 21:10,11
21:13,15,20 22:2
22:15 24:8,13,21
25:12 30:9 31:14
33:9 34:4 36:6
37:11 39:13,14
40:18 41:4 42:7
44:5,8,18,19
46:17,23 47:16,20
48:17 49:15 51:11
52:6,17
**thinking** 10:3
50:14
**third** 26:5 27:19
**thought** 7:9,13 11:8
11:13
**thoughts** 4:23
**three** 11:19 19:20
20:23 21:23 23:9
23:10 29:8,13,16
**three-quarters**
18:18
**throw** 39:6
**throwing** 19:23
**thrown** 38:20
**thrust** 14:9
**Thynge** 1:13 3:6
**time** 3:24 5:1,10,14
6:1 7:3,10,23 8:11
8:23 9:14,24 12:9
13:4 14:6 15:2,3
22:18 23:8,22
24:2,3 25:22 31:6
38:6 40:2 41:14
45:10,11,18,21
46:11,12 47:5,6,8
47:9,13 48:2,7
49:7,21 50:17
51:8 52:11 54:8

**timing** 17:23 24:19
  43:11 46:1 50:7
  50:10,12
**today** 3:19,21 4:13
  23:22 26:5 28:14
  34:12 49:10
**told** 8:24 11:1
  36:23
**tons** 30:16
**top** 14:24
**total** 11:10,19,19
  11:20,22 15:23
  20:7,19 21:2
**totally** 5:21 32:3
  38:1,7
**track** 21:14
**transcribed** 54:10
**transcript** 5:8
  12:24 28:17,20
  31:18 54:12
**transcription** 54:11
**trend** 9:23 12:18
  13:16 15:18
**trial** 8:20,22 9:6
  22:9,10 37:9 38:5
  38:6 41:21 52:12
  52:14
**true** 29:22,24 36:20
  43:3 54:12
**trust** 25:18
**truthful** 36:15,18
  36:23
**try** 16:12 17:10
  22:13,17 49:1
**trying** 6:4 14:13,14
  14:21 22:4 38:8
  38:13,17 39:24
**Tuesday** 1:10
**TUNNELL** 1:16
**turn** 35:2
**tutorial** 4:17,19,24
  4:24 5:6,24
**two** 8:2 11:1,13,21
  12:6 20:7 25:6
  35:10 43:2 44:12
  47:17
**two-point** 22:23

23:2
**type** 17:19 23:5
  44:15,16
**typical** 11:5 14:18
  15:13 30:17
**typically** 10:9

**U**
**ultimately** 8:20
**unconstrued** 16:10
**understand** 22:3
  23:6,19 40:11,15
  45:7
**understanding**
  22:6
**unfair** 32:3,21
**unilaterally** 37:6
**UNITED** 1:1
**unnecessary** 5:5
**unrebutted** 29:18
  35:1
**updated** 12:10
**use** 31:18,18
**User** 12:21 28:16
**U.S.M.J** 1:13

**V**
**v** 1:6
**validity** 42:7
**values** 15:6
**valve** 13:11,14
  27:24
**various** 36:17
**vary** 40:10
**vein** 6:21
**Ventures** 50:22
**verbal** 5:1
**Veritext** 3:19
**versus** 41:4
**view** 10:6,10 31:6
  44:19 51:13 52:6
**views** 7:2 40:14
**virtually** 16:14
  22:1
**virtue** 15:10
**voices** 3:22
**voluntarily** 12:7

**W**
**wait** 20:4
**waiting** 9:11
**want** 3:21 4:3 5:24
  9:15 13:14 14:19
  17:13 19:17,19
  24:12,19 25:11,11
  26:18 27:4 32:24
  34:13,23 35:20
  39:4,7,20 41:22
  42:9,11 50:23
  51:12 52:9,11
**wanted** 8:21 9:13
  19:13 26:2 28:11
  29:17,20,22 30:3
  31:15,16 36:3,11
  37:5 51:16
**wants** 7:11 15:4,8
  15:12,14 16:3,5
  16:13,14,24 18:1
  18:10,11,11 38:5
  41:19
**warrant** 22:5
**warranted** 11:16
**Washington** 2:8
**wasn't** 21:15 47:15
**wasted** 22:20
**water** 37:13 40:2
**way** 5:18 6:17 9:7
  21:1 30:4 32:4
  33:16,23 36:13
  38:6 40:13 44:4
  44:13 50:13
**Wednesday** 47:21
**week** 17:22 24:19
  24:21,23 33:15
  45:22
**weeks** 44:12 47:17
**weight** 15:17
**went** 35:22 37:14
  40:2
**weren't** 19:18
**West** 49:9,12
**Westlaw** 26:22
**we'll** 43:4
**we've** 13:7 30:13
**whatsoever** 18:7

**willfulness** 51:24
**willing** 16:18,22
  46:9 48:2
**Wilmington** 1:10
**wiped** 34:9
**wipes** 34:4
**wish** 25:21 31:20
**withdrawing** 9:2
**WITNESS** 54:16
**words** 42:15
**work** 8:18 10:6
  51:16 52:8
**worked** 21:12
**works** 49:15
**worried** 9:3
**worry** 14:23
**wouldn't** 18:19
**wranglings** 11:17
**write** 49:1
**wrong** 11:13 12:12
  24:19 41:13

**X**
**X** 22:13

**Y**
**Yeah** 5:7
**years** 29:16
**Yovits** 2:6 3:17
**Y-O-V-I-T-S** 3:17

**Z**
**zero** 15:3

**0**
**09-08** 1:6
**09-80** 48:11,13,15
  48:17

**1**
**1** 26:4
**1-31-13** 54:20
**11** 41:9
**11-742** 1:6
**116** 18:5
**118-RPR** 54:20
**13** 29:10,11
**1303** 26:24 27:1

**135** 18:3
**14** 31:13
**14th** 48:23,23 49:3
  50:7,18 51:8
**15** 13:6 29:13 41:8
  41:9
**15th** 44:11
**18** 1:10 30:1,1
**18th** 23:22 54:16
**19** 18:4 30:13

**2**
**2:00** 49:17
**20** 16:20 46:23,24
  47:4
**20th** 47:18,21 48:3
**2010** 12:24 28:18
  29:3
**2011** 27:3
**2012** 1:10 54:17
**26** 12:24 29:5
**28th** 24:24 25:3

**3**
**3** 34:14,20
**3rd** 26:18,24
**3:00** 49:18 51:8
**30** 15:23 16:24
  18:22,22 30:7
**32** 20:19 21:5,8
**33** 14:12,15 30:1
**34** 8:15 20:19 21:5
  21:8,18
**36** 13:5 21:8,18
  29:7

**4**
**4** 47:16
**4th** 4:10 44:6
**4:00** 1:10 3:4
**4:10** 53:12

**5**
**535** 30:15

**6**
**6:30** 49:13
**629** 34:16

**639** 26:17,24

---
**7**

**7th** 25:8,11 33:7
  45:16

---
**8**

**8th** 12:24 28:22
  29:3
**88** 28:24

---
**9**

**9:30** 47:20,22
**95** 11:7,7 12:14
  14:11,15 15:11
  16:23 20:21 21:2
  21:9,16,17 22:5
  41:19,21 42:6,7
  42:17 43:8