## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MASIMO CORPORATION, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : C.A. No. 09-80-LPS |
| | : |
| PHILIPS ELECTRONIC NORTH | : |
| AMERICA CORPORATION and | : |
| PHILIPS MEDIZIN SYSTEME | : |
| BÖBLINGEN GMBH, | : |
| | : |
| Defendants. | : |

Julia Heaney, Jack B. Blumenfeld, MORRIS, NICHOLS, ARSHT & TUNNELL, LLP, Wilmington, DE

Joseph R. Re, Karen Vogel Weil, Jon W. Gurka, Perry D. Oldham, KNOBBE, MARTENS, OLSON & BEAR, LLP, Irvine, CA

　　Attorneys for Plaintiff.

Richard L. Horwitz, David E. Moore, Bindu A. Palapura, POTTER, ANDERSON & CORROON, LLP, Wilmington, DE

Brian A. Rosenthal, Alan M. Grimaldi, Ann Marie Duffy, Brian K. Andrea, Cody I. Gillians MAYER BROWN, LLP, Washington, DC

Steven Yovits, MAYER BROWN, LLP, Chicago, IL

William Rooklidge, GIBSON DUNN, Irvine, CA

Gregory A. Castanias, JONES DAY, Washington, DC

Sasha Mayergoyz, JONES DAY, Chicago, IL

　　Attorneys for Defendants.

## MEMORANDUM OPINION

May 18, 2015
Wilmington, Delaware

Lewl P. Art

**STARK, U.S. District Judge:**

Pending before the Court is Defendants' post-trial motion for Judgment as a Matter of Law and/or Motion for a New Trial. (D.I. 926) For the reasons stated below, Defendants' motion will be denied in all respects.

## I. BACKGROUND

Plaintiff Masimo Corporation ("Masimo" or "Plaintiff") filed this patent infringement action on February 3, 2009, alleging that Philips Electronic North American Corporation and Philips Medizin Systeme Böblingen GMBH (collectively, "Philips" or "Defendants") infringed several patents, including U.S. Patent Nos. 6,263,222 ("the '222 patent") and 7,215,984 ("the '984 patent"). (D.I. 1) Philips contended, among other things, that it does not infringe Masimo's patents (although it later conceded infringement) and, further, that the '222 and '984 patents are invalid. In addition, Philips alleged that Masimo infringes several of Philips' own patents, including U.S. Patent No. 6,725,074 ("the '074 patent"). (D.I. 15) In turn, Masimo asserted both non-infringement and invalidity of the '074 patent (although it later chose not to contest validity). (D.I. 17)

In the Pretrial Order for the jury trial filed on August 18, 2014, Philips admitted infringement of Masimo's '222 and '984 patents, as follows:

> Philips concedes that it has directly and indirectly infringed Claims 17 and 18 of the '222 Patent and Claims 1-5, 15-16, 19-20, 22 and 52-54 of the '984 Patent under the Court's claim construction and summary judgment orders.
>
> Specifically, this concession includes that Philips' infringement has occurred literally for all the asserted claims. In addition, Philips' concession of indirect infringement includes induced infringement, and contributory infringement, as set forth in 35 U.S.C. § 271(b) and (c). The infringing acts include the making,

1

> using, selling, offering for sale, and importing of all products
> containing the FAST algorithm (and sensors used therewith).
> Philips concedes these infringing acts have been occurring
> continuously since the issuance of the two asserted patents.

(D.I. 834 at 4-5)

After a ten-day trial,[1] the jury returned a verdict in favor of Masimo on every issue. (D.I. 912) For the '222 patent, the jury found that Philips had not proven by clear and convincing evidence that claims 17 and 18 are invalid due to anticipation, lack of written description, or lack of enablement. (*Id.* at 1, 3, 4) The jury also determined that Philips had not proven by clear and convincing evidence that claim 17 of the '222 patent is invalid as indefinite. (*Id* at 4) For the '984 patent, the jury found that Philips had not proven by clear and convincing evidence that any of claims 1-5, 15, 19, 20, 22, 52, and 53 are invalid as anticipated or that claims 16 and 54 are invalid for obviousness based on the prior art. (*Id.* at 1-2) The jury also determined that Philips had not proven by clear and convincing evidence that claims 1-5, 15, 16, 19, 20, 22, 52, 53, and 54 are invalid for lack of written description or that claim 5 of the '984 patent is invalid as indefinite. (*Id.* 3-4) With respect to damages, the jury found that Masimo had proven by a preponderance of the evidence that Nonin PureSAT is not an acceptable non-infringing substitute available to Philips. (*Id.* at 5) The jury determined that as compensation for Philips' infringement of the '222 and '984 patents, Masimo was entitled to $466,774,783 in damages. (*Id.*)

With respect to Philips' '074 patent, the jury found that Philips had not proven by a preponderance of the evidence that Masimo literally infringed, induced infringement, or

---

[1]All citations to the trial transcript are in the format "Tr." followed by the page number.

contributed to the infringement of claims 1 and 5. (*Id.* at 6) The jury awarded no damages to Philips. (*Id.* at 7)

Philips submitted a renewed motion for judgment as a matter of law ("JMOL")[2] pursuant to Fed. R. Civ. P. 50(b). (*See* D.I. 926) The specific grounds on which Philips moves for judgment as a matter of law are as follows:

1.       Claims 17 and 18 of the '222 patent are invalid under 35 U.S.C. § 112, ¶ 1 for lack of written description;

2.       Claims 17 and 18 of the '222 patent are invalid under 35 U.S.C. § 112, ¶ 1 for lack of enablement;

3.       Claims 17 and 18 of the '222 patent[3] are invalid as indefinite under 35 U.S.C. § 112, ¶ 2;

4.       Claims 17 and 18 of the '222 patent are invalid as anticipated under 35 U.S.C. § 102(b);

5.       Claims 1-5, 15, 19, 20, 22, 52, and 53 of the '984 patent are invalid as anticipated under 35 U.S.C. § 102(b); and

6.       Claims 16 and 54 of the '984 patent are invalid as obvious under 35 U.S.C. § 103.

In addition, Philips requests a new trial pursuant to Federal Rule of Civil Procedure 50(b)(2) and 59(a) (*see id.*), based on:

---

[2]During trial, Philips orally moved for JMOL on its invalidity defenses and damages pursuant to Federal Rule of Civil Procedure 50(a). (*See* Tr. at 1389-94; 2326)

[3]For the '222 patent, the jury was asked to determine only whether claim 17 was indefinite. (D.I. 913 at 4) However, because claim 18 depends from claim 17, Philips has moved for JMOL on both claims (*see* D.I. 928 at 11 n.2), and Masimo does not appear to object to this approach.

1. Masimo's introduction of irrelevant and prejudicial details regarding the *Nellcor* case; and

2. Masimo's prejudicial and improper use of Philips' concession of infringement.

Philips further requests a new trial on damages or, in the alternative, remittitur of the jury's damages award, on the following grounds:

1. The jury's finding that "Nonin PureSAT is not an acceptable non-infringing substitute available to Philips" is not supported by the evidence; and

2. The jury's award of $466,774,783 is not supported by the evidence.

The parties completed their briefing of the post-trial motion on January 16, 2015. (D.I. 928, 939, 949) The Court heard oral argument on the motions on February 18, 2015. (*See* Hearing Transcript (D.I. 895) ("Hrg. Tr."))

## II. LEGAL STANDARDS

### A. Motion for Judgment as a Matter of Law

Judgment as a matter of law is appropriate if "the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for [a] party" on an issue. Fed. R. Civ. P. 50(a)(1). "Entry of judgment as a matter of law is a sparingly invoked remedy, granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." *Marra v. Phila. Housing Auth.*, 497 F.3d 286, 300 (3d Cir. 2007) (internal citation and quotation marks omitted).

To prevail on a renewed motion for judgment as a matter of law following a jury trial, the moving party "must show that the jury's findings, presumed or express, are not supported by

4

substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (internal quotation marks omitted). "'Substantial' evidence is such relevant evidence from the record taken as a whole as might be acceptable by a reasonable mind as adequate to support the finding under review." *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984).

In assessing the sufficiency of the evidence, the court must give the non-moving party, "as [the] verdict winner, the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in his favor, and in general, view the record in the light most favorable to him." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir. 1991); *Perkin-Elmer Corp.*, 732 F.2d at 893. The court may not determine the credibility of the witnesses nor "substitute its choice for that of the jury between conflicting elements of the evidence." *Perkin-Elmer Corp.*, 732 F.2d at 893. Rather, the court must determine whether the evidence reasonably supports the jury's verdict. *See Dawn Equip. Co. v. Ky. Farms Inc.*, 140 F.3d 1009, 1014 (Fed. Cir. 1998); *Gomez v. Allegheny Health Servs. Inc.*, 71 F.3d 1079, 1083 (3d Cir. 1995) (describing standard as "whether there is evidence upon which a reasonable jury could properly have found its verdict"); 9B Wright & Miller, *Federal Practice & Procedure* § 2524 (3d ed. 2008) ("The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury properly could find a verdict for that party.").

**B. Motion for a New Trial**

Federal Rule of Civil Procedure 59(a) provides, in pertinent part:

> A new trial may be granted to all or any of the parties and on all or
> part of the issues in an action in which there has been a trial by
> jury, for any of the reasons for which new trials have heretofore
> been granted in actions at law in the courts of the United States.

New trials are most commonly granted in the following situations: (1) where the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) where newly-discovered evidence exists that would likely alter the outcome of the trial; (3) where improper conduct by an attorney or the court unfairly influenced the verdict; or (4) where the jury's verdict was facially inconsistent. *See Zarow-Smith v. N.J. Transit Rail Operations*, 953 F. Supp. 581, 584 (D.N.J. 1997).

The decision to grant or deny a new trial is committed to the sound discretion of the district court. *See Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980); *Olefins Trading, Inc. v. Han Yang Chem. Corp.*, 9 F.3d 282, 289 (3d Cir. 1993) (stating district court's grant or denial of new trial motions are reviewed under deferential "abuse of discretion" standard). However, where the ground for a new trial is that the jury's verdict was against the great weight of the evidence, the court should proceed cautiously, because such a ruling would necessarily substitute the court's judgment for that of the jury. *See Klein v. Hollings*, 992 F.2d 1285, 1290 (3d Cir. 1993). Although the standard for grant of a new trial is less rigorous than the standard for grant of judgment as a matter of law – in that the court need not view the evidence in the light most favorable to the verdict winner – a new trial should only be granted where "a miscarriage of justice would result if the verdict were to stand," the verdict "cries out to be overturned," or the verdict "shocks [the] conscience." *Williamson*, 926 F.2d at 1352-53.

## III.    DISCUSSION

### A.    Motion for Judgment as a Matter of Law of Invalidity of the '222 Patent

Philips moves for judgment as a matter of law that claims 17 and 18 of Masimo's '222 patent are invalid as (1) anticipated, (2) lacking adequate written description, (3) lacking enablement, and (4) indefinite. (D.I. 926) The Court addresses each of these bases for invalidity below.

### 1.    Lack of Written Description

At trial, the jury found Philips failed to meet its burden of proving claims 17 and 18 of the '222 patent are invalid for lack of written description. Hence, the jury concluded that Philips failed to provide clear and convincing evidence that the patent specification does not reasonably convey to a person skilled in the art that the inventors had possession of the full scope of the invention claimed in the '222 patent as of the filing date. (*See* D.I. 908 at 41)

Philips now contends that there is not substantial evidence to support the jury's finding with respect to the "signal processor" element of independent claim 17 and dependent claim 18. More precisely, Philips contends that the '222 patent described one specific type of motion tolerant technique – referred to as correlation cancellation or a correlation canceler – but claims 17 and 18 broadly cover every type of motion tolerant technique. *See Abbvie Deutschland Gmbh & Co. v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1300 (Fed. Cir. 2014) ("[M]erely drawing a fence around a perceived genus is not a description of the genus."). Masimo disagrees, arguing that correlation cancellation techniques as discussed in the specification encompass a broad range of techniques. Masimo further contends that a patent claim is not necessarily invalid for lack of written description just because it is broader than the specific examples disclosed in the

specification. Masimo also points to expert opinion testimony to support the jury's verdict.

The parties' dispute over the adequacy of the written description is related, in part, to a long-running claim construction dispute over the proper scope of the term "signal processor." A review of the Court's prior rulings relating to this term is helpful to understanding the proper scope of claims 17 and 18 and, in turn, to evaluating Philips' present contentions.

### a.    Construction of "Signal Processor"

On February 18, 2011, Magistrate Judge Thynge recommended adopting Philips' position that "signal processor" should be construed to mean "a processing unit which determines either a secondary reference n'(t) or a primary reference s'(t) *for use in a correlation canceler*, such as an adaptive noise canceler." (D.I. 210 ("Claim Construction R&R") at 3-4) (emphasis added) Ultimately, however, on January 17, 2012, the Court sustained Masimo's objection to this recommended construction. (D.I. 319 at 2-5) Examining the three passages upon which the Claim Construction R&R relied for its conclusion that the claimed invention is limited to "use in a correlation canceler," the Court stated:

> While these statements describe features of an embodiment of the patent's claims, they do not, in context, clearly and unambiguously disavow other types of signal processors. This conclusion is further supported by the fact that, as Masimo emphasizes, the '222 patent uses the term "present invention" pervasively, in many varied contexts.

(*Id.* at 3-4) (discussing '222 patent at col. 12 ll. 61-64 ("Detailed Description of the Invention")); *id.* at col. 4 ll. 54-57 ("Summary of the Invention"), col. 5 ll. 30-36 (same)) Accordingly, the Court construed "signal processor" in claim 17 to have its plain and ordinary meaning to one of skill in the art, specifically, "a device that processes an input or output signal." (D.I. 319; *see also* D.I. 908 (Final Jury Instructions) at 22)

8

In light of this construction, the third element of claim 17 of the '222 patent requires: "a signal processor [i.e., a device that processes an input or output signal] responsive to the first and second intensity signals to calculate arterial oxygen saturation without significant interference in the calculation from the motion induced noise portion of the first and second intensity signals." (*See* '222 patent at col. 75 ll. 4-8)[4]

### b.  Summary Judgment

Philips subsequently moved for summary judgment of invalidity based on lack of written description under § 112, ¶ 1, and Judge Thynge recommended Philips' motion be granted. (D.I. 662 at 24-31) ("SJ R&R") The Court sustained Masimo's objection to this portion of the SJ R&R and denied Philips' motion for summary judgment of invalidity based on lack of written description. (D.I. 776 at 16) The Court concluded that written description was a triable issue, based on the genuine dispute of material fact arising from the disagreement between Dr. Baura, Masimo's expert, who opined that "the '222 patent contains a broad disclosure describing numerous techniques for calculating arterial oxygen saturation without significant interference from motion-induced noise" (*see* D.I. 431 Ex. 23 at ¶¶ 332-35), and Dr. Stone, Philips' expert, who stated (in relatively conclusory fashion) a contrary view. (*See* D.I. 776 at 15) ("On this record . . . written description is a triable issue, as a reasonable juror could conclude from the record that Philips has failed to prove by clear and convincing evidence that the written

---

[4]During claim construction, the parties agreed that the term "motion" means "movement of body tissue which causes erratic noise, that, in the absence of a filter, would cause the ratio of red to infrared signals to not accurately reflect the arterial oxygen saturation." (D.I. 908 at 23)  In addition, it was *jointly* proposed that the term "without significant interference" means "the calculated oxygen saturation is accurate enough for the purposes of which the calculation is being employed."  (D.I. 140 at 50)

9

description does not reasonably convey to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date.") (internal citation omitted)

### c. Substantial Evidence Supports the Jury Verdict

"[T]he test for sufficiency [of written description] is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). This test requires "an objective inquiry into the four corners of the specification from the perspective of a person of ordinary skill in the art," and based on that inquiry, "the specification must describe an invention understandable to that skilled artisan and show that the inventor actually invented the invention claimed." *Id.* emphasis added). This inquiry is a question of fact, and compliance with the written description requirement varies depending on the context. *See id.*[5] Specifically, "the level of detail required to satisfy the written description requirement varies depending on the nature and scope of the claims and on the complexity and predictability of the relevant technology." *Id.*

At trial, Philips endeavored to show that the '222 patent fails to satisfy the § 112, ¶ 1 written description requirement by pointing to a particular embodiment or group of embodiments that purportedly do not employ correlation cancellation but are covered by claims 17 and 18;

---

[5] While it is true that a patent "can be held invalid for failure to meet the written description requirement based solely on the face of the patent specification," *Centocor Ortho Biotech, Inc. v. Abbott Labs.*, 636 F.3d 1341, 1347 (Fed. Cir. 2011), *cert. denied sub nom. Janssen Biotech, Inc. v. Abbott Labs.*, 132 S. Ct. 1542 (2012), the Court already concluded there was a triable issue of fact over what the '984 patent specification conveys to a person of ordinary skill – particularly, the dispute framed by Dr. Baura's opinion that the specification's "broad disclosure describing numerous techniques for calculating arterial oxygen saturation without significant interference from motion-induced noise." (D.I. 776 at 15) (citing D.I. 431, Ex. 23 at ¶¶ 332-35)

these are what Philips refers to as "non-correlation cancelers." But in asking the jury to conclude that the specification did not reasonably convey to one of ordinary skill that the inventor was in possession of a non-correlation canceler, Philips did not present a single example of a "non-correlation canceler," nor did it define a single characteristic of one.[6] Moreover, the term "correlation canceler" was never construed by the Court, as the parties did not dispute its meaning or provide a joint construction. (*See* D.I. 210; 218; 219; 319; *see also* D.I. 908) Accordingly, the parties' experts were free to present their competing opinions at trial as to written description. Both did so, and the jury was free to accept or reject each of these opinions.

Dr. Stone testified that "[t]he correlation canceler is a device which takes a first and second input and removes from the first input all signal components which are correlated to the second input." (Tr. at 1725) Dr. Stone's testimony on the '222 patent focused almost exclusively on explaining why each and every embodiment in the specification constitutes a "correlation canceler." (*See id.* at 1724-33; 1839-41; 1849) But he provided no testimony as to what made a technique fall outside of this category – i.e., what characterizes a technique that does not qualify as a "correlation canceler."[7] Without any (much less clear and convincing) evidence of ***what a non-correlation canceling technique is*** – or how this undefined technique would still be covered by the claims – the jury could reasonably have concluded that Philips failed to carry its burden on lack of written description.

---

[6] At the hearing, Philips stated that had it not conceded infringement, it was prepared to take the position that its own accused device, Philips FAST, was not a correlation canceler. (Hrg. Tr. at 43-44) However, Philips chose not to present any such evidence.

[7] Indeed, Dr. Stone agreed "correlation canceller" is "a very broad term" having a "wide variety of applications." (Tr. at 1840-41; 1729)

By contrast, Dr. Baura opined that "correlation canceling" is a term serving as an umbrella for a broad range of techniques, generally covering any technique "[t]hat can separate out signal from noise;" "within the context of that patent, that is with regard to a first and second intensity signal" of the first and second equations disclosed in the specification. (*Id.* at 2208, 2242; *see also id.* at 386)[8] In turn, Dr. Baura opined the '222 patent discloses numerous "correlation cancelers" that could be used to practice the invention, including "least mean square algorithms, wavelet transforms, spectral estimation techniques, neural networks, Weiner filters, Kalman filters, QR-decomposition based algorithms among others." ('222 patent at col. 49 ll. 36-42) Moreover, Dr. Baura explained, "there are broad concepts that are taught by the '222 patent. And you can think of this as for the red and the infrared signal, you measure the signal and it has two parts. The first is the desired signal and the second is the noise due to venous blood." (Tr. at 2206; *see also id.* at 2209; '222 patent at col. 50 ll. 47-52)

In light of Dr. Baura's testimony and the deficiencies in Dr. Stone's opinions, a reasonable jury could conclude that Philips provided less than clear and convincing evidence that the '222 patent's written description fails to reasonably convey to those skilled in the art that the inventor had possession of the claimed subject matter in claims 17 and 18 as of the filing date. *See generally Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1375 (Fed. Cir. 2001) ("Courts grant JMOL for the party bearing the burden of proof only in extreme cases, when the party bearing the burden of proof has established its case by evidence that the jury

---

[8]Philips emphasizes Dr. Baura's testimony that the patent covers techniques beyond correlation cancelers. (D.I. 949 at 1) (citing Tr. at 2234-37) Philips fails, however, to persuade the Court that Dr. Baura's opinion is inconsistent with the breadth of claims 17 and 18 as they were construed by the Court.

12

would not be at liberty to disbelieve and the only reasonable conclusion is in its favor.").

Philips' reliance on *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1344 (Fed. Cir. 2005), does not cure the deficiencies in its evidence, for reasons including that Masimo's expert opined that the '222 patent specification discloses more than correlation cancelation alone. Also, *LizardTech* found that "[w]hile the embodiment in LizardTech's specification covers only one way of creating a seamless DWT, claim 21 is *not invalid simply for that reason*." *Id.* at 1345 (emphasis added). Yet Philips' analysis does not proceed to the full analysis undertaken by the Federal Circuit in *LizardTech*. *See id.* ("[T]he patent specification is written for a person of skill in the art, and such a person comes to the patent with the knowledge of what has come before. Placed in that context, it is unnecessary to spell out every detail of the invention in the specification; only enough must be included to convince a person of skill in the art that the inventor possessed the invention . . . .") (internal citations omitted). Additionally, the jury was instructed consistent with the principles articulated in *LizardTech*.[9] Philips did not challenge this instruction, and "[u]nchallenged jury instructions state the law to be applied on review of the jury verdict." *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1573 (Fed. Cir. 1992); *see also* Fed. R. Civ. P. 51.[10]

_____

[9](*See* D.I. 908 at 42) ("A patent claim is not necessarily invalid for lack of written description just because it is broader than the specific examples disclosed. Simply because the description of the invention in the specification is narrower than that in the claim does not mean there has been a failure to fulfill the written description requirement. The written description requirement only requires that the specification reasonably convey to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date.")

[10]Philips insists that "the patent may not claim undisclosed future developments" built on the foundation of the patented invention (D.I. 949 at 2), but the jury was instructed, "The written description requirement also does not require that the description in the specification include every conceivable and possible future embodiment of the claimed invention" (D.I. 908 at 42).

13

Accordingly, Philips is not entitled to JMOL that claims 17 and 18 are invalid for lack of adequate written description.

### 2. Lack of Enablement

Similar to its written description arguments, Philips contends that the only guidance and working examples in the specification are correlation cancelers and, consequently, claims 17 and 18 of the '222 patent lack enablement, because a person of ordinary skill in the art would require undue experimentation to arrive at a non-correlation canceling technique even with the assistance of the patent. (D.I. 928 at 8-11) Masimo responds that it was not required to show enablement of unidentified "non-correlation cancelers" and that Philips' evidence is deficient to carry its burden. Once more, there is substantial evidence to support the jury's finding that Philips failed to carry its burden on its enablement defense.

Again, Philips presented no evidence on what "non-correlation canceling" techniques are. Furthermore, Dr. Stone opined that "'ordinary experimentation' is when you look at it and say I know what this is going to do. It's going to work out, you go to do it, and it works." (Tr. at 1734-35) But the jury was instructed differently on the standard for undue experimentation – specifically, that the governing inquiry is whether the disclosure "enable[s] those skilled in the art to practice the invention" in claim 17, and *not* whether an unidentified "non-correlation canceler" can be produced without undue experimentation. (D.I. 908 at 45-46) The jury was bound to follow the standard on which it was instructed (which the Court must likewise apply to Phillips' JMOL). Finally, as Philips admits, enablement is "guided" by the *Wands* factors (*see* D.I. 928 at 8) – factors Dr. Stone failed to address. *See In re Wands*, 858 F.2d 731, 737 (Fed. Cir. 1988) ("Factors to be considered in determining whether a disclosure would require undue

14

experimentation . . . include (1) the quantity of experimentation necessary, (2) the amount of direction or guidance presented, (3) the presence or absence of working examples, (4) the nature of the invention, (5) the state of the prior art, (6) the relative skill of those in the art, (7) the predictability or unpredictability of the art, and (8) the breadth of the claims.").

Accordingly, Philips' JMOL based on lack of enablement will be denied.

### 3. Indefiniteness

Philips next challenges the jury's verdict as to indefiniteness, arguing that the phrase "without significant interference" in claim 17 is indefinite. A patent is invalid for indefiniteness "if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2124 (2014). Before *Nautilus*, Philips jointly agreed to a construction for "without significant interference" as meaning "the calculated oxygen saturation is accurate enough for the purposes of which the calculation is being employed." (D.I. 140 at 50) Now, however, Philips argues that "accurate enough" is indefinite under *Nautilus*'s "reasonable certainty" standard.[11]

While indefiniteness is a question of law, the jury's finding in favor of Masimo means the Court must infer that the jury found certain facts against Philips. Specifically, in advocating that the Court submit the issue to the jury for advisory factual findings, ***Philips*** prior to trial

---

[11]Philips states that the Supreme Court changed the indefiniteness standard "[j]ust before trial." (D.I. 928 at 11) (citing *Nautilus*, 134 S. Ct. at 2129-30). To the extent Philips is implying it was prejudiced or unfairly surprised by the new standard, this argument rings hollow. *Nautilus* was decided on June 2, 2014, almost three and a half months before the jury trial commenced, affording Philips ample time to seek reconsideration of the construction – which it originally ***agreed to*** jointly with Masimo and never indicated it would challenge as indefinite – in light of a changed indefiniteness standard.

stated the jury's finding would offer proof of: "(a) the level of ordinary skill in the art; (b) the nature of the invention; (c) whether the claims inform those of skill in the field what the patent claim covers and what it does not cover with reasonable certainty; and (d) the amount of guidance provided by the patent as to what the claim means." (D.I. 834 Ex. 2 at 8) The Court agrees that Philips' prediction came true and further concludes there is substantial evidence to support the jury's findings on each of these points. The jury heard evidence about Philips and Nellcor publications from which it could reasonably be determined that these industry leaders (in addition to Masimo) understood what was "accurate enough" in the context of measuring arterial oxygen saturation as recited in claims 17 and 18. (*See* DX-690 at MASP0556289-91; PTX-1226 at COV0000001) Consistently, Philips' R&D Manager understood the "clear difference between motion tolerant and non-motion tolerant instruments." (*See* PTX-338 at PHIL01680175)

Moreover, Dr. Baura opined that the '222 patent specification informs those skilled in the art "when the calculation is accurate enough for the purpose being employed." (Tr. at 2211; *see also id.* at 2216 ("Claim 17, when read in light of the Patent Office communications and the specification, informs with reasonable certainty the scope of the claimed invention to those of skill in the art."); '222 patent at col. 3 ll. 37-43, col. 13 ll. 12-17, col. 36 ll. 48-52 & Fig. 3)

At bottom, "[t]he claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014). The evidence at trial showed that there is a clear understanding for those of ordinary skill in the industry between motion-tolerant and ***non-*** motion tolerant instruments – the latter being devices that cannot read through noise "accurate[ly] enough for the purposes of which the calculation is being employed," which in

16

claim 17 is to "calculate arterial oxygen saturation." (*See* '222 patent at col. 75 1. 5; DX-690 at MASP0556289-91; PTX-1226 at COV0000001; PTX-338 at PHIL01680175).

The cases on which Philips relies are distinguishable, as in each the term at issue was either a facially "subjective" claim phrase providing "little guidance to one of skill in the art" or a term of "degree" where the specification offered insufficient guidance on the objective boundaries of the claims. *See, e.g., Interval Licensing*, 766 F.3d at 1371-72 (finding "the wallpaper embodiment does not provide a reasonably clear and exclusive definition, leaving the facially subjective claim language [of 'unobtrusive manner'] without an objective boundary."); *Graphics Properties Holdings, Inc. v. ASUS Computer Int'l, Inc.*, 2014 WL 4929340, at *19 (D. Del. Sept. 29, 2014) (finding term of degree indefinite because *specification* did not provide any further guidance or standard for differentiating "high information content" from "information content").

Finally, the Federal Circuit previously rejected Nellcor's indefiniteness challenge to this very claim term based on the same construction. *See Mallinckrodt, Inc. v. Masimo Corp.*, 147 F. App'x 158, 179-80 (Fed. Cir. 2005) (hereinafter "*Nellcor*") (concluding district court correctly determined "motion" and "without significant interference" do not render claims 17 and 18 of the '222 patent invalid for indefiniteness). While collateral estoppel does not preclude Philips from challenging the validity of this term anew, stare decisis supports rejecting Philips' indefiniteness challenge. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 390 (1996) (noting "the importance of uniformity in the treatment of a given patent"). *Nautilus* does nothing to undermine this conclusion, as *Nellcor* applied a standard at least as rigorous as now required by *Nellcor*, stating "[a] claim is indefinite if its legal scope is not clear enough that a person of

17

ordinary skill in the art could determine whether a particular [product or method] infringes or not." *Mallinckrodt, Inc.*, 147 F. App'x at 179.

For these reasons, Philips is not entitled to JMOL that claims 17 and 18 are indefinite.

### 4. Anticipation by Hall

Philips contends claims 17 and 18 are anticipated as a matter of law by the Hall reference, U.S. Patent No. 4,955,379. In response, Masimo first takes the position that Philips waived its ability to pursue a renewed JMOL on this affirmative defense because it failed to specifically seek this relief at trial under Rule 50(a). The Court disagrees. Philips orally moved for judgment on "its validity defenses," which are clearly stated in the pretrial order, and which include anticipation of claims 17 and 18 by Hall. (Tr. at 2326) When Philips offered to go into further detail, the Court stated that Philips had preserved its rights and further detail was "not necessary for [this Court's] purposes." (*Id.*) Accordingly, Masimo "was clearly on notice of the legal rubric under which [defendants] planned to proceed," *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 184 (3d Cir. 1992), and had the opportunity to request more specificity if Masimo needed it on this (or any other) invalidity defense.

As for the substantive issue, Philips is correct that claims 17 and 18 do not recite any performance criteria or level of effectiveness. Therefore, Dr. Baura's testimony that Hall's bandpass filter "is ineffective" and "would be of little help" does little to support the jury's finding. (Tr. at 2217) Likewise, Mr. Kiani's testimony that he tested the "tunable bandpass filter disclosed in Hall" and found that it did not work well is not helpful. (*Id.* at 2265-66) Mr. Kiani's statements invite an irrelevant comparison between the effectiveness of Masimo's commercial embodiment and that of the accused device manufactured by Philips. The pertinent

18

comparison is between the asserted claims – here, claims 17 and 18 – and the accused device. *See Silicon Graphics, Inc. v. ATI Techs., Inc.*, 607 F.3d 784, 796 (Fed. Cir. 2010) ("To show that a patent claim is invalid as anticipated, the accused infringer must show by clear and convincing evidence that a single prior art reference discloses each and every element of a claimed invention.").

Still, under the applicable legal standards, the Court concludes that substantial evidence supports the jury's implicit findings regarding Hall and, hence, it was not unreasonable for the jury to find that Philips failed to present clear and convincing evidence of anticipation. As an initial matter, the jury heard from the experts that the PTO granted the claims of the '222 patent after expressly considering Hall. (*See* Tr. at 1813; PTX-124) Masimo's expert, Dr. Baura, further opined that several claim limitations were not met by Hall. For example, claims 17 and 18 require a signal processor responsive to the first and second intensity signals to calculate arterial oxygen saturation "without significant interference." Philips' expert, Dr. Stone, never addressed that limitation. (*See* Tr. at 1737-52) The experts also disagreed as to whether Hall discloses a technique for performing a calculation in the presence of "motion." The Court construed "motion" to mean "movement of body tissue which causes erratic noise, that, in the absence of a filter, would cause the ratio of red to infrared signals to not accurately reflect the arterial oxygen saturation." (D.I. 908 at 23) Hall does not expressly address erratic noise caused by movement of body tissue. (*See* DX-10) Dr. Stone provided only conclusory testimony on this limitation, without clearly incorporating the Court's construction. (*See* Tr. at 1742) (Stone: "erratic noise is noise that you can't predict, so random is another type of way of describing things that you can't predict") The jury was free to accept Dr. Baura's testimony and reject that

19

of Dr. Stone.

Separately, claim 18 requires that the "motion induced noise is *indicative of the attenuation due to venous blood*." ('222 patent at col. 75 ll. 9-11) (emphasis added) The jury heard evidence that Hall teaches away from this limitation. (*See* Tr. at 1702-03) Hall generally addresses when patient movement causes the light emitting diodes ("LEDs") or photodetector to lose contact with the skin (DX-10 at col. 1 l. 66 to col. 2 1.4). When the LEDs or photodetector are optically coupled, Hall expressly teaches "venous and capillary blood is *squeezed out* of the light path." (DX-10 at col. 2 ll. 16-17 (emphasis added); Tr. at 1702-03 (Polson agreeing Hall says nothing about venous blood in the light path)) The jury's conclusion that Philips failed to prove Hall anticipates claim 18 is supported by substantial evidence.

Accordingly, the Court will deny Philips' motion.

## B. Motion for Judgment as a Matter of Law of Invalidity of the '984 Patent

With regard to Masimo's '984 patent, Philips moves for judgment as a matter of law that (1) claims 1-5, 15, 19, 20, 22, 52, and 53 are invalid as anticipated by Hall, (2) claims 1-4, 20, 22, and 52 are invalid as anticipated by the N-200 oximeter, and (3) claims 16 and 54 are invalid as obvious based on Hall in view of Mortz. The Court addresses these contentions below.

### 1. Anticipation by Hall

At trial, the jury found Philips failed to meet its burden of proving claims 1-5, 15, 19, 20, 22, 52, and 53 are invalid as anticipated by Hall. Now, Philips contends Masimo offered no evidence to rebut anticipation by Hall. In response, Masimo asserts that Dr. Stone failed to provide testimony explaining where each limitation in the asserted claims was disclosed in Hall, and instead provided only conclusory statements in which counsel went element by element,

20

asked Stone whether each was found in Hall, and Stone answered "yes." The Court agrees with Masimo.

The bulk of Dr. Stone's testimony regarding claim 1 of the '984 patent was limited to whether Hall discloses one or two calculators. (Tr. at 1753-64) As for the remaining claim elements, however, Dr. Stone merely pointed to demonstrative exhibits without explanation and summarily concluded that Hall anticipated claim 1 of the '984 patent. (*Id.* at 1764) Dr. Stone's testimony failed to address specific claim elements for claims 2-5, 15, 19, 20, 22, 52 and 53. (*Id.* at 1765-66) For instance, claims 1-5, 15, 19, 20, and 22 require "a processing module" (*e.g.*, '984 patent at col. 66 l. 46), and claim 5 further requires that "the resulting value of the blood oxygen saturation is significantly free of an influence of motion induced noise" (*id.* at col. 66 ll. 60-61), yet Dr. Stone made no mention of these elements in his testimony.

In addition, Masimo's expert, Dr. Baura, proffered an explanation of how Hall was missing elements from each of the dependent claims, including: (1) two calculators, as required by claim 15 (Tr. at 2220-21); (2) an indication of reliability, as required by claim 19 (*id.* at 2221); (3) qualifying at least one of the first and second ratios, as required by claim 20 (*id.*); (4) relying on differing strengths in processing, as required by claim 22 (*id.*); (5) qualifying the calculated saturation for inclusion, as required by claim 52 (*id.* at 2221-22); and (6) utilization based on a property of an intensity signal, as required by claim 53 (*id.* at 2222-23).

Finally, the jury heard from both experts that the PTO granted the claims of the '984 patent after considering Hall. (*See id.* at 1847, 2223)

Thus, Philips' motion with respect to anticipation by Hall will be denied.

21

## 2.    Anticipation by N-200

The jury also found Philips failed to meet its burden of proving claims 1-4, 20, 22, and 52 are invalid as anticipated by the N-200 oximeter. Substantial evidence supports the verdict.

As with Hall, Dr. Stone's testimony on the N-200 involved pointing to a series of demonstratives and summarily concluded that all the elements of the asserted claims were found in the N-200. (*Id.* at 1817-20) Dr. Stone's testimony failed to tie the operation of the N-200 oximeter to the recited elements of claims 1-4, 20, 22, or 52. Dr. Stone provided some additional testimony that more fully addressed claims 20 and 52 (*see id.* at 1818-20, 1825-26), but deficiencies remained. Nowhere in his testimony did Dr. Stone ever explain how the N-200 calculates two different ratios, as required by claims 1-4, 20, 22, and 52. (*See, e.g.,* '984 patent at col. 66 ll. 31-45) By contrast, Dr. Baura explained that the N-200 did not anticipate the claims because it failed to disclose that "the first and second calculators are capable of relying on at least partially differing strengths in processing at least one of the one or more intensity signals," as required by claim 22 for instance. (*See id.* at 2225)[12]

The jury could have relied on the deficiencies in Philips' own evidence, and/or the opinion of Dr. Baura, to conclude that Philips had failed to carry its burden of proving by clear and convincing evidence that the '984 patent was anticipated by the N-200.

## 3.    Obviousness

The parties agree that the Philips' JMOL with regard to obviousness over Hall in view of Mortz rises and falls with the anticipation analysis above. (Hrg. Tr. at 127-28; 144) Indeed,

---

[12]Additionally, both experts testified that the PTO considered the N-200 and documents related to it in allowing the '984 claims. (*See* Tr. at 1844, 2224)

22

Philips has relied on Hall in its obviousness defense here to meet the same elements of claim 1 as were at issue in its anticipation defense. Mortz dealt with an additional limitation of dependent claims 16 and 54 regarding "correlation." Philips never took the position – and there is no evidence in the record – that Mortz cures any defect in Hall. It follows that the Court must deny Philips' motion with respect to obviousness.

## C.     Motion for a New Trial

Philips also moves for a new trial under Rules 50(b)(2) and 59(a). Philips contends a new trial is merited on the grounds that Masimo tainted the jury with unduly prejudicial statements about (1) Philips' decision not to contest infringement at trial and (2) the *Nellcor* case.

### 1.     Argument and Testimony about Philips' Concession of Infringement

Philips asserts that Masimo tainted the jury with improper and unduly prejudicial arguments about Philips' concession of infringement a month before trial, which Philips emphasizes was a decision motivated by the Court's claim construction and trial strategy. Masimo contends that it did not violate any order of the Court and that its proper references to Philips' concession caused no unfair prejudice to Philips before the jury. The Court concludes that Masimo's references to Philips' concession were not so "prejudicial as to affect the fairness of the trial and thereby cause manifest injustice," *ISCO Int'l, Inc. v. Conductus, Inc.*, 279 F. Supp. 2d 489, 508 (D. Del. 2003), nor did they constitute misconduct that is "prejudicial in the sense of affecting a substantial right in the context of the entire trial record," *Lucent Techs., Inc. v. Newbridge Networks Corp.*, 168 F. Supp. 2d 181, 260 (D. Del. 2001).

As an initial matter, Masimo did not violate any Court order regarding Philips'

concession of infringement. The issue first arose in a dispute on the eve of trial over whether

Philips' concession could be alluded to by Masimo in "Phase I" of trial in the context of

damages (*see* D.I. 856, 857, 863, 864, 865), at which time the Court ruled:

> Notwithstanding Philips' recent concession of infringement (under
> the Court's claim construction), Masimo may present evidence and
> argument that Masimo alleged infringement by Philips of the
> Masimo patents-in-suit and that these allegations were pending
> (and were being denied) during the time of the parties'
> negotiations. This is necessary to avoid the jury incorrectly
> assuming that Masimo engaged in negotiations with Philips
> because Masimo was highly motivated to license the patents.
> However, Masimo has failed to demonstrate how details beyond
> the basic facts (i.e., infringement was alleged and denied during
> the time of negotiations) are necessary as part of a proper damages
> analysis and the risk of confusing the jury with additional details
> substantially outweighs the probative value of such details.

(D.I. 878 at 2)

Subsequently, on the first day of trial, Philips objected to a slide Masimo intended to use

with its opening statement because the slide included (on a timeline) Philips' concession of

infringement. (Tr. at 13-18) Philips argued that the concession was completely untethered to the

permitted use of contextualizing the pre-suit negotiations between the parties. (*Id.*) Masimo

responded that Philips was taking the position that *the reason* for its denial of infringement

during the negotiations was always related to claim construction – and, in turn, that its admission

of infringement was due to the Court interpreting the claims differently than Philips had

advocated. Masimo explained that, in response, it intended to present evidence to show this was

not so in 2007. (*Id.* at 23-24) ("[Ms.] DiSanzo will testify and give the reason they denied

infringement, and . . . [i]t had nothing to do with this Court's activity.") The Court ruled that the

slide could be used on the condition Masimo "made clear to the jury that there were negotiations

24

and when there were negotiations" because "[t]hat's what makes the denial and the admission of infringement relevant to that damages analysis as we had ordered."[13] (*Id.* at 35)

Philips also objected to four slides Masimo intended to use in openings discussing Philips' stipulation of infringement under the doctrine of equivalents, inducement, and contributory infringement. Masimo's slides reproduced the elements of each of these theories of infringement. (*Id.* at 16) The Court also overruled this objection. (*Id.* at 36) ("I'm overruling the objection to that. I think it's fair use of what was admitted through the stipulation of infringement and is relevant to the importance of the patents as Masimo intend[s] to use it.")

During trial, the Court found Masimo's conduct was consistent with these rulings. Philips fails to persuade the Court now that the Court's impression during trial was wrong.

This is not to say that Masimo's presentation was a model of ideal trial conduct. Masimo's counsel did engage in editorializing about Philips' concession, which could have caused jury confusion. Specifically, during closing arguments, Masimo's counsel made statements that incorrectly implied that Philips' concession of infringement was tantamount to an admission of copying. (Tr. at 2398-99) ("There's no doubt that Philips had to have [Masimo's invention] . . . . And, of course, they wanted to study it and figure it out to make sure that they could benchmark and be as good as Masimo. Whether they exactly copied it or not, that's not before you, because they're admitting infringement.")

However, most of the other statements Philips claims were improper or prejudicial were

---

[13]Philips states that "on the first day of trial during opening slide objections, the court permitted Masimo to act inconsistently with [its earlier] ruling at trial by presenting more than just the basic facts." (D.I. 928 at 24) The Court disagrees. Even were there an inconsistency, however, the Court is permitted to modify its orders, for reasons including an improved understanding of the parties' disputes in the context of trial.

merely reiterations of what Philips had admitted to in its stipulation. For instance, Philips asserts, "Masimo also used the infringement concession to imply that Philips intended to cause infringement" (D.I. 928 at 25), but this ignores the fact that Philips conceded not only literal infringement, but also induced and contributory infringement – both of which require an intent to cause infringement. (*See* D.I. 908 at 29; *see also* Tr. at 17 ("[W]hen you admitted to it, shouldn't you have anticipated the jury would hear all of that?"))

In sum, Philips' contention that Masimo unduly prejudiced Philips by mentioning Philips' voluntary concession of infringement – in ways that were permitted by the Court and consistent with its orders – is unavailing. Accordingly, Philips has not met its burden to show a new trial is warranted on this ground.

### 2. Arguments and Testimony Regarding the *Nellcor* Trial

Philips contends that a new trial is also warranted due to Masimo's repeated references to the *Nellcor* litigation. In Philips' view, from the first day of trial, Masimo pursued a strategy of disclosing details about the *Nellcor* case in violation of the Court's orders, with the aim of inviting the jury to decide this case not on the facts before it, but based simply on what another jury did. Masimo told the jury that: (1) another jury found the '222 patent valid; (2) the Federal Circuit affirmed that verdict; and (3) as a result, Nellcor paid over $500 million dollars to Masimo. Masimo responds that its references to the *Nellcor* litigation were at least largely compliant with the Court's orders and, anyway, caused no unfair prejudice to Philips.

"Due to his superior vantage point, the trial judge is entrusted with wide discretion in matters relating to the conduct of counsel during trial." *Forrest v. Beloit Corp.*, 424 F.3d 344, 351 (3d Cir. 2005). In the case of alleged attorney misconduct, "the party seeking a new trial

26

must demonstrate that the attorney's conduct constitutes misconduct, and not merely aggressive advocacy, and that the misconduct is prejudicial in the sense of affecting a substantial right in the context of the entire trial record." *Lucent Techs.*, 168 F. Supp. 2d at 260 (citing 12 James William Moore et al., *Moore's Federal Practice*, § 59.13[2][C] (3d ed. 2000)). "A new trial may be granted only where the improper statements 'made it 'reasonably probable' that the verdict was influenced by prejudicial statements.'" *Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 363 (3d Cir. 1999) (citing *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 207 (3d. Cir. 1992)).

Applying these governing standards here, the Court first concludes that there was "attorney misconduct" in the sense that there were multiple violations of the Court's orders regarding the proper and improper uses of facts about the *Nellcor* litigation. These violations were committed by Masimo's lead counsel, Mr. Re.

Turning next to the issue of prejudice, the Court is confronted with the difficult question of whether Masimo's attorney's conduct affected a substantial right of Philips' in the context of the entire trial record. The Court should grant relief to Philips if, but only if, it is persuaded that counsel's improper statements made it "reasonably probable" that the verdict was influenced by the prejudicial statements.

In making this assessment, Masimo's approach following trial has heightened the difficulty of the Court's task. Rather than acknowledging Mr. Re's violations, Masimo now denies its misconduct, failing in its briefing and again at oral argument to accept responsibility for its missteps. (*See* Hrg. Tr. at 187-88) ("Mr. Rosenthal said that Mr. Re made repeated violations. I mean that is just not true. The Court did admonish Mr. Re a few times. And Mr. Re did say that he overstepped in opening statement with respect to his discussion of one of the

27

slides. But I do not agree that Mr. Re engaged or any of us engaged in improper conduct.")

In any event, the Court must decide based on the record and its own direct observation of trial whether Masimo's counsel's conduct rises to the level warranting a new trial. Below the Court describes what it observed.

### a. Pretrial Conference and Order Governing Use of *Nellcor*

At the pretrial conference, the parties raised a dispute about what role, if any, evidence relating to the earlier *Nellcor* litigation would play in the upcoming trial. (D.I. 186 (Pretrial Conference Transcript) ("PTC Tr.") at 76) The Court ordered supplemental briefing on the issue. In its papers, Philips contended that the only facts the parties should be permitted to present about *Nellcor* would be: "(a) that there was a litigation; and (b) that there were findings of infringement and validity on certain patents including the '222 Patent." (D.I. 856 at 2; D.I. 863 at 2) Philips requested that any additional evidence involving the *Nellcor* jury trial be excluded as highly prejudicial. By contrast, Masimo argued that it should be allowed to present evidence to the jury regarding the *Nellcor* litigation for purposes of supporting its damages case, and in particular to provide crucial context to the circumstances giving rise to the Nellcor settlement agreement – an agreement upon which both parties' damages experts would rely – and further to explain how "the *Nellcor* litigation impacted the pulse-oximetry industry as a whole and increased the value of Masimo's technology." (*See* D.I. 857 at 4)

Ruling on this dispute in a memorandum order on September 12, 2014, the Court held:

> Masimo may present evidence and argument that in the *Nellcor*
> litigation Masimo alleged infringement of the '222 patent, and,
> prior to settlement, that patent was found infringed and valid in
> that litigation. These facts are necessary to allow the parties'
> experts to put their damages analyses, and the Nellcor settlement
> agreement, in the proper context for the jury. Masimo may also

28

present evidence and argument as to the impact the *Nellcor* litigation had on the pulse-oximetry industry as a whole, as that impact may affect the value of Masimo's patents. ***Any additional details*** of the *Nellcor* litigation, however, would substantially risk confusing the jury (including by leading the jury to believe that Philips' invalidity challenges have already been resolved), and will be excluded under Rule 403.

(D.I. 878 at 2) (emphasis added)

### b.    First Day of Trial - Objections

On September 15, the first day of trial, Philips raised an objection to slides Masimo intended to use as part of its opening statement. Philips contended that these slides violated the Court's September 12 order, as the slides depicted several aspects of the *Nellcor* litigation that "the Court has already ruled shouldn't be in, like the Federal Circuit opinion, the seal [of the Federal Circuit], all this imprimatur of it's already been decided." (Tr. at 10) Philips also objected to detail on a slide that indicated the *Nellcor* litigation was pending for the six years and a statement on a subsequent slide that "Masimo wins *Nellcor* litigation." (*Id.* at 8) In addition to these particular objections to slides, Philips lodged an overarching objection that any facts or references to the *Nellcor* litigation were "going to cause the jury to think that the issue of validity has already been decided," simply by "putting these facts out there without putting them in context of the agreement." (*Id.*)

The Court inquired as to whether the final jury instructions were ready and suggested that a specific instruction might address Philips' overarching concern, particularly if Philips were permitted to reference the instruction. (*Id.* at 8-9) ("[Y]ou will get up and emphasize to the jury, I'm sure, that validity issues in *Nellcor* are not necessarily the same validity issues here. And I have even allowed you to say: And the Judge will instruct you to that fact.") Philips agreed this

29

would account for the potential prejudice, but then went on to suggest that since the *Nellcor* litigation was "such a dangerous issue, and it has such potential to be misused," the basic permitted facts should be read by agreed stipulation so there was no room for error or misuse. (*See id.* at 9-10)

In response to that proposal, Masimo's counsel, Mr. Re, stated, "I have a copy of the Court's order. I think the order is very explicit." (*Id.* at 18) Mr. Re then proceeded to emphasize the importance of the *Nellcor* decision to understanding the reaction of the entire pulse oximetry industry in 2005 as an essential fact going to the value of the patents for damages. (*Id.* at 18-19) Masimo assured the Court the *Nellcor* evidence would be used only for damages by its experts, stating Masimo was "not suggesting in any way the jury defers to the validity and infringement rulings." (*Id.* at 19) Masimo emphasized, "[t]his is a damages case," and the industry's reaction to *Nellcor* was a fact that "is critical. And it is relied on by all the experts." (*Id.* at 20)

Following this discussion of the issue, the Court largely overruled Philips' objections, except that it ordered Masimo to remove the Federal Circuit seal from the slide. (*Id.* at 33) The Court further directed the parties to work out a cautionary instruction regarding *Nellcor* that the Court could read to the jury. (*Id.*) ("I am concerned about prejudice to Philips lest the jury be confused into thinking that some issues that they aren't being explicitly being asked to decide have been decided and I want to prevent that.") At the end of the day, the parties jointly presented an instruction on the *Nellcor* case. (*Id.* at 225-26)

### c. Cautionary Instruction

The following day, as agreed to by the parties (*id.* at 229), the Court read the following

cautionary instruction to the jury:

> You will hear evidence in this case regarding a settlement
> agreement that was entered between Masimo and another company
> called Nellcor. In your consideration of this agreement, the parties
> have agreed that the settlement was made after the conclusion of a
> lawsuit in which several patents were involved, including the '222
> patent that Masimo asserts in this case.
>
> There was a finding that the '222 patent was infringed and that it
> was not invalid based on the evidence presented in that lawsuit.
> You *shall not defer to the outcome of that lawsuit when deciding
> whether the '222 patent is valid* in this case. You must reach your
> decision on the validity of the '222 patent based only on the
> evidence you hear in this trial.

(*Id.* at 241-42) (emphasis added)

### d. Masimo's Opening Statement

With this background, Masimo delivered its opening statement. When counsel came to

the *Nellcor* lawsuit, he stated:

> So what does Nellcor do? Take it [i.e., the patented Masimo
> technology]. They took it. Nellcor took it right from him and Joe
> [Kiani], with a small little company, brought this lawsuit. This
> lawsuit took six years also.
>
> This was a long, drawn-out case and I handled it. I tried this case
> in Los Angeles in March -- February, March of 2004. It was a *jury
> case* and the *jury verdict* was upheld by the appellate court on
> September 7th, 2005. I give you that date because the whole
> industry sat on the sidelines, or most of the whole industry. Some
> did cooperate, some did sign up, but by and large, most of the
> industry sat and waited for the appellate court in Washington, D.C.
> to determine whether or not they in fact had invented this great
> technology and their patents were good and money had to have
> been paid. That *jury decided the case*, and they awarded, they
> awarded some damages, and the parties settled after the Federal
> Circuit in Washington . . ."

(*Id.* at 259-60) (emphasis added)

The transcript trails off because at that point, Mr. Rosenthal, lead counsel for Philips, stood up and asked for a sidebar. (*Id.* at 261) Philips objected to Mr. Re's injection of details about the *Nellcor* case, counsel's personalizing of his role in the *Nellcor* trial, and, above all, repeated reference to the *Nellcor jury*, all of which Mr. Rosenthal argued were shared with the jury in violation of the Court's order. The Court agreed with Philips. (*Id.*) Specifically, the Court stated:

> That's not within the scope of my order and I share the concern [raised by Philips], and nobody wants to interrupt you, but you're going to have to comply with the orders or I'm going to have to explain to the jury that you are not complying with the orders.

(*Id.*)

Mr. Re then resumed his opening statement, including remarking on Philips' defense "that the patents actually never should have issued." (*Id.* at 275) He did add, however, "They're [Philips] entitled to bring it . . . . Don't defer to the prior litigation. They're entitled to bring that defense to you." (*Id.*)

### e. Further Clarification of the Court's Orders

During the next recess, outside of the presence of the jury, Mr. Rosenthal for Philips asked the Court to exclude all evidence related to the *Nellcor* trial as a remedy for Masimo's outright violation of the Court's order, particularly given that Philips had expressly asked that no reference be made to the prior jury or to the prior damages award. (*Id.* at 362-63) In response, Mr. Re told the Court:

> I do not plan on explaining any of the details of the [*Nellcor*] trial. However, I am a little concerned with regard to the settlement agreement. You can't really ignore the verdict when the royalty rate was derived based on the jury verdict and the jury amounts.

32

> So that, Mr. Wagner [Masimo's damages expert], I think, explains
> in the report. And so I promise I'm keeping it to a minimum. *I do
> apologize if I overstepped in opening. I clearly did and I won't
> do it, but I don't think it's realistic to keep out – I really think it's
> impossible* to keep out the jury verdict amounts including the
> royalty rate, which is one of the data points. So I don't think it's
> possible to keep it out as broad brush as Mr. Rosenthal suggests.[14]

(*Id.* at 364) (emphasis added)

Philips replied by emphasizing that it was specifically seeking to keep out the damages

amounts awarded to Masimo in the *Nellcor* jury verdict. (*Id.* at 364-65) Masimo countered that

Philips was now trying to leverage the situation to obtain relief beyond the scope of the Court's

original order and Philips' objection to the opening slides – both of which were based simply on

preventing the jury from deferring to the *Nellcor* jury in finding the '222 patent to be not invalid.

(*Id.* at 372-73) In Masimo's view, the verdict amount itself remained relevant to the industry's

reaction to the *Nellcor* litigation, which was permitted by the Court's original pre-trial order.

(*Id.* at 373-74) Philips responded to these contentions by explaining that while its chief concern

was the risk of improper inferences about patent validity, the *Nellcor* issue was specifically

raised during pre-trial letter briefing in the context of damages, at which time Philips had

"explained why this is prejudicial and not probative to the issue of damages." (*Id.* at 375-76)

At this point, the Court clarified the *Nellcor* issue once more:

> What is fair game, what you can put evidence in of, what you can

---

[14]Mr. Re later stated that he was apologizing for violating the Court's ruling on objections to the slides, not the Court's written order issued prior to the start of trial. (Tr. at 372 ("I apologize for keeping up and going behind my slide in view of our discussion yesterday. I did not violate the written order here with regard to the damages issue."), 511 ("When I said I violated an order yesterday, I never suggested I violated the Court's written order. . . . I was referring to I shouldn't have gone any deeper on the slide when I had that slide up, when I removed the seal."))

33

argue reasonable inferences from regarding the *Nellcor* litigation is that among the patents that were in suit there is the '222 patent. And in that case, the patent was found to be infringed [and not] invalid. That that ruling or that determination was affirmed on appeal. That that case was settled by an agreement. The settlement agreement, of course, can come into evidence and you can do whatever is fair and reasonable with the settlement agreement, and there can be general testimony about what impact all of that had on the industry.

What you *cannot* do is put in evidence or any further argument that it was a *jury* that made the decision at the District Court or *the jury that had the verdict*. *Nothing about damages in the Nellcor trial*. It's never been that I can recall suggested to me that Masimo thought there was any relevance or any need to put in front of this jury the fact that evidently there was *a damages component of the verdict* in *Nellcor*.

(*Id.* at 377) (emphasis added)[15]

## f.  Parties' Cases in Chief

The Court announced the above clarification order outside of the presence of the jury,

during a break in the direct examination of Masimo's first witness, Joe Kiani. Mr. Kiani,

Masimo's corporate representative and an inventor on the patents-in-suit, was present in the

courtroom during the argument and the Court's clarification ruling. Subsequently, the jury was

brought back into the courtroom, and the direct examination of Mr. Kiani resumed.

_____

[15]Independent of the *Nellcor* jury damages verdict issue, at this time Philips continued to press a further objection about also excluding another specific figure ($700 million) relating to payments made to date under the Nellcor settlement agreement. (Tr. at 379-80) The Court overruled the objection, given that the settlement agreement was going to be coming into evidence. The Court stated: "The settlement agreement is coming in. It's fair game. You can make whatever reasonable arguments and inferences from the settlement agreement. If, in fact, the evidence is that Nellcor paid X hundreds of millions of dollars under that settlement agreement, then that is fair game. If it wasn't mentioned by experts in their expert report, I fully would expect that [omission] may come out in cross-examination and the jury will give all of that whatever weight they think it should have." (*Id.* at 380-81)

34

When the examination turned to the issue of the *Nellcor* litigation, the Court granted Philips' request that Masimo's counsel be permitted to ask Mr. Kiani leading questions to avoid improper reference to aspects of the prior litigation. (*Id.* at 434) Mr. Kiani was to provide only "yes" or "no" answers to these questions. (*Id.*) However, in response to a (non-leading) question about the way in which the Nellcor settlement agreement was structured, Mr. Kiani testified (truthfully), "[i]t was based on the jury verdict." (*Id.* at 435; *see also id.* at 508 (Philips' counsel acknowledging, "The question was what was the basis for the structure of the [Nellcor] settlement agreement, which as a matter of fact was the jury verdict. Everybody knows that is the basis of the structure.")) Philips objected and moved to strike, and Masimo indicated it would not challenge the objection. (*Id.*) The Court struck the witness's response. (*Id.*) At the next break, Philips expressed that it was "on the verge of moving for a mistrial." (*Id.* at 441) The Court stated "[t]o the extent it's a request for a mistrial, at this point it's denied. If there is some other relief that Philips wants to propose, either now or after the break or later in the trial, I'll certainly listen to it." (*Id.* at 442) As the Court later explained, part of the basis for its reaction to Mr. Kiani's improper testimony about the "jury" was that it was not holding a witness responsible for understanding or even knowing of the Court's clarification order, even though Mr. Kiani had been present in the courtroom when it was announced. (*See id.* at 515-16) ("I don't think that there has been certainly any intentional violation of my order by Mr. Kiani. . . . But I don't expect a fact witness who happens to be in the room to be carefully listening, if, indeed, listening at all to what I am talking to the lawyers about . . . .")

The next morning, Philips asked for "further corrective action." (*Id.* at 505) In addition to being prejudiced by the *Nellcor* information that had been presented to the jury in violation of

the Court's orders, Philips felt it was "doubly prejudiced" because of how often it had to object

(including during Masimo's opening statement) in an effort to enforce the Court's orders. (*Id.* at

508-09) Philips requested a curative instruction. (*Id.*) Masimo objected to the instruction. (*Id.*

at 513)

In explaining why it would give a curative instruction, the Court stated:

> I attempted to draw a line that was fair to both sides based
> on my understanding of the case and the issues you put in
> contention and the many times we talked before trial began. I have
> had to make more clear what I intended and make more specific
> my ruling over the course of what is actually just a short trial to
> this point but we have had to address this issue many, many times.
> I don't think that this jury has been tainted in any irreversible way.
>
> I do think there has been violation by Mr. Re of aspects of
> my order. . . .
>
> [T]here are clear, important interests on both sides that I
> have been trying to balance and will continue to try to balance.
> One of those interests that is on the side of Masimo that I have to
> be concerned with is, Philips has made it clear they think this case
> is all about credibility. It is difficult to ask a jury to assess
> credibility of an individual like Mr. Kiani when there are these
> lines that for very good reasons I am drawing as a judge but make
> it difficult for a fact witness, for a lay individual, to testify when
> we all know what the truth is, but for good reasons I am not letting
> him tell all of the truth. Yet this case is going to in part, at least, be
> about credibility.

(*Id.* at 515-17)

Once the jury came in, the Court read it a modified version of the curative instruction

proposed by Philips, as follows:

> Philips had to object a number of times yesterday. Its
> objections were related to orders I had issued previously and
> Philips's efforts to help me enforce those orders. You should not
> hold the fact that Philips objected yesterday against Philips in any
> way.

*(Id.* at 519)

Throughout the rest of trial, both parties proceeded to put on their cases in chief without disputes arising over the use of the *Nellcor* litigation. Generally, the bulk of the parties' presentations were compliant with the Court's orders. Masimo presented a large body of evidence to support its damages case, and to rebut invalidity. Philips presented its invalidity case and chose to press an array of written description, enablement, anticipation, obviousness, and indefiniteness affirmative defenses. Due perhaps to the breadth of its case, some of these defenses were supported only by conclusory expert testimony (as has been noted above in connection with assessing Philips' request for JMOL).

### g. Closing Arguments

During Masimo's closing, Mr. Re stated: "After the win against Nellcor, and everyone was signing up once *it was resolved once and for all*, that [Masimo's inventors] Joe Kiani and Mohamed Diab, Walt Weber were truly the first inventors of measure-[through]-motion technology." *(Id.* at 2400) (emphasis added)

Throughout trial, Masimo and its counsel made clear how proud they were of the win in *Nellcor* and the impact it had on the industry. But Mr. Re's comment here went beyond understandable pride,[16] especially in light of how carefully the parties were instructed to tread

---

[16]Mr. Re's defense, in part, was: "I admit it is difficult for me not to convey the fact that I have been on this ride all along, and I do know the facts very well. And the instructions are such that the jury can disregard anything in the closing argument they think is not supported by the evidence." *(Id.* at 2440) At Philips' request, the Court admonished Mr. Re: "don't personalize this case. Don't start doing things that you know are improper because either you think you can't help yourself or because you think I told the jury to ignore it. That is not a legitimate and valid excuse . . . ." (Tr. at 2446; *see also id.* at 244 (Mr. Re during opening statement telling jury his wife is a nurse and that in the past she had to measure oxygen levels in patients by drawing blood); *id.* at 262 (Court telling Mr. Re it is not proper to bring in facts from his personal life that

37

when discussing *Nellcor*. By telling the jury that *Nellcor* resolved "once and for all" that Masimo's inventors were truly the first to invent measure-through-motion technology, Mr. Re tried to persuade the jury that it need not be concerned with whether the prior art references relied on by Philips – such as Hall – anticipated (or otherwise invalidated) Masimo's patents. Although Mr. Re made the statement in the context of his presentation about the value of Masimo's patents, i.e., damages, and not while he was expressly addressing validity, the improper link – indeed, the precise improper link the Court had consistently ordered Masimo not to make (between *Nellcor*'s finding of no invalidity and the finding of no invalidity Masimo sought from the instant jury) – was made.

### h.    Does Masimo's Misconduct Warrant a New Trial?

On this record, Philips now moves for a new trial. As must be evident from the recitation above, drawing and enforcing the line regarding what was permissible regarding the *Nellcor* litigation was challenging for the Court – and complying with the Court's rulings cannot have been easy for the parties. The *Nellcor* litigation resulted in a settlement agreement that was probative of damages and was incorporated into both sides' damages experts' reports. The *Nellcor* litigation and its resolution had an impact on the entire pulse oximetry industry, which

---

will not be in evidence)) The Court also gave yet another curative instruction to the jury, after Mr. Re's closing argument and just before Philips' began its closing argument, again at the request of Philips, stating:

> Mr. Re's personal feelings about his client, any witnesses, or any evidence in this case are irrelevant to this case. It is improper for Mr. Re to have personalized his argument and he has been admonished not to do so. You should ignore any such comment.

(*Id.* at 2446-47)

was also probative of damages.

But there was also always a risk the jury here would improperly defer to the *Nellcor* jury's finding of no invalidity of the '222 patent, which would deprive Philips of its right to a fair trial. Nor was there any proper purpose for Masimo's attorney to editorialize about the *Nellcor* litigation, especially as it was such a sensitive topic.

The Court's efforts to ensure a fair trial to both sides were made all the more difficult by Mr. Re's decision to walk up to the line the Court had drawn and, several times, step right over it. Indeed, the series of violations, and Masimo's denial that they occurred, makes the Court wonder whether Masimo's actions were mere missteps, or rather intentional maneuvers, as Philips alleges.

The sole issue for today, however, is whether "the improper assertions [of counsel] have made it 'reasonably probable' that the verdict was influenced by prejudicial statements." *Fineman*, 980 F.2d at 207 (citing *Draper v. Airco, Inc.*, 580 F.2d 91, 97 (3d Cir. 1978)). The Court finds that it is not reasonably probable that Mr. Re's conduct with respect to the *Nellcor* evidence influenced the jury's verdict. The Court reaches this conclusion based primarily on the strength of the evidence presented by Masimo. After all, this was a case in which the *undisputed* damages evidence was that an entire industry – other than Philips and one Chinese company – took licenses from Masimo for innovative technology that saved thousands of lives and billions of dollars in healthcare costs. And it was a case in which Philips took on the burden to prove, by clear and convincing evidence, that Masimo's patents – for which other industry players had paid hundreds of millions of dollars to use – were invalid not just as anticipated, not just as obvious, but also as lacking written description and enablement and as indefinite. As

39

explained earlier, Philips failed to meet that burden and Masimo provided substantial evidence to the contrary on every issue Philips has now raised in its JMOL motion. In this context – which is the context of the actual trial that the parties presented to the jury – the Court cannot conclude to any degree of reasonable probability that Masimo's misconduct regarding the *Nellcor* litigation had any impact on the verdict.

Further support for the Court's conclusion is found in the repeated efforts the Court undertook throughout the trial to cure the unfair prejudice Philips suffered as a result of Masimo's trial conduct. Moreover, from the outset of trial, the jury was instructed that it would, at times, hear about the prior *Nellcor* litigation, and that it was to disregard the outcome of that trial when deciding the issues before it. After his initial misstep during openings, Masimo's counsel even reiterated this important instruction. Then, as part of the final instructions, the jurors were once again instructed to decide the case based only on the evidence (and were told that Mr. Re had been admonished for expressing his personal views as part of his closing argument).[17] Viewed on its own, what Mr. Re said during closing argument could have been taken by the jury as an invitation to decide this case based on the simple fact that the patent's validity had already been decided in *Nellcor*. However, in the context of the entire trial, it is not reasonably probable that the jury decided on this improper basis.

The Court emphasizes that its decision required much thought and deliberation. In the end, given a careful review of the record and its own recollection of the events at trial –

---

[17]After closings were finished, the Court read several instructions to the jury, including an instruction that "the lawyers' statements and arguments are not evidence," and "[y]ou must decide the case yourselves based only on the evidence presented." (*Id.* at 2514; D.I. 908 at 3, 71)

40

including the curative instructions read to the jury specifically about *Nellcor*, the amount of admissible evidence Masimo presented, and the way the parties conducted themselves throughout the majority of trial – the Court concludes that the misconduct does not merit a new trial.

## D. Damages

### 1. Whether Nonin PureSAT is an Acceptable Non-infringing Alternative

At trial, the jury concluded that Masimo had met its burden to show that Nonin PureSAT is not an acceptable non-infringing alternative that would have been available to Philips and should, therefore, preclude Masimo from obtaining lost profits damages. Philips contends Masimo failed to carry its burden because it relied only on the following evidence: (1) a lack of evidence of Nonin's acceptability; (2) improper hearsay testimony by Joe Kiani; and (3) single-patient testing data, which Masimo's own expert said is "not evidence of anything." Because substantial evidence supports the jury's verdict, the Court will deny this portion of Philips' motion.

Masimo presented a far greater amount of evidence than the three pieces Philips critiques in its motion. Masimo presented evidence that its engineering team and Mr. Kiani tested PureSAT and confirmed it does not measure through motion. (Tr. at 522-25, 635-36) The jury heard testimony that none of Masimo's fifty-plus OEM partners ever suggested that PureSAT is a viable substitute for Masimo's technology. (*Id.* at 530-31) Philips' own personnel cast doubt on the acceptability of PureSAT. (*Id.* at 1887-89, 1894-96, 1009-10) There was also evidence that Masimo rapidly took Nonin's market share after Masimo entered the home-care and telemetry markets because of PureSAT's high false-alarm rate. (*Id.* at 529, 691, 1042-46)

41

Further, Philips' challenges to the three pieces of evidence are improper on a JMOL motion. Rather than showing a lack of substantial evidence of what was admitted, Philips seeks reconsideration of two prior rulings by the Court. *See also generally Versata Software, Inc. v. SAP*, 717 F.3d 1255, 1264 (Fed. Cir. 2013) (stating challenges to admissibility of evidence are improper in motions challenging sufficiency of evidence). First, the Court already rejected Philips' argument that a lack of peer-reviewed literature on Nonin PureSAT is not probative of acceptability. (D.I. 776 at 32 n.29) ("[I]t is undisputed that one factor one would consider in assessing acceptability is peer review.") Second, the Court also overruled Philips' hearsay objection regarding the Kiani testimony. Philips may challenge these rulings on appeal, but as arguments for JMOL they are unavailing. Finally, Philips attacks the weight the jury should have given to Ms. Harake's testimony about her single-patient controlled lab tests, given other testimony by Dr. Quill. (*See id.* at 1004; 934-35) But on a JMOL motion, "[a] court must not weigh evidence," so this argument lacks merit as well. *Pitts v. Delaware*, 646 F.3d 151, 155 (3d Cir. 2011).

Given the Court's conclusions regarding Nonin PureSAT, there is no basis for the Court to order a new trial on damages or to remit the jury's award to $23 million, which Philips contends would be the appropriate calculation of reasonable royalty damages. (*See* D.I. 928 at 29)

## 2. New Trial or Remittitur

Philips also argues that even if lost profits are awarded to Masimo, the jury's award is not supported by sufficient evidence, so the Court should grant a new trial on damages or remit the jury's damages award down to $76 million. (*Id.* at 29-30) Philips attacks three specific

42

evidentiary bases supporting Mr. Wagner's lost profits damages analysis regarding lost profits. None of these arguments withstand scrutiny.

Philips first asserts Mr. Wagner admitted that he did not use the statistical regression analysis recommended in his own textbook but instead calculated profit margins by performing an "engineering analysis" without understanding its underlying assumptions. Contrary to Philips' suggestion, Mr. Wagner explained why he did not use regression analysis for this particular case (Tr. at 1196-97, 2148) and also explained the assumptions related to his profit-margin calculation (*id.* at 1139-40, 1197, 2149). The Court will not make a credibility determination; the jury was free to accept Wagner's opinion.

Next, Philips contends that Mr. Wagner presented no evidence regarding Masimo's asserted lost sales of stand-alone pulse oximeters, as Mr. Wagner stated only that Masimo "might be" losing sales of stand-alone units. (*See id.* at 1198) This is incorrect. In accordance with the Court's earlier ruling (*see* D.I. 704 at 50; D.I. 776, 777 (adopting recommendations to which parties raised no objection)), Mr. Wagner properly relied on Masimo's historic sales data to quantify lost stand-alone sales (Tr. at 1153-57); this data was supported by Mr. Kiani and Mr. Fishel's testimony that a hospital buying Masimo technology creates further demand for Masimo's stand-alone pulse oximeters (*id.* at 463-64, 465, 1030-33).

Finally, the Court rejects Philips' argument that Masimo failed to present evidence that 70% of Philips' FAST products use Philips' sensors. Mr. Wagner chose to rely on documentary evidence of Philips' own sensor estimates made in the ordinary course of business rather than speculative statements by two party witnesses. (*Id.* at 1150-51; *see also* D.I. 776 at 35 (overruling objection that such reliance rendered Wagner's opinion unreliable)) Substantial

evidence supports the jury's finding on this point as well. (*See* PTX-1639; Tr. at 1146-47,

1187-88; *see also* DX-250; Tr. at 1986-87)

Accordingly, neither a new trial nor remittitur is warranted.

## IV. CONCLUSION

An Order consistent with this Memorandum Opinion will be entered.